Wendy Medura Krincek, Esq., (Bar No. 6417)
LITTLER MENDELSON, P.C.
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
Tel: (702) 862-8800
Fax: (702) 862-8811

Arthur Carvalho, Jr. (Cal. Bar No. 125370)
Vaughn M. Greenwalt (Cal. Bar No. 298481)
LANG, HANIGAN & CARVALHO, LLP
21550 Oxnard Street, Suite 760
Woodland Hills, California 91367
Tel (818) 883-5644
Fax (818) 704-9372
*Appearing Pro Hac Vice*

Attorneys for Creditors
EXCELSIOR MEDIA CORP., and
LIBERTY MEDIA HOLDINGS, LLC.

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>MARC JOHN RANDAZZA,<br><br>Debtor.<br>_____ | CASE NO: BK-S-15-14956-abl<br><br>CHAPTER 11<br><br>**ADV NO.** _____ |
| EXCELSIOR MEDIA CORP., a Nevada Corporation; and LIBERTY MEDIA HOLDINGS, LLC., a Nevada Limited Liability Company,<br><br>Plaintiffs,<br><br>vs.<br><br>MARC JOHN RANDAZZA, an individual,<br><br>Defendant.<br>_____ | COMPLAINT BY CREDITORS EXCELSIOR MEDIA CORP., AND LIBERTY MEDIA HOLDINGS, LLC TO DETERMINE NON-DISCHARGEABILITY OF DEBTS OWED BY DEBTOR, MARC JOHN RANDAZZA<br><br>DEMAND FOR JURY TRIAL |

By and through its counsel of record, Plaintiffs Excelsior Media Corp., and Liberty Media Holdings, LLC., ("Plaintiffs" or "E/L"), hereby file this complaint objecting to discharge of debt pursuant to 11 U.S.C. §523(a)(2), and (4) (the "Complaint"). Plaintiffs allege and state as follows:

## I. JURISDICTION AND VENUE

1. This Court has jurisdiction of this matter under 28 U.S.C. §157 and 11 U.S.C. §523. The claims for relief alleged in this complaint arise under Title 11 of the United States Code and are related to a case pending in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court"). The pending bankruptcy case to which the claims for relief alleged in this Complaint are related is In re Marc John Randazza, Bk Case No. BK-S-15-14956-abl (the "Randazza Case").

2. The determination of dischargeability is a core proceeding under 28 U.S.C. §157(b). Regardless of whether this is a core proceeding, consent is hereby given to the entry of final orders and judgment by the Bankruptcy Court.

3. Pursuant to 28 U.S.C. §1409, venue is proper in the District of Nevada, because the Randazza Case is pending in this district and division.

## II. THE PARTIES

4. Plaintiffs are domiciled in the State of Nevada.

5. Defendant Marc John Randazza ("Randazza") is the debtor in the Randazza Case.

6. The true names and capacities, whether individual, corporate or otherwise of defendants Does 1 through 50, inclusive, are unknown to Plaintiffs who therefore sue these defendants by such fictitious names. Plaintiffs will amend this complaint to identify their true names and capacities when ascertained. Plaintiffs are informed and believe and thereon allege that defendants Does 1 through 50 are in some manner responsible, liable and obligated to Plaintiffs in connection with the events and occurrences alleged herein.

7. At all material times mentioned herein, each named defendant and DOE defendant was the employee, agent, principal, officer, director, partner, employee, representative, parent, subsidiary or co-conspirator of the other defendants, and each of them, and in such capacity participated in the acts or conduct alleged herein.

## III.    GENERAL ALLEGATIONS

8. The facts alleged below are not simply the facts as E/L understands them. Indeed, virtually every fact set forth herein has been conclusively found to be true by an arbitrator in a binding award that is just days away from confirmation.

9. Defendant Randazza is the former in-house General Counsel of E/L. Randazza was employed as E/L's General Counsel from 2009 until August 2012.

