1   Wendy Medura Krincek, Esq., (Bar No. 6417)
    LITTLER MENDELSON, P.C.
2   3960 Howard Hughes Parkway
    Suite 300
3   Las Vegas, NV 89169-5937
    Tel: (702) 862-8800
4   Fax: (702) 862-8811

5   Arthur Carvalho, Jr. (Cal. Bar No. 125370)
    Vaughn M. Greenwalt (Cal. Bar No. 298481)
6   LANG, HANIGAN & CARVALHO, LLP
    21550 Oxnard Street, Suite 760
7   Woodland Hills, California 91367
    Tel  (818) 883-5644
8   Fax (818) 704-9372
    *Appearing Pro Hac Vice*

9

10  Attorneys for Creditors
    EXCELSIOR MEDIA CORP., and
11  LIBERTY MEDIA HOLDINGS, LLC.

12              UNITED STATES BANKRUPTCY COURT

13                  DISTRICT OF NEVADA

14

15  In re                              )   CASE NO: BK-S-15-14956-abl
                                       )
16  MARC JOHN RANDAZZA,                )
                                       )
17            Debtor.                  )   CHAPTER 11
                                       )
18  _____   )   **ADV NO. 15-01193-ABL**
                                       )
19  EXCELSIOR MEDIA CORP., a Nevada    )   FIRST AMENDED COMPLAINT BY
    Corporation; and LIBERTY MEDIA     )   CREDITORS EXCELSIOR MEDIA CORP.,
20  HOLDINGS, LLC., a Nevada Limited   )   AND LIBERTY MEDIA HOLDINGS, LLC
    Liability Company,                 )   TO DETERMINE NON-
21                                     )   DISCHARGEABILITY OF DEBTS OWED
              Plaintiffs,              )   BY DEBTOR, MARC JOHN RANDAZZA
22                                     )
         vs.                           )   DEMAND FOR JURY TRIAL
23                                     )
    MARC JOHN RANDAZZA, an individual, )
24                                     )
                                       )
25            Defendant.               )
    _____   )
26

27

28
                                    1
_____
*FIRST AMENDED COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBTS*

LANG, HANIGAN & CARVALHO
21550 Oxnard Street, Suite 760
Woodland Hills, CA 91367
(818) 883-5644

By and through its counsel of record, Plaintiffs Excelsior Media Corp., and Liberty Media Holdings, LLC., ("Plaintiffs" or "E/L"), hereby file this first amended complaint objecting to discharge of debt pursuant to 11 U.S.C. §523(a)(2)(A), §523(a)(4) and §523(a)(6) (the "FAC"). Plaintiffs allege and state as follows:

## I.     JURISDICTION AND VENUE

1.     This Court has jurisdiction of this matter under 28 U.S.C. §157 and 11 U.S.C. §523. The claims for relief alleged in this complaint arise under Title 11 of the United States Code and are related to a case pending in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court"). The pending bankruptcy case to which the claims for relief alleged in this Complaint are related is In re Marc John Randazza, Bk Case No. BK-S-15-14956-abl (the "Randazza Case").

2.     The determination of dischargeability is a core proceeding under 28 U.S.C. §157(b). Regardless of whether this is a core proceeding, consent is hereby given to the entry of final orders and judgment by the Bankruptcy Court.

3.     Pursuant to 28 U.S.C. §1409, venue is proper in the District of Nevada, because the Randazza Case is pending in this district and division.

## II.     THE PARTIES

4.     Plaintiffs are domiciled in the State of Nevada.

5.     Defendant Marc John Randazza ("Defendant" or "Randazza") is the debtor in the Randazza Case.

## III.     GENERAL ALLEGATIONS

6.     Defendant Randazza is the former in-house General Counsel of E/L.  Randazza was employed as E/L's General Counsel continuously from June, 2009 until August 2012.

7.     Excelsior Media is a sister company to various entities including Liberty Media Holdings and Corbin Fisher. Corbin Fisher is an on-line entertainment website and brand name whose intellectual property is owned by Liberty Media Holdings. Excelsior is a film production company that creates videos for Corbin Fisher. E/L has consistently endeavored to and succeeded at

2

conducting its business in a principled and professional manner. E/L relocated its headquarters from San Diego, California to Las Vegas in February 2011.

8.    Randazza also relocated from San Diego, California to Las Vegas in 2011 to continue his employment relationship with E/L. Randazza markets himself as a "specialist" in First Amendment and intellectual property law; particularly with regard to the adult entertainment industry.

9.    E/L and Randazza became acquainted while Randazza was an associate at a firm specializing in First Amendment work in Florida. E/L later decided to hire a General Counsel. Randazza pursued and accepted the position. Randazza drafted the Employment Agreement, which was executed by the parties in June, 2009. The primary reason E/L decided to hire a General Counsel was to ensure its intellectual property was protected. One of the most significant challenges faced by E/L and all companies in the film and entertainment industry is the illegal downloading and sharing of content/videos produced by E/L. However, Randazza was tasked with handling all of E/L's legal matters.

