Exhibit 5

1   WENDY MEDURA KRINCEK, ESQ., Bar # 6417
    ETHAN D. THOMAS, ESQ., Bar # 12874
2   LITTLER MENDELSON, P.C.
    3960 Howard Hughes Parkway
3   Suite 300
    Las Vegas, NV 89169-5937
4   Telephone:   702.862.8800
    Fax No.:      702.862.8811
5
    Attorneys for Defendant
6   EXCELSIOR MEDIA CORPORATION

7

8        **ARBITRATION BEFORE JUDICIAL ARBITRATION AND MEDIATION SERVICE**

9

10  MARC J. RANDAZZA,

11              Complainant,

12  vs.                                              **EXCELSIOR MEDIA CORPORATION'S**
                                                     **POST-ARBITRATION BRIEF**
13  EXCELSIOR MEDIA CORPORATION,

14              Respondent.

15
         Excelsior Media Corporation ("Excelsior" or "Respondent" or "Company") by and
16
    through its counsel of record, Littler Mendelson, hereby submits this Brief in support of the
17
    evidence and testimony entered during the recent arbitration hearing.  As the Arbitrator is
18
    aware, this matter involves a dispute between Excelsior and its former General Counsel,
19
    Complainant Marc Randazza ("Randazza").  Randazza failed to present evidence which
20
    would allow him to prevail on any of his claims.  Instead the evidence establishes the rather
21
    startling lengths this General Counsel went in contravention of the Professional Rules of
22
    Responsibility and his fiduciary obligations to his own client to put his own interests above
23
    all else and Excelsior should recover upon its counterclaims.
24
         Regarding Randazza's claims, Randazza was not terminated by Excelsior.  Rather,
25
    the evidence is overwhelming that Randazza negotiated a "bribe" for himself in the amount
26
    of $75,000 as part of a settlement on the Company's behalf.  After having been caught by
27
    the company, Randazza knew his transgression was upsetting to Jason Gibson ("Gibson"),
28

LITTLER MENDEL 50N, P
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

1  the Chief Executive Officer of the Company, and knew he was on unsure ground.  He, thus,

2  began plotting his exodus from the Company.  Matters came to a head on August 29, 2012,

3  when Randazza communicated his resignation to the Company stating that he withdrew

4  from all future legal matters.  Moreover, the evidence, including Randazza's own text

5  messages, establish that his allegation that he was harassed because he is a straight male

6  is nothing more than leverage --- "a fear he tried to foster" so that Excelsior would keep

7  their dispute with Randazza out of the public eye.  Randazza has not carried his burden of

8  proof as to any of his claims and Excelsior asks for judgment in its favor on all causes of

9  action asserted by Randazza.

10      Excelsior believes it met and exceeded its burden of proof with respect to its

11  counterclaims.  Randazza engaged in numerous ethical and fiduciary transgressions.  The

12  evidence at the hearing established that Randazza's transgressions include but are not

13  limited to, undisclosed negotiations with opposing counsel in another matter for yet another

14  bribe for himself, undisclosed negotiations with opposing counsel to serve as co-broker in

15  the potential sale of the Company's adversary which would entitle him to 7.5% of a possible

16  sale price of $5 million, undisclosed conflicts of interest where unbeknownst to the

17  Company, Randazza represented known copyright infringers of the Company and actually

18  dissuaded the Company from taking action against them.  Therefore, Excelsior further asks

19  for judgment upon its counterclaims asserted in this matter.

20  I.    **ARGUMENT**

21

22  A.    **RANDAZZA'S LACK OF CREDIBILITY WAS DEMONSTRATED AGAIN AND AGAIN RENDERING HIS TESTIMONY UNRELIABLE.**

23      Upon admission to the Nevada Bar, attorneys take an oath to support the

24  Constitution and the government of the United States and the State of Nevada.  Nevada

25  Supreme Court Rule ("SCR") No. 73.  Attorneys promise to abide by and "follow the Rules

26  of Professional Conduct" and to "faithfully and honestly discharge the duties of an attorney

27  at law to the best of [their] knowledge and ability."  SCR No. 73.  California attorneys take a

28  similar oath when admitted to practice in that state.  The testimony and documentary

1  evidence admitted during the hearing in this matter establish that Randazza's conduct while

2  employed as Excelsior's in-house counsel was not compliant with the oath he made when

3  he began practicing law in these states. Further, his representations and testimony in this

4  case (and other related proceedings) have shown that Randazza is not afraid to bend the

5  truth or make blatant misrepresentations if it would benefit him.

6       Randazza's mannerisms during the evidentiary hearing in this matter were telling.

7  He could not even look the cross-examiner in the eye. Instead, he sat side-ways staring

8  toward the wall for the majority of his cross-examination. Such behavior is not entirely

9  surprising considering the evidence during the hearing established multiple

10  misrepresentations he told throughout the pendency of his dispute(s) with Excelsior. [1]

11       In fact, Excelsior believes that the number and nature of the misrepresentations

12  made by Randazza clearly evidence that he is not credible and no weight should be placed

13  on his testimony. Randazza's testimony revealed that he made false statements to the

14  EEOC in his charge of discrimination, to a federal court in a motion for fees, to the Florida

15  Bar in response to a complaint made against him, in his Complaint in this matter, and in his

16  pre-arbitration brief.[2] *See Arbitration Hearing Transcript (hereinafter "Tr.") at 314:21-*

17  *318:1, 319:4-16, 326:20-329:22, 341:1-341:25, 342:24-343:16, 418:8-422:19, 538:18-*

18  *542:14, 610:11-612:5.* Indeed, the evidence at the hearing even revealed that Randazza

19  was not truthful with *his own ethics expert*. *Id.* **at 1173:2-1176:20.**

20       Some of the most powerful evidence in this case arises from Randazza's ever-

21  evolving misrepresentations to cover up his misdeeds. As the Arbitrator will recall, with

22  respect to Xvideos, prior to being compelled to produce retainer agreements and billing

---

24  [1] Randazza demonstrated further inappropriate (and childish) behavior immediately after the arbitration. Upon arriving at her vehicle in the parking lot at the conclusion of the arbitration, Ms.

25  Krincek found that someone had stuck gum on the middle of the back windshield of her vehicle. After learning of this information, Mr. Dunlap of Excelsior notified Ms. Krincek that while walking to

26  his vehicle following the arbitration, he witnessed Randazza standing at the back of Ms. Krincek's vehicle taking a photograph with a phone apparently proud of himself for having the courage to

27  deface Ms. Krincek's vehicle.

28  [2] Randazza also proudly testified that he is not opposed to lying to opposing counsel throughout the course of litigation. **Tr. at 392:18-20.**

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
(702) 862-8800

1   records, Randazza represented to the State Bar that he represented Xvideos in resolving

2   one specific matter and, "after that, Randazza did not do any work for Xvideos." **Exhibit**

3   **372 at EMC001610.** Randazza further reported this same misrepresentation to his own

4   ethics expert -- that his representation of Xvideos was very limited in scope and ceased in

5   2009 – which then became a basis for his own expert's conclusions. **Tr. at 1173:5-13.** At

6   arbitration, Randazza was forced to acknowledge his misrepresentation to the bar and

7   admit that after the one specific matter he handled for Xvideos, rather than ceasing to do

8   further work for them as he reported to the State Bar and his ethics experts, he continued

9   to represent Xvideos and, in fact, billed time to Xvideos during each of the following 23

10  months he remained employed by Excelsior, all the while dissuading Excelsior from

11  pursuing claims against Xvideos. **Tr. at 538:8-541:22 and Exhibit 313 at p. 4.**

12      Likewise, with respect to TNAFlix, prior to Excelsior disclosing that it had obtained

13  Randazza's email communications with opposing counsel in the TNAFlix matter, Randazza

14  reported to the State Bar that after being offered a bribe by opposing counsel to never sue

15  his client again, Randazza responded by informing, "both Mr. Gurvits and Gibson that

16  Randazza would not accept payment in exchange for a limitation on who Randazza could

17  represent or not represent in the future." **Exhibit 372 at EMC001606 and Tr. 240:18-**

18  **243:2.** The evidence undeniably demonstrates that Randazza's representation to the State

19  Bar is not truthful. Randazza's emails prove that he explicitly initiated and negotiated for a

20  monetary payment for himself to conflict himself out of ever being adverse to TNAFlix. **Tr.**

21  **346:17-370.23.** Thus, at arbitration, Randazza was forced to abandon the position he took

22  with the State Bar – that Gurvits offered him a payment to conflict him out and he refused

23  that overture. Randazza's new story at arbitration became that he did negotiate for a

24  payment to conflict himself out (and to broker a sale of TNAflix for a fee), but it was all

25  make-believe and part of a negotiation strategy to get Liberty more settlement money. *Id.*

26  However, even this new story is belied by the evidence. *After the TNAflix matter was*

27  *settled*, Randazza not only drafted and forwarded agreements for TNAflix to retain him to

28  conflict him out and serve as a broker, but was almost desperate in his communications

...LER MENDELSON, P.C.
Attorneys At Law
...9 Howard Hughes Parkway
...ite 300
Las Vegas, NV 89169-5937
702.862.8800

Cir. 2002) (*quoting Akiona v. U.S.*, 938 F.2d 158, 161 (9th Cir. 1991)). A party's duty to preserve begins when the party reasonably should have known that the evidence is relevant to anticipated litigation. *Painter* at *10 *citing In re Napster*, 462 F.Supp.2d 1060, 1067 (N.D.Cal. 2006).

A plaintiff, specifically, has a duty to preserve any and all relevant documentation, including electronic documents, as soon as they begin considering litigation. *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F. Supp. 2d 456, 466 (S.D.N.Y. 2010) ("A plaintiff's duty is more often triggered before litigation commences, in large part because plaintiffs control the timing of litigation."); *see also, Cyntegra, Inc. v. Idexx Labs., Inc.*, No. CV06-4170PSG(CTX), 2007 WL 5193736, at *3 (C.D. Cal. Sept. 21, 2007) *aff'd*, 322 F. App'x 569 (9th Cir. 2009)(because plaintiffs control when litigation begins, they "must necessarily anticipate litigation before the complaint is filed"); The Sedona Conference Commentary on Legal Holds: The Trigger & The Process, pp. 271 (August 2010) ("On the plaintiff's side, seeking advice of counsel, sending a cease and desist letter, or taking specific steps to commence litigation may trigger the duty to preserve.... The test of the timing of the trigger is often based on when the party 'determine[d] [that] legal action is appropriate.'") (*citing Milenkamp v. Davisco Foods, Int'l*, 562 F.3d 971, 981 (9th Cir. 2009)).

Courts have broad discretion in determining a proper sanction for spoliation, including monetary sanctions, attorney fees, adverse inferences, and outright dismissal of a lawsuit. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991); *Herson v. City of Richmond*, No. C 09-02516 PJH LB, 2011 WL 3516162, at *4 (N.D. Cal. Aug. 11, 2011)(noting that a monetary sanction is a possible sanction for spoliation of evidence). Prior to imposing sanctions, the spoliated evidence must be shown to be relevant to moving party's case. *Holiday v. Am. Cas. Co. of Reading, PA*, 2013 WL 1955561 (*citing May v. F/V LORENA MARIE*, 2011 U.S. Dist. LEXIS 52695, 2011 WL 1875470 (D. Alaska May 16, 2011)); *Ingham v. United States*, 167 F.3d 1240, 1246 (9th Cir.1999). However, the spoliator is not entitled to a presumption that the deleted evidence was irrelevant. *Leon v.*

LITTLER MENDELSON, P.C.

1   with Gurvits to have those agreements executed. **Tr. 370:24-379-18**. The absurdity of

2   Randazza's latest story is evidenced by his own testimony:

3       Q:    Now, this is building on the last e-mail that we looked at where you
            had forwarded to Val the retainer agreement, the broker agreement

4               for TNAFlix on February 11th?
    A:    Yes.

5       Q:    Later in this afternoon, Val responds and he says, I forwarded to my
            client. Will let you know what they say. Do you see that?

6       A:    Yes.
    Q:    And you respond to Val, and you say, Please prevail upon them that

7               time is of the essence. Do you see this?
    A:    I do.

8       Q:    Time is of the essence with respect to this hypothetical sale of
            TNAFlix where you don't really have a client that's interested in

9               buying them - -
    A:    Yes.

10  **Tr. 37518-376:12**.

11

12      Again and again, Randazza has shown himself to not be credible. Excelsior

13  believes Randazza's testimony should not warrant any weight in any regard absent some

14  independent evidence supporting his testimony. Randazza's defense to the counterclaims

15  brought against him depend almost entirely upon his testimony that although his actions

16  may have appeared unethical, he engaged in them in order to benefit Excelsior. Setting

17  aside the clear illogical nature of many of Randazza's positions, his lack of credibility

18  makes it impossible to believe the explanations for his unethical behavior.

19  **B.    RANDAZZA SHOULD BE SANCTIONED FOR INTENTIONALLY
       WIPING HIS COMPANY LAPTOP**

20      The evidence of presented at arbitration warrants an adverse inference based upon

21  Randazza's spoliation of evidence. Spoliation of evidence is "the destruction or significant

22  alteration of evidence, or the failure to preserve property for another's use as evidence in

23  pending or reasonably foreseeable litigation." *Painter v. Atwood*, No. 2:12-CV-01215-JCM,

24  2014 WL 1089694, at *3 (D. Nev. Mar. 18, 2014); *see also United States v. Kitsap*

25  *Physicians Service*, 314 F.3d 995, 1001 (9th Cir. 2002). A party engages in spoliation as a

26  matter of law if the party had "some notice that the documents were potentially relevant" to

27  the litigation before they were destroyed. *Kitsap Physicians Service,* 314 F.3d at 1001 (9th

28

1   *IDX SYSTEMS CORP.*, 464 F.3d 951, 959 (9th Cir. 2006) ("a party can hardly assert any

2   presumption of irrelevance as to the destroyed documents"); *Cyntegra, Inc. v. Idexx*

3   *Laboratories, Inc.*, 2007 U.S. Dist. LEXIS 97417 (C.D. Cal. September 21, 2007).  Indeed,

4   in spoliation cases, "courts must not hold the prejudiced party to too strict a standard of

5   proof regarding the likely contents of the destroyed evidence because doing so allows the

6   spoliators to profit from the destruction of evidence." *Se. Mech. Servs., Inc. v. Brody*, 657 F.

7   Supp. 2d 1293, 1300 (M.D. Fla. 2009)(citing *Kronisch v. United States*, 150 F.3d 112, 128

8   (2d Cir. 1998)); *see also Ritchie v. U.S.*, 451 F.3d 1019, 1024-25 (9th Cir. 2006)(adopting

9   the Second Circuit's approach as discussed in *Kronisch*).

10          Here, Randazza, an attorney knowledgeable about spoliation, admittedly deleted

11  and destroyed evidence or failed to properly preserve evidence.  According to Randazza,

12  his relationship with Gibson, the CEO, and the Company began deteriorating in April 2012.

13  **Exhibit 302 at ¶¶ 34-46; Tr. at 102:19-21.** Randazza claims that the hostility and unlawful

14  behavior escalated throughout the month of August 2012—so much so that he openly

15  accused Gibson of attempting to cheat him out of a bonus.  **Tr. at 204:21-205:3.** On August

16  29, 2012, Randazza wrote Gibson an email resigning his employment with the company.

17  **Exhibit 74 (EMC000186).**  Later that day, Randazza further communicated that he was

18  already represented by counsel.  *Id.*  As an attorney, Randazza was keenly aware of his

19  need to preserve the electronic information contained on his company issued laptop. **Tr. at**

20  **469:7-10.**  Nonetheless, Randazza admittedly sought help from an Excelsior employee in

21  order to successfully wipe data from his laptop.  *Id.* **at 200:7-201:10, 465:10-467:24.**

22  Excelsior's expert, Michael Holpuch, testified and submitted a detailed report in this matter

23  which highlights that Randazza ran wiping software on his computer on four separate

24  occasions from August 28-30, 2012. **See Exhibit 305, Expert Report of Michael Holpuch**

25  **at p. 3 of 41; Tr. at 975:20-978:2, 982:12-16, 982:22-984:22.** Erika Dillon's (Randazza's

26  paralegal) laptop was also wiped on August 29, 2012 using the same software. *Id.* As a

27  result of the wiping software being run, "[n]o deleted files could be recovered from the

28  unallocated space of either device due to the use of Disk Utility Secure Erase." **Exhibit 305**

7.

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89 169-5937
702.862.8800

1    at p. 3 of 41;  Tr. at 978:20-981:19, 982:17-21, 985:5-8.

2          Randazza deliberately wiped his company issued laptop and instructed Dillon to do

3    the same in order to prevent discovery of files which likely would have revealed further

4    evidence of his unethical behavior and plans to resign. Even in situations where the exact

5    contents of the spoliated evidence cannot be determined because of the nature of their

6    destruction, courts have not hesitated to impose default judgments on parties that

7    deliberately destroy potential evidence. *See Commc'ns Ctr., Inc. v. Hewitt*, No. CIV.S-03-

8    1968 WBS KJ, 2005 WL 3277983, at *1-3 (E.D. Cal. Apr. 5, 2005)(use of wiping software

9    results in recommendation of default judgment and award of over $145,000 in expenses

10   and costs); *DirecTV, Inc. v. Randy Borow*, No. 03 C 2581, 2005 WL 43261, at *5-6 (N.D. Ill.

11   Jan. 6, 2005)(defendants use of wiping software warrants default judgment); *Kucala*

12   *Enterprises, Ltd. v. Auto Wax Co.*, No. 02 C 1403, 2003 WL 21230605, at *6 (N.D. Ill. May

13   27, 2003)("[t]he possibility that relevant documents were included in that mass deletion is

14   something this Court cannot overlook-especially given the nature of the [wiping software]").

15         While Randazza testified that Excelsior's legal files were preserved on his "Jungle

16   Disk" cloud storage service, by wiping his laptop it is highly likely that he eliminated

17   documents and correspondence **related to his outside practice and personal business**

18   **interests** that would further support the claims Excelsior brings against him. ***See Tr. at***

19   ***197:20-199:14, 201:11-16 (only representing that Excelsior's data was preserved).***

20   Had Randazza not wiped his laptop, Respondent could have uncovered further evidence

21   regarding the identity of clients that created conflicts of interest, further evidence of

22   improper negotiations with adverse parties, evidence of the amount of work Randazza was

23   doing in furtherance of his own law practice at the expense of Excelsior, and further

24   evidence of Randazza's plans to resign.  Such evidence goes to the heart of this case.

25   Moreover, Randazza's allegation that he wiped his laptop due to concerns about private

26   information such as tax return information being on the laptop simply does not hold water.

27   Randazza had the same concerns regarding his iPhone and simply refused to turn over his

28   iPhone until an agreement was reached for a third party to examine and retrieve

LITTLER MENDELSON, P
ATTORNEYS AT LAW

1   information from the iPhone.  As an attorney, Randazza is well-aware that wiping the

2   Company owned and issued laptop was improper.  He risked doing so for a reason – to

3   spoliate evidence.  Randazza's failure to preserve such potentially relevant evidence

4   should **at least subject him to an adverse inference** that the documents and files wiped

5   from his laptop would have supported Excelsior's defenses and counterclaims in this

6   matter. Therefore, Excelsior requests that the Arbitrator make a formal finding that

7   Randazza's wiping of his laptop warrants an adverse inference in this matter.

8

9   **C.    RANDAZZA DID NOT PROVE HIS CLAIMS AGAINST EXCELSIOR BY A PREPONDERANCE OF THE EVIDENCE**

10          **1.    Reimbursement of Expenses Under Cal. Labor Code § 2802 and**
11                  **Unpaid Wages and Vacation Time Under Cal. Labor Code §§ 201-**
                    **203**
12
13                  **a.    The California Labor Code Does Not Apply to Randazza's**
                           **Employment in Nevada**

14          Randazza's First and Second causes of action allege violations of the California

15  Labor Code even though the alleged conduct occurred while Randazza lived and worked in

16  Nevada. In Claim One, Randazza alleges that Excelsior failed to reimburse and indemnify

17  for business expenses incurred in Nevada during 2012 in violation of California law. In

18  Claim Two, Randazza alleges Excelsior failed to pay him his final wages in August 2012 in

19  accordance with California law, even though Randazza lived and worked in Nevada.

20  Randazza admits he moved to Nevada in mid-2011 to continue his role as General

21  Counsel for Excelsior. **Tr. at 494:18-495:15; Exhibit 302 at ¶ 21.** Thus, the evidence

22  offered in support of Claim One and Claim Two solely relate to alleged conduct that

23  occurred in Nevada to a Nevada employee.

24          While Randazza argues that the Governing Law clause in the Employment

25  Agreement specifying that California law will govern the interpretation of the Employment

26  Agreement, acts to import California's wage and hour laws to his employment in the State

27  of Nevada, his position fundamentally confuses the purpose of a choice of law provision.

28

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Ste. 300
Las Vegas, NV 89169-5937
702.862.8800

1    The Governing Law clause in Section 9(E) states that the **Agreement** "shall be governed

2    by and construed in accordance with the laws of the State of California, without regard to

3    conflict of laws." **Exhibit 332.** Unfortunately for Randazza, the Governing Law clause

4    does not imply that Randazza is subject to all of the protections of California law without

5    regard to the state in which he primarily works. Rather, a choice of law provision does

6    nothing more than govern the law used for claims arising out of the contract, such as

7    contractual claims. Randazza's First and Second Causes of Action are statutory and not

8    contractual, and are completely unrelated to the Governing Law clause.

9        Case law, including that within the Ninth Circuit, establishes that choice of law

10   clauses apply only to claims asserting breach of a contract and not to statutory claims. *See,*

11   *e.g., Dollar Systems, Inc. v. Avcar Leasing Systems, Inc.*, 890 F.2d 165, 171 (9th Cir. 1989)

12   (choice of law clause does not govern statutory cause of action not founded on

13   performance or interpretation of contract); *Telequest, Inc. v. Norton Cattle Co.*, 189 F.3d

14   474,*1; 1999 U.S. App. LEXIS 18269 (9th Cir. 1999)(unpublished disposition)(applying

15   Nevada choice of law rules, holding that forum selection clause "only governs the

16   interpretation of the agreement, not the resolution of tort claims," which "ordinarily are not

17   controlled by contractual choice of law provisions"); *Med. Instrument Dev. Labs. v. Alcon*

18   *Labs.*, No. C 05-1138 MJJ, 2005 WL 1926673 (N.D. Cal. Aug. 10, 2005) (choice-of-law

19   clause does not govern non-contractual claim arising under California Business &

20   Professions Code); *Red Roof Inns, Inc. v. Murat Holdings, L.L.C.*, 223 S.W.3d 676, 684

21   (Tex. App. 2007) (choice-of-law clause does not cover statutory claims); *Ayco Co. v. Frisch*,

22   795 F. Supp. 2d 193, 203 (N.D.N.Y. 2011) (choice of law clause stating agreement "shall

23   be governed by and construed and enforced in accordance with the laws" of New York

24   does not govern non-contractual claims). The Arbitrator may further wish to review his

25   Order dated July 3, 2013 for its general agreement that California's wage and hour laws do

26   not act extraterritorially. **Attached hereto as Exhibit A.**

27       Randazza's claims arise under the California Labor Code and, therefore, are non-

28   contractual claims which are not governed by the Employment Agreement. *Narayan v.*

10.

