1
2
3
4
5
6
7
8

LARSON & ZIRZOW, LLC
ZACHARIAH LARSON, ESQ.
Nevada Bar No. 7787
E-mail: zlarson@lzlawnv.com
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
E-mail: mzirzow@lzlawnv.com
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Telephone: (702) 382-1170
Fascimile: (702) 382-1169

Attorneys for Defendant

9
10

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEVADA**

11
12
13
14

In re:

MARC JOHN RANDAZZA,

     Debtor.

Case No.: BK-S-15-14956-abl
Chapter 11

15
16
17
18
19
20
21
22
23

EXCELSIOR MEDIA CORP., a Nevada
corporation; and LIBERTY MEDIA
HOLDINGS, LLC, a Nevada limited liability
company,

     Plaintiffs,

v.

MARC JOHN RANDAZZA, an individual,

     Defendant.

Adv. No. 15-01193-abl

**REQUEST FOR JUDICIAL NOTICE IN**
**SUPPORT OF MOTION TO DISMISS**
**SECOND AMENDED COMPLAINT**

Date: September 20, 2016
Time: 9:30 a.m.

24
25
26
27
28

     Defendant, Marc John Randazza (the "Defendant"), by and through his attorneys, the law firm of Larson & Zirzow, LLC, hereby respectfully requests that the Court take judicial notice pursuant to Fed. R. Evid. 201 of the following in support of his *Motion to Dismiss Second Amended Complaint* (the "Motion") [Adv. ECF No. 75].[1]

---

[1] Unless otherwise indicated, all capitalized terms herein shall have the same meaning as set forth in the Motion.

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

**The Fee Litigation:  MJRPA v. LMH, and the MJRPA Settlement Agreement**

1.      On December 9, 2012, as later amended, Marc J. Randazza P.A. d/b/a Randazza Legal Group ("MJRPA") filed an action against Liberty Media Holdings, LLC, a California limited liability company ("LMH") in the Eighth Judicial District Court, Clark County, Nevada, being Case No. A-12-673275-C, therein alleging claims for monies due for legal services rendered in the Oron Litigation (the "Fee Litigation").  Copies of the complaint and amended complaint filed in the Fee Litigation in Nevada State Court are attached hereto as **Exhibit 1** and **Exhibit 2**, respectively.

2.      On March 28, 2013, LMH answered the amended complaint in the Fee Litigation, and filed a counterclaim against MJRPA alleging malpractice claims against MJRPA arising out its representation of LMH in the Oron Litigation, which are similar to those asserted against the Defendant in this Adversary Proceeding.  A copy of LMH's answer filed in the Fee Litigation in Nevada State Court is attached hereto as **Exhibit 3**.

3.      On June 15, 2016, the Debtor filed a *Motion to Approve Settlement Pursuant to Bankruptcy Rule 9019* (the "MJRPA Settlement Motion") [ECF No. 148] with the Bankruptcy Court, which sought court approval of a proposed Settlement Agreement and Mutual Release (the "MJRPA Settlement Agreement") by and between Excelsior, LMH and Gibson (collectively, the "LMH Parties") on the one hand, and MJRPA, the Defendant, and others on the other hand (collectively, the "RLG Parties").  The MJRPA Settlement Agreement principally involved the resolution of any and all alleged liability of MJRPA, including but not limited to arising out of the Fee Litigation in Nevada state court as against MJRPA.   Among other pertinent parts, Paragraph 3 of the MJRPA Settlement Agreement provided that, with the express exception of certain matters as to the Debtor and his personal liability referenced in Paragraph 4, the LMH Parties (as defined therein) were releasing MJRPA, among others, of any and all liability.

4.      On July 20, 2016, the Court granted the MJRPA Settlement Motion.  On July 22, 2016, the Court entered a written order granting the MJRPA Settlement Motion (the "MJRPA Settlement Order") [ECF No. 157], thereby finding in a fair and equitable compromise pursuant

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

2

to Fed. R. Bankr. P. 9019.  The MJRPA Settlement Order is fully effective and enforceable. Moreover, the settlement funds required under that agreement have been paid and the MJRPA Settlement Agreement and the releases therein are fully effective and enforceable.

5.    On August 2, 2016, and as a result of the Bankruptcy Court's approval of the MJRPA Settlement Agreement, and indeed, in effectuation of that agreement, the parties filed a *Joint Stipulation and Order for Dismissal With Prejudice* in the Fee Litigation in Nevada State Court, which that Court has also now entered.  A true and correct copy of the foregoing dismissal entered by the Nevada State Court in the Fee Litigation is attached hereto as **Exhibit 4**.

### Wayne Hoehn (The Righthaven Litigation)

6.    MJRPA represented the <u>defendant</u>, Wayne Hoehn ("Hoehn") involving litigation against Righthaven.  See <u>Righthaven, LLC v. Hoehn</u>, 792 F. Supp. 2d 1138 (D. Nev. 2011). Second, the $55,000 was not awarded for representing Hoehn, but was a distribution for administrative expenses on behalf of the Court-appointed receiver.  See <u>Righthaven, LLC v. Hoehn</u>, 2:11-cv-00050 (D. Nev. Mar. 15, 2013) (ECF Nos. 120, report of receiver; ECF No. 130 (order adopting report of receiver).  Third, it was not the Defendant individually, but his law firm, MJRPA, that received the distribution.  <u>See id.</u>  And fourth, the distribution to MJRPA occurred nine (9) months <u>after</u> Defendant's employment with Excelsior terminated.  <u>See id.</u> Copies of the Righthaven Receiver's report and the court order adopting it as entered by the U.S. District Court for the District of Nevada in the above-referenced litigation against Righthaven is attached hereto as **Exhibit 5** and **Exhibit 6**, respectively.

### The Oron Litigation

7.    On or about July 1, 2012, LMH and Oron reached a settlement in the Oron Litigation.  See SAC ¶ 50.  MJRPA successfully obtained an order enforcing the settlement agreement on behalf of LMH against Oron.  See SAC ¶ 52; <u>Liberty Media Holdings, LLC v. FF Magnat Ltd. d/b/a Oron.com</u>, No. 2:12-cv-01057, 2012 WL 3255044 (D. Nev. Aug. 7, 2012).

8.    Plaintiffs (really LMH) allege that, thereafter, Defendant (really his law firm, MJRPA) negotiated a new *potential* settlement agreement with Oron, who was represented by

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

Valentin Gurvits, Esq. of the Boston Law Group ("Mr. Gurvits"), containing certain terms with which they disagreed.  See SAC ¶¶ 53 & 55.  Defendant--again, in his capacity as an attorney with MJRPA--presented the terms of the proposed new agreement and with a full opportunity for LMH's principal, Jason Gibson, to review the terms.  See id. ¶ 53.  Mr. Gibson, LMH's principal, claims that he "discovered" the $75,000 disbursement, written in plain English, in the draft settlement agreement the Defendant, acting through MJRPA, sent to him for his review. Id. at ¶ 55.  Although Plaintiffs misleadingly describe this proposed disbursement "bribe" in order to color these proceedings, in reality the draft proposed agreement stated clearly that certain funds were to be released to Oron's attorney, Mr. Gurvits.  A copy of the foregoing document, which was also an exhibit in the pre-petition Arbitration, is attached hereto as **Exhibit 7**.

### Allegations Concerning Defendant's Contact with Co-Counsel After His Disengagement from Excelsior and LMH

9.    Even if Defendant, acting on behalf of MJRPA, contacted Philadelphia-based co-counsel more than a week before his actual separation from Excelsior and LMH due to the disputes between those parties and Defendant, see SAC ¶ 65(b), it is undisputed that such co-counsel nonetheless continued to represent LMH through the conclusion of litigation.  See Liberty Media Holdings, LLC v. John Does 1-265, No. 2:12-cv-04703 (E.D. Pa. Sept. 5, 2012) (the same attorney who filed the Complaint filed the Notice of Voluntary Dismissal).  A copy of the foregoing filings from this litigation in the United States District Court for the Eastern District of Pennsylvania are attached hereto as **Exhibit 8**.

Dated:  August 9, 2016.

By: _____
LARSON & ZIRZOW, LLC
ZACHARIAH LARSON, ESQ.
MATTHEW C. ZIRZOW, ESQ.
850 E. Bonneville Ave.
Las Vegas, Nevada  89101

Attorneys for Defendant

# EXHIBIT 1

# CIVIL COVER SHEET

A - 1 2 - 6 7 3 2 7 5 - C

Clark County, Nevada

V I I I

Case No. _____
*(Assigned by Clerk's Office)*

---

## I. Party Information

| | |
|---|---|
| **Plaintiff(s) (name/address/phone):** MARC J. RANDAZZA P.A., 6525 W. Warm Springs Rd., Suite 100, Las Vegas, NV 89118; (888) 667-1113 <br> **Attorney (name/address/phone):** <br> Clyde DeWitt, 6525 W. Warm Springs Rd., 100 <br> Las Vegas, NV 89118 <br> (702) 386-1756; fax (702) 441-0308 <br> *ClydeDeWitt@EarthLink.net* | **Defendant(s) (name/address/phone):** LIBERTY MEDIA HOLDINGS, LLC and JASON GIBSON, 4262 BLUE DIAMOND ROAD, SUITE 102-377, Las Vegas, NV 89139. <br> **Attorney (name/address/phone):** <br> Wendy Krincek, 3960 Howard Hughes Pkwy, Suite 300, Las Vegas, NV 89169; (702) 862.7726; fax (702) 993.0569 <br> *wkrincek@littler.com* |

---

## II. Nature of Controversy (Please check applicable bold category and applicable subcategory, if appropriate)

☐ **Arbitration Requested**

### Civil Cases

| Real Property | Torts | |
|---|---|---|
| ☐ **Landlord/Tenant** <br>   ☐ Unlawful Detainer <br> ☐ **Title to Property** <br>   ☐ Foreclosure <br>   ☐ Liens <br>   ☐ Quiet Title <br>   ☐ Specific Performance <br> ☐ **Condemnation/Eminent Domain** <br> ☐ **Other Real Property** <br>   ☐ Partition <br>   ☐ Planning/Zoning | Negligence <br> ☐ **Negligence – Auto** <br> ☐ **Negligence – Medical/Dental** <br> ☐ **Negligence – Premises Liability** <br>     (Slip/Fall) <br> ☐ **Negligence – Other** | ☐ **Product Liability** <br>   ☐ Product Liability/Motor Vehicle <br>   ☐ Other Torts/Product Liability <br> ☐ **Intentional Misconduct** <br>   ☐ Torts/Defamation (Libel/Slander) <br>   ☐ Interfere with Contract Rights <br> ☐ **Employment Torts** (Wrongful termination) <br> ☐ **Other Torts** <br>   ☐ Anti-trust <br>   X Fraud/Misrepresentation <br>   ☐ Insurance <br>   ☐ Legal Tort <br>   ☐ Unfair Competition |

| Probate | Other Civil Filing Types | |
|---|---|---|
| **Estimated Estate Value:** _____ <br> ☐ **Summary Administration** <br> ☐ **General Administration** <br> ☐ **Special Administration** <br> ☐ **Set Aside Estates** <br> ☐ **Trust/Conservatorships** <br>   ☐ Individual Trustee <br>   ☐ Corporate Trustee <br> ☐ **Other Probate** | ☐ **Construction Defect** <br>   ☐ Chapter 40 <br>   ☐ General <br> ☐ **Breach of Contract** <br>   ☐ Building & Construction <br>   ☐ Insurance Carrier <br>   ☐ Commercial Instrument <br>   X Other Contracts/Acct/Judgment <br>   ☐ Collection of Actions <br>   ☐ Employment Contract <br>   ☐ Guarantee <br>   ☐ Sale Contract <br>   ☐ Uniform Commercial Code <br> ☐ **Civil Petition for Judicial Review** <br>   ☐ Foreclosure Mediation <br>   ☐ Other Administrative Law <br>   ☐ Department of Motor Vehicles <br>   ☐ Worker's Compensation Appeal | ☐ **Appeal from Lower Court** *(also check applicable civil case box)* <br>   ☐ Transfer from Justice Court <br>   ☐ Justice Court Civil Appeal <br> ☐ **Civil Writ** <br>   ☐ Other Special Proceeding <br> ☐ **Other Civil Filing** <br>   ☐ Compromise of Minor's Claim <br>   ☐ Conversion of Property <br>   ☐ Damage to Property <br>   ☐ Employment Security <br>   ☐ Enforcement of Judgment <br>   ☐ Foreign Judgment – Civil <br>   ☐ Other Personal Property <br>   ☐ Recovery of Property <br>   ☐ Stockholder Suit <br>   ☐ Other Civil Matters |

---

## III. Business Court Requested (Please check applicable category; *for Clark or Washoe Counties only*.)

| | | |
|---|---|---|
| ☐ NRS Chapters 78-88 <br> ☐ Commodities (NRS 90) <br> ☐ Securities (NRS 90) | ☐ Investments (NRS 104 Art. 8) <br> ☐ Deceptive Trade Practices (NRS 598) <br> ☐ Trademarks (NRS 600A) | ☐ Enhanced Case Mgmt/Business <br> ☐ Other Business Court Matters |

---

| December 5, 2012 | */s/ clydedewitt* |
|---|---|
| Date | Signature of initiating party or representative |

Electronically Filed
12/09/2012 12:52:49 PM

*[signature]*

**CLERK OF THE COURT**

**COMP**
Clyde DeWitt (Nevada Bar No. 9791)
LAW OFFICES OF CLYDE DeWITT, APC
6525 W. Warm Springs Road, Suite 100
Las Vegas, NV 89118
Telephone: (702) 386-1756
Facsimile: (702) 441-0308
*ClydeDeWitt@EarthLink.net*

Counsel for Plaintiff,
Marc J. Randazza, P.A.

# IN THE DISTRICT COURT

## FOR THE EIGHTH JUDICIAL DISTRICT

## CLARK COUNTY, STATE OF NEVADA

| | |
|---|---|
| MARC J. RANDAZZA P.A., a Florida professional association doing business as RANDAZZA LEGAL GROUP,<br><br>Plaintiff,<br><br>vs.<br><br>LIBERTY MEDIA HOLDINGS, LLC, a California limited-liability company doing business as Corbin Fisher and JASSON GIBSON, an individual,<br><br>Defendants. | Case No. A-12-673275-C<br><br>Dept. No. VIII<br><br>**PLAINTIFF'S ORIGINAL COMPLAINT FOR FRAUD, BREACH OF CONTRACT AND UNJUST ENRICHMENT**<br><br>**ARBITRATION EXEMPTION REQUESTED: DEMAND IN EXCESS OF $50,000.00**<br><br>**JURY TRIAL DEMAND**<br>[NEV. R. CIV. PROC. 38] |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Marc J. Randazza P.A., d/b/a RANDAZZA LEGAL GROUP, based upon knowledge of its own acts and information and belief as to the acts of others, brings this Complaint against Defendants Liberty Media Holdings LLC and Jason Gibson, and alleges as follows:

- 1 -

## I.    INTRODUCTION

This is an action by a law firm to collect costs advanced and fees due from its former organizational client and to secure relief based upon the fraud perpetrated by it through Defendant Jason Gibson ("GIBSON"), who controls it.  The law firm accomplished all that was requested by the client; but the former client refuses to pay, has no intention of doing so and never intended to do so at the time of contracting the unpaid work.

Randazza Legal Group ("RLG") is a nationally recognized law firm, best known for handling high-profile First Amendment, entertainment and intellectual property matters.  Defendant Liberty Media Holdings LLC ("LMH"), an adult entertainment company, through GIBSON, who controlled it, hired RLG to represent it in a copyright infringement matter, never intending to pay RLG for its services or reimburse costs advanced.  RLG performed excellently in the litigation, obtaining, *inter alia*, a temporary restraining order of the defendant's funds without a hearing, a settlement of $550,000, judicial enforcement of that settlement, collection of that amount, and an attorney's fees award of more than $131,797.00.  LMH never paid RLG for those services and neither it nor GIBSON ever intended to do so.

## II.    JURISDICTION AND VENUE

1.    Plaintiff seeks damages in excess of $10,000 against all Defendants.  Accordingly, this court has jurisdiction pursuant to Nev. Const. Art. 6 § 6; NEV. REV. STAT. 4.370(1)(A).

2.    Venue is proper in this court because Liberty Media Holdings LLC is a California limited liability company with its principal place of business in Clark County, Nevada and GIBSON is a resident and citizen of Clark County, Nevada.

3.    Furthermore, the contract that is the subject of this action was formed, was to be performed by all parties and in fact was performed by the plaintiff in

- 2 -

Clark County, Nevada.  Therefore, venue is proper pursuant to NEV. REV. STAT. 13.010.

4.     Furthermore, both LMH and GIBSON are residents and citizens of Clark County Nevada.  Therefore, venue is proper pursuant to NEV. REV. STAT. 13.040.

5.     Accordingly, jurisdiction and venue before this court are proper.

## III.    PARTIES

### A. The Plaintiff

6.     Plaintiff, Marc J. Randazza P.A., is a professional association, organized and existing under the laws of the State of Florida that does business as Randazza Legal Group ("RLG").

7.     Well-known nation-wide for its participation and success in intellectual property and First Amendment matters, as well as other high-profile disputes widely covered by the media, RLG represents a number of adult entertainment companies, previously including Liberty Media Holdings, LLC.

8.     Particular to this action, RLG represented Liberty Media Holdings, LLC in litigation before the United States District Court for the District of Nevada, *Liberty Media Holdings LLC v. FF Magnat Limited, d/b/a Oron.com, et al.*, Case No. 2:12-cv-01057 (D. Nev. 2012) (the "Oron Litigation").

9.     Additionally, RLG has provided legal services to Liberty Media Holdings' sibling companies, including Excelsior Media Corporation, Becar Management LLC, HMF Workforce LLC, and Liberty Media Holdings LLC's principal and Chief Executive Officer, GIBSON.

/
/
/
/

- 3 -

**B. The Defendants**

10.    Liberty Media Holdings LLC ("LMH") is a California limited-liability company with its primary place of business in Clark County, Nevada, and the plaintiff in the Oron Litigation.

11.    LMH is a producer of adult entertainment and has been a leading force in the adult industry's ongoing efforts to combat digital piracy.

12.    Since 2009, LMH had retained RLG to further these goals, and frequently used RLG's services to engage in litigation against users of BitTorrent who unlawfully distributed LMH's copyrighted content, video-playing "tube" sites that unlawfully displayed LMH's copyrighted content, and one-click-hosting sites known as "cyber lockers" that also unlawfully distributed LMH's copyrighted content.

13.    Jason Gibson ("GIBSON") is a natural person who is a resident and citizen of Clark County, Nevada.  He wholly controls LMH and, to an unknown extent, owns it.

## IV.    FACTS COMMON TO ALL CLAIMS FOR RELIEF
**A. The Relationship between RLG and LMH.**

14.    RLG and its managing partner, Marc Randazza, are widely-known and nationally recognized attorneys for the adult entertainment industry, particularly in the area of copyright.

15.    One of RLG's longest-standing clients, LMH, routinely used RLG's services to engage in a variety of intellectual property litigation nationwide.

16.    Through RLG, LMH had engaged in litigation coast-to-coast, from Massachusetts, Pennsylvania, Florida, Texas and Wisconsin, to Nevada, Arizona, and California.  This strategy was made possible because of the number of law licenses held by RLG's attorneys.

- 4 -

17.    RLG's relationship with LMH was facilitated by Marc Randazza's role as general counsel to LMH and its sister companies, including Excelsior Media Corporation, Becar Management LLC, and HMF Workforce, LLC. Those companies all are controlled and, to an unknown extent, owned by GIBSON.

18.    Because of Marc Randazza's close relationship with LMH, he was able to leverage his law firm, RLG, to LMH's benefit – offering significant discounts to LMH on RLG's services in consideration of his ongoing relationship with the company.  LMH was not only fully aware of this arrangement, but encouraged it and contemplated it within its employment agreement with Marc Randazza.

19.    In return, Marc Randazza was able to provide certain discounts on RLG's rates to LMH on the condition that LMH timely paid for RLG's services, and that LMH and its sister companies continued to employ Randazza as their general counsel.

20.    Since July 2009, Marc Randazza, LMH and RLG enjoyed this understanding, and it operated as an operating contract among the parties.

21.    Although this agreement was never reduced to writing, Marc Randazza, RLG and LMH saw no reason for it to be, as LMH paid RLG's bills and continued to employ Marc Randazza as its general counsel. See Exhibit 101.

**B. The Oron Litigation and Defendants' Fraudulent Inducement.**

22.    During May and June of 2012, GIBSON and Marc Randazza extensively discussed the potential costs and merits of the Oren litigation, as that litigation is described extensively herein.

23.    On some date in early June of 2012, well prior to June 20, 2012, GIBSON, on behalf of LMH, specifically requested Marc. Randazza to cause RLG to commence the Oron Litigation; implied in that request based upon an unambiguous understanding between the two of them, RLG would pay fees and

reimburse advanced costs in connection with prosecuting that litigation as it had done regularly over a long period of time and without exception with respect to all other litigation that RLG had prosecuted on LMH.

24.    At the request of LMH and GIBSON, Marc Randazza had been researching the defendant in that action, FF Magnat Limited, for more than a year, and had carefully planned LMH's attack on the company – including the seizure of its domestic and foreign financial assets.

25.    On or about June 20, 2012, RLG commenced the Oron Litigation, filing a Complaint and ex parte motion for temporary restraining order against FF Magnat Limited.  Concurrently, Marc Randazza and other RLG attorneys had coordinated a similar action seeking a Mareva injunction[1] in Hong Kong to freeze FF Magnat Limited's assets within the Hong Kong Special Administrative Region and globally.

26.    On June 22, 2012, The United States District Court for the District of Nevada granted LMH's ex parte motion for a temporary restraining order against FF Magnat Limited's assets.  The Court granted this motion without hearing, and set a further briefing schedule for LMH's desired preliminary injunction against FF Magnat Limited.

27.    FF Magnat then moved to withdraw nearly $400,000 in funds from its frozen accounts to fund its litigation defense.  RLG swiftly opposed this motion, and the Court allowed FF Magnat Limited to withdraw only $100,000 for its litigation defense.  RLG successfully opposed all future requests for disbursement of funds and other monetary relief before both the United States District Court for the District of Nevada and the United States Court of Appeals for the Ninth Circuit.

/

---

[1]    A "Manerva injunction" freezes a defendant's assets.

- 6 -

28.     On July 1, RLG negotiated a settlement of the Oron Litigation between LMH and FF Magnat Limited for $550,000.

29.     Shortly thereafter, however, FF Magnat began acting contrary to its settlement agreement with LMH, and claiming that no such agreement had been reached.

30.     RLG moved the United States District Court for the District of Nevada to enforce LMH's settlement agreement with FF Magnat Limited.

31.     While briefing on RLG's motion to enforce LMH's settlement agreement progressed, RLG prepared and filed LMH's briefing opposing Defendant Maxim Bochenko's motion to dismiss for lack of personal jurisdiction, and an extensive reply brief in support of LMH's motion for preliminary injunction.

32.     Almost immediately after those documents were filed, the Court entered an order on August 7, 2012 granting LMH's motion to enforce its settlement agreement with FF Magnat Limited, and entering judgment of $550,000 in LMH's favor against FF Magnat Limited.

33.     RLG went about seeking to enforce LMH's $550,000 judgment immediately.  On August 21, 2012 RLG filed a motion seeking an order requiring PayPal, Incorporated – a third party payment processor holding hundreds of thousands of dollars of FF Magnat Limited's money which had been frozen under the Court's order – to pay $550,000 from FF Magnat Limited's frozen accounts to LMH, via RLG's trust account.

34.     That same day, the United States District Court for the District of Nevada granted RLG's motion and entered an order requiring PayPal to transfer $550,000 from FF Magnat Limited's account to LMH.

35.     RLG then collected those funds for LMH's benefit.

36.     In addition to the $550,000 settlement amount, RLG asked for Liberty to recover the reasonable value of its attorneys' fees and costs.

- 7 -

37.   On August 10, 2012, RLG moved for more than $132,000 in attorneys' fees and costs.   RLG's reply briefing was completed on August 28, 2012.

38.   On September 4, 2012, the United States District Court for the District of Nevada entered an order granting RLG's motion, and awarding LMH $131,797.50 in attorneys' fees.   A true and correct copy of this order is attached hereto as Exhibit 102.

**C. LMH Breaches Its Contract with RLG and Completes the Fraud.**

39.   On August 30, 2012, LMH unilaterally terminated Randazza from his employment as the company's general counsel.

40.   On or about August 31, 2012, LMH retained the Greenberg Traurig law firm to represent it in the Oron Litigation; and RLG signed a substitution of counsel form Greenberg Traurig supplied to RLG.

41.   Thereafter, the United States District Court for the District of Nevada approved LMH's request for substitution of counsel, and Greenberg Traurig replaced RLG in the Oron Litigation.

42.   Since August 30, RLG's efforts to have LMH pay the past-due balance of $81,433.98 have been unsuccessful.

43.   By terminating Randazza and failing to make any payments toward RLG's bills for its legal services in the Oron Litigation, LMH has materially breached its agreement with RLG; LMH never intended to pay any of those fees.

44.   GIBSON and LMH had intended to do that since prior to requesting that RLG to initiate the Oron litigation in June of 2012.

/
/
/
/

- 8 -

# FIRST CLAIM FOR RELIEF: FRAUD
## (Against LMH and GIBSON.)

45.    Plaintiff re-alleges paragraphs 1-45 and incorporates them by reference as if set forth here.

46.    LMH and GIBSON fraudulently induced RLG into representing it in the Oron Litigation based on specific and knowing misrepresentations to RLG's principal, Marc Randazza, that LMH would pay RLG for its services.

47.    At the time GIBSON made those statements, he knew these representations to be false.

48.    Since April 2012, GIBSON had been planning to terminate Marc Randazza as the company's general counsel and deny him his owed severance, reimbursements, and any pending non-discretionary bonuses in order to benefit LMH at Marc Randazza's personal expense, including fees that would be generated by RLG.

49.    When RLG filed the Oron Litigation in June 2012, GIBSON was already planning to reassign the Oron Litigation to Greenberg Traurig and terminate Marc Randazza – and RLG – once the case was sufficiently successful.

50.    LMH intended to induce RLG to represent LMH in the Oron Litigation without making payment for the services it rendered – demonstrated by LMH and GIBSON's concurrent and subsequent conduct.

51.    In order to obtain RLG's assent to the contract and convince RLG to undertake the representation, LMH represented that it would pay RLG's legal fees for representation in the Oron Litigation.

52.    Before and during the Oron Litigation, GIBSON had numerous meetings with Greenberg Traurig so that the firm could take over the Oron Litigation from RLG so that LMH could avoid paying RLG for the services.

53.    Additionally, GIBSON had numerous meetings with the law firm Littler Mendelson P.C., to discuss the most advantageous manner to terminate

- 9 -

Marc Randazza in order to avoid any financial liability to both Marc Randazza and RLG, in terms of severance, final wages, reimbursements, and RLG's legal fees.

54. On August 30, LMH, though GIBSON, unilaterally terminated Randazza without any payment of severance, reimbursements, or non-discretionary bonuses which were due upon termination. To date, LMH still has refused to pay these amounts.

55. Moreover, LMH substituted RLG as counsel in the Oron Litigation with Greenberg Traurig. After the United States District Court for the District of Nevada approved this substitution, LMH's plan had come to fruition, as it had obtained the benefit of RLG's services, but without making any payment therefor.

56. RLG justifiably relied on GIBSON's representations that LMH would pay for RLG's services in the Oron Litigation.

57. RLG's reliance on GIBSON's representations was reasonable because of its long-standing relationship with LMH.

58. Additionally, LMH had consistently paid RLG's legal fees in numerous similar disputes in the past – and a number of which were confidentially resolved pre-litigation and cannot be identified herein – leading RLG to believe LMH would once again pay its legal bills.

59. RLG relied upon these representations. As a result, LMH defrauded RLG of its legal services, valued in excess of $81,433.

60. Because of Marc Randazza's salaried in-house counsel relationship with LMH, the value of his services is excluded from this calculation. However, the United States District Court of Nevada specifically found the market rates of RLG attorneys Ronald Green and J. Malcolm DeVoy to be reasonable at $400 per hour and $325 per hour, respectively, and further found the market rate of RLG's legal clerk at $125 per hour to be reasonable as well.

61. LMH has not paid *any* amount owed to RLG and never intended to do so from the outset; and at present RLG has suffered an injury of $81,433.98

- 10 -

because of its reliance on LMH's fraudulent inducement of RLG's representation of LMH in the Oron Litigation.

62.    As LMH's actions through GIBSON were made with malice, fraud, and oppression, RLG is entitled to punitive damages arising from this conduct.

63.    Specifically, LMH's fraudulent inducement of RLG's performance in the Oron Litigation, without any intention to pay RLG for its services, was made specifically to deprive RLG of payment for the considerable work it poured into the Oron Litigation – achieving great success for LMH at the cost of many sleepless nights, foregoing other representations, and prioritizing the Oron Litigation above other potential matters.

64.    In return for its service, LMH has refused to pay RLG any of the funds it is owed.  In addition to the fraudulent intent described in the foregoing, LMH took these actions for no reason other than to harm RLG and to financially oppress the firm.

## SECOND CLAIM FOR RELIEF: BREACH OF CONTRACT
### (Against LMH Only.)

65.    Plaintiff realleges paragraphs 1-45 and incorporates them by reference as if set forth here.

66.    RLG and LMH had an oral agreement for RLG to provide LMH with legal representation in the Oron Litigation, as well as in other matters.

67.    Over many years' course of dealing, LMH solidified this contractual relationship with RLG, with regular payments for its legal services in a wide range of legal matters, including copyright infringement litigation.

68.    LMH materially breached this contract by failing to pay RLG for any of the legal services it rendered in the Oron Litigation.

69.    RLG has been damaged by LMH's breach, and suffered $81,433.98 in damages due to LMH's breach and non-payment for RLG's legal services.

### THIRD CLAIM FOR RELIEF:
### UNJUST ENRICHMENT / QUANTUM MERUIT
### (Against LMH Only.)

70.   Plaintiff re-alleges paragraphs 1-45 and incorporates them by reference as if set forth here.

71.   In the alternative to RLG's breach of contract claim, Plaintiff brings an unjust enrichment claim in an effort to streamline this litigation.

72.   During negotiation, LMH and its sibling companies have adopted unreasonable, inconsistent, and even contradictory positions regarding its liability to RLG for its attorneys' fees.

73.   RLG thus expects LMH to disavow any form of contract with the firm, and as a result the firm is entitled to the reasonable value of its attorneys fees. As established by Exhibit 102, the reasonableness of these fees at $81,433.98 has been adjudicated by the United States District Court for the District of Nevada.

