# EXHIBIT "1"

# EXHIBIT "1"

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1                    ARBITRATION BEFORE

2         JUDICIAL ARBITRATION AND MEDIATION SERVICE

3

4      MARC J. RANDAZZA,                )
                                        )
5               Complainant,            )
                                        )
6      vs.                              ) Ref. No. 1260002283
                                        )
7      EXCELSIOR MEDIA                  )
       CORPORATION, a Nevada            )
8      corporation; LIBERTY             )
       MEDIA HOLDINGS, LLC, a           )
9      California limited               )
       liability company; and          )
10     JASON GIBSON,                    )
       individually,                    )
11                                      )
                Respondents.            )
12     _____ )

13

14          TRANSCRIPT OF ARBITRATION PROCEEDINGS

15                       VOLUME I

16     BEFORE THE HONORABLE STEPHEN E. HABERFELD

17        Taken on Monday, February 9, 2015

18          At 3800 Howard Hughes Parkway

19                   Eleventh Floor

20               Las Vegas, Nevada

21

22

23

24

25     REPORTED BY:   JO A. SCOTT, RPR, CCR NO. 669

**CERTIFIED COPY**

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1    APPEARANCES:

 2       For the Complainant:

 3           KENNETH P. WHITE, ESQ.
             HENRY L. WHITEHEAD, ESQ.
 4           Brown White & Newhouse
             333 South Hope Street
 5           40th Floor
             Los Angeles, California 90071
 6           (213) 613-0500

 7       For the Respondents:

 8           WENDY MEDURA KRINCEK, ESQ.
             ETHAN THOMAS, ESQ.
 9           Littler Mendelson
             3960 Howard Hughes Parkway
10           Suite 300
             Las Vegas, Nevada 89169
11           (702) 862-8800

12       Also Present:

13           MARC J. RANDAZZA
             JASON GIBSON
14           BRIAN LOWDERMAN
             BRIAN DUNLAP
15

16

17                    I N D E X

18    WITNESS                              PAGE

19    MARC J. RANDAZZA
         Direct Examination by Mr. White      13
20

21

22

23

24

25
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1            MR. WHITE:  That is correct, Your Honor.
 2            ARBITRATOR HABERFELD:  Okay.
 3   Mr. Randazza, I would ask you please, before we
 4   get started, would you kindly print your name and
 5   business address, and then I'm going to ask you to
 6   please stand after you've done that, face me --
 7   or, actually, our court reporter, whom we have
 8   present, and to be sworn as a witness.
 9            MR. WHITE:  Mr. Randazza will be doing
10   that by affirmation.
11            ARBITRATOR HABERFELD:  That's fine.
12            And you know how to do that,
13   Ms. Reporter?
14            THE COURT REPORTER:  Yes.
15            ARBITRATOR HABERFELD:  Fine.
16            MR. WHITE:  Where would you like
17   Mr. Randazza to sit?
18            ARBITRATOR HABERFELD:  I think we spoke
19   with the court reporter, and I think she would
20   like the witness chair to be where Mr. Randazza is
21   presently sitting, all the better to see him.
22            MR. WHITE:  Would you like me to move,
23   then?
24            ARBITRATOR HABERFELD:  I think it's fine.
25   I think it would probably work the way you have
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1    it, but what would work best for you, Mr. White?

2          MR. WHITE:  It works for me, or at least

3    it does for the moment.  If it seems that he's

4    looking -- it's difficult, then perhaps we'll find

5    a way to move around.

6          ARBITRATOR HABERFELD:  Okay.  Let's see

7    about that.  We're good on that.

8          MS. KRINCEK:  This chair is open, too.

9          MR. WHITE:  Thank you.

10          ARBITRATOR HABERFELD:  I would just ask,

11   Mr. Randazza, if you could, as much as you can,

12   although the questions will be coming from

13   Mr. White, who is to your right, and I am to your

14   left, and the court reporter is across from you,

15   to please try to be as much giving your testimony

16   to me and to the court reporter, rather than

17   looking to Mr. White, which would be making it

18   difficult to read your lips and to hear you

19   better.