10. Excelsior Media is a sister company to various entities including Liberty Media Holdings and Corbin Fisher. Corbin Fisher is an on-line entertainment website and brand name whose intellectual property is owned by Liberty Media Holdings. Excelsior is a film production company that creates videos for Corbin Fisher. E/L has consistently endeavored to and succeeded at conducting its business in a principled and professional manner. E/L relocated its headquarters from San Diego, California to Las Vegas in February 2011.

11. Randazza also relocated from San Diego, California to Las Vegas during 2011 to continue his employment relationship with E/L. Randazza markets himself as a "specialist" in First Amendment and intellectual property law; particularly with regard to the adult entertainment industry.

12. E/L and Randazza became acquainted while Randazza was an associate at a firm specializing in First Amendment work in Florida. E/L later decided to hire a General Counsel. Randazza pursued and accepted the position. Randazza drafted the Employment Agreement, which was executed by the parties in June 2009. The primary reason E/L decided to hire a General Counsel was to ensure its intellectual property was protected. One of the most significant challenges faced by E/L and all companies in the film and entertainment industry is the illegal downloading and sharing of content/videos produced by E/L.

### A.    THE EMPLOYMENT AGREEMENT

13. Pursuant to the Employment Agreement, Randazza was to wind down his private practice during his first 90 days of employment and become E/L's full-time General Counsel employed on an at-will basis.

14. Section "6.C" of the Employment Agreement permitted Randazza to continue to provide professional services to a "limited number of outside clients" during non-working hours if such work did not present a conflict of interest for E/L. Contrary to his obligations under the Employment Agreement, Randazza continued to aggressively grow his private practice during his employment.

15. Randazza's compensation consisted of an annual salary of $208,000. Randazza also included in the Employment Agreement the rather unique arrangement of a nondiscretionary bonus of 25% of any settlement funds paid to E/L.

16. At the time of the execution of the Employment Agreement, the parties contemplated that Randazza would be handling all of E/L's legal matters independently. As it turns out, Randazza eventually utilized his own firm, Randazza Legal Group ("RLG") and various outside counsel to assist in E/L's legal matters.

17. The Employment Agreement also required that E/L provide a laptop and PDA/phone, which were primarily to be used for E/L business and only occasional and incidental personal use permitted. The Employment Agreement further provided that such equipment was not to be used for professional services rendered to other clients.

18. The Employment Agreement provided for severance in the amount of 12 weeks of salary if E/L were to unilaterally terminate Randazza in the fourth year of employment or later. There is no severance obligation if Randazza resigned or was terminated for cause.

19. The Employment Agreement also includes a governing law provision stating "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to conflict of laws." Randazza was able to reside virtually anywhere he wanted. Initially, Randazza and his wife relocated to San Diego, California. However, Randazza relocated to Las Vegas, Nevada in June 2011, just as few months after E/L relocated its headquarters. At Randazza's request, E/L hired Erika Dillon ("Dillon"), a paralegal from out of state. Dillon was employed by E/L as a paralegal at the time of Randazza's resignation.

//
//

### B.     ISSUES ARISE BETWEEN E/L AND RANDAZZA

#### 1.     Randazza Attempts To Negotiate A Personal Settlement Payment To The Detriment Of E/L

22.     Randazza had filed suit on behalf of E/L against an Internet file-locker site, Oron.com ("Oron"), regarding that company's facilitation of the illegal downloading of E/L content in Hong Kong and the U.S. District Court in Nevada. In Nevada, U.S. District Court Judge Gloria Navarro issued an Order finding enforceable a settlement agreement between Oron and E/L executed on July 1, 2012, which provided for payment of Excelsior of $550,000.

23.     Pursuant to the settlement agreement $550,000 was to be transferred to the RLG trust account and Randazza agreed to be personally liable if the funds were prematurely disbursed (before all terms were complied with), including being responsible for a 10% penalty. Randazza, along with counsel in Hong Kong, also had success in having Oron's funds frozen to ensure any judgment against them could be satisfied.