A.    **THE EMPLOYMENT AGREEMENT**

10.    Pursuant to the Employment Agreement, Randazza was to wind down his private practice during his first 90 days of employment and become E/L's full-time General Counsel employed on an at-will basis.

11.    Section "6.C" of the Employment Agreement permitted Randazza to continue to provide professional services to a "limited number of outside clients" during non-working hours if such work did not present a conflict of interest for E/L. Contrary to his obligations under the Employment Agreement, Randazza continued to aggressively grow his private practice during his employment.

12.    Randazza's compensation consisted of an annual salary of $208,000. Randazza also included in the Employment Agreement the rather unique arrangement of a nondiscretionary bonus of 25% of any settlement funds paid to E/L.

13.    At the time of the execution of the Employment Agreement, the parties contemplated that Randazza would be handling all of E/L's legal matters independently. Instead, Randazza

3

1   eventually utilized his own firm, Randazza Legal Group ("RLG") and various outside counsel to

2   assist in E/L's legal matters.

3       14.     The Employment Agreement also required that E/L provide Randazza with a laptop

4   computer and PDA/phone, which were to be primarily used for E/L business and only occasional

5   and incidental personal use permitted. The Employment Agreement further provided that such

6   equipment was not to be used for professional services rendered to other clients.

7       15.     The Employment Agreement provided for severance in the amount of 12 weeks of

8   salary if E/L were to unilaterally terminate Randazza in the fourth year of employment or later.

9   There is no severance obligation if Randazza resigned or was terminated for cause.

10      16.     The Employment Agreement also includes a governing law provision stating "[t]his

11  Agreement shall be governed by and construed in accordance with the laws of the State of

12  California, without regard to conflict of laws." Randazza was able to reside virtually anywhere he

13  wanted. Initially, Randazza and his wife were located to San Diego, California. However,

14  Randazza relocated to Las Vegas, Nevada in June 2011, just as few months after E/L relocated its

15  headquarters.

16      17.     At Randazza's request, E/L hired Erika Dillon ("Dillon"), a paralegal from out of

17  state. Dillon was employed by E/L as a paralegal at the time of Randazza's resignation.

18      **B.     ISSUES ARISE BETWEEN E/L AND RANDAZZA**

19          **i.     Randazza Attempts To Negotiate A Personal Settlement Payment To**

20              **The Detriment Of E/L**

21      18.     Randazza had filed suit on behalf of E/L in  the U.S. District Court of Nevada and in

22  Hong Kong against an Internet file-locker website, Oron.com ("Oron"), asserting copyright

23  infringement claims arising out of Oron's facilitation of the illegal downloading of E/L content.

24  Randazza and counsel for E/L in Hong Kong obtained a preliminary injunction on behalf of E/L

25  preventing Oron from disbursing any of its Hong Kong based assets.

26      19.     After extensive negotiations, in which E/L's CEO, Jason Gibson ("Gibson") was

27  involved, on July 1, 2012, the E/L and Oron executed a settlement agreement which provided for

28  payment by Oron to Excelsior of $550,000.

4

1      20.    Pursuant to the settlement agreement $550,000 was to be transferred to the RLG trust

2  account and Randazza agreed to be personally liable if the funds were prematurely disbursed (before

3  all terms were complied with), including being responsible for a 10% penalty.

4      21.    Oron later claimed the settlement agreement was not enforceable.  E/L sought the

5  intervention of the district court and obtained an order declaring the settlement agreement to be

6  valid and enforceable as a judgment against Oron.

7      22.    After the entry of the order declaring the settlement agreement to be enforceable,

8  Randazza engaged in further settlement negotiations with Oron's counsel to resolve both the Hong

9  Kong proceeding and address the judgment/order issued by the District Court of Nevada.  On

10  August 13, 2012, Randazza presented Gibson, with a new Oron settlement agreement.  The

11  settlement agreement provided for a payment of $600,000 to E/L to be held in trust until various

12  provisions of the settlement agreement were preformed.  However, the settlement agreement also

13  provided for payment of $75,000 to Randazza.  Notably, there were no restrictions upon

14  disbursement of Randazza's payment.

15      23.    Randazza did not inform Gibson that the settlement offer by Oron was only valid

16  until August 14, 2012.

17      24.    Upon review of the settlement agreement, Gibson discovered the provision calling

18  for a payment of $75,000 to Randazza.  Randazza had not previously disclosed this provision to

19  Gibson and did not obtain Gibson's authority or consent to negotiate or include such a provision.

20  The payment to Randazza immediately raised questions for Gibson as did the nervous manner in

21  which Randazza presented the agreement to him.  In response to Gibson's inquiry regarding the

22  $75,000 payment, Randazza characterized it to be a "bribe" to his firm for a promise not to sue

23  Oron again.  When Gibson questioned why that payment should not go to the E/L, Randazza

24  claimed Oron had specifically taken the position that not a penny more than $600,000 could go to

25  E/L.

26      25.    Randazza's entire explanation did not ring true in Gibson's eyes, nor did Randazza's

27  self-dealing sit well with E/L.  Gibson advised Randazza that he was not comfortable with that

28  payment given that Randazza was already being compensated by E/L for his work on the matter and

1  that it seemed illogical that Oron would care at all whether all of the $675,000 it was willing to pay

2  went to E/L or not.