LITTLER MENDELSON, P
ATTORNEYS AT LAW
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

1   *EGL, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010) (benefit claims brought under California Labor

2   Code "do not arise out of the contract, involve the interpretation of any contract terms, or

3   otherwise require there to be a contract"); *SEC v. Elmas Trading Corp.*, 683 F. Supp. 743,

4   749 (D. Nev. 1987)(source of the right at issue, rather than the jurisdictional basis of the

5   court, shall control the choice of law). Thus, the Governing Law clause does not offer

6   Randazza the protections of California law for his employment in Nevada. As a resident of

7   Nevada performing work solely in Nevada during the time period specified in the allegations

8   of the claims, Randazza has no basis for asserting any statutory claims brought pursuant to

9   the California Labor Code and the claims should be dismissed.

10          Even if Randazza's theory was correct and California substantive law applied to his

11   employment relationship with Excelsior while working in Nevada by virtue of the Governing

12   Law clause, California's wage and hour laws would still not apply to his employment in

13   Nevada. California follows the presumption against extraterritoriality. In other words,

14   California does not apply its laws outside of its borders unless intent to apply

15   extraterritorially is set forth explicitly within a statute. See *Sullivan v. Oracle Corp.*, 51 Cal.

16   4th 1191, 1207 (Cal. 2011) (noting California's long standing presumption against

17   extraterritoriality). If the Governing Law clause imports all of California law to the

18   employment relationship between Excelsior and Randazza, Randazza cannot pick and

19   choose which parts of California law he wants and discard the others. He is also forced to

20   live with California's presumption against extraterritoriality.[3]

21              *b.*    ***Excelsior has Correctly Compensated Randazza***

22          Section 2802(a) provides that "[a]n employer shall indemnify his or her employee for

23   all necessary expenditures or losses incurred by the employee in direct consequence of the

24

25   [3] In fact, the Supreme Court of California reinforced its reliance on the presumption against
    extraterritorial application in a wage and hour case and held that California laws, unless explicitly
26   stated within the language of the statute, do not extend to acts occurring outside of the state.
    *Sullivan*, 51 Cal. 4th at 1207. Moreover, on May 3, 2012, in *Wright v. Adventures Rolling Cross
27   Country, Inc.*, 2012 U.S. Dist. LEXIS 104378 (N.D. Cal., May 3, 2012), the court noted that the
    presumption against extraterritorial application of state law applies to the California Labor Code with
28   regard to claims for unpaid wages.

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

discharge of his or her duties, or of his or her obedience to the directions of the employer, even though unlawful, unless the employee, at the time of obeying the directions, believed them to be unlawful." Cal. Lab. Code § 2802(a). Similarly, Section 201 states that "[i]f an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately." Cal. Lab. Code § 201. Randazza claims he has not been compensated for: (1) a $25,000 loan he made to the company which he attempts to characterize as an advancement in furtherance of the Oron litigation, (2) one day of his final week's salary, (3) a wage increase he claims he was owed during the last two months of his employment totaling $2,281.95, (4) unused vacation time, and (5) various bonuses he claims were vested prior to his termination (Oron settlement, Oron attorney fee award, Excubitor gross instead of net, alleged Pennsylvania settlement and unspecified other settlements).[4] **Tr. at 492:19-495:15; Exhibit 302.** As discussed below, all of Randazza's claims are meritless.

The evidence establishes that Randazza is not entitled to the compensation and reimbursements he claims he is owed in light of the following:

- The Company never received full payment of the Oron settlement given that the money remains in Randazza's trust account and is in dispute in this matter. **Tr. at 495:16-497:5.** Respondent's requirement to pay the $25,000 loan under the Promissory Note is not triggered until the settlement money is received (which is yet to occur). **See Exhibit 373.** Additionally, and as discussed in Dennis Kennedy's Expert Report, Randazza committed malpractice and breached the fiduciary duty owed to Excelsior when he entered into the improper loan agreement with the company. **Exhibit 304, Kennedy's Report at ¶¶ 32.9 - 32.9.7; Tr. 1022:20-1025:3.** In light of his unethical behavior, the transaction is voidable at Liberty's election. **Exhibit 304, Kennedy's Report at ¶ 32.9.7.** Excelsior formally seeks that the

---

[4] Randazza's Amended Arbitration Demand alleges he is also owed a final expense report totaling $1,103.70. However, during the hearing, Randazza's counsel admitted that Randazza is no longer pursuing such a claim. **Tr. at 492:19-493:6.**

1    $25,000 note be voided.

2    • The Fair Labor Standards Act allows an employer to prorate an employee's salary in

3    the first and last weeks of employment based on actual time worked. *See* 29 C.F.R.

4    § 541.602. Nevada's state wage and hour law typically mirrors provisions of the

5    FLSA unless language from a Nevada statute indicates otherwise. *See Terry v.*

6    *Sapphire Gentlemen's Club*, 130 Nev. Adv. Op. 87, 336 P.3d 951, 955-956 (Nev.

7    2014). Gibson, Excelsior's CEO, testified that the company pro-rated Randazza's

8    final paycheck to the amount of days he actually worked as was customary. **Tr. at**

9    **728:22-729:2.** In light of these facts, Randazza was correctly paid for the actual

10   amount of days he was employed by the Company during his final week as

11   permitted by law.

12   • The wage increase Randazza claims he is owed was optional to the Company. In

13   accordance with the Employment Agreement, Excelsior elected not to give

14   Randazza the raise he claims he was entitled to in light of unforeseen business

15   circumstances. *See* **Exhibit 332**, **Section 3.B.** Gibson testified that Randazza

16   advised him that the Company was not obligated to give him the salary increase he

17   now claims he is owed. **Tr. at 727:5-728:21.** While Randazza claims that in order

18   for Excelsior to not owe him the raise the Company was required to execute a

19   Memorandum of Understanding reflecting the same, Gibson testified that Randazza

20   never advised him of such a requirement and never informed him of the need to

21   consult with another attorney for assistance in interpreting the Agreement. *Id.*

22   Additionally, in correspondence with Gibson on August 16, 2012, Randazza

23   admitted that he had advised Gibson that the company was not obligated to give him

24   a raise. **Exhibit 327.**

25   • As to the paid time-off and vacation Randazza claims he is owed, he presented no

26   evidence that he was owed any additional vacation or paid time-off than he was

27   already compensated for. Additionally, Gibson testified that he was careful to

28   ensure that all of the PTO owed to Randazza, was paid in his final check. **Tr. at**

13.

LITTLER MENDELSON, P.C.
Attorneys at Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

**724:13-726:14; Exhibits 392-393.**

- Contrary to Randazza's belief, he is not entitled to the bonuses he claims were vested because: (1) the 25% bonus off the Oron settlement he claims he was owed should be disgorged/forfeited in light of his malpractice, breach of fiduciary duty, and damages caused to the Company[5] (**See Exhibit 304, Kennedy Report at ¶51-52.5**); (2) As to his claimed bonus off the Oron fee award, there is no evidence that the Company received the fee award from the District of Nevada and even if there were, Randazza would not be entitled to a portion of it because his agreement only entitles him to a portion of settlement proceeds, not fee awards[6] (**See Exhibit 332 at Section 3.C stating Randazza receives bonus from "settlement funds"**); (3) As to his claim that he is owed an additional portion of the Excubitor bonus, Randazza, as set forth below, Randazza is not entitled to receive any Oron-related bonus because of his misconduct in handling those matters.  Even if Randazza were entitled to receive a bonus on the Oron settlement, he was only entitled to bonuses off the net of settlement awards and not the gross amount he now claims he is owed (**See Tr. at 497:6-498:8; Exhibit 383**)(acknowledging that Agreement did not adequately address whether bonus should be paid on net or gross).  In an attempt to avoid the well settled rule that ambiguities in a contract are to be construed against the drafter, during the hearing Randazza misrepresented his role as the drafter of the employment agreement.  In reality, after the parties discussed Randazza potentially joining the Company, Excelsior sent him an *offer letter* and Randazza responded by sending Gibson the draft Employment Agreement (**Tr. 666:25-668:7, 671:25-672:11, 673:17-674:4**).  In light of these facts, any ambiguity as to whether

---

[5] Additionally, the Company was forced to resettle the Oron litigation and $275,000 of that original settlement amount was returned to Oron.  Accordingly, even if Randazza were owed a bonus off the settlement it would not be 25% of the $550,000 original settlement (it would be a portion of the $275,000 resettlement value).

[6] In an email to opposing during the Oron litigation Randazza was requesting that Oron pay for half of the fees expended on the litigation and while asking for them to extend an "olive branch" he admitted that he doesn't "get paid more for [a fee award]." **Exhibit 376.**

1    Randazza should be paid off the gross vs. the net, should be construed against

2    Randazza; and (4) the other bonuses he claims he was owed are entirely

3    speculative, no evidence was presented in this case which establishes a right to a

4    portion of such bonuses, and any such bonus should be disgorged.

5          **2.**      **Unpaid Wages and Penalties Under NRS § 608.050**

6          In the alternative to Randazza's California Labor Code claims, Randazza alleges

7    that he is entitled to unpaid wages and penalties under NRS § 608.050. As noted

8    previously, Randazza's allegation that the damages he seeks are provided for under this

9    statute clearly misses the mark. NRS § 608.050 allows the continuation of regular wages to

10   an employee who is not paid his or her regular wage when that wage becomes due after

11   the employment relationship terminates, for up to 30 days. *Orquiza v. Walldesign, Inc.*, No.

12   2:11-CV-1374 JCM CWH, 2012 WL 2327685, at *6 (D. Nev. June 19, 2012). These

13   penalties "apply only to the **regular wages** owed to an employee for the work performed

14   between pay periods at the time employment ended." *Id.* at 5 (emphasis added); *Evans v.*

15   *Wal-Mart Stores, Inc.*, No. 2:10-CV-1224 JCM VCF, 2014 WL 298632, at *3-5 (D. Nev. Jan.

16   24, 2014) *see also* NRS 608.012 (specifically noting that a bonus is not within the definition

17   of wages under Nevada law). Accordingly, Randazza's allegation that the alleged unpaid

18   $25,000 loan and the various bonuses he claims he is owed give rise to this claim is an

19   attempt to fit a square peg into a round hole. Additionally, this statute applies only when an

20   employee was discharged or laid off. NRS § 608.050 ("[w]henever an employer of labor

21   shall discharge or lay off employees"). As discussed *infra*, Randazza was not discharged or

22   laid off—he resigned his employment. Accordingly, NRS § 608.050 is inapplicable.

23         Even if the statute were applicable to the instant situation, Nevada case law holds

24   that no private right of action exists to enforce this statute. *McDonagh v. Harrah's Las*

25   *Vegas, Inc.*, No. 2:13-CV-1744 JCM CWH, 2014 WL 2742874, at *3 (D. Nev. June 17,

26   2014). In actuality, enforcement of this statute, and many others in NRS Chapter 608, lies

27   with the Nevada Labor Commissioner—not private litigants. *Id.* Given that no private right

28   of actions exists to enforce the penalties envisioned in NRS § 608.050, the instant claim

15.

LITTLER MENDELSON, P
Attorneys At Law
3960 Howard Hughes Parkway
Ste 300
Las Vegas, NV 89169-5937
702 862 8800

1    should be dismissed accordingly.[7]

2           **3.    Breach of Contract**

3         Randazza claims Excelsior breached his Employment Agreement by not paying him

4    a 12-week severance he claims he was entitled to, a 25% bonus off of the Oron settlement,

5    and a bonus off any additional settlements received since his employment ended.[8]

6    Randazza has not proven his allegations by a preponderance of the evidence because the

7    evidence shows that he resigned his employment which excused Excelsior's obligation to

8    pay a severance, Randazza has prevented Excelsior from ever collecting the actual Oron

9    settlement funds and committed a material breach of the agreement which excuses

10    Excelsior's performance under the agreement.    Additionally, Randazza presented no

11    competent evidence which shows any other settlements were ever received by the

12    company to which he would be entitled a portion thereof.

13         The well-established elements of a cause of action for breach of contract are: (1) the

14    existence of a contract; (2) Plaintiff's performance or excuse for nonperformance; (3)

15    Defendant's breach; and (4) the resulting damages to Plaintiff.[9]  *Careau & Co. v. Security*

16    *Pacific Business Credit, Inc.*, 222 Cal. App. 3d 1371, 1388 (1990).  When a party's failure to

17    perform a contractual obligation constitutes a material breach of the contract, the other

18    party may be discharged from its duty to perform under the contract. *Brown v. Grimes*, 192

19    Cal. App. 4th 265, 277, 120 Cal. Rptr. 3d 893, 902 (2011)(citing 1 Witkin, Summary of Cal.

20    Law (10th ed. 2005) Contracts, §§ 813, 814, p. 906 (Witkin)("*Material* failure of

21    consideration discharges the other party's duty").

22     

---

[7] Even if a cause of action existed for violation of NRS § 608.050, as discussed *supra* Respondent fulfilled all payment obligations it had at the time of Randazza's termination. Accordingly, Randazza is not entitled to any of the alleged items of damages he seeks.

[8] Randazza's Amended Arbitration Demand claims Randazza was also owed money for Excelsior's failure to pay expenses to attend the annual International Trademark Association Conference. Even so, Randazza did not testify that he continues to seek such alleged damages. Even if he were, Randazza admits he never attended the conference and thus did not incur any such expenses. **Exhibit 302 at ¶ 100.**   He also presented no evidence at the hearing to establish any other alleged damages flowing from this claimed breach. Randazza's inability to establish damages from this alleged breach renders it meritless.

[9] Excelsior agrees that California law governs the determination of whether it breached Randazza's Employment Agreement in light of the choice of law provision contained in the agreement.

LITTLER MENDELSON, P.

1    Excelsior does not dispute that it never paid Randazza the severance. Randazza

2  resigned his employment and is not entitled to severance for a resignation. **Exhibit 332,**

3  **Section 7.B.** That is exactly what Randazza did when he emailed Gibson to tell him that it

4  was necessary to withdraw from representing the company in further matters. **Exhibit 329**

5  **(EMC000186).**  An analysis of Randazza's communications with various individuals prior to

6  sending his resignation email on August 29, 2012 reveals that (even though he may have

7  soon after regretted his actions) he undoubtedly meant to resign on the day in question and

8  Excelsior reasonably construed his email communication as such:

### August 24, 2012

9

10    **6:28 p.m. Randazza text to Dillon (Randazza's paralegal at Excelsior):**
Btw: if I get my severance, which I might, you're not taking a pay cut of any
11  significance.  If at all.  **Exhibit 421 (Dillon Text Messages).**[10]

### August 27, 2012
12

13    **1:13 p.m. Randazza text to Dillon:** Dictations go to eed@randazza.con.
Com. From now on. **Exhibit 421.**[11]
14

### August 29, 2012
15

16  **9:26 a.m. Randazza Skype message to Dillon:** today may be D-Day.

17  **9:28 a.m. Dillon Skype message to Randazza:** it shall be done.

18  **9:28 a.m. Randazza Skype message to Dillon:** when you do quit, make
sure you delete your jungle disk program.

19  **9:29 a.m. Dillon Skype message to Randazza:** roger.  **Exhibit 375 (Skype**
**Conversation).**
20

21    **12:28 p.m. Randazza email to Gibson and Henry Leonard:** I'm not
forwarding $550,000.  I'm taking my share, the costs we owe to outside
22  parties, and paying myself back the $25,000 I advanced.  Then I'm giving you
your net, which is more than you expected ... **Exhibit 328; see also Tr.** at
23  461:14-462:15.

24    **12:32 p.m. Randazza text to Dillon:** Get ready.  Make sure to log out of
servers.

25

26  [10] Randazza doesn't deny that even as early as August 24, 2012 he and Dillon had already
discussed an arrangement for her to leave with him to work at Randazza Legal Group. **Tr.** at
27  **474:2-16.**  Randazza also confirmed that on August 24, 2012 he filed Articles of Incorporation for
Randazza Legal Group in Nevada. **Id.** at 474:24-475:4.
[11] Randazza also acknowledges that at this time he had already set-up an email account for Dillon
28  at Randazza Legal Group. **Tr.** 474:7-16.

17.

ITTLER MENDELSON, P.
[illegible address lines]

**Dillon text to Randazza:** Oh jeeze. Really? Hold on. I have some shit I need to wipe delete. Give me 15?

**Randazza text to Dillon:** K. Just be ready.

**Dillon text to Randazza:** Yeah. I just want to make sure I have everything together.

**Dillon text to Randazza:** Hey. I need a little more time. I've got the disk stuff transferring now. It's segregated on the cf legal, but it's not done transferring to the sharedadmin.

**Randazza text to Dillon:** Ok.

**12:45 p.m. Dillon text to Randazza:** There are still some personal things in your office (tools, shoes, guns, boxes). Should I be trying to take all of that with me?

**Randazza text to Dillon:** Ya.

**Dillon text to Randazza:** Okay then I have a lot of stuff to get out of here. Would it be possible for me to walk tmrw so I can come in early and clear this all out or is that not gonna happen?

**Randazza text to Dillon:** Yep.

**Dillon text to Randazza:** That was an or question.

**Randazza text to Dillon:** You can boogie tomorrow.

**Dillon text to Randazza:** Phew. Sweet. I'm going to run to lunch while this finishes transferring.

**Randazza text to Dillon:** Just log out of Jungle disk when you leave today. And erase any emails that have the keys in them. (put them in your gmail).

**Dillon text to Randazza:** I've already removed any emails with your PW or links.

**Randazza text to Dillon:** Ok Good.

**Dillon text to Randazza:** I'll check the email again tonight. And I'll get Nick to help me finish a wipe of everything.

**Randazza text to Dillon:** Ok.

**1:06 p.m. Randazza text to Dillon:** Might be today.

**Dillon text to Randazza:** Ok. I might have a hard time getting all of your stuff out if they object.

**Randazza text to Dillon:** Ok. Exhibit 421.

**3:10 p.m. Randazza** email to **Gibson, Henry Leonard, and Brian**

18.

**Lowderman:** Given our now openly adversarial relationship, it seems appropriate that I withdraw from representing Liberty in any further matters. There might be a way I can continue to wind down existing matters, but it's going to require a call to discuss it. **Exhibit 329 (EMC000186).**

**3:14 p.m. Randazza text to Dillon:** Anything going on?

**Dillon text to Randazza:** Yeah. We should talk when you have a minute.

**Randazza text to Dillon:** Ok... So they are making it out to be like it might all get worked out?

**4:05 p.m. Randazza text to Dillon:** Call me.

**Dillon text to Randazza:** Hey. Can def not call you ATM.

**Randazza text to Dillon:** Ok. Pull the trigger.[12]

**4:15 p.m. Randazza text to Dillon:** Right away.

**Dillon text to Randazza:** Hold on. I want to make sure the Jungle Disk is offline.

**Randazza text to Dillon:** It is

**Dillon text to Randazza:** Ok

**Randazza text to Dillon:** Fischer killed it.[13]  Report to RLG office tomorrow. :) **Exhibit 421.**

Randazza's communications confirm that he was undoubtedly planning his exit from Excelsior.  The intent of Randazza's email to Gibson on August 29, 2012 was clear—that he could no longer represent the Company and that he could only "potentially" work to wind up his matters with them, but even that would require a discussion with Gibson. **Exhibit 329 (EMC000186).**  Randazza desperately attempts to soften the implications of all the communications he had with Dillon prior to sending his resignation email by arguing that he was in a different time zone and that he likely sent those communications **after his resignation email**.  Other than his self-serving testimony, there is no evidence that Randazza being on the east coast would change the time stamps displayed on his company email account or on Dillon's phone.  Excelsior's email server is set to Pacific Time

---

[12] Randazza testified that by stating "Pull the trigger," he meant for Dillon to quit. **Tr. at 488:12-17.**
[13] "Fischer" refers to Jason Fischer, an employee of Randazza Legal Group.  **Tr. at 489:4-8.**

19.

LITTLER MENDELSON, P

1   and would be entirely unaffected by Randazza's travel. **Tr. at 712:19-714:7; 818:16-25;**

2   **846:4-847:5.** Similarly, the text messages were provided from Dillon's phone, which was in

3   Nevada at the time of the communications. **See Exhibit 421; Tr. 479:1-14.**

4       Randazza's other actions are consistent with the fact that he intended to resign on

5   August 29, 2012. A forensic analysis of Randazza's laptop revealed that he ran software

6   specifically designed to wipe his laptop on four separate occasions during the last week of

7   his employment. **See Exhibit 305, Holpuch Report at p. 3 of 41.** The first time the wiping

8   software was utilized was on August 28, 2012 at 12:08 p.m. PDT—more than 24 hours

9   prior to sending his resignation email. **Compare Exhibit 305, Holpuch Report at p. 3 of**

10  **41 with Exhibit 329.** The wiping software also ran twice to completion on August 29, 2012.

11  *Id.* The evidence at the hearing also revealed that days prior to his resignation, Randazza

12  had cleaned out belongings from his office and audibly stated "Fuck this shit, I quit" during

13  a Company happy hour. **Tr. at 454:13-18, 715:10-716:1.** These are not the actions of

14  someone who did not intend to resign on the day in question. Given that Randazza

15  voluntarily resigned his employment he is not entitled to the severance he now seeks under

16  the Employment Agreement.

17      Randazza also claims Excelsior breached the contract by not paying him a "non-

18  discretionary" bonus on the Oron settlement funds. As discussed previously, Randazza

19  was only entitled to receive such a bonus once it was "received by Excelsior." **Exhibit 332**

20  **at EMC000496.** It is undisputed that the Oron settlement funds remain in Randazza's trust

21  account as disputed funds, thus Excelsior has never received them. Additionally, the

22  evidence at the hearing established that Excelsior was forced to resettle the Oron litigation

23  and paid back $275,000 to Oron as a direct result of allegations raised by Oron regarding

24  Randazza's malfeasance during the Oron litigation. Indeed, on November 16, 2012 Oron

25  filed an arbitration demand against Liberty. **Exhibit 334.** The demand alleged, amongst

26  other things, that Randazza utilized a hacker to obtain privileged and confidential

27  documents/information for use in the litigation. **Exhibit 334 (EMC000738); Tr. at 768:18-**

28  **769:12.** Oron also alleged that in contravention of the settlement agreement, Randazza

LITTLER MENDELSON, P.C.
Attorneys at Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

1   (and Liberty) did not dissuade others from bringing suit against Oron and actually assisted

2   another company in filing a "copycat" lawsuit against them. **Exhibit 334 (EMC000741).** As

3   discussed in depth *infra*, Randazza was the sole cause of both of these serious allegations

4   made in the arbitration demand.