74.   By providing extensive legal services to LMH in the Oron Litigation, RLG conferred the benefits of its labor and legal representation onto LMH.

75.   LMH benefitted from this representation by achieving a settlement of $550,000 from FF Magnat Limited, obtaining judicial enforcement of that settlement agreement (including a third party's transfer of FF Magnat Limited's funds into RLG's trust account), and an attorney's fee award of more than $131,797.00.

76.   LMH consumed these services as they were rendered, and retained their benefits – including the favorable orders and decisions RLG obtained for it – without payment, or beseeching the Court to reverse the benefits of RLG's representation.

77.   LMH refused to pay RLG for these services, yet has retained the benefits and legal entitlements RLG obtained for LMH.

- 12 -

78.     As a consequence of LMH's refusal to render any payment for RLG's services in the Oron Litigation, RLG has been damaged in the amount of its services reasonable value: $81,433.98.

79.     In light of the services RLG provided to LMH and results the firm obtained for LMH, it would be inequitable for LMH to retain the benefits of RLG's services without payment.

## PRAYER FOR RELIEF

Plaintiff seeks judgment including the following:

1.     On the First Claim for Relief, actual damages of more than $10,000 arising from LMH's fraud upon RLG.

2.     On the First Claim for Relief, punitive damages of more than $10,000 for LMH's fraudulent actions against RLG, to wit: the maximum amount that is permissible without offending the Constitution of the State of Nevada or the Constitution of the United States.

3.     On the Second Claim for Relief, actual damages of more than $10,000 arising from LMH's breach of contract.

4.     On the Third Second Claim for Relief, actual damages of more than $10,000 arising from LMH's unjust enrichment at RLG's expense based upon *quantum meruit.*

5.     On the First, Second and Third Claims for Relief, a total of over $50,000.

6.     As to each Claim for Relief, costs of court.

7.     Any and all additional relief as ordered by the Court.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues to which the right to jury attaches.

/

- 13 -

1

**ARBITRATION EXEMPTION DEMANDED**

2    The total of Plaintiffs claims herein, exclusive of interest and costs, which the

3    judge and/or jury is likely to award, exceeds $50,000.  Accordingly, it is exempt

4    from arbitration and Plaintiff demands that exemption.  *E.g.*, Nev. Arb. R. 3(A).

5    Dated: December 5, 2012.

6                                    Respectfully Submitted,

7                                    LAW OFFICES OF CLYDE DeWITT, APC

8
                                     By:  */s/ clydedewitt*  .
9                                         Clyde DeWitt

10
11                                   Counsel for Plaintiff,
                                     Marc J. Randazza, P.C.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 101

# EXHIBIT 101

9/18/12                         https://secure.bill4time.com/B4T2/Invoicing/printInvoices2.aspx

| | |
|---|---|
| **Total Hours** | 12.90 hrs |
| **Total Attorney Time** | $913.00 |
| **Total Amount** | **$913.00** |

| | |
|---|---|
| Total Hours | 13.70 hrs |
| Total Attorney Time | $953.00 |
| Total Expenses | $5,468.85 |
| Total Invoice Amount | **$6,421.85** |
| Previous Balance | $0.00 |
| Balance (Amount Due) | **$6,421.85** |

**Notes:**

Jason,

This is for the RLG lawyers we have used as local counsel. I have only billed you what I pay them, to the closest approximation I can come up with. Normally, Jason Fischer bills at $325 per hour, and Jay DeVoy bills a $275 per hour. You're getting billed at $90 and $50 per hour respectively on this bill. In the future, that may go up or down as the expenses I pay for those guys change. However, the intent is to ensure that they don't cost me anything out-of-pocket, but also that I do not earn any profit from their labor if they do work for you.

That's the $913.

The remainder is just the expenses that I put on my RLG credit card. I have submitted, through Eric, a separate expense report for that.

I also have a personal expense report. But, that is submitted separately.

# EXHIBIT 102

# EXHIBIT 102

1

UNITED STATES DISTRICT COURT

2

DISTRICT OF NEVADA

3

4  LIBERTY MEDIA HOLDINGS, LLC,           )        Case No.: 2:12-cv-01057-GMN-RJJ
                                          )
5               Plaintiff,                )                 ORDER
                                          )
6       vs.                               )
                                          )
7  FF MAGNAT LIMITED, *d/b/a Oron.com*;   )
   MAXIM BOCHENKO, *a/k/a Roman Romanov*, )
8  and JOHN DOES 1-500,                   )
                                          )
9               Defendants.               )
                                          )
10 _____)

11                          INTRODUCTION

12        Before the Court is Plaintiff Liberty Media Holdings, LLC's (hereinafter "Plaintiff")

13  Motion to Enforce Settlement (ECF No. 33).  Defendant FF Magnat Limited (hereinafter

14  "Defendant") filed a Response (ECF No. 44), and Plaintiff filed a Reply (ECF No. 66).

15        Also before the Court is Plaintiff's Motion to Seal Motions #33 and #34 (ECF No. 32).

16  Defendant filed an Opposition (ECF No. 39), and Plaintiff filed a Reply (ECF No. 41).

17                      FACTS AND BACKGROUND

18        The instant case involves a dispute over Defendants' alleged copyright infringement of

19  Plaintiff's works.  This Court previously granted Plaintiff's motion for a temporary restraining

20  order against Defendant. (TRO Order, ECF No.11.)[1]  Thereafter, on July 1, 2012, attorneys for

21  Plaintiff and Defendant signed a letter memorializing settlement terms in regards to this case and

22  a similar case between these two parties in Hong Kong (hereinafter "Settlement Letter").

23  (Settlement Letter, Ex. A attached to Mtn to Enforce Settlement, ECF No. 33-1.)  The pertinent

24  parts of the settlement letter are as follows:

25  _____
    [1] The TRO was later amended. (Amended TRO, ECF No. 13.)

                            Page 1 of 8

1.    Oron pays Liberty Media $550,000.
. . .
8.    Once payment is received by both parties, both proceedings in NV and HK will be dismissed with prejudice, and in the event that Oron breaks any part of the deal, the claims may be reinstated via arbitration after a 30 day "notice and cure" period.
. . .
12.    Liberty agree to announce publically that after a careful review of the facts they believe Oron is protected by the DMCA safe harbor and that a review of the actual files shows that there never was any child porn on Oron's site.
. . .
14.    Liberty will immediately, once the terms of the agreement are agreed to issue a letter asking that the HK bank accounts be unfrozen allowing the payment to the Randazza Trust and then to Leaseweb as well as send a letter to Leaseweb asking them to allow Oron ten (10) days to pay as the settlement of the matter is imminent.

15.    All parties mutually release
. . .
19.    If you agree to these terms for your client please sign on the line below and return. (*See id.*)

On July 2, 2012, Plaintiff sent a letter to Bob Rietjens, Senior Legal Counsel at LeaseWeb, disclosing that the parties were near a settlement and requested that LeaseWeb not terminate the account for www.oron.com due to nonpayment. (Letter to LeaseWeb, Ex. B attached to Mtn to Enforce Settlement, ECF No. 33-2.)  On July 3, 2012, the parties filed a Joint Stipulation to Extend Hearing Date and Submission Deadlines so that the parties could "facilitate attempts to narrow the issues in this matter or to come to a mutually beneficial resolution to the dispute." (Stipulation, ECF No. 28.)  On July 3, 2012, S.T. Poon & Wong, Defendant FF Magnat Limited's counsel in the Hong Kong matter, delivered a letter to Plaintiff's Hong Kong counsel that states "[w]e are instructed that our client had reached an amicable settlement." (HK Letter, Ex. C attached to Mtn to Enforce Settlement, ECF No. 33-3.)

A dispute arose after the Settlement Letter was signed and after Plaintiff sent the letter to LeaseWeb.  E-mails sent between Stevan Lieberman, counsel for Defendant, and Marc Randazza, counsel for Plaintiff, on July 3, 2012, indicate that the parties disputed who was/would

Case 2:12-cv-01057-GMN -RJJ   Document 85   Filed 08/07/12   Page 3 of 8

1  be bound by the terms of the Settlement Letter. (*See* Lieberman Decl. ¶¶6-9, ECF No.44-1; E-

2  mails, Exs. B-E attached to Response, ECF Nos. 44-3-44-6.)  Defendant believed that all

3  defendants, including Mr. Bochenko, would be included in the terms; Plaintiff apparently did not.

4  (*See id.*)  On July 3, 2012, Marc Randazza sent an e-mail to his paralegal, on which Stevan

5  Lieberman was copied.  In this e-mail Randazza instructs his paralegal that they "need to put the

6  brakes on this. While I am not certain, it appears that settlement is not going to happen…we may

7  get back on track, but it seems that right now, the settlement we brokered is going off the rails."

8  (Email re: Consent Summons, Ex. 1 attached to Reply, ECF No. 66-1.)

9         However, Plaintiff eventually conceded to Defendant's interpretation of the Settlement

10  Letter and agreed that the settlement would also apply to Mr. Bochenko. (*See* Text Messages,

11  Ex. B attached to Reply to Mtn to Seal, ECF No. 41-2; Randazza Decl. ¶¶ 2-7, ECF No. 66-3.)

12  After discussing the issue with Defendant's local counsel, Mr. David Kahn, Plaintiff's counsel

13  agreed to Defense Counsel's interpretation and said he would back down from his interpretation

14  that the settlement was only with Defendant. (*See id.*)

DISCUSSION

16  A.   Legal Standard

17         "It is well settled that a district court has the equitable power to enforce summarily an

18  agreement to settle a case pending before it.  However, the district court may enforce only

19  *complete* settlement agreements." *Callie v. Near*, 829 F.2d 888, 890 (9th Cir. 1987) (citations

20  omitted).  "Whether the parties *intended* only to be bound upon the execution of a written,

21  signed agreement is a factual issue." *Id.* at 890-91.  "In addition to the intent of the parties to

22  bind themselves, the formation of a settlement contract requires agreement on its *material*

23  *terms*." *Id.* at 891.  "Because a settlement agreement is a contract, its construction and

24  enforcement are governed by principles of contract law." *May v. Anderson*, 119 P.3d 1254, 1257

25  (Nev. 2005) (footnote omitted).

1    Under Nevada law, "[b]asic contract principles require, for an enforceable contract, an

2   offer and acceptance, meeting of the minds, and consideration." *Id.* (footnote omitted).  "A valid

3   contract cannot exist when material terms are lacking or are insufficiently certain and definite."

4   *Id.* (footnote omitted).  "A contract can be formed, however, when the parties have agreed to the

5   material terms, even though the contract's exact language is not finalized until later." *Id.*

6   (footnote omitted).  Ordinarily, "[w]here a complete contract was made orally, the fact that it

7   was expected that a written contract would afterwards be signed, embodying the terms of the

8   oral contract, does not prevent the oral contract from taking effect." *Micheletti v. Fugitt*, 134

9   P.2d 99, 104 (Nev. 1943).

10    "In the case of a settlement agreement, a court cannot compel compliance when material

11   terms remain uncertain." *May v. Anderson*, 119 P.3d at 1257 (footnote omitted).  "The court

12   must be able to ascertain what is required of the respective parties." *Id.* (footnote omitted).

13   "[T]he question of whether a contract exists is one of fact." *Id.*

14    "[T]he evidence that the parties intended to be presently bound must be convincing and

15   subject to no other reasonable interpretation." *Tropicana Hotel Corporation v. Speer*, 692 P.2d

16   499, 502 (Nev. 1985) (examining manifestations of the parties' intent regarding the finality of an

17   oral contract); *see also Mack v. Estate of Mack*, 206 P.3d 98, 108 (Nev. 2009) (concluding that

18   "substantial evidence exists that shows a meeting of the minds between the parties" "based on

19   [opposing party]'s clear assent to the terms of the settlement agreement at the hearings held by

20   [the judge]").

21   B.    Analysis

22    The Court first looks at the Settlement Letter to determine if the parties intended to be

23   presently bound by the terms within.  Defendant describes the letter as a "draft term sheet for

24   review by Plaintiff's counsel, setting out certain terms of a proposed settlement." (Response,

25   4:18-19, ECF No. 44, citing Lieberman Decl. ¶¶ 3-4.)  At the top of this letter the subject line

1  reads "Potential Settlement." (Settlement Letter, pg. 1.)  The first line of the letter states "[t]his

2  letter is to memorialize what I believe is the settlement terms we are currently at for Liberty

3  Media Holdings (LMH)." (*Id.*)  The last page of the letter includes the following language: "[i]f

4  you agree to these terms for your client please sign on the line below and return." (*Id.* at pg. 3.)

5         There is nothing in the Settlement Letter that indicates that Defendant did not intend to be

6  presently bound by the proposed terms or that a future writing was required.  The requirement

7  for the Plaintiff's attorney to sign and return indicates that the parties do agree that all these

8  terms are acceptable and binding.  If this was only a proposal of terms there probably would not

9  be a requirement for Plaintiff's counsel to sign and return.

10        Moreover, Defendant does not argue that it did not intend to be bound by the terms once

11  the letter was signed.  Instead Defendant only points to statements made by Plaintiff after

12  signing the letter that it argues indicates the negotiations were ongoing.  Defendant argues that

13  the settlement was not final because the letter sent by Plaintiff to LeaseWeb states that

14  "Oron.com is on the eve of making a deal with us."  Likewise Defendant argues that the

15  stipulation submitted to the court to delay the hearing on the permanent injunction motion does

16  not state that a settlement was reached and that Plaintiff's counsel's comments indicating that

17  "the settlement we brokered is going off the rails," is further proof of no settlement.

18        However, the Court is not persuaded that any of these statements are sufficient evidence

19  to indicate that the parties did not intend to be bound by the terms in the signed Settlement

20  Letter.  The comment that "Oron.com is on the eve of making a deal" only indicates that

21  documents have not been finalized.  A contract can be formed so long as the parties agree to the

22  material terms, even though the contract's exact language is not finalized until later. *See May*,

23  119 P.3d 1254 at 1257.  The stipulation submitted to the Court likewise makes no concession

24  regarding the state of the settlement negotiations.  Finally, the comments that the "settlement we

25  brokered is going off the rails" including the context of the e-mail actually indicates the

contrary, that Defendant was not holding up its end of the bargain.

Thus the Court needs to determine if all the material terms of the contract were agreed to in the Settlement Letter.  Defendant claims that it understood the Settlement Letter would release all defendants from the claims by Plaintiff.  The e-mail correspondence that took place on July 3, 2012, however, demonstrates that Plaintiff believed the Settlement Letter only applied to Defendant and not Mr. Bochenko.  The parties' correspondence on July 3, 2012, makes clear that the avoidance of future litigation was a goal of Defendant in seeking the settlement. (*See* E-mails.)  Defendant argues that it always believed that it could not ensure future litigation arising from the facts of this case if Mr. Bochenko was not also dismissed with prejudice.  "If the prevention of future litigation is one of the primary goals of a settlement, the essential terms of the release needed to achieve that goal are material to the settlement agreement." *May*, 119 P.3d at 1258.  Thus it does appear there was no meeting of the minds regarding a material term of the settlement at the time of the Settlement Letter.  However, the issue then becomes whether or not Plaintiff's latter acceptance of Defendant's proposed interpretation of the settlement term – a latter "meeting of the minds" – constitutes an enforceable settlement agreement.

Plaintiff's counsel orally accepted Defendant's interpretation of the released parties in his conversation with local counsel David Kahn on July 5, 2012, and also sent the same in a text message to Mr. Lieberman. (Randazza Decl. attached to Reply, ECF No. 66-3.)  There can be no dispute that there was a meeting of the minds regarding the material term at that point. Defendant cannot simply disregard Plaintiff's acceptance of its settlement term and argue that there was never a "meeting of the minds" because there obviously was at some point.  It does not matter that some of the material terms are agreed to orally so long as there was intent to be bound by the agreement. *See May*, 119 P.3d 1254 at 1257.  Defendant cannot plausibly claim that it no longer intended to be bound by all the other terms of the Settlement Letter when it "got its way" on the one material term in dispute.

1   The Court finds that there is an enforceable contract. The Settlement Letter written by

2   Defendant was an offer, accepted by Plaintiff when its counsel signed the letter. There was a

3   meeting of the minds as to all material terms on July 5, 2012, when Plaintiff agreed that the

4   settlement would include dismissal with prejudice of Mr. Bochenko. There settlement includes

5   valuable consideration on the part of both Plaintiff and Defendant. In this case, the Court can

6   compel compliance because there are no uncertain material terms that remain. Accordingly, the

7   Court grants Plaintiff's Motion to Enforce Settlement.[2]

8   C.   Motion to Seal

9   Plaintiff filed a Motion to Seal (ECF No. 32) its Motion to Enforce Settlement (ECF No.

10   33) and Motion for Attorney's Fees (ECF No. 34). Plaintiff explains that it wishes to file these

11   two motions with accompanied exhibits under seal because they include discussions of the

12   settlement agreement which was supposed to be confidential. Defendant filed a fiery opposition

13   explaining that the motions should not be filed under seal because the terms had already been

14   leaked to the media and that Plaintiff has not proffered any other reason to file the documents

15   under seal. (*See* Opposition, ECF No. 39.) Plaintiff basically withdraws its motion in its Reply.

16   Plaintiff acknowledges that if Defendant does not want the documents filed under seal then it

17   will not continue to move for such protection. (*See* Reply, ECF No. 41.) Accordingly, the Court

18   does not see any reason to grant the Motion to Seal.

19                                    C O N C L U S I O N

20   IT IS HEREBY ORDERED that Plaintiff Liberty Media Holdings, LLC's Motion to

21   Enforce Settlement (ECF No. 33) is GRANTED.

22   IT IS FURTHER ORDERED that the Clerk of the Court shall enter judgment against

23

24   ───────────────
     [2] The Court recognizes that Defendant has always challenged personal jurisdiction in this case. (*See* Response to PI, ECF No.
25   71; Mtn to Dismiss, ECF No. 73.) However, Defendant waived personal jurisdiction as to the enforcement of the settlement
     agreement when it agreed to settle this case with Plaintiff. Accordingly, this Court finds that it has personal jurisdiction over
     Defendant for the sole purpose of enforcing the settlement agreement.

1 "FF Magnat Limited, *d/b/a/ Oron.com*" and in favor of Plaintiff in the amount of $550,000.00,

2 and execution of that amount shall be issued forthwith.

3      IT IS FURTHER ORDERED that FF Magnat's account shall remain frozen, in order to

4 satisfy any fee award, which may be sought by Plaintiff, but which must be brought within thirty

5 (30) days of this Order.

6      IT IS FURTHER ORDERED that this case is DISMISSED with prejudice against

7 Defendant FF Magnat and Defendant Maxim Bochenko.

8      IT IS FURTHER ORDERED that Plaintiff's Motion to Seal (ECF No. 32) is DENIED.

9 All documents filed under seal shall be immediately unsealed by the Clerk.

10      IT IS FURTHER ORDERED that the Motions at ECF Nos. 4, 5, 6, 21, 68, 70 and 73

11 are DENIED as moot.

12      IT IS FURTHER ORDERED that Plaintiff's Motion for Attorney's Fees (ECF No. 34)

13 remains under submission with the Court.

14      IT IS FURTHER ORDERED that the motion hearing scheduled for Thursday, August

15 9, 2012 at 1:30 p.m. in Courtroom 7D, is hereby VACATED.

16      DATED this 7th day of August, 2012.

17

18

19      _____

20      Gloria M. Navarro
        United States District Judge

21

22

23

24

25

1  **IAFD**
Clyde DeWitt
2  Nevada State Bar No. 9791
Law Offices of Clyde DeWitt,
3       A Nevada Professional Corporation
6525 West Warm Springs Road, Suite 100
4  Las Vegas, NV 89118-4679
(702) 386-1756; Fax (310) 362-8667
5  *clydedewitt@earthlink.net*

6  Counsel for Plaintiff

7            **IN THE DISTRICT COURT**

8   **FOR THE STATE OF NEVADA, COUNTY OF CLARK**

9           **EIGHTH JUDICIAL DISTRICT**

10  MARC J. RANDAZZA P.A., a Florida
professional association doing business
11  as RANDAZZA LEGAL GROUP,

12        Plaintiff,

13

14        vs.

15

16  LIBERTY MEDIA HOLDINGS, LLC,
a California limited-liability company
17  doing business as Corbin Fisher,

18        Defendant.

Case No: _____

**INITIAL APPEARANCE FEE
DISCLOSURE**

**[NEV. REV. STAT. Ch. 19]**

19
20
21
22
23
24
25
26
27
28

**INITIAL APPEARANCE FEE DISCLOSURE (N.R.S. CHAPTER 19)**

Pursuant to Nevada Revised Statutes Chapter 19, as amended by Senate Bill 106, filing fees are submitted for parties appearing in the above entitled action as indicated below:

| New Complaint Fee | 1st Appearance Fee |
|---|---|
| ☐ $1530   ☐ $520   ☐ $299<br>☒ **$270.00** | ☐ $1483.00   ☐ $473.00<br>☐ $223.00 |

Name: LIBERTY MEDIA HOLDINGS, LLC

| | |
|---|---|
| Jason Gibson | **X** $30 |
| | ☐ $30 |
| ☐ Total of Continuation Sheet Attached | ☐ $ |

**TOTAL REMITTED: $270.00**          **Total Paid**          **$300.00**

Dated: December 5, 2012                Respectfully Submitted,

CLYDE DeWITT
LAW OFFICES OF CLYDE DeWITT, APC


By:    /s/ Clyde DeWitt
          Clyde DeWitt

Counsel for Plaintiff

Page 2

1  Clyde DeWitt (Nevada Bar No. 9791)
2  LAW OFFICES OF CLYDE DeWITT, APC
   6525 W. Warm Springs Road, Suite 100
3  Las Vegas, NV 89118
   Telephone: (702) 386-1756
4  Facsimile: (702) 441-0308
   *ClydeDeWitt@EarthLink.net*
5
   Counsel for Plaintiff,
6  Marc J. Randazza, P.A.

7
   **IN THE DISTRICT COURT**
8
   **FOR THE EIGHTH JUDICIAL DISTRICT**
9
   **CLARK COUNTY, STATE OF NEVADA**
10

11  MARC J. RANDAZZA P.A., a Florida          Case No. _____
    professional association doing business as
12  RANDAZZA LEGAL GROUP,

13            Plaintiff,                       Dept. No. _____

14      vs.

15  LIBERTY MEDIA HOLDINGS, LLC, a            **DISCLOSURE STATEMENT**
    California limited-liability company      **[NEV. R. CIV. PROC.7.1]**
16  doing business as Corbin Fisher and
    JASSON GIBSON, an individual,
17
              Defendants.
18

19

20

21

22

23

24

25

26

27

28

- 1 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DISCLOSURE STATEMENT

Pursuant to Rule 7.1 of the Nevada Rules of Civil Procedure, Plaintiff Marc J. Randazza P.A. d/b/a Randazza Law Group here discloses that it has no parent corporation or any publicly held corporation owning 10% or more of its stock.

Dated: December 9, 2012.

Respectfully Submitted,

LAW OFFICES OF CLYDE DeWITT, APC

By: _ /s/ clydedewitt _ .
        Clyde DeWitt

Counsel for Plaintiff,
Marc J. Randazza, P.C.

- 2 -

# EXHIBIT 2

Electronically Filed
03/11/2013 02:41:06 PM

CLERK OF THE COURT

**FAC**
Ronald D. Green (Nevada Bar No. 7360)
J. Malcolm DeVoy (Nevada Bar No. 11950)
RANDAZZA LEGAL GROUP
6525 W. Warm Springs Road, Suite 100
Las Vegas, NV 89118
Telephone: 888-667-1113
Fax: 305-437-7662
ecf@randazza.com

## DISTRICT COURT
## CLARK COUNTY, NEVADA

MARC J. RANDAZZA P.A., a Florida
professional association doing business as
RANDAZZA LEGAL GROUP,

             Plaintiff,

      vs.

Liberty Media Holdings, LLC, a California
limited-liability company doing business as
CORBIN FISHER,

             Defendant.

Case No. A-12-673275-C
Dept. No. VIII

**PLAINTIFF'S FIRST AMENDED
COMPLAINT**
**-BREACH OF CONTRACT**
**-UNJUST ENRICHMENT**
**-ACCOUNT STATED**

• **JURY TRIAL DEMANDED**

   **NRCP 38**

## PLAINTIFF'S FIRST AMENDED COMPLAINT

    Plaintiff Marc J. Randazza P.A., d/b/a RANDAZZA LEGAL GROUP, hereby brings this

Complaint against Defendant Liberty Media Holdings LLC ("LMH"), and alleges as follows:

### I.    Introduction

    This is an action by a law firm to collect fees due from its former client.  The law firm

accomplished all that was requested by the client, but the former client refuses to pay and has no

intention of doing so. LMH has admitted that RLG performed extensive work for it, as is obvious

from the underlying case's docket, and was charged for this work.  (Exhibit 101 ¶¶ 1, 3, 6)

Despite these admissions, LMH has forced RLG to seek judicial assistance to resolve this issue.

- 1 -

1          1.     Randazza Legal Group ("RLG") is a nationally recognized law firm, best known

2  for handling high-profile First Amendment, entertainment and intellectual property matters.

3  Liberty Media Holdings LLC ("LMH"), an adult entertainment company, hired RLG to represent

4  it in a copyright infringement matter before the United States District Court for the District of

5  Nevada[1] (the "Oron Litigation").  RLG performed excellently in the litigation, obtaining, *inter*

6  *alia*, a temporary restraining order of the defendant's funds without a hearing, a settlement of

7  $550,000, judicial enforcement of that settlement, collection of that amount, and an attorney's

8  fees award of more than $131,797.00.  In return, LMH refused to pay RLG anything for its

9  services.

10        2.     RLG had long represented LMH in copyright infringement litigation in Nevada,

11  Florida, Arizona, California, Texas, and Wisconsin.  In the past, LMH regularly paid RLG for its

12  services.

13        3.     Because of the close, ongoing relationship between LMH and RLG, and the

14  hourly nature of the firm's fee structure in such matters, the parties saw no need for a written

15  agreement, nor was one required by any provision of the law or Nevada Rules of Professional

16  Conduct.  Nevertheless, Randazza made the terms of representation clear to LMH's CEO, Jason

17  Gibson, and he ratified them.

18        4.     To date, Liberty Media Holdings LLC has refused to pay RLG any amount for its

19  services in the Oron Litigation.  With negotiations having failed, RLG has no choice but to sue

20  LMH to recover the $81,433.98 in reasonable attorneys' fees it provided to LMH without

21  payment.[2]

22  //

23  //

---

[1] *Liberty Media Holdings LLC v. FF Magnat Limited, d/b/a Oron.com, et al.*, Case No. 2:12-cv-01057 (D. Nev. 2012).

[2] The actual value of RLG's services exceeds $131,797, but a portion of this value is resolved with Marc Randazza's personal salary from Liberty Media Holdings and its sister company, Excelsior Media Corporation. Thus, Plaintiff seeks only the outstanding $81,433.98 in reasonable attorneys' fees that it is owed.

- 2 -

## II.    Jurisdiction and Venue

5.    Plaintiff seeks damages in excess of $10,000 against LMH.  Accordingly, this court has jurisdiction pursuant to Nev. Const. Art. 6 § 6; NRS 4.370(1)(A).

6.    Venue is proper in this court because Liberty Media Holdings LLC is a California limited liability company with its principal place of business in Clark County, Nevada.

7.    Furthermore, the contract and transaction that are the subject of this action were formed, to be performed, and in fact performed in Clark County, Nevada.  Therefore, venue is proper pursuant to NRS 13.010.

8.    Accordingly, jurisdiction and venue before this court are proper.

## III.    Parties

### A.  The Plaintiff

9.    Plaintiff, Marc J. Randazza P.A., is a professional association organized and existing under the laws of the State of Florida that does business as Randazza Legal Group.

10.    Known nation-wide for its participation and success in intellectual property and First Amendment matters, as well as other high-profile disputes widely covered by the media, RLG represents a number of adult entertainment companies, previously including LMH.

11.     Particular to this action, RLG represented LMH in the Oron Litigation before the United States District Court for the District of Nevada.

### B.  The Defendant

12.    LMH is a California limited-liability company with its primary place of business in Clark County, Nevada, and the plaintiff in the Oron Litigation.

13.    LMH is a producer of adult entertainment and has been a leading force in the adult industry's ongoing efforts to combat digital piracy.

14.    Since 2009, LMH had retained RLG to further these goals, and frequently used RLG's services to engage in litigation against users of BitTorrent who unlawfully distributed LMH's copyrighted content, video-playing "tube" sites that unlawfully displayed LMH's copyrighted content, and one-click-hosting sites known as "cyber lockers" that also unlawfully distributed LMH's copyrighted content.

- 3 -

15.     LMH's CEO, Jason Gibson, was RLG's point of contact within LMH, and had a close, working relationship with RLG's managing partner, Marc Randazza, for many years.

### IV.     Facts Common to All Claims for Relief

#### A. The Relationship between RLG and LMH.

16.     RLG and its managing partner, Marc Randazza, are widely-known and nationally recognized attorneys for the adult entertainment industry, particularly in the area of copyright.

17.     As one of RLG's longest-standing clients, LMH routinely used RLG's services to engage in a variety of intellectual property litigation nationwide.

18.     Through RLG, LMH had engaged in litigation coast-to-coast, from Massachusetts, Pennsylvania, Florida, Texas and Wisconsin, to Nevada, Arizona, and California. This strategy was made possible because of the number of law licenses national connections, and affiliates held and maintained by RLG's attorneys.

19.     RLG's relationship with LMH was facilitated by Marc Randazza's role as general counsel to LMH and its sister companies, including Excelsior Media Corporation, Becar Management LLC, and HMF Workforce, LLC.

20.     Because of Marc Randazza's close relationship with LMH, he was able to leverage his law firm, RLG, to LMH's benefit – offering significant discounts to LMH on RLG's services in consideration of his ongoing relationship with the company.  LMH was not only fully aware of this arrangement, but encouraged it and contemplated it within its employment agreement with Marc Randazza.

21.     In return, Marc Randazza was able to provide certain volume discounts on RLG's rates to LMH on the condition that LMH timely paid for RLG's services, and that LMH and its sister companies continued to employ Randazza as their general counsel.

22.     Since July 2009, Marc Randazza, LMH and RLG enjoyed this understanding, and it operated as an operating contract among the parties.

23.     Although this agreement was never reduced to writing, Marc Randazza, RLG and LMH saw no reason for it to be, as LMH paid RLG's bills and continued to employ Marc Randazza as its general counsel. (Exhibit 102)

- 4 -

**B.  The Oron Litigation**

24.    In June 2012, LMH used RLG to commence the Oron Litigation.

25.    Marc Randazza had been researching the defendant in that action, FF Magnat Limited, for more than a year, and had carefully planned LMH's attack on the company – including the seizure of its domestic and foreign financial assets.