20          MR. RANDAZZA:  Okay.

21          ARBITRATOR HABERFELD:  Fair enough?

22          MR. RANDAZZA:  Sure.

23          ARBITRATOR HABERFELD:  Okay.  For

24   purposes of direct examination, and this is

25   applicable to all witnesses, just about anything

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 31

```
 1    something like that, they couldn't just then

 2    immediately fire me, keep the money, and pay me

 3    the severance, and then I'm out.

 4         Q.   The next part says, Settlement fund

 5    bonuses will vest at the time of settlement.

 6              Do you see that?

 7    A.   I do.

 8         Q.   Is that something you also deliberately

 9    negotiated?

10    A.   I did.

11         Q.   And the next sentence is, If

12    Mr. Randazza's employment terminates for any

13    reason by either party, Randazza will be entitled

14    to all vested settlement bonus amounts, regardless

15    of when they are collected.

16              Why would you negotiate a term like that?

17    A.   Because I could also see that perhaps the

18    settlement funds wouldn't come in for a long time,

19    so I wanted to make sure that that was also

20    something clear, that if I was working for a

21    certain goal, I didn't want that goal to evaporate

22    simply because the relationship might not have

23    continued.

24         Q.   Now, this doesn't explicitly say whether

25    that 25 percent is of gross or of net, does it?
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1    That should be "or of net."

2        A.    No, it doesn't make it -- it doesn't make

3    it clear.

4        Q.    Did you have any discussions with

5    Mr. Gibson during the course of your work with

6    Excelsior about which one it was?

7        A.    Yes.  It was my understanding, and I

8    believe his understanding, that it was from the

9    gross.  And, in fact, from the very first

10   settlement that came in, it was gross.

11       Q.    Would you please turn to Exhibit 30 in

12   the binder before you?

13       A.    Yes.

14       Q.    And let me know when you have it and you

15   are ready to talk about what it is.

16       A.    I am ready.

17       Q.    Do you recognize what this is?

18       A.    Yes.  This is an e-mail exchange that

19   Jason and I had where we discussed whether it

20   would be net or gross.

21            And you can see the -- on the second page

22   of the exhibit, Jason began the discussion in

23   February of 2010, really bringing up the issue of,

24   you know, what would happen if possibly our

25   expenditures on a file wind up exceeding the

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1   amount of the settlement, or making it that they

2   actually get nothing, but I still get my

3   25 percent.  And I acknowledge that, you know, we

4   didn't even ponder that at the time.

5           However, I did offer to change the

6   agreement, if he wanted to, but I wanted to make

7   sure that the -- you know, that wasn't the only

8   equity that we took into consideration.

9       Q.   Did you, in fact, change the agreement?

10      A.   We did not.  When I proposed, for

11  example, you know, I had -- I had in mind at that

12  time a settlement that we came to that, you know,

13  I was -- I was particularly disappointed in,

14  because we had gotten -- I don't remember the

15  exact amount, but we had gotten something like a

16  $600,000 judgment against a trademark infringer,

17  cybersquatter, so that would have been a pretty

18  large bonus for me.

19          And Jason made the decision that he would

20  of rather -- he made the decision to settle for

21  something like, you know, $30,000 and the transfer

22  of a domain name that I didn't think was

23  particularly worth all that much, but he was the

24  boss, so I did what he told me to do.

25          But there you can see, if they were going

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 34

1    to change the equities on net versus gross, maybe

2    we could put in some consideration for what

3    happens if we get a domain name that's worth a lot

4    of money, I don't know how I get a quarter of

5    that.

6            Jason and I discussed that in this

7    e-mail, and, you know, Jason decided at the end of

8    that, let's just keep it the way we've had it all

9    along.

10        Q.   Let me ask you about that.  On the first

11    page of the e-mail, the second to last

12    paragraph --

13        A.   Yeah.

14        Q.   -- in Mr. Gibson's last e-mail to you,

15    saying, So to keep things clean and simple, I'm

16    thinking maybe we should just continue under the

17    original agreement where we pay all expenses,

18    assume all risks, and I can freely hit the brakes

19    on the expenses and settle at will if I feel it

20    was the business's best interest?

21        A.   Yes.

22        Q.   Was that what you understood the

23    agreement continued to be after that exchange?

24        A.   Yes.  I think it couldn't be more clear.

25    We were -- it was going to be 25 percent of net,

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 55

1      A.    I would often send them to him for his

2    approval.  You know, sometimes he didn't want to

3    be bothered with it, but I thought that this one

4    was important to send to him.

5      Q.    Now on the next page, I see the letter is

6    dated January 2011, and it's on the letterhead of

7    Randazza Legal Group?

8      A.    Yes.

9      Q.    Did you do many letters from Randazza

10   Legal Group?

11     A.    When it came to litigation communications

12   or demand letters, it was almost exclusively on

13   RLG letterhead, although earlier in the beginning

14   we did have it on Liberty or Corbin Fisher

15   letterhead.

16     Q.    Is there any particular strategy behind

17   doing that?

18     A.    Yeah.  You know, we wanted -- we wanted

19   the opposing parties to see that there was a law

20   firm behind the threats, not just a one-person

21   legal department.  Wanted them to see that there

22   were multiple offices.  And, also, I didn't

23   want -- I wanted them to see that there was a

24   level of separation between this and the company.

25     Q.    Did Mr. Gibson or anyone else at

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1      Q.    All right.  In this one, if you look at

2   Exhibit 325, the first page --

3      A.    Yes.

4      Q.    -- towards the bottom.

5      A.    Yes.

6      Q.    There's a reference to $75,000 in there.

7      A.    Yep.

8      Q.    And there's a notation, Who gets this?

9      A.    Right.

10     Q.    Who was, under this draft, at this time

11   supposed to get that?

12     A.    That was supposed to go into Val Gurvits'

13   trust account under this agreement.

14     Q.    But who was supposed to get it next, the

15   way you and Val had been negotiating it?

16     A.    According to Val, he was then going to

17   transfer it to me.

18     Q.    Was it your intention ever to actually

19   get it for yourself?

20     A.    No.

21     Q.    Did you explain that to Jason?

22     A.    I did.

23     Q.    So let's take a look -- it's inevitable

24   that we bounce around a lot, I guess -- at

25   Exhibit 66.  That's in our second volume.

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 197

1        A.    Oh, God, no.

2        Q.    Did you threaten her, like things would

3   go badly for her in the industry?

4        A.    No.  In fact, I tried to -- you know, I

5   wanted her to come, but I was pretty clear that it

6   was going to be a huge pay cut, and, you know,

7   maybe not even any benefits to start off, but that

8   I would do my best to fix that.

9        Q.    Okay.

10        A.    The worst job offer I've ever seen.

11        Q.    So aside from speaking with Ms. Dillon

12   about the possibility of joining you, did you take

13   any steps to secure your personal data?

14        A.    Yes.

15        Q.    Let's talk about the computers you used

16   when you were there.  Did you have a laptop, a

17   company-issued laptop at this time?

18        A.    Yeah, I had -- I had had two by this

19   time.

20        Q.    The one you had at this point, what kind

21   of laptop was it?

22        A.    It was a MacBook Air.

23        Q.    And when you did Excelsior work on it,

24   did you store Excelsior documents long term on the

25   laptop?

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 206

1      Q.   So what time did you -- does this show

2   you sending it?

3      A.   At 3:10 p.m.

4      Q.   And turning to the next one, what's the

5   time for Mr. Gibson's response?

6      A.   4:04 p.m.

7      Q.   Do you recall where he was with respect

8   to where you were?

9      A.   He was in Las Vegas.

10     Q.   All right.

11     A.   And I was on the East Coast.  This is

12  printed from a different server.  This is printed

13  from one that --

14     Q.   Well, this one has the Respondents' Bates

15  stamp, correct?

16     A.   Oh, yeah.

17     Q.   EMC?

18     A.   Yeah.

19     Q.   And he says in here, he directs you to

20  counsel that he's hired, correct?

21     A.   Uh-huh.

22     Q.   Did you -- and he says your -- We

23  construe your e-mail as a resignation of your

24  employment and accept your resignation effective

25  immediately.

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 207

```
 1         Do you see that?
 2    A.   I do.
 3    Q.   Did you respond to that promptly?
 4    A.   I did.
 5    Q.   And the very top e-mail on the page --
 6    A.   Yes.
 7    Q.   -- what did you say?
 8    A.   I wrote to Wendy and Patrick saying that
 9   it wasn't a resignation, as much as Mr. Gibson
10   would like it to be so he can try and evade
11   payment of my severance.
12    Q.   And looking at the second paragraph,
13   there is a reference to you being represented by
14   people --
15    A.   Yes.
16    Q.   -- in respect to this.
17         Had you already lined up the
18   representation before you got that response from
19   Mr. Gibson?
20    A.   I had not.
21    Q.   How did you get it together that quickly?
22    A.   Well, Allan Rubin at Jackson Lewis is a
23   good friend of mine, as is Clyde DeWitt.  So I
24   called Allan, because I knew that Allan and
25   Jackson Lewis specialized in employment law, and
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

 1      A.    Yes.

 2      Q.    -- about possibly brokering the sale and

 3  who would get the percentage of what?

 4      A.    Uh-huh, yes.

 5      Q.    Did you understand during any of this

 6  that that was actually ever going to amount to

 7  anything?

 8      A.    This, like anything with Val Gurvits,

 9  it's always very suspect.  So, no, I did not

10  expect it would ever amount to anything except

11  perhaps Val telling TNAFlix to up the amount of

12  settlement.

13      Q.    Now, we talked about Megaupload and the

14  discussion in that case, as well?

15      A.    Yes.

16      Q.    Did you expect the negotiations there

17  with the opposing counsel to result in anything

18  actually going to you as opposed to Liberty?

19      A.    No, I did not.

20      Q.    You occasionally go as far as to

21  produce -- create documents kind of playing along

22  with the other side?

23      A.    Yes.

24      Q.    What was your ultimate purpose in doing

25  that?

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1        A.    To get the most I could in the settlement
 2   that I was working on at the time.
 3        Q.    Let's talk about XVideos.
 4        A.    Yes.
 5        Q.    What was XVideos?
 6        A.    A tube site.
 7        Q.    Like the tube site you testified about
 8   this morning?
 9        A.    Yes.  Not just was, but is.
10        Q.    Did you ever make a proposal to
11   Mr. Gibson about a joint effort against XVideos, a
12   joint suit against XVideos?
13        A.    There was some discussion of that.
14        Q.    Would you look at Exhibit 28, please?
15        A.    All right.  I'm there.
16        Q.    Please let me know when you've reviewed
17   it and you recognize what it is?
18        A.    I have reviewed it.
19        Q.    Is this an e-mail from you to Mr. Gibson
20   about a proposed lawsuit against XVideos?
21        A.    It is.
22        Q.    And why at this time, January 2010, was a
23   lawsuit against XVideos feasible?
24        A.    Well, Gill was going to do most of the
25   work, and so I -- I was relying in large part on
```

Arbitration Proceedings  ~ Volume II ~  February 10, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1                ARBITRATION BEFORE

2        JUDICIAL ARBITRATION AND MEDIATION SERVICE

3

4    MARC J. RANDAZZA,              )
                                    )
5              Complainant,         )
                                    )
6    vs.                            )  Ref. No. 1260002283
                                    )
7    EXCELSIOR MEDIA                )
     CORPORATION, a Nevada          )
8    corporation; LIBERTY           )
     MEDIA HOLDINGS, LLC, a         )     CERTIFIED
9    California limited             )
     liability company; and        )      COPY
10   JASON GIBSON,                  )
     individually,                  )
11                                  )
               Respondents.         )
12   _____  )

13

14        TRANSCRIPT OF ARBITRATION PROCEEDINGS

15                    VOLUME II

16   BEFORE THE HONORABLE STEPHEN E. HABERFELD

17      Taken on Tuesday, February 10, 2015

18        At 3800 Howard Hughes Parkway

19                 Eleventh Floor

20               Las Vegas, Nevada

21

22

23

24

25   REPORTED BY:   JO A. SCOTT, RPR, CCR NO. 669

Arbitration Proceedings ~ Volume II ~ February 10, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 276