24.     Randazza further engaged in settlement negotiations with Oron's counsel to resolve both the Hong Kong proceeding and address the Nevada judgment/order issued by Judge Navarro. On August 13, 2012, Randazza presented E/L's CEO, Jason Gibson ("Gibson"), with a new Oron settlement agreement. The settlement agreement provided for a payment of $600,000 to E/L to be held in trust until various provisions of the settlement agreement were complied with. However, the settlement agreement also provided for payment of $75,000 to Randazza. Notably, there were no restrictions upon disbursement of Randazza's payment.

25.     Randazza did not inform Gibson that the settlement offer by Oron was only valid until August 14, 2012. The payment to Randazza immediately raised questions for Gibson as did the nervous manner in which Randazza presented the agreement to him. When questioned about the reason for the $75,000 payment, Randazza characterized it to be a "bribe" to his firm for a promise not to sue Oron again. When Gibson questioned why that payment should not go to the company, Randazza claimed Oron had specifically taken the position that not a penny more than $600,000 could go to E/L.

26. Randazza's entire explanation did not ring true in Gibson's eyes, nor did Randazza's self-dealing sit well with E/L. Gibson advised Randazza that he was not comfortable with that payment given that Randazza was already being compensated by E/L for his work on the matter and that it seemed illogical that Oron would care at all whether all of the $675,000 it was willing to pay went to E/L or not. Although unknown to Gibson at the time, his uneasiness about the $75,000 payment was justified because it is unethical for counsel to accept a payment in exchange for an agreement not to sue.

27. E/L's concerns with Randazza grew significantly because of this incident. Over the next couple of weeks, Randazza made various attempts to discuss the bribe, which Gibson politely rebuffed having determined it was best to keep matters with Randazza limited to professional dealings until E/L had a better feel for whether Randazza was acting in its best interests or not. Gibson also reminded Randazza that he was busy with a film shoot and would speak to him about the settlement after filming was complete.

28. Randazza apparently read more into this than intended, perhaps because of a guilty conscience, and began to act increasingly paranoid. Following a happy hour tour event during this time period, Randazza acted erratically by cleaning personal items out of his office and saying "F**ck this shit, I quit."

    **2.    Randazza Takes Unilateral Control Of The Oron Settlement Funds and Resigns.**

29. In late August, 2012, Gibson learned from outside counsel in Hong Kong that the $550,000 settlement payment from Oron had been received by Randazza into his firm's trust account without immediately notification to Gibson. Randazza had previously notified the executive team as soon as settlement monies were received touting his successes.

30. Gibson questioned Randazza about the delay and Randazza responded claiming the delay was due to the money finally being released late the day before. Gibson indicated E/L's desire to move forward with fulfilling the conditions of settlement such that the $550,000 could be immediately released to E/L and also expressed displeasure with the fact that E/L likely would only

receive about $262,500 of the total settlement amount once fees, costs, and Randazza's 25% bonus were taken into account.

31.     Randazza refused to comply with Gibson's directive, stating that he was not forwarding the $550,000 and instead, "I'm taking out my share, the costs we owe to outside parties, and paying myself back the $25,000 I advanced. Then I'm giving you your net, which is more than you expected." In other words, Randazza was unilaterally taking control of the settlement funds. E/L found this to be completely inappropriate but was at a loss as to how to rectify the situation as the money was in Randazza's trust account over which it had no control.

32.     Only a couple of hours later, Randazza communicated the following to E/L: "Given our now openly adversarial relationship, it seems appropriate that I withdraw from representing Liberty in any further matters. There might be a way I can continue to wind down existing matters, but it's going to require a call to discuss it. When are you free?"

33.     E/L communicated to Randazza that it construed his email as a resignation, which it accepted effective immediately, instructed that neither he nor RLG touch the Oron settlement funds, advised it had retained Littler Mendelson, and further instructed that Randazza retain all E/L property in its possession for the time being. E/L then promptly paid Randazza his salary through his last day of employment and accrued, unused PTO.