3      26.    E/L's concerns with Randazza grew significantly because of this incident.  Over the

4  proceeding few weeks, Randazza made various attempts to discuss the "bribe" in an effort to obtain

5  Gibson's consent to include it in the settlement agreement.  Gibson rebuffed Randazza's efforts

6  having determined it was best to closely consider the quality of Randazza's work for E/L.

7      27.    Randazza reacted strongly to Gibson's refusal to address the term of the settlement

8  agreement.  Following a happy hour event during this time period, Randazza began cleaning

9  personal items out of his office and loudly saying "F**ck this shit, I quit."

10              ii.    **Randazza Takes Unilateral Control Of The Oron Settlement**

11                      **Funds and Resigns.**

12      28.    In late August, 2012, Gibson learned from outside counsel in Hong Kong that the

13  $550,000 settlement payment from Oron had been received by Randazza into his firm's trust

14  account without immediately notification to Gibson.  Randazza had previously notified the

15  executive team as soon as settlement monies were received touting his successes.

16      29.    Gibson questioned Randazza about the delay and Randazza responded claiming the

17  delay was due to the money finally being released late the day before.  Gibson indicated E/L's desire

18  to move forward with fulfilling the conditions of settlement such that the $550,000 could be

19  immediately released to E/L and also expressed displeasure with the fact that E/L likely would only

20  receive about $262,500 of the total settlement amount once fees, costs, and Randazza's 25% bonus

21  were taken into account.

22      30.    Randazza refused to comply with Gibson's directive, stating that he was not

23  forwarding the $550,000 and instead, "I'm taking out my share, the costs we owe to outside parties,

24  and paying myself back the $25,000 I advanced.  Then I'm giving you your net, which is more than

25  you expected."  In other words, Randazza was unilaterally taking control of the settlement funds.

26  E/L found this to be completely inappropriate but was at a loss as to how to rectify the situation as

27  the money was in Randazza's trust account over which it had no control.

28

31.    Only a couple of hours later, Randazza communicated the following to E/L: "Given our now openly adversarial relationship, it seems appropriate that I withdraw from representing Liberty in any further matters. There might be a way I can continue to wind down existing matters, but it's going to require a call to discuss it. When are you free?"

32.    E/L communicated to Randazza that it construed his email as a resignation, which it accepted effective immediately, instructed that neither he nor RLG touch the Oron settlement funds, advised it had retained new counsel, Littler Mendelson, and further instructed that Randazza retain all E/L property in its possession for the time being. E/L then promptly paid Randazza his salary through his last day of employment and accrued, unused PTO.

> ### iii.    The Aftermath Of Randazza's Resignation And Randazza's Bad Faith Conduct.

33.    After Randazza's resignation, E/L learned that without its knowledge or consent, Randazza had begun storing all of E/L's legal records on the RLG server to which only he and the paralegal had access. Immediately after resigning, Randazza cut off all E/L access to its legal records and refused to grant E/L any access to, or copies of, its records. In addition, E/L had no access to records regarding legal settlements or agreements with vendors and outside counsel that were engaged in its legal matters.

34.    Since his resignation, Randazza has continually engaged in conduct designed to make E/L's life difficult while at the same time attempting to portray a facade of being conciliatory. E/L's paralegal Erika Dillon informed the Human Resources Manager that Randazza was pressuring her to leave E/L to work for Randazza's outside firm. On the day of Randazza's resignation, but prior to his resignation email being sent, Randazza and Dillon plotted to delete and wipe information from computer hard drives and cut-off E/L's access to its records in anticipation of their resignations.

Randazza further engaged in the following conduct:

a.    The day he resigned, Randazza contacted Hong Kong counsel and informed them he was no longer counsel for E/L because E/L refused to pay his or the Hong Kong firm's fees. This blatant falsehood was calculated to cause harm to E/L. In

7

corresponding with the Hong Kong firm, E/L learned Randazza had not disclosed to them that he was General Counsel for E/L. E/L had to immediately wire approximately $33,000 to the Hong Kong firm in order for the firm to continue representing E/L because of their unease over Randazza's improper communication.

b.   Randazza also began contacting other outside counsel attempting to influence them to withdraw from representation of E/L. On August 20th, local counsel for litigation in Philadelphia informed E/L that he had been contacted by Randazza about Randazza's departure and requested to withdraw as counsel for E/L.

c.   On September 4, 2014, when Randazza knew E/L's CEO was out of state, Randazza and Dillon appeared unannounced at E/L's headquarters despite knowing this was not something that E/L would tolerate from an ex-employee. Caught off-guard, the Human Resources Manager allowed Randazza access to his office.