5       Because of these allegations, Excelsior's new counsel engaged in settlement

6   discussions with Oron and eventually Liberty was forced to resettle the Oron case for

7   $275,000 (which was half of the previous settlement amount of $550,000). **Tr. at 765:17-**

8   **768:5,   768:18-769:12.**  Randazza's unethical behavior undoubtedly breached his

9   employment agreement with the company and excuses Excelsior from their performance

10  obligations under the contract. *See Brown*, 192 Cal. App. 4th at 277.   In light of these facts,

11  Randazza should not be entitled to recover a bonus from the Oron settlement (and even if

12  he was, such a bonus should be on the $275,000 adjusted settlement amount and not the

13  $550,000 original settlement value).

14      Finally, Randazza claims that Excelsior breached its agreement if it has not paid any

15  other settlements it received since Excelsior terminated his employment.   As previously

16  stated, Randazza presented no evidence which shows Excelsior received additional

17  settlements which were vested at the time he resigned his employment.  Accordingly, he

18  failed to meet his burden of proof with respect to this alleged breach.

19          4.   **Wrongful Termination**

20      Randazza claims he was wrongfully terminated in violation of Nevada public policy.

21  As discussed previously, Randazza's claim fails because there is no evidence that he was

22  terminated or constructively discharged.  Instead, Excelsior proved by a preponderance of

23  the evidence that Randazza voluntarily resigned his employment from the company.

24      Nevada law recognizes a "tortious discharge" exception to the at-will employment

25  doctrine. *Wayment v. Holmes*, 112 Nev. 232, 236, 912 P.2d 816, 818 (1996). "This

26  exception states that '[a]n employer can dismiss an at-will employee with or without cause,

27  so long as the dismissal does not offend a public policy of this state.'" *Id.* (citing *Vancheri v.*

28  *GNLV Corp.,* 105 Nev. 417, 421, 777 P.2d 366, 369 (1989)). Terminating an employee for

21.

LITTLER MENDELSON, P.
Attorneys At Law
3960 Howard Hughes Parkway
Ste. 300
Las Vegas, NV 89169-5937
702.862.8800

1   reasons which violate public policy gives rise to an action for tortious discharge. *D'Angelo v.*
2   *Gardner,* 107 Nev. 704, 712, 819 P.2d 206, 212 (1991). The Nevada Supreme Court has
3   held that "public policy tortious discharge actions are severely limited to those rare and
4   exceptional cases where the employer's conduct violates strong and compelling public
5   policy." *Sands Regent v. Valgardson,* 105 Nev. 436, 440, 777 P.2d 898, 900
6   (1989)(concluding that a legislative public policy against age discrimination was not
7   sufficiently strong to warrant an exception to the at-will employment doctrine). Additionally,
8   "recovery for retaliatory discharge under state law may not be had upon a 'mixed motives'
9   theory; thus, a plaintiff must demonstrate that his protected conduct was *the* proximate
10  cause of his discharge. *Allum v. Valley Bank of Nevada,* 114 Nev. 1313, 1319-20, 970
11  P.2d 1062, 1066 (1998)(emphasis added).
12          Randazza's claim that he was wrongfully terminated is meritless because Excelsior
13  did not terminate his employment. Instead, as Excelsior executives expected in light of his
14  erratic behavior, Randazza resigned his employment. **See Exhibit 329 and discussion**
15  *supra*.    Additionally, even if the Arbitrator were to find that Randazza was terminated
16  (which Excelsior maintains was not the case), there is adequate evidence to conclude that
17  it was warranted in light of the then recently revealed fact that Randazza was negotiating
18  the $75,000 bribe from Oron. His involvement in the Oron bribe negotiations would **at least**
19  amount to a mixed motive for terminating/constructively discharging Randazza which is
20  fatal to his wrongful termination claim. *See Allum,* 114 Nev. at 1319-20.
21          5.      **Hostile Work Environment**
22          Randazza claims that he was sexually harassed when: (1) Excelsior filmed a scene
23  for a pornographic film in his office in April 2012; and (2) when Gibson allegedly performed
24  oral sex on another Excelsior employee while riding in Randazza's vehicle after a company
25  retreat to Lake Mead in August 2012.    Randazza did not prove his claim by a
26  preponderance of the evidence because the evidence shows that the scene was not
27  offensive to Randazza, unwelcome, or in any way related to his status as a straight male.
28  Additionally, despite strong evidence to the contrary, Randazza's testimony is the only

22.

LITTLER MENDELSON, P.S
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

1    evidence that the alleged sex act in his car ever occurred.

2    To prove a *prima facie* case of a hostile work environment under Title VII or Nevada

3    law, Randazza must show that: (1) he was subjected to verbal or physical conduct of a

4    harassing nature and based on a protected classification; (2) this conduct was unwelcome;

5    and (3) the conduct was sufficiently severe or pervasive to alter the conditions of his

6    employment. *Galdamez v. Potter*, 415 F.3d 1015, 1023 (9th Cir. 2005) (based on race and

7    national origin); *Nichols v. Azteca Restaurant Enter., Inc.*, 256 F.3d 864, 873 n.4 (9th Cir.

8    2001) (based on sex). Here, Randazza claims gender-based sex harassment because he

9    is a heterosexual male. As such, he must prove that any harassment took place "because

10   of sex." *Nichols*, at 873 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75,

11   79 (1998) (emphasis added). When hostility is not based on the protected status, it is not

12   actionable harassment. *See, e.g., Hervey v. Cnty. of Koochingching*, 527 F.3d 711, 722

13   (8th Cir. 2008) (plaintiff failed to show that her supervisor's conduct, which included

14   criticism, shouting at her, and changing her reporting relationships, was due to her gender).

15   The primary element of a hostile work environment claim is proof that "the workplace

16   is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe

17   or pervasive to alter the conditions of the victim's employment and create an abusive

18   working environment." *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993). The conduct must

19   also be both subjectively and objectively offensive. *Faragher v. City of Boca Raton*, 524

20   U.S. 775, 787 (1998). Accordingly, Randazza must show that he subjectively regarded the

21   environment as severe and abusive such that it altered his employment conditions. *Burrell*

22   *v. Star Nursery, Inc.*, 170 F.3d 951, 954-55 (9th Cir. 1999)("To assert a Title VII claim

23   based on a hostile work environment, a plaintiff must allege a pattern of ongoing and

24   persistent harassment severe enough to alter the conditions of employment . . . The

25   working environment must both subjectively and objectively be perceived as abusive

26   because of the harassment")(internal citations and quotations omitted).

27   It must be noted that the Company believes Randazza included his sexual

28   harassment allegation purely to embarrass Gibson, ensure the Company would not make

23.

LITTLER MENDELSON, P.C.

1   its dispute with Randazza public, and serve as a vehicle to invade Gibson's privacy by

2   making spurious allegations.   The evidence introduced at the hearing confirms the

3   Company's suspicions. After filing the Arbitration Demand, Randazza was in

4   communication with Excelsior's Director of Marketing, Chip Carter ("Carter"), and

5   questioned whether Gibson had sent the state bar complaints Excelsior filed against

6   Randazza to the media or any of his clients. **Tr. at 332:16-335:22; John Thurston Carter**

7   **("Chip") Deposition Transcript at Exhibit 89 (Bates No. QUIVX002016-2017).**  When

8   Carter told Randazza that he had not sent them to the media because Randazza's

9   allegations raise too many questions and Gibson didn't want the sexual harassment stuff to

10  be public, Randazza responded by stating that Gibson's fear was "[a] fear I tried to foster."

11  *Id.*   Additionally, during a conversation Randazza had with Excelsior executive Brian

12  Dunlap ("Dunlap") while at the Phoenix Forum in April 2013, Randazza told Dunlap "[i]f I

13  have to file and fight for the $200,000 I deserve, I might as well go for $4 million." **Tr. at**

14  **881:3-884:4; Brian Dunlap Deposition Transcript at Exhibit 302 (EMC003473).**

15  Randazza also conceded to Dunlap that his Arbitration Brief was "out there." *Id.*  Both of

16  these instances indicate that the sexual harassment allegations Randazza asserts are not

17  centered in a pursuit of justice, but are actually a means by which Randazza felt he could

18  bully Excelsior and Gibson.

19       With regard to the allegations relating to the scene in his office, Randazza claims

20  that when he was informed that Excelsior was going to use his office in a scene prior to

21  filming, he believed the warning to be in jest. Randazza claims that the next day, however,

22  he discovered that his office had been used in filming the scene, including the desk where

23  he keeps pictures of his children. Randazza also claims that the next day he complained

24  about the use of his office to Gibson, who responded that Randazza should not be

25  "butthurt" [14] about it.  A review of the text message exchange between Gibson and

26  Randazza shows that Randazza was not actually offended by having a scene shot in his

27  _____

28  [14] While Randazza appears to claim that the use of this term offended him, he admits to using the term himself. **Tr. at 326:4-10.**

LITTLER MENDELSON, P.C.
Attorneys At Law
...
Las Vegas, NV 89169-5937
702.862.8800

office. In fact, in his typical crude manner, Randazza encouraged it—as evidenced by the fact that after he was alerted that his office would be used in a scene, Randazza texted Gibson "Don't get jizz on my briefs." **Exhibit 330 (EMC000459-460), Text Message Exchange between Marc Randazza and Jason Gibson Texts 23605 and 23622 ("out" messages are from Gibson, "in" messages are to Gibson from Randazza).** [15] Randazza even stated that he didn't want the mess cleaned up in Text 23662. He later stated "I'm glad to help out if we need a place to shoot. I'd just ask that I get some notice so I can prep the place for it next time." *Id.* at Text 23774.

Excelsior fully acknowledges that it did film a scene for an adult film in Randazza's office. However, the evidence established that this is not unique; Excelsior commonly uses other areas of its facilities to film scenes including offices, the fitness center, and cafeteria. **Tr. at 681:15-682:19, 857:17-858:16, 943:7-14, 955:8-956:3.** In fact, at that time, customers were requesting more variety as to filming locations. *Id.* at 681:15-682:19. Nothing about the scene shot in Randazza's office was out of the ordinary, and after the scene was completed his office was cleaned and sanitized as per Company protocol. *Id.* at **956:4-957:22.** Filming in an office has never been considered harassing conduct before.

Further, two additional facts clearly contradict Randazza's contention that the filming in his offensive was offensive, unwelcome, or in any way related to his status as a straight male. First, Randazza admitted he offered up his own personal residence for use in filming pornographic scenes prior to the filming in his office. *Id.* at **339:13-340:12; 683:23-684:17.** Randazza not only admitted to making this overture to Gibson and others, but one of Excelsior's scene directors additionally testified Randazza had frequently made this offer and that he, in fact, communicated directly with Randazza regarding the fact that Randazza's office was going to be used for filming with no objection from Randazza. **Tr. at 953:14-23; 954:10-955:1, 957:23-958:25.**

Additionally, Randazza's testimony to his offense at the thought that his desk had

---

[15] While many of the statements in the text messages are crude, this exchange shows that this was not something that subjectively offended Randazza.

1 TLER MENDELSOHN, P
2 1 0 Howard Hughes Parkway
Las Vegas, NV 8901
2 362 4900

1   been used in a pornographic scene is utterly belied by the fact that he purchased a couch

2   from Excelsior that had been used in multiple pornographic films, placed that couch in the

3   home he occupied with his family, and boasted to visitors that pornography had been filmed

4   on the couch. *Id.* at **338:2-338:18.** Randazza even sent a photograph of his scantily-clad

5   wife on the couch to Gibson—which, of course, flies in the face of his allegations that

6   Gibson had any issues with the fact that he was a straight male. **Exhibit 315; Tr. at**

7   **338:19-339:12.** While Randazza now claims he made formal complaints to then Human

8   Resources manager, Kirk Addison, Addison denies ever receiving such a complaint. *Id.* **at**

9   **916:9-23, 917:3-5.** The truth is that Randazza's only complaints in April 2012 about filming

10  a scene in his office was that his effects had been cleaned off of his desk and not properly

11  replaced. *See* **Exhibit 330 (Texts 23782, 23783).**

12        As for the alleged sex act in Randazza's car, the Company denies that Randazza

13  witnessed anything sexually inappropriate between Gibson and the other Excelsior

14  employee on August 9, 2012, or any other day.  In fact, the only person that actually

15  supports Randazza's version of events is Randazza.[16]  Gibson testified that the alleged sex

16  act did not occur. **Tr. at 687:12-688:14.**  Cameron Frost, another individual who was in the

17  car that day also denies that Gibson engaged in the alleged sex act.  **Exhibit   309**

18  **(Declaration of Cameron Frost).**  The evidence shows that the employee who the act was

19  allegedly performed on, David McCoig, was severely inebriated and ill on the car ride that

20  day—making Randazza's version of the drive home entirely unbelievable.  **Exhibit   309;**

21  **Tr. at 688:12-691:2.**  Additionally, Randazza never made formal complaints about the

22  alleged sex act to Gibson or Addison.  **Tr. at 690:24-691:2; 916:24-917:15.**

23        Finally, all of Randazza's allegations of the deterioration of his relationship with

24

25  [16] The only witness testimony Randazza provided in support of his claim was from two individuals
    (Ron Green and Cari Piper) that testified to hearsay statements regarding the alleged act—one of

26  which even had markedly different facts than the allegations Randazza currently makes by claiming
    that the wrong person performed the sex act.  **Tr. at 945:16-946:1.**  Additionally, Cari Piper, a

27  former Excelsior employee who recently resigned from the company when they changed her job
    duties, admitted to having an "axe to grind" against Excelsior CEO Jason Gibson.  *Id.* at **938:9-**

28  **940:21.**  Accordingly, her testimony should be taken with the appropriate grain of salt.

LITTLER MENDELSON, P.C.

Gibson as a result of these alleged events are belied by evidence.  Randazza admitted to the close relationship he and Gibson shared during his employment with the company.  It included many friendly gestures between the two, regular social interaction outside of the office, and Randazza and his family staying with Gibson for extended periods of time.  **Tr. at 303:2-306:7, 312:9-23; Exhibit 318-319.**  An examination of their relationship in early August shows that they still shared that close relationship including dinners, a boat excursion with Randazza and his children, and time spent at Gibson's home.  **Tr. at 312:24-314:15, 438:1-446:6.**    What is also evident is that it was not until August 13, 2012—the day Gibson discovered Randazza negotiated a bribe for himself —when the relationship began to turn.  **Tr. at 446:7-450:3.** As is evident from the foregoing, there was no harassment and, as Randazza asserted to a third party, the sexual harassment allegations were only included to foster a fear in Excelsior of making their dispute with Randazza public.  In light of these facts, Randazza cannot establish that he was subject to hostile working environment which altered the terms and conditions of his employment.

      **6.    Retaliation**

Excelsior is further entitled to judgment in its favor with respect to Randazza's claim that he was terminated to retaliate against him for reporting sexual harassment.   An employer cannot retaliate against an employee for "oppos[ing] any practice made an unlawful employment practice" by Title VII. 42 U.S.C. § 2000e–3(a). In order to establish a *prima facie* case of retaliation, Randazza must show: (1) involvement in a protected activity, (2) a "materially adverse" employment action, and; (3) a causal link between the two events. *See Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000) (citing *Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir. 1997)); *see also Burlington Northern & Santa Fe Rwy. Co. v. White*, 548 U.S. 53, 68 (2006) (setting forth the "materially adverse" standard). "The employee's statement cannot be 'opposed to an unlawful employment practice' unless it refers to *some* practice by the employer that is allegedly unlawful." *E.E.O.C. v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1013 (9th Cir. 1983).

The U.S. Supreme Court recently clarified the standard of proof with respect to

27.

causation in a retaliation case, holding that "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation [motivating factor] test. This standard requires proof that the unlawful retaliation would not have occurred in the absence of the "alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar,* 133 S. Ct. 2517, 2533 (2013)). The Court recognized that "claims of retaliation are being made with ever-increasing frequency" and that "lessening the causation standard could also contribute to the filing of frivolous claims, which would siphon resources from efforts by employer, administrative agencies, and courts to combat workplace harassment." *Nassar,* 133 S. Ct. at 2531.

Randazza claims his alleged termination was retaliation for complaining about the scene being filmed in his office and a non-existent complaint alleging oral sex occurred in his vehicle. Randazza's retaliation claim is meritless for several reasons. First, Randazza cannot show that he participated in a protected activity. **Tr. at 687:8-11, 685:16-686:4, 690:24-691:2, 916:9-917:5.** At most, Randazza claims he complained about his office having been used to film a pornographic scene. Randazza, an attorney, did not claim that this constituted sexual harassment. Rather, he merely complained about his office having not been put back together the way he liked it. *See* **Exhibit 330, Texts 23782, 23783.** This is not a protected complaint. *Crown Zellerbach Corp.,* 720 F.2d at 1013 (activity must refer to something unlawful). Additionally, other than his own self-serving testimony, there is no evidence that Randazza ever issued a complaint to any executive at the company regarding the alleged sex act that occurred in his vehicle. **Tr. at 687:8-11, 685:16-686:4, 690:24-691:2.** Randazza's testimony has proven to be untrustworthy and Mr. Addison denied that Randazza ever complained to him about Gibson. *Id.* at **916:9-917:5**

Additionally, Randazza cannot prove that he would not have been terminated **_but for_** making a complaint of sexual harassment against Gibson as Title VII requires. The preponderance of the evidence establishes that the root of the discord between Randazza and Gibson stems from the fact that Randazza was caught with his hand in the proverbial cookie jar when he presented Gibson with a settlement agreement providing for a $75,000

28.

1  bribe to Randazza (on top of the bonus of $150,000 he already potentially would be entitled

2  to receive). Randazza never suffered an adverse employment action because he willingly

3  resigned his employment on August 29, 2012. **See Exhibit 329 and discussion** *supra.*

4  Indeed, after being caught negotiating the bribe and acting in blatant contradiction to the

5  ethical codes that bind attorneys by taking control of Excelsior's funds and becoming

6  "adverse" to his client, Randazza decided to quit. *Id.*

7       While Randazza may claim that this was a constructive discharge and not a true

8  resignation, he produced nothing other than self-serving testimony in support of this

9  allegation. Indeed, in the same month of August, Gibson had taken Randazza and his

10 children to the lake, had gone out to eat with Randazza, and still considered himself

11 Randazza's friend. **Tr. at 313:10-314:15, 438:1-445:3.** Finally, even if the Arbitrator were

12 to find that Randazza was subject to an adverse employment action, Randazza can point to

13 no evidence which will establish the "but for" causal connection between his alleged

14 complaints and the alleged employment action—let alone the but-for causal connection

15 necessary in order to establish a retaliation claim. *Nassar,* 133 S. Ct. at 2533.

16  **D.    EXCELSIOR    ESTABLISHED    ITS    COUNTERCLAIMS    AGAINST**
17  **RANDAZZA BY A PREPONDERANCE OF THE EVIDENCE**

18       **1.    Legal Malpractice, Breach of Fiduciary Duty, and Tortious Breach**
              **of the Duty of Good Faith and Fair Dealing**

19       The elements of a legal malpractice claim are: (1) an attorney-client relationship

20 between the parties; (2) a duty owed to the client by the attorney to use such skill,

21 prudence, and diligence as lawyers of ordinary skill and capacity possess in exercising and

22 performing the tasks which they undertake; (3) a breach of that duty; (4) the breach being

23 the proximate cause of the client's damages; and (5) actual loss or damage resulting from

24 the negligence. *Day v.* Zubel, 112 Nev. 972, 922 P.2d 536 (Nev. 1996); *Mainor v. Nault,*

25 120 Nev. 750, 774, 101 P.3d 308, 324 (Nev. 2004); *see also Hall v. Kalfayan,* 190

26 Cal.App.4[th] 927 (Ct. App. 2010)(same elements under California law). The Nevada Rules of

27 Professional Conduct and the California Rules of Professional Conduct are evidence of the

28 standards of care to which attorneys are held. *Mainor,* 120 Nev. at 769; *City & Cty. Of San*

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

1  *Francisco v. Cobra Solutions, Inc.*, 135 P.3d 20, 25 (Cal. 2006).    Respondent's

2  counterclaims for Breach of Fiduciary Duty (First Claim For Relief), Tortious Breach of the

3  Duty of Good Faith and Fair Dealing (Fourth Claim For Relief), and Legal Malpractice (Fifth

4  Claim For Relief) are essentially all claims for legal malpractice (though they may give rise

5  to different forms of relief), and are therefore analyzed as such.  *Stalk v. Mushkin*, 125 Nev.

6  21, 28-29, 199 P.3d 838, 842-43 (Nev. 2009); *Oasis W. Realty, LLC v. Goodman*, 250 P.3d

7  1115, 1120-21 (Cal. 2011).

8          The parties do not dispute that an attorney-client relationship existed and that

9  Randazza owed to the Company(ies) a duty to use such skill, prudence and diligence as

10  lawyers of ordinary skill and capacity possess in exercising and performing his job as

11  Excelsior's General Counsel. The standard of care below which an attorney's conduct

12  should not fall is generally established through expert testimony. *Flatt v. Superior Court*, 9

13  Cal. 4th 275, 297, 885 P.2d 950, 963 (1994); *Mainor*, 120 Nev. at 767. The evidence on the

14  record establishes that Randazza breached his duty by improperly negotiating with adverse

15  parties to retain his firm while litigating against them on behalf of Liberty and by failing to

16  disclose conflicts of interest.  This occurred during his settlement negotiations with TNAFlix

17  and MegaUpload, his actions throughout the Oron case, and by engaging in conflicts of

18  interest with various clients, amongst other unethical behavior.

19                  **a.  TNAFLIX Litigation**

20          Excelsior proved by a preponderance of the evidence that Randazza committed

21  malpractice and breached his fiduciary duties with respect to his handling of the TNAFlix

22  matter.  As set forth in further detail herein, Randazza tainted settlement discussions by

23  negotiating to personally receive a monetary payment from TNAFlix in exchange for not

24  suing the company in the future.  During the same negotiations, Randazza proposed and

25  negotiated with TNAFlix regarding the potential sale of the site to one of his other clients

26  which would have paid him a lucrative "broker fee" had the sale gone through.  Randazza

27  engaged in this behavior without ever disclosing it to or seeking Excelsior's consent.