26.    On or about June 20, 2012, RLG commenced the Oron Litigation, filing a Complaint and ex parte motion for temporary restraining order against FF Magnat Limited. Concurrently, Marc Randazza had coordinated a similar action seeking a Mareva injunction[3] in Hong Kong to freeze FF Magnat Limited's assets within the Hong Kong Special Administrative Region and globally.

27.    Concurrent with LMH's United States litigation, it also desired to freeze Oron.com's international assets through the use of a Mareva injunction obtained in Hong Kong, where FF Magnat Limited was organized.

28.    On June 22, 2012, The United States District Court for the District of Nevada granted LMH's ex parte motion for a temporary restraining order against FF Magnat Limited's assets.  The Court granted this motion without hearing, and set a further briefing schedule for LMH's desired preliminary injunction against FF Magnat Limited.

29.    FF Magnat then moved to withdraw nearly $400,000 in funds from its frozen accounts to fund its litigation defense.  RLG swiftly opposed this motion, and the Court allowed FF Magnat Limited to withdraw only $100,000 for its litigation defense.  RLG successfully opposed all future requests for disbursement of funds and other monetary relief before both the United States District Court for the District of Nevada and the United States Court of Appeals for the Ninth Circuit.

30.    On July 1, RLG negotiated a settlement of the Oron Litigation between LMH and FF Magnat Limited for $550,000.

---

[3] A Mareva Injunction freezes a defendant's assets in numerous foreign jurisdictions.

31. Shortly thereafter, however, FF Magnat began acting contrary to its settlement agreement with LMH, and claiming that no such agreement had been reached.

32. RLG moved the United States District Court for the District of Nevada to enforce LMH's settlement agreement with FF Magnat Limited.

33. While briefing on RLG's motion to enforce LMH's settlement agreement progressed, RLG prepared and filed LMH's briefing opposing Defendant Maxim Bochenko's motion to dismiss for lack of personal jurisdiction, and an extensive reply brief in support of LMH's motion for preliminary injunction.

34. Almost immediately after those documents were filed, the Court entered an order on August 7, 2012 granting LMH's motion to enforce its settlement agreement with FF Magnat Limited, and entering judgment of $550,000 in LMH's favor against FF Magnat Limited.

35. RLG went about seeking to enforce LMH's $550,000 judgment immediately. On August 21, 2012, RLG filed a motion seeking an order requiring PayPal, Incorporated – a third party payment processor holding hundreds of thousands of dollars of FF Magnat Limited's money which had been frozen under the Court's order – to pay $550,000 from FF Magnat Limited's frozen accounts to LMH, via RLG's trust account.

36. That same day, the United States District Court for the District of Nevada granted RLG's motion and entered an order requiring PayPal to transfer $550,000 from FF Magnat Limited's account to LMH.

37. RLG then collected those funds for LMH's benefit.

38. In addition to the $550,000 settlement amount, RLG wished for Liberty to recover the reasonable value of its attorneys' fees and costs.

39. On August 10, 2012, RLG moved for more than $132,000 in attorneys' fees and costs.

40. On September 4, 2012, the United States District Court for the District of Nevada entered an order granting RLG's motion, and awarding LMH $131,797.50 in attorneys' fees. A true and correct copy of this order is attached as Exhibit 103.

- 6 -

41.     In recent filings before the United States Court of Appeals for the Ninth Circuit, LMH affirmed the reasonableness of RLG's attorneys' fees and confirmed that RLG provided extensive legal services in the Oron Litigation at its direction. (Exhibits 101, 104)

42.     Regarding RLG's $81,433.98 in reasonable attorneys' fees expended in the Oron Litigation, LMH represented that:

a.   "the District Court ultimately based its attorney fees award [Exhibit 103] on a lodestar analysis that **did not depend on the amount of attorney fees incurred**";

b.   "the amount of **fees awarded by the District Court [should] stand**";

c.   "Because the outcome of **the lodestar method employed by the District Court required an examination of the reasonableness of the attorney fees expended on Liberty's behalf rather than the reasonableness of the attorney fees actually [paid] by Liberty, no further analysis by the District Court [as to the reasonableness of RLG's fees] is necessary**"; and

d.   "Liberty respectfully submits that **the Court should exercise this authority and summarily affirm the amount of attorney fees awarded by the District Court**" (Exhibit 104) (emphasis added).

43.     LMH's Chief Financial Officer, Henry Leonard – a Certified Public Accountant, Certified Management Accountant, and holder of a Ph.D. – affirmed under penalty of perjury that RLG provided legal services to LMH in the Oron Litigation (Exhibit 101 ¶ 4).

44.     Mr. Leonard further stated, under penalty of perjury, that RLG charged LMH in the Oron Litigation (Exhibit 101 ¶ 6).[4]

45.     However, Liberty has not paid any of RLG's fees.

46.     Thus, while LMH refuses to pay RLG anything for its legal services – and wishes to impugn RLG before the Court of Appeals for conduct it simultaneously admits was proper – LMH seeks to retain the benefit of RLG's market value rates within its fee award. (Exhibit 104)

_____

[4] Mr. Leonard's discussion of a discount for LMH is consistent with the discount Mr. Randazza provided to LMH for his firm's rates as a condition of his continued employment and the timely payment of RLG's fees.

**C. LMH Breaches Its Contract With RLG**

47.     On August 30, 2012, LMH unilaterally terminated Randazza from his employment as the company's general counsel.

48.     On or about August 31, 2012, LMH retained the Greenberg Traurig law firm to represent it in the Oron Litigation; and RLG signed a substitution of counsel form Greenberg Traurig supplied to RLG.

49.     Thereafter, the United States District Court for the District of Nevada approved LMH's request for substitution of counsel, and Greenberg Traurig replaced RLG in the Oron Litigation.

50.     Since August 30, RLG's efforts to have LMH pay the past-due balance of $81,433.98 have been unsuccessful.

51.     By terminating Randazza, terminating its relationship with RLG, and failing to make any payments toward RLG's bills for its legal services in the Oron Litigation, LMH has materially breached its agreement with RLG.

**First Claim for Relief: Breach of Contract**

**Against Defendant LMH**

52.     Plaintiff incorporates and realleges each preceding paragraph by reference as if set forth herein.

53.     RLG and LMH had an oral agreement for RLG to provide LMH with legal representation in the Oron Litigation, as well as in other matters.

54.     Over many years' course of dealing, LMH solidified this contractual relationship with RLG, with regular payments for its legal services in a wide range of legal matters, including copyright infringement litigation.

55.     LMH materially breached this contract by failing to pay RLG for any of the legal services it rendered in the Oron Litigation.

56.     RLG has been damaged by LMH's breach, and suffered $81,433.98 in damages due to LMH's breach and non-payment for RLG's legal services.

//

- 8 -

**Second Claim for Relief: Unjust Enrichment / Quantum Meruit**

**Against LMH**

57.    Plaintiff incorporates and realleges each preceding paragraph by reference as if set forth herein.

58.    In the alternative to RLG's breach of contract claim, Plaintiff brings an unjust enrichment claim in an effort to streamline this litigation.  During negotiation, LMH and its sibling companies have adopted unreasonable, inconsistent, and even contradictory positions regarding its liability to RLG for its attorneys' fees.

59.    RLG thus expects LMH to disavow any form of contract with the firm, and as a result the firm is entitled to the reasonable value of its attorneys fees.  As established by Exhibit 103, the reasonableness of these fees at $81,433.98 has been adjudicated by the United States District Court for the District of Nevada.

60.    By providing extensive legal services to LMH in the Oron Litigation, RLG conferred the benefits of its labor and legal representation onto LMH.

61.    LMH benefitted from this representation by achieving a settlement of $550,000 from FF Magnat Limited, obtaining judicial enforcement of that settlement agreement (including a third party's transfer of FF Magnat Limited's funds into RLG's trust account), and an attorney's fee award of more than $131,797.00.

62.    LMH consumed these services as they were rendered, and retained their benefits – including the favorable orders and decisions RLG obtained for it – without payment, or beseeching the Court to reverse the benefits of RLG's representation.

63.    LMH refused to pay RLG for these services, yet has retained the benefits and legal entitlements RLG obtained for LMH.

64.    LMH further seeks to enjoy the benefit of RLG's market rates through its award of attorneys' fees, but now refuses to pay those market rates (or anything) to RLG.

65.    As a consequence of LMH's refusal to render any payment for RLG's services in the Oron Litigation, RLG has been damaged in the amount of its services reasonable value: $81,433.98.

- 9 -

66. In light of the services RLG provided to LMH and results the firm obtained for LMH, it would be inequitable for LMH to retain the benefits of RLG's services without payment.

**Third Claim for Relief: Account Stated**

**Against LMH**

67. Plaintiff incorporates and re-alleges each preceding paragraph by reference as if set forth herein.

68. LMH's use of RLG in the Oron Litigation represented an account with RLG, as it periodically charged LMH for its services. (Exhibit 101 ¶¶ 3, 6)

69. In the past, LMH paid RLG's invoices and charges passed on to it by Mr. Randazza, and had agreed to pay RLG's invoices and charges going forward – including in the Oron Litigation.

70. Mr. Randazza kept LMH's executives apprised of RLG's fees and charges during the Oron Litigation's pendency.

71. Despite providing a statement confirming an outstanding balance, and repeated demands to repay this obligation, LMH refused and continues to refuse pay <u>any part</u> of this obligation.

72. RLG has suffered damages from LMH refusing to pay any portion of its still-outstanding account with RLG.

**Request for Relief**

Plaintiff seeks judgment including the following:

1. On the First Claim for Relief, Actual damages of more than $10,000 arising from LMH's breach of contract.

2. On the Second Claim for Relief, actual damages of more than $10,000 arising from LMH's unjust enrichment at RLG's expense.

3. On the Third Claim for Relief, actual damages of more than $10,000 arising from RLG's account stated against LMH.

4. Any and all additional relief as ordered by the Court.

- 10 -

1

**Jury Trial Demanded**

2      Plaintiff demands a jury trial on all issues to which the right to jury attaches.

3  Dated March 11, 2013

4

5                                          RANDAZZA LEGAL GROUP

6

7                                          /s/ Ronald D. Green

8                                          Ronald D. Green
                                           J. Malcolm DeVoy

9                                          Attorney for Plaintiff,
10                                         *Marc J. Randazza P.A.*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 11 -

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was deposited in the U.S. Mail via First Class mail addressed to the recipients below and served upon them pursuant to Nev. R. Civ. P. 5 on March 11, 2013.

Mitchell J. Langberg
Brownstein Hyatt Farber Schreck, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106

Laura E. Bielinski
Brownstein Hyatt Farber Schreck, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106

Dated: March 11, 2013

Erika Dillon, Paralegal
Randazza Legal Group
6525 W. Warm Springs Road, Suite 100
Las Vegas, NV 89118
ecf@randazza.com

# EXHIBIT 101

## DECLARATION OF HENRY LEONARD

I, Henry Leonard, PhD, CPA, CMA, hereby declare under penalty of perjury as follows:

1.    I am the Chief Financial Officer of Appellee Liberty Media Holdings, LLC ("Liberty"). I have served in this capacity since November 2011 and have been employed by Liberty since 2009. I make this Declaration in support of "Appellee's Motion For An Order Reassessing And Summarily Affirming The Amount Of The District Court's Attorney Fees Award Or, In The Alternative, Remanding This Case To The District Court, Following The Disposition Of This Appeal, For The Limited Purpose Of Obtaining A Reassessment Of The Amount Of Its Attorney Fees Award."

2.    I have personal knowledge of the matters set forth in this Declaration and, if called as a witness, could and would competently testify thereto.

3.    As Chief Financial Officer, I am involved in Liberty's day-to-day financial decisions and am familiar with the billing and payment processes for Liberty's vendors and service providers, including Liberty's former counsel, the Randazza Legal Group.

4.    The Randazza Legal Group represented Liberty in the matter of *Liberty Media Holdings, LLC v. FF Magnat Limited d/b/a Oron.com*, United States

District Court, District of Nevada, Case No. 2:12-cv-01057-GMN-RJJ (the "Oron Litigation").

5.    Marc Randazza, Esq. of the Randazza Legal Group served as Liberty's general counsel during the course of the Oron Litigation, and in that capacity was a salaried employee of Liberty.  Mr. Randazza did not charge Liberty an hourly rate for his own services in the Oron Litigation.

6.    Mr. Randazza also charged Liberty reduced hourly rates in the Oron Litigation for the legal services provided by other attorneys and legal assistants employed by his firm.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 12th day of February, 2013 at Las Vegas, Nevada.


Henry Leonard

# EXHIBIT 102

| Total Hours | 12.90 hrs |
| Total Attorney Time | $913.00 |
| Total Amount | **$913.00** |

| | |
|---|---|
| Total Hours | 13.70 hrs |
| Total Attorney Time | $953.00 |
| Total Expenses | $5,468.85 |
| Total Invoice Amount | **$6,421.85** |
| Previous Balance | $0.00 |
| Balance (Amount Due) | **$6,421.85** |

**Notes:**

Jason,

This is for the RLG lawyers we have used as local counsel. I have only billed you what I pay them, to the closest approximation I can come up with. Normally, Jason Fischer bills at $325 per hour, and Jay DeVoy bills a $275 per hour. You're getting billed at $90 and $50 per hour respectively on this bill. In the future, that may go up or down as the expenses I pay for those guys change. However, the intent is to ensure that they don't cost me anything out-of-pocket, but also that I do not earn any profit from their labor if they do work for you.

That's the $913.

The remainder is just the expenses that I put on my RLG credit card. I have submitted, through Eric, a separate expense report for that.

I also have a personal expense report. But, that is submitted separately.

# EXHIBIT 103

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | | |
|---|---|---|
| LIBERTY MEDIA HOLDINGS, LLC, | ) | Case No.: 2:12-cv-01057-GMN-RJJ |
| | ) | |
| Plaintiff, | ) | ORDER |
| vs. | ) | |
| | ) | |
| FF MAGNAT LIMITED, *d/b/a Oron.com*; | ) | |
| MAXIM BOCHENKO, *a/k/a Roman Romanov*; | ) | |
| and JOHN DOES 1-500, | ) | |
| | ) | |
| Defendants. | ) | |

## INTRODUCTION

Before the Court is Plaintiff Liberty Media Holdings, LLC's (hereinafter "Plaintiff") Motion to Enforce Settlement (ECF No. 33). Defendant FF Magnat Limited (hereinafter "Defendant") filed a Response (ECF No. 44), and Plaintiff filed a Reply (ECF No. 66).

Also before the Court is Plaintiff's Motion to Seal Motions #33 and #34 (ECF No. 32). Defendant filed an Opposition (ECF No. 39), and Plaintiff filed a Reply (ECF No. 41).

## FACTS AND BACKGROUND

The instant case involves a dispute over Defendants' alleged copyright infringement of Plaintiff's works. This Court previously granted Plaintiff's motion for a temporary restraining order against Defendant. (TRO Order, ECF No.11.)[1] Thereafter, on July 1, 2012, attorneys for Plaintiff and Defendant signed a letter memorializing settlement terms in regards to this case and a similar case between these two parties in Hong Kong (hereinafter "Settlement Letter"). (Settlement Letter, Ex. A attached to Mtn to Enforce Settlement, ECF No. 33-1.) The pertinent parts of the settlement letter are as follows:

---

[1] The TRO was later amended. (Amended TRO, ECF No. 13.)

1.      Oron pays Liberty Media $550,000.
. . .
8.      Once payment is received by both parties, both proceedings in NV and HK will be dismissed with prejudice, and in the event that Oron breaks any part of the deal, the claims may be reinstated via arbitration after a 30 day "notice and cure" period.
. . .
12.     Liberty agree to announce publically that after a careful review of the facts they believe Oron is protected by the DMCA safe harbor and that a review of the actual files shows that there never was any child porn on Oron's site.
. . .
14.     Liberty will immediately, once the terms of the agreement are agreed to issue a letter asking that the HK bank accounts be unfrozen allowing the payment to the Randazza Trust and then to Leaseweb as well as send a letter to Leaseweb asking them to allow Oron ten (10) days to pay as the settlement of the matter is imminent.

15.     All parties mutually release
. . .
19.     If you agree to these terms for your client please sign on the line below and return.

(*See id.*)

On July 2, 2012, Plaintiff sent a letter to Bob Rietjens, Senior Legal Counsel at LeaseWeb, disclosing that the parties were near a settlement and requested that LeaseWeb not terminate the account for www.oron.com due to nonpayment. (Letter to LeaseWeb, Ex. B attached to Mtn to Enforce Settlement, ECF No. 33-2.)  On July 3, 2012, the parties filed a Joint Stipulation to Extend Hearing Date and Submission Deadlines so that the parties could "facilitate attempts to narrow the issues in this matter or to come to a mutually beneficial resolution to the dispute." (Stipulation, ECF No. 28.)  On July 3, 2012, S.T. Poon & Wong, Defendant FF Magnat Limited's counsel in the Hong Kong matter, delivered a letter to Plaintiff's Hong Kong counsel that states "[w]e are instructed that our client had reached an amicable settlement." (HK Letter, Ex. C attached to Mtn to Enforce Settlement, ECF No. 33-3.)

A dispute arose after the Settlement Letter was signed and after Plaintiff sent the letter to LeaseWeb.  E-mails sent between Stevan Lieberman, counsel for Defendant, and Marc Randazza, counsel for Plaintiff, on July 3, 2012, indicate that the parties disputed who was/would

Case 2:12-cv-01057-GMN -RJJ    Document 85    Filed 08/07/12    Page 3 of 8

1    be bound by the terms of the Settlement Letter. (*See* Lieberman Decl. ¶¶6-9, ECF No.44-1; E-

2    mails, Exs. B-E attached to Response, ECF Nos. 44-3-44-6.) Defendant believed that all

3    defendants, including Mr. Bochenko, would be included in the terms; Plaintiff apparently did not.

4    (*See id.*) On July 3, 2012, Marc Randazza sent an e-mail to his paralegal, on which Stevan

5    Lieberman was copied.  In this e-mail Randazza instructs his paralegal that they "need to put the

6    brakes on this. While I am not certain, it appears that settlement is not going to happen…we may

7    get back on track, but it seems that right now, the settlement we brokered is going off the rails."

8    (Email re: Consent Summons, Ex. 1 attached to Reply, ECF No. 66-1.)

9         However, Plaintiff eventually conceded to Defendant's interpretation of the Settlement

10   Letter and agreed that the settlement would also apply to Mr. Bochenko. (*See* Text Messages,

11   Ex. B attached to Reply to Mtn to Seal, ECF No. 41-2; Randazza Decl. ¶¶ 2-7, ECF No. 66-3.)

12   After discussing the issue with Defendant's local counsel, Mr. David Kahn, Plaintiff's counsel

13   agreed to Defense Counsel's interpretation and said he would back down from his interpretation

14   that the settlement was only with Defendant. (*See id.*)

15                                  <u>D I S C U S S I O N</u>

16   A.    Legal Standard

17        "It is well settled that a district court has the equitable power to enforce summarily an

18   agreement to settle a case pending before it.  However, the district court may enforce only

19   *complete* settlement agreements." *Callie v. Near*, 829 F.2d 888, 890 (9th Cir. 1987) (citations

20   omitted).  "Whether the parties *intended* only to be bound upon the execution of a written,

21   signed agreement is a factual issue." *Id.* at 890-91.  "In addition to the intent of the parties to

22   bind themselves, the formation of a settlement contract requires agreement on its *material*

23   *terms*." *Id.* at 891.  "Because a settlement agreement is a contract, its construction and

24   enforcement are governed by principles of contract law." *May v. Anderson*, 119 P.3d 1254, 1257

25   (Nev. 2005) (footnote omitted).

Case 2:12-cv-01057-GMN -RJJ   Document 85   Filed 08/07/12   Page 4 of 8

1    Under Nevada law, "[b]asic contract principles require, for an enforceable contract, an

2  offer and acceptance, meeting of the minds, and consideration." *Id.* (footnote omitted). "A valid

3  contract cannot exist when material terms are lacking or are insufficiently certain and definite."

4  *Id.* (footnote omitted). "A contract can be formed, however, when the parties have agreed to the

5  material terms, even though the contract's exact language is not finalized until later." *Id.*

6  (footnote omitted). Ordinarily, "[w]here a complete contract was made orally, the fact that it

7  was expected that a written contract would afterwards be signed, embodying the terms of the

8  oral contract, does not prevent the oral contract from taking effect." *Micheletti v. Fugitt*, 134

9  P.2d 99, 104 (Nev. 1943).

10    "In the case of a settlement agreement, a court cannot compel compliance when material

11  terms remain uncertain." *May v. Anderson*, 119 P.3d at 1257 (footnote omitted). "The court

12  must be able to ascertain what is required of the respective parties." *Id.* (footnote omitted).

13  "[T]he question of whether a contract exists is one of fact." *Id.*

14    "[T]he evidence that the parties intended to be presently bound must be convincing and

15  subject to no other reasonable interpretation." *Tropicana Hotel Corporation v. Speer*, 692 P.2d

16  499, 502 (Nev. 1985) (examining manifestations of the parties' intent regarding the finality of an

17  oral contract); *see also Mack v. Estate of Mack*, 206 P.3d 98, 108 (Nev. 2009) (concluding that

18  "substantial evidence exists that shows a meeting of the minds between the parties" "based on

19  [opposing party]'s clear assent to the terms of the settlement agreement at the hearings held by

20  [the judge]").

21  B.    Analysis

22    The Court first looks at the Settlement Letter to determine if the parties intended to be

23  presently bound by the terms within. Defendant describes the letter as a "draft term sheet for

24  review by Plaintiff's counsel, setting out certain terms of a proposed settlement." (Response,

25  4:18-19, ECF No. 44, citing Lieberman Decl. ¶¶ 3-4.) At the top of this letter the subject line

1  reads "Potential Settlement." (Settlement Letter, pg. 1.)  The first line of the letter states "[t]his

2  letter is to memorialize what I believe is the settlement terms we are currently at for Liberty

3  Media Holdings (LMH)." (*Id.*)  The last page of the letter includes the following language: "[i]f

4  you agree to these terms for your client please sign on the line below and return." (*Id.* at pg. 3.)

5       There is nothing in the Settlement Letter that indicates that Defendant did not intend to be

6  presently bound by the proposed terms or that a future writing was required.  The requirement

7  for the Plaintiff's attorney to sign and return indicates that the parties do agree that all these

8  terms are acceptable and binding.  If this was only a proposal of terms there probably would not

9  be a requirement for Plaintiff's counsel to sign and return.

10      Moreover, Defendant does not argue that it did not intend to be bound by the terms once

11  the letter was signed.  Instead Defendant only points to statements made by Plaintiff after

12  signing the letter that it argues indicates the negotiations were ongoing.  Defendant argues that

13  the settlement was not final because the letter sent by Plaintiff to LeaseWeb states that

14  "Oron.com is on the eve of making a deal with us."  Likewise Defendant argues that the

15  stipulation submitted to the court to delay the hearing on the permanent injunction motion does

16  not state that a settlement was reached and that Plaintiff's counsel's comments indicating that

17  "the settlement we brokered is going off the rails," is further proof of no settlement.

18      However, the Court is not persuaded that any of these statements are sufficient evidence

19  to indicate that the parties did not intend to be bound by the terms in the signed Settlement

20  Letter.  The comment that "Oron.com is on the eve of making a deal" only indicates that

21  documents have not been finalized.  A contract can be formed so long as the parties agree to the

22  material terms, even though the contract's exact language is not finalized until later. *See May*,

23  119 P.3d 1254 at 1257.  The stipulation submitted to the Court likewise makes no concession

24  regarding the state of the settlement negotiations.  Finally, the comments that the "settlement we

25  brokered is going off the rails" including the context of the e-mail actually indicates the

1    contrary, that Defendant was not holding up its end of the bargain.

2         Thus the Court needs to determine if all the material terms of the contract were agreed to

3    in the Settlement Letter.  Defendant claims that it understood the Settlement Letter would

4    release all defendants from the claims by Plaintiff.  The e-mail correspondence that took place

5    on July 3, 2012, however, demonstrates that Plaintiff believed the Settlement Letter only applied

6    to Defendant and not Mr. Bochenko.  The parties' correspondence on July 3, 2012, makes clear

7    that the avoidance of future litigation was a goal of Defendant in seeking the settlement. (*See* E-

8    mails.)  Defendant argues that it always believed that it could not ensure future litigation arising

9    from the facts of this case if Mr. Bochenko was not also dismissed with prejudice.  "If the

10    prevention of future litigation is one of the primary goals of a settlement, the essential terms of

11    the release needed to achieve that goal are material to the settlement agreement." *May*, 119 P.3d

12    at 1258.  Thus it does appear there was no meeting of the minds regarding a material term of the

13    settlement at the time of the Settlement Letter.  However, the issue then becomes whether or not

14    Plaintiff's latter acceptance of Defendant's proposed interpretation of the settlement term – a

15    latter "meeting of the minds" – constitutes an enforceable settlement agreement.

16         Plaintiff's counsel orally accepted Defendant's interpretation of the released parties in his

17    conversation with local counsel David Kahn on July 5, 2012, and also sent the same in a text

18    message to Mr. Lieberman. (Randazza Decl. attached to Reply, ECF No. 66-3.)  There can be no

19    dispute that there was a meeting of the minds regarding the material term at that point.

20    Defendant cannot simply disregard Plaintiff's acceptance of its settlement term and argue that

21    there was never a "meeting of the minds" because there obviously was at some point.  It does

22    not matter that some of the material terms are agreed to orally so long as there was intent to be

23    bound by the agreement. *See May*, 119 P.3d 1254 at 1257.  Defendant cannot plausibly claim

24    that it no longer intended to be bound by all the other terms of the Settlement Letter when it "got

25    its way" on the one material term in dispute.

Case 2:12-cv-01057-GMN -RJJ   Document 85   Filed 08/07/12   Page 7 of 8

1    The Court finds that there is an enforceable contract.  The Settlement Letter written by

2    Defendant was an offer, accepted by Plaintiff when its counsel signed the letter.  There was a

3    meeting of the minds as to all material terms on July 5, 2012, when Plaintiff agreed that the

4    settlement would include dismissal with prejudice of Mr. Bochenko.  There settlement includes

5    valuable consideration on the part of both Plaintiff and Defendant.  In this case, the Court can

6    compel compliance because there are no uncertain material terms that remain.  Accordingly, the

7    Court grants Plaintiff's Motion to Enforce Settlement.[2]

8    C.    Motion to Seal

9    Plaintiff filed a Motion to Seal (ECF No. 32) its Motion to Enforce Settlement (ECF No.

10   33) and Motion for Attorney's Fees (ECF No. 34).  Plaintiff explains that it wishes to file these

11   two motions with accompanied exhibits under seal because they include discussions of the

12   settlement agreement which was supposed to be confidential.  Defendant filed a fiery opposition

13   explaining that the motions should not be filed under seal because the terms had already been

14   leaked to the media and that Plaintiff has not proffered any other reason to file the documents

15   under seal. (*See* Opposition, ECF No. 39.)  Plaintiff basically withdraws its motion in its Reply.

16   Plaintiff acknowledges that if Defendant does not want the documents filed under seal then it

17   will not continue to move for such protection. (*See* Reply, ECF No. 41.)  Accordingly, the Court

18   does not see any reason to grant the Motion to Seal.

19                          CONCLUSION

20   IT IS HEREBY ORDERED that Plaintiff Liberty Media Holdings, LLC's Motion to

21   Enforce Settlement (ECF No. 33) is GRANTED.

22   IT IS FURTHER ORDERED that the Clerk of the Court shall enter judgment against

23

24   _____
25   [2] The Court recognizes that Defendant has always challenged personal jurisdiction in this case. (*See* Response to PI, ECF No. 71; Mtn to Dismiss, ECF No. 73.)  However, Defendant waived personal jurisdiction as to the enforcement of the settlement agreement when it agreed to settle this case with Plaintiff.  Accordingly, this Court finds that it has personal jurisdiction over Defendant for the sole purpose of enforcing the settlement agreement.

1   "FF Magnat Limited, *d/b/a/ Oron.com*" and in favor of Plaintiff in the amount of $550,000.00,

2   and execution of that amount shall be issued forthwith.

3        IT IS FURTHER ORDERED that FF Magnat's account shall remain frozen, in order to

4   satisfy any fee award, which may be sought by Plaintiff, but which must be brought within thirty

5   (30) days of this Order.

6        IT IS FURTHER ORDERED that this case is DISMISSED with prejudice against

7   Defendant FF Magnat and Defendant Maxim Bochenko.

8        IT IS FURTHER ORDERED that Plaintiff's Motion to Seal (ECF No. 32) is DENIED.

9   <u>All documents filed under seal shall be immediately unsealed by the Clerk</u>.

10        IT IS FURTHER ORDERED that the Motions at ECF Nos. 4, 5, 6, 21, 68, 70 and 73

11   are DENIED as moot.

12        IT IS FURTHER ORDERED that Plaintiff's Motion for Attorney's Fees (ECF No. 34)

13   remains under submission with the Court.

14        IT IS FURTHER ORDERED that the motion hearing scheduled for Thursday, August

15   9, 2012 at 1:30 p.m. in Courtroom 7D, is hereby VACATED.

16        DATED this 7th day of August, 2012.

17

18

19                     Gloria M. Navarro

20                     United States District Judge

21

22

23

24

25

# EXHIBIT 104

No. 12-16976

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

LIBERTY MEDIA HOLDINGS, LLC, *Plaintiff-Appellant*,

v.

FF MAGNAT LIMITED d/b/a ORON.COM, *Defendant-Appellee*.

---

On Appeal from a Judgment of the United States District Court
for the District of Nevada

Hon. Gloria M. Navarro, United States District Judge
No. 2:12-cv-01057-GMN-RJJ

---

APPELLEE'S MOTION FOR AN ORDER REASSESSING AND
SUMMARILY AFFIRMING THE AMOUNT OF THE DISTRICT
COURT'S ATTORNEY FEES AWARD OR, IN THE ALTERNATIVE,
REMANDING THIS CASE TO THE DISTRICT COURT, FOLLOWING
THE DISPOSITION OF THIS APPEAL, FOR THE LIMITED PURPOSE
OF OBTAINING A REASSESSMENT OF THE AMOUNT OF ITS
ATTORNEY FEES AWARD

---

Mitchell J. Langberg (NV Bar No. 10118)
Scott M. Schoenwald (NV Bar No. 5484)
Laura E. Bielinski (NV Bar No. 10516)
BROWNSTEIN HYATT FARBER
   SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106
Telephone: (702) 382-2101
Facsimile: (702) 382-8135
*Attorneys for Appellee*
*Liberty Media Holdings, LLC*

Appellee Liberty Media Holdings, LLC ("Liberty") hereby moves this Honorable Court for an order reassessing and summarily affirming the amount of the attorney fees award entered in its favor on September 4, 2012 (Dist. Ct. Doc. Nos. 114 and 115) or, in the alternative, remanding this case to the United States District Court for the District of Nevada, following the disposition of this appeal, for the limited purpose of reassessing the amount of its attorney fees award.