```
1    APPEARANCES:

2    For the Complainant:

3        KENNETH P. WHITE, ESQ.
         HENRY L. WHITEHEAD, ESQ.
4        Brown White & Newhouse
         333 South Hope Street
5        40th Floor
         Los Angeles, California 90071
6        (213) 613-0500

7    For the Respondents:

8        WENDY MEDURA KRINCEK, ESQ.
         ETHAN THOMAS, ESQ.
9        Littler Mendelson
         3960 Howard Hughes Parkway
10       Suite 300
         Las Vegas, Nevada 89169
11       (702) 862-8800

12   Also Present:

13       MARC J. RANDAZZA
         JASON GIBSON
14       BRIAN LOWDERMAN
         BRIAN DUNLAP
15

16

17                 I N D E X

18   WITNESS                              PAGE

19   MARC J. RANDAZZA
         Cont. Direct Examination by Mr. White    277
20       Cross-Examination by Ms. Krincek         298

21

22

23

24

25
```

Arbitration Proceedings ~ Volume II ~ February 10, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 377

1   Oron.

2        Q.   I'm sorry.  TNAFlix.

3        A.   Correct.

4        Q.   And did you draft this agreement,

5   Mr. Randazza?

6        A.   I don't recall if I was the author of it.

7        Q.   So you forwarded to -- you did forward it

8   to Mr. Gurvits?

9        A.   It looks that way, yes.

10       Q.   Under recitals, it says, Whereas, RLG has

11  indicated that it is aware of certain prospective

12  buyers who may be interested in purchasing the

13  assets or stock of the company, correct?

14       A.   Yes.

15       Q.   And then do you see under the Commission

16  section, Number 2, is providing for you and

17  Mr. Gurvits to split a ten percent commission on

18  the sale of Youngtek, correct?

19       A.   I do.

20       Q.   This is a lot of work you are going

21  through just to thwart your allusive being a

22  broker and taking a bribe, when the settlement of

23  TNAFlix has already been accomplished; don't you

24  think?

25       A.   Doesn't look like a lot of work to me.

Arbitration Proceedings ~ Volume II ~ February 10, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1            Do you see that?
 2      A.    I do.
 3      Q.    And then you attach to Mr. Lieberman's
 4 e-mail a retainer agreement between yourself and
 5 Oron, correct?
 6      A.    Yes, yes.
 7      Q.    Now, on the TNAFlix matter, you never got
 8 your retaining agreement signed after the
 9 settlement agreement was finalized, correct?
10      A.    Correct.
11      Q.    So here you are sending out your
12 retaining agreement before you've gotten to the
13 point of having a settlement agreement about the
14 600 or $650,000 drafted with Mr. Lieberman,
15 correct?
16      A.    Yes.  Direct your attention to
17 Paragraph C.
18      Q.    But it's correct that you haven't gotten
19 to the point where you've exchanged settlement
20 agreements about the 600, $650,000 that you've
21 been e-mailing about with Mr. Lieberman, correct?
22      A.    No.  We had a settlement already at this
23 point, as far as I was concerned.
24      Q.    And now you are negotiating in the past
25 e-mails that we have looked at for more money to
```

Arbitration Proceedings ~ Volume II ~ February 10, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 421

1    Q.    What conversations had occurred?

2    A.    That if it were paid, that he -- that he

3    had offered to, quote, unquote, bribe me again,

4    and that if it were paid to me as fees, I couldn't

5    put it in the pot.  Jason said, Well, I would

6    think that every dollar that comes in belongs to

7    the company.  None of it belongs to you.

8          Which is why Val and I were discussing

9    let's just make it a settlement agreement with me,

10   that way if I get a settlement, that can be -- I

11   can do whatever I want with that.  But I can't

12   share fees with a nonlawyer.

13         Ultimately the math on this worked out to

14   it would change my bonus by, you know, $31,000, so

15   didn't ultimately matter.

16   Q.    Mr. Randazza, the communication that you

17   are just talking about with Jason about if it's

18   fees, it can't be paid to you --

19   A.    Yeah.

20   Q.    -- that's the August 13th, 2012,

21   communication, correct?

22   A.    That's the e-mail, but that's not the

23   conversation.  I don't have a recording of the

24   conversation I had with Jason.

25   Q.    So it's your testimony today that you had

Arbitration Proceedings ~ Volume III ~ February 11, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1                ARBITRATION BEFORE

 2        JUDICIAL ARBITRATION AND MEDIATION SERVICE

 3

 4    MARC J. RANDAZZA,              )
                                     )
 5              Complainant,         )
                                     )
 6    vs.                           ) Ref. No. 1260002283
                                     )
 7    EXCELSIOR MEDIA               )
      CORPORATION, a Nevada         )
 8    corporation; LIBERTY          )
      MEDIA HOLDINGS, LLC, a        )
 9    California limited            )
      liability company; and       )
10    JASON GIBSON,                 )
      individually,                 )
11                                   )
                Respondents.        )
12    _____      )

13

14         TRANSCRIPT OF ARBITRATION PROCEEDINGS

15                    VOLUME III

16    BEFORE THE HONORABLE STEPHEN E. HABERFELD

17      Taken on Wednesday, February 11, 2015

18         At 3800 Howard Hughes Parkway

19                  Eleventh Floor

20                Las Vegas, Nevada

21

22

23

24

25    REPORTED BY:   JO A. SCOTT, RPR, CCR NO. 669
```

CERTIFIED COPY

Arbitration Proceedings ~ Volume III ~ February 11, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 575

```
 1    APPEARANCES:

 2    For the Complainant:

 3        KENNETH P. WHITE, ESQ.
          HENRY L. WHITEHEAD, ESQ.
 4        Brown White & Newhouse
          333 South Hope Street
 5        40th Floor
          Los Angeles, California 90071
 6        (213) 613-0500

 7    For the Respondents:

 8        WENDY MEDURA KRINCEK, ESQ.
          ETHAN THOMAS, ESQ.
 9        Littler Mendelson
          3960 Howard Hughes Parkway
10        Suite 300
          Las Vegas, Nevada 89169
11        (702) 862-8800

12    Also Present:

13        MARC J. RANDAZZA
          JASON GIBSON
14        BRIAN LOWDERMAN
          BRIAN DUNLAP
15

16

17

18

19

20

21

22

23

24

25
```

Arbitration Proceedings ~ Volume III ~ February 11, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 576

```
 1                    I N D E X

 2     WITNESS                                  PAGE

 3     MARC J. RANDAZZA
            Cont. Cross-Examination by Ms. Krincek    577
 4          Redirect Examination by Mr. White         613

 5     RONALD D. GREEN, JR.
            Direct Examination by Mr. Whitehead       638
 6          Cross-Examination by Mr. Thomas           647

 7     JASON GIBSON
            Direct Examination by Ms. Krincek         659
 8          Cross-Examination by Mr. White            776
            Redirect Examination by Ms. Krincek       839
 9
       BRIAN FLOYD LOWDERMAN
10          Direct Examination by Ms. Krincek         840
            Cross-Examination by Mr. Whitehead        848
11          Redirect Examination by Ms. Krincek       852
            Furt. Cross-Examination by Mr. Whitehead  853
12
       BRIAN DUNLAP
13          Direct Examination by Ms. Krincek         855