33.     Randazza apparently immediately realized the effect his resignation would have on his entitlement to severance and responded that he had not resigned but had been terminated or if he did resign, it was a constructive discharge. As such, even though it had reason to do so based on Randazza's conduct, E/L never actually terminated Randazza. Rather, Randazza resigned after he took actions that he knew were unethical against his employer. Indeed, E/L had made no determination that a termination would even occur.

### 3.     The Aftermath Of Randazza's Resignation And Randazza's Bad Faith Conduct.

34.     After Randazza's resignation, E/L learned that without its knowledge or consent, Randazza had begun storing all of E/L's legal records on the RLG server to which only he and the paralegal had access. Immediately after resigning, Randazza cut off all E/L access to its legal

records and refused to grant E/L any access to, or copies of, its records. In addition, E/L had no access to records regarding legal settlements or agreements with vendors and outside counsel that were engaged in its legal matters.

35. Since his resignation, Randazza has continually engaged in conduct designed to make E/L's life difficult while at the same time attempting to portray a facade of being conciliatory. E/L's paralegal Erika Dillon informed the Human Resources Manager that Randazza was pressuring her to leave E/L to work for Randazza's outside firm. On the day of Randazza's resignation, but prior to his resignation email being sent, Randazza and Dillon plotted to delete and wipe information and cut-off E/L's access to its records in anticipation of their resignations.

Randazza further engaged in the following conduct:

a. The day he resigned, Randazza contacted Hong Kong counsel and informed them he was no longer counsel for E/L because E/L refused to pay his or the Hong Kong firm's fees. This blatant falsehood was calculated to cause harm to E/L. In corresponding with the Hong Kong firm, E/L learned Randazza had not disclosed to them that he was General Counsel for E/L. E/L had to immediately wire approximately $33,000 to the Hong Kong firm in order for the firm to continue representing E/L because of their unease over Randazza's improper communication.

b. Randazza also began contacting other outside counsel attempting to influence them to withdraw from representation of E/L. On August 20th, local counsel for litigation in Philadelphia informed E/L that he had been contacted by Randazza about Randazza's departure and requested to withdraw as counsel for E/L.

c. On September 4, 2014, when Randazza knew E/L's CEO was out of state, Randazza and Dillon appeared unannounced at E/L's headquarters despite knowing this was not something that E/L would tolerate from an ex-employee. Caught off-guard, the Human Resources Manager allowed Randazza access to his office.

d. After prodding, Randazza eventually returned his company owned laptop, but not without first wiping the computer several times. In fact, we know that Randazza wiped his laptop the day before his resignation. Randazza was informed in writing

8
*COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBTS*

to retain all E/L property in his possession before he wiped his computer. In addition, E/L subsequently sent Randazza a formal preservation notice. As an attorney, Randazza knows he is not permitted to spoliate evidence. Randazza's spoliation is a serious issue as it *at least* creates an adverse inference that he deliberately destroyed relevant evidence.

e.  E/L has further learned that Randazza attempted to coerce at least one former employee to provide unfavorable testimony against E/L in the parties underlying arbitration. Fortunately, that former employee alerted E/L to the duress he was being placed under by Randazza.

### C.  E/L LEARNS OF MULTIPLE UNETHICAL ACTS RANDAZZA ENGAGED IN DURING HIS EMPLOYMENT

36.  Randazza involved his lawfirm, RLG, in the Oron litigation. Randazza never had E/L enter into any form of fee agreement with RLG as any prudent General Counsel would and should. Randazza often asserted to E/L that when he used RLG, he would not make money on his firm's work and E/L would only have to pay a highly discounted hourly rate reflecting RLG's direct costs incurred for the labor. In short, E/L was never to be charged the customary hourly rates of RLG attorneys. Nor, would it ever have incurred charges of $500 per hour for Randazza's time as he was an employee of E/L. With that in mind, Randazza and his firm filed a Motion for Attorneys Fees and Costs in the Oron matter. In the Motion, Randazza represented to the court that E/L incurred/expended approximately $134,000 in attorneys fees and costs.