d.   After prodding, Randazza eventually returned his company owned laptop, but not without first wiping the computer several times. In fact, Randazza wiped his laptop the day before his resignation. Randazza was informed in writing to retain all E/L property in his possession before he wiped his computer. In addition, E/L subsequently sent Randazza a formal preservation notice. As an attorney, Randazza knows he is not permitted to spoliate evidence. Randazza's spoliation is a serious issue as it *at least* creates an adverse inference that he deliberately destroyed relevant evidence.

e.   E/L has further learned that Randazza attempted to coerce at least one former employee to provide unfavorable testimony against E/L in the parties underlying arbitration. Fortunately, that former employee alerted E/L to the duress he was being placed under by Randazza.

## C.   E/L LEARNS OF MULTIPLE UNETHICAL ACTS RANDAZZA ENGAGED IN DURING HIS EMPLOYMENT

35.   Randazza involved his lawfirm, RLG, in the Oron litigation. Randazza never had E/L enter into any form of fee agreement with RLG as any prudent General Counsel would and

8

1    should.  Randazza often asserted to E/L that when he used RLG, he would not make money on his

2    firm's work and E/L would only have to pay a highly discounted hourly rate reflecting RLG's direct

3    costs incurred for the labor.  In short, E/L was never to be charged the customary hourly rates of

4    RLG attorneys.  Nor, would it ever have incurred charges of $500 per hour for Randazza's time as

5    he was an employee of E/L.  With that in mind, Randazza and his firm filed a Motion for Attorneys

6    Fees and Costs in the Oron matter.  In the Motion, Randazza represented to the court that E/L

7    incurred/expended approximately $134,000 in attorneys fees and costs.

8        36.    Unbeknownst to E/L, Randazza misrepresented to the court that it paid Randazza

9    and RLG their standard rates to the tune of $134,000, and that E/L was receiving regular billing

10   from RLG.  A review of Randazza's filings in other matters show this is not the first time such

11   misrepresentations have been made.  E/L discovered these misleading statements during the process

12   of locating new counsel.

13       37.    Discovery in the underlying arbitration between the parties has also confirmed that

14   throughout the course of Randazza's employment with E/L, he engaged in unethical conduct, and

15   the representation of various companies that created conflicts of interest in light of his employment

16   as E/L's General Counsel.  Indeed, Randazza offered legal advice to known infringers of E/L's

17   copyrighted material and ignored E/L's please to take action against said companies.  Occasionally,

18   he even dissuaded E/L from taking said action against those undisclosed clients; including, but not

19   limited to Xvideos.com and XNXX.com.  The full extent of Randazza's conflicts remain unknown

20   as E/L does not have knowledge of Randazza's full and complete client base.

21       37.    On multiple occasions, Randazza also engaged in negotiations with adverse parties

22   who had litigation pending against E/L, regarding those parties retaining his services in order to

23   conflict him out from any future cases against them.  In fact, Randazza improperly engaged in those

24   negotiations during E/L's litigation with TNAFlix, Oron, and Megaupload.

25       38.    Randazza also negotiated to potentially broker a deal for the sale of TNAFlix while

26   actively litigating against them on E/L's behalf, he encouraged E/L to enter into an unethical

27   business transaction during the Oron litigation, jeopardized the entire Oron settlement as a result of

28   his unethical behavior and explicit non-compliance with the settlement agreement, and encouraged

9

1   E/L to enter into agreements with vendors he represented without any disclosure therefor. Randazza

2   never disclosed the existence of any of these conflicts of interest and never sought written informed

3   consent from E/L.

### D.   THE ARBITRATION

39.   On December 19, 2012, Randazza initiated arbitration proceedings against E/L,
under the auspices of Judicial Arbitration and Mediation Services, Inc. ("JAMS") for employment-
related claims lacking any basis in law or fact (the "Arbitration").  In an effort to multiply the costs
to E/L, Randazza also initiated a state court action against E/L for those same claims.

40.   E/L filed counterclaims against Randazza alleging numerous serious violations of the
his fiduciary duties to E/L, legal malpractice, conversion, breach of contract, and other contract-
related claims.

41.   The parties agreed to the appointment of the Hon. Stephen E. Haberfeld (Ret.) As the
arbitrator for that matter (the "Arbitrator").

42.   The parties conducted over 2 years of discovery and pre-hearing litigation, as well as
the Arbitration hearing itself which was held over 5 days from February 9-13, 2015.

43.   On June 3, 2015, the Arbitrator issued his Interim Arbitration Award (the "IAA").
The IAA found in favor of E/L on all of the claims and counterclaims, and awarded E/L damages
against Randazza in a sum exceeding $568,715.  A true and correct copy of the IAA is attached
hereto as **Exhibit 1**, and fully incorporated herein by reference.