28          In December 2010 and January 2011 Randazza and Val Gurvits ("Gurvits") of

30.

1   Boston Law Group, LLP, negotiated a settlement in the lawsuit Randazza filed on Liberty's

2   behalf against TNAFlix for infringement of Liberty's copyrighted works.  **Tr. at 346:17-**

3   **348:25; Exhibit 350.**  During those negotiations, Gurvits raised a concern about TNAFlix

4   being sued by other copyright owners in the future based on allegations similar to those

5   made by Liberty.  **Exhibit 350.**  Randazza responded to Gurvits' concern by advising him

6   that he "could largely prevent other plaintiffs from entering the fray."  As negotiations

7   related to the litigation continued, Randazza continued to discuss the prospect of conflicting

8   him out of future cases.  To those ends, on December 22, 2015, Randazza stated "[a]s far

9   as conflicting me out of future cases, that will require significantly more than $5,000."

10  **Exhibit 352; Tr. at 350:24-351:11.**

11       On December 30, 2010 Randazza emailed Gurvits to inform him that another client

12  of his was interested in acquiring TNAFlix.  **Exhibit 353.**  In this email, Randazza proposed

13  that he and Gurvits broker the potential sale of TNAFlix to Randazza's client but also

14  recognized that potential ethical issues could arise from such a transaction.  *Id.*  In another

15  email that same day, Randazza hypothesized how the two could avoid the obvious conflict

16  by tying the settlement and sale together.  **Exhibit 354; Tr. at 355:12-15.**

17       In January 2011 Randazza continued to discuss the potential acquisition of TNAFlix

18  by suggesting that he and Gurvits personally split a 15% broker's fee for putting together

19  the potential $5 million dollar deal.  **Exhibit 356; Tr. at 356:6-359:2.**  Randazza also

20  reminded Gurvits of the previous offer to conflict him out of future cases:

21       Keeping me out of the TNA game is a little more complicated.

22       If your client wants to keep me personally out of the TNA game, then I think
        that there needs to be a little gravy for me.  And it has to be more than the
23      $5k you were talking about before.  I'm looking at the cost of at least a new
        Carrera in retainer deposits after circulating around the adult entertainment
24      expo this week. I'm gonna want at least used BMW money.

25       In order to conflict me out of future matters, I suggest this: Your firm retains
        me as "of counsel" to you. I get $5k per month (for six months) paid to me,
26      from you (TNA will reimburse you, I presume).  I will render advice on TNA
        and TNA only, and I'll be Chinese walled from your other clients so that other
27      conflicts are not created. ... That way, I'm adequately compensated for my
        loss of major potential work, and I'm conflicted out of acting adversely to TNA.
28      **Exhibit 356.**

31.

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

On January 12, 2011, Randazza purportedly discovered that he was ethically prohibited from discussing limitations on the right to practice law during the course of settlement negotiations on behalf of a client, and emailed Gurvits to say that he could no longer discuss it. Nevertheless, Randazza recommended the following:

> Like I said before, if TNA wants to hire me *after* settlement, on terms that we discuss *after* settlement, then my phone line will be open. However, it seems that if we place any part of a 'buyoff' as a condition of settlement, then all four of us could wind up in bar trouble. I'm certainly not risking it. **Exhibit 357.**

Two things are clear from this sequence of events. First, Randazza put his client's interest (Excelsior) to the side in favor of negotiating for himself a potential $30,000 payment to "conflict him out of acting adversely to TNA" and a potential $375,000 broker fee for from the sale of the site. Second, Randazza's communication that his retention would need to take place "*after*" a settlement was finalized was insincere and meant to cover his true intentions.

On February 1, 2011 Liberty signed a Settlement Agreement with TNAFlix in which they agreed to dismiss their claims against TNAFlix in exchange for a payment of $50,000. **Exhibit 360; Tr. at 370:16-371:10.** The very next day (February 2), Randazza sent an email to Gurvits asking if TNAFlix wanted a retainer letter from him and asking if Gurvits was working on a broker agreement for the sale. **Exhibit 361; Tr. at 371:8-372:18.** On February 11, 2011, Randazza also emailed a draft retainer letter for TNAFlix to sign, which required a $36,000 retainer deemed to be earned upon receipt. **Exhibit 362; Tr. at 373:1-374:10.** The retainer letter also had a provision in which TNAFlix would agree that Randazza and Boston Legal Group would have the exclusive right to sell the company and any of its online assets for 10% of the sales price. **Exhibit 362; Tr. at 374:11-375:15.** Randazza later emailed Gurvits pleading that he prevail upon his clients that "time is of the essence." **Exhibit 363; Tr. at 375:16-376:7.** Randazza offered no explanation for the changed terms (which raised the amount of fully earned upon receipt payment to Randazza to $36,000). On February 15, 2011 Randazza also prepared and sent Gurvits a draft

LITTLER MENDELSON, P.C.
An Firm at Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

1   broker agreement for the potential sale. **Exhibit 364; Tr. at 376:14-377:19.** While the

2   settlement was completed, the side deals that would have benefitted Randazza were never

3   finalized. **Tr. at 378:6-10.**

4        It is undisputed that Randazza never received written consent from Liberty to

5   negotiate for a monetary payment to Randazza Legal Group in connection with the TNAFlix

6   dispute. **Tr. at 351:20-23.** Randazza also never informed Liberty orally or in writing that he

7   was negotiating and proposing to broker the sale of TNAFlix. *Id.* **at 352:23-3; 353:14-24.**

8   Excelsior denies ever having been informed that Randazza was engaging in these

9   unethical negotiations nor did it authorize him to engage in the same. *Id.* **at 698:3-699:25.**

10       After Excelsior disclosed the improper negotiations to the State Bar but prior to

11  Excelsior disclosing in this litigation that it had obtained Randazza's email communications

12  with opposing counsel in the TNAFlix matter, Randazza reported to the bar that after being

13  offered a bribe by opposing counsel to never sue his client again, Randazza responded by

14  informing, "both Mr. Gurvits and Gibson that Randazza would not accept payment in

15  exchange for a limitation on who Randazza could represent or not represent in the future."

16  **Exhibit 372 at EMC001606 and Tr. at 240:18-243:2.** After making this blatant

17  misrepresentation to the Bar, and upon discovering that Excelsior had copies of his actual

18  communications with opposing counsel in the case, Randazza was forced to abandon the

19  position he took with the State Bar – that Gurvits offered him a payment to conflict him out

20  and he refused that overture. As the Arbitrator knows, Randazza's story at arbitration

21  became that he did negotiate for a payment to conflict himself out and to broker a sale of

22  TNAflix, but it was all make-believe and part of a negotiation strategy to somehow get

23  Liberty more money. Randazza's continually evolving story is belied by the fact that *after*

24  *the TNAflix matter was settled*, Randazza drafted and forwarded agreements for TNAflix to

25  retain him to conflict him out and to serve as a broker. **Tr. at 370:24-379-18.**

26       As detailed in Dennis Kennedy's Expert Report, Randazza's actions while settling

27  the TNAFlix matter breached his fiduciary duty and failed to comport to the standard of care

28  expected of him – Randazza failed to keep Excelsior informed of significant developments,

33.

Randazza failed to properly disclose his personal interest in the matter, and Randazza improperly negotiated to restrict his practice. **Exhibit 304, Kennedy's Report at ¶¶ 17-21.13; see also** Tr. at 1003:20-1016:18.  California Rule of Professional Conduct ("Cal. RPC") 3-500 provides that lawyer "shall keep a client reasonably informed about significant developments relating to the employment or respresentation."  In the course of negotiating a settlement, a lawyer is required to communicate to his client all amounts, terms, and conditions of any written (and significant oral) offer of settlement.  Cal. RPC 3-510(A)(2); Discussion to Cal. RPC 3-510.  In order to prevent conflicts, Cal. RPC 3-310(B)(4) provides that a lawyer "shall not accept or continue representation of a client without providing written disclosure to the client" where the lawyer has "a legal, business, financial, or professional interest in the subject matter of the representation."[17]  Additionally, Cal. RPC 1-500(A) provides that a lawyer shall not "be a party to or participate in offering or making an agreement, whether in connection with the settlement of a lawsuit or otherwise, if the agreement restricts the right of [the lawyer] to practice law."[18]  The prohibition against restricting a lawyer's right to practice law also prohibits instances where a lawyer separately, though simultaneously, negotiates to be retained by an opposing party in litigation during settlement negotiations even if the retention occurs after the settlement. See e.g., *Cardillo v. Bloomfield 206 Corp.*, 988 A.2d 136, 139-40 (N.J. App. 2010); *In re Brandt/Griffin*, 10 P.3d 906, 918-19 (Ore. 2000).

Kennedy's testimony summarized his conclusions as to Randazza's unethical actions during the TNAFlix matter as follows:

> There is a failure to communicate to his client, Liberty, what he was doing. He has a personal conflict in ... negotiating to settle the agreement, while simultaneously negotiating a payment to himself, which I say it's either a

---

[17] "The primary purpose of this prophylactic rule is to prevent situations in which an attorney might compromise his or her representation of the client in order to advance the attorney's own financial or personal interests."  *Santa Clara Cty. Counsel Attys. Assn. v. Woodside*, 869 P.2d 1142, 1153 (Cal. 1994).

[18] "[T]he practice, in connection with settlement agreements, of proposing that a member refrain from representing other clients in similar litigation, is prohibited. Neither counsel may demand or suggest such provisions nor may opposing counsel accede or agree to such provisions." Discussion Cal. RPC 1-500.

34.

bribe, because that language is used, or to be retained by TNA concurrent with or immediately after the settlement. And then there's the matter of him restricting or agreeing to restrict his right to practice law, which is prohibited by Rule 5.6 of the Nevada Rules of Professional Conduct and by comparable California Rule of Professional Conduct [Cal RPS 1-500]. And, lastly, the conflict in negotiating the broker's agreement and commission while simultaneously negotiating the settlement agreement.

The essential conflict here are three. It's a failure to communicate with the client and tell the client, well, here is what I'm doing. It is a conflict because he has a personal interest in both the future retention and in the receipt of a commission if there is a sale. And, lastly, the restriction on the right to practice, which is just flatly prohibited by the rules. So those are the three issues and I think he violated his duty to the client in each one of those.

Tr. at 1007:14-1008:20.

Accordingly, Randazza should have provided written disclosure to the Company that he was engaging in these negotiations. In light of his personal business interest in the retention of his firm and in brokering a deal that would have paid him an exorbitant amount of money, a conflict existed between him Liberty which required disclosure and informed consent in order for him to continue his representation of the Company. The evidence reveals that such disclosure and consent never occurred. Finally, as Mr. Kennedy concluded, his negotiation to refrain from representing other clients in similar litigation against TNAFlix in the future is undoubtedly prohibited by the rules.

Randazza's defense to this matter is that he never actually intended to, nor did he actually consummate an agreement with TNAFlix for either the restriction of his practice or brokering of the TNAFlix sale he proposed. Randazza's argument misses the mark for multiple reasons. As an initial matter, had Randazza's only motivation been to get a better settlement for his client, he would not have prepared the retention and broker agreements and sent them to Gurvits **after** the settlement was completed.[19]

Randazza's expert, Ellen Peck, testified that there was no personal interest conflict because of her acceptance of Randazza's "bluffing" narrative and the fact that the

---

[19] One of Randazza's own ethics expert testified that he saw no intent by Randazza to consummate any of the improper deals he was asked to review but was later forced to retreat from that position when he acknowledged that sending an agreement to an opposing party evidences intent to consummate. *See* Tr. 1197:13-1198:2.

LITTLER MENDELSON, P
Las Vegas NV 27128 9937
702 862 2500

1  brokerage and retention agreements were not incorporated into the settlement agreement

2  and were never actually consummated prior to the settlement of the TNAFlix litigation.[20] **Tr.**

3  **at 1307:3-1310:2.**  Indeed, Ms. Peck's entire opinion that there was no conflict is premised

4  on her theory that Randazza was not negotiating for a payment in order to restrict his

5  practice but legitimately negotiating for representation of a new client. Ms. Peck's premise

6  is incorrect because Randazza and Gurvits' communications show the true intent was

7  Randazza to not be adverse to TNAFlix in the future.  Indeed, Gurvits' original reason for

8  raising the issue was that "there is no way to prevent others from suing [TNAFlix] once this

9  action is settled."  **Exhibit 350.**  Randazza's subsequent representation that he would be

10  "willing to be conflicted out of future cases against TNA" if the price was right ("I'm gonna

11  want at least used BMW money") shows that this was undoubtedly the goal of the potential

12  agreement between he and TNAFlix.  **Exhibit 352; Exhibit 356.**

13      As to Ms. Peck's opinion that the failure to consummate prior to the settlement

14  occurring absolves Randazza of any personal interest, not only is her opinion on this matter

15  illogical, but she admits she had no authority to support that interpretation of the rule.  **Tr. at**

16  **1309:8-1311:4.**  Kennedy's opinion as to why a conflict existed is clear:

17      Rather than focusing on Liberty's interests, which he was required to do as its
18      fiduciary, Mr. Randazza was motivated by his own personal gain in the form
        of earning a non-refundable, earned-upon receipt retainer of $36,000 as soon
19      as he settled the TNA Matter.  By so doing, he ... compromised the trust and
        confidence reposed in him by Liberty.  Mr. Randazza was unable to exercise
20      independent professional judgment and provide unbiased advice to Liberty in
        settling the TNA Matter given his personal interest in being retained by TNA
21      for a substantial sum immediately upon settlement of the TNA Matter.  He
        was required to disclose those interest and the resulting conflict to Liberty in
22      writing pursuant to California RPC 3-310(B)(4), 3-500 and 3-510 so that
        Liberty could intelligently decide whether and how to proceed with settling the
23      TNA Matter.  Aside from the impermissible restriction on his right to practice
        law and person conflict of interest, Mr. Randazza should not have broached
24      the possible multi-million dollar sale of TNA with Mr. Gurvits while attempting
        to settle the TNA Matter, which created another personal conflict of interest
25      for him ... The prospect of earning up to $375,000 undoubtedly clouded Mr.
        Randazza's independent professional judgment and his ability to give

26

27  [20] Ms. Peck also conceded that her report was based upon her understanding that Excelsior was
    aware of the bribes and had knowledge that Randazza was negotiating a bribe.  As was evident at

28  the hearing, that is not true—making her entire report based upon this faulty premise.  **Tr. at**
    **1283:5-1286:23.**

LITTLER MENDELSON, P.C.

unbiased advice to Liberty in settling the TNA Matter; it was impossible for him to separate one from the other, as he acknowledged in the January 20, 2011 email that he sent to Mr. Gurvits. While Mr. Randazza was only due to earn twenty-five percent (25%) of the TNA Settlement, or twelve thousand five hundred dollars ($12,500), pursuant to his employment agreement with Liberty, he was hoping to earn up to thirty (30) times that amount by brokering sale of TNA to another one of his clients.

**Exhibit 304, Kennedy's Report at ¶¶ 21.5 – 21.9.**

Finally, Ms. Peck takes the position that (1) there is no evidence which shows that Randazza proposed or agreed to restrict his right to practice and (2) that Kennedy's report confuses agreeing to refrain from representing other clients against an TNAFlix with agreeing to represent TNAFlix in the future without express reservations. As discussed previously, **Exhibit 352 and 356,** leave no doubt that the true intent of the deal he was arranging with TNAFlix was to not represent other clients against TNAFlix in the future. When presented directly with these Exhibits, Ms. Peck admitted that it was "close" but not "over the line" and then wrestled to find a distinction between Randazza agreeing to be conflicted out of future cases and agreeing to not sue TNAFlix in the future. **Tr. at 1287:3-1297:22.** Her attempts to do so were entirely unpersuasive. **See id.** When Ms. Peck was questioned for an example of an offer that would violate Cal. RPC 1-500(A), surprisingly she cited as an example the offer that Gurvits made to Randazza to not represent anybody against TNAFlix in the future in exchange for $5,000. **Tr. at 1304:22-1305:25.**

> Q:   So one example you gave was Mr. Gurvits' offer to Mr. Randazza in the TNAFlix, and that was a payment of $5,000?
> A:   For his agreement not to ever take clients against TNAFlix again.
> Q:   Right. Mr. Randazza, in the e-mails that we looked at, was just countering Mr. Gurvits' offer, correct?
> A:   Well, I don't think that he was countering Mr. Gurvits' statement or offer in a way that was inappropriate under the rule. He didn't say that he would limit his practice geographically or that he would limit his practice by saying—by not taking any clients.

**Id.** at 1305:12-25. In other words, even though all Randazza was doing was countering Mr. Gurvits' previous offer and requesting additional compensation for himself in order to not represent clients against TNAFlix, Ms. Peck would only find a violation if Randazza utilized the proverbial "magic words" she needs to hear in order to find a violation. Such an

LITTLER MENDELSON, P.
Bespeckeb At Law
1950 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

1  interpretation is as illogical as it is unpersuasive.[21]

2          b.  MegaUpload

3          Excelsior established at the hearing that Randazza also committed malpractice and

4  breached his fiduciary duties with respect to his handling of the MegaUpload litigation.  As

5  set forth in further detail herein, Randazza tainted settlement negotiations when he solicited

6  a monetary payment from MegaUpload in exchange for conflicting him out of future

7  litigation against the site.  Randazza failed to disclose this side-negotiation to Excelsior.

8          By way of reminder, Randazza represented Liberty in a copyright infringement

9  dispute against MegaUpload in 2011.  **Tr. 380:10-14.** Ira Rothken ("Rothken") and Venkat

10  Balasubramani ("Balasubramani") represented MegaUpload in that matter.  **See Exhibit**

11  **53.**  In August 2011, the parties attended a mediation in the matter and the parties

12  eventually settled in September 2011 after exchanging multiple drafts of an agreement.

13  During the course of those negotiations, Rothken expressed an interest in precluding

14  Randazza from pursuing future claims against MegaUpload.

15          On August 22, 2011, Randazza responded to the interest in taking him out of "future

16  games" by stating:

17          In order to address any of your clients concerns about future suits, I am
18          blocking off some time on September 5, 2011 (which should be sufficiently
            beyond the wire date for my client to consider the matter closed).  I will make
19          myself available for an hour ... to have a conversation with your client about
            assisting them in putting some protections in place to counter future attacks
20          from other companies.  I think that I have some good ideas, which would
            prove useful to them, and which may act as a prophylactic (if implemented)
21          from future infringement suits.  Naturally, to share those ideas, I will need
            Mega to share some confidential information with me.  And, I believe that
22          possession of that information in that context will place me in a position of not
            being able to represent other companies against them, as the receipt of that
23          confidential information in the course of representation would make it
            unethical for me to later represent another party against them.  **Exhibit 53**
24          **(ECM003461).**

25  _____

26  [21] It is irrelevant whether Randazza was actually successful in getting TNAFlix to enter into the
    agreement to restrict his practice.  Kennedy testified that "the rule says lawyers may not propose
27  and may not agree to.  And when a matter like that comes up, I mean sometimes a lawyer will
    propose that because a lawyer is ignorant of what the rule says.  But the other lawyer has to tell
28  you, Look, you can't propose that, it violates the rule, and I can't even consider it."  **Tr. at 1011:9-
    20.**

Randazza went on to state that while he could not enter into an agreement to conflict him out while the case was pending:

> [T]he same ethics that do not make it possible for me to cut corners on the 'conflict out' provisions will be in in place after the agreement is signed. I did not get where I am by having a reputation for being someone who would stab others in the back.

*Id.*; *see also* **Tr. at 380:15-382:22.** Over the next several days, the parties continued to engage in communications which reveal the intent to restrict Randazza's right to practice law. *See* **Exhibit 53 (ECM003458-60); Tr. at 382:23-383:3.**

Under a substantially similar analysis as the facts in the TNAFlix matter, Randazza's conduct implicates Cal. RPC 1-500(A)(offering or agreeing to restrict right to practice), Cal. RPC 3-310(B)(4)(personal interest conflict), and Cal. RPC 3-500 and 3-510 (informing client of significant developments). As was the case with TNAFlix, Randazza breached his fiduciary duty and committed malpractice by (1) failing to communicate with Liberty about his negotiation to be retained by MegaUpload immediately after settlement; (2) having a personal conflict of interest in settling the MegaUpload matter while simultaneously negotiating to be retained by MegaUpload immediately after settlement;[22] and (3) improperly engaging in negotiations to restrict his right to practice law by offering to "represent Megaupload immediately after settling the Megaupload Matter (an indirect restriction of his right to practice law)." **Exhibit 304, Kennedy's Report at ¶¶ 50.1-50.6.**

The fact that Randazza sought to avoid a violation of California RPC 1-500(A) by claiming that his representation of MegaUpload would be addressed after the settlement was complete "does not change the fact that the matter was discussed at length during settlement negotiations for the Megaupload matter." *Id.* at ¶ 50.2. By pursuing retention by MegaUpload, Randazza acted contrary to Liberty's interest and created a personal conflict

---

[22] "Mr. Randazza should have refrained from discussing any potential future work for Megaupload. The prospect of earning $5,000 for a 1-hour phone call with Megaupload and the likelihood of future work for Megaupload, created a personal conflict of interest for Mr. Randazza that he was required to disclose in writing pursuant to California RPC 3-310(B)(4), 3-500 and 3-510 so that Liberty could decide whether Mr. Randazza was capable of providing unbiased advice and exercising independent professional judgment." **Exhibit 304, Kennedy's Report at ¶¶ 50.6.**

39.

LITTLER MENDELSON, P.C.
ATTORNEYS AT LAW
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

of interest that he should have disclosed to Liberty in writing. *Id.* at ¶¶ 50.4-50.6. In failing to do so, Randazza undoubtedly breached the duties he owed to the Company.

### c. ORON Litigation

Randazza committed malpractice and breached his fiduciary duties in various ways throughout the course of the Oron litigation. As set forth in further detail herein, Randazza tainted settlement negotiations when he solicited a $75,000 payment from Oron in exchange for conflicting him out of future litigation against that company and by seeking information from an individual who was utilizing a hacker to obtain confidential information about Oron. Randazza also fell below the standard of care by entering into personal transaction with his client without making adequate disclosure to the Company, by breaching the Oron settlement agreement without disclosing and seeking informed consent from the company, and concurrently representing Porn Guardian in negotiations against Oron while also negotiating on Liberty's behalf.