This motion is made pursuant to Rule 27 of the Federal Rules of Appellate Procedure and the local rules of this Circuit and is based on the following Points and Authorities, the attached Declaration of Henry Leonard, the attached exhibits, all papers on file with the Court in this action, such further evidence as the Court deems appropriate, and the oral arguments of counsel at the hearing on this motion if requested by the Court.

## POINTS AND AUTHORITIES

## I.    INTRODUCTION.

Liberty prevailed in the District Court on a motion for attorney fees, but is now in the extraordinary position of having to ask for a reassessment of the amount of attorney fees awarded in its favor.  The impetus for this request is Liberty's recent discovery that statements made by its former counsel in support of its motion may have misled the District Court into concluding that it had incurred more attorney fees than it had actually incurred during the underlying litigation.

1

Concerned that this mistake would perpetuate if it remained silent, Liberty determined that the interests of justice required it to bring this issue to this Court's attention even though: (1) the District Court ultimately based its attorney fees award on a lodestar analysis that did not depend on the amount of attorney fees incurred; and (2) Appellant FF Magnat Limited d/b/a Oron.com ("Oron") has not appealed the amount of that award.[1] Liberty would have raised this issue directly with the District Court once it became apparent, but Oron's filing of its notice of appeal had already divested the District Court of jurisdiction over issues relating to attorney fees. *See Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982).

Liberty respectfully submits that, despite the false impression created by its former counsel's filings in support of the attorney fees motion, the Court should let the amount of fees awarded by the District Court stand. Because the outcome of the lodestar method employed by the District Court required an examination of the reasonableness of the attorney fees expended on Liberty's behalf rather than the reasonableness of the attorney fees actually incurred by Liberty, no further analysis by the District Court is necessary. This Court may exercise its broad remedial powers conferred by 28 U.S.C. § 2601 ("Section 2601") to reassess and summarily

---

[1] Oron challenges on appeal the District Court's legal authority to award Liberty attorney fees, but does not dispute the amount of the award. *See Appellant's Opening Brief*, at 2, 24-25 (filed 12/14/12).

2

affirm the amount of the attorney fees award under these circumstances.   If the

Court nevertheless finds that this issue calls for the District Court's reassessment of

the amount of fees awarded (which it should not), a remand solely for this limited

purpose should be ordered following the disposition of this appeal.

## II.    STATEMENT OF RELEVANT FACTS.

After granting Liberty's motion to enforce its agreement with Oron that

settled the underlying litigation, the District Court entered a written order and

judgment awarding attorney fees to Liberty in the amount of $131,797.50 pursuant

to Section 505 of the Copyright Act ("Section 505").   *See* Exhibit 1, at 3:17-18,

8:21-22, 9:14-16; Exhibit 2.   The District Court exercised its discretion to grant

such relief because Liberty was the prevailing party under Section 505 and an

attorney fees award would further the purposes of the Copyright Act.   *See* Exhibit

1, at 4:9-7:19.

Upon finding that Liberty's recovery of attorney fees was warranted, the

District Court proceeded to calculate the amount of its award.  *See id*. at 7:20-9:12.

References to the charges that Liberty claimed to have "incurred" for the legal

services rendered by its attorneys, the Randazza Legal Group, appeared throughout

the papers filed by that counsel and, in turn, throughout the District Court's

analysis.  The District Court, for example, stated:

(1)    "To pursue this case, Plaintiff enlisted Randazza Legal Group

and *incurred charges* ranging from $400-$500 per hour for partners, $350 per hour for of counsel, $325 per hour for associate attorneys, and $125 per hour for law clerks," [Exhibit 1, at 3:2-5 (emphasis added); *see also id*. at 8:12-14 (same)];

(2)    "The resolution of this case required 325.90 labor hours from Randazza Legal Group, resulting in Plaintiff *incurring* $134,910.00 in attorney fees and $64,911.50 in costs," [*Id*. at 3:5-7 (emphasis added)];

(3)    "On August 26, 2012, Plaintiff supplemented its original request for seeking attorneys' fees *incurred* in attempting to satisfy the judgment against Defendant," [*Id*. at 3:8-10 (emphasis added)]; and

(4)    "[T]he hourly rates that Plaintiff's attorneys *charged* are reasonable rates in the Las Vegas legal market," [*Id*. at 8:11-12 (emphasis added)].

This confusion occurred through no fault of the District Court, but rather was entirely the result of the filings made by Liberty's former counsel in support of the attorney fees motion.

Following Oron's commencement of this appeal, Liberty learned that various assertions made in support of its attorney fees motion apparently led the District

4

Court to misconstrue the extent of the attorney fees that it had actually incurred in the underlying litigation. For instance, Liberty's motion stated:

(1)    Liberty had "*incurred*" attorney fees "worth" $134,910.00 based on "325.90 total labor hours," [Exhibit 3, at 4:25-26 (emphasis added)];

(2)    The $199,821.50 in attorney fees and costs sought by Liberty "was reached by adding Liberty's $64,911.50 in costs to the $134,910 *incurred* by Liberty's attorneys and legal assistants in this matter, at their *regular* hourly rates of $500, $400, $350, $325, and $125 per hour, respectively," [*Id.* at 5:2-4 (emphasis added)];

(3)    "The fees counsel *charged* Liberty in this matter were *customary* and, like other enforcement actions of this nature, *accrued on an hourly basis*," [*Id.* at 8:1-2 (emphasis added)];

(4)    Liberty *incurred* Randazza Legal Group's c*ustomary fees that are regularly charged to all clients*: Marc Randazza, owner, at $500 per hour; Ronald Green, partner, at $400 per hour; Jason A. Fischer, of counsel, at $350 per hour; J. Malcolm DeVoy, associate, at $325 per hour; and Laura Tucker, law clerk, at $125 per hour," [*Id.* at 8:2-5 (emphasis added)]; and

5

Case: 12-16976    02/13/2013    ID: 8513401    DktEntry: 27    Page: 7 of 145

(5)    "In the above-captioned matter, Randazza Legal Group *regularly billed Liberty* for their services, calculated based on the *attorneys' standard hourly rates*," [*Id.* at 8:7-8 (emphasis added)].

Liberty's motion was supported by:  (1) the affidavit of a Randazza Legal Group attorney, which stated that "[m]ultiplying the appropriate rate by the hours their respective user spent working on this matter, the total attorney's fees *incurred* representing Liberty in this matter are $134,910.00," [Exhibit 4, ¶ 28, at 4:23-24 (emphasis added)]; and (2) the declaration of an attorney fees expert, which concluded that "[t]he rates and hours Liberty *incurred* in this case" and "the rates *charged* by Randazza Legal Group" to Liberty were reasonable.[2]  *See* Exhibit 5, ¶ 11, at 2:26-3:2; ¶ 21, at 4:11; ¶ 23, at 4:20 (emphasis added).

Liberty made similar assertions in a subsequently filed supplement to its attorney fees motion that sought an additional $15,142.50 in fees, for a total of $150,052.50 in attorney fees, relating to legal services made necessary by Oron's failure to abide by the terms of the parties' agreement that settled the underlying action.[3]  *See* Exhibit 7.  These statements included:

---

[2]  Liberty's memorandum of law in support of its motion also referred to attorney fees "incurred."  *See* Exhibit 6, at 3:18, 4:24, 5:24, 6:21, 7:23.
[3]  Liberty relatedly observed in its reply in support of its attorney fees motion that "the fees *incurred* after the settlement agreement were substantial."  *See* Exhibit 9, at 1:28 (emphasis added).

(1)    "In its renewed motion, Liberty sought nearly $200,000 in
attorneys' fees and costs that it **_incurred_** in the course of
litigation – much of which **_accrued_** after the parties had entered
into a valid and binding settlement agreement," [*Id.* at 1:27-2:2
(emphasis added)];

(2)    "Liberty has **_incurred_** an additional $15,142.50 in attorney's
fees," [*Id.* at 2:5-6 (emphasis added)];

(3)    "In responding to Oron's actions following the entry of
judgment, Liberty has **_incurred_** an additional 40 hours of
attorney time, at a cost of $15,142.50 just between August 10
and 25 alone," [*Id.* at 2:8-9 (emphasis added)];

(4)    "As Oron caused, and continues to cause, **_the accrual of_** these
subsequent attorneys' fees, their burden should fall on Oron,
rather than Liberty," [*Id.* at 3:10-11 (emphasis added)]; and

(5)    "Oron (and its counsel) [should be] ordered to **_repay_** Liberty its
[total of] $214,964.00 in attorney's fees and costs," [*Id.* at 3:23-
25 (emphasis added)].

Liberty supported its supplemental attorney fees request with the affidavit of a
Randazza Legal Group attorney, which stated that Liberty had been "forced to
**_incur_** more than $15,000 in additional legal fees responding to Oron's ongoing

7

attempts to avoid performance of its obligations under the settlement agreement with Liberty." *See* Exhibit 8, ¶ 7, at 2:22-24 (emphasis added).

Despite these various assertions, Liberty neither incurred nor was charged attorney fees in the amount stated in support of its motion. Marc Randazza, Esq. of the Randazza Legal Group served as Liberty's general counsel during the course of the underlying litigation, and in that capacity was a salaried employee of Liberty.[4] *See* Leonard Declaration, ¶ 5. Mr. Randazza consequently did not charge Liberty on an hourly basis for his own services in the Oron matter. *See id.* Mr. Randazza also charged Liberty reduced hourly rates for the legal services provided by others in his firm. *See id.*, ¶ 6. Thus, while the legal services rendered on Liberty's behalf were "worth" a total of $150,052.50, as maintained in Liberty's motion and related supplement, Liberty did not actually incur attorney fees in that amount at the Randazza Legal Group's regular hourly rates or otherwise.

While the District Court focused on the attorney fees that Liberty claimed to have incurred, the reasonableness of the fee request ultimately provided the basis for its award. *See* Exhibit 1, at 7:20-9:12. To make this determination, the District Court undertook a lodestar analysis through which it concluded that the Randazza Legal Group's hourly billing rates for this matter were reasonable in the Las Vegas legal market, found that most of the hours claimed were recoverable, and decided

---

[4] Liberty advised the District Court in its attorney fees motion that Mr. Randazza served as its general counsel. *See* Exhibit 3, at 9:20-21.

8

that the lodestar factors required no upward or downward adjustment. *See id.* at 7:20-9:12. Based on these considerations, the District Court awarded Liberty attorney fees in the amount of $131,797.50 and entered judgment accordingly. *See id.* at 3:17-18, 8:21-22, 9:14-16; Exhibit 2.

## III.    **ARGUMENT.**

### A.    **This Court Has Authority Under 28 U.S.C. § 2106 To Reassess And Summarily Affirm The Amount Of The District Court's Attorney Fees Award In Order To Further The Interests Of Justice.**

Even though Oron has not appealed the amount of the District Court's attorney fees award, Liberty recognizes that the interests of justice support a reassessment of that amount. Liberty's concern is that its former counsel's filings in support of its attorney fees motion caused the District Court to misapprehend the amount of attorney fees that it had incurred or been charged in the underlying litigation. *See Black's Law Dictionary*, at 782 (8th ed. 2004)(defining "incur" as "[t]o suffer or bring on oneself (a liability or expense)"); *see also id.* at 248 (defining "charge" as "[t]o demand a fee; to bill"). The relief now requested by Liberty will ensure that any misconception caused by its motion does not taint the attorney fees award properly entered in its favor by the District Court.[5]

---

[5] The Court should not construe this motion as an acknowledgement that the amount of attorney fees awarded to Liberty by the District Court was somehow excessive.

A remand of this issue for consideration by the District Court is unwarranted, however, because it would result in an unnecessary additional proceeding. Any misunderstanding resulting from Liberty's assertions regarding its attorney fees incurred in the underlying litigation should have no bearing on the disposition of its motion because the actual fees charged for legal services rendered on behalf of a prevailing party do not set the parameters of a reasonable attorney fees award. The record below confirms that the District Court properly premised its attorney fees award on the reasonableness of Liberty's fee request as determined using the lodestar method. *See* Exhibit 1, at 7:20-9:12; *see also Lahiri v. Universal Music & Video Distrib. Corp.*, 606 F.3d 1216, 1222-23 (9th Cir. 2010)(affirming the use of a traditional lodestar analysis to ascertain a reasonable attorney fees award in a copyright infringement action); *see generally Hensley v. Eckerhart*, 461 U.S. 424, 433-37 (1983)(discussing the lodestar method).

A "lodestar" is calculated by multiplying the number of hours the prevailing party "reasonably expended" on the litigation by a reasonable hourly rate. *See McGrath v. County of Nevada*, 67 F.3d 248, 252 (9th Cir. 1995). The resulting lodestar figure, which is presumptively reasonable, may then be adjusted upward or downward based on a variety of factors.[6] *See id.* The outcome of a lodestar

---

[6] Because reasonable attorney fees are "calculated according to the prevailing market rates in the relevant community," [*Blum v. Stenson*, 465 U.S. 886, 895 (1984)], fees may be awarded at such rates for services provided by in-

analysis therefore does not depend in any way on whether the party seeking an attorney fees award had actually incurred or been charged the subject fees.

Given that the amount of attorney fees actually incurred by Liberty was not determinative and that the District Court has already found that the attorney fees claimed by Liberty were reasonable as required by Section 505, no involvement by the District Court in a reassessment of the amount of its attorney fees award is necessary. *See* Exhibit 1, at 7:20-9:12; *see also* 17 U.S.C. § 505 (authorizing a court to "award a reasonable attorney's fee to the prevailing party"). This motion instead presents an issue that is appropriate for disposition by this Court under its expansive authority, conferred by Section 2106, to provide relief "as may be just under the circumstances." *See Nonnette v. Small*, 316 F.3d 872, 878 (9th Cir. 2002)("[l]ike the Supreme Court, we have statutory authority to provide such relief "'as may be just under the circumstances'").

This Court has long recognized that it "has the power to make such disposition of [a] case as justice may require." *See Bank of China v. Wells Fargo Bank & Union Trust Co.*, 190 F.2d 1010, 1012 (9th Cir. 1951); *see also Haynes v.*

---

house counsel as well as by attorneys and legal staff paid at below market rates. *See Missouri v. Jenkins by Agyei*, 491 U.S. 274, 284-89 (1989)(legal staff); *Brandenberger v. Thompson*, 494 F.2d 885, 889-90 (9th Cir. 1974)(pro bono counsel); *Broadcast Music, Inc. v. R Bar of Manhattan, Inc.*, 919 F.Supp. 656, 661 (S.D.N.Y. 1996)(in-house counsel). The District Court has already found that the Randazza Legal Group's hourly rates in this case were "reasonable" for the Las Vegas market. *See* Exhibit 1, at 8:11-12.

11

*United States*, 390 U.S. 85, 101 (1968)("[w]e have plenary authority under 28 U.S.C. § 2106 to make such disposition of the case 'as may be just under the circumstances'"). Liberty respectfully submits that the Court should exercise this authority and summarily affirm the amount of attorney fees awarded by the District Court, which has not been appealed by Oron, on the basis that the amount of attorney fees actually incurred by Liberty was inconsequential to the District Court's lodestar analysis.

**B.    If The Court Declines To Exercise Its Authority Under Section 2601, The Interests Of Justice Support A Limited Remand, Following The Disposition Of This Appeal, To Allow The District Court To Reassess The Amount Of Its Attorney Fees Award.**

Any remand ordered for the limited purpose of obtaining from the District Court a reassessment of the amount of its attorney fees award is unnecessary until after a decision has been rendered on Oron's appeal. Oron does not appeal the amount of attorney fees granted to Liberty, but rather appeals whether the District Court had legal authority to award Liberty attorney fees in any amount. *See* Oron's Opening Brief, at 2, 24-25 (filed 12/14/12). Not only can the Court decide the question presented by Oron without ordering an immediate remand, it would promote judicial economy for the Court not to order an immediate remand given that the parties are in the process of briefing this issue. Moreover, while Liberty is confident that it will demonstrate on appeal that the District Court properly exercised its discretion under Section 505 to award attorney fees in this matter, the

12

determination of whether Liberty may recover attorney fees necessarily is a prerequisite to the determination of the appropriate amount of such a recovery. Under these circumstances, any remand ordered by the Court for the limited purpose of allowing the District Court to reassess the amount of its attorney fees award in Liberty's favor should occur following the disposition of Oron's appeal.

## IV.    CONCLUSION.

For the foregoing reasons, Liberty respectfully requests that the Court grant the relief requested by this motion in its entirety.

Dated this 13th day of February, 2013.

BROWNSTEIN HYATT FARBER
SCHRECK, LLP

By: /s/ Mitchell J. Langberg
    Mitchell J. Langberg (NV Bar No. 10118)
    Scott M. Schoenwald (NV Bar No. 5484)
    Laura E. Bielinski (NV Bar No. 10516)
    100 N. City Parkway, Suite 1600
    Las Vegas, Nevada 89106
    Telephone: (702) 382-2101
    Facsimile: (702) 382-8135
    *ATTORNEYS FOR APPELLEE*
    *LIBERTY MEDIA HOLDINGS, LLC*

# EXHIBIT 3

Electronically Filed
03/28/2013 04:41:36 PM

CLERK OF THE COURT

1   **AACC**
    Mitchell J. Langberg, Esq., Nevada Bar No. 10118
2   Laura E. Bielinski, Esq., Nevada Bar No. 10516
    BROWNSTEIN HYATT FARBER SCHRECK, LLP
3   100 North City Parkway, Suite 1600
    Las Vegas, Nevada  89106
4   mlangberg@bhfs.com
    lbielinski@bhfs.com
5   Telephone:  (702) 382-2101
    Facsimile:  (702) 382-8135
6

7   *Attorneys for Defendants Liberty Media Holdings, LLC*

8

9                        **DISTRICT COURT**

10                  **CLARK COUNTY, NEVADA**

11  MARC J. RANDAZZA, P.A., a Florida       Case  No. A-12-673275-C
    professional association doing business as
12  RANDAZZA LEGAL GROUP,                   Dept. No. VIII

13              Plaintiff,

14  v.                                      **DEFENDANT LIBERTY MEDIA HOLDINGS,
                                            LLC'S ANSWER TO PLAINTIFF'S FIRST
15                                          AMENDED COMPLAINT AND
    LIBERTY  MEDIA  HOLDINGS,  LLC, a       COUNTERCLAIM**
16  California  limited-liability  company  doing
    business as Corbin Fisher
17

18              Defendant.

19          Defendant/Counterclaimant Liberty Media Holdings, LLC ("Liberty"), by and through its

20  attorneys of record, Brownstein Hyatt Farber Schreck, LLP, hereby answers and responds to the

21  allegations of Plaintiff/Counterdefendant Marc J. Randazza, P.A., d/b/a Randazza Legal Group's

22  ("RLG") First Amended Complaint as follows:

23                       **I.      Introduction**

24          1.      Answering Paragraph 1 of RLG's First Amended Complaint, Liberty admits that

25  RLG is a law firm.  Liberty further admits RLG obtained a temporary restraining order of Oron's

26  funds without a hearing, a settlement of $550,000, judicial enforcement of that settlement,

27  collection of that amount, and an attorney's fees award of more than $131,797.00 in a copyright

28  infringement matter before the United States District Court for the District of Nevada (the "Oron

1    Litigation").   Liberty generally and specifically denies all other allegations contained in said

2    paragraph.

3         2.         Answering Paragraph 2 of RLG's First Amended Complaint, Liberty admits that

4    RLG represented Liberty in copyright infringement litigation in Nevada, Florida, Arizona,

5    California, Texas, and Wisconsin.  Liberty further admits that it paid RLG for it services.  Liberty

6    generally and specifically denies all other allegations contained in said paragraph.

7         3.         Answering Paragraph 3 of RLG's First Amended Complaint, Liberty generally and

8    specifically denies the allegations contained in said paragraph.

9         4.         Answering Paragraph 4 of RLG's First Amended Complaint, Liberty generally and

10   specifically denies the allegations contained in said paragraph.

**II.         Jurisdiction and Venue**

12        5.         Answering Paragraph 5 of RLG's First Amended Complaint, Liberty admits the

13   allegations contained in said paragraph.

14        6.         Answering Paragraph 6 of RLG's First Amended Complaint, Liberty admits the

15   allegations contained in said paragraph.

16        7.         Answering Paragraph 7 of RLG's First Amended Complaint, Liberty admits the

17   allegations contained in said paragraph.

18        8.         Answering Paragraph 8 of RLG's First Amended Complaint, Liberty admits the

19   allegations contained in said paragraph.

**III.         Parties**

21   **A.         Plaintiff**

22        9.         Answering Paragraph 9 of RLG's First Amended Complaint, Liberty admits the

23   allegations contained in said paragraph.

24        10.        Answering Paragraph 10 of RLG's First Amended Complaint, Liberty admits that

25   RLG previously represented it.   Liberty is without sufficient knowledge or information upon

26   which to form a belief as to the truth of the allegations contained in said paragraph, and therefore

27   denies all other allegations contained in said paragraph.

28

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 NORTH CITY PARKWAY, SUITE 1600
LAS VEGAS, NV 89106
(702) 382-2101

1    11.    Answering Paragraph 11 of RLG's First Amended Complaint, Liberty admits the

2    allegations contained in said paragraph.

3    **A.    The Defendant**

4    12.    Answering Paragraph 12 of RLG's First Amended Complaint, Liberty admits the

5    allegations contained in said paragraph.

6    13.    Answering Paragraph 13 of RLG's First Amended Complaint, Liberty generally

7    and specifically denies the allegation that it produces adult entertainment.  Liberty admits the

8    remaining allegations contained in said paragraph.

9    14.    Answering Paragraph 14 of RLG's First Amended Complaint, Liberty admits that

10   LMH used RLG's services to engage in litigation against users of BitTorrent who unlawfully

11   distributed LMH's copyright content, video-playing "tube" sites that unlawfully displayed LMH's

12   copyrighted content, and one-click-hosting sites known as "cyber lockers" that also unlawfully

13   distributed LMH's copyrighted content.  Liberty denies all other allegations contained in said

14   paragraph.

15   15.    Answering Paragraph 15 of RLG's First Amended Complaint, , Liberty generally

16   and specifically denies the allegations contained in said paragraph.

17   **IV.    Facts Common to All Claims for Relief**

18   **A.    The Relationship between RLG and Liberty.**

19   16.    Answering Paragraph 16 of RLG's First Amended Complaint, Liberty is without

20   sufficient knowledge or information upon which to form a belief as to the truth of the allegations

21   contained in said paragraph, and therefore denies each and every allegation contained therein.

22   17.    Answering Paragraph 17 of RLG's First Amended Complaint, Liberty generally

23   and specifically denies the allegations contained in said paragraph.

24   18.    Answering Paragraph 18 of RLG's First Amended Complaint, Liberty admits that

25   through RLG, LMH has engaged in litigation in Massachusetts, Pennsylvania, Florida, Texas and

26   Wisconsin, Nevada, Arizona, and California.  Liberty generally and specifically denies all other

27   allegations contained in said paragraph.

28

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 NORTH CITY PARKWAY, SUITE 1600
LAS VEGAS, NV 89106
(702) 382-2101

19.    Answering Paragraph 19 of RLG's First Amended Complaint, Liberty generally and specifically denies the allegations contained in said paragraph.

20.    Answering Paragraph 20 of RLG's First Amended Complaint, Liberty generally and specifically denies the allegations contained in said paragraph.

21.    Answering Paragraph 21 of RLG's First Amended Complaint, Liberty generally and specifically denies the allegations contained in said paragraph.

22.    Answering Paragraph 22 of RLG's First Amended Complaint, Liberty generally and specifically denies the allegations contained in said paragraph.

23.    Answering Paragraph 23 of RLG's First Amended Complaint, Liberty generally and specifically denies the allegations contained in said paragraph.

**B.    The Oron Litigation**

24.    Answering Paragraph 24 of RLG's First Amended Complaint, Liberty admits the allegations contained in said paragraph.

25.    Answering Paragraph 25 of RLG's First Amended Complaint, Liberty is without sufficient knowledge or information upon which to form a belief as to the truth of the allegations contained in said paragraph, and therefore denies each and every allegation contained therein.

26.    Answering Paragraph 26 of RLG's First Amended Complaint, Liberty admits the allegations contained in said paragraph.

27.    Answering Paragraph 27 of RLG's First Amended Complaint, Liberty admits the allegations contained in said paragraph.

28.    Answering Paragraph 28 of RLG's First Amended Complaint, Liberty admits the allegations contained in said paragraph.

29.    Answering Paragraph 29 of RLG's First Amended Complaint, Liberty admits the allegations contained in said paragraph.

30.    Answering Paragraph 30 of RLG's First Amended Complaint, Liberty is without sufficient knowledge or information upon which to form a belief as to the truth of the allegations contained in said paragraph, and therefore denies each and every allegation contained therein.

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 NORTH CITY PARKWAY, SUITE 1600
LAS VEGAS, NV 89106
(702) 382-2101

31.    Answering Paragraph 31 of RLG's First Amended Complaint, Liberty admits the allegations contained in said paragraph.

32.    Answering Paragraph 32 of RLG's First Amended Complaint, Liberty admits the allegations contained in said paragraph.

33.    Answering Paragraph 33 of RLG's First Amended Complaint, Liberty admits the allegations contained in said paragraph.

34.    Answering Paragraph 34 of RLG's First Amended Complaint, Liberty admits that the Court entered an order on August 7, 2012 granting LMH's motion to enforce its settlement agreement with FF Magnat Limited, and entering judgment of $550,000 in LMH's favor against FF Magnat Limited.   Liberty is without sufficient knowledge or information upon which to form a belief as to the truth of the allegations contained in said paragraph, and therefore denies all other allegations contained in said paragraph.

35.    Answering Paragraph 35 of RLG's First Amended Complaint, Liberty admits that on August 21, 2012, RLG filed a motion seeking an order requiring PayPal, Incorporated – a third party payment processor holding hundreds of thousands of dollars of FF Magnat Limited's frozen accounts to LMH, via RLG's trust account.   Liberty is without sufficient knowledge or information upon which to form a belief as to the truth of the allegations contained in said paragraph, and therefore denies all other allegations contained in said paragraph.

36.    Answering Paragraph 36 of RLG's First Amended Complaint, Liberty admits the allegations contained in said paragraph.

37.    Answering Paragraph 37 of RLG's First Amended Complaint, Liberty is without sufficient knowledge or information upon which to form a belief as to the truth of the allegations contained in said paragraph, and therefore denies each and every allegation contained therein.

38.    Answering Paragraph 38 of RLG's First Amended Complaint, Liberty is without sufficient knowledge or information upon which to form a belief as to the truth of the allegations contained in said paragraph, and therefore denies each and every allegation contained therein.

39.    Answering Paragraph 39 of RLG's First Amended Complaint, Liberty admits the allegations contained in said paragraph.

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 NORTH CITY PARKWAY, SUITE 1600
LAS VEGAS, NV 89106
(702) 382-2101

1    40.    Answering Paragraph 40 of RLG's First Amended Complaint, Liberty admits the

2    allegations contained in said paragraph.

3    41.    Answering Paragraph 41 of RLG's First Amended Complaint, Liberty is not

4    required to respond to the allegations as the documents referred to therein speak for themselves.

5    To the extent said paragraph is construed to require a response, Liberty denies the allegations

6    therein.

7    42.    Answering Paragraph 44 of RLG's First Amended Complaint, Liberty is not

8    required to respond to the allegations as the documents referred to therein speak for themselves.

9    To the extent said paragraph is construed to require a response, Liberty denies the allegations

10    therein.

11    43.    Answering Paragraph 43 of RLG's First Amended Complaint, Liberty is not

12    required to respond to the allegations as the documents referred to therein speak for themselves.

13    To the extent said paragraph is construed to require a response, Liberty denies the allegations

14    therein.

15    44.    Answering Paragraph 44 of RLG's First Amended Complaint, Liberty is not

16    required to respond to the allegations as the documents referred to therein speak for themselves.

17    To the extent said paragraph is construed to require a response, Liberty denies the allegations

18    therein.

19    45.    Answering Paragraph 45 of RLG's First Amended Complaint, Liberty generally

20    and specifically denies the allegations contained in said paragraph.

21    46.    Answering Paragraph 46 of RLG's First Amended Complaint, Liberty generally

22    and specifically denies the allegations contained in said paragraph.

23    **C.    Liberty Breaches Its Contract With RLG**

24    47.    Answering Paragraph 47 of RLG's First Amended Complaint, Liberty generally

25    and specifically denies the allegations contained in said paragraph.

26    48.    Answering Paragraph 48 of RLG's First Amended Complaint, Liberty admits the

27    allegations contained in said paragraph.

28

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 NORTH CITY PARKWAY, SUITE 1600
LAS VEGAS, NV 89106
(702) 382-2101

49. Answering Paragraph 49 of RLG's First Amended Complaint, Liberty admits the allegations contained in said paragraph.

50. Answering Paragraph 50 of RLG's First Amended Complaint, Liberty generally and specifically denies the allegations contained in said paragraph.

51. Answering Paragraph 51 of RLG's First Amended Complaint, Liberty generally and specifically denies the allegations contained in said paragraph.

## First Claim for Relief: Breach of Contract

## Against Liberty

52. Answering Paragraph 52 of RLG's First Amended Complaint, Liberty repeats and realleges its answers to paragraphs 1 through 51 above, and incorporates the same herein by reference as though fully set forth.

53. Answering Paragraph 53 of RLG's First Amended Complaint, Liberty generally and specifically denies the allegations contained in said paragraph.

54. Answering Paragraph 54 of RLG's First Amended Complaint, Liberty generally and specifically denies the allegations contained in said paragraph.

55. Answering Paragraph 55 of RLG's First Amended Complaint, Liberty generally and specifically denies the allegations contained in said paragraph.

56. Answering Paragraph 56 of RLG's First Amended Complaint, Liberty generally and specifically denies the allegations contained in said paragraph.

## Second Claim for Relief: Unjust Enrichment / Quantum Meruit

## Against Liberty

57. Answering Paragraph 57 of RLG's First Amended Complaint, Liberty repeats and realleges it answers to paragraphs 1 through 56 above, and incorporates the same herein by reference as though fully set forth.

58. Answering Paragraph 58 of RLG's First Amended Complaint, Liberty generally and specifically denies the allegations contained in said paragraph.