14

15

16

17

18

19

20

21

22

23

24

25
```

Arbitration Proceedings ~ Volume III ~ February 11, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1      A.   I did know it had a policy.

2      Q.   Why didn't you use the procedures set

3  forth in the policy?

4      A.   Can you be more specific?

5      Q.   Well, why didn't you go through the

6  complaint procedure specified in Excelsior's

7  harassment policy?

8      A.   Which time?

9      Q.   After the film?

10      A.   Well, I went directly to the CEO instead.

11  I thought that was the more appropriate way to do

12  it.

13      Q.   And the second time, after the car

14  incident?

15      A.   Given the way that Jason had treated me

16  on the first incident, I didn't see there being

17  any sense in it, and I was reasonably sure that I

18  would be summarily fired at that point.

19      Q.   You were asked some questions about the

20  TNAFlix negotiations.

21           Do you recall that?

22      A.   Yes.

23      Q.   And specifically Ms. Krincek showed you

24  some of the e-mails and agreements in which you

25  went back and forth with the lawyer on the other

Arbitration Proceedings ~ Volume III ~ February 11, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 628

1     Q.   Did you do a formal waiver or formal

2  disclosure?

3     A.   I did not.

4     Q.   Did you, in fact, brag about how your

5  relationship with them as their lawyer helped you

6  get things?

7     A.   Yes, including that they would do active

8  suppression.

9     Q.   Late in the afternoon yesterday, you

10  speculated that you might have been the DMCA agent

11  for XVideos.

12          Is that true?

13     A.   No.  I -- in fact, I checked my records

14  last night, and there's no truth to that at all.

15     Q.   Why would you say such a thing?

16     A.   As you probably saw from my outburst at

17  the end of the day, I was exhausted and looking at

18  very small print on a page, and looking at that, I

19  got confused.

20     Q.   How was it handled when something was up

21  on XVideos that was Liberty's content?

22     A.   If someone had uploaded content to

23  XVideos, normally XVideos would suppress it before

24  anything even happened.

25          But then there would be -- if someone

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Arbitration Proceedings ~ Volume III ~ February 11, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 629

1   sent them a DMCA notice, they would go and take

2   the materials down.  But if that notice was at any

3   point elevated to me, I would send it, either

4   myself or through one of the other RLG attorneys,

5   to the CEO of the company and ask him to deal with

6   it directly.

7       Q.   Ms. Krincek showed you an e-mail in which

8   you sent direction to Jason Fischer to report a

9   link to XVideos.  Is that representative of how

10  you would do it?

11      A.   That was typical, although sometimes I

12  would check the link to make sure it was active

13  before doing so.

14      Q.   What do you mean to check if it was

15  active?

16      A.   Well, a lot of the reports that came

17  in -- in fact, the vast majority of them, by the

18  time they were reported, XVideos had already

19  suppressed the video proactively.  So I would

20  click it, and it would go to a dead link.

21      Q.   Let me ask you about the day when you

22  sent the e-mail to Mr. Gibson, and he sent one

23  back saying that We accept your resignation.

24           Do you have that day in mind?

25      A.   I do.

Arbitration Proceedings ~ Volume III ~ February 11, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1    disagreed, that he didn't want to offend possibly

2    right wing fans of the -- of the site, so he said

3    I can do it under my own flag, but not under

4    Corbin Fisher's flag.

5        Q.   Did you do the Righthaven litigation

6    under Corbin Fisher's flag?

7        A.   I did not.

8        Q.   You were asked --

9        A.   And I can be clear.  Some of the

10   Righthaven litigation was pro bono and some was

11   paid.

12       Q.   Do you remember being asked about the

13   amount of hours you worked various months for

14   outside clients?

15       A.   I do.

16       Q.   In the course of your career, let's say

17   starting at the firm you were at before you joined

18   Excelsior, how many hours a month are you

19   accustomed to working?

20       A.   When I was there, at least -- at least

21   250.  Sometimes I would even have 300 hour months.

22       Q.   Was it unusual for you to work between

23   250 and 300 hours a month?

24       A.   I mean, those would be big months, but,

25   no, it wasn't unusual at all.

Arbitration Proceedings ~ Volume III ~ February 11, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1      Q.    Was it unusual for that to happen, also,

2    by the time you were working for Excelsior, when

3    you combined your Excelsior work and the outside

4    work?

5      A.    No, that wasn't unusual.  In fact, I

6    think I averaged about -- I don't know.  I mean, I

7    averaged over 200 a month combined.

8      Q.    Do you recall being asked with respect to

9    Mr. Grady -- and I apologize for jumping around a

10   little bit -- if you understood what digging

11   behind domains for proxy meant?

12     A.    I do recall that.

13     Q.    Do you understand what that phrase means?

14     A.    The entire phrase, no.

15     Q.    What is domains by proxy?

16     A.    That I know.  That's a service that

17   Go Daddy, which is a domain name registrar,

18   provides to its customers.  So you can pay

19   Go Daddy, I think it's an extra dollar a year, and

20   they will list domains by proxy as the registrant

21   of the domain name itself for your -- that you've

22   registered, and not list you, unless they get

23   something like, you know, if they get a

24   threatening letter, they will usually give up that

25   information.

Arbitration Proceedings ~ Volume III ~ February 11, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 658

```
 1    agreement, now going to ask Ms. Krincek on behalf
 2    of Respondents to take over her part of the case
 3    to move us through until we resume claimant's
 4    case; is that correct?
 5             MS. KRINCEK:  Correct.
 6             ARBITRATOR HABERFELD:  Let's look to you.
 7    Who is our next witness, please?
 8             MS. KRINCEK:  The respondent calls Jason
 9    Gibson.
10             ARBITRATOR HABERFELD:  Mr. Gibson, can I
11    ask you, please, since we haven't done this at
12    this point, to kindly complete on that form your
13    name and business address for the record?
14             MR. GIBSON:  Okay.
15             ARBITRATOR HABERFELD:  I'll put that
16    along with Mr. Randazza's and Mr. Green's
17    recordkeeping.
18             While you are doing that, I'll just
19    remind that, as we've done with prior witnesses,
20    upon completion of that, if you would kindly
21    stand, face the court reporter, and raise your
22    right hand to be sworn as a witness.
23             MR. GIBSON:  Okay.  So just name and
24    address?
25             ARBITRATOR HABERFELD:  Name and business
```

Arbitration Proceedings ~ Volume III ~ February 11, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1    address will be fine.

 2              MR. GIBSON:  Okay.

 3              ARBITRATOR HABERFELD:  I'll take that.

 4    And kindly stand, face the reporter, please.

 5    Whereupon --

 6                   JASON GIBSON,

 7    having been first duly sworn to testify to the

 8    truth, the whole truth and nothing but the truth,

 9    was examined and testified as follows:

10                 DIRECT EXAMINATION

11    BY MS. KRINCEK:

12       Q.   Mr. Gibson, can you state your name for

13    the record?

14       A.   Jason Gibson.

15       Q.   And what is your position with Excelsior

16    Media Company?

17       A.   I am the CEO and co-founder.

18       Q.   Could you, Mr. Gibson, tell us a little

19    bit about your educational background?

20       A.   I attended the University of Missouri,

21    Rolla for about two and a half years, studying

22    mechanical engineering, and finished my degree in

23    management human resources at Park University in

24    Kansas City.  Actually Parkville, Missouri.

25       Q.   So your undergraduate degree is in human
```

Arbitration Proceedings ~ Volume III ~ February 11, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 675

1    head up our anti-piracy efforts and command the

2    offensive we are preparing to take against those

3    stealing our consent, seeking out the infringers

4    and their real identity, initiating legal action

5    against them, pursuing judgment, and firmly,

6    loudly, and forcefully sending the message that

7    violating our intellectual property rights can and

8    will result in major consequences for the

9    violators.

10        Q.    Does that accurately reflect the

11    company's intended role for Mr. Randazza?

12        A.    Yes.

13        Q.    And did Mr. Randazza ever take issue with

14    that characterization?

15        A.    No, he did not.

16        Q.    Now, Mr. Randazza testified that the vast

17    majority of work he did for the company was for

18    Liberty Media.

19            Do you agree with that assertion?

20        A.    Yes.

21        Q.    Mr. Randazza testified that he was not

22    counseled about work not getting done for the

23    company in a timely manner -- let me strike that

24    and start over.

25            Mr. Randazza testified that he was not

Arbitration Proceedings ~ Volume III ~ February 11, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1    counseled about not getting work done in a timely

2    manner, despite spending time working for other

3    clients.