37.  Unbeknownst to E/L, Randazza misrepresented to the court that it paid Randazza and RLG their standard rates to the tune of $134,000, and that E/L was receiving regular billing from RLG. A review of Randazza's filings in other matters show this is not the first time such misrepresentations have been made. E/L discovered these misleading statements during the process of locating new counsel.

38.  Discovery in the underlying arbitration between the parties has also confirmed that throughout the course of Randazza's employment with E/L, he engaged in unethical conduct, and the representation of various companies that created conflicts of interest in light of his employment

as E/L's General Counsel. Indeed, Randazza offered legal device to known infringers of E/L's copyrighted material and ignored E/L's please to take action against said companies. Occasionally, he even dissuaded E/L from taking said action against those undisclosed clients; including, but not limited to Xvideos.com and XNXX.com. The full extent of Randazza's conflicts remain known as E/L does not have knowledge of Randazza's full and complete client base.

39. On multiple occasions, Randazza also engaged in negotiations with adverse parties who had litigation pending against E/L, regarding those parties retaining his services in order to conflict him out from any future cases against them. In fact, Randazza improperly engaged in those negotiations during E/L's litigation with TNAFlix, Oron, and Megaupload.

40. Randazza also negotiated to potentially broker a deal for the sale of TNAFlix while actively litigating against them on E/L's behalf, he encouraged E/L to enter into an unethical business transaction during the Oron litigation, jeopardized the entire Oron settlement as a result of his unethical behavior and explicit non-compliance with the settlement agreement, and encouraged E/L to enter into agreements with vendors he represented without any disclosure therefor. Randazza never disclosed the existence of any of these conflicts of interest and never sought written informed consent from E/L.

### D. THE ARBITRATION

41. On December 19, 2012, Randazza initiated arbitration proceedings against E/L, under the auspices of Judicial Arbitration and Mediation Services, Inc. ("JAMS") for employment-related claims lacking any basis in law or fact (the "Arbitration"). In an effort to "divide and conquer" Randazza also initiated a state court action against E/L for those same claims. Randazza incorrectly calculated that he could use his own law license to prosecute those claims while forcing E/L to expend significant resources to defend the same, under the false belief that such expenditures would eventually result in E/L's capitulation to Randazza's demands.

42. E/L filed counterclaims against Randazza alleging numerous serious violations of the his fiduciary duties to E/L, legal malpractice, conversion, breach of contract, and other contract-related claims.

43. The parties agreed to the appointment of the Hon. Stephen E. Haberfeld (Ret.) As the arbitrator for that matter (the "Arbitrator").

44. The parties conducted over 2 years of discovery and pre-hearing litigation, as well as the Arbitration hearing itself which was held over 5 days from February 9-13, 2015.

45. On June 3, 2015, the Arbitrator issued his Interim Arbitration Award (the "IAA"). The IAA found in favor of E/L on all of the claims and counterclaims, and awarded E/L damages against Randazza in a sum exceeding $568,715. A true and correct copy of the IAA is attached hereto as **Exhibit 1**, and fully incorporated herein by reference.

46. Among other things, the Arbitrator made numerous findings of fact in the underlying dispute, particularly relevant are the following:

   a. "Whether or not Mr. Randazza's employment by E/L was terminated voluntarily by Mr. Randazza or involuntarily by E/L, the principal proximate cause for the ending of Mr. Randazza's employment was Mr. Randazza's breaches of fiduciary duty and the covenant of good faith and fair dealing, implied in his employment agreement, as an employee, executive and general counsel of E/L." IAA, p.2 ¶C

   b. "Mr. Randazza's credibility was also undermined by the variance between his testimony and positions at hearing and his written Nevada State Bar submission concerning the Oron litigation $75,000 bribe..." IAA p. 6 fn.4