44.   Among other things, the Arbitrator made numerous findings of fact in the underlying
dispute, particularly relevant are the following:

a.   "Whether or not Mr. Randazza's employment by E/L was terminated
voluntarily by Mr. Randazza or involuntarily by E/L, the principal proximate
cause for the ending of Mr. Randazza's employment was Mr. Randazza's
breaches of fiduciary duty and the covenant of good faith and fair dealing,
implied in his employment agreement, as an employee, executive and general
counsel of E/L."  IAA, p.2 ¶C

10

b. "Mr. Randazza's credibility was also undermined by the variance between his testimony and positions at hearing and his written Nevada State Bar submission concerning the Oron litigation $75,000 bribe..." IAA p. 6 fn.4

c. "The evidence established at the hearing was that Mr. Randazza intended that his allegations would induce [Gibson] to authorize a settlement financially favorable to Mr. Randazza, based on Mr. Randazza's belief at the time – and ultimately proven incorrect – that [Gibson] would so settle, rather than have to litigate true or false allegations related to his own sexuality, sexual activity, and the pornographic natuer of E/L's business." IAA p. 6-7 ¶F

d. "Turning to E/L's counterclaims, Mr. Randazza owed fiduciary duties to E/L, because he was their in-house general counsel and their attorney of record in judicial civil actions, and an E/L executive and employee. As such, Mr. Randazza owed E/L, as his clients, employers and principals, the highest duty of loyalty and honesty in the performance of his professional and executive obligations [...] Each of Mr. Randazza's ethical duties owed to his principals/clients was a legal fiduciary duty owed to them. Mr. Randazza violated those fiduciary duties owed by him to E/L, as his principals/clients/employers – including by the following:" IAA p.13 ¶Q

e. "(1) engaging in negotiations for monetary bribes to be paid to him – including the Oron $75,000 which [Gibson] noticed, without Mr. Randazza's affirmative disclosure of it – which would result in his being 'conflicted out' of future litigation or any disputes with parties then and/or in the future with interests adverse to E/L's interests, (2) taking control for his personal benefit of, and refusing to relinquish control over, Oron settlement funds – all of which ought to have been for the benefit and under the direction and control of his principals/clients E/L, before and after the end of his employment and representations on behalf of E/L, (3) Mr. Randazza's ordering and causing the deliberate 'wiping' of his and legal assistant's corporate laptops, as an

11

integral part of his planned resignation as E/L's General Counsel and outside counsel of record, and (4) Mr. Randazza's continuing an undisclosed (and thus unconsented-to) legal work for clients (e.g., Bang Bros., Xvideos, XNXX, Porn [Guardian], Titan Media, Kink), whose interests were actually and potentially adverse to E/L's interests." IAA p.14-15

f. "As E/L's inside general counsel and employee, Mr. Randazza had a legal and fiduciary duty – no later than when his employment ceased, regardless of whether or not with or without cause and/or by whom ended – to deliver every file and other piece of data and/or information – complete, intact and undeleted, unmodified and immediately accessible and usable by E/L [...] Because of his noncompliance, indeed resistance to compliance with those duties, they continue to the day of the rendering of this award [...] Those continuing fiduciary duties owed by him to E/L exist, including by reason of his exclusive control over the computers and thus superior knowledge of what was on each computer's hard drive before and after he had everything on the returned laptops completely and multiply deleted..." IAA p.16

g. "By the same token, that ordered conduct raises an inference that whatever was deleted was known and intended by Mr. Randazza to be harmful to him and any claims and contentions which he might make in any dispute with E/L – i.e., deliberate spoliation, in addition to conversion." IAA p.17

h. "Mr. Randazza committed spoliation of evidence, as well as improper conversion of his employer's files, data and equipment and, in so doing, also violated his fiduciary duties owed to E/L." IAA p. 17

i. "... Mr. Randazza's response to E/L's [state bar] grievance contained at least one material misrepresentation acknowledged during an evidentiary session in this arbitration..." IAA p. 17 ¶S

j. "E/L was damaged in at least the amount of $275,000, by reason of the Oron resettlement, as a direct and proximate result of events being set in motion by

12

Mr. Randazza's violations of fiduciary duty and other duties, by his having secretly negotiated a $75,000 bribe to conflict himself out from suing Oron in the future." IAA p. 18 ¶T

k.    "The extent of Mr. Randazza's contractual material breaches made them also breaches of fiduciary duty – regardless of whether or not those breaches of fiduciary duty were conflicts of interests, as some were." IAA p. 19 ¶V

l.    "Disgorgement of compensation paid by E/L to Mr. Randazza is an available remedy, which is appropriate in the circumstances of Mr. Randazza's clear and serious violations of fiduciary duty owed to E/L, and within the Arbitrator's discretion, based on the evidence in this arbitration." IAA p. 19 ¶W

m.    "E/L are the prevailing parties in this arbitration.  As such one or both of Respondents is or may be entitled to contractual attorneys fees under the employment agreement." IAA p. 22 ¶Y

45.    The damages awarded by the Arbitrator to E/L have not been fully calculated, but exceed $1 million.  IAA p.23-26 ¶1-9

46.    Subject to a determination of the full amount of damages to be awarded to Plaintiffs, the IAA, "including the Determinations hereinabove set forth, is intended to be in full settlement of all claims, issues, allegations and contentions, on the merits, submitted by any party against any adverse party in this arbitration." IAA p. 26.