### i. *Unethical Negotiations*

In 2012, Randazza filed suit against Oron alleging that Oron (a file-sharing website) infringed on Liberty's copyrighted works. **Tr. at 384:2-6.** Oron was initially represented by Stevan Lieberman ("Lieberman"). *Id.* at 384:7-9. In June 2012, the parties participated in settlement negotiations which resulted in a Lieberman sending Randazza an agreement that Randazza subsequently executed on behalf of Liberty. *Id.* at 384:12-22; **Exhibit 345.** Under the agreement, Oron was to pay Liberty $550,000 in exchange for the dismissal of Liberty's lawsuit. *Id.* Part of the agreement also required Liberty to dissuade others from bringing suit against Oron in the future. **Tr. at 385:15-20.**

Oron subsequently claimed that the agreement was not binding. *Id.* at 388:3-5. Accordingly, Randazza filed a motion to enforce the settlement that was granted on August 7, 2012 by Judge Gloria Navarro of the U.S. District Court for the District of Nevada. *Id.* at 388:6-10; **Exhibit 91.** Randazza also filed a motion for attorneys' fees. After the court granted the motion to enforce the settlement, Randazza and Lieberman recommenced settlement negotiations. On August 7, 2012 Randazza sent an email to Lieberman offering

40.

TLER MENDELSON, P
...................
...... ........ ......
.. ...
... ..... .. ..... .....
..... ... ....

1    to resolve the Oron matter (including withdrawing the original motion for fees that remained

2    pending before the court) if Oron agreed to wire $550,000.00 to his trust account within

3    twenty four hours. **Exhibit 377.** Randazza also made a proposition to Lieberman: "And, if

4    Oron would like someone to show them how not to get sued in the future and would like to

5    have some more of my play book, they are welcome to contact me directly, or through you.

6    I make a much better friend than an enemy."[23] *Id.*

7          Randazza continued negotiating with Lieberman and proposed that Oron pay to

8    Liberty $650,000 and that the money be transferred to Liberty's local attorney's account in

9    Hong Kong. **Tr. at 392:21-393:25; Exhibit 366.** Randazza then proposed:

> whatever you guy [sic] pay me to retain me would come from your paypal
> account, and would have no real relevance to that.  I spoke to my partner,
> who was adamant that we should earn $100k if we're never to be able to sue
> [Oron] forever and ever.  I got him to go with $75k.  But, for that, we'll provide
> some really great value—including a jurisdiction derailing plan that you'll drool
> over.

**Exhibit 366.**  By referencing the "jurisdictional derailing plan" Randazza was referring to a

plan that would make it more difficult for companies like Liberty to obtain jurisdiction in the

US over Oron in the future (to Liberty's detriment).  **Tr. at 396:2-8.**  Four minutes later,

while still negotiating a final resolution of the Oron matter for Liberty, Randazza emailed a

fee agreement to Lieberman to memorialize his future retention by Oron.  **Exhibit 367.**  The

agreement required Oron to pay Randazza a $75,000 non-refundable retainer which

entitled Oron to advice for a period of thirty days.  **Exhibit 367; Tr. at 398:10-400:17.**

Notably, Randazza made a point to send the retainer agreement to Oron before the

settlement agreement is signed so as to avoid being left hanging like he was after the

TNAFlix matter settled.

          Sometime in early August, Gurvits (the same opposing counsel in the TNAFlix case)

took over as Oron's lead negotiator in this potential settlement.  **Tr. at 404:25-405:16.**  On

August 9, 2012, Gurvits sent Randazza a draft settlement agreement which provided for

---

[23] Randazza claims this was not the first time the topic of potentially assisting Oron was raised, but he acknowledges that he is not aware of any documentation prior to that email which shows that Oron initiated the discussion.  **Tr. at 390:20-391:9.**

LITTLER MENDELSON, P
3960 Howard Hughes Parkway
Las Vegas

Oron to pay Liberty Media $600,000, and $75,000 to be paid to Randazza (along with other bonuses) after the full amount is transferred from Oron to Gurvits' trust account. **Exhibit 405; Tr. at 405:2-408:16.** This specific draft also made Randazza's engagement agreement an attachment to the settlement agreement. **Exhibit 405 at MJR 020236.** When faced with the prospect of having his unethical negotiations and consummation of his agreement to restrict his practice being incorporated into the written settlement agreement, Randazza attempted to cover his tracks by stating he had consulted with ethics counsel and asked to modify a portion of Gurvits' proposed settlement agreement because he didn't feel he could ethically enter into an agreement that restricts his right to practice. **Exhibit 406.** The truth of the matter is that Randazza had known since at least his handling of the TNAFlix matter that his negotiations to restrict his practice were unethical. *See* **Exhibit 357.**

As was the case in the TNAFlix matter, with a wink and a nod, Randazza attempts to sidestep his ethical transgressions to further his own personal interests of receiving the bribe payment by assuring Oron's counsel he was sufficiently motivated by the prospect of receiving the $75,000 bribe after the settlement --- "[t]hat is a hell of a lot of money, so they can probably consider my possible incentives and act accordingly." **Exhibit 406.** Gurvits responded by stating "Understood. I will take care of it in a way that addresses your concerns. *Id.* Then, on August 10, 2012, Randazza proposed an alternative way for him to get the $75,000—by saying it was a settlement with him personally. **Exhibit 368.** There is no evidence Randazza actually had a claim against Oron and he admitted during the hearing that he has no communications which evidence he ever asserted to Oron that he had any personal claims against them. **Tr. at 416:19-417:2.** It is evident that this was just another attempt to hide the fact that Randazza was negotiating a bribe to restrict his right to practice.

On August 10, 2012, Randazza filed a renewed motion for fees on behalf of Liberty.[24] **Tr. at 388:11-14; Exhibit 92.** On August 12, 2012, Gurvits sent a revised

---

[24] Although it was never collected, the motion for fees was eventually granted by Judge Navarro awarding $131,797.50 in fees on September 4, 2012. **Exhibit 93.**

1    version of the settlement agreement to Randazza which proposed that Liberty would be paid

2    $600,000 and an additional $75,000 would be held by Gurvits.  **Exhibit 407 (MJR020326);**

3    **Tr. at 417:3-418:21.**  Gone from this version of the settlement agreement is any reference

4    to the $75,000 being paid to Randazza, however the email correspondence between

5    Gurvits and Randazza clearly envisions that the money would be paid to Randazza if he

6    agreed "to assist Oron after Liberty is paid and the Liberty cases are dismissed."  **Exhibit**

7    **407 (MJR020321)(August 12, 12:04 p.m. email); Tr. at 418:8-21.**

8         On August 13, 2012, Randazza presented a draft of the proposed settlement

9    agreement to Gibson for his review.  **Tr. at 424:7-425:9, 701:15-702:10.**  Upon review,

10   Gibson questioned why the $75,000 was being set aside for Gurvits and who the money

11   would be going to.  *Id.* at **425:14-16; 701:21-702:10.**  Randazza then, for the first time,

12   informed Gibson that the money was a "bribe" from Oron in order to keep him from suing

13   Oron in the future.  *Id.* at **701:21-702:24, 703:1-704:24.**  Upon hearing this, Gibson

14   demanded that Liberty receive the money and not Randazza.  **Tr. at 428:11-19; *see also***

15   **Exhibit 324.**  Randazza informed Gibson that he had an ethical problem as a result of his

16   demand because giving Liberty the money would result in illegal fee sharing.  **Tr. at**

17   **428:11-19**    Because he knew Gibson was "chafing" over the $75,000 "bribe," on August

18   16, 2012 Randazza sent an email to Gibson attempting to explain it.[25]  **Exhibit 327.**  He

19   first indicated that the money was not being taken from Liberty because Oron was only

20   willing to pay $600,000 anyway.  *Id.*  He also represented that he had disclosed the

21   payment to Gibson "even before it happened."[26]  *Id.*  Finally, he told Gibson that it would be

22   improper fee sharing if he gave the money to Liberty but he was willing to step over that

23   line for him.  *Id.*  Gibson denies having any knowledge that Randazza was actively

24   negotiating a payment to his firm throughout the course of the Oron litigation.  **Tr. at**

25   _____

26   [25] Randazza's email acknowledged that Gibson had not spoken to him since August 13, 2012 (the
     day the $75,000 payment was first revealed to the Company).  **See Exhibit 327.**  Additionally, the
27   evidence shows a clear shift in the nature of the relationship between Gibson and Randazza once
     the bribe was discovered.  **Tr. at 446:7-449:14.**

28   [26] This is clearly not true given that Randazza admitted during the hearing that he never disclosed
     an amount to Gibson.  **Tr. at 429:16-22.**

LITTLER MENDELSON, P
Los Vegas, NV

1    **701:17-701:20, 702:14-702:24.** He also denies consenting to such negotiations. *Id.* at

2    **704:25-705:3, 705:23-706:16.**

3                        ii.    *James Grady*

4            Prior to filing the Oron lawsuit, Randazza solicited other adult content producers to

5    potentially join the lawsuit in order to minimize the costs to Liberty. A man named James

6    Grady was interested in pursuing Oron and, unbeknownst to Liberty, agreed to contribute

7    $5,000 and to assist in gathering facts in support of Liberty's claims.[27] **Tr. at 594:12-21;**

8    **Exhibit 396.** On June 6, 2012, Randazza emailed Grady inquiring about information

9    regarding Maxim Bochenko ("Bochenko"), who was the owner of Oron. **Exhibit 396.**

10   Grady responded by providing some personal information about Bochenko. *Id.* Grady

11   stated in his June 6, 2012 email that he "pay[s] a guy—call him a forensic investigator—to

12   dig past Domains by Proxy and things like that." *Id.* With regard to the information he was

13   providing about Oron, Grady told Randazza that the forensic investigator "didn't get the info

14   at Walmart in the course of normal commerce." *Id.* Despite the clear implications of Grady's

15   comments, Randazza continued to solicit information from Grady regarding Oron. **See**

16   **Exhibit 397.** Grady provided Randazza with access to privileged emails Oron exchanged

17   with Lieberman, Oron's financial and business records, information about emails sent and

18   received from Oron's email accounts, and Bochenko's personal email account and Skype

19   phone logs. **Tr. at 594:22-595:16; Exhibit 397.**

20           With knowledge the information was gathered by a "forensic investigator", Randazza

21   asked Grady to assemble the documentation and have it sent in an anonymous package to

22   Liberty/Excelsior. **Tr. at 595:17-21.** Randazza later submitted some of the information

23   Grady provided him to the court. *Id.* at **595:22-596:1.** Randazza also asked for Grady to

24   come to Las Vegas to be a "star witness" in the case by testifying about the information he

25   knows about Oron. **Exhibit 399.** Randazza coached Grady about the correct manner in

26   which he should respond if asked where the information came from:

27

28   _____
     [27] Randazza never gave Excelsior the $5,000 Grady contributed.

                                      44.

1    As far as I know it was lawfully obtained.  You certainly got it lawfully.  If the
     source is a disgruntled Oron employee, great.  Jilted lover, great.  Hacker,
2    problematic.

3    *Id.*; **Tr. at 602:1-12.**  Gibson was aware that an anonymous package was delivered to the

4    company from an anonymous source containing confidential documents related to Oron.

5    **Tr. at 748:17-20.**  When Gibson asked Randazza where the documents came from

6    Randazza's only response was: "don't ask."  *Id.* at 748:21-749:3.  Oron subsequently

7    accused Liberty of utilizing a hacker to steal confidential information from the company in a

8    demand for arbitration filed against the Company.  *Id.* at 749:4-12.

9                              *iii.     $25,000 Note*

10       The Oron litigation involved a strategic lawsuit being filed in Hong Kong against

11   Oron so that an injunction could be obtained to freeze Oron's various bank accounts

12   outside of the United States.  **Tr. at 720:19-722:4.**  Seeking the injunction necessitated that

13   Liberty retain counsel in Hong Kong.  *Id.*  In order to do so, it would cost $50,000 in fees to

14   Hong Kong counsel.  *Id.*  Gibson and Brian Lowderman were growing weary of the ever-

15   increasing fees in the Oron case so they asked if Randazza was confident that this was the

16   correct strategy.  *Id.* at 722:6-723:10.  When Randazza said he was, Gibson asked if

17   Randazza would chip in half of the "investment" given how confident he was.  *Id.*

18   Randazza agreed to loan the company the $25,000 and subsequently prepared a note

19   reflecting the transaction.  *Id.*; **Exhibit 373.**  Gibson signed the note and gave it back to

20   Randazza.  **Exhibit 373.**  The promissory note refers to the transaction as a loan and

21   characterizes Randazza as the lender and Liberty as the borrower.  *Id.*  The note also

22   includes a unilateral attorneys' fee provision for collection on the note.  *Id.*

23       Contrary to Randazza's allegations, no one at the Company ever stated or implied

24   that Randazza would be terminated if he didn't contribute the $25,000 to the optional

25   pursuit of the injunction.  **Tr. at 723:11-20.**  Randazza prepared the note but gave no verbal

26   or written explanation of what his role as a lender meant, nor did he encourage Gibson to

27   consult with separate counsel prior to executing the agreement.  *Id.* at 723:21-724:12.

28

LITTLER MENDELSON, P.

1              *iv.    Violation of Settlement Agreement*

2              As discussed previously, Randazza signed the Oron settlement agreement on behalf

3    of Liberty on July 1, 2012. Randazza then moved to enforce the agreement after Oron took

4    the position that the agreement was not binding. One of the provision of the agreement

5    required Liberty to "dissuade others from bringing suit against Oron." After the settlement

6    agreement had been enforced in the U.S. District Court for the District of Nevada,

7    Randazza provided another attorney, Gill Sperlein, with information about the Oron matter,

8    including pleadings and motions, and Oron account information. **Exhibit 346; Tr. at**

9    **589:20-591:10.** On August 29, 2012, Randazza wrote an email to his paralegal (Dillon) in

10   which he discussed filing a "half-hearted Motion to Stay" in federal court in order to "mask

11   that we are not helping Gill." **Exhibit 349; Tr. at 592:22-593:21.** He also informed Dillon

12   that they should help Sperlein anymore until the appeal deadline passes. *Id.*

13             Randazza testified that he fully informed Gibson that assisting Sperlein would

14   breach the settlement agreement with Oron. However, Randazza admits that there is no

15   documentation which shows he provided adequate disclosure to Gibson of what he was

16   assisting Sperlein with and that it would be considered a breach of the settlement

17   agreement. **Tr. at 584:17-588:21.** Gibson denies that Randazza ever provided him with

18   notice that he was breaching the agreement, or consent to allow Randazza to breach the

19   agreement. *Id.* at 746:15-748:4. Oron appealed Judge Navarro's order enforcing the July

20   1, 2012 settlement agreement with Liberty. **Tr. at 583:16-20.** Oron also subsequently filed

21   a demand for arbitration against Liberty in which they claimed that Liberty breached the

22   settlement agreement by assisting Sperlein in suing Oron on behalf of another company.

23   **Tr. at 583:21-584:8; Exhibit 334.**

24             *v.    Simultaneous Representation of Porn Guardian*

25             Another conflict arose when, unbeknownst to Liberty, Randazza was representing

26   Porn Guardian in a dispute it had with Oron during the same time period Randazza was

27   representing Liberty. **Tr. at 283:24-285:13.** In fact, the evidence indicates that Randazza

28   was actively negotiating settlements for both companies during that time period. *Id.* at

46.

384:12-388:2, 559:17-567:4. During portions of the negotiations Oron even proposed that the two settlements be tied together. *Id.* Randazza eventually did stop negotiating on Porn Guardian's behalf because he realized how blatant his conflict was. However, he never once advised the company that he was concurrently representing Porn Guardian during that period or that Porn Guardian stood to gain in a potential settlement. *Id.* at 743:12-744:4. In fact, Randazza failed to even disclose to Gibson that the Oron settlement agreement was contingent upon Porn Guardian also settling with Oron.

> ### vi.    *Randazza Committed Malpractice and Breached His Fiduciary Duty During the Course of the Oron Matter*

Randazza breached his fiduciary duty and his conduct fell below the standard of care by negotiating a payment with Oron during the settlement of the Oron matter, utilizing information obtained from James Grady when it clearly arose from an unlawful or unethical source, entering into a transaction with Liberty in the form of the $25,000 note, violating the settlement agreement with Oron by providing information to Sperlein in order to assist him in a suit against Oron, and simultaneously representing Porn Guardian and Liberty in settlement negotiations with Oron. **Exhibit 304, Kennedy's Report at ¶¶ 25-32.12.**

The Oron litigation occurred in Nevada and implicates various violations of the Nevada Rules of Professional Conduct ("Nev. RPC"). Nevada attorneys have a duty to communicate with a client regarding substantive matters requiring the clients informed consent, reasonable consulting with the client about the means to accomplish the client's objectives, keep the client abreast of the status of the matter, and explaining matters to the client as is reasonably necessary to permit the client to make informed decisions. Nev. RPC 1.4(a)-(b). Nev. RPC 1.7 (a)(2) provides that a lawyer shall not represent a client if "[t]here is a significant risk that the representation of one of more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer." Notwithstanding the existence of a concurrent conflict of interest an attorney may represent a client if the lawyer reasonably believes that he can competently and diligently represent the client, the representation is not prohibited

LITTLER MENDELSON, P

1  by law, the representation does not involved assertion of a claim by one client against the

2  other in the same matter, and each affected client "gives informed consent, confirmed in

3  writing." Nev. RPC 1.7(b).

4       Like California attorneys, Nevada attorneys are also prohibited from restricting their

5  right to practice. Nev. RPC 5.6(b) provides that an attorney shall not "participate in offering

6  or making" an agreement "in which a restriction on the lawyer's right to practice is part of

7  the settlement of a client controversy." Nevada lawyers also have restrictions on business

8  transactions they can enter into with their clients. A lawyer may not enter into a business

9  transaction with a client unless:

10      (1) The transaction and terms on which the lawyer acquires the interest are

11      fair and reasonable to the client and are fully disclosed and transmitted in
    writing in a manner that can be reasonably understood by the client;

12      (2) The client is advised in writing of the desirability of seeking and is given a
    reasonable opportunity to seek the advice of independent legal counsel on
    the transaction; and

13      (3) The client gives informed consent, in a writing signed by the client, to the

14      essential terms of the transaction and the lawyer's role in the transaction,
    including whether the lawyer is representing the client in the transaction.

15  Nev. RPC 1.8(a).

16       When representing a client, a lawyer "shall not use means that have no substantial

17  purpose other than to embarrass, delay, or burden a third person, or use methods of

18  obtaining evident that violate the legal rights of such a person." Nev. RPC 4.4(a). Along

19  similar lines, a lawyer "who receives a document relating to the representation of the

20  lawyer's client and knows or reasonably should know that the document was inadvertently

21  sent shall promptly notify the sender." Nev. 4.4(b). In *Merits Incentives, LLC v. Eighth

22  Judicial District Court*, 262 P.3d 720, 725 (2011), the Nevada Supreme Court discussed

23  Rule 4.4(a) and its proscription against lawyers taking a part in "obtaining an opposing

24  party's documents" through wrongful means or being "complicit in actions used to

25  wrongfully obtain those documents."

26       With respect to the conflict of interest which arose from his negotiations, Randazza

27  should not have been discussing the prospect of receiving a payment directly from Oron

28  through settlement of the Oron Matter because he "risked diverting money away from his

...TLER MENDELSON, P
...

1  client (Liberty) to himself." **Exhibit 304, Kennedy's Report at ¶ 32.1.**  The prospect of

2  earning a non-refundable, earned-upon receive retainer for $75,000 "blinded Mr. Randazza

3  to his fiduciary obligation—negotiating a settlement exclusively for and on behalf of

4  Liberty—and created a personal conflict of interest under Nevada RPC 1.7(a)(2) for which

5  he did not obtain informed consent, confirmed in writing, from Liberty as required." *Id.* **at ¶**

6  **32.3.**

7        Randazza's legal ethics expert, Joseph Garin, concludes that Randazza does not

8  have a personal interest that must be discussed under Nev. RPC 1.7, however his opinion

9  is based on his acceptance of Randazza's version of the events (that Randazza was

10  bluffing and had no expectation of receiving the bribes). **Tr. at 1219:20-1221:24.**  As if

11  Randazza's overall lack of credibility has not already been established, two specific facts

12  are worth mentioning with respect to Randazza's negotiation of this and the other bribes.

13  Randazza originally testified that to his recollection, the conversation he had with his

14  partner Ron Green about the potential $75,000 payment referenced in **Exhibit 366** actually

15  occurred. **Tr. at 395:7-395:17.**  However, during Green's deposition Green denied that the

16  two ever had such a conversation. *Id.* at 395:18-21.  Additionally, while Randazza claims

17  (and his experts accept as true) that it was common in intellectual property litigation to be

18  approached with a "bribe" as part of settlement negotiations, Randazza's own partner

19  testified that it is not common and that he has never been approached for such an

20  arrangement. *Id.* at 656:14-657:13.  Mr. Garin admitted during his testimony that if the

21  Arbitrator were to accept the premise that Randazza actually intended or expected to

22  receive the money he was negotiating for, then a personal interest did exist. *Id.* **at**

23  **1221:11-24.**  As discussed herein, Randazza's attempted justification of his improper

24  conduct in negotiating bribes has been shown to not be credible.[28]  If the Arbitrator accepts

25

---

26  [28] This includes the fact that in the TNAFlix litigation Randazza sent the retention agreement after the settlement was completed but it was ultimately not completed and then in the Oron case

27  Randazza attempted to avoid a similar result by sending the agreement prior to settlement. Additionally, when Randazza was confronted by Gibson about the money he told Gibson it was a

28  bribe for Randazza Legal Group.

49.

LITTLER MENDELSON, P.

1    the premise that Randazza intended or hoped to receive the $75,000 dollars then an

2    obligation arose to seek informed consent from Excelsior.[29]

3        As has been discussed previously, Randazza likewise never should have been

4    engaging in negotiations to restrict his right to practice.  Randazza violated Nev. RPC 5.6

5    when he participated in negotiations and activity encouraged Oron to hire him.  **Exhibit**

6    **304, Kennedy's Report at ¶ 32.2.**  Randazza knew that Rule 5.6 "prohibited him from

7    directly or indirectly negotiating to conflict himself out of future cases against Oron

8    (admitting that it 'creates an ethical gray area' for him).  He should have flatly rejected the

9    suggestion when it was raised."  *Id.*  Instead, he told opposing counsel that he should earn

10   "$100k if we're never to be able to sue [Oron] forever and ever."  **See Exhibit 366.**

11   Randazza's expert, Ms. Peck, testified that such an offer would fit into even her narrow

12   view of what restricting ones right to practice would be:

13       Q:    Would another example of [offering to restrict your right to practice],
14             the unlawful type of restriction, be somebody saying something like, I
             should get $75,000 if I'm never going to sue you again forever and
             ever?
15       A:    I think that that could be within it.  I think you would somehow—well, it
             could—it's arguably over the line.
16

17   **Tr. at 1306:1-7.**  At the hearing, Randazza's other expert, Mr. Garin, backed away from his

18   expert report and admitted that Randazza committed what he characterized as a "technical

19   violation" of Nev. RPC 5.6 (even while assuming Randazza's "negotiation strategy" defense

20   is true).  **Tr. at 1129:8-1130:4.**  Nonetheless, he maintained that no malpractice occurred

21   with respect to this issue based upon a tortured assumption that Gibson knew about the

22   alleged bribes and was actually encouraging that conduct because of a direction he

23   allegedly gave to Randazza to maximize the result for Liberty as efficiently and quickly as

24   he saw fit.  *Id.* at 1195:21-1197:1.  To assume that such a generic direction (if it even

25   occurred) authorized Randazza to engage in this unethical behavior is a stretch, at best.