59. Answering Paragraph 59 of RLG's First Amended Complaint, Liberty generally and specifically denies the allegations contained in said paragraph.

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 NORTH CITY PARKWAY, SUITE 1600
LAS VEGAS, NV 89106
(702) 382-2101

1    60.    Answering Paragraph 60 of RLG's First Amended Complaint, Liberty generally

2    and specifically denies the allegations contained in said paragraph.

3    61.    Answering Paragraph 61 of RLG's First Amended Complaint, Liberty generally

4    and specifically denies the allegations contained in said paragraph.

5    62.    Answering Paragraph 62 of RLG's First Amended Complaint, Liberty generally

6    and specifically denies the allegations contained in said paragraph.

7    63.    Answering Paragraph 63 of RLG's First Amended Complaint, Liberty generally

8    and specifically denies the allegations contained in said paragraph.

9    64.    Answering Paragraph 64 of RLG's First Amended Complaint, Liberty generally

10    and specifically denies the allegations contained in said paragraph.

11    65.    Answering Paragraph 65 of RLG's First Amended Complaint, Liberty generally

12    and specifically denies the allegations contained in said paragraph.

13    66.    Answering Paragraph 66 of RLG's First Amended Complaint, Liberty generally

14    and specifically denies the allegations contained in said paragraph.

15                    **Third Claim for Relief:  Account Stated**

16                              **Against Liberty**

17    67.    Answering Paragraph 67 of RLG's First Amended Complaint, Liberty repeats and

18    realleges its answers to paragraphs 1 through 66 above, and incorporates the same herein by

19    reference as though fully set forth.

20    68.    Answering Paragraph 68 of RLG's First Amended Complaint, Liberty generally

21    and specifically denies the allegations contained in said paragraph.

22    69.    Answering Paragraph 69 of RLG's First Amended Complaint, Liberty generally

23    and specifically denies the allegations contained in said paragraph.

24    70.    Answering Paragraph 70 of RLG's First Amended Complaint, Liberty generally

25    and specifically denies the allegations contained in said paragraph.

26    71.    Answering Paragraph 71 of RLG's First Amended Complaint, Liberty generally

27    and specifically denies the allegations contained in said paragraph.

28

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 NORTH CITY PARKWAY, SUITE 1600
LAS VEGAS, NV 89106
(702) 382-2101

72.     Answering Paragraph 72 of RLG's First Amended Complaint, Liberty generally and specifically denies the allegations contained in said paragraph.

### AFFIRMATIVE DEFENSES

1.     RLG has failed to state a claim upon which relief can be granted.

2.     RLG's claims for relief are barred, in whole or in part, by the equitable doctrines of waiver, estoppel, and laches.

3.     RLG has unclean hands.

4.     RLG's claims for relief are barred by fraud.

5.     RLG has not suffered any damages.

6.     RLG's prior material breach of the contract it seeks to enforce forgives any performance by Liberty.

7.     All possible affirmative defenses may not have been alleged herein insofar as sufficient facts were not available after reasonable inquiry upon the filing of this Answer and, therefore, Liberty reserves all rights to amend this Answer to allege additional affirmative defenses if subsequent investigation so warrants.

WHEREFORE, having fully answered RLG's First Amended Complaint, Liberty respectfully demands judgment in its favor as follows:

A.     That RLG's First Amended Complaint be dismissed with prejudice, with RLG taking nothing thereby;

B.     That Liberty be awarded its costs incurred herein;

C.     That Liberty be awarded its reasonable attorneys' fees incurred herein; and

D.     That Liberty be awarded such other and further relief as the Court deems just and proper.

///

///

///

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 NORTH CITY PARKWAY, SUITE 1600
LAS VEGAS, NV 89106
(702) 382-2101

**COUNTERCLAIM**

Defendant/Counterclaimant Liberty Media Holdings, LLC ("Liberty"), by and through its attorneys of record, Brownstein Hyatt Farber Schreck, LLP, hereby states its counterclaim against Plaintiff/Counterdefendant Randazza Legal Group ("RLG") and alleges as follows:

**THE PARTIES**

1.    Liberty is a California limited liability company with its primary place of business in Clark County, Nevada,

2.    Liberty holds certain intellectual property produced by its affiliated entity, Excelsior Media Corp. ("Excelsior").

3.    Liberty is informed and believes, and thereon alleges, that RLG is a professional association organized and existing under the laws of the State of Florida that does business in Clark County, Nevada, as Randazza Legal Group.

4.    Liberty is informed and believes, and thereon alleges, that one of RLG's principals is Marc Randazza, Esq. ("Randazza"), a resident of Clark County, Nevada.

**GENERAL ALLEGATIONS**

**Randazza's Full-Time And Salaried Position As General Counsel Of Liberty's Affiliate**

5.    Prior to and through mid-2009, Randazza worked for the law firm that served as outside counsel to Excelsior.

6.    During that time, he solicited Liberty for possible employment as general counsel.

7.    Subsequently, in June 2009, Excelsior hired Randazza to work as its general counsel.

8.    Randazza began working as general counsel for Excelsior on or about June 24, 2009, and was a full time salaried employee for the duration of his employment.

*Randazza's Duties As General Counsel*

9.    In connection with Randazza's employment with Excelsior, on or about June 10, 2009, the parties executed a written employment agreement, entitled Contract for Employment of Corporate General Counsel ("Randazza Agreement").

10.    As general counsel for Excelsior, Randazza performed a number of duties,

1    including enforcement of intellectual property rights for the copyrighted content produced by

2    Excelsior and owned by Liberty.

3        11.    Randazza's duty to enforce Liberty's intellectual property rights included advising

4    Liberty on enforcement strategies.

5        12.    As general counsel, Randazza was also tasked with filing and prosecuting lawsuits,

6    where appropriate, against those who infringed Liberty's rights in its copyrighted material.

7        13.    In connection with the Randazza Agreement, Randazza executed a Confidentiality

8    and Inventions Assignment Agreement ("Confidentiality Agreement").

9        14.    The Confidentiality Agreement provided, among other things, that Randazza's

10    employment was conditioned on his agreement to keep company information confidential.

11                    *Randazza's Agreement To Limit Outside Legal Work*

12        15.    Under the Randazza Agreement, notwithstanding that Randazza was a full time

13    salaried employee of Excelsior, Excelsior agreed to allow Randazza to pursue limited outside

14    employment.

15        16.    Specifically, Excelsior permitted Randazza to provide professional services to a

16    limited number of outside clients on an ongoing basis, as long as such services were rendered

17    without legal or professional conflict with Excelsior.

18        17.    Randazza's outside employment was further limited under the Randazza

19    Agreement to ensure that such activities did not violate any professional ethics standards or his

20    Confidentiality Agreement.

21        18.    Randazza agreed that any outside employment he pursued would be rendered

22    during non-working hours, on vacation days or on unpaid leave days.

23        19.    Randazza further agreed that Excelsior's work would always take priority over any

24    outside projects he pursued.

25        20.    Additionally, the Randazza Agreement contemplated that Randazza would pursue

26    pro bono work on behalf of Excelsior, generally consisting of free speech and civil rights cases.

27        21.    Any pro bono work Randazza pursued required approval by Excelsior to ensure

28    that the work was in Excelsior's best interest.

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 NORTH CITY PARKWAY, SUITE 1600
LAS VEGAS, NV 89106
(702) 382-2101

016194\0005\1814304.1                                11

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 NORTH CITY PARKWAY, SUITE 1600
LAS VEGAS, NV 89106
(702) 382-2101

22. When Excelsior approved pro bono work, Randazza was required to coordinate his efforts with Excelsior's public relations staff to maximize the benefit to Excelsior for its community service.

*Randazza's Generous Compensation As General Counsel*

23. Excelsior provided Randazza significant compensation and benefits during the course of his employment, including:

    a.    a starting annual salary of over $200,000;

    b.    periodic raises that resulted in a salary increase of more than twenty-five percent before Randazza's employment ceased;

    c.    bonuses, such as year-end bonuses, incentive program bonuses and profit-sharing bonuses under Excelsior's bonus plans;

    d.    payment of Randazza' bar preparation courses and bar application fees in California, Nevada and Arizona;

    e.    payment of Randazza's annual bar dues for all states in which he is licensed, namely: Massachusetts, California, Nevada, Arizona and Florida;

    f.    payment of Randazza's annual dues for professional associations and travel to conferences for such associations;

    g.    payment of Randazza's relocation expenses from Florida to California;

    h.    payment of Randazza's relocation expenses from California to Nevada;

    i.    payment for work-related equipment, including, but not limited to, cellular phones and laptops;

    j.    health benefits for Randazza and his family;

    k.    retirement benefits for Randazza;

    l.    paid time off starting at fifteen days per year and eventually reaching four weeks per year before Randazza's employment ceased, in addition to certain federal holidays;

    m.    a flexible schedule that allowed Randazza to work remotely when he so desired; and

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106
(702) 382-2101

n.    use of Excelsior's private gym facility for Randazza and his wife, including personal training.

24.    In addition to his regular salary and other benefits, Randazza proposed and Liberty agreed that he would receive a non-discretionary bonus of ***twenty-five percent*** of any settlement funds paid to Excelsior in connection with legal matters, irrespective of whether formal litigation was commenced.

### RLG's Performance Of Legal Services For Liberty

25.    Liberty is informed and believes, and thereon alleges, that Randazza formed the RLG entity after he accepted his position with Excelsior.

26.    In or about Fall 2010, Randazza informed Liberty that its interests would be best served if Randazza prosecuted lawsuits and performed other enforcement tasks in the name of his firm, RLG, so that litigants would not seek Liberty's confidential information through discovery.

27.    Randazza also indicated that, given the number of cases filed on Liberty's behalf, he could no longer handle his litigation duties as general counsel for Excelsior without additional assistance.

28.    On Randazza's advice and request, Liberty assented to the proposal, and in or around January 2011 RLG began filing and prosecuting copyright infringement lawsuits on Liberty's behalf.

29.    Significantly, RLG never proposed or presented a written fee agreement to Liberty.

30.    Thus, the representation agreement between RLG and Liberty was an oral agreement.

31.    Nonetheless, through Randazza, its principal, RLG agreed and memorialized in writing that it would only charge Liberty its hourly out-of-pocket cost for its attorneys and paralegals' services, rather than their regular hourly rates.

32.    The parties' express intent, as communicated by RLG in writing, was to ensure that RLG would not profit from the work that it did on Liberty's behalf.

33.    At no time did RLG inform Liberty that the fee arrangement between them was

1  contingent on either Randazza's continued employment by Excelsior or payment within a certain

2  period of time.

3      34.    Over the course of its representation, RLG was counsel of record for Liberty in a

4  number of copyright infringement lawsuits filed in various jurisdictions.

5      35.    Among others, RLG filed lawsuits on Liberty's behalf against website operators

6  who profited from unauthorized large-scale distribution of Liberty's copyrighted material over the

7  Internet.

8      36.    RLG also filed lawsuits on Liberty's behalf against individuals who distributed

9  Liberty's copyrighted material over the Internet without authorization ("Torrent Suits").

10     37.    Throughout RLG's representation, Randazza held himself out as a representative

11  of RLG, rather than a full time salaried employee of Excelsior or Liberty.

12                          **RLG'S Lack of Candor To Tribunals**

13     38.    During the course of its representation, RLG misrepresented the nature of the

14  relationships and agreements between it, Randazza and Liberty.

15     39.    RLG failed to inform several United States District Courts that Randazza was a

16  salaried employee of Liberty's affiliated entity, Excelsior, in connection with requests for

17  attorneys' fees.

18     40.    In fact, RLG made statements, sometimes under oath, that were certain to cause

19  those courts to believe contrary circumstances that were false.

20     41.    One of the cases in which RLG represented Liberty is *Liberty Media Holdings,*

21  *LLC v. FF Magnat* ("Oron Case"), currently on appeal from the United States District Court for

22  the District of Nevada ("District Court"), Case No. 2:11-cv-00637-RLH-GWF, which RLG filed

23  on behalf of Liberty in June 2012.

24     42.    In the Oron Litigation, RLG sought and obtained a substantial fee award on behalf

25  of Liberty and against the defendant ("Oron").

26     43.    In connection with RLG's moving papers for an award of fees, an RLG attorney

27  represented through a sworn declaration that Liberty "incurred" the full hourly market rate fees

28  sought by the motion.

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 NORTH CITY PARKWAY, SUITE 1600
LAS VEGAS, NV 89106
(702) 382-2101

44.     To the contrary, in accordance with its oral agreement with Liberty, RLG charged Liberty the reduced "at cost" rates of its employees, and not full hourly market rates.

45.     In connection with RLG's moving papers for an award of fees, RLG also represented that it "charged" Liberty certain hourly rates.

46.     To the contrary, at the time RLG filed its motion, RLG had not sent Liberty any invoices for work performed on the Oron Case.

47.     In connection with its moving papers for an award of fees, RLG represented that RLG charged an hourly rate of $500 for Randazza's services.

48.     To the contrary, Randazza was a full time salaried employee of Excelsior who provided his services to Liberty in connection with his role as general counsel for Excelsior.

49.     The Oron Case is currently on appeal to the Ninth Circuit Court of Appeals ("Ninth Circuit").

50.     Oron has appealed numerous orders of the District Court, including the fee award.

51.     While Liberty contends that the amount of the fee award is justified, it acknowledges that the award was made based upon misleading and incomplete facts that prevented the District Court from basing its ruling on a full and accurate record.

52.     Once Liberty discovered that RLG failed to fully disclose the terms of both it and Randazza's employment to the Court, it was compelled to raise the issue with the Ninth Circuit.

53.     Liberty filed a motion in the Ninth Circuit to ensure that all interested parties and tribunals are aware of the true circumstances surrounding the fee request ("Appellate Fee Motion").

54.     The Appellate Fee Motion requests that the Ninth Circuit reassess and summarily affirm the amount of the fee award or, in the alternative, remand the issue to the District Court.

55.     Liberty has incurred significant legal expenses to rectify RLG's lack of candor to the District Court regarding the nature of the relationship between Liberty, RLG and Randazza.

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 NORTH CITY PARKWAY, SUITE 1600
LAS VEGAS, NV 89106
(702) 382-2101

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 NORTH CITY PARKWAY, SUITE 1600
LAS VEGAS, NV 89106
(702) 382-2101

**RLG'S Failure To Communicate With Liberty**

56.    During the course of its representation, RLG failed to keep Liberty properly informed about the matters in which it was representing Liberty.

57.    For example, RLG did not regularly invoice Liberty for its services, sometimes allowing months to pass without apprising Liberty of the precise work performed or amount due.

58.    Additionally, RLG failed to obtain approval from Liberty for expenditures.

59.    In fact, RLG did not seek or obtain prior approval before commencing work on the Oron Case.

60.    Liberty initially believed that Randazza's work on the Oron Case was done in his role as general counsel for Excelsior.

61.    When Liberty discovered that RLG had performed work in the Oron Case, Randazza, on behalf of RLG, informed Liberty that RLG had no expectation of receiving payment for its services unless and until a settlement was reached or judgment collected upon.

62.    Also, after Liberty had approved a settlement agreement with Oron, RLG failed to inform Liberty that it had received a $550,000 transfer of funds into its trust account for the settlement payment.

63.    In fact, Liberty was unaware that Oron had transferred the settlement funds into RLG's trust account until, nearly a week after the transfer, Liberty's foreign counsel in Hong Kong—not RLG—informed Liberty that the transfer occurred.

64.    RLG also failed to inform Liberty or obtain Liberty's consent regarding the substance of its arguments prior to some of its filings.

65.    For example, while Liberty was generally aware that a motion for fees would be filed in the Oron Case, neither Randazza nor RLG circulated the motion to Liberty before or after it was filed.

66.    Liberty was unaware that RLG made misrepresentations to the District Court in connection with the motion for fees for several weeks after the motion was filed.

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 NORTH CITY PARKWAY, SUITE 1600
LAS VEGAS, NV 89106
(702) 382-2101

**RLG's Acts Of Self-Dealing**

67.    During the course of its representation, RLG engaged in several acts of self-dealing and attempted self-dealing, to the detriment of Liberty.

68.    Liberty is informed and believes, and thereon alleges, that RLG did not begin doing business as "Randazza Legal Group" until well after Randazza began working for Excelsior, and after Randazza sought approval to begin pursuing matters in RLG's name.

69.    Perhaps the most egregious act of attempted self-dealing by RLG occurred when Randazza, on behalf of RLG, negotiated a $75,000 payment from Oron to RLG in the Oron Case.

70.    When Liberty discovered this proposed payment to RLG, it confronted Randazza to ascertain why RLG would receive any settlement funds because any such payment would be to Liberty's detriment.

71.    Randazza characterized this proposed payment as a "bribe" to prevent RLG from instituting other lawsuits against Oron.

72.    Notably, Randazza also negotiated a loan by him to Liberty, supported by a promissory note, in connection with the Oron Case, after he convinced Liberty that it was necessary to retain foreign counsel in the case.

73.    Also, in direct violation of his employment agreement, Randazza, on behalf of RLG, concurrently represented both Liberty and companies that Liberty discovered were infringing its copyrighted content, or that Liberty contracted or negotiated with to license Liberty's content.

74.    RLG never disclosed to Liberty that it represented companies that may have directly adverse interests to Liberty, or that Liberty contracted with or considered contracting with.

75.    Liberty is also informed and believes, and thereon alleges, that in connection with RLG's dealings with its other clients and Liberty's former employees, Randazza, on behalf of RLG, disclosed confidential business information to third parties in direct violation of the Randazza Agreement and Confidentiality Agreement.

76.    Additionally, Randazza, on behalf of RLG and in direct contravention of the

Randazza Agreement, pursued substantial work outside of the work performed for Excelsior and Liberty.

77.    In this regard, Randazza promoted himself and RLG in a manner designed to place RLG's interests above those of Liberty and Excelsior.

78.    Also, Randazza, on behalf of RLG, pursued pro bono projects for which RLG received favorable media attention.

79.    Instead of attributing the pro bono work to Liberty, as promised, RLG publicly took credit for it.

**RLG's Unauthorized Statements Without Liberty's Consent**

80.    During the course of its representation, Randazza, on behalf of RLG, made several public statements regarding Liberty and the adult entertainment industry without consulting Liberty.

81.    As RLG began filing the Torrent Suits, Liberty's customers and the public at large became concerned that certain defendants in the lawsuits would be put at a unique risk as a result of the suits due to the fact that Liberty's adult content is primarily purchased by the homosexual community.

82.    Specifically, public concern arose that, as a result of the suits, gay teenagers whose parents were unaware of their sexual orientation might be involuntarily "outed" to their parents and the community by virtue of being served with legal process in public proceedings.

83.    This concern was and is one that Liberty takes very seriously.  Liberty desired to publicly address the issue to assure the community that it would in no way intentionally harm its consumers in that manner—even those who illegally traded its copyrighted content.

84.    Contrary to Liberty's position on this issue, and without seeking or obtaining authorization from Liberty, Randazza, on behalf of RLG, made statements to members of the public regarding the risk that Liberty's suits presented to gay teenagers.

85.    Specifically, Randazza publicly declared that "any thieving little shit who gets caught can very easily lie to his parents that he was looking at straight porn."

86.    Randazza's unauthorized and inflammatory statement created a public relations

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 NORTH CITY PARKWAY, SUITE 1600
LAS VEGAS, NV 89106
(702) 382-2101

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 NORTH CITY PARKWAY, SUITE 1600
LAS VEGAS, NV 89106
(702) 382-2101

1    crisis for Liberty, which required Liberty to expend significant resources to assure the public that

2    Randazza's statement did not reflect Liberty's position.

3          87.    Notwithstanding Liberty's efforts to mitigate the damage caused by Randazza's

4    statement, as a direct result of this statement Liberty suffered and continues to suffer damage to

5    its reputation amongst its consumers and members of the gay community.

6    **Randazza Resigns From Excelsior And RLG Ceases Providing Services To Liberty**

7          88.    By late August 2012, the relationship between Randazza and Liberty had seriously

8    deteriorated.

9          89.    In late August 2012, Randazza elected to resign from his position as general

10    counsel for Excelsior.

11          90.    After Randazza resigned, RLG ceased performing work on behalf of Liberty.

12          91.    Liberty subsequently retained new counsel to handle its outstanding legal matters.

13    **RLG's Actions To Liberty's Detriment After Or Around The Time That It Ceases**

14    **Providing Services To Liberty**

15          92.    At or about the time when Randazza resigned from Excelsior as general counsel,

16    Randazza, on behalf of RLG, removed Excelsior and Liberty's legal files from Excelsior's

17    premises.

18          93.    The files removed from Excelsior's premises were the property of Excelsior and

19    Liberty, and not the property of RLG.

20          94.    As a result of RLG's removal of Liberty's files, Liberty does not have access to its

21    legal files.

22          95.    RLG refuses to turn over Liberty's legal files.

23          96.    Randazza, on behalf of RLG, also refuses to turn over the iPhone belonging to

24    Excelsior that was issued to Randazza for company use, which contains Liberty's files and

25    proprietary information.

26          97.    Additionally, Randazza, on behalf of RLG, destroyed some of Liberty's files,

27    including files maintained on the laptop belonging to Excelsior that was issued to Randazza for

28    company use.

98.    Moreover, RLG refuses to turn over funds to Liberty that are currently being held in RLG's trust account.

99.    Approximately $30,000 of the funds that RLG refuses to turn over to Liberty are not subject to any dispute between the parties or any third party.

## FIRST CLAIM FOR RELIEF

## LEGAL MALPRACTICE

100.    Liberty repeats and re-alleges the allegations in Paragraphs 1 though 99, as if fully set forth herein.

101.    RLG had a duty to use such skill, prudence and diligence as other members of the legal profession commonly possess and exercise.

102.    RLG breached that duty by, among other things:

   a.    failing to apprise federal district court judges of the nature of its and Randazza's relationship with Liberty and the parties' fee arrangement;

   b.    making misrepresentations to courts;

   c.    failing to apprise Liberty of the status of its cases;

   d.    failing to obtain approval for expenditures made on Liberty's behalf

   e.    taking actions that benefitted RLG to Liberty's detriment;

   f.    making statements to the public that directly contravened Liberty's positions on the issues made in the statements; and

   g.    destroying and refusing to turn over Liberty's files and the undisputed funds belonging to Liberty currently held in RLG's trust account.

103.    RLG's negligent conduct proximately caused injury to Liberty.

104.    Liberty suffered damage or actual loss resulting from RLG's negligence.

105.    Among other injuries, Liberty has suffered direct pecuniary loss in the form of attorneys' fees to bring Randazza's lack of candor to the District Court to the Ninth Circuit's attention, and other costs to rectify RLG's acts of professional negligence enumerated herein.

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 NORTH CITY PARKWAY, SUITE 1600
LAS VEGAS, NV 89106
(702) 382-2101

016194\0005\1814304.1

WHEREFORE, Liberty prays for relief as follows:

1.       for damages in an amount to be determined at trial, but in excess of $10,000.00;

2.       for attorneys' fees and costs of suit;

3.       for prejudgment and post-judgment interest on the amounts owed; and

4.       any further relief this Court deems proper.

Dated this 28th day of March, 2013.

BROWNSTEIN HYATT FARBER SCHRECK, LLP

By: __/s/ Laura E. Bielinski_____
     Mitchell J. Langberg, Esq., Nevada Bar No. 10118
     Laura E. Bielinski, Esq., Nevada Bar No. 10516
     100 North City Parkway, Suite 1600
     Las Vegas, Nevada 89106
     mlangberg@bhfs.com
     lbielinski@bhfs.com
     Telephone:  (702) 382-2101
     Facsimile:  (702) 382-8135

*Attorneys for Defendants Liberty Media Holdings, LLC*

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 NORTH CITY PARKWAY, SUITE 1600
LAS VEGAS, NV 89106
(702) 382-2101

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 NORTH CITY PARKWAY, SUITE 1600
LAS VEGAS, NV 89106
(702) 382-2101

1

## CERTIFICATE OF SERVICE

2   I HEREBY CERTIFY that I am an employee of BROWNSTEIN HYATT FARBER

3   SCHRECK, LLP, and that on this 28th day of March, 2013, I caused to be served a true and

4   correct copy of the above foregoing **DEFENDANT LIBERTY MEDIA HOLDINGS, LLC'S**

5   **ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT AND COUNTERCLAIM**

6   and via U.S. Mail, postage prepaid, and properly addressed to the following:

7   Clyde DeWitt, Esq.                          Ronald G. Green, Esq.
    LAW OFFICES OF CLYDE DeWITT,                 J. Malcolm DeVoy, Esq.
8   APC                                         RANDAZZA LEGAL GROUP
    6525 W. Warm Springs Road, Suite 100        6525 W. Warm Springs Road, Suite 100
9   Las Vegas, NV 89118                         Las Vegas, NV 89118
    clydedewitt@earthlink.net                   ecf@randazza.com
10  *Attorneys for Plaintiff*                    *Attorneys for Plaintiff*

11

12

13                      /s/ Karen Mandall
                        an employee of Brownstein Hyatt Farber Schreck, LLP
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

016194\0005\1814304.1                          22

# EXHIBIT 4

Electronically Filed
08/02/2016 02:18:06 PM

*[signature]*

**CLERK OF THE COURT**

1   **SAO**
    JOHN H. COTTON, ESQ.
2   Nevada Bar No.: 5268
    E-mail:       JHCotton@JHCCottonlaw.com
3   MELANIE BERNSTEIN CHAPMAN, ESQ.
    Nevada Bar No. 6223
4   E-mail:       MChapman@JHCottonlaw.com
    JOHN H. COTTON & ASSOCIATES
5   4900 West Sahara Avenue, Suite 200
    Las Vegas, Nevada 89117
6   Telephone:    702/832-5909
    Facsimile:    702/832-5910
7   *Attorneys for Counterdefendant*

8                           **DISTRICT COURT**
9                       **CLARK COUNTY, NEVADA**

10  MARC J. RANDAZZA, P.A., a Florida          Case No.:    A-12-673275-C
    professional association doing business as   Dept. No.:   VIII
11  RANDAZZA LEGAL GROUP,

12                  Plaintiff,

13          v.

14  LIBERTY MEDIA HOLDINGS, LLC, a             **JOINT STIPULATION AND ORDER FOR**
    California limited-liability company doing  **DISMISSAL WITH PREJUDICE**
15  business as Corbin Fisher.

16                  Defendant.

17  ───────────────────────────────────

18  LIBERTY    MEDIA    HOLDINGS,    LLC,    a
    California   limited-liability   company   doing
19  business as Corbin Fisher,

20                  Counterclaimant,

21          vs.

22  MARC    J.   RANDAZZA,   P.A.,   a   Florida
    professional   association   doing   business   as
23  RANDAZZA LEGAL GROUP,

24                  Counterdefendant.

25          IT IS HEREBY STIPULATED AND AGREED, by and between Plaintiff, MARC J.

26  RANDAZZA P.A. d/b/a RANDAZZA LEGAL GROUP, by and through its attorney or record,

27  Ronald Green, Esq. of the RANDAZZA LEGAL GROUP, Counterdefendant, MARC J.

28  RANDAZZA, P.A. d/b/a RANDAZZA LEGAL GROUP, by and through its counsel of record,

*Randazza v. Liberty*
Case No. A-12-673275-C
Stipulation and Order for Dismissal

John H. Cotton, Esq., and Melanie Bernstein Chapman, Esq. of the law firm of JOHN H. COTTON

& ASSOCIATES and Defendant/Counterclaimant, LIBERTY MEDICA HOLDINGS, LLC d/b/a

CORBIN FISHER, by and through its counsel of record, Mitchell Langberg, Esq. of the law firm of

BROWNSTEIN HYATT FARBER SCHRECK, LLP, that the above-entitled action be dismissed

in its entirety, with prejudice, as to all parties, including all claims and counterclaims, each party

to bear their own attorneys' fees and costs.

Dated this 28 day of July, 2016.           Dated this 27th day of June, 2016.

JOHN H. COTTON & ASSOCIATES, LTD.          BROWNSTEIN HYATT FARBER SCHRECK,
                                           LLP
                                                           NV Bar #12737

By: _____             By: _____ for
John H. Cotton, Esq.                       Mitchell J. Langberg, Esq.
Nevada Bar No. 5268                        Nevada Bar No. 10118
Melanie Bernstein Chapman, Esq.            100 North Cirty Parkway, Suite 1600
Nevada Bar No. 6223                        Las Vegas, Nevada 89106
7900 W. Sahara Ave., Suite 200
Las Vegas, Nevada 89117                    *Attorneys for Liberty Media Holdings, LLC*
*Attorneys for Counterdefendant, Marc J.*  *d/b/a Corbin Fisher*
*Randazza, P.A. d/b/a Randazza Legal Group*

Dated this ____ day of July, 2016

RANDAZZA LEGAL GROUP

By: _____
Ronald D. Green, Esq.
Nevada Bar No. 7360
6525 W. Warm Springs Road, Ste. 100
Las Vegas, NV 89118
*Attorneys for Plaintiff, Marc J. Randazza,*
*P.A. d/b/a Randazza Legal Group*

////
////
////

-2-

*Randazza v. Liberty*
Case No. A-12-673275-C
Stipulation and Order for Dismissal

John H. Cotton, Esq., and Melanie Bernstein Chapman, Esq. of the law firm of JOHN H. COTTON

& ASSOCIATES and Defendant/Counterclaimant, LIBERTY MEDICA HOLDINGS, LLC d/b/a

CORBIN FISHER, by and through its counsel of record, Mitchell Langberg, Esq. of the law firm of

BROWNSTEIN HYATT FARBER SCHRECK, LLP, that the above-entitled action be dismissed

in its entirety, with prejudice, as to all parties, including all claims and counterclaims, each party

to bear their own attorneys' fees and costs.

Dated this _____ day of July, 2016.          Dated this _____ day of June, 2016.

JOHN H. COTTON & ASSOCIATES, LTD.          BROWNSTEIN HYATT FARBER SCHRECK,
                                           LLP

By:_____          By:_____
John H. Cotton, Esq.                          Mitchell J. Langberg, Esq.
Nevada Bar No. 5268                           Nevada Bar No. 10118
Melanie Bernstein Chapman, Esq.               100 North Cirty Parkway, Suite 1600
Nevada Bar No. 6223                           Las Vegas, Nevada 89106
7900 W. Sahara Ave., Suite 200
Las Vegas, Nevada 89117                       *Attorneys for Liberty Media Holdings, LLC*
*Attorneys for Counterdefendant, Marc J.*     *d/b/a Corbin Fisher*
*Randazza, P.A. d/b/a Randazza Legal Group*

Dated this 25 day of July, 2016.