4              Do you recall that testimony?

5    A.    Yes.  Yes, I do.

6    Q.    Now, if Mr. Randazza was not providing

7    timely service, did you believe it to be because

8    he was doing work for other clients?

9    A.    No.  We would have no way of knowing,

10   really, because when he first started working with

11   us, he worked out in the San Diego office.

12   Probably a year and a half there was really no

13   supervision out in the office.  He was the only, I

14   think, executive team member there, so there was

15   really no way to know one way or the other, so --

16   Q.    You're aware that Mr. Randazza is

17   claiming that you harassed him because he's a

18   straight male, correct?

19   A.    Yes, I am.

20   Q.    Do you care what his sexual orientation

21   is?

22   A.    No.

23   Q.    Your co-owner Brian Lowderman, what is

24   his sexual orientation?

25   A.    He is straight.

Case 15-01193-abl    Doc 138-1    Entered 03/16/17 18:26:22    Page 34 of 62

Arbitration Proceedings ~ Volume III ~ February 11, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 731

1    BY MS. KRINCEK:

2        Q.   Dudevu, what kind of site was that?

3        A.   There might have been one called

4    PornoLove or something like that.

5             I'm sorry, what?

6        Q.   Dudevu, what kind of -- was that a tube

7    site or file locker?

8        A.   Yes, a tube site.

9        Q.   It's a tube site?

10       A.   Yes.

11       Q.   Do you recall what the company's recovery

12   on Dudevu was?

13       A.   I believe it was around 60 or $75,000.

14       Q.   How about Hotfile, what was the company's

15   recovery on Hotfile?

16       A.   I believe 275, 275,000.

17       Q.   What about Megaupload?

18       A.   It was around 600,000.

19       Q.   How about TNAFlix, that was --

20       A.   These are estimates.  I don't -- I don't

21   have the exact --

22       Q.   Got it.

23            How about TNAFlix, that's a tube site,

24   correct?

25       A.   Yes.

Arbitration Proceedings ~ Volume III ~ February 11, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1      Q.    And that was a $50,000 settlement,

2    correct?

3      A.    Correct, yes.

4      Q.    Did Mr. Randazza ever say he was XNXX's

5    lawyer?

6      A.    No.

7      Q.    We heard some testimony about technology

8    known as Vobile to electronically fingerprint

9    content so it could be identified and removed when

10   posted illegally to participating sites.

11          Who signed the company up with Vobile?

12     A.    Marc did.  In fact, he even -- it was --

13   he unilaterally signed us up for it and paid for

14   it.

15     Q.    Mr. Randazza testified that Vobile

16   flopped.  What was your opinion of Vobile?

17     A.    It was a disaster.  It put the onus on

18   the producer to, you know, basically do the

19   legwork and all the effort to keep the content off

20   of the tube sites, and it -- it was obviously, in

21   his own words, a flop.  It was -- that was

22   apparent pretty quick, so --

23     Q.    Are you familiar with an entity known as

24   XVideos?

25     A.    Yes.

Arbitration Proceedings ~ Volume III ~ February 11, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 734

1      A.    There is a couple other tube sites, as

2    well; GLBT, I think it's all gay, and Gayfort, as

3    well.

4      Q.    Those are additional tube sites --

5      A.    Uh-huh.

6      Q.    -- and did Mr. -- all the tube sites that

7    you mentioned, did Mr. Randazza recommend taking

8    legal action against them?

9      A.    Yes, he did.

10      Q.    Exhibit 390 is the e-mail from Marc

11    Randazza with a subject, Fair Use Warning, that's

12    dated September 6th, 2011, where he's advising

13    some of -- yourself and other team members not to

14    send a takedown notice to XVideos.

15         Do you recall looking at that exhibit?

16      A.    Yeah, I've seen this exhibit.  Now, the

17    e-mail address it was sent to, it's a joint e-mail

18    address that my business partner and I share, so

19    whether I read that on that day or not, I don't

20    know, but --

21      Q.    But you were aware that Mr. Randazza was

22    providing legal advice to the company about

23    XVideos?

24      A.    Yes.

25      Q.    To your knowledge, did Mr. Randazza ever

Arbitration Proceedings ~ Volume III ~ February 11, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 735

1    take legal action against XVideos on behalf of the

2    company?

3         A.   He did not.

4         Q.   Do you recall that you told Mr. Randazza

5    that you wanted to go after XVideos?

6         A.   I explicitly told him in an e-mail that I

7    wanted him to sue XVideos.

8         Q.   And to your recollection, was that after

9    June 19th of 2010, when they became a client of

10   Mr. Randazza's?

11        A.   Yes.

12        Q.   To your knowledge, did he take any action

13   in response?

14        A.   No.

15        Q.   At any time during his employment, did

16   Mr. Randazza ever advise you verbally or in

17   writing that XVideos was his client?

18        A.   No, he did not.

19        Q.   Mr. Randazza has given some testimony

20   about bragging, I guess, about XVideos and access

21   to XVideos.

22             Did you ever have any understanding from

23   any sort of bragging that that meant that whatever

24   entity he was talking about was a client of his?

25        A.   No.  Marc brags a lot about a lot of

Arbitration Proceedings ~ Volume III ~ February 11, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 736

1    things.  No.

2        Q.    At any time during his employment, did

3    Mr. Randazza ever advise you verbally or in

4    writing that XVideos was his client, and they paid

5    him $35,000?

6        A.    No.

7        Q.    Did he ever seek the company's consent to

8    represent XVideos?

9        A.    No, he did not.

10       Q.    Mr. Randazza claimed one of the reasons

11   XVideos was not a tube site that should be sued is

12   that it was located offshore.

13            Had Mr. Randazza chosen for the company

14   other offshore companies to sue?

15       A.    Many.  I think virtually every one of

16   those that I named earlier were all offshore.

17   Most, if not all of them are.

18       Q.    While Mr. Randazza was employed, the

19   company did not sue XVideos or XNXX, correct?

20       A.    That's correct.

21       Q.    Why not?

22       A.    Say that again.

23       Q.    Why not?  Why didn't the company sue

24   XVideos or XNXX, even though your material was

25   being found on --

Arbitration Proceedings ~ Volume III ~ February 11, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1          A.    We were -- Marc -- Marc is the person

2    that would identify litigation targets for us.

3          Q.    Did you rely upon him to identify

4    targets --

5          A.    Yes.

6          Q.    -- and advise which ones to take action

7    against?

8          A.    Yes, absolutely.   Absolutely.

9               And he would also be the one that would,

10   you know, lay out dollar amounts that, you know,

11   were target amounts.

12         Q.    During Mr. Randazza's employment, did the

13   company acquire the domain gay.xxx?

14         A.    Yes, we did.

15         Q.    Have you ever heard of an entity Titan

16   Media?

17         A.    Yes.   They are an adult content producer.

18         Q.    And how about have you heard of Kink.com?

19         A.    They are another adult content producer.

20         Q.    Did Mr. Randazza ever disclose to the

21   company that Titan Media was a client of his?

22         A.    No, he did not.

23         Q.    Did he ever disclose to the company that

24   Kink.com was a client of his?

25         A.    No, he did not.

Arbitration Proceedings  ~ Volume III ~  February 11, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1      A.   Uh-huh.

 2      Q.   And his response was, Don't ask?

 3      A.   Don't ask.

 4      Q.   Did Oron ever attempt to use allegations

 5   that the company used a hacker against the

 6   company --

 7      A.   Yes.

 8      Q.   -- against Liberty Media?

 9      A.   Yes.

10      Q.   Where do they do that; do you recall?

11      A.   I believe it was in the arbitration

12   demand that they filed.

13      Q.   Mr. Randazza represented the company in a

14   dispute against Megaupload in 2011; is that

15   correct?

16      A.   That's correct.

17      Q.   Did Mr. Randazza ever disclose to you

18   that part of his negotiations with Megaupload

19   included his representation that he was interested

20   in being retained by Megaupload after the matter

21   was concluded?