   c. "The evidence established at the hearing was that Mr. Randazza intended that his allegations would induce [Gibson] to authorize a settlement financially favorable to Mr. Randazza, based on Mr. Randazza's belief at the time – and ultimately proven incorrect – that [Gibson] would so settle, rather than have to litigate true or false allegations related to his own sexuality, sexual activity, and the pornographic natuer of E/L's business." IAA p. 6-7 ¶F

   d. "Turning to E/L's counterclaims, Mr. Randazza owed fiduciary duties to E/L, because he was their in-house general counsel and their attorney of record in judicial civil actions, and an E/L executive and employee. As such, Mr. Randazza owed E/L, as his clients, employers and principals, the highest duty of loyalty and honesty in the

performance of his professional and executive obligations [...] Each of Mr. Randazza's ethical duties owed to his principals/clients was a legal fiduciary duty owed to them. Mr. Randazza violated those fiduciary duties owed by him to E/L, as his principals/clients/employers – including by the following:" IAA p.13 ¶Q

   e. "(1) engaging in negotiations for monetary bribes to be paid to him – including the Oron $75,000 which [Gibson] noticed, without Mr. Randazza's affirmative disclosure of it – which would result in his being 'conflicted out' of future litigation or any disputes with parties then and/or in the future with interests adverse to E/L's interests, (2) taking control for his personal benefit of, and refusing to relinquish control over, Oron settlement funds – all of which ought to have been for the benefit and under the direction and control of his principals/clients E/L, before and after the end of his employment and representations on behalf of E/L, (3) Mr. Randazza's ordering and causing the deliberate 'wiping' of his and legal assistant's corporate laptops, as an integral part of his planned resignation as E/L's General Counsel and outside counsel of record, and (4) Mr. Randazza's continuing an undisclosed (and thus unconsented-to) legal work for clients (e.g., Bang Bros., Xvideos, XNXX, Porn [Guardian], Titan Media, Kink), whose interests were actually and potentially adverse to E/L's interests." IAA p.14-15

   f. "As E/L's inside general counsel and employee, Mr. Randazza had a legal and fiduciary duty – no later than when his employment ceased, regardless of whether or not with or without cause and/or by whom ended – to deliver every file and other piece of data and/or information – complete, intact and undeleted, unmodified and immediately accessible and usable by E/L [...] Because of his noncompliance, indeed resistance to compliance with those duties, they continue to the day of the rendering of this award [...] Those continuing fiduciary duties owed by him to E/L exist, including by reason of his exclusive control over the computers and thus superior knowledge of what was on each computer's hard drive before and after he had everything on the returned laptops completely and multiply deleted..." IAA p.16

g. "By the same token, that ordered conduct raises an inference that whatever was deleted was known and intended by Mr. Randazza to be harmful to him and any claims and contentions which he might make in any dispute with E/L – i.e., deliberate spoliation, in addition to conversion." IAA p.17

h. "Mr. Randazza committed spoliation of evidence, as well as improper conversion of his employer's files, data and equipment and, in so doing, also violated his fiduciary duties owed to E/L." IAA p. 17

i. "... Mr. Randazza's response to E/L's [state bar] grievance contained at least one material misrepresentation acknowledged during an evidentiary session in this arbitration..." IAA p. 17 ¶S

j. "E/L was damaged in at least the amount of $275,000, by reason of the Oron resettlement, as a direct and proximate result of events being set in motion by Mr. Randazza's violations of fiduciary duty and other duties, by his having secretly negotiated a $75,000 bribe to conflict himself out from suing Oron in the future." IAA p. 18 ¶T

k. "The extent of Mr. Randazza's contractual material breaches made them also breaches of fiduciary duty – regardless of whether or not those breaches of fiduciary duty were conflicts of interests, as some were." IAA p. 19 ¶V

l. "Disgorgement of compensation paid by E/L to Mr. Randazza is an available remedy, which is appropriate in the circumstances of Mr. Randazza's clear and serious violations of fiduciary duty owed to E/L, and within the Arbitrator's discretion, based on the evidence in this arbitration." IAA p. 19 ¶W

m. "E/L are the prevailing parties in this arbitration. As such one or both of Respondents is or may be entitled to contractual attorneys fees under the employment agreement." IAA p. 22 ¶Y