47.    The findings made in the IAA are binding on Defendant Randazza and he is collaterally estopped from re-litigating the facts and issues determined by the arbitrator.  *See In re Molina*, 228 B.R. 248 (9th Cir. BAP 1998); *In re O'Neill*, 260 B.R. 122 (Bankr.E.D.Tex.2001); *In re Marx*, 171 B.R. 218 (Bankr.N.D.Tex.1994).

///

///

///

///

## III.    CLAIMS FOR RELIEF

FIRST CLAIM FOR RELIEF

(For Determination of Non-Dischargeability of Debts under 11 U.S.C. §523(a)(2)(A) - False Pretenses, False representation, or Actual Fraud)

48.    Plaintiffs hereby incorporate by reference each and every allegation stated hereinabove as though fully set forth herein.

49.    In or about the year 2009, Defendant Randazza represented and induced Plaintiffs to enter into the Employment Agreement, as alleged above with the implied and actual promise that if it entered into the Employment Agreement, Defendant would act in accord with all duties, fiduciary or otherwise, inherent in the position of employee/executive/principal as well as in accord with the heightened duties, fiduciary and otherwise, inherent in his position as attorney and in-house General Counsel to E/L. By the nature of his position and relationship with E/L as in-house general counsel, employee, principal, and executive, as well has his fiduciary duties, Randazza owed a duty to disclose to E/L.

50.    In reliance and in furtherance of said representations, Plaintiffs contributed substantial time, money, and labor to fulfill its obligations under the Employment Agreement. Moreover, Plaintiffs fully relied on the advice of Defendant in all legal matters.

51.    As Plaintiffs' general counsel, Defendant had an affirmative duty to disclose to Plaintiffs all facts material to his work on their behalf and to keep Plaintiffs fully apprized of his activities. Plaintiffs relied on Defendants full disclosures in making decisions regarding their operations of the companies and in continuing their relationship with Defendant.

52.    Defendant failed to disclose to Plaintiffs various facts material to his work and to his continued employment including: the true nature of his dealings with infringers of Plaintiffs intellectual property; his engagement in negotiations with adverse parties who had litigation pending against Plaintiffs, regarding those parties retaining his services in order to conflict him out of any future cases against them; his negotiations to broker a deal for the sale of a defendant (TNAFlix) while actively litigating against them on EL's behalf.

1    53.    Had Plaintiffs been aware of these facts and circumstances, Plaintiffs would not have

2    taken Defendants advise on any matter, would not have acceded to the payments made to Defendant

3    by the various third parties, would have immediately terminated Defendants' employment for cause

4    and would not have contributed any time, money, or labor to the fulfillment of the Employment

5    Agreement, or paid the substantial amounts comprising Randazza's compensation.

6    52.    At the time Defendant made such representations and committed the nondisclosures,

7    he did so with the intent to induce Plaintiffs to act as alleged. At the time Defendant made such

8    representations, and committed such nondisclosures, such representations were false, and he knew

9    that they were false, and/or purposefully did not disclose said facts in that he intended to act for the

10   sole benefit of himself, and at the detriment of E/L, in full disregard for the Employment Agreement

11   and his duties to E/L. Consequently, Plaintiffs are entitled to an award of compensatory damages,

12   disgorgement of funds paid to Defendant, and punitive damages against Defendant in an amount

13   according to proof at trial.

14   53.    As a result of the false representations of Defendant, Plaintiffs have been damaged in

15   an amount exceeding $1 million dollars. Plaintiffs are also entitled to an award in the amount of the

16   compensation paid to Defendant in reliance on his fraud as alleged herein as well as the attorneys

17   fees and costs incurred in connection with the Arbitration and punitive damages against Defendant

18   in an amount according to proof at trial.

19   54.    Plaintiffs therefore seek an order under 11 U.S.C. §523(a)(2)(A): (1) determining: (i)

20   Defendant is liable to Plaintiffs in the full amount of the Arbitration Award to be issued by the

21   Arbitrator or, in the alternative in an amount to be proved at trial herein; and (ii) that said liability is

22   non-dischargeable; and (2) awarding attorneys' fees and costs incurred by Plaintiffs in connection

23   with the prosecution and defense of the Arbitration and this adversary proceeding.

24                              SECOND CLAIM FOR RELIEF

25   (For Determination of Non-Dischargeability of Debts under 11 U.S.C. §523(a)(4) - Fraud or

26                       Defalcation while acting in a Fiduciary Capacity)

27   55.    Plaintiffs hereby incorporate by reference each and every allegation stated

28   hereinabove as though fully set forth herein.