26       Randazza also violated Nev. RPC 4.4(a) and 4.4(b) by using the information

27

28   [29] Mr. Garin also admitted that he cannot say for certain that the Oron settlement amount would not
     have been different if Randazza was not negotiating a $75,000 bribe for himself. **Tr. at 1201:7-11.**

1   provided to him by James Grady—when he either knew, or should have known that the

2   information had been illegally or unethically obtained. *Id.* at **1025:5-1030:2**.

3           This, above all things I looked at, is the most serious, in my view. It is pretty
            obvious that Mr. Grady's source was hacking the opposing party's e-mails
4           and records. I mean, there's–there's a lot of code words and things like that
            that are used, but it's pretty apparent and would be apparent to any lawyer
5           who received this information that the information that was being received
            including communications between the opposing party and the opposing
6           party's lawyer, and the opposing party's bank records and PayPal records.
            So to ask someone to get that information for you, and then say to them,
7           Send it, in essence, anonymously to the following address, and then it's
            received, and it is then used, that is as serious a violation of the Rules of
8           Professional Conduct as there is.

9   **Id.** at **1025:17-1026:9**. Randazza's expert tellingly provided no opinion as to whether

10  Randazza violated NRPC 4.4(a) during his direct examination. **Tr. at 1189:5-8**. However,

11  Mr. Garin did admit that if Randazza knew that the Oron information was unlawfully

12  gathered it would be a violation of Nev. RPC 4.4(a). *Id.* at **1211:24-1212:2**.

13          With regard to the $25,000 loan Randazza gave to the Company, he should have

14  made the requisite disclosures to Liberty prior to presenting the $25,000 note to Liberty.

15  Specifically, Liberty should have been advised in writing to seek separate counsel in such a

16  transaction and Randazza should have given them a reasonable opportunity to do so. *Id.*

17  at **1023:20-1025:3**.  Liberty should have been told to consult with independent counsel

18  about the terms of the promissory note—especially the unilateral attorneys' fee provision

19  and clause requiring repayment upon seven (7) days of Randazza's termination.[30]  **Exhibit**

20  **304, Kennedy's Report at ¶ 32.9.2**.  Randazza also should have explained the

21  advantages and disadvantages of the loan and reasonably available alternatives. *See In re*

22  *Discipline of Singer*, 109 Nev. 1117, 1120 (Nev. 1993).  It is undisputed that this did not

23  occur.  Accordingly, Randazza violated Nev. RPC 1.8 by entering into the agreement with

24  his client.

25          As for his role in breaching the settlement agreement, in assisting Sperlein by

26  providing the Oron information Randazza's conduct constituted a material change in

27

28  _____
    [30] Even Randazza's own expert admitted that including an attorneys' fee provision in the note raised
    a "yellow light" in his analysis. **Tr. at 1140:4-14**.

LITTLER MENDELSON, P.S.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

circumstances which required him to obtain client approval prior to acting. **Tr. at 1030:15-1032:16**. Only the client could authorize the attorney to violate a settlement agreement pursuant to Nev. RPC 1.2. *Id.* Even Randazza's own expert, who has a different opinion than Kennedy on this matter, admitted during the hearing that he does not know what Randazza shared with Sperlein. **Tr. at 1180:18-1183:10**. He also admitted that Randazza and his counsel never informed him that Randazza had provided Sperlein with a list of known bank accounts and his entire legal file on Oron. *Id.* at 1183:2-11. As Mr. Garin himself admitted, Randazza's lack of candor and truthfulness with him could alter his conclusions. *Id.* at 1164:4-12. Given that Randazza never made adequate disclosure of his intentions and the potential consequences for Excelsior to make an informed decision, Randazza breached his fiduciary duty and committed malpractice in assisting Sperlein to bring suit against Oron.

Finally, Randazza's concurrent representation of Porn Guardian and Liberty in settlement negotiations with Oron was a violation of Nev. RPC 1.7. **Exhibit 304, Kennedy's Report at ¶¶ 37.10-37.12**. Randazza's expert argues that there was never a reportable conflict which arose because Randazza informed Porn Guardian that he could no longer represent them.[31] Kennedy's Report explains the problem with this theory:

> By negotiating a settlement for Porn Guardian with Oron's counsel, Mr. Randazza potentially diverted settlement funds away from Liberty ... Mr. Randazza recognized during settlement negotiations that he had a conflict of interest, and withdrew from continuing to represent Porn Guardian. However, by that point, he had already reached a settlement in principle with Oron and those parties simply needed to execute the settlement agreement. Mr. Randazza could not sidestep the conflict by having Porn Guardian represent itself at the eleventh hour. Mr. Randazza needed Liberty to provide informed consent, confirmed in writing, to the work that he had done and was simultaneously doing for Porn Guardian.

As a matter of fact, it wasn't even the eleventh hour when Randazza actually resigned from representing Porn Guardian. Randazza sent his resignation email to Porn Guardian on July 5, 2012. **Exhibit 404**. That is five days after Randazza executed the original

---

[31] Ms. Peck's opinion on this matter is meritless given that she admittedly analyzed this potential conflict under California law even though the conflict arose in Nevada.

settlement agreement on Excelsior's behalf. *See* **Exhibits 90 and 345.** In light of these facts, Randazza undoubtedly breached his fiduciary duty and committed malpractice during the course of the Oron litigation.

### d. XVideos/XNXX

Randazza's representation of XVideos and XNXX, two known copyright infringers, during the time period in which he was employed by and represented Excelsior/Liberty created an undeniable conflict of interest. Despite repeated knowledge that Liberty's copyrighted material was being found on these sites and explicit pleas for Randazza to take legal action against them, Randazza ignored, and at times actively dissuaded Liberty from taking action without ever revealing that XVideos and XNXX were his clients. In so doing, Randazza breached his fiduciary duty and committed malpractice.

During Randazza's employment with Excelsior, he was retained by an entity which owns and operates two pornographic sites entitled XVideos and XNXX. **Exhibit 420 (showing XVideos and XNXX became Randazza's client in June 2010).** It was common throughout Randazza's employment for Liberty's copyrighted films to be found on the XVideos site and for Randazza to be informed about it. *See e.g.* **Exhibit 389; Exhibit 410; Tr. at 503:22-23, 519:10-520:15, 520:18-525:7, 733:6-24.** XNXX, like XVideos, is another site in which Liberty's copyrighted material was often found. *See e.g.* **Exhibit 422, Tr. at 502:4-503:21, 511:4-517:16, 729:11-730:2.** In January 2010 (prior to representing XVideos and XNXX), Randazza himself proposed to Gibson that the company contemplate suing both sites. *See* **Exhibit 316; Tr. at 507:20-508:3.** In January 2011, after Randazza's representation of XVideos and XNXX began, Liberty approached Randazza about suing XVideos for copyright infringement. **Exhibit 410 (EMC 004583); Exhibit 378.** In response to Excelsior, Randazza indicated that he and another attorney at his firm had previously forced XVideos to implement a system for detecting unauthorized uploads of copyrighted works onto its website, which he represented would present a strong defense to an infringement lawsuit. **Exhibit 378; Tr. at 525:13-526:1, 527:15-529:22.**

In September 2011, Liberty once again broached the topic of suing XVideos for

53.

LITTLER MENDELSON, P
A Professional Corporation
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

1   copyright infringement because of the continued copyrighted works found on its site.

2   **Exhibit 390; Tr. at 734:10-24.** Randazza advised Liberty against the proposed course of

3   action, claiming that XVideos' use of the content at issue was "fair use," and thus, protected

4   under federal law. **Exhibit 390; Tr. at 734:21-735:14.** He also indicated that it would look

5   bad from a publicity standpoint to bring a claim against XVideos. **Exhibit 390.**

6       Randazza never disclosed that he represented XVideos and did not obtain informed

7   consent, confirmed in writing, from Liberty to continue representing XVideos once it

8   became apparent that his representation of Liberty could be materially limited by his

9   concurrent representation of XVideos. **Tr. at 508:4-15, 735:15-736:9, 847:11-13, 875:23-**

10  **25.** Randazza also never disclosed the fact that he represented XNXX—even after Gibson

11  explicitly requested that Randazza sue XNXX. **Tr. at 509:3-8, 516:14-517:16, 730:3-12,**

12  **876:1-3, 847:14-16; Exhibit 422.** The Company never provided informed consent to

13  Randazza that would have allowed him to continue his representation XNXX. **Tr. at**

14  **508:23-509:2, 730:3-12.**

15      In light of these facts, Randazza undoubtedly had a conflict of interest in advising

16  Liberty not to pursue a copyright infringement action against XVideos based on his existing

17  professional relationship with XVideos and XNXX. **Exhibit 304, Kennedy's Report at ¶¶**

18  **35-37, 37.5-37.7; Tr. at 1032:17-1035:14, 1037:15-1040:60.** Cal. RPC 3-310(c)(2) states

19  that a lawyer shall not, without informed written consent of each client "[a]ccept or continue

20  representation of more than one client in a matter in which the interests of the clients

21  actually conflict." Nevada has a similar rule: "a lawyer shall not represent a client if the

22  representation involves a concurrent conflict of interest. A concurrent conflict of interest

23  exists if … [t]here is a significant risk that the representation of one or more clients will be

24  materially limited by the lawyer's responsibilities to another client." Nev. RPC 1.7(a)(2).

25  Notwithstanding the existence of a concurrent conflict of interest a lawyer may represent a

26  client if the lawyer reasonably believes that the lawyer will be able to provide competent

27  and diligent representation to both parties and the representation does not involve the

28  assertion of a claim by one client against another client represented by the lawyer in the

1  same matter, and each client gives informed consent, confirmed in writing.    Nev. RPC

2  1.7(b).

3       By way of reminder, Randazza initially represented to the State Bar that he

4  represented XVideos in resolving one specific matter and, "after that, Randazza did not do

5  any work for XVideos." **Exhibit 372 at EMC001610.** Randazza further reported this same

6  misrepresentation to both of his own ethics experts. **Tr. at 1173:5-13, 1320:9-20.** At

7  arbitration, Randazza was forced to acknowledge his misrepresentation and admit that

8  after the one specific matter he handled for XVideos, rather than ceasing to do further work

9  for them, he continued to represent XVideos throughout the remainder of his employment

10  with Excelsior. **Tr. at 538:8-541:22 and Exhibit 313 at p. 4.** Randazza's own ethics

11  expert admitted that Randazza's representation to the bar that XVideos was no longer a

12  client could be considered a false statement of material fact. **Tr. at 1176:9-20.**

13       Randazza should have refrained from advising Liberty on the merits of a copyright

14  infringement action against XVideos based upon his concurrent representation of the site.

15  **Exhibit 304, Kennedy's Report at ¶ 37.5.** When asked to sue XVideos and XNXX

16  Randazza was put between a rock and a hard place because it involved a potential claim

17  by one of his clients against his other client.  In other words, such a conflict was not

18  consentable, Randazza should have disclosed the representation to Liberty and Randazza

19  and he should have encouraged them to seek separate counsel. *Id.* at ¶¶ 37.6 – 37.7; **Tr.**

20  **at 1038:17-1040:6.**  Randazza's own expert admitted on direct examination by Randazza's

21  counsel that "when they ask you to sue, boom, you are in conflict land." **Tr. at 1157:25-**

22  **1158:13.** He later admitted on cross examination that Randazza should have disclosed his

23  representation of XVideos in light of the request to sue (the same could be said for XNXX

24  upon Gibson's request to sue that site).

25      Q:   Now, given that Mr. Randazza was representing at this time both
              XVideos and Liberty, should he have provided Liberty with full

26                disclosure that he was XVideos' attorney?

    A:    Assuming that to be the case, yes.

27      ...

28      Q:   On XVideos you gave some testimony that when someone is asked—if

LITTLER MENDELSON, P.C.
ATTORNEYS AT LAW
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

1    when you are asked to sue someone and there is potential conflict of
2    interest, boom, you are in conflict land; do you recall what I'm talking
     about?
     A:    Yes, I recall that, yes.
3    Q:    So in the circumstance where Mr. Randazza represents XVideos and
          my client asks him to sue XVideos , unless my client then immediately
4          withdrew the request to sue XVideos, Marc should have disclosed that
          he represented XVideos; is that a fair statement?
5    A:    Yeah, I would say that is fair.

6  **Tr. at 1180:3-11, 1211:1-13.**

7         Randazza's other expert, Ms. Peck, admitted during the hearing that at the time of

8  her report she was also under the misimpression, created by Mr. Randazza, that by 2011

9  he was no longer representing XVideos. **Tr. at 1317:3-14; 1320:9-1321:18.** Ms. Peck also

10 confirmed that an attorney has to be truthful when disclosing a conflict of interest to his or

11 her client. *Id.* at 1323:6-12. Ms. Peck then attempted, albeit unpersuasively, to claim that

12 Randazza had disclosed his representation of XVideos by relying upon the email Randazza

13 sent where he represents that he shoved Vobile down XVideos' throat "for the free speech

14 coalition." **Exhibit 378.** Nowhere in that document does Randazza provide actual

15 disclosure that he was concurrently representing XVideos—at most it implies that he was

16 acting in the interest of an adult industry interest group and was another evasive response

17 to avoid revealing his representation of XVideos. **See id.** Accordingly, Randazza clearly

18 was not truthful with Liberty in his disclosure of the conflict. When pressed on that issue

19 Ms. Peck then attempted to cast the email as Randazza declining to represent Liberty in its

20 pursuit against XVideos in order to avoid the conflict.[32] **Tr. 1323:13-1327:18.** She then

21 was forced to admit that **Exhibit 378** would not be enough disclosure to Excelsior of the

22 conflict. *Id.* at 1326:5-1327:18.

23        Finally, Randazza testified that he saw no need to seek informed consent because

24 he did not believe a valid claim existed against XVideos or XNXX. Randazza also tried to

25 imply that Liberty/Excelsior was aware of his representation because he would brag about

26

27 ───────────
[32] The problem with this point is that Randazza was not outside counsel. His primary responsibility
28 was to litigate on Liberty's behalf. It's illogical to conclude that he was declining to accept the
   company as a client in a specific case as if he was operating as outside counsel.

56.

1   being able to get these sites to take content down when he requested.  Both of these

2   arguments are meritless.  First, Randazza himself defended XVideos and XNXX against

3   copyright infringement claims made by other pornographic content producers which

4   resulted in XNXX and XVideos paying over $100,000 to settle those claims.  **Tr. at 507:20-**

5   **511:1.**  If content producers had no valid claims against sites like XNXX and XVideos there

6   would have been no need for Randazza to represent them in such disputes.  *Id.*  Second,

7   Kennedy's testimony made clear that simply bragging about relationships comes nowhere

8   near what is required in order to adequately disclose a conflict of interest.  **Tr. at 1034:19-**

9   **1035:14.**  In light of these facts, Randazza committed malpractice by engaging in the dual

10  representation of these companies with interests that were materially adverse to one

11  another.

12                    **e. Titan Media/Kink**

13          In 2012 Randazza advised Excelsior/Liberty with respect to various producer

14  agreements they were entering into with adult production companies as part of a new

15  business venture.  Unbeknownst to Liberty, two of the companies Liberty was entering into

16  agreements with happened to be Randazza's clients, Titan Media and Kink.  Throughout

17  the course of those negotiations Randazza advised Liberty to accept concessions Titan

18  Media was requesting be made to the producer agreements.  Even while faced with this

19  conflict, Randazza never revealed that he represented either Titan Media or Kink while

20  employed by the Company.

21          Randazza represented Titan Media and Kink.com during the time period in which he

22  was employed by Excelsior.  **Tr. at 285:22-286:5, 579:2-16, 580:6-8; Exhibit 416.**  During

23  the course of Randazza's employment with the Company, Liberty acquired the internet

24  domain "gay.xxx".  **Tr. at 737:12-14, 876:13-16.**  With Randazza's assistance, Liberty

25  entered into producer agreements with other adult entertainment producers to sell their

26  content on gay.xxx.  *Id.* at 876:13-878:17.  In 2012, both Titan Media and Kink entered into

27  producer agreements with Liberty for this purpose.  *Id.*  During the course of negotiating

28  the producer agreement with Titan Media, Randazza urged Liberty to make an exception

57.

1   with respect to certain terms in the Titan Media agreement. *Id.*  Randazza never disclosed

2   that he represented Titan Media and Kink in other matters and did not obtain informed

3   consent, confirmed in writing, to do so once it became apparent that his representation of

4   Liberty could be limited by his representation of Titan Media or Kink. **Tr. at 737:15-25,**

5   **847:17-22, 876:4-878:17.**

6          As noted previously, a concurrent conflict of interest exists if ... [t]here is a significant

7   risk that the representation of one or more clients will be materially limited by the lawyer's

8   responsibilities to another client, a former client or a third person or by a personal interest

9   of the lawyer." Nev. RPC 1.7(a)(2).  Notwithstanding the existence of a concurrent conflict

10  of interest a lawyer may represent a client if the lawyer reasonably believes that the lawyer

11  will be able to provide competent and diligent representation to both parties and the

12  representation does not involve the assertion of a claim by one client against another client

13  represented by the lawyer in the same matter, and each client gives informed consent,

14  confirmed in writing.  Nev. RPC 1.7(b).

15         Randazza was under the obligation to disclose his representation.  **Exhibit 304,**

16  **Kennedy's Report at ¶¶ 35-37, 37.13.**  Randazza's expert, Ms. Peck, disagreed with

17  Kennedy that any conflict existed—referring to them only as hypothetical conflicts.  **Tr. at**

18  **1275:16-1276:1.**  Unfortunately for Randazza, there is nothing hypothetical about the fact

19  that at a minimum Randazza advised the company with respect to significant concessions

20  Titan wanted in the producer agreements they entered into with the Company (which

21  Excelsior had not made for anyone else) but failed to disclose that he represented Titan

22  Media. *Id.* at **876:13-878:17.**  Accordingly, Randazza should have obtained Liberty's

23  informed consent, confirmed in writing, to represent Titan Media and Kink while negotiating

24  the producer agreements for Liberty. His failure to do so violated Nev. RPC 1.7(a)(2) and

25  amounts to malpractice.[33]  **Exhibit 304, Kennedy's Report at ¶¶ 35-37, 37.13; Tr. at**

26  _____

27  [33] Randazza's other expert, Mr. Garin, admitted that when he authored his report on this topic he did
     not know that Titan Media entered into producer agreements with the Company and that Randazza
28  gave advice to the company about changes Titan Media wanted made to the agreements.  **Tr. at**
     **1209:11-1210:9.**

LITTLER MENDELSON P

1    1043:19-1044:24.

2          **f.  Bang Bros/GRHK**

3          Another way in which Randazza committed malpractice was through the conflicting

4    representation of Bang Bros and GRHK during the time period in which he was employed

5    as Excelsior's General Counsel.   One of Randazza's long-time adult industry clients is

6    Bang Bros.  **Tr. at 544:9-24.**  Randazza billed over $20,000 to Bang Bros while he was

7    representing Excelsior and Liberty.  *Id.* **at 545:8-546:7.**   In June 2012, Liberty was

8    negotiating a potential acquisition of Cody Media, Inc. ("Cody Media"), a large adult

9    entertainment producer.  *Id.* **at 550:21-24.**   Liberty intended the finance the purchase

10    through a third-party lender.  *Id.* **at 550:25-551:2.**  During a meeting in which potential

11    funding options were discussed, Randazza advised the Company to not seek funding from

12    a potential source that had been identified (Ackrell Capital) and instead suggested that the

13    Company obtain financing from Bang Bros.  *Id.* **at 551:3-25, 739:6-740:23, 871:9-874:1.**

14    Randazza failed to advise Liberty that he also represented Bang Bros and never obtained

15    informed consent to continue representing both companies.  *Id.* **at 544:25-545:7, 847:7-10.**

16    Liberty ultimately did not proceed with the acquisition of Cody Media.

17          In August 2011, Randazza also represented Liberty in a dispute against an adult site

18    entitled Fapzap.  *Id.* **at 554:25-557:17.**   Unbeknownst to Liberty, Randazza was

19    simultaneously representing a company affiliated with Bang Bros entitled GRHK, LLC in a

20    dispute against Fapzap.  *Id.* **at 553:14-557:17, 740:24-741:8.**  Randazza eventually settled

21    the dispute on behalf of both parties.  *Id.* **at 557:15-558:3.**  Randazza recovered $30,000

22    for Liberty, and he recovered the Fapzap website for GRHK, LLC.  *Id.* **at 557:15-558:33.**

23    Randazza never disclosed to Liberty that GRHK was his client.  *Id.* **at 553:24-554:5,**

24    **740:24-741:22.**  Randazza also never disclosed to Liberty that the site could potentially be

25    acquired in the settlement.  *See id.* **at 740:24-741:22.**  Randazza's employment contract

26    with Liberty afforded him 25% of the settlement proceeds of settlements he obtained on

27    behalf of the company.  *Id.* **at 558:4-559:6.**  Had he obtained the site on Liberty's behalf, it

28    would not have afforded him any bonus.  *Id.* **at 558:4-559:6.**

LITTLER MENDELSON, P.
Attorneys at Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

1    Under Nevada law, a concurrent conflict of interest exists if ... [t]here is a significant

2  risk that the representation of one or more clients will be materially limited by the lawyer's

3  responsibilities to another client, a former client or a third person or by a personal interest

4  of the lawyer." Nev. RPC 1.7(a)(2). Notwithstanding the existence of a concurrent conflict

5  of interest a lawyer may represent a client if the lawyer reasonably believes that the lawyer

6  will be able to provide competent and diligent representation to both parties and each client

7  gives informed consent, confirmed in writing.  Nev. RPC 1.7(b).

8    Randazza should have disclosed his ongoing work for Bang Bros to Liberty in

9  writing.  **Exhibit 304, Kennedy's Report at ¶¶ 37.2-37.4; Tr. at 1035:19-1037:7.**

10  Randazza also needed Liberty to consent in writing to his concurrent work for Bang Bros to

11  the extent that he was advocating having Liberty use Bang Bros to finance the acquisition

12  of Cody Media. *Id.* The same can be said of Randazza simultaneously pursuing claims on

13  behalf of GRHK and Liberty against a common defendant while negotiating the settlement.