RANDAZZA LEGAL GROUP

By:_____
Ronald D. Green, Esq.
Nevada Bar No. 7360
6525 W. Warm Springs Road, Ste. 100
Las Vegas, NV 89118
*Attorneys for Plaintiff, Marc J. Randazza,*
*P.A. d/b/a Randazza Legal Group*

////

////

////

- 2 -

*Randazza v. Liberty*
Case No. A-12-673275-C
Stipulation and Order for Dismissal

## ORDER

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that, pursuant to the Stipulation of the parties, and good cause appearing, the above-entitled action shall be dismissed in its entirety, with prejudice, as to all parties, including all claims and counterclaims, each party to bear their own attorneys' fees and costs.

DISTRICT COURT JUDGE

FOR

**DOUGLAS E. SMITH**

Submitted by:
JOHN H. COTTON & ASSOCIATES, LTD.
By:
John H. Cotton, Esq.
Nevada Bar No. 5268
Melanie Bernstein Chapman, Esq.
Nevada Bar No. 6223
7900 W. Sahara Ave., Suite 200
Las Vegas, Nevada 89117
*Attorneys for Counterdefendant*
*Marc J. Randazza, P.A. d/b/a Randazza Legal Group*

- 3 -

# EXHIBIT 5

**RPT**
Ryan A. Hamilton, Esq.
Nevada Bar No. 11587
Hamilton Law, LLC
5125 S. Durango Dr., Ste. C
Las Vegas, Nevada 89113
(702) 818-1818
(702) 974-1139
ryan@hamiltonlawlasvegas.com

*Receiver for Righthaven, LLC*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

RIGHTHAVEN LLC, a Nevada limited-
liability company,

               Plaintiff,

v.

WAYNE HOEHN, an individual,

               Defendant.

Case No.: 2:11-cv-00050-PMP-RJJ

**RECEIVER'S REPORT**

## RECEIVER'S REPORT

    Ryan Hamilton, Receiver for Righthaven LLC, hereby files the following Report as to the status of Righthaven's Receivership

### I.    Scope of the Receivership

    On November 14, 2011, Judgment Creditor Wayne Hoehn moved the Court for the installation of a receiver to marshal and sell Righthaven's intellectual property in partial satisfaction of his judgment and writ of execution against the company (ECF 62). The Court granted Hoehn's motion and appointed a Receiver (ECF 66).

    At hearing on October 31, 2012, Hoehn argued that the Receivership was a general receivership that included the power to terminate Righthaven's appeal of the case to avoid potentially incurring further attorneys' fees to Hoehn. The Court rejected the proposition that the

1

Receiver had all the powers of a general Receivership.  Instead the Court explained that it granted only the specific power Hoehn requested in his application for Receiver, *i.e.*, to marshal and sell Righthaven's intellectual property rights in attempt to satisfy Hoehn's judgment.  The "Minutes of Proceedings" from the October 31 hearing provide, in relevant part, "[t]he Court clarifies the scope of the Receivership and confirms the Receivership was for the limited purpose to dispose of assets to satisfy the judgment, not to fire counsel handling the appeal and not to take any other action regarding Righthaven's appeal." (ECF 117).

The Receiver has received inquiries from judgment creditors of Righthaven from other cases requesting to make claims on the property of the Receivership Estate.  Based on the foregoing, however, the undersigned Receiver understands the powers and the purpose of this Receivership to be limited to disposing of Righthaven's intellectual property to satisfy only Hoehn's judgment, not the judgments of creditors in other cases.  After all, were the Receiver to allow judgment creditors from other cases to make claims to the Receivership's Assets, that would frustrate the Receivership's "limited purpose" of satisfying Hoehn's judgment.[1] Likewise, the Receiver concludes that any distribution of the Receivership Estate to Stephen Gibson – CEO of the party that necessitated the Receivership in the first place – would defeat the purpose of the Receivership.

In the interest of forever terminating this litigation, Hoehn has agreed to accept the funds he and his counsel obtained from the Receiver in full satisfaction of his judgment.  This benefits Righthaven as well, since Hoehn's judgment and claims for additional attorneys' fees will be resolved for less than their full value.  Accordingly, the Receiver proposes a distribution of the Receivership property only to the judgment creditor in this case, Hoehn.   Upon judicial approval

---

[1]  If the Receiver is mistaken and the Court declares that persons outside this litigation may make claims, the Receiver believes that the filing of a bankruptcy petition would be the best manner to resolve those competing claims to the Receivership Estate.

of the Receivership's distribution, Hoehn and the Receiver have arranged to resolve all claims and bring this case to an end.

## II.    Proposed Distribution of Funds

Presently, the Righthaven Receivership Estate consists of $85,000.  $80,000 of this was obtained from a private sale of Righthaven's rights back to Stephens Media LLC, the creators of the works underlying many of Righthaven's more than 275 lawsuits.  While this was not obtained at auction, prior auctions for Righthaven's rights failed, largely due to their indefinite nature.  After searching for buyers in the face of the auction's failure, Righthaven's rights acquired from Stephens Media were sold back to their original source in a commercially reasonable manner, as no other market existed for them.  As the Receiver in this limited receivership, I am satisfied that no other method of sale could have brought a higher price.

Below is the proposed distribution of the Receivership Estate.

### a.    Administrative Expense Claims

Administrative expense claims receive the ultimate priority over all other claims.  *See Fla. Dep't of Ins. v. Chase Bank of Tex. N.A.,* 274 F.3d 924, 932 (5th Cir. 2001) (providing for "payment of administrative claims first"); *Battista v. FDIC*, 195 F.3d 1113, 1119 (9th Cir. 2000) ("the receiver's administrative expenses are paid ahead of all other claims"); *SEC v. Byers*, 637 F. Supp. 2d 166 (S.D.N.Y. 2009) (approving of liquidation/distribution plan proposed by receiver where administrative expenses are paid first); *In re Buttonwood Secur., Inc.*, 349 F. Supp. 273 (S.D. Cal. 1972) (holding that expenses incurred by receiver in liquidating estate are first-priority administrative expenses).  Thus, receivership expenses reasonably incurred in the administration of the Receivership Estate are paid first.

I presided over the addition of $80,000 to the Righthaven receivership estate.  I claim as an administrative expense fee 10% of the property I marshaled for the Receivership Estate, or $8,000.  I submit that this expense is reasonable in light of the services I provided, and is in keeping with the typical administrative expense of one marshaling and administering the assets of a Receivership or Bankruptcy Estate.

The prior Receiver, Lara Pearson, performed approximately $36,000 worth of services for the Receivership Estate in marshaling approximately $9,000 in assets into the estate.

3

Because her term as Receiver concluded before the end of the Receivership, she has sought 10% of the $36,000 in services she provided, or $3,600, as compensation. This is a reasonable in light of the services she provided.

Finally, Randazza Legal Group ("RLG") has made a claim for administrative expenses billed to the Receiver in the installation of the Receiver, marshaling of assets into the Receivership estate, services in obtaining buyers for estate assets, and preserving the estate in the face of litigation by third parties. These actions, undertaken for the Receiver's and Receivership Estate's benefit, are administrative expenses entitled to first priority repayment. The priority and sufficiency of RLG's claim is evaluated by the Receiver. *CFTC v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1113 (9th Cir. 1999); *SEC v. American Capital Invs., Inc.*, 98 F.3d 1133, 1146 (9th Cir. 1996); *SEC v. Wencke*, 783 F.2d 829, 836 (9th Cir. 1986); *SEC v. Universal Fin.*, 760 F.2d 1034, 1037 (9th Cir. 1985).

RLG seeks $55,000 in expenses for the reasonable market value of its administrative expenses undertaken for the benefit of the receivership estate. This Court (Doc. # 43), the District of Colorado in *Righthaven LLC v. Wolf*, Case No. 1:11-cv-00830 (D. Colo.) and the *Righthaven LLC v. Leon* court, Case No. 2:10-cv-01367 Doc. # 52, have all found that the defendants represented by RLG were entitled to recover the full reasonable market value of their attorneys' fees, indicating that the fees charged by RLG were reasonable. Consistent with the findings of this District and the District of Colorado in these Righthaven cases, the Receiver approves RLG's administrative expense claim for $55,000.00.

### b. Judgment Creditor Claims

Wayne Hoehn holds a judgment for $34,045.50 that has been registered with Clark County and the Nevada Secretary of State. Additionally, Hoehn holds approximately $100,000 in additional reasonable attorneys' fees that he has incurred during the course of this litigation. This claim is not secured, but Hoehn contends it is properly taxed to Righthaven.

Hoehn has already received approximately $2,500 from the Receivership Estate following the sale of <righthaven.com>. After administrative expenses, all that remains is $18,400. Although this is less than what Hoehn is owed under his judgment, he has agreed with the Receiver that if this sale is approved and the proposed disbursement authorized, his judgment will be satisfied in full and he will release the Receivership Estate from any further claims. This

represents a benefit to Hoehn, and also removes a source of potential liability for Righthaven. Indeed, this would allow Righthaven not only to satisfy a judgment pending against it, but also a potential civil claim for Hoehn's fees.

It is my opinion that the proposed distribution is equitable, proper, and in the interests of judicial economy. Moreover, the proposed distribution will bring finality to this litigation.[2]

### III.    Conclusion

The Receiver finds that it is in the interests of the parties for the Court to approve the Receiver's sale of Righthaven's rights acquired from Stephens Media LLC back to Stephens Media LLC for $80,000. Consistent with this Court's prior Orders, this sum is to be divided between the Receiver, the administrative expenses he has incurred and approved, and Mr. Hoehn's remaining judgment. If this sale and distribution of funds is approved, Hoehn has agreed to waive any claim for his remaining judgment and unsecured claims against Righthaven, and the Receivership may be terminated.

I propose the funds be disbursed as follows:

$ 8,000 to Ryan A. Hamilton as Receiver;

$ 3,600 to Lara Pearson for the administrative expense of her prior service as Receiver;

$ 55,000 to Randazza Legal Group for its administrative expenses in this matter; and

$18,400 to Wayne Hoehn, judgment creditor.

Respectfully submitted,


DATED March 15, 2013

/s/ Ryan A. Hamilton

*Receiver for Righthaven LLC*

---

[2]  Hoehn has indicated that he reserves the right to re-open this matter if the above disbursements are not approved, as he believes this proposal to be in his interest.

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 5(b), I hereby certify that I caused the foregoing to be served by first class U.S. Mail and the Court's CM/ECF system on the following:

Michael R. Mushkin
MICHAEL R. MUSHKIN & ASSOCIATES
4475 South Pecos Road
Las Vegas, NV 89121

Marc J. Randazza
James M. DeVoy, IV
RANDAZZA LEGAL GROUP
6525 W. Warm Springs Road, Ste. 100
Las Vegas, NV 89118

/s/Ryan A. Hamilton

# EXHIBIT 6

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

RIGHTHAVEN, LLC,

              Plaintiff,

v.

WAYNE HOEHN,

              Defendant.

2:11-CV-00050-PMP-RJJ

O R D E R

Having read and considered the Receiver's March 15, 2013 Report (Doc. #120) and the Receiver's proposed distribution of the Receivership's assets, and having received no opposition thereto, the Court finds that the Receiver's proposed distributions are appropriate and consistent with the Receivership's purpose.  Accordingly, the Court hereby APPROVES the Receiver's distribution of assets as set forth in the March 15, 2013 Report.

IT IS THEREFORE ORDERED the Receiver is authorized, and shall make, the following distributions within ten days of this Order:

$8,000 to Ryan A. Hamilton as Receiver;

$3,600 to Lara Pearson for the administrative expense of her prior service as Receiver;

$55,000 to Randazza Legal Group for its administrative expenses in this matter; and

$18,400 to Wayne Hoehn, Judgment Creditor.

DATED: June 6, 2013

PHILIP M. PRO
United States District Judge

# EXHIBIT 7

# SETTLEMENT AGREEMENT

**THIS AGREEMENT** is made between, on the one hand, FF Magnat Limited, a Hong Kong corporation with its principle place of business at _____Hong Kong (hereinafter, referred to as, "Oron"), and on the other hand, Liberty Media Holdings, LLC a/k/a Corbin Fisher with a principal place of business at 4262 Blue Diamond Rd., Suite 102-377, Las Vegas, NV 89141 (hereinafter collectively referred to as "Liberty").

WHEREAS, Liberty has alleged copyright infringement against Oron;

WHEREAS, Oron denies such copyright infringement;

WHEREAS, Liberty has filed litigation in the Federal District Court for the District of Nevada in the United States, Docket No.2:12-cv-01057-GMN-RJJ (the "Nevada Lawsuit");

WHEREAS, Liberty has filed litigation in Hong Kong (including obtaining an injunction), case # HCPM 1275 /2012 (the "Hong Kong Lawsuit");

WHEREAS, the Court in Nevada ruled in favor of Liberty on certain issues of the Nevada Lawsuit and Oron plans to appeal said rulings;

WHEREAS, the parties wish to settle their disputes without further litigation.

NOW THEREFORE, in consideration of the mutual promises contained herein, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## 1. MONETARY TERMS (ALL AMOUNTS IN US DOLLARS) AND JOINT OBLIGATIONS

1. Oron shall pay Liberty six hundred thousand dollars ($600,000.00) (the "Settlement Funds"). The Settlement Funds will be paid as follows: the parties will stipulate that $600,000 US Dollars of the frozen funds in Oron's PayPal account will be transferred as soon as possible to the Randazza Legal Group's client trust account to be held in trust and released only in strict accordance with the terms hereof (the "Escrowed Funds"). In addition, $75,000 of Oron's PayPal funds will be transferred immediately to the client trust account of Boston Law Group, PC. Randazza Legal Group shall not disburse the Escrowed Funds to Liberty until the occurrence of all of the following conditions (the completion of (a), (b), (c) and (d) below shall be referenced herein as the "Dispersal Contingency"):

   a. this settlement becomes final, including the exchange of signed copies of the agreement;

   b. Liberty complies with the terms set forth in all sections in Article II (LIBERTY'S

*[handwritten: $6754]*

*[handwritten: 1254 after for CF]*

*[handwritten: WHO GETS THIS?]*

*[stamp: DEFENDANT'S EXHIBIT 325]*

NON-MONETARY OBLIGATIONS) hereof;

c.  all of Oron's funds, worldwide (including without limitation in the US and in Hong Kong as well as the accounts set forth in Attachment A herein, collectively the "Oron Accounts") are no longer frozen and have all been dispersed to a bank account of Oron's designation (it being understood and agreed that Oron may, at its sole discretion, direct some of these funds to be transferred to its bank account in Hong Kong and then from that account to another account of its designation);

d.  no new lawsuits, motions or injunctions are filed against Oron before subsections (a) through (c) above are fulfilled in their entirety; and

e.  the Parties agree that any delay to disbursement under paragraph 1(c) or other lawsuits under paragraph 1(d) that are filed completely independently of Liberty or Randazza Legal Group's involvement shall not affect this Agreement. For example, Flavaworks has filed a case against Oron in Illinois, and neither Liberty nor Randazza Legal Group have any involvement in that case, and nothing that happens with regards to that case shall affect this agreement.

Upon the completion of the Dispersal Contingency in its entirety, the Escrowed Funds shall become the property of Liberty and Randazza Legal Group shall pay the Settlement Funds to Liberty.

If Randazza Legal Group transfers any of the Escrowed Funds to anyone at all before the Dispersal Contingency is complete in its entirety (other than pursuant to a court order or a written agreement of Oron and Liberty) Randazza Legal Group and Attorney Marc Randazza shall be jointly and severally personally liable to Oron for the Escrowed Funds plus a 10% liquidated damages fee. If Oron unreasonably delays the transfer of funds, or more than fourteen (14) days passes, without all contingencies occurring, then the $600,000 shall become Liberty's property immediately, and no further delay in disbursement shall occur.

2.  Each party shall cooperate with the other, use best efforts, file all such motions, and take all such actions as are necessary in order to release all funds in all Oron Accounts and enable Oron to transfer all funds from all Oron Accounts to a bank account of Oron's designation and to ensure the occurrence of all other provisions of the Dispersal Contingency.

3.  Upon receipt of the Escrowed Funds by Randazza Legal Group, the parties shall file a joint motion under seal with the Nevada Court requesting all remaining money in the Paypal account be wired to an account of Oron's designation and requesting that the court order all other Oron funds to be released in accordance with Oron's wishes (it being understood and agreed that Oron shall first direct these funds to be delivered to its account in Hong Kong and then from that account to another account of its choosing — Oron shall not be required to disclose the details of its final target bank account to Liberty or to any other party.

2

CONFIDENTIAL

EMC000161

Deleted: , and

Deleted: .

Deleted: other than Oron

Deleted: In the event that despite Oron's reasonable efforts, the Dispersal Contingency does not occur within thirty (30) days from the date hereof, Randazza Legal Group shall return the Escrowed Funds to Oron upon Oron's written request

Deleted: t

Deleted: ,

Deleted: designation

## II. LIBERTY'S NON-MONETARY OBLIGATIONS

4. Liberty warrants and affirms that it shall not act on the Execution obtained in the Nevada Lawsuit at any time after the date hereof;

5. Upon the occurrence of the Dispersal Contingency, Liberty shall, within 24 hours, report the Execution as satisfied in full to the Nevada Court.

6. Upon receipt of the Escrowed Funds by Randazza Legal Group as indicated above, Liberty shall dismiss the Hong Kong Lawsuit within 48 hours (including lifting the injunction), with prejudice, against all Defendants to the action and without claiming any legal fees or any other amounts. Liberty will also affirmatively report to the Hong Kong court that it is not seeking any legal fees from Oron.

7. Upon receipt of the Escrowed Funds by Randazza Legal Group as indicated above, the Nevada Lawsuit will be dismissed against Maxim Bochenko aka Roman Romanov within 24 hours, with prejudice and all motions (including without limitation Liberty's Motion for Legal Fees) shall be withdrawn. However, this shall only occur if Maxim Bochenko signs this agreement and agrees to be bound by all of its terms.

8. Liberty agrees to privately arbitrate any future disputes with the parties to this Agreement and/or to the parties to the Nevada Lawsuit and/or the parties to the Hong Kong Lawsuit, based on facts that occur after the date of this agreement. If there is arbitration, no in-person hearings for the parties shall be required, but they shall be permitted. The parties agree that the Arbitrators shall have injunctive powers equivalent with that of a Federal Judge including, but not limited to the power to grant equitable relief. Any party may attend arbitration telephonically if they wish, and/or arbitration is not required to take place in the United States. For example, the parties may arbitrate through WIPO or ICC in Stockholm, or any other arbitration forum to which the parties may mutually agree. If the Parties cannot agree on a arbitral forum, then the aggrieved party may bring a central claim in Las Vegas, Nevada.

9. Liberty will actively dissuade others from bringing suit against Oron and the parties to the Nevada and Hong Kong lawsuits.

10. Liberty will actively assist Oron in sending letters written by Oron, and doing everything else necessary, to convince Paypal and other payment processors to allow Oron to accept payments through their service. No dishonest statements will be required. In the event that Liberty cannot, in good faith, make a helpful statement (due to a belief that it would require a dishonest statement), then Liberty agrees to make no comment whatsoever. The content of the letter is attached as Exhibit B.

11. Liberty shall announce publically that, after a careful review of the facts, they believe Oron is protected by the DMCA safe harbor and that neither it nor its agents ever specifically viewed or downloaded child pornography from the site.

3

Randazza Motion 8/1/2012 12:40 PM
Formatted: Indent: Left: 0", First line: 0"

Randazza Motion 8/1/2012 1:26 AM
Deleted: that it has not to date acted on the Execution obtained in the Nevada Lawsuit and warrants and affirms

Randazza Motion 8/1/2012 12:40 PM
Formatted: Underline
Randazza Motion 8/1/2012 1:31 AM
Deleted: 24

Randazza Motion 8/1/2012 12:40 PM
Deleted: and all John Does

Randazza Motion 8/1/2012 1:27 AM
Deleted: of

Randazza Motion 8/1/2012 1:26 AM
Deleted: Attorney Randazza and

Randazza Motion 8/1/2012 1:26 AM
Deleted: Attorney Randazza and
Randazza Motion 8/1/2012 1:28 AM
Deleted: and to send letters to every company and or entity to whom Liberty or Randazza sent letters pertaining to this matter

Randazza Motion 8/1/2012 1:28 AM
Comment: ...that the files are owned by Oron.

12. The parties will craft a joint letter for publications stating that the parties are joining together in the fight against child porn and copyright infringement. This letter will include a statement that Oron is modifying its business practices, with Liberty's help, to embark on a campaign to run a profitable cyber locker without piracy. The content of the letter is attached as Exhibit C.

## III. ORON'S NON-MONETARY OBLIGATIONS:



13. Within 24 hours of the Settlement Contingency, the filing of the Execution as Satisfied and the Dismissal of the Hong Kong and Nevada Lawsuits along with all pending motions, Oron shall withdraw any Notice of Appeal in the Nevada Lawsuit, and will waive any motions, appeals, claims, or any other process that it may have, known or unknown, as will Bochenko.



14. Oron will take both strong and bold measures to keep Liberty Media content off of its servers, and Bochenko will do the same with regards to his websites and businesses.

15. Oron will assist Liberty in the identification and civil prosecution of any parties who have been using Oron to distribute Liberty's copyrighted material, including but not limited to, full disclosure of IP addresses, banking information, emails and any other information that may assist in Liberty in such prosecution (Client Identification). This will not include Oron paying any legal costs for such prosecution however; it may require Oron to sign statements authenticating the information. Liberty shall keep confidential the fact that Oron is providing Client Identification and if such information must be used in a court case then shall both provide a subpoena to Oron for each piece of such information, shall endeavor to only use such information under seal and if such information must be filed publically shall provide Oron with reasonable notice of this fact. The subpoena requirement may be met with a DMCA subpoena, or a state court subpoena issued in a bill of pure discovery, or other similar pre-suit subpoena procedure, and Oron agrees that it will not contest the validity of any such subpoena, or its applicability to Oron.

16. Liberty will have unfettered access to takedown / delete any of Liberty's material that are being distributed through Oron.com, through Oron.com's online access so long as Liberty reasonably believes the content is infringing content owned by Liberty. Liberty may delegate this function to a third-party takedown services (3P). Liberty acknowledges that any such takedowns will automatically include an email notice to the account holder's email telling them that the material has been taken down through the auspices of a DMCA takedown notice filed by Liberty, providing a copy of the DMCA takedown notice including Liberty's contact information. If the takedown is done through a 3P then said 3P must follow the same terms as if they were Liberty.

17. Any payment due to anyone who has been distributing Liberty materials will be frozen, and an accounting thereof will be provided to Liberty. Oron agrees to hold such funds in escrow and to pay them to Liberty if Liberty secures a judgment or settlement from these parties.

4

18. Oron will permanently ban, by email address, PayPal account, IP address or any other reasonable and robust metric, any user who is the subject of even a single Liberty Media takedown notice. Any user account that has a takedown by Liberty will automatically be banned by these terms. Liberty agrees not to abuse this unfettered access.

## IV. GENERAL TERMS.

19. **By Liberty.** Upon receipt by Liberty of the Settlement Payment and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Liberty releases and forever discharges Oron, Maxim Bochenko a/k/a Roman Romanov, and each of their past and present subsidiaries, parent corporations, and each of their respective officers, directors, shareholders, attorneys, agents, employees, contractors, and assigns (collectively, the "Oron Releasees") from any and all debts, claims, demands, actions, causes of action, controversies, attorney's fees, omissions, damages, and liabilities of every description, at law or in equity, whether known or unknown, that Liberty had, now has, or may have against the Oron Releasees, including, without implied limitation, all claims which were raised or could have been raised in the Nevada Lawsuit or the Hong Kong Lawsuit. For that reason, Liberty hereby waives any and all rights or benefits, which it may have under the terms of any applicable statute or case law.



20. **By Oron.** Upon receipt by Liberty of the Settlement Payment and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Oron and all of its directors, employees, and agents, releases and forever discharges Liberty, and each of its past and present subsidiaries, parent corporations, and each of their respective officers, directors, shareholders, attorneys, agents, employees, contractors, and assigns (collectively, the "Liberty Releasees") from any and all debts, claims, demands, actions, causes of action, controversies, attorney's fees, omissions, damages, and liabilities of every description, at law or in equity, whether known or unknown, that Oron had, now has, or may have against the Liberty Releasees, including, without implied limitation, all claims which were raised or could have been raised in the Nevada Lawsuit or the Hong Kong Lawsuit. For that reason, Oron hereby waives any and all rights or benefits, which it may have under the terms of any applicable statute or case law.

21. By Bochenko. Upon receipt by Liberty of the Settlement Payment and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Bochenko releases and forever discharges Liberty, and each of its past and present subsidiaries, parent corporations, and each of their respective officers, directors, shareholders, attorneys, agents, employees, contractors, and assigns (collectively, the "Liberty Releasees") from any and all debts, claims, demands, actions, causes of action, controversies, attorney's fees, omissions, damages, and liabilities of every description, at law or in equity, whether known or unknown, that Bochenko had, now has, or may have against the Liberty Releasees, including, without implied limitation, all claims which were raised or could have been raised in the Nevada Lawsuit or the Hong Kong Lawsuit. For that reason, Bochenko hereby waives any and all rights or benefits, which it may

5

CONFIDENTIAL

have under the terms of any applicable statute or case law.

## V. GENERAL TERMS

22. The terms of this Agreement shall be confidential and shall not be disclosed to any third party, except (a) Oron may disclose the terms of this Agreement relating to withdrawing lawsuits and releasing funds (Sections 2, 3, 4, 6 and 7) and (b) as required by law, court, or government agency regulation and in such event under a suitable protective order protecting this agreement from disclosure to the extent available in accordance with the laws of the pertinent country. Both parties shall take reasonable measures to maintain the confidentiality of the terms of this Agreement. Oron may indicate publically that it is implementing new anti-piracy measures (to Oron's benefit in order to dissuade other suits). Liberty may announce that it is instructing and assisting Oron with such measures.

23. Arbitration of all disputes arising after date of this Agreement. All arbitrations may be done telephonically by one or both parties. This Agreement shall be governed by the laws of Nevada without respect to the local conflict of laws provisions thereof. Nevada Law applies to future arbitration disputes, but both parties stipulate that this is not a "contact" with the United States and although Nevada law applies to the agreement, nothing herein shall be deemed to bring Oron into the US for purposes of Jurisdiction or otherwise. Nevertheless, any arbitral award may be enforced in Nevada, and the Parties stipulate that the Courts in Nevada shall have jurisdiction over them for the sole purpose of the enforcement of arbitral awards.

24. This Agreement shall be binding upon the parties hereto, their successors or assigns, and upon any and all others acting by or through them or in privity with them, or under their direction.

25. No representation or warranties have been made by either party to the other, or by anyone else, except as expressly set forth in this Agreement, and this Agreement is not being executed in reliance on any representation or warranty other than those expressly set forth herein.

26. In the event that any provision of this Agreement or the application of any provision of this Agreement is held by a tribunal of competent jurisdiction to be contrary to law, the remaining provisions of this Agreement shall remain in full force and effect, and this Agreement shall be interpreted as if such invalid provisions were omitted.

27. This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, and supersedes all prior negotiations or agreements, whether written or oral, relating to such subject matter (specifically including the alleged agreement enforced by the Nevada Court). This Agreement may not be altered, amended, modified or otherwise changed except by an instrument in writing duly executed by authorized representatives of each of the parties hereto.

28. In the event that any party must take legal or arbitral action to enforce the terms of this

6

Deleted: 1

Deleted: 2

Deleted: 3

Deleted: 4

Deleted: 5

Deleted: 6

Deleted: 7

Agreement, the prevailing party shall be entitled to its legal costs and expenses (including reasonable attorneys' fees) in addition to any other damages

29. This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together should constitute one and the same agreement.

30. In the event that Maxim Bochenko does not sign this Agreement, then he receives no benefits hereunder, and Liberty shall be free to bring any claims whatsoever against Bochenko in any forum. However, if Bochenko does sign, then he shall be bound by any terms that also bound Oron.

IN WITNESS OF their understanding and agreement, the parties have executed this Agreement by signature of a duly authorized officer on the date set forth below.

ACCEPTED AND AGREED TO:

FF Magnat Limited

Date: _____     Signature: _____

Liberty Media Holdings, LLC

Date: _____     Signature: _____

Maxim Bochenko a/k/a Roman Romanov

Date: _____     Signature: _____

Randazza Legal Group and Attorney Marc Randazza personally
(with respect to the trust obligations in Section 1 only)

Date: _____     Signature: _____
                          Marc Randazza, Esq.

7

EMC000166

**Attachment A**
**Oron Accounts**

1. PayPal (paypal.com)
2. PaymentWall (http://www.paymentwall.com/)
3. MicroPayment (https://www.micropayment.ch/)
4. CCBill (http://www.ccbill.com/) may have a negative balance even but I guess that doesn't really matter.
5. Payza, ex AlertPay (https://www.payza.com/)
6. PaySpace (payspace.lv)
7. AcquiroPay (http://acquiropay.com/)
8. DaoPay (http://www.daopay.com/)
9. HSBC Hong Kong Bank

8

CONFIDENTIAL

EMC000167

# EXHIBIT 8

**Mulvihill & Rushie LLC**
By: A. Jordan Rushie
Pa Id. 209066
2424 East York Street • Suite 316
Philadelphia, PA 19125
215.385.5291                           ATTORNEYS FOR PLAINTIFF

### In the Court of Common Pleas
### First Judicial District of Pennsylvania

| | |
|---|---|
| Liberty Media Holdings LLC, *Plaintiff,* | Jury Trial Demanded |
| v. | Term 2012 |
| John Does 1-265, *Defendants.* | No. |

### Praecipe to Issue Writ of Summons.

To the Prothonotary:

Please issue a Writ of Summons in the above-captioned action.

Respectfully Submitted,

A. Jordan Rushie
**Mulvihill & Rushie LLC**
2424 East York Street • Suite 316
Philadelphia, PA 19125
ATTORNEYS FOR PLAINTIFF

Case ID: 120401874

C.P.97

# Commonwealth of Pennsylvania

SUMMONS
*CITACION*

## CITY AND COUNTY OF PHILADELPHIA

Liberty Media Holdings LLC

COURT OF COMMON PLEAS

_____ Term, 20__12__

No. _____

*vs.*

John Does 1-441, Identified by IP addresses in
attached Exhibit A.

To[1]

John Does 1-441, Identified by IP
addresses in attached Exhibit A.

You are notified that the Plaintiff[2]
*Usted esta avisado que el demandante[2]*

Liberty Media Holdings LLC

Has (have) commenced an action against you.
*Ha (han) iniciado una accion en contra suya.*



JOSEPH H. EVERS
*Prothonotary*

By _____

120401874
17 APR 2012 01:03 pm
J. MURPHY

Date _____

[1] Name(s) of Defendant(s)
[2] Name(s) of Plaintiff(s)

10-208 (Rev. 6/00)

Case ID: 120401874

COURT OF COMMON PLEAS

——————————— Term, 20 12 . No. ———————

Liberty Media Holdings LLC

vs.