22      A.   No, he did not.

23      Q.   Did he tell you that opposing counsel

24   tried to bribe him?

25      A.   Yes, that -- that was Ira Rothken, I
```

Case 15-01193-abl   Doc 138-1   Entered 03/16/17 18:26:22   Page 41 of 62

Arbitration Proceedings ~ Volume III ~ February 11, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 750

1  believe was the attorney's name.  And apparently

2  he said something, it was $5,000 or something, and

3  he seemed very put off and upset, and called Ira

4  an unethical piece of shit.  He was actually very

5  hostile towards Ira.  I don't think he liked him

6  very well.

7      Q.   I'm going to move to a different topic

8  now, public relations for the company.

9           Was some level of publicity to the

10 company's anti-piracy efforts desirable --

11     A.   Yes.

12     Q.   -- to the company?

13     A.   Yes.

14     Q.   Was there a limit to how much press you

15 wanted to get on that?

16     A.   Of course.

17     Q.   Did you ever authorize Mr. Randazza to

18 unilaterally decide what information was provided

19 to the press regarding the company?

20     A.   Never.

21     Q.   Can you turn to Exhibit 320?

22          Exhibit 320 is an e-mail exchange between

23 yourself and Mr. Randazza from November of 2011.

24 Can you tell us about what happened that prompted

25 this e-mail string?

Arbitration Proceedings ~ Volume III ~ February 11, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1        Q.    Are you seeking disgorgement of

2    Mr. Randazza's salary for the time period he

3    represented XVideos and XNXX?

4        A.    Yes.

5        Q.    And the retainer agreements with XVideos

6    and XNXX was entered in June 2010; is that

7    correct?

8        A.    That's correct.

9        Q.    Are you seeking an award of fees and

10   costs in this matter?

11       A.    Yes, we are.

12       Q.    Are you seeking reimbursement for the

13   costs of the forensic examination of

14   Mr. Randazza's laptop that was wiped?

15       A.    Yes, we are.

16       Q.    Are you seeking the return of the second

17   company laptop that Mr. Randazza testified he had,

18   and has not returned to the company?

19       A.    Yes, we are.

20       Q.    Are you requesting that Mr. Randazza be

21   required to turn over the company's funds he's

22   holding in his trust account since August 2012

23   that is disputed funds?

24       A.    Yes, we are.

25       Q.    Do you believe the amount that

Arbitration Proceedings ~ Volume III ~ February 11, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1    Mr. Randazza is holding in his trust account to be

2    in excess of $275,000?

3        A.   Yes, we do.

4        Q.   Are you asking for a third-party audit of

5    Mr. Randazza's trust account to be ordered so the

6    company can determine whether all monies have been

7    submitted to it?

8        A.   Yes, we are.

9        Q.   Are you unsure whether Mr. Randazza has

10   continued to receive settlement payments for the

11   company since his termination?

12       A.   Yes, we are.

13       Q.   Why is that?

14       A.   There were a number of pay-over-time

15   settlements that were -- agreements that were

16   entered into while Marc was employed with us that

17   we don't know the status.  And those amounts were

18   all paid directly to Marc.

19       Q.   So do you have knowledge of whether or

20   not installment settlement payments have continued

21   to come in to Mr. Randazza since his termination?

22       A.   We don't know for sure.  We suspect,

23   because there were a number of them, so we don't

24   know the status of them.

25       Q.   And the installment -- the people making

Arbitration Proceedings ~ Volume III ~ February 11, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 774

1    the installment payments, where would they direct

2    their payments to?

3        A.    To Marc at Randazza Legal Group, I guess.

4        Q.    The last thing I just wanted to ask you

5    about was in Mr. Randazza's testimony, he

6    referenced there being some change to an e-mail

7    system for the company in the spring of 2012?

8        A.    Yes.

9        Q.    And I think the implication was that

10   after that, he did not use Apple -- the Apple

11   e-mail system.

12       A.    Yeah, that is hogwash.  Nothing happened

13   to the company e-mail system in the spring.  He

14   religiously used Apple mail.  In fact, he made it

15   clear that he couldn't do his job using a Web

16   interface deal.  So the Apple mail client would

17   have stored e-mails and documents locally to his

18   laptop, whereas the Web interface wouldn't.  So,

19   yes, there was no change to the e-mail server.

20       Q.    Do you believe had Mr. Randazza not wiped

21   his laptop, that there would be evidence of e-mail

22   communications from, for example, his Randazza

23   Legal Group e-mail address to other clients?

24       A.    We're -- we're pretty confident, yes.

25            MS. KRINCEK:  No further questions.

Arbitration Proceedings ~ Volume III ~ February 11, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 801

1      Q.   Well, you looked at a lot of e-mails

2   preparing for this arbitration, right?

3      A.   I have, yes.

4      Q.   You looked at a lot of e-mails preparing

5   for your deposition?

6      A.   Yes.

7      Q.   And you haven't seen any e-mails from you

8   counseling him for not getting work done in a

9   timely fashion?

10      A.   That doesn't mean they don't exist, but I

11   haven't seen them.  Sorry.

12      Q.   So e-mails that we may not have here

13   might still exist; is that right?

14      A.   No.  I'm saying that I didn't see every

15   e-mail.  There was 100,000 pages of documents that

16   you -- that were dumped on us.

17      Q.   Okay.

18      A.   So I can't testify that I read every

19   single one of them.

20      Q.   So you haven't read all the e-mails that

21   are in the production, correct?

22      A.   Correct.

23      Q.   Now, you testified that Mr. Randazza

24   never gave you any written notice of any sort

25   about his representation of, for instance,

Arbitration Proceedings ~ Volume III ~ February 11, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1    expenses that were being run up by the legal

2    department, yes.  It was -- it was very expensive

3    without -- we weren't winning any lawsuits of note

4    that year.  And, yes, it was a financial burden on

5    the company.

6        Q.    Now, and you said several times that you

7    thought the company should focus instead on DMCA

8    takedowns and other methods of getting things

9    taken down, correct?

10       A.    I have said that over -- over the years,

11   yes.

12       Q.    Now, you haven't sued, for instance,

13   XVideos since Mr. Randazza left, correct?

14       A.    Correct.

15       Q.    You haven't sued XNXX, if I have that

16   right, since Mr. Randazza left?

17       A.    Not yet, correct.

18       Q.    Do you recall the large sheets of e-mails

19   that Ms. Krincek showed to Mr. Randazza --

20       A.    Yes.

21       Q.    -- of alerts about those?

22       A.    Yes.

23       Q.    Those went from -- everywhere from 2010

24   to 2012, correct?

25       A.    Yes.

Arbitration Proceedings ~ Volume III ~ February 11, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1    other than looking at their books.  You can't just

2    run a -- there's various services online that

3    purport to give the value of a domain name, but

4    they're wildly inaccurate.

5         Q.   Do you have any basis to assign any

6    particular value to the Fapzap.com domain name?

7         A.   No, I don't.

8         Q.   Mr. Randazza's litigation efforts did

9    some years, or at least one year, turn a profit,

10   correct?

11        A.   We don't know.

12        Q.   Didn't you once say in an e-mail to him

13   that it had, the year before, turned a profit?

14        A.   We don't know the exact costs that we

15   were spending versus what we were bringing in.  We

16   were trying to get that on a case-by-case basis to

17   get the ROI, and we never got that.  That was

18   actually the purpose of the August 17th, 2012

19   meeting, or one of the purposes.

20        Q.   And other than that, you did not ever

21   assess that he had made a profit for you?

22        A.   We feel that we had lost money with him.

23   As best we can tell with the records that we have,

24   we've lost money.  We're in the hole.

25        Q.   You described the circumstances of

Arbitration Proceedings  ~ Volume III ~  February 11, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  833

```
 1    Mr. Randazza agreeing to advance $25,000 to Hong

 2    Kong, correct?

 3        A.   Yes.

 4        Q.   And you were the one who suggested it,

 5    right?