47. The damages awarded by the Arbitrator to E/L have not been fully calculated, but *exceed* $1 million. IAA p.23-26 ¶1-9

48. Subject to the full measure of damages, the IAA, "including the Determinations hereinabove set forth, is intended to be in full settlement of all claims, issues, allegations and contentions, on the merits, submitted by any arty against any adverse party in this arbitration." IAA p. 26

### III. CLAIMS FOR RELIEF

#### FIRST CLAIM FOR RELIEF

(For Determination of Non-Dischargeability of Debts under 11 U.S.C. §523(a)(2)(A))

49. Plaintiffs hereby incorporate by reference each and every allegation stated hereinabove as though fully set forth herein.

50. In or about the year 2009, Defendant Randazza represented and induced Plaintiffs to enter into the Employment Agreement, as alleged above with the implied and actual promise that if it entered into the Employment Agreement, Defendant would act in accord with all duties, fiduciary or otherwise, inherent in the position of employee/executive/principal as well as in accord with the heightened duties, fiduciary and otherwise, inherent in his position as attorney and in-house General Counsel to E/L. Furthermore, Defendant represented that he would act in furtherance of all duties and obligations as stated in the Employment Agreement. By the nature of his position and relationship with E/L as in-house general counsel, employee, principal, and executive, as well has his fiduciary duties, Randazza owed a duty to disclose to E/L.

60. In reliance and in furtherance of said representations, Plaintiffs contributed substantial time, money, and labor to fulfill its obligations under the Employment Agreement. Moreover, Plaintiffs fully relied on the advice of Defendant in all legal matters.

61. Had Plaintiffs not been promised the duties and responsibilities as stated above, Plaintiffs would not have contributed any time, money, or labor to the fulfillment of the Employment Agreement, nor would it have relied on the legal advice of Defendant, or paid the substantial amounts comprising Randazza's compensation.

62. At the time Defendant made such representations, he did so with the intent to induce Plaintiffs to act as alleged. At the time Defendant made such representations, and/or did not disclose information related to his "bribes", self-interests, and intentional conflicts of interests, such

representations were false, and he knew that they were false, and/or purposefully did not disclose said facts in that he intended to act for the sole benefit of himself, and at the detriment of E/L, in full disregard for the Employment Agreement and his duties to E/L. Consequently, Plaintiffs are entitled to an award of compensatory damages, disgorgement of funds paid to Defendant, and punitive damages against Defendant in an amount according to proof at trial.

63.  As a result of the false representations of Defendant, Plaintiffs have been damaged in an amount exceeding $1 million dollars, an amount to be awarded by the Arbitrator in the IAA p. 23-26 ¶1-9. Plaintiffs are also to be awarded disgorgement of compensation, attorneys fees and costs incurred in connection with the Arbitration, for which the Arbitrator will determine hastily after the automatic stay has been lifted. In the alternative, should the automatic stay not be lifted, Plaintiffs are entitled to an award of compensatory damages, disgorgement of funds paid to Defendant, and punitive damages against Defendant in an amount according to proof at trial.

64.  Plaintiffs therefore seek an order under 11 U.S.C. §523(a)(2)(A) determining that (1) Defendant is liable to Plaintiffs in the full amount of the Arbitration Award to be issued by the Arbitrator or, in the alternative in an amount to be proved at trial herein; (2) that said liability is non-dischargeable; and (3) the attorneys' fees and costs incurred by Plaintiffs in connection with the prosecution and defense of the Arbitration and pendant State Court Confirmation Action, which are the direct result of Defendant's false representations to Plaintiff, are also non-dischargeable.