15

56.     As Plaintiffs' general counsel, Defendant was tasked with the responsibility of handling all of Plaintiff's legal affairs, including, but not limited to, employment, regulatory, transactional, intellectual property protection and litigation matters. In such capacity, Defendant owed to Plaintiffs the full panoply of fiduciary duties, all of which required Defendant to give to Plaintiffs his absolute and complete fidelity. These duties include, but are not limited to:

a. the duty to fully and completely disclose to Plaintiffs all facts relevant to all of Plaintiff's legal matters;

b. the duty to maintain inviolate the confidence, and at every peril to himself to preserve the secrets, of Plaintiffs;

c. the duty to protect Plaintiff in every possible way;

d. the duty to assiduously avoid assuming a position adverse or antagonistic to Plaintiffs without Plaintiffs' free and intelligent consent;

e. the duty to represent Plaintiffs' interests without being influenced by the his own personal or financial interests or the interests of other clients or third parties; and,

f. the duty to maintain Plaintiffs' funds and property separate from his own, to promptly, regularly and honestly account for Plaintiffs' fund and property and promptly pay over to Plaintiffs all funds to which Plaintiffs are entitled.

57.     Defendant breached those duties by all of the acts and omissions alleged above and as determined by the Arbitrator in the IAA; including, but not limited to, willfully violating the Employment Agreement, engaging in willful conflicts of interests at the expense of Plaintiffs, benefitting himself at the expense of Plaintiffs, committing acts of legal malpractice, making false representations, spoliation and destruction of evidence, failing to account for or pay over to Plaintiffs funds belonging to them and converting Plaintiffs funds and property.

58.     As a direct and proximate result of Defendant's breaches of his fiduciary duties, Plaintiffs have suffered damages in an amount exceeding $1 million, including costs and attorneys fees and disgorgement; the full measure of which the Arbitrator will determine once the automatic stay has been lifted. Or in the alternative, should the stay not be lifted, according to proof at trial.

59.     The breaches of fiduciary duties alleged above were committed with the intent to deprive Plaintiffs of their money and interests by means of deceit and concealment of material facts, which actions were despicable and done maliciously and oppressively, with the intent to cause injury to Plaintiffs and with a willful and conscious disregard for Plaintiffs' rights.  Consequently, Plaintiffs are entitled to an award of compensatory damages, disgorgement of funds paid to Defendant, and punitive damages against Defendant in an amount according to proof at trial.

60.     Plaintiffs therefore seek an order under 11 U.S.C. §523(a)(4): (1) determining that: (i) Defendant is liable to Plaintiffs in the full amount of the Arbitration Award to be issued by the Arbitrator or, in the alternative in an amount to be proved at trial herein; and (ii) said liability is non-dischargeable; and (2) awarding attorneys' fees and costs incurred by Plaintiffs in connection with the prosecution and defense of the Arbitration and this adversary proceeding.

THIRD CLAIM FOR RELIEF

(For Determination of Non-Dischargeability of Debts under 11 U.S.C. §523(a)(6) - Willful or Malicious Injury)

61.     Plaintiffs hereby incorporate by reference each and every allegation stated hereinabove as though fully set forth herein.

62.     Pursuant to §523(a)(6) of the Unites States Bankruptcy Code, a debt incurred by a debtor who engages in wilful and malicious conduct which results in damages shall be nondischargeable.

63.     While acting as in-house general counsel for Plaintiffs, the Debtor engaged in the following wilful and malicious acts, among others:

    a.     Willfully and maliciously engaging in voluntary conflicts of interest for the sole benefit of himself and at the intentional expense of his clients, Plaintiffs. As found by the arbitrator: "(1) engaging in negotiations for monetary bribes to be paid to him – including the Oron $75,000 which [Gibson] noticed, without Mr. Randazza's affirmative disclosure of it – which would result in his being 'conflicted out' of future litigation or any disputes with parties then and/or in the future with interests adverse to E/L's interests, (2) taking control

17

1      for his personal benefit of, and refusing to relinquish control over, Oron

2      settlement funds – all of which ought to have been for the benefit and under

3      the direction and control of his principals/clients E/L, before and after the end

4      of his employment and representations on behalf of E/L, (3) Mr. Randazza's

5      ordering and causing the deliberate 'wiping' of his and legal assistant's

6      corporate laptops, as an integral part of his planned resignation as E/L's

7      General Counsel and outside counsel of record, and (4) Mr. Randazza's

8      continuing an undisclosed (and thus unconsented-to) legal work for clients

9      (e.g., Bang Bros., Xvideos, XNXX, Porn [Guardian], Titan Media, Kink),

10      whose interests were actually and potentially adverse to E/L's interests."