14  **Tr. at 1036:16-1037:14.**[34]  Accordingly, Randazza's conduct undoubtedly fell below the

15  standard of care and breached the fiduciary duty he owned to the Company.

16    **g.  Miscellaneous**

17    *i.    Retention/Destruction of Company Property*

18    Immediately after ending his employment relationship with Excelsior, Randazza

19  wiped his company issued laptop without notifying Excelsior or seeking their permission.

20  **Tr. 468:8-469:10, 754:15-17.**  Randazza also cut-off Excelsior's access to their legal files.

21  Additionally, Randazza refused to return his company issued iPhone until months after this

22  litigation had begun. *Id.* at 470:6-20, 754:12-14. Nev. RPC 1.16(d) provides:

23    Upon termination of representation, a lawyer shall take steps to the extent
    reasonably practicable to protect a client's interests, such as giving
24    reasonable notice to the client, allowing time for employment of other counsel,
    **surrendering papers and property to which the client is entitled** and
25    refunding any advance payment of fee or expense that has not been earned
    or incurred. The lawyer may retain papers relating to the client to the extent
26    permitted by other law.

27  _____

28  [34] Tellingly, neither of Randazza's experts offered opinions (in their reports or at the hearing) as to
    Randazza's representation of GRHK.

60.

1   Randazza violated NRPC 1.16 by retaining the iPhone and destroying his client's property

2   (the documents located on the company issued laptops) against their will. **Exhibit 304,**

3   **Kennedy's Report at ¶¶ 50, 50.10-50.11; Tr. at 1044:25-1046:16, 1094:13-1098:24.** In

4   so doing, Randazza fell below the standard of care required of a Nevada attorney.

5                                    *ii.    Representation of Eric Carrender*

6            Randazza also violated the rules applicable to Nevada attorneys by assisting a

7   former Excelsior employee in an employment dispute against Excelsior by helping Eric

8   Carrender ("Carrender") in his search for an attorney, soliciting others to be a witness in

9   support of his Carrender's case, and offering himself to be a witness against the Company

10  in the dispute.   After Randazza resigned from the Company, he was approached by

11  Carrender.  **Tr. at 607:23-608:22.**  Carrender had filed a charge of discrimination against

12  the company with the proper administrative agency.  *Id.*  Carrender approached Randazza

13  about the claims he was making against the Company and Randazza proceeded to have

14  his associate, Jay Devoy ("Devoy"), assist Carrender in finding an attorney to represent him

15  against Excelsior.  **Tr. at 606:11-607:8; Exhibit 379.**  At one point Devoy even refers to

16  himself as Carrender's attorney when explaining confidentiality to him.  *Id.*  Randazza

17  offered to be a witness against Excelsior, and communicated with another employee of the

18  Company, Nick Mosier, to request that he also serve as a witness on Carrender's behalf.

19  **Tr. at 607:9-22, 608:23-609:3; Exhibit 379.**  When Carrender informed Randazza that he

20  was still having difficulty finding an attorney to assist him, Randazza encouraged him to

21  keep looking (and in turn continue pursuing his claims against Excelsior).  **Exhibit 379.**

22           Nev. RPC 1.9 provides that: "A lawyer who has formerly represented a client in a

23  matter shall not thereafter represent another person in the same or a substantially related

24  matter in which that person's interests are materially adverse to the interests of the former

25  client unless the former client gives informed consent, confirmed in writing."  As Kennedy

26  explained, neither Randazza nor Devoy should have assisted Carrender, whether by giving

27  him advice, agreeing to testify on his behalf, encouraging others to testify on his behalf, or

28  helping him to find a lawyer.  **Exhibit 304, Kennedy's Report at ¶¶ 50, 50.12-50.15.**

LITTLER MENDELSON, P.C.
2024 Howard Hughes Parkway
Suite 1600
Las Vegas, NV 89169-5937
702.862.8800

1    Randazza owed a duty of loyalty to Excelsior and cannot, without informed, written

2    consent, assist persons such as Carrender whose interests are materially adverse to the

3    Company in matters substantially related to the prior representation. *Id.* at ¶¶ 50, 50.12-

4    50.15; Tr. at 1046:17-1047:25.  By doing so, Randazza undoubtedly violated Nev. RPC

5    1.9(a).

6                    *iii.*    *Improper Solicitation of Information From Excelsior*

7            By way of reminder, Chip Carter is the former Excelsior Director of Marketing who

8    Randazza would communicate with regarding the dispute between Randazza and Excelsior

9    during the time period that Carter still worked for the Company.[35]  Specifically, Randazza

10   requested that Carter send him copies of the bar complaints the company sent to various

11   State Bar organizations and also shared his opinions about those complaints.   Tr. at

12   332:23-335:22, 609:4-609:22.  During the time period that Carter and Randazza were in

13   contact, Randazza confronted Dunlap at an industry event in Phoenix, Arizona, and during

14   their confrontation Randazza cited sales figures that Carter had access to but Randazza

15   would not have known about given that he no longer worked for the company.   Tr. at

16   761:25-763:16, 880:11-884:4

17           Nevada lawyers may not communicate about the subject of the representation with a

18   person the lawyer knows to be represented by another lawyer. Nev. RPC 4.2.  A lawyer

19   also "shall not use means that have no substantial purpose other than to embarrass, delay,

20   or burden a third person, or use methods of obtaining evidence that violate the legal rights

21   of such a person." Nev. RPC 4.4(a).  In light of these expectations, Randazza should not

22   have been in contact with Carter regarding the litigation given that he knew the Company

23   was represented by counsel.  Exhibit 304, Kennedy's Report at ¶¶ 50, 50.16-50.20.

24   Randazza also should not have requested that Carter disclose confidential information

25   related to Excelsior/Liberty.  *Id.*  His conduct in so doing violated Nev. RPC 4.2 and 4.4(a)

26

27   _____
     [35] Carter authored and issued press releases for the company, his office was in the executive wing
28   of the building, he attended Executive meetings, he also had authority to and at times did bind the
     company to contracts.  Tr. at 887:13-888:8.

                                                    62.

1  and evidences a complete disregarding for Excelsior's rights. *Id.*

2      **h. Proper Remedy For Malpractice and Breach of Fiduciary Duty**

3       *i.*   ***Actual Damages***

4     As a result of various forms of legal malpractice committed by Randazza during the

5  course of the Oron litigation, Oron not only appealed Judge Navarro's Order enforcing the

6  settlement agreement, but on November 16, 2012 they also filed an arbitration demand

7  against Liberty. **Exhibit 334**. The demand alleged, amongst other things, that Randazza

8  utilized a hacker to obtain privileged and confidential documents/information for use in the

9  litigation. **Exhibit 334 (EMC000738); Tr. at 768:18-769:12.** Oron also alleged that in

10  contravention of the settlement agreement, Liberty did not dissuade others from bringing

11  suit against Oron and actually assisted another company in filing a "copycat" lawsuit

12  against them. **Exhibit 334 (EMC000741).** As discussed above, Randazza was the sole

13  cause of both of these serious allegations made in the arbitration demand. Because of

14  these serious allegations, Excelsior's new counsel engaged in settlement discussions with

15  Oron and eventually Liberty was forced to resettle the Oron case for $275,000 (which was

16  half of the previous settlement amount of $550,000). **Tr. at 765:17-768:5, 768:18-769:12.**

17  At the time of the resettlement the entire $550,000 settlement remained in Randazza's trust

18  account as supposed disputed funds, but Randazza agreed to release $275,000 to Liberty

19  so that amount could be paid back to Oron. *Id.* at **765:17-768:5, 768:18-769:12.**

20     Randazza's malpractice and unethical behavior was the driving force behind the

21  arbitration demand filed by Oron which forced Liberty to agree to resettle the case for half

22  of what it had already been awarded. **Tr. at 766:21-767:8, 770:4-770:8.** Accordingly,

23  Randazza's actions undoubtedly caused Liberty actual damages in the amount of **$275,000**

24  **(plus interest from August 2012 to the present)**. The Arbitrator should award that

25  Randazza pay such damages as a result of his malpractice and breach of fiduciary duties.

26     Additionally, in early August 2012 Gurvits and Randazza were negotiating to settle

27  with Oron in exchange for Liberty dropping their motion for attorneys' fees. **Tr. at 404:25-**

28  **405:16.** On two separate occasions, Randazza was presented with a settlement offer and

LITTLER MENDELSON, P
1100 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.583.3600

draft agreement which provided for Oron to pay $600,000 ($50,000 more than the previous settlement amount that had been enforced but had not yet been paid). **Exhibit 405-407; Tr. at 405:2-408:16, 417:3-418:21.** By way of reminder, the agreements also had a $75,000 payment (or "settlement") to Randazza. *Id.* That subsequent settlement agreement was eventually presented to Gibson and Randazza's "bribe" negotiations were revealed. **Tr. at 424:7-425:16, 701:15-702:10.** Randazza neglected to tell Gibson that the agreement had a specific expiration date, and after the discovery of the "bribe" occurred the settlement was not executed. **Tr. at 710:11-711:6, 770:9-16.** Had Randazza not committed malpractice by engaging in improper negotiations with Oron, Liberty would have accepted the $600,000 settlement and would have been entitled to an additional $50,000. *Id.* The Arbitrator should award this additional **$50,000 loss (plus interest from August 2012)** as another form of Excelsior's damages resulting from Randazza's misconduct.

### ii.    *Disgorgement/Fee Forfeiture*

In addition to the blatant damages caused by Randazza discussed above, Excelsior seeks disgorgement/forfeiture of the salary and bonuses it paid to Randazza during the time periods in which he was committing malpractice and breaching the fiduciary duty to Liberty. As noted in Dennis Kennedy's expert report, if an attorney violates the duties owed to a client while representing that client, he is generally precluded from recovering his fees. *See e.g. Pringle,* 87 Cal. Rptr. 2d at 93-94; *Settelmeyer & Sons, Inc. v. Smith & Harmer, Ltd.,* 124 Nev. 1206, 1217, 197 P.3d 1051, 1059 (Nev. 2008); *see also* Restatement (Third) Law Governing Lawyers § 37 (stating that when a layer engages in a "clear and serious violation of duty to a client," the lawyer "may be required to forfeit some or all of the lawyer's compensation for the matter"); Restatement (Third) of Agency § 8.01 cmt. d(2)("An agent's breach of fiduciary duty is a basis on which the agent may be required to forfeit commissions and other compensation paid or payable to the agent during the period of the

LITTLER MENDELSON, P.C.

1   agent's disloyalty").[36]

2       The factors the Arbitrator should consider when assessing forfeiture and/or

3   disgorgement include: (1) the gravity and timing of the violation; (2) the attorney's

4   willfulness; (3) the effect of the violation on the value of the attorney's work for the client; (4)

5   other  threatened or actual harm suffered by the client; (5) the adequacy of other available

6   remedies.   *See* Restatement (Third) Law Governing Lawyers § 37.   It is generally a

7   question of fairness and reasonableness in determining what portion and/or amount of fees

8   the attorney and/or his firm must disgorge or forfeit.   **See discussion in Exhibit 304,**

9   **Kennedy's Report at ¶ 51.5.**

10       Randazza's expert, Ms. Peck, took issue with Kennedy's opinion that fee forfeiture

11   and disgorgement are appropriate in this matter.  She cited *Pringle v. La Chapelle,* 73 Cal.

12   App. 4th 1000, 1006, 87 Cal. Rptr. 2d 90 (1999) for the proposition that not every violation

13   of the rules of professional conduct make fee forfeiture appropriate.  Mr. Kennedy, and in

14   turn Excelsior, do not disagree with Ms. Peck's point.  Indeed, as the court in *Pringle*

15   suggests, under California law there typically "must be a serious violation of the attorney's

16   responsibilities." *Id.* The evidence entered during the hearing and discussed herein shows

17   that Randazza committed serious violations of the duties and responsibilities he owed

18   Excelsior/Liberty which make forfeiture/disgorgement entirely appropriate.

19       Randazza's experts also attempt to limit forfeiture and/or disgorgement in this case

20   by claiming that Excelsior must demonstrate causation and actual damages in order to for

21   the Arbitrator to award such a remedy.  As discussed above, Randazza did cause actual

22   damages to Excelsior to the tune of $325,000.  Nonetheless, even if it hadn't suffered

23   actual damages case law and trusted secondary authority makes clear that a client is not

24   required to prove actual damages resulting from the fiduciary breach in order to seek

25   forfeiture and/or disgorgement of fees. *See e.g. Burrow v. Arce,* 997 S.W.2d 229, 237-40

26

27   [35] It is well settled that forfeiture and disgorgement is appropriate when attorneys engage in
28   conflicting representation without obtaining informed consent from all affected clients. *See* cases
     cited in **Exhibit 304, Kennedy's Report at ¶ 51.2-51.3.**

LITTLER MENDELSON, P.

1   (Tex. 1999); *see also* Restatement (Third) of Agency § 8.01 cmt. d(2) ("Forfeiture may be

2   the only available remedy when it is difficult to prove that harm to a principal resulted from

3   the agent's breach or when the agent realizes no profit through the breach"). In *Burrow*,

4   the Supreme Court of Texas thoroughly analyzed the issue and noted:

5           Pragmatically, the possibility of forfeiture of compensation discourages an
        agent from taking personal advantage of his position of trust in every situation
6       no matter the circumstances, whether the principal may be injured or not.
        **The remedy of forfeiture removes any incentive for an agent to stray**
7       **from his duty of loyalty based on the possibility that the principal will be**
        **unharmed or may have difficulty proving the existence or amount of**
8       **damages.**  In other words, as comment b to section 49 of the proposed
        *Restatement (Third) of the Law Governing Lawyers* states, '[f]orfeiture is also
9       a deterrent.'

10
    *Id.* at 238 (emphasis added).  To limit forfeiture of compensation to instances in which the
11
    principal can prove actual harm conflicts with the justifications for the rule.  *Id.*  The main
12
    purpose of forfeiture is not to compensate the injured principal "even though it may have
13
    that effect."  *Id.*  "Rather, the central purpose of the equitable remedy of forfeiture is to
14
    protect relationships of trust by discouraging agents' disloyalty."  *Id.* In light of this analysis,
15
    **the court held that a client need not prove actual damages** in order to obtain forfeiture
16
    of an attorney's compensation for the attorney's breach of fiduciary duty to the client.  *Id.* at
17
    240(emphasis added); *see also* Restatement (Third) of Agency § 8.01 cmt. d(2) for
18
    discussion of this issue.
19
            Randazza's experts rely on two California cases for their argument that actual
20
    damages must be established in order for disgorgement or forfeiture to be awarded.  In
21
    *Frye v. Tenderloin Housing Clinic, Inc.*, 38 Cal.4th 23 (2006), the court was faced with the
22
    decision of whether a nonprofit corporation which performed public interest legal work
23
    should be forced to disgorge *statutory* attorneys fees awarded in a lawsuit it filed on behalf
24
    of tenants of a residential hotel against their landlord.  The nonprofit was sued by one of the
25
    tenants after the nonprofit won a favorable judgment (and was awarded fees) on behalf of
26
    the tenants in the underlying lawsuit.  The only purported ethical violation the nonprofit
27
    corporation committed was whether it was lawfully allowed to practice law without
28

LITTLER MENDELSON, P.C.
Attorneys At Law
3993 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.802.5000

1    registering or complying with California Corporations Code section 13406(b) which provides

2    the sole authority under which a nonprofit corporation is authorized to practice law. *Id.* The

3    court noted that the state bar permitted numerous nonprofit corporations to practice law

4    without registering and that the plaintiff had suffered no injury from the minor violation

5    (given that the opposing party was the one who paid the fees plaintiff sought disgorged). In

6    light of those facts, the court held that in this case the "remedy of disgorgement is grossly

7    disproportionate to the wrongdoings on [the nonprofit's] part and would constitute a totally

8    unwarranted windfall to [the plaintiff]." *Id.* at 50.

9        Similarly, in *Slovensky v. Friedman*, 142 Cal.App.4th 1518 (2006), a client sued his

10   former attorneys for legal malpractice and breach of fiduciary duty arising from their

11   settlement of a personal injury claim on the client's behalf. In this case, the firm committed

12   several violations of ethical duties against the client but was still able secure a settlement

13   for the plaintiff of $340,000. Plaintiff argued that she suffered damages because had the

14   firm not engaged in the misconduct it was accused of she would have received a higher

15   settlement amount. On summary judgment, the firm was able to present undisputed

16   evidence that they were able to secure the $340,000 settlement for plaintiff even though the

17   statute of limitations had run on her claims before she ever consulted with the firm. *Id.* at

18   1525-1533. In light of these facts, plaintiff could not prove that she suffered actual

19   damages as a result of the claims she made against her former attorneys. *Id.* at 1533-

20   1534. Based almost entirely upon the reasoning articulated in *Frye* (although *dicta* in the

21   *Slovensky* overstates the actual holding in *Frye*), the court upheld summary judgment as to

22   plaintiffs breach of fiduciary duty claim because Plaintiff clearly suffered no damages. The

23   court's decision was firmly rooted on the fact that "the only apparent consequence of

24   defendants' fiduciary breach was a substantial settlement plaintiff could not otherwise have

25   obtained." *Id.*

26       Unlike *Frye* and *Slovensky*, here, the equitable remedy of forfeiture/disgorgement of

27   Randazza's salary and bonuses for periods in which he was unethically behaving would not

28   be "grossly disproportionate to the wrongdoings" Randazza engaged in. This is also not a

1   situation like *Slovensky* where the plaintiff actually received something extremely valuable
2   from the representation that it would not and arguably should not have otherwise received.
3   All these two cases show is that the Arbitrator has the authority to weigh the evidence in its
4   entirety and make his determination in accordance with the factors articulated n the
5   Restatement (Third) Law Governing Lawyers § 37. *See Rodriguez v. Disner*, 688 F.3d
6   645, 653 (9th Cir. 2012)("A court has broad equitable power to deny attorneys' fees (or to
7   require an attorney to disgorge fees already received"). Indeed, since *Frye* and *Slovensky*
8   were decided, a California court has cited to Section 37 of the Restatement when analyzing
9   whether damages are required in order to grant forfeiture or disgorgement of fees. *See*
10  *Fair v. Bakhtiari,* 195 Cal.App.4th 1135 (2011)("it makes sense to require proof of damages
11  where the client seeks compensatory damages as a tort remedy for breach of fiduciary
12  duty, but not if the client seeks only forfeiture of fees").

13         Randazza and his experts also attempted to argue that the Arbitrator cannot order
14  forfeiture/disgorgement from Randazza because he worked in-house and received a salary
15  instead of fees from clients. This argument is illogical. Disgorgement is available if "a
16  lawyer is paid by a client to render legal services." *See Tr. at 1049:18-1050:9.* Whether
17  that compensation is in the form of fees or salary, the principal remains the same. *Id.*

18         Additionally, forfeiture is commonly applied in the context of fiduciary relationships
19  outside the attorney-client relationship. In such situations, courts have not hesitated to
20  require employees/agents to forfeit/disgorge, salary, commissions, and bonuses. *See*
21  *Mabry v. Tom Stanger & Co.,* 33 P.3d 1206, 1209 (Colo. App. 2001)(real-estate broker's
22  breach of fiduciary duty results in a forfeiture of a broker's entitlement to a commission);
23  *Zakibe v. Ahrens & McCarron, Inc.,* 28 S.W.3d 373, 385-386 (Mo. Ct. App. 2000)(plaintiff's
24  breach forfeited his right to "all compensation, including bonuses and severance pay, to
25  which he may have been entitled"); *Riggs Inv. Mgmt. Corp. v. Columbia Partners, L.L.C.,*
26  966 F. Supp. 1250, 1266-67 (D.D.C. 1997)(agent forfeits all compensation from time of
27  disloyal action to agent's termination six months later). There is simply no reason that
28  Randazza should be treated more favorably because he was an in-house counsel.

68.

1   Moreover, Randazza was not strictly an in-house counsel. Instead, Randazza had a robust

2   outside practice the he grew during the course of his employment with Excelsior. Indeed,

3   interrogatory responses in this case indicate that Randazza regularly billed large sums of

4   hours to his outside clients (11/09 75.35 hours; 12/09 55.9 hours; 07/10 73.6 hours; 08/10

5   41.37 hours; 10/10 43.2 hours; 03/11 43.95 hours; 07/11 52.5 hours; 09/11 68.8 hours;

6   10/11 70.4 hours; 11/11 92.3 hours; 12/11 83.45 hours; 01/12 75.7 hours; 03/12 52.9

7   hours; 05/12 91.75 hours; 06/12 73.8 hours; 07/12 60.15 hours; 08/12 63.9 hours). **Exhibit**

8   **313.** Also, it must not be forgotten that these numbers only reflect hours Randazza

9   personally billed and do not reflect the hours billed by the attorneys working at his firm

10  through which he was also profiting during this time period.

11       Consistent with Dennis Kennedy's Expert Opinion, Randazza should be compelled

12  to forfeit and/or disgorge various fees, bonuses and salary paid to him during the time

13  period he was committing malpractice and breaching the fiduciary duty he owed to

14  Excelsior/Liberty. **Exhibit 304, Kennedy's Report at ¶¶ 51 - 52.5.** Specifically, Excelsior

15  seeks forfeiture/disgorgement of Randazza's salary from September 2010 to February

16  2011 while working on the TNAFlix case **($125,580)**;[37] the bonus Randazza received on the

17  TNAFlix case **($12,500)**; Randazza's salary from April 2011 to September 2011 while

18  working on the MegaUpload case **($128,719.50)**; the bonus Randazza received on the

19  MegaUpload case **($150,000)**; Randazza's salary from June 2012 to August 2012 during

20  the pendency of the Oron case **($65,929.50)**; the remaining portion of the Oron settlement

21  funds currently in his trust account because his breaches during the Oron case do not

22  entitle him to any bonus **(believed to be $275,000)**; and Randazza's salary from June

23  2010 to August 2012 during the time period he represented XVideos and XNXX while

24  employed by and representing Excelsior/Liberty **($586,626.61 in total but only**

25  **$266,397.61 in addition to the salary listed above so as to avoid double recovery).** Tr.

26

27  [37] The salary reflected in this paragraph that was paid to Randazza during the periods stated herein

28  was calculated from Randazza's actual pay records which were entered into evidence as **Exhibit**
    **374.**

1  at 770:17-772:8.

2          2.     **Conversion**

3         Upon his resignation, Randazza converted Excelsior's property by failing to return

4  his laptops and iPhone and deleted and/or destroyed all documents and files saved on his

5  laptop without the Company's permission.  Randazza also kept a company whiteboard

6  forcing Excelsior to expend legal fees to get it back. Randazza's actions caused direct

7  damage to Excelsior in the form of the costs it incurred to undergo a forensic examination

8  of the laptop and attempt to recover any files Randazza deleted.  Excelsior seeks a

9  recovery of these damages caused by virtue of Randazza's actions.  Conversion is "a

10  distinct act of dominion wrongfully exerted over another's personal property in denial of, or

11  inconsistent with his title or rights therein or in derogation, exclusion, or defiance of such

12  title or rights." *Evans v. Dean Witter Reynolds, Inc.*, 116 Nev. 598, 606, 5 P.3d 1043, 1048

13  (2000)(internal citations omitted). Further, conversion is an act of general intent, which

14  does not require wrongful intent and is not excused by care, good faith, or lack of

15  knowledge. *Id.*

16        It is undisputed that at the time of Randazza's resignation he failed to return

17  Company property, including the Company issued laptop and iPhone that had been issued

18  to him. Randazza eventually did return one of the laptops and the phone but prior to

19  returning the laptop he deleted and/or destroyed all documents and files saved on it without

20  the Company's permission. *See* **Exhibit 305, Expert Report of Michael Holpuch at p. 3**

21  **of 41; Tr. at 200:7-201:10, 470:6-20, 465:10-467:24, 468:8-469:10, 754:12-14, 754:15-17,**

22  **975:20-978:2, 982:12-16, 982:22-984:22.** Randazza never returned the second laptop he

23  testified was in his possession. **Tr. at 197:15-19; 772:16-19.** By deleting, destroying, or

24  saving the company's legal files in a location they had no access to, and by not returning

25  the second laptop, Randazza committed a distinct act of dominion wrongfully exerted over

26  Excelsior's property. This conversion of Excelsior's property was in denial of, or

27  inconsistent with Excelsior's title or rights or in derogation, exclusion, or defiance of such

28  rights. Excelsior has suffered actual damages as a result of Randazza's deletion,

LITTLER MENDELSON, P.C.

destruction, or exertion of Excelsior's legal files that were in his possession and requests an appropriate award to compensate for said damages. It also seeks return of the second laptop. Additionally, Excelsior requests that it be compensated for the costs of the forensic examination conducted on Randazza's laptop and iPhone by QUIVX in an attempt to restore data that was contained on those devices. The cost of such examination and attempted-restoration was **$3,215.98.** *See* **QUIVX Invoice attached hereto as Exhibit B.**

### 3.    Intentional Interference with Contractual Relations

Upon a thorough review of the evidence presented at the hearing with respect to this cause of action, Excelsior agrees to dismiss its intentional interference with contractual relations claim against Randazza.

### 4.    Unjust Enrichment

The evidence at the arbitration showed that Randazza conducted pro-bono litigation while accepting salary from the Company during that time period, yet he failed to disclose or turn over an award of $55,000 in attorney's fees he recovered in the pro-bono case. Excelsior is entitled to recover the $55,000 fee award kept by Randazza pursuant to its claim for unjust enrichment.

Unjust enrichment is "'the unjust retention ... of money or property of another against the fundamental principles of justice or equity and good conscience.'" *Asphalt Products Corp. v. All Star Ready Mix, Inc.*, 111 Nev. 799, 802, 898 P.2d 699, 701 (1995). The evidence showed that in early 2011, Randazza proposed a pro-bono project to Excelsior, which Excelsior accepted under the condition that Randazza comply with his Employment Agreement and represent the client as General Counsel of Excelsior. **Tr. at 603:9-19, 719:6-20, 803:13-21.** Randazza's Employment Agreement specifically contemplates that when Randazza conducts pro-bono cases under the auspices of Excelsior's legal department, the approved projects are to be part of his work for the Company and were supposed to be done in a manner that would allow any benefits from the representation to flow to the company. *See* **Exhibit 332 at EMC000499.**

Randazza handled the matter through his personal law firm while still using company

71.

LITTLER MENDELSON P.S.

1  time and resources to work on the matter. *Id.* at **719:21-720:18, 804:10-805:13, 839:8-**

2  **839:15.** Excelsior later discovered that Randazza actually charged the pro-bono client for

3  some of his time despite the fact that Excelsior fronted fees and costs associated with the

4  matter, including Randazza's compensation. *Id.* at **603:20-604:23, 719:21-720:18.**

5  Randazza also kept a $55,000 fee award from the court rather than reimbursing Excelsior

6  for the fees and costs it expended on the project. *Id.* Additionally, Randazza was unjustly

7  enriched by the $5,000 contribution made by James Grady which was never paid or

8  contributed to the company. **Tr. at 602:16-20**. Indeed, Randazza could not testify as to

9  what those funds were used for. In light of these facts, the Arbitrator should order that

10  Randazza reimburse Excelsior for the unjust enrichment he benefitted from.

11         **5.**    **Breach of Contract**

12        Excelsior established by a preponderance of the evidence that Randazza breached

13  his Employment Agreement by failing to comply with his ethical obligations as required, by

14  spending excessive time on non-Excelsior matters and by failing to wind down his outside

15  law practice as envisioned by the agreement. Randazza's breach of these provisions of

16  the Employment Agreement excused Excelsior's performance under the agreement but

17  caused Excelsior damages in the form of the excessive salary and bonuses it compensated

18  Randazza with throughout the course of his employment while he was in violation of the

19  agreement.

20        The elements of a cause of action for breach of contract under California law are: (1)

21  the existence of a contract; (2) Plaintiff's performance or excuse for nonperformance; (3)

22  Defendant's breach; and (4) the resulting damages to Plaintiff. *Brown v. Grimes*, 192 Cal.

23  App. 4th 265, 277, 120 Cal. Rptr. 3d 893, 902 (2011). It is undisputed that Randazza's

24  Employment Agreement was a valid contract between the parties. The evidence

25  established that Excelsior performed its obligations under the Employment Agreement or

26  was excused from performance of certain aspects of the agreement as a result of

27  Randazza's material breach. The evidence at the hearing also established that Randazza

28  breached the Employment Agreement by failing to comply with many ethical obligations as

72.

LITTLER MENDELSON, P.
A PROFESSIONAL CORPORATION
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169.5937
702.862.8800

1  detailed *supra* and in Dennis Kennedy's Expert Report (**Exhibit 304**).  *See* **Exhibit 332**

2  **(EMC000498-499)(noting Randazza is "bound to adhere to the professional ethical**

3  **standards imposed upon attorneys by state bar associations and under the common**

4  **law" and that his representation of other clients must be rendered without legal or**

5  **professional conflict with Excelsior).** Randazza also breached the Employment

6  Agreement by spending excessive time on non-Excelsior matters, which conflicted with his

7  ability to perform his duties as the General Counsel for Excelsior and maintaining a private

8  law practice in excess of that permitted by the agreement.  *See* **Exhibit 332 (EMC 000494,**

9  **EMC 000499)(noting that his outside practice should taper down as quickly and**

10 **ethically as possible and that outside projects should be rendered during non-**

11 **working hours); Exhibit 313 (showing excessive hours billed by Randazza to outside**

12 **clients during his full-time employment with Excelsior).** As a result of Randazza's

13 breach, Excelsior suffered damages, which included but were not limited to the generous

14 salary and many bonuses Randazza received throughout his employment with the

15 company which it seeks disgorgement of as discussed above.

16 **II.    CONCLUSION**

17       For the foregoing reasons, an arbitration award should be returned in favor of

18 Excelsior on all counts discussed herein.

19       Judgment should be rendered in favor of Excelsior on each of the claims Randazza

20 brought against it in light of the following:

21       1.  Randazza's First and Second causes of action are for violations of the

22           California Labor Code even though the alleged conduct occurred while

23           Randazza lived and worked in Nevada and because Excelsior properly

24           compensated Mr. Randazza for the items he claims he is owed;

25       2.  Randazza's Third claim for unpaid wages and penalties under NRS § 608.050

26           fails because the statute is inapplicable to the damages Randazza seeks and

27           because no private right of action exists to enforce it;

28       3.  Randazza's Fourth claim for breach of contract fails because he resigned his

LITTLER MENDELSON, P.
Attorneys at Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

employment making his claim for a severance moot and because he committed various breaches of the agreement which excused Excelsior's performance;

4. Randazza's Fifth claim for wrongful termination failed because the evidence establishes that Randazza was not terminated or constructively discharged;

5. Randazza's Sixth claim for hostile work environment fails because there is no evidence Randazza was harassed because he was a heterosexual male; and

6. Randazza's Seventh claim for retaliation fails because there is no evidence that he engaged in protected activity or that he suffered an adverse employment action in light of such activity.

With respect to its Counterclaims, Excelsior specifically seeks an award of:

1. $275,000 plus interest that Excelsior was forced to pay Oron as part of the resettlement of the Oron litigation;

2. $50,000 plus interest in additional funds that Oron offered Excelsior in August 2012 in exchange to drop their attorneys fee award but was not received as a result of Randazza's actions;

3. Disgorgement of $125,580 salary paid to Randazza during the pendency of the TNAFlix litigation;

4. Disgorgement of $12,500 bonus paid to Randazza for his work in the TNAFlix case;

5. Disgorgement of $128,719.50 salary paid to Randazza during the pendency of the MegaUpload case;

6. Disgorgement of $150,000 bonus paid to Randazza for his work in the MegaUpload case;

7. Disgorgement of $65,929.50 salary paid to Randazza during the pendency of the Oron case;

8. Disgorgement of $586,626.61 in total salary but only $266,397.61 in addition to the salary already listed herein (so as to avoid double recovery) paid to

74.

Randazza during the period in which he was concurrently representing XVideos/XNXX and Excelsior;

9. The remaining portion of the Oron settlement funds currently in Randazza's trust account as disputed funds because his breaches during the Oron case do not entitle him to any bonus (believed to be $275,000 plus interest);

10. The additional non-Oron related funds currently in Randazza's trust account totaling at least $30,000 plus interest to which Liberty is entitled;

11. An award deemed appropriate by the Arbitrator for the destruction and/or conversion of Excelsior's files contained on Randazza and Erika Dillon's computers prior to them being wiped;

12. $3,215.98 cost of the forensic examination and attempted restoration of Randazza and Erika Dillon's laptops and Randazza's iPhone;

13. A company laptop (and any other company property) that Randazza indicated remain in his possession;

14. $55,000 fee award that unjustly enriched Randazza for his work in the Righthaven pro-bono matter;

15. $5,000 contribution to the Oron legal fees made by James Grady which was never paid to Excelsior and unjustly enriched Randazza;

16. A third-party accounting of Randazza's trust fund(s) to ensure all settlement funds (including various pay-over-time settlements) Excelsior/Liberty is entitled to have been paid to the Company. Such accounting should be done by an accounting firm of Excelsior's choice but paid for by Randazza;

///
///
///
///
///
///

LITTLER MENDELSON, P.
Attorneys At Law
3i5 South Fourth Parkway
ie 100
as Vegas, NV 89169 5937
702 862 9800

17. An award of fees and costs in this case in light of the frivolous nature of Randazza's claims against Excelsior.

Dated: April 3, 2015

Respectfully submitted,

WENDY MEDURA KRINCEK, ESQ.
ETHAN D. THOMAS, ESQ.
LITTLER MENDELSON, P.C.

Attorneys for Defendant
EXCELSIOR MEDIA CORPORATION

76.

## PROOF OF SERVICE

I am a resident of the State of Nevada, over the age of eighteen years, and not a party to the within action. My business address is 3960 Howard Hughes Parkway, Suite 300, Las Vegas, Nevada 89169. On April 3, 2015, I served the within document(s):

### EXCELSIOR MEDIA CORPORATION'S POST-ARBITRATION BRIEF

☒   By **E-Mail** – a true copy of the document(s) listed above e-mailed to the parties as set forth below.

Kenneth P. White, Esq.
Brown White & Newhouse, LLP
333 South Hope Street, 40th Floor
Los Angeles, CA 90071

(kwhite@brownwhitelaw.com)

Hon. Stephen E. Haberfeld (Ret.)
Reggie Joseph
707 Wilshire Blvd., 46th Floor
Los Angeles, CA 90017

(rjoseph@jamsadr.com)
(shaberfeld@jamsadr.com)

☒   By **Federal Express** - a true copy of the document(s) listed above sent via Federal Express to the person(s) at the address(es) set forth below.

Hon. Stephen E. Haberfeld (Ret.)
8224 Blackburn Ave., Suite 100
Los Angeles, CA 90048

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 3, 2015, at Las Vegas, Nevada.

Robyn Craig

Robyn Craig

Firmwide:131782927.1 073131.1001

77.

# EXHIBIT A

EXHIBIT A

JAMS ARBITRATION No. 1260002283

MARK J. RANDAZZA,

     Claimant,

vs.

EXCELSIOR MEDIA CORP., a Nevada Corporation;
LIBERTY MEDIA HOLDINGS, LLC, a California limited
-liability company and JASON GIBSON, individually,

     Respondents.

---

## ORDER OF JULY 3, 2013

The Arbitrator denies Claimant's application for JAMS Employment Arbitration Rule 24(e) preliminary relief, without prejudice. That is principally because Claimant's application is based on the following assertion:

"Mr. Randazza is entitled to a [JAMS Arbitration Rule 24(e)] Preliminary Order because Excelsior, standing alone, does not have sufficient assets to compensate Mr. Randazza [if or] when he recovers at Arbitration." [March 29, 2013 letter application, at p. 2.]

Claimant's March 29, 2013 application, among other things, requested "an Order compelling Excelsior's sister entities, Liberty Media Holdings ('Liberty') and Becar Management, LLC ('Becar') and the companies' principal, Jason Gibson ('Gibson') (collectively the 'Affiliated Parties') to join this arbitration." [Id., at p. 1] Claimant asserted that an order "to secure his likely recovery is warranted" because, importantly, "Jason Gibson (....) (2) kept the intellectual property of the enterprise --- the valuable property --- in the separate entity Liberty to insulate it from any judgment against Excelsior." [Id. at p. 2, see also id. at pp. 4, 7]

On June 27, 2013, Liberty Media Holdings, LLC made an unconditional general appearance in this arbitration.

By so appearing, the Arbitrator has personal jurisdiction over Liberty and, for the reasons set forth below, Claimant shall be afforded the opportunity to amend his pleadings.

There has not been a showing that Liberty no longer has the valuable intellectual property alleged* or that either Excelsior or Liberty --- separately or together --- does/do not have sufficient assets to satisfy Claimant's financial claims --- assuming arguendo that he would prevail the maximum value of his maximum claims and seek enforcement of a monetary arbitration award in his favor.

[*According to Claimant, the intellectual property consists of copyrights and trademarks, which Excelsior produced, sold and licensed are the only assets of value --- other than, to a lesser extent, expensive cars used by Excelsior's employees (which are owned by Becar Management, LLC). Randazza Decl., Pars. 11(a), 12, 23.]

1

In light of the foregoing and based on the scant current record before the Arbitrator, it does not appear necessary to decide whether it is required, appropriate or permissible --- before a full evidentiary hearing --- to decide whether any person or entity is an "alter ego" of Excelsior or, now, of Liberty or that not determining "an alter ego relationship would be tantamount to limiting Mr. Randazza's potential recovery to near zero, even before this arbitration began." [Id. at p.7]  If circumstances change, Claimant may re-seek preliminary relief, without prejudice to the denial of initially requested preliminary relief.  If that occasion arises, the Arbitrator might revisit the preliminary determination set forth in the first sentence of this paragraph.

The Arbitrator is also not inclined to grant requested early preliminary relief, because a key element in the decisional process is whether or not Claimant has shown the probable validity of his breach-of-contract claim and/or is likely to prevail on at least one of his other claims to warrant freezing or tying up or even liening the asset of a party.  The very undeveloped state of the record at this very early stage of the arbitral process militates against making important merits-related determinations at this time. The Arbitrator is also not inclined at this very early stage of the arbitration to dismiss Claimant's Claims One or Two** or to foreclose Claimant from attempting to show that Nevada and/or California law provide legal predicates for the claims which are the subject of the motion to dismiss.

[**The two claims are claims for reimbursement of expenses under California Labor Code sec. 2802 and for unpaid wages and vacation time under California Labor Code secs. 201-203.]

Subject to revisitation and/or reconsideration --- unless and until shown and persuaded otherwise --- the Arbitrator preliminarily believes that:

A) The applicability of California or Nevada wage-and-hour law is not extraterritorial generally --- including not generally following assumed former California employees forever and for all purposes --- but only in certain circumstances, if at all.

B) Whether those circumstances can be alleged and proven to have occurred here is not clear.

C) The "governing law" provision of the parties' employment contract for Claimant's services --- generally providing for the application of California substantive law --- does not govern which law applies to statutory wage-and-hour and other non-contractually-based claims in arbitration.  See Narayan v. EGL, Inc., 616 F.3d 895, 899 (9th Cir. 2010) (benefit claims brought under the California Labor Code "do not arise out of the contract, involve the interpretation of any contract terms, or otherwise require there to be a contract.")

The case law also appears to be that --- even assuming a wholesale incorporation of a particular state's substantive law via a contractual general "governing law" provision, absent a contractual showing of specific intent to the contrary, among other things, such an incorporation must also incorporate the State's presumption against extraterritoriality, if that is the presumption, and so it appears to be under California law.

D) Without resolving the issue at this early juncture, it appears that the strongest authority relied upon by Claimant -- Oracle*** --- only extends the benefits and protections of California wage-and-hour law to "California resident employees of California employers who leave the state temporarily" and that "California law might not apply to nonresident employees of out-of-state businesses who enter California temporarily..."  Whether or to what extent the wage-and-hour laws of California, and possibly Nevada (which are not discussed in extenso in either side's papers) appears to be highly fact and circumstances specific and, additionally, involve considerations of the principles of interstate comity.

2

[***Sullivan v. Oracle Corp., 51 Cal.4th 1191 (2011)]

E)  The Arbitrator has a few questions, which the parties might consider for future purposes --- assuming, arguendo, that only California and/or Nevada wage-and-hour law arguably applies to what Claimant will contend in a later, particularized writing trigger(s) the benefits and protections of particular statutory wage-and-hour provisions:

    1) At what point --- in the facts and circumstances to be adduced at evidentiary hearing --- did California Labor Code cease to apply and, if different, at what point --- given the same facts and circumstances --- did Nevada wage-and-hour law begin to apply, and what is that law? Is there a material difference between CA and NV law applicable to Claims One & Two?

    2) What is the statutory and/or judicial "trigger" for the applicability of one state's wage-and-hour laws to Claimant's activities claimed to be protected under that state's wage-and-hour laws?

    3) What is the "nexus" between Claimant's actions in and outside of California and his employment by Excelsior --- which Claimant contends makes California and/or Nevada wage-and-hour law applicable to those actions?

F)  What is clear at this very early stage is that now is not the time to deprive or deny Claimant the opportunity to amend or to otherwise provide Respondent with written particulars as to applicable law and facts which make that law applicable. In arbitration, motions to dismiss --- while not prohibited --- are not specifically provided for, either. Generally, deciding on a motion to dismiss "on the pleadings" in an arbitration is not usual or appropriate, because pleadings do not have the same importance as in certain jurisdictions or courts.  The JAMS Employment Rules, however, do have Rule 18, to which the parties are respectfully referred.

    While Respondent has asserted that "Nevada law does not have analogous wage and hour [or other] laws under which [Claimant] could bring his claims," and has given some NRS sec. 608 examples [ Reply, at p.10], Claimant will not be foreclosed at this point from showing otherwise.****

[****Claimant has asked for the opportunity "to cure any perceived deficiencies... [including] pleading additional facts regarding Mr. Randazza's work in California and for Liberty, or bringing [the same] or similar causes of action under Nevada law."  Randazza Opp., at pp. 2, 7]

In light of the foregoing and the unconditional general appearance of Liberty Media Holdings, LLC in this arbitration, the Arbitrator hereby grants leave to Claimant to replead --- if he wishes --- and leaves it to another occasion (Rule 18) for both sides, among other things, to submit applicable statutory and case law to show which statutory wage-and-hour/labor provisions --- if any --- are applicable to what conduct on which date(s).

Dated: July 3, 2013

STEPHEN E. HABERFELD
        Arbitrator

3

<u>PROOF OF SERVICE BY EMAIL & U.S. MAIL</u>

Re: Randazza, Marc J. vs. Excelsior Media Corp., Liberty Media Holdings LLC, Jason Gibson
Reference No. 1260002283

    I, Lulu Santos, not a party to the within action, hereby declare that on July 03, 2013 I served the attached ORDER OF JULY 3, 2013 on the parties in the within action by Email and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at Los Angeles, CALIFORNIA, addressed as follows:

Wendy M. Krincek Esq.
Kristina E. Gilmore Esq.
Littler Mendelson
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV  89109
Phone: 702-862-8800
wkrincek@littler.com
KGilmore@littler.com
    Parties Represented:
    Excelsior Media Corp.
    Jason Gibson
    Liberty Media Holdings

Mishell Taylor Esq.
Littler Mendelson
501 W. Broadway
Suite 900
San Diego, CA  92101-3577
Phone: 619-232-0441
mtaylor@littler.com
    Parties Represented:
    Excelsior Media Corp.

Kenneth P. White Esq.
Nannina L. Angioni Esq.
Henry L. Whitehead Esq.
Brown, White & Newhouse,  LLP
333 South Hope St.
40th Floor
Los Angeles, CA  90071-1406
Phone: 213-613-0500
kwhite@brownwhitelaw.com
nangioni@brownwhitelaw.com
hwhitehead@brownwhitelaw.com
    Parties Represented:
    Marc J. Randazza

    I declare under penalty of perjury the foregoing to be true and correct. Executed at Los Angeles, CALIFORNIA on July 03, 2013.

_____
Lulu Santos
lsantos@jamsadr.com

# EXHIBIT B

# EXHIBIT B



## Excelsior Media v. Marc Randazza E-Discovery Costs

| Service | Invoice Number | Date | Total |
|---|---|---|---|
| **Forensic Acquisition of Laptop** <br> -2 Laptops | 83765 | 5/31/2013 | $1000 |
| **Hard Drive** <br> -Active and recovered Files delivered on hard drive | 83765 | 5/31/2013 | $150 |
| **Jungle Disk Export** <br> -Export of Jungle Disk Cache Files | 84342 | 7/31/2013 | $875 |
| **Hard Drive** <br> -3 hard drives of exported Jungle Disk files | 84342 | 7/31/2013 | $450 |
| **Forensic Acquisition of Desktop** <br> -1 Desktop | 82450 | 9/30/2013 | $500 |

Subtotal: $2,975
Tax: 240.98

Total: **$3,215.98**