John Does 1-441, Identified by IP addresses
in attached Exhibit A.

SUMMONS

Case ID: 120401874

# Exhibit A

Case ID: 120401874

| Host IP address | Hit Date(UTC) | ISP |
|---|---|---|
| 24.62.3.50 | 2011-10-31 04:35 AM | Comcast Cable |
| 24.18.233.139 | 2011-10-31 07:31 PM | Comcast Cable |
| 69.244.148.138 | 2011-11-01 06:46 PM | Comcast Cable |
| 24.16.231.107 | 2011-11-02 08:40 AM | Comcast Cable |
| 71.59.189.44 | 2011-11-02 10:04 AM | Comcast Cable |
| 24.19.26.176 | 2011-11-02 05:55 PM | Comcast Cable |
| 71.56.119.154 | 2011-11-02 05:32 AM | Comcast Cable |
| 69.251.253.65 | 2011-11-03 12:26 AM | Comcast Cable |
| 98.210.11.89 | 2011-11-03 02:33 AM | Comcast Cable |
| 71.201.49.214 | 2011-11-03 09:27 PM | Comcast Cable |
| 71.58.0.93 | 2011-11-04 12:31 PM | Comcast Cable |
| 67.182.244.250 | 2011-11-05 05:06 AM | Comcast Cable |
| 174.52.169.57 | 2011-11-07 03:49 PM | Comcast Cable |
| 76.24.192.192 | 2011-11-07 03:53 PM | Comcast Cable |
| 24.21.97.202 | 2011-11-07 08:41 AM | Comcast Cable |
| 24.1.115.213 | 2011-11-07 04:06 AM | Comcast Cable |
| 69.251.199.118 | 2011-11-07 04:51 AM | Comcast Cable |
| 76.26.132.11 | 2011-11-07 05:09 AM | Comcast Cable |
| 71.199.13.228 | 2011-11-08 08:06 AM | Comcast Cable |
| 68.84.78.225 | 2011-11-08 01:10 PM | Comcast Cable |
| 76.103.142.134 | 2011-11-08 05:04 PM | Comcast Cable |
| 107.5.95.184 | 2011-11-08 12:55 AM | Comcast Cable |
| 75.70.13.20 | 2011-11-08 12:00 AM | Comcast Cable |
| 174.55.130.68 | 2011-11-08 09:39 PM | Comcast Cable |
| 24.131.79.45 | 2011-11-09 04:49 AM | Comcast Cable |
| 76.16.51.24 | 2011-11-09 06:25 AM | Comcast Cable |
| 24.118.194.183 | 2011-11-12 11:02 PM | Comcast Cable |
| 71.62.92.42 | 2011-11-12 01:57 PM | Comcast Cable |
| 71.227.219.246 | 2011-11-12 04:32 AM | Comcast Cable |
| 66.30.12.248 | 2011-11-13 01:03 AM | Comcast Cable |
| 24.10.169.119 | 2011-11-13 02:09 AM | Comcast Cable |
| 69.137.171.142 | 2011-10-30 02:11 AM | Comcast Cable |
| 69.244.148.138 | 2011-10-30 12:40 AM | Comcast Cable |
| 71.237.113.17 | 2011-10-31 06:26 AM | Comcast Cable |
| 98.222.80.187 | 2011-10-31 02:46 PM | Comcast Cable |
| 71.58.0.93 | 2011-10-31 10:20 AM | Comcast Cable |
| 71.194.213.72 | 2011-11-01 03:36 AM | Comcast Cable |
| 98.218.232.81 | 2011-11-01 02:17 AM | Comcast Cable |
| 98.203.25.88 | 2011-11-01 12:00 AM | Comcast Cable |
| 67.162.85.172 | 2011-11-02 07:29 AM | Comcast Cable |
| 98.217.0.171 | 2011-11-02 04:06 PM | Comcast Cable |

| | | |
|---|---|---|
| 98.197.160.137 | 2011-11-03 08:19 AM | Comcast Cable |
| 24.98.225.151 | 2011-11-03 03:18 PM | Comcast Cable |
| 98.213.83.250 | 2011-11-04 04:25 AM | Comcast Cable |
| 68.58.67.157 | 2011-11-05 02:43 AM | Comcast Cable |
| 24.20.246.60 | 2011-11-05 02:48 AM | Comcast Cable |
| 66.41.166.206 | 2011-11-05 03:50 PM | Comcast Cable |
| 69.181.145.123 | 2011-11-05 05:24 AM | Comcast Cable |
| 24.21.97.202 | 2011-11-10 06:30 PM | Comcast Cable |
| 67.185.16.112 | 2011-11-11 10:45 AM | Comcast Cable |
| 24.118.48.147 | 2011-11-12 02:51 AM | Comcast Cable |
| 68.83.249.180 | 2011-11-12 05:26 AM | Comcast Cable |
| 71.197.234.229 | 2011-11-12 06:05 PM | Comcast Cable |
| 69.136.190.7 | 2011-11-12 06:05 AM | Comcast Cable |
| 98.232.14.246 | 2011-11-13 09:45 AM | Comcast Cable |
| 76.23.122.74 | 2011-11-13 02:10 AM | Comcast Cable |
| 71.59.189.44 | 2011-11-14 09:24 AM | Comcast Cable |
| 76.124.111.133 | 2011-11-14 10:13 PM | Comcast Cable |
| 76.114.202.41 | 2011-11-14 12:09 PM | Comcast Cable |
| 98.193.16.225 | 2011-11-15 11:32 AM | Comcast Cable |
| 174.51.103.237 | 2011-11-15 04:40 AM | Comcast Cable |
| 24.19.150.235 | 2011-11-15 03:11 AM | Comcast Cable |
| 76.26.174.168 | 2011-11-16 12:07 AM | Comcast Cable |
| 71.229.112.220 | 2011-11-16 02:44 AM | Comcast Cable |
| 68.83.168.63 | 2011-11-16 02:18 AM | Comcast Cable |
| 98.246.145.246 | 2011-11-16 03:32 AM | Comcast Cable |
| 98.214.150.240 | 2011-11-16 01:07 PM | Comcast Cable |
| 69.246.25.236 | 2011-11-16 11:23 AM | Comcast Cable |
| 24.61.15.202 | 2011-11-17 01:08 AM | Comcast Cable |
| 98.212.194.179 | 2011-11-17 04:18 AM | Comcast Cable |
| 24.131.19.11 | 2011-11-17 02:16 AM | Comcast Cable |
| 98.202.105.55 | 2011-11-18 03:53 AM | Comcast Cable |
| 71.201.49.214 | 2011-11-18 01:05 AM | Comcast Cable |
| 71.204.160.210 | 2011-11-18 04:04 AM | Comcast Cable |
| 76.120.15.74 | 2011-11-18 12:07 AM | Comcast Cable |
| 98.193.89.164 | 2011-11-19 12:00 AM | Comcast Cable |
| 69.181.40.65 | 2011-11-21 01:44 AM | Comcast Cable |
| 71.236.21.16 | 2011-11-29 06:26 PM | Comcast Cable |
| 98.227.104.229 | 2011-11-29 06:24 PM | Comcast Cable |
| 75.73.75.146 | 2011-11-29 06:20 PM | Comcast Cable |
| 107.3.149.198 | 2011-11-29 06:29 PM | Comcast Cable |
| 76.119.110.227 | 2011-11-29 10:18 PM | Comcast Cable |
| 68.42.125.39 | 2011-11-29 08:51 PM | Comcast Cable |

| | | |
|---|---|---|
| 76.100.69.136 | 2011-11-29 06:32 PM | Comcast Cable |
| 98.196.56.230 | 2011-11-30 12:00 AM | Comcast Cable |
| 67.175.200.198 | 2011-12-05 05:28 PM | Comcast Cable |
| 71.232.91.50 | 2011-12-05 05:19 PM | Comcast Cable |
| 68.50.143.223 | 2011-12-06 01:17 AM | Comcast Cable |
| 98.206.151.1 | 2011-12-06 01:45 AM | Comcast Cable |
| 75.65.135.31 | 2011-12-06 11:45 AM | Comcast Cable |
| 98.248.228.128 | 2011-12-06 11:44 AM | Comcast Cable |
| 98.252.65.121 | 2011-12-06 04:57 AM | Comcast Cable |
| 67.160.219.73 | 2011-11-29 06:00 PM | Comcast Cable |
| 98.196.56.230 | 2011-11-29 02:52 PM | Comcast Cable |
| 69.143.106.222 | 2011-11-29 05:23 PM | Comcast Cable |
| 67.163.50.116 | 2011-11-30 07:00 PM | Comcast Cable |
| 98.227.120.59 | 2011-11-30 06:05 AM | Comcast Cable |
| 67.171.235.110 | 2011-11-30 12:00 AM | Comcast Cable |
| 68.50.143.223 | 2011-11-30 02:55 AM | Comcast Cable |
| 24.7.166.219 | 2011-11-30 06:04 AM | Comcast Cable |
| 98.194.227.7 | 2011-11-30 12:08 AM | Comcast Cable |
| 76.17.117.59 | 2011-11-30 02:15 AM | Comcast Cable |
| 67.173.146.11 | 2011-12-02 04:20 AM | Comcast Cable |
| 98.193.213.133 | 2011-12-02 07:51 AM | Comcast Cable |
| 107.3.76.214 | 2011-12-02 12:10 AM | Comcast Cable |
| 75.73.55.222 | 2011-12-03 12:16 AM | Comcast Cable |
| 71.229.112.220 | 2011-12-03 07:04 AM | Comcast Cable |
| 69.181.145.123 | 2011-12.-05 09:08 AM | Comcast Cable |
| 24.19.56.232 | 2011-12-05 11:00 AM | Comcast Cable |
| 68.41.140.255 | 2011-10-29 06:29 PM | Comcast Cable |
| 24.98.225.151 | 2011-10-30 05:41 PM | Comcast Cable |
| 69.142.219.202 | 2011-10-31 07:51 PM | Comcast Cable |
| 68.58.109.63 | 2011-10-31 02:39 AM | Comcast Cable |
| 69.243.157.215 | 2011-10-31 04:43 PM | Comcast Cable |
| 76.126.126.196 | 2011-10-31 07:25 AM | Comcast Cable |
| 68.58.67.157 | 2011-11-01 10:04 PM | Comcast Cable |
| 76.102.43.86 | 2011-11-01 04:36 AM | Comcast Cable |
| 67.189.45.85 | 2011-11-01 10:55 PM | Comcast Cable |
| 174.54.128.120 | 2011-11-02 03:40 AM | Comcast Cable |
| 24.218.27.126 | 2011-11-02 03:09 AM | Comcast Cable |
| 98.239.104.42 | 2011-11-04 01:45 AM | Comcast Cable |
| 24.20.246.60 | 2011-11-04 06:18 AM | Comcast Cable |
| 24.98.223.61 | 2011-11-04 03:39 AM | Comcast Cable |
| 98.193.16.225 | 2011-11-04 11:27 AM | Comcast Cable |
| 68.58.237.61 | 2011-11-04 03:02 PM | Comcast Cable |

| | | |
|---|---|---|
| 174.52.169.57 | 2011-11-05 11:39 PM | Comcast Cable |
| 98.213.94.178 | 2011-11-05 12:39 PM | Comcast Cable |
| 76.117.135.143 | 2011-11-05 08:34 AM | Comcast Cable |
| 24.61.15.202 | 2011-11-05 05:54 PM | Comcast Cable |
| 98.201.101.34 | 2011-11-05 09:20 PM | Comcast Cable |
| 98.249.9.45 | 2011-11-05 06:42 PM | Comcast Cable |
| 50.131.14.187 | 2011-11-05 07:43 AM | Comcast Cable |
| 71.193.222.32 | 2011-11-05 06:45 AM | Comcast Cable |
| 76.17.195.101 | 2011-11-06 08:41 AM | Comcast Cable |
| 24.98.33.22 | 2011-11-06 07:17 AM | Comcast Cable |
| 71.59.189.44 | 2011-11-06 11:21 AM | Comcast Cable |
| 24.126.76.103 | 2011-11-06 08:56 PM | Comcast Cable |
| 98.197.198.185 | 2011-11-06 08:55 PM | Comcast Cable |
| 69.181.50.105 | 2011-11-07 05:20 AM | Comcast Cable |
| 75.69.11.68 | 2011-11-07 03:14 AM | Comcast Cable |
| 71.59.157.103 | 2011-11-07 09:43 AM | Comcast Cable |
| 98.201.150.142 | 2011-11-07 12:36 AM | Comcast Cable |
| 67.168.212.190 | 2011-11-08 01:16 AM | Comcast Cable |
| 24.21.97.202 | 2011-11-08 12:00 AM | Comcast Cable |
| 76.106.41.12 | 2011-11-08 01:36 AM | Comcast Cable |
| 71.237.113.17 | 2011-11-08 08:59 AM | Comcast Cable |
| 68.82.31.101 | 2011-11-08 05:57 AM | Comcast Cable |
| 67.189.147.8 | 2011-11-08 02:49 PM | Comcast Cable |
| 76.28.213.253 | 2011-11-08 09:27 PM | Comcast Cable |
| 174.62.115.130 | 2011-11-13 05:24 AM | Comcast Cable |
| 98.239.153.107 | 2011-11-13 03:27 AM | Comcast Cable |
| 67.180.238.194 | 2011-11-13 06:36 AM | Comcast Cable |
| 71.202.41.139 | 2011-11-13 07:44 AM | Comcast Cable |
| 76.109.81.99 | 2011-11-13 03:13 AM | Comcast Cable |
| 67.191.188.43 | 2011-11-13 03:02 AM | Comcast Cable |
| 68.35.209.158 | 2011-11-16 03:38 AM | Comcast Cable |
| 76.103.61.49 | 2011-11-29 11:37 PM | Comcast Cable |
| 98.229.113.74 | 2011-11-29 11:34 PM | Comcast Cable |
| 76.112.145.119 | 2011-11-29 11:24 PM | Comcast Cable |
| 68.54.229.4 | 2011-11-29 11:43 PM | Comcast Cable |
| 98.218.1.186 | 2011-11-29 05:30 PM | Comcast Cable |
| 24.3.21.138 | 2011-11-29 04:50 PM | Comcast Cable |
| 76.108.170.231 | 2011-11-29 03:50 PM | Comcast Cable |
| 76.100.123.194 | 2011-11-29 11:17 PM | Comcast Cable |
| 98.253.50.25 | 2011-11-29 05:33 PM | Comcast Cable |
| 71.60.188.195 | 2011-11-29 05:30 PM | Comcast Cable |
| 98.248.228.128 | 2011-11-30 11:18 AM | Comcast Cable |

| IP Address | Date/Time | Provider |
|---|---|---|
| 76.19.161.234 | 2011-11-30 11:13 AM | Comcast Cable |
| 98.212.194.179 | 2011-11-30 09:14 AM | Comcast Cable |
| 24.18.34.196 | 2011-11-30 06:40 AM | Comcast Cable |
| 174.48.250.231 | 2011-11-30 05:49 AM | Comcast Cable |
| 98.240.67.40 | 2011-11-30 05:28 AM | Comcast Cable |
| 24.3.18.180 | 2011-11-30 09:13 AM | Comcast Cable |
| 67.160.29.205 | 2011-11-30 07:11 AM | Comcast Cable |
| 98.220.23.140 | 2011-11-30 06:56 AM | Comcast Cable |
| 68.84.104.102 | 2011-11-30 12:22 AM | Comcast Cable |
| 50.129.226.185 | 2011-11-30 12:00 AM | Comcast Cable |
| 76.115.75.141 | 2011-11-30 02:55 AM | Comcast Cable |
| 98.232.185.114 | 2011-11-30 02:30 AM | Comcast Cable |
| 76.112.211.92 | 2011-11-30 02:24 AM | Comcast Cable |
| 68.40.104.242 | 2011-11-30 05:11 AM | Comcast Cable |
| 67.172.134.150 | 2011-11-30 03:45 AM | Comcast Cable |
| 76.16.251.122 | 2011-11-30 03:12 AM | Comcast Cable |
| 98.245.246.108 | 2011-11-30 01:24 AM | Comcast Cable |
| 174.52.151.246 | 2011-11-30 01:14 AM | Comcast Cable |
| 24.17.15.19 | 2011-11-30 12:43 AM | Comcast Cable |
| 69.245.1.182 | 2011-11-30 02:15 AM | Comcast Cable |
| 98.194.207.194 | 2011-11-30 02:01 AM | Comcast Cable |
| 98.223.170.193 | 2011-11-30 01:39 AM | Comcast Cable |
| 67.172.122.15 | 2011-12-01 04:42 AM | Comcast Cable |
| 98.249.104.170 | 2011-12-01 04:17 AM | Comcast Cable |
| 98.245.240.72 | 2011-12-01 03:43 AM | Comcast Cable |
| 76.30.123.49 | 2011-12-01 12:18 PM | Comcast Cable |
| 67.169.19.241 | 2011-12-01 09:41 AM | Comcast Cable |
| 69.251.152.48 | 2011-12-01 09:12 AM | Comcast Cable |
| 107.3.135.198 | 2011-12-01 01:09 PM | Comcast Cable |
| 24.12.140.136 | 2011-12-02 09:46 PM | Comcast Cable |
| 98.243.215.85 | 2011-12-02 03:29 PM | Comcast Cable |
| 98.230.56.188 | 2011-12-02 03:51 AM | Comcast Cable |
| 69.143.25.65 | 2011-12-02 12:03 AM | Comcast Cable |
| 24.23.244.81 | 2011-12-04 08:59 PM | Comcast Cable |
| 24.62.60.212 | 2011-12-05 03:30 AM | Comcast Cable |
| 98.228.0.139 | 2011-12-05 12:00 AM | Comcast Cable |
| 174.58.6.21 | 2011-12-07 10:44 AM | Comcast Cable |
| 67.173.54.67 | 2011-10-07 12:07 AM | Comcast Cable |
| 24.118.24.199 | 2011-10-10 12:45 PM | Comcast Cable |
| 67.176.168.10 | 201-10-13 01:05 AM | Comcast Cable |
| 98.242.186.85 | 2011-10-14 12:25 AM | Comcast Cable |
| 75.65.59.254 | 2011-10-14 05:05 AM | Comcast Cable |

Case 2:12-cv-04703-ER    Document 1-1    Filed 08/17/12    Page 10 of 32

| | | |
|---|---|---|
| 71.200.160.48 | 2011-10-23 07:51 AM | Comcast Cable |
| 76.113.247.188 | 2011-10-26 12:00 AM | Comcast Cable |
| 71.59.187.17 | 2011-10-26 08:32 PM | Comcast Cable |
| 76.118.202.2 | 2011-10-29 01:10 AM | Comcast Cable |
| 68.83.249.180 | 2011-11-22 03:55 AM | Comcast Cable |
| 76.109.154.248 | 2011-11-22 09:02 PM | Comcast Cable |
| 67.186.163.136 | 2011-11-23 07:52 PM | Comcast Cable |
| 98.232.194.205 | 2011-11-23 09:09 PM | Comcast Cable |
| 50.131.16.215 | 2011-11-24 02:40 PM | Comcast Cable |
| 24.17.153.170 | 2011-11-26 02:27 AM | Comcast Cable |
| 67.170.208.34 | 2011-11-26 05:44 AM | Comcast Cable |
| 71.204.186.169 | 2011-11-26 07:18 AM | Comcast Cable |
| 76.123.3.176 | 2011-11-26 09:16 PM | Comcast Cable |
| 76.107.7.55 | 2011-11-27 01:40 AM | Comcast Cable |
| 71.236.187.64 | 2011-11-27 10:55 AM | Comcast Cable |
| 67.184.105.187 | 2011-11-29 11:17 PM | Comcast Cable |
| 24.21.246.25 | 2011-11-30 01:01 AM | Comcast Cable |
| 68.48.249.91 | 2011-12-01 01:50 AM | Comcast Cable |
| 24.218.28.170 | 2011-12-04 12:28 AM | Comcast Cable |
| 76.103.9.149 | 2011-12-05 02:12 AM | Comcast Cable |
| 71.229.144.51 | 2011-12-06 03:19 PM | Comcast Cable |
| 76.98.245.194 | 2011-11-29 11:10 PM | Comcast Cable |
| 67.160.219.73 | 2011-11-29 11:26 PM | Comcast Cable |
| 76.24.113.211 | 2011-11-29 11:18 PM | Comcast Cable |
| 24.245.40.122 | 2011-11-29 03:20 PM | Comcast Cable |
| 68.35.68.74 | 2011-11-29 04:52 PM | Comcast Cable |
| 24.7.178.30 | 2011-11-30 06:30 PM | Comcast Cable |
| 24.131.19.11 | 2011-11-30 10:05 AM | Comcast Cable |
| 76.98.254.35 | 2011-11-30 09:40 AM | Comcast Cable |
| 67.164.32.143 | 2011-11-30 05:07 AM | Comcast Cable |
| 68.32.136.153 | 2011-11-30 12:50 AM | Comcast Cable |
| 50.133.225.38 | 2011-11-30 03:02 AM | Comcast Cable |
| 98.228.50.9 | 2011-11-30 12:07 AM | Comcast Cable |
| 24.7.166.219 | 2011-11-30 06:08 AM | Comcast Cable |
| 71.192.175.9 | 2011-11-30 08:42 AM | Comcast Cable |
| 68.63.66.194 | 2011-12-01 04:14 AM | Comcast Cable |
| 68.36.122.151 | 2011-12-01 04:43 AM | Comcast Cable |
| 67.171.235.110 | 2011-12-01 06:17 PM | Comcast Cable |
| 24.98.32.24 | 2011-12-02 08:18 AM | Comcast Cable |
| 76.21.33.226 | 2011-12-02 10:55 AM | Comcast Cable |
| 98.230.56.188 | 2011-12-02 02:40 AM | Comcast Cable |
| 71.61.18.14 | 2011-12-02 03:11 PM | Comcast Cable |

Case ID: 120401874

| 66.41.167.160 | 2011-12-02 09:45 PM | Comcast Cable |
| 98.200.146.249 | 2011-12-02 12:25 AM | Comcast Cable |
| 98.220.10.146 | 2011-12-03 08:42 AM | Comcast Cable |
| 67.173.52.14 | 2011-12-03 11:27 AM | Comcast Cable |
| 68.53.80.60 | 2011-12-03 12:08 PM | Comcast Cable |
| 66.56.20.172 | 2011-12-03 11:22 PM | Comcast Cable |
| 66.30.61.35 | 2011-12-03 10:38 PM | Comcast Cable |
| 75.73.53.66 | 2011-12-03 02:46 AM | Comcast Cable |
| 71.235.47.88 | 2011-12-03 07:02 AM | Comcast Cable |
| 24.4.36.255 | 2011-12-04 12:00 AM | Comcast Cable |

Case ID: 120401874

| Host IP address | Hit Date(UTC) | ISP |
|---|---|---|
| 174.62.77.249 | 2012.01.30 11:41 PM | Comcast Cable |
| 71.201.68.36 | 2012.01.30 05:21 PM | Comcast Cable |
| 76.127.138.192 | 2012.01.31 09:28 AM | Comcast Cable |
| 71.227.173.75 | 2012.02.01 07:11 AM | Comcast Cable |
| 174.61.160.104 | 2012.02.01 11:46 AM | Comcast Cable |
| 76.103.91.101 | 2012.02.01 12:06 PM | Comcast Cable |
| 76.26.8.170 | 2012.02.01 01:31 PM | Comcast Cable |
| 98.211.44.146 | 2012.02.01 01:57 AM | Comcast Cable |
| 68.48.190.95 | 2012.02.01 03:01 AM | Comcast Cable |
| 71.232.232.68 | 2012.02.01 01:54 PM | Comcast Cable |
| 68.62.201.160 | 2012.02.01 09:47 AM | Comcast Cable |
| 98.201.135.200 | 2012.02.01 04:52 AM | Comcast Cable |
| 71.233.55.147 | 2012.02.01 06:06 AM | Comcast Cable |
| 98.201.93.204 | 2012.02.01 05:33 PM | Comcast Cable |
| 98.210.153.137 | 2012.02.02 10:24 AM | Comcast Cable |
| 174.55.183.118 | 2012.02.02 06:02 PM | Comcast Cable |
| 76.98.205.144 | 2012.02.02 06:55 AM | Comcast Cable |
| 67.180.9.72 | 2012.02.02 10:44 AM | Comcast Cable |
| 76.112.234.27 | 2012.02.02 05:18 AM | Comcast Cable |
| 66.41.70.233 | 2012.02.02 08:27 AM | Comcast Cable |
| 98.228.234.202 | 2012.02.02 03:39 AM | Comcast Cable |
| 75.64.63.167 | 2012.02.02 06:19 AM | Comcast Cable |
| 50.138.14.18 | 2012.02.02 07:13 PM | Comcast Cable |
| 98.201.173.184 | 2012.02.02 03:42 PM | Comcast Cable |
| 71.62.39.126 | 2012.02.02 04:06 PM | Comcast Cable |
| 67.173.176.20 | 2012.02.02 02:50 AM | Comcast Cable |
| 67.180.246.181 | 2012.02.03 05:45 AM | Comcast Cable |
| 67.190.219.254 | 2012.02.03 12:13 PM | Comcast Cable |
| 50.135.123.88 | 2012.02.03 01:57 PM | Comcast Cable |
| 50.138.90.193 | 2012.02.03 10:54 PM | Comcast Cable |
| 71.193.238.135 | 2012.02.03 10:25 AM | Comcast Cable |
| 69.248.163.60 | 2012.02.03 05:38 PM | Comcast Cable |
| 71.204.180.24 | 2012.02.03 03:19 PM | Comcast Cable |
| 24.7.12.185 | 2012.02.03 07:34 AM | Comcast Cable |

Case ID: 120401874

| IP Address | Timestamp | Provider |
|---|---|---|
| 24.99.129.129 | 2012.02.04 08:55 AM | Comcast Cable |
| 98.194.139.147 | 2012.02.04 08:25 AM | Comcast Cable |
| 75.72.36.80 | 2012.02.04 01:23 PM | Comcast Cable |
| 76.21.212.251 | 2012.02.04 06:31 AM | Comcast Cable |
| 24.129.41.159 | 2012.02.04 05:11 AM | Comcast Cable |
| 76.31.236.19 | 2012.02.04 12:58 AM | Comcast Cable |
| 24.20.43.72 | 2012.02.04 03:17 AM | Comcast Cable |
| 24.118.49.154 | 2012.02.04 08:34 AM | Comcast Cable |
| 174.51.15.224 | 2012.02.04 09:20 AM | Comcast Cable |
| 67.170.155.37 | 2012.02.04 05:16 AM | Comcast Cable |
| 24.7.202.229 | 2012.02.04 09:32 AM | Comcast Cable |
| 173.164.198.6 | 2012.02.04 09:15 AM | Comcast Business Communications |
| 24.1.206.5 | 2012.02.04 05:26 AM | Comcast Cable |
| 71.227.177.203 | 2012.02.05 09:16 AM | Comcast Cable |
| 24.99.103.130 | 2012.02.05 09:16 PM | Comcast Cable |
| 75.69.193.166 | 2012.02.05 05:49 PM | Comcast Cable |
| 98.207.115.124 | 2012.02.05 03:41 AM | Comcast Cable |
| 69.245.21.74 | 2012.02.05 04:28 PM | Comcast Cable |
| 71.63.238.74 | 2012.02.05 07:07 AM | Comcast Cable |
| 24.0.77.161 | 2012.02.05 12:54 AM | Comcast Cable |
| 75.151.58.93 | 2012.02.05 11:15 AM | Comcast Business Communications |
| 174.59.37.205 | 2012.02.05 01:52 PM | Comcast Cable |
| 68.61.0.136 | 2012.02.05 10:20 PM | Comcast Cable |
| 76.121.187.92 | 2012.02.06 07:52 PM | Comcast Cable |
| 24.15.193.98 | 2012.02.06 12:30 AM | Comcast Cable |
| 68.55.186.48 | 2012.02.06 06:19 AM | Comcast Cable |
| 71.224.159.15 | 2012.02.06 09:34 PM | Comcast Cable |
| 71.206.160.198 | 2012.02.06 05:58 PM | Comcast Cable |
| 24.128.245.101 | 2012.02.07 11:36 PM | Comcast Cable |
| 68.33.182.81 | 2012.02.07 05:04 AM | Comcast Cable |
| 68.61.68.170 | 2012.02.07 03:00 AM | Comcast Cable |
| 68.38.250.1 | 2012.02.07 05:38 AM | Comcast Cable |
| 67.182.212.69 | 2012.02.07 05:37 AM | Comcast Cable |
| 71.206.202.23 | 2012.02.07 06:40 AM | Comcast Cable |
| 67.177.4.174 | 2012.02.08 05:37 AM | Comcast Cable |

Case ID: 120401874

| IP Address | Date/Time | Provider |
|---|---|---|
| 67.161.186.120 | 2012.02.08 02:53 PM | Comcast Cable |
| 24.128.189.32 | 2012.02.08 03:51 AM | Comcast Cable |
| 68.33.189.172 | 2012.02.08 07:48 PM | Comcast Cable |
| 98.210.123.62 | 2012.02.08 08:49 PM | Comcast Cable |
| 24.61.139.74 | 2012.02.08 03:43 AM | Comcast Cable |
| 76.21.212.70 | 2012.02.08 05:39 AM | Comcast Cable |
| 98.252.84.194 | 2012.02.09 12:31 AM | Comcast Cable |
| 68.63.139.38 | 2012.02.09 12:07 AM | Comcast Cable |
| 24.22.29.108 | 2012.02.09 03:07 PM | Comcast Cable |
| 98.254.195.114 | 2012.02.09 07:29 PM | Comcast Cable |
| 174.48.171.241 | 2012.02.09 10:27 PM | Comcast Cable |
| 76.109.183.215 | 2012.02.09 07:23 PM | Comcast Cable |
| 67.185.16.254 | 2012.02.10 03:50 PM | Comcast Cable |
| 71.204.157.168 | 2012.02.10 02:33 PM | Comcast Cable |
| 24.10.225.69 | 2012.02.10 09:36 PM | Comcast Cable |
| 76.21.248.109 | 2012.02.10 11:38 PM | Comcast Cable |
| 67.175.162.89 | 2012.02.10 04:03 AM | Comcast Cable |
| 69.251.206.240 | 2012.02.10 10:14 PM | Comcast Cable |
| 71.197.169.37 | 2012.02.10 12:03 AM | Comcast Cable |
| 76.103.49.147 | 2012.02.10 12:31 AM | Comcast Cable |
| 98.252.146.23 | 2012.02.10 04:03 AM | Comcast Cable |
| 76.115.101.170 | 2012.02.10 04:32 AM | Comcast Cable |
| 76.115.56.111 | 2012.02.10 05:43 AM | Comcast Cable |
| 68.35.247.227 | 2012.02.10 07:27 AM | Comcast Cable |
| 71.197.66.161 | 2012.02.10 06:48 PM | Comcast Cable |
| 24.20.218.62 | 2012.02.10 06:27 PM | Comcast Cable |
| 67.174.199.102 | 2012.02.10 04:34 AM | Comcast Cable |
| 75.73.80.254 | 2012.02.10 09:36 AM | Comcast Cable |
| 24.22.72.26 | 2012.02.10 12:34 AM | Comcast Cable |
| 76.24.26.177 | 2012.02.11 05:13 AM | Comcast Cable |
| 98.202.12.122 | 2012.02.11 12:21 PM | Comcast Cable |
| 75.68.235.221 | 2012.02.11 01:20 PM | Comcast Cable |
| 98.195.122.221 | 2012.02.11 11:29 PM | Comcast Cable |
| 98.244.182.8 | 2012.02.11 05:04 AM | Comcast Cable |
| 71.196.156.78 | 2012.02.11 03:24 AM | Comcast Cable |

Case 2:12-cv-04703-ER    Document 1-1    Filed 08/17/12    Page 15 of 32

Case ID: 120401874

| IP Address | Date/Time | Provider |
|---|---|---|
| 76.120.135.114 | 2012.02.11 03:14 PM | Comcast Cable |
| 24.130.112.113 | 2012.02.11 12:41 AM | Comcast Cable |
| 98.204.153.165 | 2012.02.11 01:32 PM | Comcast Cable |
| 68.36.169.204 | 2012.02.11 09:53 PM | Comcast Cable |
| 68.49.52.196 | 2012.02.11 03:39 PM | Comcast Cable |
| 68.50.140.209 | 2012.02.11 06:13 AM | Comcast Cable |
| 76.125.18.166 | 2012.02.11 03:01 PM | Comcast Cable |
| 24.62.101.33 | 2012.02.12 01:24 PM | Comcast Cable |
| 24.218.146.114 | 2012.02.12 06:30 AM | Comcast Cable |
| 24.16.101.128 | 2012.02.12 05:02 AM | Comcast Cable |
| 173.12.98.230 | 2012.02.12 07:47 PM | Comcast Business Communications |
| 50.129.10.239 | 2012.02.12 08:59 PM | Comcast Cable |
| 24.245.3.14 | 2012.02.12 11:14 PM | Comcast Cable |
| 71.59.242.98 | 2012.02.12 12:55 AM | Comcast Cable |
| 98.252.165.91 | 2012.02.12 02:46 AM | Comcast Cable |
| 69.181.54.185 | 2012.02.12 07:24 PM | Comcast Cable |
| 24.61.187.110 | 2012.02.13 03:29 AM | Comcast Cable |
| 107.3.168.14 | 2012.02.13 12:20 AM | Comcast Cable |
| 98.219.56.42 | 2012.02.13 03:14 AM | Comcast Cable |
| 71.59.7.29 | 2012.02.13 08:59 AM | Comcast Cable |
| 24.7.123.209 | 2012.02.13 08:18 AM | Comcast Cable |
| 98.197.116.85 | 2012.02.14 01:25 PM | Comcast Cable |
| 67.191.65.135 | 2012.02.14 04:02 PM | Comcast Cable |
| 67.162.194.242 | 2012.02.14 10:53 PM | Comcast Cable |
| 24.18.118.63 | 2012.02.14 11:55 PM | Comcast Cable |
| 174.55.165.113 | 2012.02.14 09:37 AM | Comcast Cable |
| 70.89.66.61 | 2012.02.14 05:50 PM | Comcast Business Communications |
| 67.186.41.198 | 2012.02.15 03:53 AM | Comcast Cable |
| 68.52.5.169 | 2012.02.15 07:21 AM | Comcast Cable |
| 75.145.115.77 | 2012.02.15 05:53 AM | Comcast Business Communications |
| 98.242.218.223 | 2012.02.15 09:06 AM | Comcast Cable |
| 24.23.241.112 | 2012.02.15 05:44 AM | Comcast Cable |
| 98.234.26.211 | 2012.02.15 04:25 PM | Comcast Cable |
| 76.97.48.93 | 2012.02.15 08:50 PM | Comcast Cable |
| 98.208.8.233 | 2012.02.15 01:19 AM | Comcast Cable |

Case ID: 120401874

| IP Address | Timestamp | ISP |
|---|---|---|
| 76.22.60.198 | 2012.02.15 11:04 PM | Comcast Cable |
| 67.167.163.207 | 2012.02.15 02:53 AM | Comcast Cable |
| 67.161.178.225 | 2012.02.15 12:00 AM | Comcast Cable |
| 24.9.232.102 | 2012.02.15 02:27 AM | Comcast Cable |
| 98.239.88.189 | 2012.02.15 07:54 AM | Comcast Cable |
| 24.21.128.122 | 2012.02.15 07:15 AM | Comcast Cable |
| 67.173.228.11 | 2012.02.16 09:42 PM | Comcast Cable |
| 69.181.60.100 | 2012.02.16 08:15 AM | Comcast Cable |
| 71.228.233.235 | 2012.02.16 06:09 AM | Comcast Cable |
| 71.238.52.18 | 2012.02.16 01:12 AM | Comcast Cable |
| 98.244.55.162 | 2012.02.16 08:51 AM | Comcast Cable |
| 71.197.96.239 | 2012.02.16 09:48 PM | Comcast Cable |
| 98.246.240.66 | 2012.02.16 11:56 PM | Comcast Cable |
| 24.5.42.67 | 2012.02.16 08:09 PM | Comcast Cable |
| 68.82.158.160 | 2012.02.16 01:33 PM | Comcast Cable |
| 71.204.188.114 | 2012.02.16 11:09 PM | Comcast Cable |
| 75.65.6.49 | 2012.02.16 03:50 PM | Comcast Cable |
| 76.113.208.75 | 2012.02.16 11:38 PM | Comcast Cable |
| 76.99.55.76 | 2012.02.16 08:42 AM | Comcast Cable |
| 98.218.1.81 | 2012.02.16 09:11 AM | Comcast Cable |
| 75.149.178.34 | 2012.02.16 08:09 AM | Comcast Business Communications |
| 24.127.171.241 | 2012.02.16 04:08 PM | Comcast Cable |
| 50.78.253.49 | 2012.02.16 04:13 PM | Comcast Business Communications |
| 174.48.120.105 | 2012.02.16 11:18 PM | Comcast Cable |
| 76.108.120.176 | 2012.02.16 12:24 AM | Comcast Cable |
| 98.235.129.242 | 2012.02.17 04:01 AM | Comcast Cable |
| 67.175.52.165 | 2012.02.17 09:42 AM | Comcast Cable |
| 67.164.191.53 | 2012.02.17 09:06 AM | Comcast Cable |
| 24.7.2.214 | 2012.02.17 07:25 AM | Comcast Cable |
| 76.103.80.176 | 2012.02.17 10:14 AM | Comcast Cable |
| 65.96.164.225 | 2012.02.17 09:57 AM | Comcast Cable |
| 24.147.161.203 | 2012.02.17 09:51 AM | Comcast Cable |
| 98.233.221.104 | 2012.02.17 03:20 AM | Comcast Cable |
| 24.1.147.209 | 2012.02.17 05:48 AM | Comcast Cable |
| 24.13.158.145 | 2012.02.17 07:26 AM | Comcast Cable |

Case ID: 120401874

Comcast Cable
Comcast Cable

2012.02.17 12:42 AM
2012.02.17 01:18 PM

98.244.207.87
76.21.208.98

FILED

17 APR 2012 03:46 pm

Civil Administration

J. EVERS

### In the Court of Common Pleas of Philadelphia
### Civil Trial Division

| Liberty Media Holdings, LLC, *Plaintiff,* | Jury Trial Demanded |
|---|---|
| v. | Term 2012 |
| John Does 1-441, *Defendants.* | No. |

### Order.

Today, this _____ day of _____ 2012, this Court hereby orders that plaintiff's Motion for Leave to Take Pre-Complaint Discovery is granted.

In light of the Cable TV Privacy Act of 1984, 47 USC §551, plaintiff may issue a subpoena to internet service provider Comcast to obtain subscriber identification information relating to the IP addresses attached as EXHIBIT A to this Order.

Upon receipt of this subpoena, Comcast will provide notice of the subpoena to its subscribers under the Cable TV Privacy Act. Comcast will then turn over the information plaintiff requests after waiting 20 days, under the guidelines provided by Pa.R.Civ.P. 4009.21.

This Court has contemplated the Cable TV Privacy Act and this order specifically complies with the Act's requirements.

BY THE COURT:

_____

, J.

Case ID: 120401874

Control No.: 12042085

By: A. Jordan Rushie
Jordan@FishtownLaw.com
Pa. Id. 209066
Mulvihill & Rushie LLC
2424 East York Street · Suite 316
Philadelphia, PA 19125
215.385.5291                                    Attorneys for Plaintiff

### In the Court of Common Pleas of Philadelphia
### Civil Trial Division

| Liberty Media Holdings, LLC, *Plaintiff,* | Jury Trial Demanded |
|---|---|
| v. | Term 2012 |
| John Does 1-441, *Defendants.* | No. |

### Motion for Hearing to Take Pre-Complaint Discovery
### Under Pa.R.Civ.P. 4003.8

Plaintiff Liberty Media Holdings, LLC, though its attorney A. Jordan Rushie of Mulvihill & Rushie LLC, moves this honorable Court to grant its Motion for Leave to Take Pre-Complaint Discovery under Pa. R. Civ. P. 4008.3. Plaintiff states the following in support of its motion:

1.  Plaintiff is a California LLC that produces and distributes adult films.

2.  Plaintiff began this action on Tuesday, April 17, 2012, by filing a Writ of Summons against John Does 1-441.

3.  Plaintiff believes that defendants, John Does 1-441, have illegally shared its content via the internet.

4.  Defendants John Does 1-441, to date, have been identified only by internet protocol (IP) addresses.

Liberty Media Holdings LLC v. John Does 1-441
*Motion for Lease to Take Pre-Complaint Discovery Under Pa.R.Civ.P. 4003.8*

4.1.   An IP address is a numerical label assigned to a device (like a computer) that participates in a computer network that uses the internet protocol for communication.

4.2.   An IP address is a unique identifying number for a computer connection that is assigned by an internet service provider to an internet service subscriber. It is similar to a telephone number.

5.   Plaintiff does not possess information identifying defendants other than 441 IP address.

6.   To file a sufficient complaint against the Doe defendants, plaintiff must conduct pre-complaint discovery so it may:

      6.1.   Identify defendants;

      6.2.   Serve defendants; and

      6.3.   Notify defendants of the claims against them.

7.   Pa.R.Civ.P. 4003.8 provides that a plaintiff may obtain pre-complaint discovery where the information plaintiff seeks is material and necessary to the filing of the complaint. Furthermore, the rule requires that the discovery will not cause unreasonable annoyance, embarrassment, oppression, burden, or expense to any person or party.

8.   In *McNeil v. Jordan*,[1] the Pennsylvania Supreme Court explained the standard for obtaining pre-complaint discovery:

> To obtain pre-complaint discovery, a litigant should be required to demonstrate his good faith as well as probable cause that the information sought is both material and necessary to the filing of a complaint in a pending action. A plaintiff should describe with reasonable detail the materials sought, and state with

---

[1] 586 Pa. 413, 443 (Pa. 2006). This standard was later codified in Rule 4003.8

2

Case ID: 120401874

Control No.: 12042085

Liberty Media Holdings LLC v. John Does 1-441
*Motion for Leave to Take Pre-Complaint Discovery Under Pa.R.Civ.P. 4003.8*

particularity probable cause for believing the infor-
mation will materially advance his pleading, as well
as averring that, but for the discovery request, he will
be unable to formulate a legally sufficient pleading.
Under no circumstance should a plaintiff be allowed
to embark upon a "fishing expedition," or otherwise
rely on an amorphous discovery process to detect a
cause of action he lacks probable cause to anticipate
prior to the pre-complaint discovery process under
this standard. The reasonableness of a given request,
as well as the existence of probable cause and the
good faith of the party seeking discovery, are matters
for the trial court to determine in the exercise of its
sound discretion.

9.  In this case, the John Doe defendants' identities are material
and necessary to the filing of a complaint.

10. The defendants' identities are necessary to advance this case to
the point where plaintiff may file a legally sufficient complaint;
the defendants' identities are essential to name and properly
serve them. Pre-complaint discovery is essential to learn the
identities of the persons behind these IP addresses.

11. This is not a "fishing expedition" like that which the Supreme
Court cautioned against in *McNeil*. In this case, plaintiff already
possesses the IP addresses of those individuals who have down-
loaded and shared its content without permission.

12. This pre-complaint discovery request is reasonable. Plaintiff
seeks leave to subpoena Comcast, an internet service provider,
to learn the identities of the owners of the IP addresses that have
downloaded and shared plaintiff's materials by downloading and
sharing its content without making proper payment to plaintiff.

3

Case ID: 120401874
Control No.: 12042085

Case 2:12-cv-04703-ER    Document 1-1    Filed 08/17/12    Page 22 of 32

Liberty Media Holdings LLC v. John Does 1-441
*Motion for Leave to Take Pre-Complaint Discovery Under Pa.R.Civ.P. 4003.8*

13. Without the identities of the owners of the IP addresses already in plaintiff's possession, it cannot file a sufficient complaint, nor can it properly serve all defendants under Pa.R.Civ. P. 400.

WHEREFORE, plaintiff Liberty Media Holdings, LLC, requests that this Court grant its Motion for Leave to Pre-Complaint Discovery and enter the proposed order that accompanies this Motion.

RESPECTFULLY SUBMITTED,

A. Jordan Rushie
Jordan@FishtownLaw.com
Pa. Id. 209066
Mulvihill & Rushie LLC
2424 East York Street · Suite 316
Philadelphia, PA 19125
215.385.5291

4

Case ID: 120401874
Control No.: 12042085

By: A. Jordan Rushie
Jordan@FishtownLaw.com
Pa. Id. 209066
Mulvihill & Rushie LLC
2424 East York Street · Suite 316
Philadelphia, PA 19125
215.385.5291

Attorneys for Plaintiff

### In the Court of Common Pleas of Philadelphia
### Civil Trial Division

| Liberty Media Holdings, LLC, *Plaintiff,* | Jury Trial Demanded |
|---|---|
| v. | Term 2012 |
| John Does 1-441, *Defendants.* | No. |

**Plaintiff's Memorandum of Law Supporting its Motion for Leave to Take Pre-Complaint Discovery Under Pa.R.Civ.P. 4003.8**

*Summary of the Argument: A plaintiff may obtain pre-complaint discovery where the information it seeks is material and necessary to file its complaint, and the discovery will not cause unreasonable annoyance, embarrassment, oppression, burden, or expense to any person or party. The Court may require a plaintiff requesting this pre-complaint discovery to particularly state how it will materially advance the preparation of a complaint. In this case, begun by a writ of summons, plaintiff has in its possession a list of Internet Protocol (IP) addresses of John Does who illegally downloaded and shared plaintiff's content. Plaintiff requests that this Court grant its motion so it may obtain the identities of John Does 1-441 from the internet service provider Comcast, and properly initiate legal proceedings to vindicate its rights against those who illegally shared plaintiff's content. Defendants will not be steamrolled or surprised by this discovery request, as the Cable TV Privacy Act of 1984 provides that any internet service provider notify customers before it discloses identifying information.*

Case ID: 120401874

Control No.: 12042085

Liberty Media Holdings LLC v. John Does 1-441

*Plaintiff's Memorandum f Law in Support of its Motion for Leave to Take Pre-Complaint Discovery Under Pa.R.Civ.P. 4003.8*

### 1.  Matter before the Court.

Before this Court is plaintiff's request for leave of court to take pre-complaint discovery to serve a subpoena upon Comcast, a cable TV and internet service provider in Pennsylvania..

### 2.  Statement of Question Involved.

Question: This is a case where pre-complaint discovery is necessary to identify the proper defendants against whom plaintiff may file a legally-sufficient complaint. In such a case, should the Court grant a request for leave of court to take pre-complaint discovery, that plaintiff may obtain the identities of the defendant to file a complaint?

Suggested Answer: Yes.

### 3.  Facts.

#### 3.1.Introduction.

A flash mob of ski-masked thieves barge into an electronics store. They run over to the DVD rack, stuff their pockets, then promptly run out the door. But these thieves weren't the sharpest tools in the shed — each was wearing a shirt with their home telephone number prominently printed on the back of it. And unfortunately for them, they didn't realize that a video camera in the store recorded the entire incident. The police, reviewing the surveillance footage, see the phone numbers, link the phone numbers to the thieves, and prosecute them for theft.

Now imagine that happened over the internet, and you understand precisely what happened here.

In this case, a swarm of individuals, believing they were anonymous, downloaded and shared plaintiff's content using BitTorrent, an online file-sharing protocol. While they thought their anonymity would shield them from being identified, they missed something.

2

Case ID: 120401874

Control No.: 12042085

Just like the ski masked mob, each of the John Doe defendants in this case left behind the electronic equivalent of their phone number printed on the back of their shirt — their internet protocol (IP) address.[2]

With this motion, plaintiff asks this Court to provide it with the tools to electronically unmask the 441 John Doe defendants. Plaintiff desires to serve a subpoena on Comcast Cable to link the IP addresses to the individuals behind them, based on its belief that the users of these IP addresses downloaded and distributed plaintiff's content.

### 3.2. The Parties — A Pornography Company and 441 Doe Defendants.

Plaintiff Liberty Media Holdings is a California Limited Liability Company doing business as CORBIN FISHER®. Liberty Media produces, markets, and distributes adult entertainment products, including Internet website content, videos, DVDs, photographs, etc. Plaintiff operates and maintains a website by and through which individuals who pay a monthly subscription fee can view its photographic and audiovisual works.

Defendant Does 1—441 are individuals whose true names and addresses are unknown to Plaintiff. These Doe defendants duplicated and distributed unauthorized and infringing copies of plaintiff's motion pictures. Plaintiff has obtained the internet protocol addresses assigned to the individual defendants.

Plaintiff can only further identify the individuals who downloaded and shares plaintiff's material by using pre-complaint discovery.

---

[2] An IP address is similar to a telephone number. It is a numerical label assigned to any device (like a computer or printer) that participates in a computer network that uses the internet protocol for communication. It is an identifier that links internet communication to the individual responsible for the internet account.

Case ID: 120401874

Control No.: 12042085

Liberty Media Holdings LLC v. John Does 1-441

*Plaintiff's Memorandum f Law in Support of its Motion for Leave to Take Pre-Complaint Discovery Under Pa.R.Civ.P. 4003.8*

### 3.3. Plaintiff's Request for Pre-Complaint Discovery.

As part of this pre-complaint discovery investigation, plaintiff intends to subpoena Comcast, an internet service provider, to determine the identity of each internet subscriber assigned the corresponding IP address on the date and time of infringement.

The information which plaintiff will request in subpoenas to be directed to Comcast is governed by 47 U.S.C. §551 (The Cable TV Privacy Act of 1984). The Cable TV Privacy Act prohibits cable operators from disclosing a subscriber's identifying information without either 1) the subscriber's express consent; or 2) a court order that specifically authorizes the disclosure.[3]

Accordingly, plaintiff requests that this Court issue the attached order instructing Comcast Cable to produce all documents or information sufficient to identify the user or users of the respective IP addresses as listed in Exhibit A during the corresponding dates and times.

Additionally, plaintiff asks permission to conduct pre-complaint discovery on each user identified by these internet service providers to determine whether the actual subscriber performed the acts complained of, or it was some other individual with access to the subscriber's internet connection.

### 3.4. Internet Service Providers, Internet Protocol Addresses, and How This Court Will Help Unmask the Defendants.

The infringement and other wrongful acts at issue in this action occurred online. In order execute the illegal acts complained of, a user must connect to the internet.

---

[3] The Act requires the ISP notify the subscriber of any such order. See 47 U.S.C. § 551(c)(2)(B).

4

Individuals gain access to the internet through an internet service provider (ISP). When an ISP provides internet access to a subscriber, it does so through a modem located at the subscriber's home or office. Each time the subscriber accesses the Internet, the ISP provides a unique number to the subscriber called an Internet protocol (IP) address. This is somewhat akin to a telephone number. The IP address for a subscriber may stay the same (a static IP address) or it may change from time to time (a dynamic IP address). An ISP generally records the times and dates it assigns each IP address to a subscriber.

Internet theft of content relies on the ability to identify the computers to and from information streams, which users search and exchange files. The technology identifies those computers through the IP address from which the computer connects to the Internet. In this manner, plaintiff identified the IP addresses from which individuals connected to the internet to unlawfully access plaintiff's works, make electronic copies of those works, and further distribute those works.

Plaintiff recorded the exact date and time individuals used various IP addresses to access the internet to illegally download, copy, and redistribute plaintiff's copyrighted work.

Anyone can perform a simple search on public databases to determine which Internet access provider controls a specific IP address. Plaintiff now seeks to subpoena Comcast, an ISP, to determine the name and address of the subscribers to whom they assigned the various IP addresses recorded.

Case ID: 120401874
Control No.: 12042085

Liberty Media Holdings LLC v. John Does 1-441
*Plaintiff's Memorandum f Law in Support of its Motion for Leave to Take Pre-Complaint Discovery Under Pa.R.Civ.P. 4003.8*

### 3.5. Defendants Are Using BitTorrent to Steal Plaintiff's Works in a Virtual Flashmob Known as a Swarm.

Defendants downloaded and shared plaintiff's material via BitTorrent. BitTorrent is a mechanism though which internet users may share data electronically, and it is a notorious vehicle for internet piracy. Digital motion pictures are among the many types of files shared by BitTorrent users.

Instead of the stereotypical ideal of an internet user downloading a file from a single source, the BitTorrent protocol allows users to join a **swarm**, a group of connections from which they may to download and upload from each other simultaneously.

The life cycle of a file shared using BitTorrent begins with just one individual — the initial propagator, sometimes called a **seed** user or **seeder**. The initial propagator intentionally elects to share a file with a torrent swarm. The original file, in this case, contains plaintiff's entire copyrighted work.

Other members of the swarm connect to the seed to download the file. This download creates an exact digital copy of plaintiff's copyrighted work on each of the downloaders' computers. As additional thieves request the same file, each additional thief joins the collective swarm, and each new thief receives the same or different pieces of the file from each other thief in the swarm who has already downloaded any part of the file.

Eventually, once the initial propagator has distributed each piece of the file to at least one other thief, so that together the pieces downloaded by members of the swarm comprises the whole motion picture when reassembled, the initial propagator may leave the swarm, and the remaining thieves can still obtain a full copy of the motion picture by exchanging the pieces of the motion picture that each one has.

Essentially, these swarms work as a virtual flash mob, working together to facilitate the theft and unauthorized sharing of plaintiff's

6

Case ID: 120401874
Control No.: 12042085

Liberty Media Holdings LLC v. John Does 1-441

*Plaintiff's Memorandum f Law in Support of its Motion for Leave to Take Pre-Complaint Discovery Under Pa.R.Civ.P. 4003.8*

works. Just as the courts hold the individuals in a mob of DVD thieves stealing DVDs from a brick-and-mortar store responsible for their theft, this court should allow plaintiff to proceed and hold the John Doe defendants responsible for theirs. The only difference here is the masked defendants are operating over the internet.

### 3.6. Procedural Background and the Reasons for this Request for Pre-Complaint Discovery.

On Tuesday, April 17, 2012, plaintiff filed an action by writ of summons against 441 John Doe defendants, who have so far been identified by IP address only. Plaintiff believes that these John Doe defendants are Comcast customers.

To properly identify and serve the defendants who illegally shared plaintiff's content, plaintiff must conduct pre-complaint discovery to subpoena the IP address holders' identities. Plaintiff files this motion and ask that this Court grant its request for leave to file pre-complaint discovery for the following reasons:

A.  Pre-complaint discovery is necessary in this case to obtain the information material and necessary to the filing of the complaint—specifically defendants' identities. Plaintiff cannot file a legally sufficient pleading without identifying the defendants as persons, rather than simply as IP addresses;

B.  This request is not a fishing expedition, nor is it meant to cause unreasonable annoyance, embarrassment, oppression, burden, or expense to any person or party. Once this Court grants plaintiff's motion, plaintiff will serve Comcast with a subpoena. Under the Cable TV Privacy Act of 1984 (47 USC §551), Comcast must notice the Doe defendants of the subpoena. After notice, Com-

7

Case ID: 120401874
Control No.: 12042085

Liberty Media Holdings LLC v. John Does 1-441
*Plaintiff's Memorandum f Law in Support of its Motion for Leave to Take Pre-Complaint Discovery Under Pa.R.Civ.P. 4003.8*

cast will provide plaintiff with the subscribers' identify-
ing information;

C. Defendants will not be steamrolled or surprised by this
   action. Under the Cable TV Privacy Act of 1984, 47 USC
   §551(c)(2)(b), a cable provider who provides identifying
   information regarding a customer must first provide no-
   tice to the subscriber before it discloses any such infor-
   mation. This includes internet service providers.

Plaintiff addresses each of these elements in turn in Argument.

## 4. Argument.

### 4.1. Pre-complaint Discovery is Necessary to File a Legally Sufficient Complaint. Though this Discovery, Plaintiff Will Ascertain John Doe Defendants' Identifies.

Plaintiff requires pre-complaint discovery to learn defendants'
identities, that it may properly serve them with civil process.

Plaintiff does not yet have any other identifying information of de-
fendants other than IP address, which uniquely identify the John
Doe defendants. To prosecute its claims to protect its intellectual
property, plaintiff must learn the defendants' identities. These
identities can be discerned by pre-complaint discovery.

Pre-complaint discovered is governed by Pa.R.Civ.P. 4003.8. Rule
4003.8 provides that a plaintiff may obtain pre-complaint discovery
where (1) the information sought is material and necessary to the
filing of the complaint; and (2) the discovery will not cause unrea-
sonable annoyance, embarrassment, oppression, burden, or ex-
pense to any person or party.

8

Case ID: 120401874
Control No.: 12042085

In *McNeil v. Jordan*,[4] the Pennsylvania Supreme Court explained the standard for obtaining pre-complaint discovery:

> To obtain pre-complaint discovery, a litigant should be required to demonstrate his good faith as well as probable cause that the information sought is both material and necessary to the filing of a complaint in a pending action. A plaintiff should describe with reasonable detail the materials sought, and state with particularity probable cause for believing the information will materially advance his pleading, as well as averring that, but for the discovery request, he will be unable to formulate a legally sufficient pleading. … The reasonableness of a given request, as well as the existence of probable cause and the good faith of the party seeking discovery, are matters for the trial court to determine in the exercise of its sound discretion.

In this case, the identities of the John Doe defendants is material and necessary to the filing of a complaint against them. Plaintiff seeks the identities of John Doe defendants that have so far been identified only by IP address. Once Comcast provides the identities of these defendants to the plaintiff, then plaintiff will be able to properly name and serve the defendants with process under Pa.R.Civ.P. 400. Furthermore, without this specific identifying information, plaintiff will be wholly unable to prosecute its claims for conversation against defendants.

This request is made in good faith, as plaintiff has already identified, by IP address, those defendants who have illegally downloaded and shared its content.

---

[4] 586 Pa. 413. 443 (Pa. 2006). This standard was later codified in Rule 4003.8

9

Case ID: 120401874

Control No.: 12042085

Liberty Media Holdings LLC v. John Does 1-441
*Plaintiff's Memorandum f Law in Support of its Motion for Leave to Take Pre-Complaint Discovery Under Pa.R.Civ.P. 4003.8*

Additionally, there are no other practical measures plaintiff could take to identify the Doe defendants. Plaintiff is aware of no available information that would identify the infringing users, other than information maintained by their internet service provider. Because of the nature of internet transactions, plaintiff has no way of determining Doe defendants' identities except through a third-party subpoena.

Other courts have indicated that a plaintiff requesting early discovery to identify defendants should justify specific requests and explain how such requests will lead to identifying information about a defendant that would make service of process possible".[5] The process explained above shows precisely how plaintiff's request will lead to the identification of defendants that will make service possible.

Sometimes, the internet subscriber is not the proper defendant in an action like as this. Plaintiff may seek to depose and issue interrogatories to the internet subscriber identified by the ISPs to determine whether any specific subscriber is a proper defendant in this action. Plaintiff believes that pre-complaint discovery under Pa.R.Civ.P 4003.8 is the only proper method to made this determination.

Therefore, plaintiff respectfully requests that this Court finds that it has satisfied the Supreme Court's requirements for pre-complaint

[5] *Columbia Ins. Co. v. Seescandy.com*, 185 F.R.D. 573, 580 (N.D. Cal 1999). The *Columbia* court additionally explained that "[s]ervice of process can pose a special dilemma for plaintiffs in cases ... in which the tortuous activity occurred entirely on-line." 185 F.R.D. at 580. For a further discussion of John Doe defendants, see *Gillespie v. Civiletti*, 629 F. 2d 637, 642 (9th Cir. 1980) ("As a general rule, the use of 'John Doe' to identify a defendant is not favored. However, situations arise ... where the identity of alleged defendants will not be known prior to the filing of a complaint. In such circumstances, the plaintiff should be given an opportunity through discovery to identify the unknown defendants, unless it is clear that discovery would not uncover the identities, or that the complaint would be dismissed on other grounds.") (internal citations omitted).

10

Case ID: 120401874
Control No.: 12042085

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Liberty Media Holdings, LLC | : | |
| | : | Docket No. 2:12-cv-04703-ER |
| Plaintiff | : | |
| | : | |
| vs. | : | |
| | : | |
| John Does, 1-265 | : | **NOTICE OF DISMISSAL** |
| | : | |
| Defendants | : | |

Pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i), the plaintiff, Liberty Media Holdings, LLC, hereby voluntarily dismisses the above matter, without prejudice, as the opposing parties have not served an answer or a motion for summary judgment.

Respectfully Submitted,

**Mulvihill & Rushie, LLC**

/S/

Date: September 5, 2012

A. Jordan Rushie
2424 East York Street, Suite 316
Philadelphia, PA 19125
Tel: (215) 385-5291
E-mail: Jordan@fishtownlaw.com

## Certificate of Service

I, A. Jordan Rushie, Esquire, served this notice of voluntary dismissal upon the following parties:

Charles Thomas, Esquire
**The Thomas Firm**
117 West Gay Street
Suite 316
West Chester, PA 19380

Corey J. Osborn
Tucker Law Group
1617 JFK Boulevard, Suite 1700
Philadelphia, PA 19103
Counsel for Comcast

Dated: September 5, 2012