 6        A.   The --

 7        Q.   That he --

 8        A.   Splitting the -- he was the one that

 9    suggested the Mareva injunction, said it would be

10    $50,000.  And Brian and I were sitting in the

11    meeting, and we were -- we're not willing to go

12    $50,000.  So we offered $25,000,

13    dollar-for-dollar, up to 50,000.  He said yes.

14        Q.   He suggested that the Mareva injunction

15    would be valuable for leverage over Oron, correct?

16        A.   To get more money from them, yes.

17        Q.   And after you obtained the Mareva

18    injunction in Hong Kong was when Oron signed the

19    agreement for $550,000, correct?

20        A.   Yes, it was more leverage.

21        Q.   So what --

22        A.   Wait.  I wasn't disputing that it wasn't

23    leverage.  It was leverage.  It was whether or not

24    the amount -- we were juggling whether the $50,000

25    was going to pay off or not, so --
```

Arbitration Proceedings ~ Volume III ~ February 11, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1    BY MR. WHITE:

2        Q.    All right.  Mr. Gibson, do you recall

3    testifying how the company took a public relations

4    hit after the so-called "thieving little shits"

5    e-mail?

6        A.    Yes.

7        Q.    You said in your deposition that you've

8    never attempted to quantify business loss

9    resulting from that, correct?

10       A.    Correct.

11       Q.    You pointed to Mr. Randazza's e-mail

12   applying -- discussing fair use in the context of

13   an XVideos link, correct?

14       A.    Yes.

15       Q.    You don't have any basis to think that

16   the advice in the e-mail is legally incorrect, do

17   you?

18       A.    I wouldn't know.  I guess that's a no.

19       Q.    You have lawyers outside now to advise

20   you on DMCA matters, correct?

21       A.    Yes.

22       Q.    And you are not aware of any changes that

23   your company has made in its approach to the DMCA

24   since Mr. Randazza left, correct?

25       A.    I'm not going to discuss the advice that

Arbitration Proceedings ~ Volume III ~ February 11, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1    our attorneys have given us.

 2        Q.   I'm not going to ask you to, sir.

 3             My question is:  Has your company changed

 4    its approach to DMCA takedown notices since

 5    Mr. Randazza left?

 6             MS. KRINCEK:  I'm going to object.  I

 7    think that is vague and ambiguous.  I'm not -- are

 8    you talking about --

 9             ARBITRATOR HABERFELD:  Over -- overruled

10    on that.

11             THE WITNESS:  I'm not --

12             ARBITRATOR HABERFELD:  Do you have

13    knowledge or recollection as to whether there has

14    been any change in policy since the departure?

15             THE WITNESS:  I don't recall any.

16    BY MR. WHITE:

17        Q.   And you don't recall any changes in

18    policy with respect to how to check whether a

19    challenged link might be fair use, correct?

20        A.   I don't -- I don't recall that.  I don't

21    know.

22             MR. WHITE:  Thank you, sir.

23             I don't have any more questions, Your

24    Honor.

25             ARBITRATOR HABERFELD:  Redirect?
```

Arbitration Proceedings ~ Volume IV ~ February 12, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 890

```
 1              ARBITRATION BEFORE

 2      JUDICIAL ARBITRATION AND MEDIATION SERVICE

 3

 4    MARC J. RANDAZZA,              )
                                     )
 5              Complainant,         )
                                     )
 6    vs.                           ) Ref. No. 1260002283
                                     )
 7    EXCELSIOR MEDIA               )
      CORPORATION, a Nevada         )
 8    corporation; LIBERTY          )
      MEDIA HOLDINGS, LLC, a        )
 9    California limited            )
      liability company; and       )
10    JASON GIBSON,                 )
      individually,                 )
11                                   )
                Respondents.        )
12    _____)

13

14        TRANSCRIPT OF ARBITRATION PROCEEDINGS

15                   VOLUME IV

16    BEFORE THE HONORABLE STEPHEN E. HABERFELD

17       Taken on Thursday, February 12, 2015

18        At 3800 Howard Hughes Parkway

19              Eleventh Floor

20            Las Vegas, Nevada

21

22

23

24

25    REPORTED BY:  JO A. SCOTT, RPR, CCR NO. 669
```

CERTIFIED COPY

Arbitration Proceedings ~ Volume IV ~ February 12, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 891

```
 1   APPEARANCES:

 2   For the Complainant:

 3       KENNETH P. WHITE, ESQ.
         HENRY L. WHITEHEAD, ESQ.
 4       Brown White & Newhouse
         333 South Hope Street
 5       40th Floor
         Los Angeles, California 90071
 6       (213) 613-0500

 7   For the Respondents:

 8       WENDY MEDURA KRINCEK, ESQ.
         ETHAN THOMAS, ESQ.
 9       Littler Mendelson
         3960 Howard Hughes Parkway
10       Suite 300
         Las Vegas, Nevada 89169
11       (702) 862-8800

12   Also Present:

13       MARC J. RANDAZZA
         JASON GIBSON
14       BRIAN LOWDERMAN
         BRIAN DUNLAP

15

16

17

18

19

20

21

22

23

24

25
```

Arbitration Proceedings ~ Volume IV ~ February 12, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1                        I N D E X

 2   WITNESS                                  PAGE

 3   BRIAN DUNLAP
          Cross-Examination by Mr. White      893
 4        Redirect Examination by Ms. Krincek  913

 5   ROBERT KIRK ADDISON
          Direct Examination by Ms. Krincek    915
 6        Cross-Examination by Mr. Whitehead   920

 7   CARI PIPER
          Direct Examination by Mr. White      923
 8        Cross-Examination by Mr. Thomas      937
          Redirect Examination by Mr. White    946
 9
     ROBERT KIRK ADDISON
10        Rebuttal Examination by Ms. Krincek  949

11   CHAZ VORRIAS
          Direct Examination by Mr. Thomas     952
12        Cross-Examination by Mr. White       962

13   MICHAEL HOLPUCH
          Direct Examination by Mr. Thomas     968
14        Cross-Examination by Mr. White       989

15   DENNIS L. KENNEDY, ESQ.
          Direct Examination by Ms. Krincek    993
16        Cross-Examination by Mr. White      1062
          Redirect Examination by Ms. Krincek 1100
17

18

19

20

21

22

23

24

25
```

Arbitration Proceedings ~ Volume IV ~ February 12, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1      A.    I did.

2      Q.    What was the extent of your contact?

3      A.    I couldn't quote you exactly what I said,

4  but it went along the lines of, Hey, we had an

5  idea of filming in your office today, which Marc

6  and I had discussed in the past before, and he's

7  made several offers to please film in my office,

8  please film in my home, whether it had been in

9  San Diego, in Las Vegas.  Any home he's ever had,

10  he's made that offer to us.

11         So I had the idea, We should do an office

12  scene today.  I texted him, I said, Would you be

13  okay if we filmed an office scene?  And he said,

14  Yes, absolutely.

15      Q.    Did he seem upset by the fact that you

16  were going to film in his office?

17      A.    No.  He was actually -- he seemed pretty

18  excited about it.

19      Q.    But the extent of your contact with him

20  was a text message -- it was a text message

21  exchange, correct?

22      A.    Correct, text.

23      Q.    Did you think he was going to have any

24  objection to you filming in his office?

25      A.    I didn't get that impression at all.

Arbitration Proceedings ~ Volume IV ~ February 12, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1   answers to each question without in any way

2   anticipating, arguing, explaining, or giving a

3   narrative.

4            THE WITNESS:  Understood.

5            ARBITRATOR HABERFELD:  Are you okay with

6   that?

7            THE WITNESS:  Yes.

8            ARBITRATOR HABERFELD:  Any questions

9   about it?

10           THE WITNESS:  No.

11           ARBITRATOR HABERFELD:  Okay.  Let's go

12  ahead, Mr. White.

13  BY MR. WHITE:

14      Q.   Good morning, sir.

15      A.   Good morning.

16      Q.   The film in Mr. Randazza's office was in

17  April 2012, correct?

18      A.   Correct.

19      Q.   Now, you knew that Mr. Randazza left

20  Excelsior in August of 2012?

21      A.   I believe so.  I don't recall the exact

22  date he left.

23      Q.   And you knew that there was controversy

24  surrounding his leaving, correct?

25      A.   I did.

Arbitration Proceedings ~ Volume IV ~ February 12, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 964

1    Q.    You knew there was a dispute between him

2    and Excelsior, correct?

3        A.    Correct.

4        Q.    In fact, you knew in 2012 that one of the

5    disputes was about that scene filmed on his desk,

6    correct?

7        A.    I wasn't aware that was a dispute until

8    further down the road, much further.

9        Q.    How much further?

10        A.    Until I was maybe -- maybe couple months

11    ago that I was told that he was questioning the

12    scene filmed in his office.

13        Q.    So was it a secret that you were the one

14    who filmed the scene in his office?

15        A.    No.    It's all -- we -- it's never a

16    secret who films what.

17        Q.    So Excelsior knew in 2012 that you had

18    filmed the scene in his office?

19        A.    They would have, yes.

20        Q.    Did they come to you and ask you in 2012

21    whether you had asked his permission?

22        A.    I believe they did, just out of

23    curiosity, if I asked Marc, just to make sure it

24    was okay.    It wasn't whether it was in dispute or

25    not.    They just asked me, Did you make sure it was

Arbitration Proceedings ~ Volume IV ~ February 12, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1    okay with Marc?  And I said yes.

2        Q.    Did you tell -- so you told them in 2012

3    that it was okay with Marc?

4        A.    Yes.

5        Q.    Did you look for your text message in

6    2012?

7        A.    Not that I recall.

8        Q.    Did they ask you to look for your text

9    messages in 2012?

10       A.    Not that I can recall.

11       Q.    But you told them that he had said it was

12   okay by text, right?

13       A.    I did.

14       Q.    Whose job is it to get the permission of

15   the person whose office is being filmed in?

16       A.    Either director or Aaron Anderson.

17       Q.    So who was the director here?

18       A.    I was the director.

19       Q.    So it would be generally either your

20   responsibility or Aaron's responsibility?

21       A.    Correct.

22       Q.    Was it Mr. Gibson's responsibility?

23       A.    No.

24       Q.    Was there any reason that you know of for

25   Mr. Gibson to seek separate approval?

Arbitration Proceedings ~ Volume IV ~ February 12, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1        A.    The files are stored using like -- they

2    are temporary or cache identifiers, so the file

3    names have been changed.  But within the database

4    on the cache, we can see that or what the original

5    files and folder paths were, and so from that we

6    were able to restore them.

7        Q.    And so were you able to restore some of

8    the Jungle Disk files in this case?

9        A.    Yes, we were.

10        Q.    How many were you able to restore?

11        A.    You know, I'll have to look again.   It

12    was quite --

13        Q.    I think Page 11 talks about it.

14        A.    -- quite a few.

15             Approximately 19,000 files.

16        Q.    Now, just a couple more final questions.

17             So even though you were able to restore

18    these Jungle Disk files, those were recoverable,

19    but if there were files or data that was deleted

20    from either of the devices, and that specific file

21    had not been saved into the Jungle Disk, would

22    there be any way to recover those files?

23        A.    No, there would not have been.

24        Q.    And there's no way to tell exactly what

25    was deleted and then subsequently wiped, correct?

Arbitration Proceedings ~ Volume V ~ February 13, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1                   ARBITRATION BEFORE

 2          JUDICIAL ARBITRATION AND MEDIATION SERVICE

 3

 4      MARC J. RANDAZZA,              )
                                       )
 5               Complainant,          )
                                       )
 6      vs.                            )  Ref. No. 1260002283
                                       )
 7      EXCELSIOR MEDIA                )
        CORPORATION, a Nevada          )
 8      corporation; LIBERTY           )
        MEDIA HOLDINGS, LLC, a         )
 9      California limited             )
        liability company; and        )
10      JASON GIBSON,                  )
        individually,                  )
11                                     )
                 Respondents.          )
12      _____)

13

14          TRANSCRIPT OF ARBITRATION PROCEEDINGS

15                      VOLUME V

16     BEFORE THE HONORABLE STEPHEN E. HABERFELD

17          Taken on Friday, February 13, 2015

18            At 3800 Howard Hughes Parkway

19                    Eleventh Floor

20                   Las Vegas, Nevada

21

22

23

24

25     REPORTED BY:   JO A. SCOTT, RPR, CCR NO. 669
```

CERTIFIED COPY

Arbitration Proceedings  ~ Volume V ~  February 13, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  1107

```
 1   APPEARANCES:

 2     For the Complainant:

 3       KENNETH P. WHITE, ESQ.
         HENRY L. WHITEHEAD, ESQ.
 4       Brown White & Newhouse
         333 South Hope Street
 5       40th Floor
         Los Angeles, California 90071
 6       (213) 613-0500

 7     For the Respondents:

 8       WENDY MEDURA KRINCEK, ESQ.
         ETHAN THOMAS, ESQ.
 9       Littler Mendelson
         3960 Howard Hughes Parkway
10       Suite 300
         Las Vegas, Nevada 89169
11       (702) 862-8800

12     Also Present:

13       MARC J. RANDAZZA
         BRIAN LOWDERMAN
14       BRIAN DUNLAP

15

16

17                    I N D E X

18   WITNESS                              PAGE

19   JOSEPH GARIN, ESQ.
         Direct Examination by Mr. White      1108
20       Cross-Examination by Ms. Krincek     1163
         Redirect Examination by Mr. White    1212
21       Recross-Examination by Ms. Krincek   1224

22   ELLEN R. PECK, ESQ.
         Direct Examination by Mr. White      1228
23       Cross-Examination by Ms. Krincek     1279
         Redirect Examination by Mr. White    1338
24

25
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Arbitration Proceedings ~ Volume V ~ February 13, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 1244

1    of what Mr. Kennedy said was that the -- that

2    Mr. Randazza was indirectly violating the rule by

3    negotiating prior to the end of the negotiations

4    the ability to be employed by -- by the either

5    Youngtek Solutions Limited or TNAFlix after --

6    after the matter was settled.

7            He saw that that was an indirect

8    violation of Rule 5-100(A), and --

9        Q.    Why do you disagree?

10       A.    Well, first of all, the idea -- first of

11   all, I'm troubled with the logic of it, because

12   what Mr. Kennedy is saying is that you can't open

13   yourself up as a lawyer and be free to represent

14   other parties the way you are negotiating with

15   them, because, you know, that would be a violation

16   of the rule.  But that in and of itself appears to

17   me logically to be a limitation on the right to

18   practice.  So I -- so that part of the logic I

19   just don't understand.

20           But, secondly, and more -- more

21   importantly, California does not limit in any way

22   a lawyer's ability to take on a new -- a new

23   client, provided that there is no conflict of

24   interest between the current client's interests

25   and the new client, and doesn't prohibit the

Arbitration Proceedings ~ Volume V ~ February 13, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 1245

1    negotiation for that or perceive -- there is

2    absolutely no authority for the idea that a lawyer

3    who negotiates for representation after the close

4    of a negotiation or lawsuit, and agrees to

5    represent the other -- the opposing party is, in

6    fact, a violation of our Rule 1-500(A).

7         Q.    Let me ask you about a distinction that

8    you drew in your report.  Is there a distinction

9    between making an agreement never to work for

10   people in the future, never to represent certain

11   people in the future on the one hand, and making

12   an agreement to represent somebody that will have

13   with it natural consequences in terms of ethics

14   and conflicts?

15        A.    Yes, I do make that very distinction.

16   And that really is my quarrel with Mr. Kennedy in

17   that the rule plainly prohibits your negotiation

18   that you are not going to hold yourself out to

19   practice to anyone who is going to -- who is going

20   to bring cases against TNAFlix, in this particular

21   example.  The rule clearly prohibits that.

22            But our common law in California has

23   another provision that I don't believe the

24   American Bar Association has, and that is that

25   once you represent a current client, you have a