### SECOND CLAIM FOR RELIEF

(For Determination of Non-Dischargeability of Debts under 11 U.S.C. §523(a)(4))

65.  Plaintiffs hereby incorporate by reference each and every allegation stated hereinabove as though fully set forth herein.

66.  Defendant's relationship with Plaintiffs as alleged hereinabove involved the latter placing trust or confidence in the former. It imposed upon Defendant fiduciary or other legal or equitable duties, including not to breach Defendant's fiduciary duties to Plaintiffs, not to fail to make full disclosure to Plaintiffs of all material facts in connection with his responsibilities and duties, and not to knowingly and fraudulently benefit at the expense of Plaintiffs.

67. Defendant breached those duties by all of the acts and omissions determined by the Arbitrator in the IAA; including, but not limited to, willfully violating the Employment Agreement, engaging in willful conflicts of interests at the expense of Plaintiffs, benefitting himself at the expense of Plaintiffs, committing acts of legal malpractice, making false representations, spoliation and destruction of evidence, and conversion.

68. As the Arbitrator determined: "The extent of Mr. Randazza's contractual material breaches made them also breaches of fiduciary duty – regardless of whether or not those breaches of fiduciary duty were conflicts of interests, as some were." IAA p. 19 ¶V The Arbitrator repeatedly referenced the breaches of fiduciary duty by Defendant and that the award "is appropriate in the circumstances of Mr. Randazza's clear and serious violations of fiduciary duty owed to E/L..." IAA p. 22 ¶Y

69. As a direct and proximate result of Defendant's breaches of his fiduciary duties, Plaintiffs have suffered damages in an amount *exceeding* $1 million, including costs and attorneys fees and disgorgement; the full measure of which the Arbitrator will determine once the automatic stay has been lifted. Or in the alternative, should the stay not be lifted, according to proof at trial.

70. Plaintiffs are informed and believe - as was it adjudicated - and thereon alleges that the fraud and/or breaches of fiduciary duties alleged above were committed with the intent to deprive Plaintiffs of its money and interests by means of deceit and concealment of material facts, which actions were despicable and done maliciously and oppressively, with the intent to cause injury to Plaintiffs and with a willful and conscious disregard for Plaintiffs' rights. Consequently, Plaintiffs are entitled to an award of compensatory damages, disgorgement of funds paid to Defendant, and punitive damages against Defendant in an amount according to proof at trial.

71. Plaintiffs therefore seek an order under 11 U.S.C. §523(a)(4) determining that (1) Defendant is liable to Plaintiff in the full amount of the forthcoming arbitration award issued in the underlying Arbitration; (2) that said liability is non-dischargeable; and (3) the attorneys' fees and costs incurred by Plaintiffs in connection with the prosecution of the Arbitration and pendant State Court Confirmation Action, which are the direct result of Defendant's false representations and breaches of fiduciary duty to Plaintiffs, are also non-dischargeable.

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

1. For consequential and special damages as awarded by the Arbitrator as will be awarded in the forthcoming final award or, alternatively, according to proof at trial;
2. For punitive damages according to proof at trial;
3. For a decree determining that all debts determined to be owing by Defendant to Plaintiffs which are the subject of this action are deemed and adjudicated to be non-dischargeable pursuant to 11 U.S.C. §523(a)(2)(A) and/or §523(a)(4);
4. Attorneys fees according to proof;
5. For costs of suit incurred herein; and
6. For such other and further relief as this Court deems just and appropriate.

Dated:   November 29, 2015                    LANG, HANIGAN & CARVALHO, LLP


By s/ Vaughn M. Greenwalt
Vaughn M. Greenwalt
Attorneys for Plaintiffs

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial in the within action.

DATED: November 29, 2015        LANG, HANIGAN & CARVALHO, LLP


By: s/ Vaughn M. Greenwalt
Vaughn M. Greenwalt
Attorneys for Plaintiffs