11      IAA p.14-15

12      b.    Willfully, maliciously, and intentionally engaging in spoilation of evidence

13      and the corporate property of Plaintiffs. As found by the arbitrator:  "As

14      E/L's inside general counsel and employee, Mr. Randazza had a legal and

15      fiduciary duty – no later than when his employment ceased, regardless of

16      whether or not with or without cause and/or by whom ended – to deliver

17      every file and other piece of data and/or information – complete, intact and

18      undeleted, unmodified and immediately accessible and usable by E/L [...]

19      Because of his noncompliance, indeed resistance to compliance with those

20      duties, they continue to the day of the rendering of this award [...] Those

21      continuing fiduciary duties owed by him to E/L exist, including by reason of

22      his exclusive control over the computers and thus superior knowledge of

23      what was on each computer's hard drive before and after he had everything

24      on the returned laptops completely and multiply deleted..." IAA p.16

25      c.    By willfully, maliciously, and intentionally engaging in spoilation of

26      evidence to conceal his bad acts. As found by the arbitrator: "By the same

27      token, that ordered conduct raises an inference that whatever was deleted was

28      known and intended by Mr. Randazza to be harmful to him and any claims

18

and contentions which he might make in any dispute with E/L – i.e., deliberate spoliation, in addition to conversion." IAA p.17 [...] "Mr. Randazza committed spoliation of evidence, as well as improper conversion of his employer's files, data and equipment and, in so doing, also violated his fiduciary duties owed to E/L." IAA p. 17

    d.   By willfully, maliciously, and intentionally making repeated misrepresentations to investigative administrative bodies, including the State Bar of Nevada - to conceal his willful and malicious injuries to Plaintiff. As found by the arbitrator: "... Mr. Randazza's response to E/L's [state bar] grievance contained at least one material misrepresentation acknowledged during an evidentiary session in this arbitration..." IAA p. 17 ¶S

    f.   By willfully, maliciously, and intentionally breaching his fiduciary duties to Plaintiffs by, among other things, negotiating bribes for himself at Plaintiffs' expense, and committing intentional violations of Plaintiffs' settlement agreements. As found by the arbitrator: "E/L was damaged in at least the amount of $275,000, by reason of the Oron resettlement, as a direct and proximate result of events being set in motion by Mr. Randazza's violations of fiduciary duty and other duties, by his having secretly negotiated a $75,000 bribe to conflict himself out from suing Oron in the future." IAA p. 18 ¶T

    g.   By willfully, maliciously, and intentionally breaching his employment contract with Plaintiffs, to whom he owed fiduciary duties. As determined by the arbitrator: "The extent of Mr. Randazza's contractual material breaches made them also breaches of fiduciary duty – regardless of whether or not those breaches of fiduciary duty were conflicts of interests, as some were." IAA p. 19 ¶V

64.   As a direct and proximate result of the foregoing, Plaintiffs have suffered damages in an amount not presently ascertained but believed to be in excess of $1,000,000.

1    65.   In committing the acts hereinabove described, the Debtor acted wilfully, maliciously,

2  and with deliberate intent to injure Plaintiffs. Therefore Plaintiffs are entitled to punitive and

3  exemplary damages in an amount to be determined at the time of trial, including contractual

4  attorneys fees.

5    66.   Plaintiffs therefore seek an order under 11 U.S.C. §523(a)(6): (1) determining that:

6  (i) Defendant is liable to Plaintiffs in the full amount of the Arbitration Award to be issued by the

7  Arbitrator or, in the alternative in an amount to be proved at trial herein; and (ii) said liability is

8  non-dischargeable; and (2) awarding attorneys' fees and costs incurred by Plaintiffs in connection

9  with the prosecution and defense of the Arbitration and this adversary proceeding.

10    WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

11    1.   For consequential and special damages as awarded by the Arbitrator as will be

12       awarded in the forthcoming final award or, alternatively, according to proof at trial;

13    2.   For a disgorgement of the monies paid to Defendant in his capacity as Plaintiffs'

14       attorney;

15    3.   For punitive damages according to proof at trial;

16    4.   For a decree determining that all debts determined to be owing by Defendant to

17       Plaintiffs which are the subject of this action are deemed and adjudicated to be non-

18       dischargeable pursuant to 11 U.S.C. §523(a)(2)(A) and/or §523(a)(4);

19    5.   Attorneys fees according to proof;

20    6.   For costs of suit incurred herein; and

21    7.   For such other and further relief as this Court deems just and appropriate.

22

23  Dated:   February 10, 2016               LANG, HANIGAN & CARVALHO, LLP

24

25

26                               By s/ Vaughn M. Greenwalt
                                    Vaughn M. Greenwalt
27                                  Attorneys for Plaintiffs

28

20

1    ## DEMAND FOR JURY TRIAL

2    Plaintiffs hereby demand a jury trial in the within action.

3

4    DATED: February 10, 2016          LANG, HANIGAN & CARVALHO, LLP

5

6                                      By: s/ Vaughn M. Greenwalt
                                            Vaughn M. Greenwalt
7                                           Attorneys for Plaintiffs

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*FIRST AMENDED COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBTS*