# EXHIBIT 1

# EXHIBIT 1

Case 15-01193-abl   Doc 144-1   Entered 04/07/17 10:04:43   Page 2 of 240

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 1

```
 1                    ARBITRATION BEFORE

 2        JUDICIAL ARBITRATION AND MEDIATION SERVICE

 3

 4    MARC J. RANDAZZA,           )
                                  )
 5              Complainant,      )
                                  )
 6    vs.                         ) Ref. No. 1260002283
                                  )
 7    EXCELSIOR MEDIA            )
      CORPORATION, a Nevada      )
 8    corporation; LIBERTY       )
      MEDIA HOLDINGS, LLC, a     )
 9    California limited         )
      liability company; and     )
10    JASON GIBSON,              )
      individually,              )
11                                )
                Respondents.      )
12    _____)

13

14        TRANSCRIPT OF ARBITRATION PROCEEDINGS

15                      VOLUME I

16    BEFORE THE HONORABLE STEPHEN E. HABERFELD

17        Taken on Monday, February 9, 2015

18           At 3800 Howard Hughes Parkway

19                   Eleventh Floor

20                  Las Vegas, Nevada

21

22

23

24

25    REPORTED BY:  JO A. SCOTT, RPR, CCR NO. 669
```

**CERTIFIED COPY**

Arbitration Proceedings  ~ Volume I ~  February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  2

```
 1    APPEARANCES:

 2    For the Complainant:

 3         KENNETH P. WHITE, ESQ.
           HENRY L. WHITEHEAD, ESQ.
 4         Brown White & Newhouse
           333 South Hope Street
 5         40th Floor
           Los Angeles, California 90071
 6         (213) 613-0500

 7    For the Respondents:

 8         WENDY MEDURA KRINCEK, ESQ.
           ETHAN THOMAS, ESQ.
 9         Littler Mendelson
           3960 Howard Hughes Parkway
10         Suite 300
           Las Vegas, Nevada 89169
11         (702) 862-8800

12    Also Present:

13         MARC J. RANDAZZA
           JASON GIBSON
14         BRIAN LOWDERMAN
           BRIAN DUNLAP
15

16

17                    I N D E X

18    WITNESS                          PAGE

19    MARC J. RANDAZZA
        Direct Examination by Mr. White          13
20

21

22

23

24

25
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1          LAS VEGAS, NEVADA; MONDAY, FEBRUARY 9, 2015
 2                          9:10 A.M.
 3                           -oOo-
 4
 5          ARBITRATOR HABERFELD:  On the record.
 6          Good morning, all.  We're here in the
 7   first of five scheduled evidentiary sessions of
 8   the arbitration hearing in the matter of Marc J.
 9   Randazza, Complainant, and Excelsior Media
10   Corporation, et al., Respondents.  JAMS Reference
11   Number 1260002283.
12          We have had an off-the-record discussion
13   of a number of subjects, which I will try to
14   remember and will ask the assistance of counsel,
15   who I would, I guess, ask first to make your
16   appearances.
17          MR. WHITE:  Your Honor, Kenneth White,
18   Brown White & Newhouse for Complainant,
19   Mr. Randazza.
20          MR. WHITEHEAD:  Your Honor, Henry
21   Whitehead, also Brown White & Newhouse, also for
22   Mr. Randazza.
23          ARBITRATOR HABERFELD:  Okay.
24          MS. KRINCEK:  Wendy Krincek for Littler
25   Mendelson on behalf of the Respondent.
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1            MR. THOMAS:  Ethan Thomas from Littler
 2   Mendelson on behalf of the Respondent.
 3            ARBITRATOR HABERFELD:  Any other
 4   appearances today?
 5            MS. KRINCEK:  For the record, our company
 6   representatives for Respondent are Jason Gibson,
 7   Brian Lowderman, and Brian Dunlap.
 8            ARBITRATOR HABERFELD:  We may get to an
 9   issue of that.  I think I'm seeing --
10            MR. WHITE:  And Mr. Randazza is also
11   present.
12            ARBITRATOR HABERFELD:  Is there an issue
13   about the presence of representatives of the
14   company during the examination of any witnesses,
15   or that's not a problem?
16            MR. WHITE:  I believe that under the JAMS
17   rules, it's permitted.  I'll leave it to your
18   discretion, Your Honor, to consider when I
19   cross-examine, the fact that they've been here for
20   other proceedings.
21            ARBITRATOR HABERFELD:  Since it appears
22   we have three representatives, I think we can
23   narrow it down to one if it becomes an issue.
24            But they are entitled to have a
25   representative?
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 5

```
 1              MR. WHITE:  Yes, sir.
 2              ARBITRATOR HABERFELD:  As is indicated
 3    when I said "on the record," we have a court
 4    reporter present taking everything down, I
 5    believe, as we are proceeding now and through the
 6    conclusion of the evidentiary sessions of the
 7    arbitration hearing.
 8              And it is my understanding off the
 9    record, and you will now confirm on the record,
10    that it has been stipulated by both sides that
11    this matter may be stenographically, electrically
12    recorded as applicable by our court reporter, and
13    that the transcript, which will be prepared by her
14    of these evidentiary sessions, will become the
15    official record of the arbitration hearing; is
16    that so stipulated?
17              MS. KRINCEK:  We agree, Your Honor.
18              MR. WHITE:  So stipulated.
19              ARBITRATOR HABERFELD:  We also had a
20    conversation about what, if any, evidentiary rules
21    apply beyond the JAMS employment arbitration
22    rules.  And after checking and colloquy, it has
23    been stipulated and is so ordered that the
24    evidentiary rulings by the chair will be guided
25    solely by the arbitrator's discretion under the
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 6

1    JAMS employment arbitration rules, which in this

2    arbitration will be a more relaxed set of rules.

3    And we had a conversation about how, with respect

4    to documentary evidence and testimonial evidence,

5    that will work.  And I'm not going to go into a

6    long conversation now, except to, as briefly as I

7    can, just reference that off the record

8    conversation, and hope that it doesn't require

9    extensive regurgitation on the record.

10          But basically anything that has been

11   premarked and exchanged in the deposition volumes,

12   copies of which have been provided to the

13   arbitrator, are received in evidence subject to

14   specific objection which need not be made at this

15   time; however, timely objection should be made

16   should either side have any serious objection to

17   the documentation of marked and presented by the

18   other side, and, as I say, received in evidence,

19   that evidence is in until it is out, subject to

20   objection, as I've noted.

21          And that I have further noted that it is

22   very likely that I will overrule objections,

23   unless in the kind of category going to the bona

24   findings, whether it is a manufactured or altered

25   document, that would be the kind of objection that

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 7

1    I might be more inclined to sustain.  But,

2    otherwise, objections are not prohibited, but will

3    be taken more as flagging that I should pay more

4    attention because there is a sensitivity of which

5    I am being made aware.  But in the event that

6    everything that is received in evidence goes to

7    the weight, if any, of the evidence, and that

8    would be as to testimonial -- as to documentary

9    evidence.

10           As to testimonial evidence, I've

11   indicated off the record that just about

12   everything that will come in will be received,

13   even if it's hearsay.  But I did also indicate

14   specifically with respect to cross-examination,

15   that because of the relaxed evidentiary standard

16   being followed concerning the receipt of evidence,

17   there is a greater burden on the cross-examining

18   party, and, accordingly, a wider berth and robust

19   cross-examination is invited and should be

20   allowed, and I, in that connection, made clear

21   that there are certain disfavored objections,

22   those being asked and answered and unduly vague

23   and ambiguous for the reasons that I explained

24   when we were discussing off the record.

25           Is there anything else?

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1              Oh, I think we talked about
 2   confidentiality, and this matter will not be the
 3   subject of any protective order regarding privacy
 4   or confidentiality of the arbitration or any
 5   particular testimony based on what the arbitrator
 6   knows thus far, but if there is anything that
 7   comes up that requires that, I will entertain that
 8   at that time.
 9              And we talked about order of proof, and I
10   believe that we are going to accommodate the
11   experts, and we're going to testify essentially
12   out of order, if you will, with certain sides
13   presenting their experts on a day that might
14   follow the other side's.  But we're going to be as
15   flexible as necessary, and I believe that will not
16   lead to any confusion as to scheduling and with
17   respect to matters being covered on direct or
18   cross that bear on both the claims in chief and
19   counterclaims.
20              The parties have agreed, and the
21   arbitrator has agreed, also, that to the extent
22   that same witness has testimony with respect to
23   both claims and counterclaims, that should be, but
24   I'm not going to require by order, should be the
25   subject of one appearance only, but leaving it to
```

Page 9

```
 1   each side to decide how you want to handle that.

 2         Is there anything else that we discussed

 3   off the record that we should now put on the

 4   record?

 5         MR. WHITE:  I don't believe so, Your

 6   Honor.

 7         ARBITRATOR HABERFELD:  Okay.  I talked

 8   about no cross talk.  I also have what I call the

 9   Haberfeld antiskittle rule.  That has to do with

10   papers going from one side to another, which might

11   happen.  In order to preserve a civility and as

12   much calm in the series of hearings as possible,

13   all papers will go through me rather than being

14   pushed or skittled, if you will, across the table

15   to the other side.

16         MR. WHITE:  Yes, Your Honor.

17         ARBITRATOR HABERFELD:  Okay.  Anything

18   else we should discuss?

19         Hearing nothing, I think I read in the

20   papers, and I hope that this is correct, that each

21   side has waived opening argument based upon your

22   submission of prehearing briefs, with which the

23   arbitrator is familiar, so that we will proceed

24   with the first witness, who I have been advised is

25   Mr. Randazza; is that correct?
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1              MR. WHITE:  That is correct, Your Honor.
 2              ARBITRATOR HABERFELD:  Okay.
 3    Mr. Randazza, I would ask you please, before we
 4    get started, would you kindly print your name and
 5    business address, and then I'm going to ask you to
 6    please stand after you've done that, face me --
 7    or, actually, our court reporter, whom we have
 8    present, and to be sworn as a witness.
 9              MR. WHITE:  Mr. Randazza will be doing
10    that by affirmation.
11              ARBITRATOR HABERFELD:  That's fine.
12              And you know how to do that,
13    Ms. Reporter?
14              THE COURT REPORTER:  Yes.
15              ARBITRATOR HABERFELD:  Fine.
16              MR. WHITE:  Where would you like
17    Mr. Randazza to sit?
18              ARBITRATOR HABERFELD:  I think we spoke
19    with the court reporter, and I think she would
20    like the witness chair to be where Mr. Randazza is
21    presently sitting, all the better to see him.
22              MR. WHITE:  Would you like me to move,
23    then?
24              ARBITRATOR HABERFELD:  I think it's fine.
25    I think it would probably work the way you have
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1    it, but what would work best for you, Mr. White?
 2            MR. WHITE:  It works for me, or at least
 3    it does for the moment.  If it seems that he's
 4    looking -- it's difficult, then perhaps we'll find
 5    a way to move around.
 6            ARBITRATOR HABERFELD:  Okay.  Let's see
 7    about that.  We're good on that.
 8            MS. KRINCEK:  This chair is open, too.
 9            MR. WHITE:  Thank you.
10            ARBITRATOR HABERFELD:  I would just ask,
11    Mr. Randazza, if you could, as much as you can,
12    although the questions will be coming from
13    Mr. White, who is to your right, and I am to your
14    left, and the court reporter is across from you,
15    to please try to be as much giving your testimony
16    to me and to the court reporter, rather than
17    looking to Mr. White, which would be making it
18    difficult to read your lips and to hear you
19    better.
20            MR. RANDAZZA:  Okay.
21            ARBITRATOR HABERFELD:  Fair enough?
22            MR. RANDAZZA:  Sure.
23            ARBITRATOR HABERFELD:  Okay.  For
24    purposes of direct examination, and this is
25    applicable to all witnesses, just about anything
```

Case 15-01193-abl   Doc 144-1   Entered 04/07/17 10:04:43   Page 13 of 240

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 12

1    comes in on direct.

2           On cross-examination, Mr. Randazza, I

3    would ask you to be as completely and strictly

4    under the control of the cross-examining attorney

5    as possible, not in any way giving a narrative,

6    being anything other than completely concise,

7    truthful, and responsive with your answer, and not

8    in any way anticipating or arguing those kinds of

9    things; fair enough?

10          MR. RANDAZZA:  Fair enough.

11          ARBITRATOR HABERFELD:  And I know that

12   it's very hard for lawyers to follow that, so we

13   may have another conversation about that, but I

14   just wanted to give that as we begin.

15          Anything before we start, Mr. Randazza,

16   that you would like to ask or say before we have

17   Mr. White give the first question?

18          MR. RANDAZZA:  I don't think so.

19          ARBITRATOR HABERFELD:  Okay.  Mr. White?

20          MR. WHITE:  Would you like him to be

21   sworn by affirmation?

22   Whereupon --

23                  MARC J. RANDAZZA,

24   having been first duly sworn to testify to the

25   truth, the whole truth and nothing but the truth,

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1   was examined and testified as follows:
 2                 DIRECT EXAMINATION
 3   BY MR. WHITE:
 4        Q.   Good morning, Mr. Randazza.
 5        A.   Good morning.
 6        Q.   I'm going to be asking you questions
 7   about a number of categories.  The first one is
 8   about your background and how you came to work for
 9   Excelsior.
10        A.   Okay.
11        Q.   The second will be about your first years
12   working with Excelsior.
13        A.   Okay.
14        Q.   The next will be the time at which your
15   relationship with -- at Excelsior became
16   difficult.
17        A.   Okay.
18        Q.   The next will be the time at which you
19   left Excelsior.
20        A.   Okay.
21        Q.   Then I will also be asking you about the
22   Oron litigation in particular and about
23   Respondents' claims against you.
24             Let's start with your background.
25        A.   Okay.
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1        Q.    Can you tell me where you got your
 2   college and law degrees?
 3        A.    My undergraduate degree is from the
 4   University of Massachusetts at Amherst, and
 5   majored in journalism and minored in Italian.  My
 6   law degree is from Georgetown.
 7        Q.    And did you get any postgraduate degrees?
 8        A.    Yes, two of them.
 9        Q.    Where are those?
10        A.    I have a Master of Arts in mass
11   communication from the University of Florida, and
12   an LLM in international intellectual property law
13   from the University of Torino in Italy.
14        Q.    Now are you -- in the last five years,
15   have you been called upon as a consultant by the
16   media to speak on First Amendment or intellectual
17   property issues?
18        A.    Longer than that, actually.  That began
19   in 2004.
20        Q.    And can you describe very briefly what
21   types of things you've been called on?
22        A.    Yeah.  My first request to be a
23   commentator was by Fox News in, I want to say
24   2004 -- yeah, 2004, just prior to the 2004
25   election.  I did some commentary on First
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 15

```
 1    Amendment and election law issues.  And then

 2    continued to do commentary for Fox nationally,

 3    some local news media, as well, in Florida.  Over

 4    the next couple of years, when I moved out to --

 5    when I left Florida, I stopped doing Fox, got a

 6    little annoying.  But then I got -- I got -- a

 7    little too adversarial for me.  But then we -- I

 8    started doing commentary more recently for CNN

 9    on -- on mostly First Amendment issues.

10            As far as print media, and -- I don't

11    even -- I couldn't even begin to truthfully list

12    how many times I've been interviewed by them from

13    2004 until now.

14       Q.   And would the print media interviews also

15    be on First Amendment/intellectual property

16    issues?

17       A.   Almost exclusively on those.

18       Q.   When you got out of law school and

19    started working, did you work towards developing a

20    specialty?

21       A.   Yes.  It was my intent to do media law,

22    First Amendment, and intellectual property issues.

23       Q.   And how did you go about developing

24    towards that specialty?

25       A.   It was a little bit meandering at first,
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1    unfortunately.  I took a job with a firm that

2    did -- that had me working primarily in their

3    condominium association practice.  However, that

4    did have a few copyright and First Amendment

5    issues that would come up, often defamation issues

6    among board members and copyright issues, like --

7    the most interesting one, or the first one that I

8    had I thought was -- there was some issues with

9    licensing and playing the radio in clubhouses on

10   golf courses and things like that.

11        Q.   Did you eventually take a different job?

12        A.   I did.  In, I believe, 2004, it might

13   have been 2004.  I started working for Larry

14   Walters at Weston, Garrou & DeWitt.

15        Q.   What type of work did you do at that

16   firm?

17        A.   Well, they were primarily a First

18   Amendment and intellectual property firm.  They

19   were a small firm with their main office in

20   Los Angeles, but they had a small satellite office

21   in Orlando, and I became familiar with Mr. Walters

22   through a case I did at the prior firm for an

23   adult entertainment company.

24        Q.   Did they have a particular industry

25   client base for their IP and First Amendment work?

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1        A.   They were heavily slanted toward adult
 2   entertainment.
 3        Q.   Did you, when you were working for them,
 4   service adult entertainment clients?
 5        A.   Yes, almost exclusively.
 6        Q.   When did you first come to meet or work
 7   with Mr. Gibson at Excelsior?
 8        A.   It was while I was at Weston Garrou.
 9   Again, I'm not entirely certain exactly when it
10   was, but it was just prior to me being named a
11   partner there.
12        Q.   Did there come a time when you had a
13   discussion with Mr. Gibson about the possibility
14   of you joining Excelsior as an employee?
15        A.   Yes.
16        Q.   About when was that?
17        A.   I would say that was in 2009, maybe
18   spring or summer of 2009.
19             MR. WHITE:  And, Your Honor, as we go
20   through this, I'm going to ask for Mr. Whitehead's
21   assistance in getting out the relevant volumes of
22   exhibits for you and for the witness, if that's
23   all right.
24             ARBITRATOR HABERFELD:  As long as it's
25   not any way disturbing to the process, it's fine
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1    with me.
 2             MR. WHITE:  Okay.
 3             ARBITRATOR HABERFELD:  Particularly if it
 4    assists the process.
 5             MR. WHITE:  Yes.
 6             MR. WHITEHEAD:  And, Your Honor, just for
 7    your reference, both parties have put their sets
 8    of exhibits for you behind here.  Those are
 9    Respondents' and ours are right here, and I'm
10    going to pull out the first volume for you.
11             ARBITRATOR HABERFELD:  Will we be going
12    pretty much in order in which they are tabbed, so
13    there is only one volume?
14             MR. WHITE:  I'm afraid not.
15             ARBITRATOR HABERFELD:  All right.  Which
16    one?  Which volume?
17             MR. WHITE:  Would you put the first
18    volume?
19             MR. WHITEHEAD:  Yeah, that's the first
20    volume.
21             MR. WHITE:  For the witness, as well,
22    please?
23             MR. WHITEHEAD:  Yes, of course.
24    BY MR. WHITE:
25        Q.   And, Mr. Randazza, I'm going to ask you
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 19

 1   to look at our Exhibit 1.

 2        A.   Okay.

 3        Q.   Take a look at it sufficiently and tell

 4   me if you recognize what it is?

 5        A.   Yes, I recognize it.

 6        Q.   Is that the contract you eventually

 7   executed with Excelsior?

 8        A.   Yes, it appears to be.

 9        Q.   Is that your signature on the last page

10   of it?

11        A.   That is my signature.

12        Q.   Now, how did the process of drafting a

13   contract get started?  Who sent the first draft?

14        A.   Jason sent me the first draft of the

15   agreement.

16        Q.   And did you make changes?

17        A.   I did.

18        Q.   Were you being helped by anyone in this

19   process?

20        A.   I was.

21        Q.   And who was that?

22        A.   Jessica Christensen.

23        Q.   Did you have any understanding based on

24   your communications with Mr. Gibson that he was

25   being assisted by anyone?

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  20

```
 1        A.    I did believe that he was.

 2        Q.    Based on what?

 3        A.    Well, Mr. Gibson had often communicated

 4   to me that he was a -- that he had a higher degree

 5   in human resources.  He had communicated to me

 6   that he had done work with an attorney John

 7   Dozier, and the nature of the agreements that he

 8   sent me, I was under the impression had been

 9   professionally drafted.

10        Q.    And when you were going back and forth

11   with Excelsior over the possibility of joining

12   them, did they give you everything you asked for?

13        A.    No.

14        Q.    Can you give me an example of something

15   that you negotiated for that they refused?

16        A.    You know, the most important thing that I

17   wanted, that I didn't -- that we didn't do was

18   we -- if I moved from -- at the time I was living

19   in Florida, and there was some contemplation that

20   I would have to move to San Diego.  And if I did

21   that, I would not have been able to afford a down

22   payment on a house, so I asked them if they would

23   provide me with a loan for the down payment.  They

24   declined to do that.

25        Q.    But other terms that were important to
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 21

```
 1    you were included?

 2        A.    Yes.

 3        Q.    Let's talk about some of the terms in the

 4    agreement.  Would you first look at Paragraph 7B,

 5    which was -- which is on Page 6 of the contract.

 6    Let me know when you have it there.

 7        A.    Yes, I have it.

 8        Q.    This is a severance term.  Is this

 9    something you specifically negotiated?

10        A.    This was important to me.

11        Q.    Why was it important to you?

12        A.    Well, I was leaving a law firm that I had

13    established a good relationship with.  I made

14    partner there much faster than most associates

15    did.  Giving that up was a big deal to me.

16            I also had a new baby at the time, and I

17    was a bit worried taking the risk of going with

18    this company, and then maybe having it not work

19    out, especially if I had to move all the way

20    across the country to San Diego.  I didn't want to

21    be left high and dry with a -- you know, a new kid

22    and new wife and a family to provide for.

23        Q.    Please look on the next page, Page 7,

24    under the heading Exceptions.

25            Do you see on Page 7 and 8 a series of
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  22

```
 1    disciplinary steps?

 2        A.    I do.

 3        Q.    Do you know where those came from?

 4        A.    I copied and pasted those almost verbatim

 5    from another document that Mr. Gibson sent me as

 6    part of their offer.  They had an employee

 7    handbook that had -- again, I don't know if I

 8    might have edited word to word, but I think if you

 9    look at the provisions here and you look at the

10    handbook, you will see that it's very clearly

11    plagiarized from it.

12        Q.    Have you reviewed the handbook that is

13    Plaintiff's -- excuse me -- Respondents'

14    Exhibit 340, 340?

15            Have you reviewed it in preparation for

16    this?

17        A.    I have.

18        Q.    And is that -- does that appear to be the

19    one they provided you with?

20        A.    It does.

21        Q.    Why was this important to you, a

22    progressive discipline system?

23        A.    Well, it was already in their policies.

24    It was in their offer papers.  I wanted to make

25    sure that it -- I really liked it, so I wanted to
```

Arbitration Proceedings  ~ Volume I ~  February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  23

```
 1   make sure that if they changed their handbook,
 2   that that remained part of the deal.  And I wanted
 3   to be able to have the ability to correct any
 4   issues if we had any disagreement on how things
 5   were going.
 6       Q.   Mr. Randazza, did you discuss during the
 7   negotiations whether or not you could have outside
 8   clients while you were being general counsel of
 9   Excelsior?
10       A.   Yes.
11       Q.   And did you and Mr. Gibson ever discuss
12   sort of a model or an example of how that might
13   work?
14       A.   Actually, yes.  When -- you know, when
15   Jason first approached me about this position, you
16   know, it was sort of an oblique reference.  I got
17   an e-mail from him really expressing a bit of
18   dissatisfaction with how my firm was being -- was
19   acting towards his affairs.
20           Like when we had an emergency, we ran it
21   like an emergency room.  If he had an emergency,
22   we jumped right on that.  But something like an
23   ongoing contract might get put to the side for a
24   few weeks.  I agreed that perhaps it was a little
25   bit less service than he should get, and he
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 24

```
 1    mentioned -- he mentioned something about, you

 2    know, do you know anybody who might be interested

 3    in being our general counsel, and I think there

 4    might have even been an emoticon wink in there.

 5           And he expressed that he wanted to have

 6    his own Gill Sperlein.  And Gill Sperlein was the

 7    general counsel for another adult entertainment

 8    company called Titan Media at the time.  But he

 9    had --

10        Q.   Did Mr. Sperlein have an outside practice

11    at the time?

12        A.   He did.  So that was -- you know, I saw

13    that as a -- I saw his model as a pretty good

14    model, and so that was part of what piqued my

15    interest about doing this.

16        Q.   Did you discuss whether or not there

17    would be any benefit to you maintaining an outside

18    practice for Excelsior?

19        A.   Yes.  I felt that it would be of benefit

20    to them, especially given the way that I foresaw

21    the position developing.

22        Q.   How would it be a benefit?

23        A.   Well, I didn't get the impression this

24    was going to be a typical general counsel position

25    where you refer out, where you are essentially
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 25

1  managing outside counsel, you know.  The way Gill

2  did it, he did all of their work for Titan, as

3  well.  So it wasn't really a GC, it was doing a

4  lot of litigation, a lot of hands-on work, rather

5  than managing outside counsel.

6      Q.   So how would having an outside practice

7  assist Excelsior in your view?

8      A.   Well, I also explained that, you know, I

9  felt like going in-house was somehow -- you know,

10  could make some of my skills atrophy.  Also, at

11  that point, I had developed a lot of connections

12  in the adult entertainment industry, a lot of

13  clients that I continued to do work for that I

14  think had symbiotic needs.  So keeping those

15  relationships going, I think would only have made

16  me able to do my job better.

17      Q.   I'm going to read you a sentence from

18  Mr. Lowderman's deposition.

19           And who is Mr. Lowderman, just for the

20  Arbitrator's benefit?

21      A.   He's sitting at the end of the table.

22      Q.   What was his position at Excelsior?

23      A.   He's a part owner of the company, a large

24  shareholder in the company, and a -- I want to say

25  chief technology officer.

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  26

```
 1       Q.   Let me read this sentence from his

 2   deposition, and you tell me whether it accurately

 3   reflects a discussion you were having.

 4       A.   Okay.

 5       Q.   You testified, We allowed him to have

 6   outside clients to help him maintain a legal

 7   presence so that it would help the company in any

 8   future endeavors.

 9            Does that accurately reflect the

10   discussion?

11       A.   It does.

12       Q.   All right.  Would you please look again

13   at Exhibit 1 before you?

14       A.   Yes.

15       Q.   Now, did you do anything to structure --

16   in negotiating to structure this agreement to make

17   it clear that you would be able to have outside

18   clients?

19       A.   Two things, really.  If you look at

20   Paragraph 1, I wanted to make it clear that there

21   might be some, you know, serious impositions on my

22   time for my existing clients.  For example, I had

23   some litigation going on that I couldn't just set

24   aside.  The clients wanted to go with me rather

25   than stay with my firm, my prior firm.  So I
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 27

```
 1    wanted to make it clear there that that would be
 2    going on.
 3              But, additionally, I wanted to make it
 4    clear that while that current work would taper
 5    down, that I would also have ongoing
 6    representation to other private clients.
 7         Q.   Where did you make that clear?
 8         A.   Well, I made that -- I put that in
 9    Paragraph 6C, but I also deliberately put a
10    reference to it in Paragraph 1, because I didn't
11    want -- I didn't want at any point for this to be
12    seen as a surprise.  You know, sometimes people
13    read through a contract, and by the time they get
14    to the sixth or seventh page, perhaps their
15    attention isn't as clear.  I wanted to make sure
16    that if this was an issue, that it was front and
17    center.
18         Q.   And did you -- there is language in 6C
19    about -- if you turn to that, which is on --
20    beginning on Page -- pardon me.  The part I'm
21    going to ask you about is on Page 6.
22         A.   Okay.
23         Q.   There's a reference to such services
24    being rendered through a separate legal entity --
25         A.   Yes.
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  28

1       Q.   -- such as Marc Randazza, PA, or another

2   outside law firm.

3       A.   Yes.

4       Q.   What was the purpose, as you understood,

5   of that term?

6       A.   Well, I wanted to make sure that it was

7   clear that I would be practicing with that outside

8   entity, or even, you know, while this never

9   happened, I thought it might be possible that I

10  would wind up as of counsel to another law firm,

11  larger law firm.  Really at the time I thought

12  there was a law firm in Miami that I was doing a

13  lot of work for as a contract attorney, and I

14  suspected that it might develop that I would

15  become of counsel to them, although that never

16  happened.

17      Q.   Now, when did you contemplate that you

18  would be doing this work if you were doing outside

19  work?

20      A.   Well, I didn't expect it to take up all

21  that much time, so I would do it nights, weekends,

22  beforehand.  You know, a lot of my clients were

23  back on the East Coast, and I thought if I moved

24  to the West Coast, well, that would give me some

25  nice time zone arbitrage to do it, but I would be

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  29

1   doing it essentially on my own time.

2       Q.   Did you negotiate for any time off that

3   would empower you to use, if you needed to go to a

4   hearing or something, for a private client?

5       A.   I did.  I mean, if you look in the

6   contract, there is a pretty generous amount of

7   paid time off.

8       Q.   Are you looking at Page 3, Item E?

9       A.   Actually, I was looking at Page 7.  But

10  it's also -- I think it's also referenced -- it's

11  referenced here -- I'm sorry.  No.  The numbers

12  were beguiling me.

13          I am looking at 3E.  It says I get

14  15 days in the first year; second and third year,

15  20 days, 25, and then 30 for the seventh year

16  onward.

17      Q.   What was your purpose in negotiating a

18  fairly generous amount of paid time off?

19      A.   Well, of course I would want to have the

20  maximum amount of time off possible, but, also, I

21  wanted to make sure that if I had, for example, a

22  five-day arbitration I had to go to while I was

23  working for them, that I could take that time off,

24  and still have time to take off with my family.

25      Q.   I would like to talk to you now about the

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  30

```
 1    Remuneration section, particularly

 2    nondiscretionary bonuses, which is on Page 3,

 3    Paragraph C.

 4          Would you turn to that, please?

 5      A.   I see it.

 6      Q.   Did you also deliberately negotiate the

 7    terms of this paragraph?

 8      A.   Yes.

 9      Q.   So this says that you get, as a

10    discretionary bonus, 25 percent of any settlement

11    funds paid to Excelsior in connection with legal

12    matters.

13          What -- why did you negotiate the next

14    sentence about vesting?  Can you read that and

15    tell us why you did that?

16      A.   Well, the first part was actually

17    proposed by Excelsior, the 25 percent.  I wanted

18    to make it clear that in the event that -- you

19    know, I looked at the math here, and I said it is

20    possible I could get a settlement or a judgment

21    that was large enough that it was more economical

22    to pay my severance than to pay my bonus, and I

23    could see that there would be a way to work that,

24    so I wanted to make sure that if the benefit

25    inured to the company that I got this, if I got
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 31

1    something like that, they couldn't just then

2    immediately fire me, keep the money, and pay me

3    the severance, and then I'm out.

4        Q.   The next part says, Settlement fund

5    bonuses will vest at the time of settlement.

6            Do you see that?

7        A.   I do.

8        Q.   Is that something you also deliberately

9    negotiated?

10       A.   I did.

11       Q.   And the next sentence is, If

12   Mr. Randazza's employment terminates for any

13   reason by either party, Randazza will be entitled

14   to all vested settlement bonus amounts, regardless

15   of when they are collected.

16           Why would you negotiate a term like that?

17       A.   Because I could also see that perhaps the

18   settlement funds wouldn't come in for a long time,

19   so I wanted to make sure that that was also

20   something clear, that if I was working for a

21   certain goal, I didn't want that goal to evaporate

22   simply because the relationship might not have

23   continued.

24       Q.   Now, this doesn't explicitly say whether

25   that 25 percent is of gross or of net, does it?

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1    That should be "or of net."

2        A.    No, it doesn't make it -- it doesn't make

3    it clear.

4        Q.    Did you have any discussions with

5    Mr. Gibson during the course of your work with

6    Excelsior about which one it was?

7        A.    Yes.  It was my understanding, and I

8    believe his understanding, that it was from the

9    gross.  And, in fact, from the very first

10   settlement that came in, it was gross.

11       Q.    Would you please turn to Exhibit 30 in

12   the binder before you?

13       A.    Yes.

14       Q.    And let me know when you have it and you

15   are ready to talk about what it is.

16       A.    I am ready.

17       Q.    Do you recognize what this is?

18       A.    Yes.  This is an e-mail exchange that

19   Jason and I had where we discussed whether it

20   would be net or gross.

21            And you can see the -- on the second page

22   of the exhibit, Jason began the discussion in

23   February of 2010, really bringing up the issue of,

24   you know, what would happen if possibly our

25   expenditures on a file wind up exceeding the

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 33

```
 1   amount of the settlement, or making it that they

 2   actually get nothing, but I still get my

 3   25 percent.  And I acknowledge that, you know, we

 4   didn't even ponder that at the time.

 5         However, I did offer to change the

 6   agreement, if he wanted to, but I wanted to make

 7   sure that the -- you know, that wasn't the only

 8   equity that we took into consideration.

 9     Q.    Did you, in fact, change the agreement?

10     A.    We did not.  When I proposed, for

11   example, you know, I had -- I had in mind at that

12   time a settlement that we came to that, you know,

13   I was -- I was particularly disappointed in,

14   because we had gotten -- I don't remember the

15   exact amount, but we had gotten something like a

16   $600,000 judgment against a trademark infringer,

17   cybersquatter, so that would have been a pretty

18   large bonus for me.

19         And Jason made the decision that he would

20   of rather -- he made the decision to settle for

21   something like, you know, $30,000 and the transfer

22   of a domain name that I didn't think was

23   particularly worth all that much, but he was the

24   boss, so I did what he told me to do.

25         But there you can see, if they were going
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 34

```
 1    to change the equities on net versus gross, maybe
 2    we could put in some consideration for what
 3    happens if we get a domain name that's worth a lot
 4    of money, I don't know how I get a quarter of
 5    that.
 6           Jason and I discussed that in this
 7    e-mail, and, you know, Jason decided at the end of
 8    that, let's just keep it the way we've had it all
 9    along.
10      Q.   Let me ask you about that.  On the first
11    page of the e-mail, the second to last
12    paragraph --
13      A.   Yeah.
14      Q.   -- in Mr. Gibson's last e-mail to you,
15    saying, So to keep things clean and simple, I'm
16    thinking maybe we should just continue under the
17    original agreement where we pay all expenses,
18    assume all risks, and I can freely hit the brakes
19    on the expenses and settle at will if I feel it
20    was the business's best interest?
21      A.   Yes.
22      Q.   Was that what you understood the
23    agreement continued to be after that exchange?
24      A.   Yes.  I think it couldn't be more clear.
25    We were -- it was going to be 25 percent of net,
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 35

```
 1    but Jason had the right, as always, to settle on
 2    whatever terms he wanted.
 3         Q.   Now, finally, with respect to this
 4    contract, let's talk about the choice of law
 5    provisions.
 6         A.   Okay.
 7         Q.   There are two places here that talk about
 8    California law.  Can you tell me, was there a
 9    discussion of what law should apply, or did you --
10    let me ask it this way:  Did you make a deliberate
11    choice about what law you wanted to apply?
12         A.   Yes.  I can't recall if the original
13    agreement as presented proposed California or not.
14    I think it was, but I wanted it to be California,
15    because at the time, there was some -- when we
16    signed this, there was lack of clarity about where
17    I would be working.
18              What I contemplated when we first signed
19    the agreement was really that I was going to move
20    to Massachusetts and work off site, and that was
21    perfectly permissible under the agreement.  The
22    other likelihood was that I would move to the
23    Tampa area, where my wife already owned a house,
24    if we could get our tenant to move out of that,
25    that would have been convenient.  But I also, you
```

000036

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 36

1    can see the agreement, contemplated a possible

2    move to California.  And I wanted to make sure of

3    two things.  One, I knew that California law

4    was -- was a -- was employee-friendly, it had a

5    large developed body of law around most

6    situations.

7            But, also, I wanted to make sure that no

8    matter how much this position made me move from

9    one place to the other to the other, that the

10   agreement itself didn't effectively change every

11   time I did a move.

12       Q.   And when you entered into the agreement,

13   did Excelsior have a presence in California?

14       A.   Yeah.  In fact, that was the only place

15   they had offices.  Their headquarters was in

16   San Diego.  The executives all lived in the Tampa

17   Bay area, and they had a house that they shot

18   movies in there, but there was no office facility

19   in Florida.

20       Q.   All right.  So let's move into the second

21   area of inquiry, and that's before 2012, your

22   experiences working for Excelsior.

23       A.   Uh-huh.

24       Q.   About when did you start working for the

25   company?

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1    A.   You know, I haven't reviewed anything to

2  give me a recollection of the exact date, but I

3  want to say it was in 2008, maybe 2009.  I got the

4  referral from a -- from the associate that I

5  actually replaced at Weston Garrou.

6    Q.   And that's my fault for asking a vague

7  question.  When did you start under this contract

8  working for Excelsior?

9    A.   Oh, I'm sorry.  That would have been, I

10  think -- I think July; June or July of 2009.

11    Q.   Now, I asked you working for Excelsior.

12  Was the legal work you did mostly for Excelsior --

13    A.   You mean --

14    Q.   -- the entity?

15    A.   -- from 2009 on?

16    Q.   Yes.

17    A.   Oh, yes.  No, no.  In fact, I did almost

18  nothing for Excelsior.  In fact, most the vast

19  majority of the work I did was for its subsidiary

20  Liberty Media Holdings.

21    Q.   So, for instance, when you filed

22  lawsuits, on whose behalf did you file them?

23    A.   They were always filed for Liberty.  I

24  don't recall ever filing one for Excelsior.

25    Q.   Did Mr. Gibson give you business cards

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1    for different entities?

2        A.    Yes.   In fact, we got -- I got business

3    cards from Excelsior Media and Corbin Fisher, and

4    I think -- I think I got a box for Liberty Media

5    Holdings, but really the only business cards I

6    ever used were the Corbin Fisher business cards.

7        Q.    What's Corbin Fisher?

8        A.    Corbin Fisher is really the trade name

9    that all of this is underneath.   Corbin Fisher is

10   the Website that Liberty manages and Liberty

11   publishes, and that is what the company's really

12   known as, is Corbin Fisher.

13            Excelsior Media is almost more of a front

14   that it tries to -- so that when they move into a

15   place or they have a Website, people can say, it's

16   just a media company, when, in fact, it's an adult

17   entertainment company.

18       Q.    Now, when you started working for

19   Excelsior under this contract, where were you

20   working physically?

21       A.    From my house in Lake Mary, Florida.

22       Q.    And did you eventually move to

23   California?

24       A.    I did.

25       Q.    How soon?

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

 1      A.    It wasn't long thereafter.  I had really
 2  been contemplating whether I should move to --
 3  move to Massachusetts, as had really been my plan,
 4  or go someplace where the company's headquarters
 5  was.
 6           I felt like I could be more effective and
 7  make a better impression on the company and do a
 8  better job by getting up and moving to their
 9  headquarters and working there.
10      Q.    Did they encourage you, also, to move to
11  California?
12      A.    Yeah, they incentivized it.  They
13  actually proposed that if I moved there, I would
14  get a salary bump to account for the higher cost
15  of living in San Diego.
16      Q.    Now, during this time from 2009 through
17  2011, how would you describe your personal
18  relationship with Mr. Gibson?
19      A.    It grew pretty close pretty quickly.
20  He -- I know when I first went out to San Diego to
21  go looking for a house to rent, he let us stay at
22  a house that he rented for the -- in San Diego,
23  and gave me and my wife and daughter his own room
24  to stay in there.  And I thought that was a pretty
25  nice gesture.

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 40

```
 1              And from there forward, every time that
 2   he and the other executives came into town, we
 3   would usually -- which was on a regular basis, but
 4   never actually scheduled, as far as I knew, we
 5   would have a lot of meals together, spend a lot of
 6   personal time together.  We would spend hours
 7   talking in his office from time to time, go out
 8   for drinks together.
 9      Q.   And did he become fairly close to the
10   rest of your family, as well?
11      A.   Yes.  In fact, he became very close to my
12   wife, and, you know, even my kids.  You know, my
13   daughter called him Uncle Jason.
14      Q.   Would you please look at Exhibit 50,
15   which was the last one in the binder in front of
16   you.
17      A.   Yes.
18      Q.   I don't believe that's --
19      A.   Oh, I'm sorry.  That's 49.
20           Got it.
21      Q.   The very last exhibit.
22      A.   Yes.
23      Q.   Do you recognize that e-mail?
24      A.   I do.
25      Q.   This is an e-mail in which you are
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1   expressing gratitude to Jason, Mr. Gibson, for
 2   something.
 3          Does this characterize the -- at that
 4   point in time, 2011, the friendliness and
 5   closeness of your relationship?
 6      A.   Yeah.  At the time, I was -- you know, I
 7   had been working so much, that I really neglected
 8   my health.  So he took me to a -- Jason picked me
 9   up one morning and took me to a weight loss
10   doctor.  I was like 205 or so at that time.
11   Brought me there, and I think he even paid for my
12   initial visit, and I thought it was really nice of
13   him.
14      Q.   I hope you are not implying that 205 is
15   expressive.  Well, strike that.
16      A.   Well, I'm only --
17          ARBITRATOR HABERFELD:  Off the record.
18            (Whereupon, an off-record
19             discussion was had.)
20          ARBITRATOR HABERFELD:  Back on the
21   record.
22   BY MR. WHITE:
23      Q.   So can you describe, once you arrive in
24   San Diego and you are working for the company,
25   generally what your duties were with connection to
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 42

1    the company's litigation?

2        A.   Aside from committing gross faux pas

3    about weight, when -- I'm sorry.  Could you repeat

4    the question?

5        Q.   Yes.  Can you describe generally your

6    duties with respect to litigation for the company

7    at the time you arrived in San Diego during that

8    time period?

9        A.   We already had some litigation ongoing

10   that started when I was with Weston Garrou.  I

11   think the first two cases that I worked -- the

12   very first matter that I worked on as general

13   counsel was a lawsuit against a former actor for

14   the company by the name of Breck Orshal.  He

15   had -- he was -- he had contracted to do six

16   scenes for the company, had only done five of

17   them, and then had a change of heart that he

18   didn't want to appear in the sixth one.  So the

19   company asked me, of course, to get that $10,000

20   back from him.

21       Q.   And was that one of your earliest things

22   that Mr. Gibson tasked you to do?

23       A.   It was.

24       Q.   And how would you characterize that

25   particular litigation?

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 43

```
 1       A.    It was pretty amicable with the opposing

 2   counsel.  He was a pretty nice guy.  In fact, I

 3   wasn't -- you know, he and I had an informal

 4   mediation with me, him, and his client in his

 5   office.  Although his client was upset, he put a

 6   lot of water on the fire and seemed to get us to a

 7   place where we could probably settle the case.

 8       Q.    Did he make an offer?

 9       A.    He did.  And, you know, I was -- I was

10   instructed to be very, you know, hard-core about

11   the settlement.  But he took me aside and said,

12   you know, Look, Kid, can you -- can you get this

13   thing settled for 9,500 bucks just so that I can

14   go in and tell my client that I brought any value

15   to him at all?

16           And I told him that while I didn't have

17   that authority at that time, that seemed

18   reasonable, I would -- I would do what I could to

19   get that done.

20       Q.    Did you take that to Mr. Gibson?

21       A.    I did.

22       Q.    What was his response?

23       A.    Literally or do you want me to make it

24   nice language?

25       Q.    If you remember as accurately as you can
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 44

```
 1   remember?
 2        A.   Fuck no.  He's paying every fucking
 3   dollar back.  Fuck him.
 4        Q.   How would -- how does that compare with
 5   the type of stance that Mr. Gibson typically took
 6   in litigation that he was directing through your
 7   relationship with him?
 8        A.   It was consistent.  You know, it was, you
 9   know, be -- be hard with people and get -- you
10   know, get the maximum.  It was more like, you
11   know, Express my will, and that's what you are
12   going to do.  And if he felt that somebody owed
13   him $10,000, $9,500 wasn't going to cut it.
14        Q.   Now, were you present for Mr. Gibson's
15   deposition in this case?
16        A.   Yes, I was.
17        Q.   Did you hear him suggest that he was
18   concerned that your aggressiveness would hurt the
19   company's reputation?
20        A.   I did hear him say that.
21        Q.   Let me read you one question and answer.
22   I'm going to ask you whether it accurately
23   reflects your memory of the way things worked?
24             The question was:  Wasn't it, in part,
25   one of your goals to make Corbin Fisher known for
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 45

1    going after infringers, to deter them?

2              The answer was Not to the point of

3    driving our customer base away.

4              Does that answer accurately --

5         MS. KRINCEK:  I just want to state an

6    objection for the record.  I'm not sure what

7    portion of the transcript he's referring to, but I

8    believe it refers to a portion where they were

9    talking about public relations for the firm, which

10   would be not relevant to this subject matter.

11             To the extent he's going to cite parts of

12   the deposition without including other relevant

13   parts to give you context, I don't think it's

14   helpful.  I think it's misleading and confusing.

15        ARBITRATOR HABERFELD:  I think we're

16   going to have to go to page and line.

17        MR. WHITE:  Certainly.  I'll pass that

18   line and come back to it, then.

19        ARBITRATOR HABERFELD:  Will that satisfy?

20        MS. KRINCEK:  That's fine.

21        ARBITRATOR HABERFELD:  Okay.  Page and

22   line will be the rule.

23        MR. WHITE:  Yes.

24   BY MR. WHITE:

25        Q.   Was he concerned between 2009 and 2011 as

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 46

```
 1    he was directing you in litigation about not going
 2    after the little guy for fear of how it would make
 3    Corbin Fisher look?
 4         A.   Not at all.  In fact, I think he actually
 5    relished that.  In one of our first cases -- one
 6    of the first cases that I filed against a
 7    copyright infringer was against a guy, I remember
 8    his -- he went by the name of A.D. Trice.  This
 9    guy was a -- lived in Dallas.  He was unemployed,
10    had been unemployed for quite a while, and was --
11    you know, nevertheless, he was still stealing
12    their content, burning it to DVDs, and selling
13    those on eBay.
14              Despite the fact that he didn't really
15    have any money, we -- I was instructed to go after
16    him hard and to get a large judgment against him
17    and make it public so that other people would be
18    afraid of stealing from Corbin Fisher.
19              Frankly, I thought it was a good policy.
20    It was to -- we would go against a lot of people,
21    and Jason liked that fact because the more we came
22    down on somebody small, the more it made the
23    press, and then the more it made the next
24    settlement easier.
25         Q.   Was the impact of public settlements part
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

 1   of your strategy, as well?

 2       A.   It was the entire executive team's

 3   strategy, as far as I knew, that we would -- you

 4   know, we would often get a stipulated judgment or

 5   a public settlement for a very large amount of

 6   money.  We would accept payment of a much smaller

 7   amount of money with the rest of it either, you

 8   know, abated or suspended until -- you know,

 9   unless the person then made it public that they

10   really only paid a thousand dollars or $2,500 or

11   something like that.

12           But that -- that was on -- you know, that

13   was our general strategy, to make it appear that

14   we were extremely aggressive about litigation, and

15   that you should be just as afraid of stealing our

16   content as perhaps you were of stealing Titan's

17   content, which was, again, following the Gill

18   model.

19       Q.   Did Mr. Gibson convey his expectations

20   about aggressiveness to you verbally or in writing

21   or both?

22       A.   Both.

23       Q.   Let's take a look at an example.  Would

24   you please look at Exhibit 34 in the notebook

25   before you?

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  48

```
 1        A.   Yes, I see it.

 2        Q.   Take a look --

 3             ARBITRATOR HABERFELD:  One moment,

 4   please.

 5             MR. WHITE:  I beg your pardon.

 6             ARBITRATOR HABERFELD:  Go ahead.

 7   BY MR. WHITE:

 8        Q.   And tell me when you recognize it and

 9   can -- make sure you are at 34, and tell me when

10   you recognize it and can talk about it?

11        A.   Okay.  I am at 34.  I recognize it, and I

12   can talk about it.

13        Q.   This e-mail is a -- is this an exchange

14   of e-mails about what sort of warnings to put at

15   the beginning of films?

16        A.   Yes.

17        Q.   And take a look at the part -- let's see

18   here -- at the bottom of the first page.  Do you

19   see it, the portion of the e-mail from Mr. Gibson?

20        A.   I do.

21        Q.   Where it says, That verbiage is a start,

22   but I'd still like to remind them that stealing

23   the video is a felony.  And then later on, Whether

24   the FBI enforces that or not, it is important they

25   know they have committed a serious criminal
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 49

```
 1   offense.  And maybe put in there the civil

 2   penalties when we come and sue their ass.

 3          Do you see that?

 4      A.   I do.

 5      Q.   Is that fairly characteristic of the sort

 6   of aggression that Mr. Gibson conveyed to you that

 7   he expected?

 8      A.   I would say it's actually a bit light.

 9   You know, in fact, there was a while that I had to

10   continually remind him that I could not threaten

11   criminal sanctions in negotiations in order to get

12   a higher civil penalty.  And he did want me to try

13   and get some prosecutors interested in going after

14   some of these little guys to -- you know, figure

15   if one person went to jail for stealing a Corbin

16   Fisher video, that would certainly make piracy

17   drop.

18          MS. KRINCEK:  For the record, we noticed

19   recently that this exhibit and several others, the

20   timing of them, of the exhibits does not make

21   sense.  And I'm not sure if it's the matter that

22   is was printed out, but, for example, on the first

23   page of this one, the top -- the top e-mail is at

24   July 2nd at 12:42, and then the next one is an

25   earlier e-mail, same day, at 12:34, and then an
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1    e-mail below that is a later e-mail, July 2nd at

 2    3:26.

 3            And that happens with several of the

 4    e-mails that were produced in the matter.  So I

 5    don't know if it's a matter of the way that they

 6    were printed, but I'm not entirely sure why that

 7    is or if it means that the e-mails are not in the

 8    proper order as they are on this page.

 9            THE WITNESS:  I can help you with that,

10    Your Honor.

11            ARBITRATOR HABERFELD:  Let's find out

12    what Mr. White wants to do about it.

13            MR. WHITE:  I'm happy to have

14    Mr. Randazza say what he understands to be the

15    issue.

16            THE WITNESS:  We were often in different

17    time zones when these were going back and forth,

18    so I'm reasonably certain that the time that you

19    see here is consistent, like if you look at -- I'm

20    just looking at the first page.  Jason sent an

21    e-mail at 3:26 p.m., and then Brian sent one at

22    3:28, and then you see that there's one from me at

23    12:42.

24            I would strongly suspect if we looked at

25    everybody's calendars, we would probably figure
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 51

1    out that I was in California at that time, and the
2    other gentlemen were in Florida.
3              That's a pretty common thing that I see
4    when people are sending e-mails across multiple
5    time zones.
6              MS. KRINCEK:  Their e-mails, however, I
7    understand are on the same time zone, so the same
8    time should be reflected.
9              And, also, just when I was looking at --
10   for the record, I also saw this problem with
11   Exhibit 36, and, also, there was one other,
12   Exhibit 40.
13             And I checked within one of these to see
14   if a three-hour time zone difference would account
15   for the different times, but it didn't appear to
16   me that it would.  So I just -- for these
17   exhibits, I just wanted to bring that to the
18   attention of the arbitrator.
19             ARBITRATOR HABERFELD:  Noted.
20             What would you propose that we do about
21   it, Mr. White?
22             MR. WHITE:  I propose that, for instance,
23   I'll ask Mr. Gibson whether he thinks they are
24   fabricated, and I don't believe he will.  And I
25   could ask Mr. Randazza about the method he used to

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1    produce them or gather them for production and
 2    discovery, and then I think it would go to the
 3    weight.
 4            ARBITRATOR HABERFELD:  My suggestion
 5    would be that if that's the way you want to handle
 6    it, that's the way we will handle it.  Another way
 7    might be to reserve this issue unless you feel
 8    that we need to deal with it now, and possibly get
 9    with Ms. Krincek or Mr. Thomas about to see if
10    there is some way that it can be satisfactorily
11    resolved without taking hearing time and
12    testimony.  But if not, we'll do it the way you
13    want and we'll do everything on the record.
14            MR. WHITE:  I mean --
15            ARBITRATOR HABERFELD:  It appears that
16    they might not be satisfied that it's going to
17    come to a resolution for me anyway, but I leave it
18    to you to decide how you want to do it.  Go ahead.
19            MR. WHITE:  I understand, and I will not
20    address it now.  I will take it up later.
21            ARBITRATOR HABERFELD:  I have it in my
22    notes; 34, 36, and 40.
23    BY MR. WHITE:
24       Q.  Mr. Randazza, was the level of
25    aggressiveness that was urged upon you consistent
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 53

1    between Liberty suing people for intellectual

2    property violations and Liberty suing, for

3    instance, past employees?

4        A.   Yes.  You know, it was -- you know, Jason

5    was understandably angry at people stealing his

6    intellectual property.  That was their work.

7    That's their art.  And when somebody else is

8    taking it and making money off of it, then that

9    would upset him.

10            But, you know, it would -- it would

11    certainly blow a lot of wind into the sails of

12    litigating the matter aggressively.  As far as

13    litigating against former employees, we never

14    actually, to my recollection, sued a former,

15    quote, unquote, employee, but we did go after a

16    number of people who were former actors for the

17    company.

18            I think they were all -- they were all

19    categorized as independent contractors.

20        Q.   Let me ask you a questions about one in

21    particular.  Do you remember someone named Justin

22    Krueger?

23        A.   I do.

24        Q.   And was there a dispute with him?

25        A.   There was.

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 54

```
 1      Q.   What was the general nature of it,

 2   without going into detail?

 3      A.   Copyright infringement.

 4      Q.   And what was he doing to infringe

 5   Liberty's copyright?

 6      A.   He was using photographs of himself, but

 7   that were the property of Corbin Fisher, to

 8   promote himself on a prostitution Website.

 9      Q.   Did you receive instructions about how

10   hard to deal with that?

11      A.   Yes.

12      Q.   Would you please turn to Exhibit 42 in

13   the binder before you?

14      A.   Yes, I see it.

15      Q.   Please take a look at the first page,

16   which is an e-mail, and then the second page,

17   which is a letter, just enough to see if -- answer

18   questions about it.

19      A.   Yes.  This is a proposed letter to

20   Mr. Krueger's attorney.

21      Q.   Now on the first page, did you send it to

22   Mr. Gibson?

23      A.   Yes.

24      Q.   Was it typical that you would send demand

25   letters to Mr. Gibson, or was this a special case?
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 55

```
 1      A.    I would often send them to him for his
 2   approval.  You know, sometimes he didn't want to
 3   be bothered with it, but I thought that this one
 4   was important to send to him.
 5      Q.    Now on the next page, I see the letter is
 6   dated January 2011, and it's on the letterhead of
 7   Randazza Legal Group?
 8      A.    Yes.
 9      Q.    Did you do many letters from Randazza
10   Legal Group?
11      A.    When it came to litigation communications
12   or demand letters, it was almost exclusively on
13   RLG letterhead, although earlier in the beginning
14   we did have it on Liberty or Corbin Fisher
15   letterhead.
16      Q.    Is there any particular strategy behind
17   doing that?
18      A.    Yeah.  You know, we wanted -- we wanted
19   the opposing parties to see that there was a law
20   firm behind the threats, not just a one-person
21   legal department.  Wanted them to see that there
22   were multiple offices.  And, also, I didn't
23   want -- I wanted them to see that there was a
24   level of separation between this and the company.
25      Q.    Did Mr. Gibson or anyone else at
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 56

```
 1   Excelsior ever ask you why you had this entity
 2   Randazza Legal Group?
 3       A.   No.  We -- in fact, we just talked about
 4   it.  I mean, it was never really like sat down and
 5   asked me, Why do you do this?  It was like, Hey,
 6   this seems like a better idea.
 7       Q.   I mean, did he ever ask you, upon looking
 8   at this letterhead, for details about what
 9   Randazza Legal Group was or who worked for it?
10       A.   No.  Because I think it -- I think the
11   letterhead speaks for itself.  It had, at the
12   time, these five lawyers.
13       Q.   So would you characterize the stance you
14   took against Mr. Krueger at Mr. Gibson's request
15   as aggressive?
16       A.   Well, initially, no, because initially I
17   believe our agreement with him was going to be
18   that he would, you know, not do it again, I think.
19   And this -- you know, this is quite a few years
20   ago, but I think we had an agreement with him that
21   he would sign a settlement agreement that he had
22   paid a certain amount of money, or that he would
23   stipulate to a judgment that we would refrain from
24   collecting as long as he adhered to other
25   conditions.
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 57

1        Q.   All right.  Would you please now look at

2    Exhibit 35?

3        A.   Yes, I see it.

4        Q.   And let me know when you are ready to

5    answer questions about it.

6        A.   I can answer questions about it now.

7        Q.   First of all, I see that there's the same

8    time stamp discrepancy on this one where there

9    seems to be an e-mail from Mr. Dunlap coming

10   before your e-mail.

11           Do you see that?

12       A.   Okay.  So on the first page, you are

13   saying that this comes at 2:28 p.m.?

14       Q.   The one from you.  And then if you look

15   at the top of the page, the response from

16   Mr. Dunlap comes at 11:31?

17       A.   Yes.

18       Q.   Do you see that?

19       A.   Yes.

20       Q.   Have you noticed that on many of the

21   e-mails that you've printed out?

22       A.   Yes.

23       Q.   Now, when you printed them out, were they

24   from -- for production in this case, were they

25   from Excelsior's server?

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  58

```
 1       A.   No.  I had -- I had these e-mails saved
 2   on my own server, but only up until spring of
 3   2012.  And then some -- some setting on the e-mail
 4   servers at Excelsior changed, and I couldn't -- I
 5   couldn't download them anymore.  I could only use
 6   them on the Web mail client.
 7       Q.   All right.  Let me ask you a question
 8   about this e-mail exchange with Mr. Dunlap.
 9            What position did Mr. Dunlap have in the
10   company?
11       A.   Chief operating officer.
12       Q.   All right.  The last sentence in his
13   e-mail at the top of the page says, Perhaps a link
14   to some Justin Krueger coverage to put the fear of
15   God into him.
16       A.   Uh-huh, yes.
17       Q.   Can you explain the significance of that
18   as you understood it?
19       A.   Well, we were being very aggressive
20   towards Justin Krueger as, you know, somebody to
21   make an example of.  You know, we didn't want to
22   make an example of everybody.  But when we picked
23   somebody to make an example of, that was
24   frequently a psychological warfare method that we
25   used.  Send -- send our prior judgments that were
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 59

```
 1    usually reported on in the adult media to them,
 2    and say, If you don't want to -- don't want this
 3    to be you, you'll do as we say.
 4        Q.   Did Mr. Krueger become something of a
 5    catch phrase about how hard to go after somebody?
 6        A.   Yes.
 7        Q.   Would you please turn to Exhibit 40 next?
 8        A.   Yes.
 9        Q.   And let me know when you are ready to
10    answer questions about it.
11        A.   I'm ready to answer questions about it.
12        Q.   I don't need you to do too much on this,
13    but can you tell me generally what you were
14    talking about with the Excelsior team in this
15    e-mail?
16        A.   I think this was -- this was a podcast
17    by -- this was regarding a podcast by a gentleman
18    by the name of Mike Hancock.  And Mike was a
19    smalltime podcaster who -- I don't remember a
20    whole lot about him, but I do remember he did a
21    portion on Justin Krueger, otherwise known in the
22    industry as Jake Lyons.  That was his stage name.
23        Q.   And did that podcast cause any
24    consternation --
25        A.   Yes.
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 60

1          Q.    -- from --

2          A.    Yeah.  People were upset because, you

3    know, Krueger was -- Krueger is a little bit

4    crazy.  You know, he would -- I don't remember if

5    it was in this podcast or something else, but he

6    claimed that we had -- we had sent people, in

7    effect, I think it might have even been me that

8    allegedly broke into his house with a crowbar in

9    order to steal information to be used to the

10   prosecution of claims against him.

11         Q.    In the top of Exhibit 40 in your e-mail

12   exchange with Mr. Gibson, there is a sentence, We

13   should spend every last penny going after him.  We

14   must end this injustice.  Full speed ahead.

15         A.    Right.

16         Q.    Again, is that sort of language

17   consistent with what you would get from Mr. Gibson

18   instructing you on stances to take in litigation?

19         A.    I would say it's at the top end of over

20   the top for him, but it wasn't -- it wasn't

21   inconsistent.  But I don't think we actually wound

22   up going after this guy, though, because we had

23   a -- you know, had a bit of a -- bit of an issue

24   with that.

25         Q.    Now, was it just Mr. Gibson himself who

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 61

```
 1    was urging aggressiveness and use of the media, or
 2    did other members of the Excelsior team do so, as
 3    well?
 4         A.   Oh, no.  The whole team was very in favor
 5    of doing that.
 6         Q.   Would you look at Exhibit 45, please?
 7         A.   Okay.
 8         Q.   And let me know when you have it and are
 9    ready to answer a question about it.
10         A.   I have it, and I'm ready.
11              MR. WHITE:  Also wait for His Honor, too.
12              ARBITRATOR HABERFELD:  Ready.
13    BY MR. WHITE:
14         Q.   So this is an e-mail from Mr. Dunlap to
15    Mr. Gibson and you, correct?
16         A.   It is.
17         Q.   What is he talking about in general?  Do
18    you recall the circumstances?
19         A.   Yeah, I do.  This was -- I don't remember
20    exactly which case this was, but Corbin Fisher, in
21    general, saw itself as a leader in the adult
22    entertainment industry's fight against piracy.
23              So part of the PR strategy was to show
24    people that, and possibly to shame other companies
25    into pulling their weight, as well.  But, also,
```

000062

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 62

```
 1    to, you know, make sure that people knew that if

 2    you stole from us, that that was going to result

 3    in consequences.

 4            MR. WHITE:  Your Honor, it's 10:15.  May

 5    I request a brief break?

 6            ARBITRATOR HABERFELD:  Sure.  How long

 7    would you like?

 8            MR. WHITE:  I would only need ten

 9    minutes, but whatever.

10            ARBITRATOR HABERFELD:  Off the record.

11            (Whereupon, a recess was taken.)

12            ARBITRATOR HABERFELD:  Back on the

13    record.

14            Mr. White?

15            MR. WHITE:  Thank you, Your Honor.

16    BY MR. WHITE:

17       Q.   Mr. Randazza, what types of different

18    lawsuits did you file to vindicate Liberty's

19    intellectual properties?  Are there sort of types

20    of classifications of defendants?

21       A.   Yes.

22       Q.   And why don't you tell me the first one

23    that comes to mind?

24       A.   There were a lot of BitTorrent users.

25            ARBITRATOR HABERFELD:  Is the court
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  63

```
 1    reporter, is she familiar with this as you say

 2    that?

 3              THE WITNESS:  I think so.

 4              THE COURT REPORTER:  Yeah.

 5              ARBITRATOR HABERFELD:  Okay.  Very good.

 6              MS. KRINCEK:  She did all the depositions

 7    in the case.

 8              ARBITRATOR HABERFELD:  Very good.  I

 9    didn't know.  I just thought to ask.

10              MR. WHITE:  Would you -- Your Honor,

11    would you like a brief explanation of BitTorrent?

12              ARBITRATOR HABERFELD:  If it is relevant

13    to our case.

14    BY MR. WHITE:

15      Q.   Can you briefly tell us what BitTorrent

16    is in terms of who you would be suing in

17    BitTorrent situations?

18      A.   Sure.  BitTorrent is actually a really

19    neat technology, Your Honor.  It's a -- if you

20    have an Internet connection, you usually have the

21    ability to download stuff a lot faster than you

22    can upload it.  So let's say you have an Internet

23    connection of 50 megabits per second and that's

24    what, say, Comcast tells you that you've got.

25              It is really a little bit of a fib
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 64

1    because you've got 50 download, but only five

2    upload.  So, really, if you and I want to

3    communicate, we're only able to do this at five

4    megabits per second.

5           But imagine if you got the same file from

6    ten different people all at the same time, just a

7    little bit of each from everybody, now everybody

8    can send five megabits per second at you, but

9    since it's ten people doing it, you are

10   downloading it at 50 megabits per second.

11          So it's really a way of transmitting

12   enormous files at a speed that your Internet

13   connection theoretically doesn't have the ability

14   to do.  So it's really kind of cool.  You know,

15   NASA uses it to transmit data about -- you know,

16   from space exploration, for example.

17          But then there is another use for it, and

18   that is if you want to illegally pirate movies, it

19   would take you a really long time if I just

20   e-mailed you a movie.  But if you get it from,

21   say, a thousand different people all at the same

22   time, you can do it in possibly in minutes or even

23   seconds.

24          But in order to do this, everybody needs

25   to participate in what's known as a BitTorrent

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 65

```
 1   swarm.  And that swarm is all the individual
 2   people all across the country and often across the
 3   world who have that particular movie, and not just
 4   that particular movie, but that particular
 5   hashtag.  What happens is the movie, the first
 6   person to upload it to make it available to the
 7   swarm, they are the only one person that has it.
 8   But as it metastasizes, it goes to more people,
 9   and it can go faster.  But it's always got to have
10   this kind of electronic DNA to it so everybody
11   knows we're getting the same piece of the same
12   file, that gets reassembled on your computer.
13          So all of these people participate in the
14   swarm, and each one of these individuals can only
15   communicate with each other based on their IP
16   address, which is essentially the address -- not
17   really an address.  It's more like a phone number
18   to their individual Internet connection.
19          So you can -- you can trace them to that,
20   and then what you've got is you've at least got
21   the house that was part of this swarm.  And then
22   when you download the movie, theoretically, you
23   now become part of the swarm.  So you are the next
24   infringer, or in our cases, you are my next
25   defendant, if I can find your IP address.
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 66

1      Q.    So was piracy of Liberty's content over

2    BitTorrent a significant problem?

3      A.    Huge.  I remember at one point we

4    released a DVD, and I want to say that, you know,

5    we sold maybe a thousand copies of it.  And we

6    just stopped looking when we found 100,000 pirated

7    version of it.

8            So, you know, you can imagine that for a

9    media company trying to sell movies, I mean,

10   imagine any other business in the world where you

11   have for every one you sell, you know, a thousand

12   people steal it.  No other business -- no business

13   can sustain that.

14     Q.    So did you at Excelsior go on campaign of

15   suing BitTorrent users to the extent you could?

16     A.    We did.  You know, this was actually a

17   strategy that the recording industry and the

18   motion industry had employed, and some adult

19   entertainment companies were doing it at the same

20   time.  That really created a lot of tension, you

21   know, although I didn't feel that the

22   anti-torrenting narrative was accurate.  It still

23   created a large crowd of people who would be very

24   negative about it.

25            You can imagine that if you have a

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 67

```
 1    thousand people getting sued for stealing -- you
 2    know, stealing a Bob Dylan song, well, they are
 3    going to get kind of upset about it.  So the
 4    recording industry took a public relations hit for
 5    it, one that they ultimately decided wasn't worth
 6    it because, you know, even if everybody steals
 7    that one song, you can still license it to movies,
 8    you can still license it to commercials.  The
 9    recording industry will persevere even if nobody
10    ever buys the song again.
11           So here I was looking at this and
12    thinking if I do this, I don't want to go into a
13    court and have, you know, a judge sitting there
14    saying, you know, You've got this essentially
15    no-warning lawsuit where all of a sudden, sure,
16    maybe this guy in Topeka, Kansas stole your movie,
17    but you are coming down on him under the Copyright
18    Act, where you have to file a Federal lawsuit
19    against them, which is a little unfortunate that
20    there's, you know, exclusive jurisdiction in
21    Federal Courts, but I didn't write the laws.
22           But I really wanted to have the optics of
23    it look good for any judge I was before, and I
24    wanted to make sure that we minimized the public
25    relations impact.  So what we did is I came up
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 68

```
 1   with an idea that we would send out a press

 2   release that we were about to do this, thinking

 3   that it would, at least, be a response when

 4   somebody says they did this without warning.

 5          And what we did was we said, If you've

 6   been stealing Corbin Fisher movies, you can

 7   contact us, and we will sell you amnesty from one

 8   of these lawsuits for a thousand dollars, thinking

 9   that was pretty good, given that the statutory

10   minimum was 750 bucks, we're going 250 bucks over

11   that, and I -- I didn't really expect it to do

12   anything except be a nice exhibit when somebody

13   says that we're, you know -- or at least a nice

14   piece of public relations when somebody says we're

15   a bunch of meanies for doing this.

16       Q.   How did it actually work?

17       A.   I'm still to this day surprised.  People

18   started mailing checks, so -- and I'm not

19   testifying to the exact number here, but I want to

20   say the first round, we got about $20,000 in

21   checks and agreements from people.

22       Q.   Did you then repeat the amnesty offer?

23       A.   Yeah.  I figured, Hey, let's try it

24   again.  Let's up the number to $2,500, and let's

25   say that we're going to extend it.  And I thought
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 69

```
 1   maybe we would get three or four more.  I think we
 2   got about $80,000 in that next round, which,
 3   again, was making all of us feel a little giddy
 4   because we had essentially embarked on a campaign
 5   to stop BitTorrenting of our movies, but we hadn't
 6   even so much as identified a defendant or sent a
 7   demand letter, and we were already $100,000 up.
 8       Q.   Did you eventually start suing
 9   individuals by IP address --
10       A.   Yes.
11       Q.   -- for piracy?
12       A.   Yes, we did.  In fact, we did one more
13   round of the amnesty where we raised it to like
14   $5,000, and then we got a few more bucks.
15           And then we started doing what's known as
16   John Doe lawsuits, where -- well, I had seen that
17   people were -- you know, some judges were
18   concerned about joinder issues, and defendants
19   were certainly raising joinder issues when you sue
20   John Doe 1 through 500.  I limited them to periods
21   of time and essentially sued the BitTorrent swarm
22   as an unincorporated entity.
23           And then what you would do is you would
24   file this lawsuit, and then file a motion for
25   early discovery with the court, the court would
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1    universally grant them, and then we would send
 2    subpoenas to the Internet service providers for
 3    the identities of the people attached to those IP
 4    addresses.  We had the IP addresses.  We just
 5    needed the names in order to start talking to
 6    them.
 7         Q.   Now, was this approach of suing
 8    individuals for BitTorrent, would you characterize
 9    it as popular in the press or in the community?
10         A.   Oh, no, no.  Everybody hates these,
11    except -- you know, and when I was going to go
12    down this road, I remember I sat down with Jason
13    and said, Look, this is an option for us.  We can
14    probably scare people into not stealing movies as
15    much, and I said we can probably make, you know,
16    50 to $100,000 on it, but, you know, you need to
17    understand there's going to be a little bit of a
18    PR hit.  And I showed him what the recording
19    industry and other companies had dealt with.
20         Q.   Did he ever express any hesitancy about
21    going forward with BitTorrent lawsuits?
22         A.   No.  He, you know, somewhat mocked my
23    concern about that.  I wouldn't say
24    disrespectfully, but said that, you know, What the
25    hell do I care?  These aren't -- I'm not really --
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1    you know, I explained people might get upset if

2    you are suing your fans.  And his position was,

3    and I still support his position, was that they

4    are not our fans if they are stealing from us.

5    Our fans are the people who are paying for it.

6        Q.    Let's take a look at an example.  Could

7    you please look in the second volume that's been

8    put in front of you at Exhibit 52?

9        A.    Yes.

10       Q.    And while His Honor is finding it, I

11   would like you to just look at it until you are

12   familiar with what it is.

13       A.    I am.

14       Q.    This is an e-mail exchange.  What is it

15   about, in general?

16       A.    This is about a defendant Prin

17   Tippayagosai.

18       Q.    Why don't you spell it for the reporter.

19       A.    I'm sorry.  Prin is P-r-i-n, Tipp is

20   T-i-p-p-a-y-a-g-o-s-a-i.

21       Q.    And was this someone you identified to

22   someone involved in BitTorrent piracy?

23       A.    Yes, yeah.  You can see in this e-mail we

24   have his IP address, which is 99.129.3.214.  We

25   have the exact movie that he was pirating and

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 72

1    when, so we had a guy targeted.

2        Q.    And I see at the top there is an exchange

3    between you and Mr. Gibson where you say, I

4    presume you want me to destroy this guy, and he

5    says, But of course.

6            Do you see that?

7        A.    I do.

8        Q.    Again, is that characteristic of the type

9    of level of aggression that he was asking for from

10   you?

11       A.    Yes.

12           MS. KRINCEK:   Just for the record, this

13   exhibit appears to have the same problem with the

14   time stamps of the e-mails, too.   So I'm not even

15   sure that the e-mails are printed out in the

16   correct order.

17   BY MR. WHITE:

18       Q.    So we talked about that.   Tell me, what

19   are tube sites?

20       A.    Well, if you are familiar with YouTube,

21   which if there is anybody in the Western

22   Hemisphere who isn't, you know -- I presume we all

23   know what that is.   You can upload a movie of your

24   choice to the site if you sign up and have an

25   account with that site.

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 73

 1      Q.    And were tube sites a piracy problem for
 2   Excelsior and Liberty?
 3      A.    They were.
 4      Q.    And were tube sites a viable target for
 5   lawsuits themselves?
 6      A.    They weren't really that good of a target
 7   because in large part, you know, they -- they have
 8   some very significant defenses.  They have -- the
 9   problem is the tube site is not the infringer.
10   The infringer is -- kind of like you couldn't sue
11   BitTorrent, you couldn't sue the company that
12   invented BitTorrent, because all BitTorrent did
13   was provide a tool.  That's why we never went
14   after the BitTorrent foundation.  It would have
15   been a disaster.
16          As far as tube sites go, they have a lot
17   of the same defenses, although they had some
18   vulnerabilities that I thought made them, at
19   least, a decent target for purposes of a -- you
20   know, what we refer to as a smash and grab suit.
21          So that, you know, if you want to hold a
22   tube site liable, you've got to show that they
23   were doing more than providing just the tube site.
24   They have to have some involvement in uploading
25   the video.

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 74

 1          So where YouTube doesn't do that, if
 2     somebody uploads -- you know, I know that you can
 3     get first run movies before they're even out in
 4     theaters sometimes on YouTube, YouTube is not
 5     liable for that.  The individual uploader is.
 6          Q.   What would make a tube site something
 7     that would make it a viable litigation target for
 8     what you called as colorfully a smash and grab?
 9          A.   Well, I would still look at them, and,
10     you know, the uncertainty of litigation was
11     certainly enough to motivate some of them to make
12     a payment.
13          And so I would look at them and see, are
14     they -- you know, where are they based?  Where is
15     their hosting company?  Where is their domain name
16     registrar?  If I have any indication of where
17     their money is, because all that can be in the
18     United States, but if their money is hidden under
19     a mattress in Kazakhstan, it isn't going to do us
20     much good.
21          So I would look at those, and then I
22     would kind of keep my finger on the pulse of what
23     rumors were about one being sold, because they did
24     tend to change hands on a regular basis.  And a
25     good time to file a lawsuit against them, even on

000075

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 75

```
 1    one that had very, you know, limited likelihood of
 2    success was when they were about to go into a
 3    sale.  You hit them with a Complaint, they call
 4    you up in a panic, how much can I give you to go
 5    away, and, you know, you get 50 grand here, 20
 6    grand there, and then next thing you know, you've
 7    got some real money.
 8        Q.   Did you succeed in getting any money in
 9    settlements from tube sites when you were doing
10    this on behalf of Liberty?
11        A.   I did.  You know, the average yield was
12    not all that good.  It was -- you know, I think
13    there was -- you know, I think we got 20 grand
14    from one, 40 or 50 from another.
15        Q.   Now, for the last, say, ten years, have
16    you followed IP lawsuits against tube sites?
17        A.   Of course, yeah.
18        Q.   Are you part of any organizations?
19        A.   Yeah.  I'm a member of the -- I don't
20    know if I'm still current, but I've been off and
21    on a member of the IP sections of all of my five
22    state Bars.  I've been a member of the
23    International Trademark Association, which while
24    it is trademarks only, they still follow copyright
25    issues.  I was an adjunct professor of copyright
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  76

```
 1    law, so I'm on a couple of list servers for

 2    copyright lawyers and copyright professors.  And

 3    then, of course, everybody who see a copyright

 4    case who I know tends to flood my inbox with

 5    e-mails saying, Have you seen this?

 6          MS. KRINCEK:  Your Honor, I would just

 7    object to this line of questioning.  It sounds

 8    like they are trying to qualify Mr. Randazza to

 9    give expert testimony or legal conclusions

10    regarding litigation against tube sites, which

11    would be inappropriate for him to be testifying

12    about legal conclusions about the types of

13    defenses or merit of defenses available,

14    especially given that that's relevant -- his

15    advice to our clients on that topic is relevant to

16    this arbitration, and he would obviously have

17    reason to be biased in giving this testimony in

18    his opinions.

19          MR. WHITE:  Your Honor, he's been accused

20    of improperly not advising certain suits.  I'm

21    laying the foundation for why he didn't.  And on

22    this, I'm only going to inquire another question

23    or two to follow up on that line of questioning.

24          ARBITRATOR HABERFELD:  Okay.  I reserve

25    the decision on the objection.
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 77

1   BY MR. WHITE:

2       Q.   Mr. Randazza, based on all that

3   following, are you -- have you ever seen any

4   successful lawsuit for copyright violation against

5   a tube site?

6       A.   The only success -- the only ones that I

7   am aware of with all of that background of places

8   that I would know to look where there has actually

9   been a successful lawsuit against a tube site were

10  one that we filed in the District of Arizona where

11  the other party defaulted, and then there was

12  another where we were involved in a three-way

13  lawsuit involving IO Group, which is Titan Media,

14  Corbin Fisher, and Channel 1 Releasing.

15          We sued a trio of tube sites that had --

16  that we had direct evidence of them uploading the

17  materials themselves and then charging for

18  subscriptions.  But we actually didn't win that

19  one on the merits.  We won that on terminating

20  sanctions for discovery abuses.

21          And on neither of those cases did we

22  collect a dime.  And I'm not aware of any -- any

23  lawsuit at all in the United States where a tube

24  site was successfully sued for copyright

25  infringement.

000078

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1            ARBITRATOR HABERFELD:  I'm ready to rule
 2    on the objection.  Overruled.
 3            Next question, please.
 4    BY MR. WHITE:
 5       Q.   Mr. Randazza, did Mr. Gibson ever give
 6    you any instructions or guidelines about
 7    litigation that would make prolonged litigation
 8    difficult for you?
 9       A.   Yes.
10       Q.   What was that?
11       A.   Well, when I first started litigating
12    cases, I just presumed he knew that it would
13    eventually result in possible counterclaims,
14    discovery, depositions, having to open up the
15    company's books on certain issues.  And he was
16    sort of upset about that, saying, Well -- I'm not
17    quoting him, but the general theme of the
18    conversation was, I didn't do anything wrong, why
19    should I have to open up my books?  Why should
20    that have to happen?  And I don't want to ever
21    have to sit for a deposition.
22       Q.   Did you succeed in your litigation
23    campaign in preventing Mr. Gibson from ever having
24    to sit for deposition?
25       A.   During my representation of the company,
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1    I do not recall us ever having to even so much as

2    provide responses to written discovery, much less

3    tolerate anybody having to sit for a deposition.

4        Q.   Do you know about how much you brought in

5    through your campaign at the time you were at

6    Excelsior?

7        A.   I want to say about $2 million.

8        Q.   Did Mr. Gibson ever complain to you that

9    the costs of litigation were getting too high?

10       A.   He did complain in the Oron litigation

11   because of the local counsel fees, primarily.

12       Q.   Well, let me ask this:  Was his stance on

13   the comparison of cost to resolve consistent?

14       A.   I wouldn't say so.

15       Q.   Were there cases -- were there any cases

16   where you thought that what was going out was

17   disproportionate to what might come in?

18       A.   No, not that I recall.  There might have

19   been some -- you know, I know that we had

20   expensive local counsel fees in some cases, but,

21   you know, nothing that -- nothing that really came

22   up.

23       Q.   How about the Krueger case, was that a

24   case where what you expected to get was consistent

25   with what you were putting into it?

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1      A.   Well, no, because we -- you know, we
 2   weren't laying out any outside counsel fees on
 3   that.  I was just putting a lot of my own time
 4   into it.  I didn't feel like it was really worth
 5   it, because I didn't expect -- you know,
 6   Mr. Krueger barely had, you know, anything to his
 7   name.  I knew no matter how big of a judgment we
 8   got against him, we were very unlikely to collect
 9   better than ten cents on the dollar.
10      Q.   Did Mr. Gibson ever have you conduct
11   litigation against a former landlord?
12      A.   Yes.
13      Q.   And how was that in terms of what was put
14   in versus what you could get out?
15      A.   I did complain about that because I felt
16   that -- again, I don't have the exact number in
17   front of me, but I want to say that there was a
18   security deposit that he failed to return to them,
19   so it was like a -- you know, I think it was
20   around $3,000.  And if I remember correctly, we
21   had perhaps the ability to collect attorney's fees
22   and an elevated amount on it, but it was -- I
23   don't know how much time I put into that, but it
24   was very disproportionate to what we could
25   possibly have collected from it, especially
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 81

```
 1   knowing that -- I think we ultimately discovered
 2   after conducting some pretty hard-core
 3   investigation that he had run away from a lot of
 4   debts, declared bankruptcy, run away from a lot of
 5   debts, and then was living on a small island off
 6   the coast of Honduras where I was to be sent to
 7   personally escort a process server to finally
 8   serve him with this thing.
 9           But kind of at the 11th hour, we figured
10   out that he had left that island, and we didn't
11   know where he was, so that can -- that trip got
12   canceled.
13      Q.   Let me move to another subject area, and
14   that is the press and relationship with the press.
15           Can you tell me what XBIZ is?
16      A.   XBIZ is a magazine that covers the adult
17   entertainment industry.  You might consider it
18   sort of to be like, I don't know, Entertainment
19   Weekly for the porn industry.  But it's a trade --
20   mostly just a trade publication.  Adult
21   entertainment executives and the like would be
22   interested in it.
23      Q.   Did you develop a relationship with XBIZ?
24      A.   Yes.
25      Q.   And how did that happen?
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1      A.   I represented them.

 2      Q.   Was that through your -- privately?

 3      A.   It was.

 4      Q.   And was some of that representation while

 5 you were at Excelsior?

 6      A.   Yes.

 7      Q.   Now, did you conceal from Excelsior that

 8 you were doing work for XBIZ?

 9      A.   Anything but.  I actually bragged about

10 it.

11      Q.   What type of work were you doing for

12 them?

13      A.   It was -- they would have me look at

14 contracts that they had with various vendors.  I

15 think I did some trademark enforcement work for

16 them.  I would respond -- I want to say they got a

17 demand letter or two from time to time that I

18 responded to.  But, you know, some pretty mundane

19 work, actually.

20      Q.   Did you perceive that you were getting

21 any benefits from Excelsior for doing the work for

22 XBIZ?

23      A.   Well, you know, my work for XBIZ, I

24 didn't get paid for most of it.  I agreed to do, I

25 think, up to $2,500 worth of billable time per
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  83

```
 1   month for free.  And, you know, they initially
 2   proposed to me a whole package of promotional
 3   considerations, you know, stuff that I really
 4   didn't have any use for.  I didn't want to insult
 5   them, so I said, You know what, I'll just take a
 6   little ad, and then, you know, I'll do all this
 7   stuff for you for free.  And --
 8       Q.   But did it offer any benefits for
 9   Excelsior based on the relationship you
10   cultivated?
11       A.   It most certainly did.
12       Q.   What type?
13       A.   Well, any time that they were considering
14   writing an article that could be perceived as
15   negative toward Corbin Fisher, they would call me
16   first, ask me how I felt about it, and give me an
17   opportunity to adjust the article.  And that
18   happened -- as far as I know, there was never a
19   negative article about them while I was there, and
20   nor since.
21       Q.   How receptive were they to positive news
22   or to press releases?
23       A.   They would -- as I would tell the guys at
24   Corbin Fisher, they would print pretty much
25   anything I asked them to print, as long as I asked
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 84

1   nicely.  And that was, I felt, a really good coup,

2   because, you know, we get a big judgment against

3   somebody and they publish it, then the next demand

4   letter comes with a link to that article saying,

5   As you might see, we just got a huge judgment

6   against somebody similarly situated to you.

7       Q.   Did they ever give any awards to

8   Excelsior?

9       A.   Yes.  In 2010 or '11, I can't put my

10  finger on exactly which one, they -- they really

11  got an unprecedented award as Gay Site of the

12  Year.  And I say it's unprecedented because while

13  I wouldn't say that the XBIZ awards are rigged, I

14  would certainly say that how much advertising

15  space you buy tends to weigh in your favor as to

16  whether you are looked upon favorably by the

17  judges.  And at that point, I don't believe -- in

18  fact, I'm virtually certain that Corbin Fisher had

19  either never bought an ad or never bought an ad

20  while I was there.

21      Q.   Did you present -- did you inform

22  Mr. Gibson about winning the award?

23      A.   I did.  I told him that we needed to put

24  together a presentation, and we sent them our

25  candidacy presentation, and it was -- I know it

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 85

```
 1   got to the top of the pile.
 2       Q.   What happened when you won the award?
 3   How did Mr. Gibson react?
 4       A.   Well, he was -- it was mixed feelings,
 5   because I know -- you know, I might be conflating
 6   this with the Free Speech Coalition award.
 7           But there was some -- one award that he
 8   got that I put in a good word for.  It was either
 9   FSC or XBIZ.  And I know that it was partially
10   sponsored by a company called Cybersocket.
11   Cybersocket is another industry trade.  They are
12   more of like an advertising directory.
13           When the award came, it had Cybersocket's
14   name on it as a sponsoring party.  And Jason
15   instructed me to call up the Free Speech Coalition
16   and inform them that they were rejecting the
17   award, and that they could place it in an
18   anatomically uncomfortable place.
19       Q.   Now, you heard -- or you've seen expert
20   reports in this case about an e-mail you sent that
21   caused some controversy calling someone a "little
22   shit."
23           Do you recall that controversy?
24       A.   I believe the direct quote was "thieving
25   little shit."
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 86

```
 1        Q.    Okay.  Thank you for that.
 2              Did XBIZ report on that controversy?
 3        A.    No.
 4        Q.    Did the other adult press report on it?
 5        A.    No.  The only other adult press that I
 6   would say there is is AVN, with whom I also had a
 7   relationship, although not an attorney/client
 8   relationship, and YNOT.  And YNOT is probably the
 9   third largest adult industry publication.  And
10   none of them published on this.
11        Q.    Was it something that was elsewhere on
12   blogs or published?
13        A.    Yes, it was.
14        Q.    Now, did Mr. Gibson ever ask you if you
15   could cultivate similar relationships with other
16   companies?
17        A.    He did ask me at one point, you know, why
18   I didn't have AVN in my pocket, too.  I assured
19   him that we had a friendly relationship with them,
20   but since they were represented by a friend of
21   mine, I wasn't going to actively try to poach
22   them.
23        Q.    Did he ever -- did Mr. Gibson or the rest
24   of the team ever express concern that you were
25   getting too much into XBIZ, or they were covering
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 87

```
 1    Excelsior too closely?

 2         A.   On the contrary.  Usually, you know, a

 3    pat on the back and congratulations when we would

 4    get things into XBIZ, or even the other media

 5    sources.

 6         Q.   Was that both verbally and in writing?

 7         A.   Yes.

 8         Q.   Let's take a look at an example.  Would

 9    you please look at Exhibit 29?

10         A.   I see it.

11         Q.   And I'm going to have --

12              ARBITRATOR HABERFELD:  One moment.

13    BY MR. WHITE:

14         Q.   -- you look at 29 at the last --

15              ARBITRATOR HABERFELD:  I have it.

16    BY MR. WHITE:

17         Q.   -- two pages, showing the last -- the

18    initial portion of this e-mail.

19         A.   Uh-huh.

20         Q.   And let me know when you are ready to

21    answer questions.

22         A.   Okay.

23         Q.   Is that from Mr. Gibson to most of the

24    team at Excelsior?

25         A.   Yeah.  This is actually a -- it all
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 88

1    started -- this all started with a San Diego City

2    Beat article.  And I cultivated a relationship

3    with a journalist who wrote for City Beat.

4         And you can see the title of it was Fly

5    Meet Sledgehammer, and I think it was

6    discussing -- I want to say it was discussing some

7    of our litigation there.

8    Q.    And was his comment, Nicely done, Marc,

9    is that fairly characteristic of the sort of

10   communications he would send you about press

11   coverage?

12   A.    Yes.  And then I had more good press.  I

13   don't know what this -- what this article was at

14   the top, the XBIZ one, but I think it was

15   involving that case that we got the default

16   judgment because of discovery abuses, because GLBT

17   was the name of the corporation we sued.

18   Q.    Now, did Mr. Gibson express strong

19   feelings about controlling press coverage -- or,

20   excuse me -- controlling the message coming out of

21   Liberty and Excelsior?

22   A.    Not at first.  He seemed pretty happy

23   about the way it was going, because it -- it lived

24   up to the goal here of Let's, you know, shoot one

25   to frighten a thousand.

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  89

```
 1      Q.   But did there come a time when he started
 2  being very explicit that he wanted to review all
 3  press releases?
 4      A.   Yeah.  I want to say it was sometime
 5  in -- sometime in 2012, but I'm not -- I don't
 6  remember exactly.  I remember there was one
 7  communication in particular where I made a
 8  judgment call to send out a release because Jason
 9  was on an eight-hour flight, and I thought, you
10  know, we wanted to get that out that day, because,
11  you know, press is not real good if you get it
12  out, say, on a Friday.  You want to get bad news
13  out on a Friday, good news out on a Tuesday or a
14  Wednesday.
15      Q.   So would you please take a look at
16  Exhibit 51, which is in the second volume?
17      A.   Okay.
18      Q.   And let me know when you've had a chance
19  to take a look at it.
20      A.   I have it.
21      Q.   Is that an exchange between you and
22  Mr. Gibson about the press release?
23      A.   Well, I'm copied on it.
24      Q.   Right.  Who initiated the press release,
25  according to it?
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 90

```
 1        A.    It looks like Chip Carter did.

 2        Q.    And who was he?

 3        A.    He was the director of marketing.

 4        Q.    And was this consistent with the way,

 5    after a certain point, Mr. Gibson started

 6    responding of people-issued press releases without

 7    his input?

 8        A.    If it was anybody except -- I think Brian

 9    Dunlap and I had a little more latitude, but Chip

10    certainly didn't.

11        Q.    And so he says, Do not send these out

12    again without my express written approval.  That's

13    about the middle of the first page.

14              Is that a message he sent on multiple

15    occasions?

16        A.    Yes.

17        Q.    Would you look at 57 in the same binder,

18    please?

19        A.    Okay.  Yes, I have it.

20        Q.    And let me know when you've looked at a

21    couple pages of it and you are ready to answer

22    questions about it.

23        A.    I'm ready.  I remember this one.

24        Q.    All right.  Is this the one you talked

25    about where he was on a plane?
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1      A.   Yes.
 2      Q.   And in this exchange, is it fair to say
 3  you apologized for it being going out without his
 4  say-so?
 5      A.   Yes.  In fact, I remember -- I'm pretty
 6  sure Chip didn't want to send it out because he
 7  didn't get express written approval from Jason.
 8  But I made the call as the company's general
 9  counsel that it would go out and I would take
10  responsibility for it.
11      Q.   Would you look at the last page of that
12  exhibit, please --
13      A.   Okay.
14      Q.   -- showing the press release?
15      A.   Yes.
16      Q.   And the paragraph that's at the top of
17  that last page.
18      A.   Uh-huh.
19      Q.   There's a quote from someone at a company
20  called PornGuardian.
21           What was PornGuardian?
22      A.   PornGuardian is a company that provides
23  takedown services.  See, under the Digital
24  Millennium Copyright Act, under Section 512 of
25  Title 17, Web host providers, hosting companies,
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1    tube sites, and the like, if you send them a

2    notice to take down something that is infringing,

3    then that will -- they are supposed to take it

4    down right away.  And if they do, then they are

5    completely immune from liability.  Although even

6    if they don't, you still have to get through the

7    secondary liability thicket.

8          So they did -- PornGuardian, in large

9    part, provided DMCA takedown services where they

10   would just generate thousands of these takedown

11   requests per day on behalf of their clients.

12         But they also had a couple of really

13   savvy computer techs there who would do -- who

14   would do a lot of research on piracy companies.  I

15   think if anybody hated porn piracy more than

16   Jason, I would say it would be these guys.

17     Q.   Now, this quote here that I drew your

18   attention to, saying, The entire industry owes its

19   thanks to Corbin Fisher for leading the charge,

20   from PornGuardian.

21     A.   Yes.

22     Q.   It's fairly glowing.  Do you know how you

23   got -- or how it was that PornGuardian gave

24   Excelsior such a good quote on this?

25     A.   I wrote that.  And I called up Peter

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1    Phinney at PornGuardian, and I asked him if I

2    could put those words into his mouth in the press

3    release.

4        Q.   And did you have a relationship with

5    PornGuardian, a legal relationship at this time?

6        A.   I did, yes.  I'm not sure how formal it

7    was, but I did provide them legal advice on a

8    pretty regular basis, usually for free.  When I

9    charged them, it was at a steeply discounted rate.

10       Q.   Do you think that relationship -- did

11   you -- was there an understanding between you that

12   that relationship was what gave you access to

13   request a viable quote like that?

14       A.   Yes, of course.

15       Q.   When you communicated with Mr. Gibson,

16   was it usually in person or writing?

17       A.   It was a myriad of ways.  It would be in

18   person, text message, e-mails.  But, you know,

19   when he was in San Diego, before he moved out to

20   Las Vegas, we would spend an awful lot of time

21   together, you know, in the car, at dinner, his

22   office.  So most of my communications when he was

23   around were verbal, most of my communications when

24   he wasn't were text message or e-mail.

25       Q.   Now, through the time you worked for

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 94

1     Excelsior and then Liberty, were you tasked to do

2     personal work for Mr. Gibson or other executives?

3          A.   I was.

4          Q.   What types of personal work?  For

5     instance, were you tasked to do any in connection

6     with firearms?

7          A.   Yes.

8          Q.   What kind of work?

9          A.   I was working on getting all of the

10    executives their concealed carry permits here in

11    Nevada.

12         Q.   Did you also give advice about a

13    concealed carry permit for a performer, Mr.

14    McCoig?

15         A.   I believe I did, because he had a -- he

16    might have had some legal trouble in the past that

17    could have impacted that.

18              I'd also get kind of weird text messages

19    from Jason from time to time with a compass

20    coordinate saying, Can I shoot my gun here?

21         Q.   Did you ever give him advice about

22    firearm use and what was legal and what wasn't?

23         A.   I did.

24         Q.   Did you ever take care of legal business

25    for him in other states?

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  95

```
 1        A.    I did.

 2        Q.    How about a name change, did you do any

 3   name change work for him?

 4        A.    Yes.  I worked on a file where he wanted

 5   to delete his middle name from his legal name.

 6        Q.    Did you work any personal lease disputes

 7   for him?

 8        A.    That one where we went after the former

 9   landlord.  But that lease was in -- the one that

10   went and hid in Honduras.  But I want to say that

11   that lease was in Mr. Rasmus' and Mr. Lowderman's

12   name, though, but it was Jason that tasked me with

13   it.

14             MS. KRINCEK:  Your Honor, I would just

15   object to this line of questioning because

16   Mr. Randazza is obviously discussing

17   attorney/client privileged information about

18   matters he handled personally for Mr. Gibson.

19             We're not disputing that he handled some

20   personal matters for Mr. Gibson in this case, so

21   it's unnecessary to get into the details of that,

22   and for him to -- Mr. Randazza to break the

23   attorney/client privilege.

24             MR. WHITE:  I would say that by raising a

25   claim against Mr. Randazza, including that he was
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 96

1    spending time on things he shouldn't have been

2    spending time on, that that privilege has been

3    waived.  However, I will not go any further into

4    any of the details of any of those items.  I only

5    have one other matter to mention in which

6    Mr. Gibson, or no one here, was a direct client.

7              ARBITRATOR HABERFELD:  Anything further

8    on your objection?

9              MS. KRINCEK:  I don't know why he needs

10   to ask any more questions about whether he handled

11   personal matters for Mr. Gibson.  Like I said --

12             ARBITRATOR HABERFELD:  Let's go off the

13   record.

14             (Whereupon, an off-record

15              discussion was had.)

16             ARBITRATOR HABERFELD:  Go back on the

17   record.

18   BY MR. WHITE:

19        Q.   Mr. Randazza, who is Abel Petrescu,

20   that's P-e-t-r-e-s-c-u?

21        A.   Abel was a -- was or probably still is a

22   performer for Corbin Fisher, as well as a personal

23   friend of Jason's.

24        Q.   And did Mr. Gibson ever ask you to do any

25   legal work for him?

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 97

1      A.   He did.

2      Q.   And generally what was the nature of it?

3      A.   He had a dispute with his former

4   girlfriend.

5      Q.   And when you were doing these things that

6   we've just been talking about, were you billing

7   anyone separately through Excelsior, or was this

8   things that you were doing on company time?

9      A.   Usually I tracked it as company time.

10     Q.   Okay.

11     A.   In fact, I don't recall tracking it any

12  other way.

13     Q.   As you built a friendship with

14  Mr. Gibson, would you and he discuss personal

15  relationships?

16     A.   Yes.

17     Q.   And would that include the personal

18  relationships that Mr. Gibson had with people at

19  the company?

20     A.   Yes.

21     Q.   Would Mr. Gibson talk about having

22  personal sexual relationships with independent

23  contractors of the company?

24     A.   Yes.

25     Q.   Now, you mentioned someone named Andrew

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 98

 1    Rasmus before.

 2             Do you recall that?

 3        A.    I do.

 4        Q.    And who was he?

 5        A.    When I joined the company, he was an

 6    executive and part owner of the company.

 7        Q.    How did he start with the company, under

 8    your understanding?

 9        A.    He was a performer that Jason had a

10    personal relationship with.

11        Q.    Did Mr. Gibson ever say anything to you

12    about how Mr. Rasmus got a share in the company?

13        A.    Yes.

14        Q.    What did he say to you?

15        A.    That it was -- he was to live with Jason

16    for -- have a relationship with him for three

17    years, and then at the end of those three years,

18    six and seven-eighths of the company would vest as

19    Andrew's property.

20        Q.    Did Mr. Gibson ever enlist you to help

21    him deal with relationship issues and problems?

22        A.    He did.

23        Q.    Who is Jon Price?

24        A.    Jon Price is a performer who Jason had a

25    relationship with after, maybe even consecutively

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1    with Andrew.
 2        Q.    And was the nature of the assistance he
 3    asked you for in connection with Mr. Price?
 4            ARBITRATOR HABERFELD:  You said
 5    consecutively.  Did you mean consecutively?
 6            Let's have this answer read back.
 7        (Whereupon, the pertinent part of the record
 8         was read back by the court reporter.)
 9            THE WITNESS:  Yeah.
10            ARBITRATOR HABERFELD:  Did you mean
11    consecutively or concurrently?
12            THE WITNESS:  I'm sorry.  Concurrently,
13    yeah.  There was either a little -- there was
14    either a little overlap there, or it was one right
15    after the other.
16            ARBITRATOR HABERFELD:  All right.  Thank
17    you.
18    BY MR. WHITE:
19        Q.    So were you asked to help him with
20    respect to Jon Price somewhat?
21        A.    Yes.
22        Q.    How?
23        A.    The morning after Jason's birthday in
24    2012, I got a call very early in the morning to
25    come over to Jason's house to help him deal with a
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1    situation involving Jon.  Jon apparently --
 2    according to Jason, Jon attacked Jason.  According
 3    to Jon, Jason attacked Jon.
 4         Q.    And were you tasked to do something?
 5         A.    Yes.
 6         Q.    What was that?
 7         A.    To get Jon out of the house and to the
 8    airport and on a plane and out of Las Vegas.
 9         Q.    And did you do that?
10         A.    I did.
11         Q.    Did you do that by personally
12    communicating with Mr. Price?
13         A.    Yes.  I talked to Jon, I followed him
14    around the house as he packed his belongings.  I
15    had Jason wait as far away as possible because I
16    didn't want to have any repeat of that.  And I
17    called a cab for Jon.  And I don't know if I
18    personally booked the plane ticket or not.  I
19    think I might have.  And then I told him to go to
20    the airport, and that his 702 area code privileges
21    had been revoked.
22         Q.    Was Jon then any sort of -- in addition
23    to being a performer, did he have any other role
24    at the company?
25         A.    He did.
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 101

```
 1              MS. KRINCEK:  Your Honor, I'm going to
 2    object to this line of questioning.  I mean,
 3    Mr. Gibson was assaulted, and that personal
 4    incident and relationship has zero relevancy to
 5    the claims in this case.  I don't know why we're
 6    even going into this subject area, especially in
 7    detail.
 8              MR. WHITE:  Your Honor, I'm very near
 9    done with it, other than one other question about
10    Mr. Price's role in the company.  And the
11    relevance is that --
12              ARBITRATOR HABERFELD:  Are you going to
13    connect up the relevance?
14              MR. WHITE:  Yes, I will.
15              ARBITRATOR HABERFELD:  Or do you want
16    to --
17              MR. WHITE:  It will be a shift in
18    Mr. Gibson's attitude at about this time.  In
19    addition --
20              ARBITRATOR HABERFELD:  A shift in
21    attitude, more specifically?
22              MR. WHITE:  Mr. Gibson's attitude towards
23    Mr. Randazza.
24              ARBITRATOR HABERFELD:  Okay.  As long as
25    you make that connection.
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 102

1   BY MR. WHITE:

2        Q.    Did Mr. Price get his position with

3   Excelsior, a non-performer position before or

4   after he was in a relationship with Mr. Gibson?

5        A.    After.

6        Q.    And what type of position did he get?

7        A.    Jason actually asked -- I think Jason

8   asked all of the executives if -- and said he was

9   going to hire Jon to do something, and asked all

10  of us if we needed him in our respective

11  departments.  I volunteered to take him on in my

12  department as a -- you know, as an entry-level

13  person.

14       Q.    Mr. Randazza, I'm now going to shift to

15  another area.  Next area on the list that I gave

16  you, the point in time in which your relationship

17  with Mr. Gibson at Excelsior soured.

18       A.    Okay.

19       Q.    About when would you say it was that

20  there was a change in tone of the relationship?

21       A.    I began to notice it spring of 2012.

22       Q.    Were there any things that were happening

23  that you were observing about the time that the

24  attitude started to change?

25       A.    Well, that was when -- that was about

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1    when his -- when his deal with Mr. Rasmus began to
 2    vest, I guess you could put it.  And while -- you
 3    know, while Andrew had dated women throughout all
 4    the time that they were together, Andrew started
 5    dating one woman on a regular basis rather than
 6    just, you know, one or two-day flings.
 7         Q.   Did Mr. Gibson express upsetness about
 8    this to you?
 9         A.   Yes.
10         Q.   I apologize for "upsetness."  That's a
11    terrible word.
12         A.   I know what you meant.
13         Q.   Did it also coincide with the incident
14    with Mr. Price?
15         A.   I can't honestly place one with the other
16    in an accurate timeline.
17         Q.   Now, what was the first thing that showed
18    you that something was wrong in your relationship?
19    Was there a particular incident that really drove
20    it home?
21         A.   Yes.
22         Q.   And what was that?
23         A.   When Jason decided to shoot a porn scene
24    on my desk in my office.
25         Q.   Now, prior to this, did Mr. Gibson ever
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 104

```
 1   talk about whether or not your office should be
 2   secure and locked?
 3        A.   Yes.  In fact, it was almost -- it was
 4   almost an irritant that people weren't able to go
 5   in and out of my office.  I think he expressed
 6   even irritation that my paralegal could go in and
 7   out of my office without any control.  And I
 8   argued with him a bit saying, you know, I'm not
 9   really sure how I can function if the paralegal
10   can't be trusted.
11        Q.   Did he express why he thought the office
12   should be kept so secure?
13        A.   Yes.  It was his lawyer's office.  It was
14   full of all kinds of confidential legal
15   information, all kinds of confidential legal
16   files.
17        Q.   All right.  I'm going to ask you to look
18   at Exhibit 27, please.  That's in the first
19   binder.
20             Would you look at the first page, and at
21   the text that's at the bottom of the page, and let
22   me know when you are ready to talk about it?
23        A.   Okay.  Is it the -- what number is next
24   to it?
25        Q.   23605.  It's at the bottom of the first
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 105

```
 1    page of Exhibit 27.

 2        A.   Yes, I see it.

 3        Q.   There's a text to you?

 4        A.   Uh-huh.

 5        Q.   First of all, are these text messages

 6    between you and Mr. Gibson during this time

 7    period?

 8        A.   They appear to be.

 9        Q.   So this is in April 2012?

10        A.   Yes.

11        Q.   There is a text from Mr. Gibson to you

12    saying, I'm shooting gay porn on your office desk

13    and couch.

14        A.   Yes.

15        Q.   Do you see that?

16        A.   Yes.

17        Q.   Did you think that was true?

18        A.   No.

19        Q.   What did you think it was?

20        A.   Jason being irreverent, and, you know,

21    just making a joke.

22        Q.   Is that the sort of thing that people

23    would occasionally --

24        A.   Sorry.

25        Q.   -- joke about at the company?
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 106

1        A.    Yeah.  I think at one point somebody had

2    said that -- while I was away one time, they had

3    turned my office into a sex dungeon.

4        Q.    Let me ask you to look briefly, to turn

5    to Exhibit 37.

6        A.    Okay.  Yeah, there it is.

7        Q.    Is that the e-mail you were talking about

8    where someone joked about turning your office into

9    a dungeon?

10       A.    Yes.

11       Q.    Did they actually do that?

12       A.    Of course not, no.

13       Q.    So would there be anything unusual about

14   Mr. Gibson joking about something like this, as

15   opposed to being literal?

16       A.    No.  Jason often sent, you know,

17   irreverent jokes to me.  Like I remember one

18   morning he sent a text to me that really upset me

19   saying that he had AIDS.  And I ran over to his

20   house kind of upset, and said, What are you

21   talking about?  And he said, Oh, I'm just kidding.

22   I remember getting pretty upset with him over

23   that.

24       Q.    Let's turn back to Exhibit 27, please,

25   and go to the second page of it.

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1       A.    Okay.
 2       Q.    So you respond, Don't get jizz on my
 3  briefs?
 4       A.    Yes.
 5       Q.    In doing that, are you thinking that this
 6  is a conversation about something that's really
 7  happening?
 8       A.    No.   I mean, I think -- I don't think
 9  there's a single person with a JD degree that
10  hasn't made some irreverent crack about, you know,
11  Your Honor, can I show you my briefs, or something
12  like that, all those silly amongst lawyer jokes.
13       Q.    The next one from Mr. Gibson is about
14  Olivia squirted all over your desk and floor.
15  Sharon won't have time to clean it.
16             And you respond, I don't want it cleaned
17  up.
18       A.    Yes.
19       Q.    Again, is this something that you thought
20  you were talking about something really happening?
21       A.    I mean, I very much -- I mean, no, not at
22  all.  Come on, Jason is telling me that -- even if
23  this had happened, the cleaning lady won't have
24  time to clean it up until the end of next week?
25       Q.    And you say, I don't want it cleaned up.
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 108

1   Are you joking still?

2       A.   Of course.  I'm playing along with him.

3       Q.   In the next one he says, Jennifer's Bush

4   is going to be very famous.

5            Who is Jennifer?

6       A.   My wife.

7       Q.   Did you understand what that joke was

8   about?

9       A.   Not at the time.

10      Q.   And then he goes on -- the rest of that

11  page, he's asking you about someone with a DWI

12  getting a concealed carry permit, and he's asking

13  about a David.

14           Do you see that?

15      A.   Yes.  It's David McCoig.

16      Q.   And did David McCoig at that time have a

17  personal relationship with Mr. Gibson?

18      A.   Yes.

19      Q.   Was he also someone who started as a

20  performer with the company?

21      A.   Yes, but he wound up getting hired as an

22  employee by the company.

23      Q.   I would like you now to turn to the page

24  where the Bates stamp at the bottom says 462, it

25  says EMC000462.

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 109

```
 1      A.   Okay.  My attention is there.

 2      Q.   And looking at the last text on the page;

 3  do you see it?

 4      A.   Yes.

 5      Q.   You say, I thought you were joking about

 6  shooting in here.

 7      A.   Yes.

 8      Q.   Does that mark the time when you realized

 9  it wasn't a joke?

10      A.   Yes.

11      Q.   Let's talk about how you found out.  How

12  did you find out that a scene actually had been

13  shot in your office?

14      A.   Well, I walked into the office, and a

15  couple of employees were chuckling, and one of

16  them said, Hey, how does your desk smell?

17      Q.   Did you get more comments like that to

18  you over the next couple of days?

19      A.   No.  Just -- just that day as I walked

20  through the break area and into the executive

21  wing.

22      Q.   Did you get more than one comment?

23      A.   Yes.

24      Q.   Were these -- who were these people

25  making the comments?
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 110

```
 1      A.   I only remember one being Cameron Frost.

 2   I don't remember the others, but it was sort of

 3   a -- you know, everybody sort of laughing about it

 4   as I walked in.

 5      Q.   All right.  I'm going to ask you to go to

 6   Exhibit 23 in the binder before you.

 7      A.   You know, even at that time, I didn't --

 8   it didn't really ring to me that it had happened.

 9      Q.   Well, this is a series of pictures.

10      A.   Yeah.

11      Q.   Do you recognize your office in the

12   pictures?

13      A.   I do.

14      Q.   And this one depicts two men having sex.

15      A.   Uh-huh.

16      Q.   Did you see these pictures at the time?

17      A.   No.

18      Q.   Have you reviewed the films that are

19   Exhibits 24 and 25 that have been submitted?

20      A.   Yes.

21      Q.   And that have also been submitted by the

22   respondents?

23      A.   Yes.

24      Q.   Do you recognize your office in those?

25      A.   I do.
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1      Q.   Please turn to Exhibit 25.

 2      A.   Okay.  It just says a video clip.

 3      Q.   I'm sorry.  That should be Exhibit 26.  I

 4   apologize.

 5      A.   Okay.

 6      Q.   Is this a series of outtakes from those

 7   films?

 8      A.   Yes, it is.

 9      Q.   In the first picture, is that your

10   office?

11      A.   It is my office.

12      Q.   There's a framed picture in the upper

13   left corner.

14           Do you see it?

15      A.   Yes.

16      Q.   What is that?

17      A.   That is a painting that my wife did for

18   me.

19      Q.   Who is it of?

20      A.   It's of George Bush characterized as a

21   character in George Orwell's 1984.

22      Q.   Did you later come to think that that had

23   something to do with what Mr. Gibson said about

24   your wife's Bush?

25      A.   Yeah, and then it all sort of fell into
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

 1    place when I walked in.

 2        Q.   Looking at the second frame in this

 3    exhibit, is that your desk?

 4        A.   Yes.

 5        Q.   And the third frame, is that also your

 6    desk?

 7        A.   Yes.

 8        Q.   Do those appear to you to be fluids on

 9    the desk?

10        A.   They do.

11        Q.   Please turn to the next frame, which has

12    a tie on the monitor there.

13        A.   Uh-huh.

14        Q.   Whose tie is that?

15        A.   That was mine.  It was a gift from my

16    wife.

17        Q.   Looking behind the tie, there are also

18    some pictures visible in this.

19             Can you tell me what those are?

20        A.   Can you find out what team everybody

21    roots for -- the judge roots for before I do?

22        Q.   Take the risk.

23        A.   The first two on the left are the front

24    pages from the Houston Chronicle and the Boston

25    Globe when the Patriots won the Super Bowl --

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 113

```
 1    Super Bowl in New Orleans, the first one.  And

 2    then the one in Houston against Carolina.  And

 3    then the third one is a reproduction of the front

 4    page of the Boston Globe from when they won their

 5    World Series in 2004.

 6         Q.    Are these things that the company

 7    provided, or are those personal items?

 8         A.    No, those are personal religious items.

 9         Q.    There's a --

10              MR. WHITE:  Facetious, or --

11              THE WITNESS:  I am from Boston, Your

12    Honor.

13              ARBITRATOR HABERFELD:  Okay.

14    BY MR. WHITE:

15         Q.    There is also a legal -- what appears to

16    be a legal book on the desk.

17              Do you see that?

18         A.    I do.

19         Q.    Do you recognize that as one of the books

20    you used in your representation there?

21         A.    Yes.

22         Q.    Turning to the next slide, the woman is

23    pulling on a tie around a man's neck.

24              Do you see that?

25         A.    Yeah.  I also see that the tag has been
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 114

1    torn.

2        Q.    Is that, again, your tie?

3        A.    That is my tie.

4        Q.    When you got into your office this day

5    when someone made these comments to you as you

6    came in about how your desk smelled, what did you

7    observe in your office?

8        A.    You know, as I heard that, I didn't even

9    know what the heck they were talking about.  But

10   when I opened the door and went over to my desk, I

11   saw my pictures of my kids and my best friend

12   lying scattered on the floor.

13       Q.    When you say lying scattered on the

14   floor, can you be a little more descriptive of

15   what they were?

16       A.    They were -- if this was my desk, they

17   were usually here on my -- you know, in front of

18   my monitor, and they were lying down on the floor

19   over to the left side of my desk.

20       Q.    Were they lying face up, face down?

21       A.    Face up.

22       Q.    Were other items in the room disturbed?

23       A.    Yeah.  A lot of papers that I had on the

24   desk were kind of stacked in other places, not on

25   the desk.

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 115

1     Q.    How did you feel?

2     A.    It was a kick in the gut at that point.

3   I realized what -- I realized that the text

4   messages about shooting in my office were not a

5   joke.  I saw -- you know, it would have bothered

6   me anyway, but to see my kids' pictures scattered

7   on the floor, it was like a -- you know, it was a

8   very deep sign of disrespect, and I realized at

9   that moment that, you know, that was not only the

10  effect, but the intent.

11    Q.    What was your interpretation of the

12  message sent by doing that?

13    A.    The only honest way I can put it is that

14  this was Jason telling me you're my bitch, and

15  don't you forget it.

16    Q.    Did you observe any bodily fluids on the

17  desk?

18    A.    I cannot honestly say I did.  In fact, I

19  didn't even know that they were on the desk until

20  seeing these videos.

21        MS. KRINCEK:  I'm just going to object.

22  It assumes facts not in evidence.  We don't have

23  any evidence that there were bodily fluids on the

24  desk.

25        MR. WHITE:  We'll submit other pictures,

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1    Your Honor.

2    BY MR. WHITE:

3        Q.    What was the material --

4            MR. WHITE:  I'm sorry.  May I proceed?

5            ARBITRATOR HABERFELD:  Let me hear the

6    question.

7        (Whereupon, the pertinent part of the record

8         was read back by the court reporter.)

9            ARBITRATOR HABERFELD:  Objection

10   sustained.

11           Do you want to rephrase?

12           MR. WHITE:  Yes.

13   BY MR. WHITE:

14       Q.    Did you see any fluids on the desk?

15       A.    I did not.

16       Q.    For instance, the pictures we just saw

17   appeared to depict some fluids on the desk.

18           Did you observe those when you got there?

19       A.    No.  The fluids that were on the desk in

20   these pictures, I did not.  I -- they were not --

21   I did not see them at that time.

22       Q.    Now, what's the material that the top of

23   the desk is made out of?

24       A.    It is a porous soft leather.

25       Q.    Have you ever spilled anything on it?

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1       A.    Yes.

2       Q.    And what does it tend to do with liquids

3   on it?

4       A.    Soaks into it.

5       Q.    So what effect did it have on you, or how

6   did you feel that people were making jokes about

7   this when you got there?

8       A.    It was a -- it was a pretty -- you know,

9   it was upsetting on two different levels.  One

10  level it was -- you know, as a -- as a

11  professional, it was -- and, you know, I felt like

12  my place of work where I spent most of my time,

13  more than I spend at home had been violated.  I

14  felt like the intent of it was to humiliate me in

15  front of everybody.  It was just -- but, also, it

16  was -- you know, it was one of those situations

17  where you see somebody treat other people poorly,

18  and then I realized, Well, it's now my turn.

19      Q.    Did you -- let's go back, please, to the

20  exhibit we were looking at before, the texts,

21  Exhibit 27.

22      A.    Okay.

23      Q.    If you go to page -- the Bates number

24  463, which is the page after the one we were just

25  looking at where you said, I thought you were

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1    joking about shooting in here.

2        A.    Yeah.

3        Q.    Did you consider at this point really

4    saying something strong or stern to Mr. Gibson

5    about not liking this?

6        A.    I did, but I thought better of it.  I

7    wanted to keep my job.

8        Q.    So how long did you think over these

9    texts when you are sending them?

10       A.    I would say these are probably the

11   seventh or eighth drafts before I finally hit

12   send.

13       Q.    Do you see the one where he says, I was

14   the person who cleaned off your briefs, so no one

15   saw anything confidential?

16       A.    Yes.

17       Q.    Would you go to the next page, please?

18       A.    Okay.

19       Q.    And there's the second text down to say,

20   I can get Sharon back in there to clean up

21   Olivia's juice.  She apparently squirted

22   everywhere.

23            Do you think that was a joke or not a

24   joke?  How did you understand it?

25       A.    Well, at that time I understood that he

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 119

```
 1    was telling me that there were bodily fluids left
 2    on my desk.
 3         Q.   And --
 4         A.   But now a couple days later, he would
 5    send the maid in to clean it up.
 6         Q.   So do you see the next series where you
 7    say, Can I -- can you understand how I might not
 8    be all that happy?
 9         A.   Yes.
10         Q.   Why aren't you being more explicit about
11    how you feel?
12         A.   I had a wife and two kids and wanted to
13    keep my job, and I knew if I -- if you tell Jason
14    he's wrong, you don't last very long at the
15    company.
16         Q.   Is that something you had observed during
17    your time at the company?
18         A.   Yeah.  In fact, it was why I had to fire
19    a number of people.  I was tasked with doing that
20    confrontation.
21         Q.   All right.  Moving to the next page,
22    there's an exchange where you say, I'd rather talk
23    to you in person about this because I think texts
24    are creating more misunderstanding.
25              Why did you say that?
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 120

```
 1        A.    Because I usually was able to talk things
 2   out with Jason, like -- well, with anybody.  I
 3   think if you talk things out with somebody, you
 4   can communicate to them how you are really
 5   feeling, what things really are.  I mean, you
 6   always lose something in text messages and e-mails
 7   that you don't get in face-to-face conversation.
 8        Q.    So he responds, We can have a 5:30
 9   meeting.  Would you like Kirk there?
10            Who is Kirk?
11        A.    Kirk was, at the time, the HR director.
12        Q.    And you respond, Don't be silly.  It's
13   not a huge deal.
14            Was it a big deal for you?
15        A.    It was a huge deal to me, but it was
16   like -- you know, I wanted to talk to him.  You
17   know, when I sent that 23788 text message, I
18   thought that there was a possibility that I could
19   talk to my friend about this, and say, Look, I
20   don't know what you were thinking, but, you know,
21   that was not acceptable.
22            And then, you know, that next text
23   message made it really clear what it was.  It's
24   like, Okay, we can have a meeting.  Do you want
25   the head of HR there?  It was almost -- what that
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 121

1   means is, Are you challenging me?

2       Q.   Do you mean that's how you interpreted

3   it?

4       A.   That's exactly what it means.  Yes,

5   that's how I interpreted it.  That's why I -- you

6   know, it took me quite, you know, a significant

7   amount of time here to -- I mean, not that long

8   when you look at it, but that's why I sent that

9   and said, It's not that huge a deal.  I just

10  didn't want it to blow up into that.  I wanted to

11  talk to him face-to-face about it, say it's not

12  cool, and have him understand where I was coming

13  from.

14      Q.   Did you meet with him?

15      A.   I did.

16      Q.   And what was his attitude during the

17  meeting?

18      A.   He was agitated that I was making a big

19  deal of it.

20      Q.   What did you say to him?

21      A.   I remember telling him that, you know,

22  Look, I can -- I know I can work from wherever I

23  want, so if you are going to be doing this on a

24  regular basis, I will just start working from

25  home, and you can use that office for anything you

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 122

```
 1    want.  But that, you know, I spent -- at the time,
 2    I spent far more time in that office than I spent
 3    with my family.  So if it was going to be violated
 4    like that, I just didn't want to be in it.
 5        Q.   What was his response?
 6        A.   There was some back and forth between us
 7    about it, about me trying to make him understand
 8    how it upset me.  And he finally said, Look,
 9    I'm -- you know, he said something like, I'm sorry
10    you feel that way.  And he said, There, fine, you
11    fucking made me say it.  I said I'm sorry, okay?
12    I won't do it again.
13        Q.   What was his tone in that?
14        A.   It was dismissive --
15        Q.   Did you do anything --
16        A.   -- angry.
17        Q.   -- with your personal items in your
18    office after this?
19        A.   No.  But beforehand, I packed everything
20    up in my office because I just didn't want -- I
21    didn't want my -- you know, my wife's painting in
22    there, my kids' pictures, my -- you know, my
23    Red Sox and Patriots stuff in there.  I just
24    wanted to take it all home and not work in that
25    office.
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 123

```
 1        Q.   Did you eventually take it home?
 2        A.   No.  After that conversation, I was, you
 3   know, pretty confident that it wouldn't happen
 4   again, that he understood where I stood as far as
 5   my office goes.  It was -- I mean, I don't know
 6   why they shot -- well, I do know why they shot in
 7   there in the first place, but it's --
 8        Q.   Well, let me ask you:  Can you describe
 9   that office?
10        A.   It was a long narrow corridor-like
11   office.  It was really about the -- there was not
12   very much room on either side of the desk, but
13   then it was a long kind of tunnel-like office with
14   a window at the end.
15        Q.   How was the light?
16        A.   You know, that was probably what bothered
17   me about this, is I could see if it was one of the
18   corner offices with all the big beautiful windows,
19   or if it was one -- but it was really a dark,
20   tunnel-like office.  The window faced directly
21   north, so it got probably the least amount of
22   direct sunlight in the whole building.
23        Q.   Now, Mr. Randazza, would you describe
24   yourself as being very sensitive?
25        A.   I would not.
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1      Q.    You voluntarily worked for a gay porn
 2  company, correct?
 3      A.    I did.
 4      Q.    Are you comfortable around porn?
 5      A.    Yeah, I would say so.
 6      Q.    You represented many different types of
 7  players in the adult industry?
 8      A.    I have.
 9      Q.    Do you tell off-collar jokes?
10      A.    Almost all the time.
11      Q.    Do you use rude language?
12      A.    I'm suppressing it here, but, yes, often.
13  I'm well-known for it.
14      Q.    Have you been to adult clubs with members
15  of the Excelsior team?
16      A.    I went to a gay club that had a go-go boy
17  dancing at it, but, yeah.
18      Q.    Any running jokes with Jason about him
19  kissing your wife?
20      A.    Yeah, that was one of my favorites.  That
21  just we would -- when we would go out places
22  socially, you know, Jennifer and Jason would take
23  a picture of themselves kissing, and then I would
24  be in the foreground with a horrified look on my
25  face.  And we would take it in like grainy
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1    photograph style, making it look like it was the

2    front page of a newspaper, and they were always

3    really funny.

4         Q.   Have you ever circulated to him what I'll

5    describe as cheesecake pictures of your wife?

6         A.   Yeah.   There was a photograph my wife had

7    taken of her on a couch that used to belong to the

8    company.

9         Q.   Is that a couch that porn scenes used to

10   be filmed on?

11        A.   As I understand it, yes.

12        Q.   Did you mind that you had a couch that

13   porn scenes used to be filmed on?

14        A.   No, because that's -- it came as

15   advertised, and, you know, we cleaned it off, and

16   it actually factored into the -- into the lower

17   price, I think.

18        Q.   So given all that, Mr. Randazza, why did

19   you object to the scene being filmed on your desk

20   in your office?

21        A.   Well, for a couple of reasons.   Just

22   because you work at a gay porn company doesn't

23   mean that there is no line over which you can

24   cross.   I mean, I think we agree that if they had

25   told me I have to be in the scene or I'm fired,

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 126

```
 1   well, that would be crossing the line.  The

 2   question is, Where is the line?

 3           I think that was very clearly over the

 4   line.  No one had ever -- there had never been a

 5   scene shot in anyone's office before.  There was

 6   no reason to shoot it in my office, except to send

 7   me a message.  It was just a sign of complete

 8   disrespect, and it was treated that way.

 9           You know, it's not like they dropped the

10   couch off at my office and said, Here, use the

11   couch or you are fired.  I mean, that was my

12   choice.  If they had asked me, Is it okay if we

13   shoot in your office because we think that the

14   long, dark tunnel nature of it will give a film

15   noir aspect to the filming, you know, I still

16   would have said no, but it was -- you know, it was

17   way over that line between respect and disrespect.

18       Q.   Did it make you -- what did it make you

19   feel about your role in the company in terms of

20   how you were viewed or what your job was like?

21       A.   I knew, given my couple of years

22   experience with Jason at the company, that that

23   was the beginning of the end.  In fact, I remember

24   going home at that point and instructing my wife,

25   Don't buy anything expensive because I don't know
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 127

```
 1   how much longer I'm going to be at the company.
 2       Q.    After this, did you notice any change in
 3   Jason's demeanor towards you?
 4       A.    Yes.
 5       Q.    How would you describe it?
 6       A.    I would say that, you know, while it
 7   didn't go completely cold, it definitely cooled.
 8       Q.    Did he start criticizing you more?
 9       A.    Yes.
10       Q.    Were you meeting with him personally as
11   much as you used to?
12       A.    No, not as much.
13       Q.    How about socializing?
14       A.    Not as much.
15       Q.    Did he -- was there any change in the
16   level of complaints about the legal department and
17   what it was doing?
18       A.    It was -- I really got a lot of -- a lot
19   more pressure at that time to bring in more money,
20   that it was -- you know, it was -- there were
21   comments about whether or not they really need an
22   in-house counsel anymore.  Then there was some
23   discussion of withdrawing my -- not my health
24   benefits, but the health benefits for my family.
25           So it was -- you know, it just started
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 128

```
 1   to -- it just started to gradually go downhill at
 2   that point.  I mean, it was sort of a -- but I
 3   didn't feel like it was beyond being retrieved.  I
 4   had seen him turn on other people before and then
 5   warm back up.
 6       Q.   Did you try -- did you decide to stay,
 7   try to stay?
 8       A.   Yes.
 9       Q.   Were you -- did you change your tone
10   towards Mr. Gibson?
11       A.   No, not really.
12       Q.   Did you, you know, bring up this incident
13   again with him frequently?
14       A.   No, I didn't bring it up again.
15       Q.   You just said something about -- and this
16   reminds me of one question I failed to ask in an
17   earlier section about bringing in money.
18       A.   Uh-huh.
19       Q.   Was Mr. Gibson consistent in saying what
20   the company's focus should be in terms of
21   protecting its intellectual property?
22       A.   No.  That would go back and forth.
23       Q.   Between what?
24       A.   Well, you know, he was delighted with the
25   money I was bringing in.  I mean, it was -- you
```

Arbitration Proceedings  ~ Volume I ~  February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1    know, the company generated on average, I would

2    say, about $7 million a year in sales.  And, you

3    know, I brought in, you know, I think one year a

4    million dollars.  So when you've got a whole

5    company bringing in $7 million and one person

6    bringing in a million, you know, that's a pretty

7    good contribution.

8         You know, but I would get, you know, kind

9    of like reminded of my place when I would say,

10   Hey, isn't it great how much money I'm bringing

11   in?  Well, no, it's not.  This company has made

12   millions and millions of dollars without you.  We

13   don't need you to bring money in.  Our biggest

14   focus is on keeping people from stealing it.

15        But then, you know, we would swing back

16   to, You haven't brought in enough money lately.

17   You know, What have you done for me lately?

18        Q.   Did Mr. Gibson ever make comments related

19   to your ethnicity?

20        A.   Yes.

21        Q.   What is your ethnicity?

22        A.   I'm Sicilian.

23        Q.   And what type of comments would he make

24   about that?

25        MS. KRINCEK:  Your Honor, I'm going to

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  130

```
 1    object to this line of questioning.  They had a
 2    claim in originally for hostile environment
 3    discrimination based upon his national origin, and
 4    in the amended arbitration demand, they dropped
 5    that claim.
 6              MR. WHITE:  I'll move on, Your Honor.
 7              ARBITRATOR HABERFELD:  Okay.
 8    BY MR. WHITE:
 9       Q.    Were there ever comments during this time
10    period about your family and your relationship to
11    them?
12       A.    I'm sorry.  Could you be more specific
13    about the time period?
14       Q.    Sure.  In 2012, when the relationship
15    began to change, were there comments about
16    families -- people with families and about you and
17    your family, in general?
18       A.    I mean, actually, yeah.  It seemed so at
19    the time to be sort of complimentary.  You know,
20    like he didn't want kids around the place.  You
21    know, didn't want -- didn't want -- you know,
22    there were a couple of us with kids, and he didn't
23    want them coming to the office to visit their
24    parents.  But, you know, he did say, But, you
25    know, yours are okay.
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 131

1      Q.    Did the tone of that then change during
2    2012?
3      A.    Well, they didn't really come by that
4    much after that and say hi to him anyways, because
5    it was -- I think we were somewhat withdrawing
6    from being more personally inter --
7    inter-involved.
8      Q.    During this time in 2012, did he start
9    saying anything about whether or not to hire
10   people with families?
11     A.    That was actually a kind of consistent
12   theme, because Jason made it clear that, you know,
13   if we could hire -- you know, if there was a
14   choice between a woman and not a woman, well,
15   women cost more for health insurance, for example,
16   so, you know, I said, Come on, man, you can't --
17   you can't do that.
18          So, yes, it was -- it was generally -- I
19   don't think it was a hard and fast rule, but it
20   was generally known that we wanted to keep costs
21   down, so low cost people were single men.
22     Q.    Let me ask you about an exhibit.  Before
23   we move on to another incident in 2012, I'm going
24   to --
25          ARBITRATOR HABERFELD:  Can we go off the

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 132

```
 1   record for a second?
 2                  (Whereupon, an off-record
 3                   discussion was had.)
 4             ARBITRATOR HABERFELD:  Back on the
 5   record.
 6             MR. WHITE:  Thank you.
 7   BY MR. WHITE:
 8        Q.   I'm going to ask you a couple of
 9   questions about drinking.
10             Have you seen a video that's in the
11   Respondents' exhibits of you drunk and naked
12   around a pool in Costa Rica?
13        A.   Not my proudest moment, but, yes.
14        Q.   Why were you in Costa Rica?
15        A.   I'm really not sure, but the team was
16   there to go and scout locations for an upcoming
17   shoot.
18        Q.   And did you volunteer to go?
19        A.   No.  I was asked to go.
20        Q.   Did you do any legal work regarding
21   Costa Rica when you were in Costa Rica?
22        A.   I tried to make myself useful, but the
23   only thing we did was we met with -- on the final
24   day we were there, we met with a Costa Rican
25   lawyer for a little bit at a casino and just
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  133

1    talked to him for about a half hour.

2        Q.    Is this about -- again, about locations?

3        A.    No.  It was just about hiring him as a --

4    as an attorney in Costa Rica.

5        Q.    So how did the situation happen depicted

6    in the movie where you -- did you start off that

7    day drinking?

8        A.    No.  I actually started off that day

9    working.  I was studying for the California Bar

10   exam, and I was -- I had a lot of ongoing work to

11   do.

12           I sat down at a large table in the house

13   where we were all staying, my laptop open and

14   working.  And Jason walked up and put a glass -- a

15   big tall glass next to me that was full of some

16   clear liquid with some cloudy pink liquid floating

17   in it, and says, Here, it's Grey Goose and peach

18   soda.  Have a drink with me.  It was like

19   9:00 o'clock in the morning.  It might have even

20   been before 9:00 o'clock.

21           I said, Are you kidding?  I've got work

22   to do.  There is no way I can drink that.  To

23   which he responded, Awe, come on, it's my

24   birthday, drink with me.  So when a friend says,

25   Come on, it's my birthday, drink with me, I was

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 134

```
 1    raised to say -- that's what you do.  So I drink
 2    the pint or so of apparently Grey Goose and peach
 3    juice, and --
 4        Q.   Do you have a clear memory of the rest of
 5    that day?
 6        A.   Pretty blurry memory of the rest of that
 7    day.
 8        Q.   Now on other occasions you had drinks
 9    with him willingly, right?
10        A.   Yes.
11        Q.   And is it fair to say that you had
12    been -- you've had too much to drink at a company
13    event before?
14        A.   Before that?
15        Q.   Yes.
16        A.   I would say it's most likely yes.  I
17    don't remember any specific occasions, but --
18        Q.   Did there tend to be a lot of alcohol at
19    company events?
20        A.   Oh, yeah.  In fact, there were quite a
21    few times when I would have to leave my car at the
22    office.
23        Q.   All right.  I'm going to now move to
24    asking you about an incident in August of 2012.
25        A.   Okay.
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 135

```
 1        Q.   Do you remember an event the company held

 2   at Lake Mead?

 3        A.   I do.

 4        Q.   And what type of event was it?

 5        A.   The company was having a party on a boat

 6   on Lake Mead.

 7        Q.   Did you want to go?

 8        A.   I did not want to go.

 9        Q.   Why not?

10        A.   Because I had a significant amount of

11   work to do to get -- I believe to get an

12   attorney's fees motion in on the Oron case.

13        Q.   So why did you go?

14        A.   Jason told me that he really wanted me to

15   go, that it would be bad for morale of the company

16   if I didn't go.

17        Q.   Did you see it as any sort of

18   opportunity?

19        A.   Well, I had hoped that maybe around that

20   time, you know, I could find some way to get

21   some -- get some face time with Jason, talk to him

22   about a few things going on.

23        Q.   All right.  So what did you do at the

24   party itself?

25        A.   I stayed on -- sat up on deck and drank
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1   coffee all day.  And I -- when I -- when we had
 2   good reception, which we actually tended to have
 3   strangely good reception out there, I would make
 4   calls and try to manage some negotiations that I
 5   was working on on settlements, and managed the
 6   filing of the papers in the Oron case.
 7        Q.   Now, did you drive back yourself?
 8        A.   No.
 9        Q.   Who drove back?  Well, did you drive a
10   car yourself?
11        A.   I drove my own car, while most everybody
12   else took a bus that the company hired.
13        Q.   Who else was in your car?
14        A.   Jason was in my car, because he left his
15   gun in my car while he was out on the boat.  And
16   Cameron Frost was in the passenger's seat.  Jason
17   was in the driver's side rear.  And then David
18   McCoig was also in the backseat with Jason,
19   alternating between jumping into my daughter's
20   child seat and sitting in the middle seat.
21        Q.   Is this a car that you used personally
22   for your family?
23        A.   Yeah, this was my family car.
24        Q.   Remind me, who is Mr. McCoig?
25        A.   Mr. McCoig was a performer.  He's the
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 137

```
 1    performer that Jason had a relationship with.  I
 2    don't believe there was anybody between Jon Price
 3    and him, and then who was eventually promoted to
 4    some position in the executive wing.  I don't
 5    know.  His office was right next to mine in the
 6    executive wing.
 7        Q.    Did anything happen on that drive back?
 8        A.    Yeah.
 9        Q.    What was that?
10        A.    Well, while we were driving down the
11    road, Jason began to give David a blowjob in the
12    backseat.
13        Q.    Did he do anything before he began to do
14    that?
15        A.    He reached up and adjusted the rear view
16    mirror.
17        Q.    What was the impact of doing that?
18        A.    It made it that you could see the blowjob
19    in the rear view mirror.
20        Q.    Where was Mr. McCoig while this was
21    happening?
22        A.    He was sitting on the -- in the middle
23    seat, kind of, you know, up against my daughter's
24    child seat.
25        Q.    Did you say anything?
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  138

```
 1       A.   Not to Jason.  I said something to
 2  Cameron.
 3       Q.   What did you say?
 4       A.   I said, Just another day at the fucking
 5  office, huh?  And Cameron rolled his eyes, and
 6  said, Yeah, really.
 7       Q.   So as this was happening, did you say
 8  anything to Jason?
 9       A.   I did say, you know, Hey, come on, my
10  kids sit back there.
11       Q.   Now, what was -- how can you describe
12  Mr. McCoig's condition during this trip?
13       A.   I believe the scientific term is "shit
14  faced."
15       Q.   He was drunk?
16       A.   Yes, quite.
17       Q.   Were there any incidents with him being
18  drunk later in the trip home?
19       A.   Yeah.  I don't recall if it was before or
20  after the blowjob, or -- but he started to express
21  that he had to vomit, and could you please pull
22  over.  Since we were on the highway, I didn't
23  think that that was the best idea, so we took the
24  next exit, and pulled over, and he puked there.
25       Q.   Where was it that you pulled over?
```

Arbitration Proceedings  ~ Volume I ~  February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 139

```
 1      A.   I pulled over and into a circular

 2 driveway in front of the Mercedes dealership.

 3      Q.   Why was that?

 4      A.   I hated that Mercedes dealership.  They

 5 had previously damaged my car while working on it,

 6 so I thought I could kill two birds with one

 7 stone; not get vomit in my car and express my

 8 disapproval with their business practices by

 9 letting him vomit there.

10      Q.   So did you say anything to Jason about

11 this after the ride was done?

12      A.   No.

13      Q.   Did you say anything to anyone?

14      A.   Yes.

15      Q.   To whom?

16      A.   I remember talking to Kirk about it.

17      Q.   Is that Kirk Addison, who was the HR

18 person?

19      A.   Yes.

20      Q.   How did it make you feel that this was

21 happening in your backseat?

22      A.   I knew at that point I was getting fired.

23      Q.   Why was that?

24      A.   Well, again, you know, it's -- it's like

25 this is the kind of thing Jason does to show you
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 140

```
 1    that he's your -- you know, you're his bitch.  I
 2    mean, I hate -- I'm sorry to put it that way, but
 3    I don't really know a non-colloquial way to
 4    express that in shorthand, so --
 5        Q.   Did it bother you just in terms of that
 6    happening in your backseat?
 7        A.   Well, yeah.
 8        Q.   Why?
 9        A.   Again, it's -- you know, there is a line
10    here, and it's -- I mean, I guess at the very
11    least, if you are going to have sex in the back of
12    somebody's car, you can ask their permission.
13            In fact, I drove a cab when I was in
14    college, and had that happen twice while I was
15    driving a cab.  At least they had the common
16    decency to ask me if it was okay.
17        Q.   Was the fact that your daughter's car
18    seat was there part of the way you feel?
19        A.   Yeah.  It wasn't a cab.  You know, a cab
20    wasn't my car.  After those events, I turned the
21    cab in, never saw that cab again.  You know, this
22    is my car.  My kids sit back there, yeah.  I mean,
23    would you -- would you go to a party at somebody's
24    house and have sex in their kid's bed?
25            I mean, some people might, but I sure
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 141

```
 1    wouldn't.  I don't know any decent person who
 2    would.
 3           MR. WHITE:  Your Honor, actually this is
 4    a point where I would be moving to a new subject
 5    matter, so it might be a good time to break.
 6           ARBITRATOR HABERFELD:  How long would you
 7    like to take for a lunch break, anybody?
 8           MS. KRINCEK:  I think we should take at
 9    least an hour.
10           ARBITRATOR HABERFELD:  That's fine.
11    Anybody need more?
12           THE WITNESS:  No.
13           MR. WHITE:  That would be fine.
14           ARBITRATOR HABERFELD:  What time is it?
15           THE COURT REPORTER:  It's 11:54.
16           ARBITRATOR HABERFELD:  How about if we
17    come back, resume at 1:00 o'clock?
18           MR. WHITE:  That would be fine.
19           ARBITRATOR HABERFELD:  We're in recess
20    until then.
21              (Whereupon, a lunch recess was taken.)
22           ARBITRATOR HABERFELD:  On the record.
23           Mr. White?
24           MR. WHITE:  Thank you, Your Honor.
25    ///
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 142

```
 1   BY MR. WHITE:
 2       Q.   Mr. Randazza, I'm going to ask you about
 3   the Oron litigation that's at the center of this
 4   case.
 5       A.   Okay.
 6       Q.   When did you first hear of Oron?
 7       A.   I can't quite remember, but probably
 8   sometime in 2011.
 9       Q.   And what did you understand it to be?
10       A.   Oron is a -- what's known as a
11   cyberlocker site.  They are -- these are Websites
12   where you can upload a file, and then other people
13   can download that file, as long as they get a
14   special link from you on that Website.
15           So you set up an account.  It doesn't
16   actually display the video on the screen.  They
17   just store it for you with this special link that
18   you click to download it.
19           The business model provides that
20   sometimes you have to join the site, so you have
21   to be a member of the site and pay money to them
22   in order to be able to download.  Once they
23   figured out that that was probably going to create
24   some liability for them, most of the cyberlockers
25   adjusted their business model that you could
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  143

1    download anything from the site you wanted to for

2    free.  But it would be throttled so it would go

3    very, very slowly.  It would take you two days to

4    download a movie.  Or for the low, low price of

5    whatever per month, you could get rapid

6    downloading, which would allow you to download it

7    in a few minutes.

8          Now, they had -- these companies all had

9    these very neat legal fiction where they would

10   say, you know, We're just -- we're just a storage

11   company, but -- and then people are uploading

12   their personal photo albums to this, for example.

13   Well, if you were going to use the site to send

14   somebody your personal photo album, I would

15   imagine that once they receive it, they can --

16   they might wait to download that material if it's

17   one download.  But if you are going back to the

18   site every day to get the latest episodes of TV

19   shows, movies, albums, it would become worth your

20   while to then become a member of the site.

21          And an additional facet of this is that

22   some of them would reward the uploaders.  In fact,

23   I think they all rewarded the uploaders with how

24   many downloads people would have.  So if I were to

25   send a file simply to you, and say, Hey, here is

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1    my photo album from our recent vacation, you're

2    going to download that one time, maybe the three

3    or four people that were with us are going to

4    download it.  You would never really get any

5    serious bonus incentives unless you had, you know,

6    a couple hundred or couple thousand downloads to

7    it.

8           Well, what kind of content is going to be

9    downloaded like that?  It's going to be movies,

10   record albums, TV shows, and the like.  Almost all

11   of it pirated, because you could download it

12   legally and probably in the same amount of time

13   from iTunes or wherever else that was legit.

14       Q.   Mr. Randazza, let me stop you there and

15   ask you, were locker sites like Oron a problem for

16   Liberty in terms of piracy?

17       A.    Yeah, I saw them as the -- probably the

18   second largest problem after torrenters, and we

19   went after three of them in a row.

20       Q.    Now, at some point did Oron kind of get

21   on your radar as a potential target?

22       A.    Well, Oron was one of dozens of potential

23   defendants that I looked at.  But they -- they

24   bumped up in the -- on my target in visibility,

25   interestingly enough, when they were sued by

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 145

```
 1    another company in San Diego.  And their defense
 2    counsel called me and asked me if I would be
 3    willing to represent them along with him, because
 4    he knew that I knew a lot about these kind of
 5    Websites.  So they approached me to be -- to
 6    defend them.
 7        Q.    What did you say?
 8        A.    Well, I said, I will have to ask Jason.
 9    So I went to Jason, and I said, you know, These
10    guys are -- they're on my radar, they want me to
11    do this.  I actually wanted to do it because we
12    had had two cases against cyberlockers at that
13    point where we had been on offense.  And to work
14    the other side of the case I think would have
15    given me a really good insight into some of the
16    possible defenses and some of the possible
17    pitfalls in our later cases if we ran into anybody
18    that put up a greater resistance.
19            And Jason said it would be okay, as long
20    as they settled the case that we were thinking
21    about filing against them, and I think he
22    wanted -- I think he was willing to take as little
23    as $50,000 on that case.
24        Q.    So what did you do?
25        A.    I told him that, you know, I had a
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 146

```
 1    conflict.  I told the defense attorney I had a

 2    conflict.  But that if he wanted to pay Liberty

 3    Media, you know, I think I started the bidding at

 4    100 grand, and, you know, let them know that we

 5    could probably work it down to 50.  And he said

 6    that they weren't willing to pay anything.

 7              So that -- that didn't work out, but it

 8    did up them on the ladder of companies to hit.

 9       Q.    So what would have been, at this point,

10    the impediment to suing Oron or collecting from

11    them?

12       A.    At that point, you know, they were an

13    offshore company.  I didn't quite know enough

14    about them to make it worth suing them.  I didn't

15    know where their money was.  You know, I knew that

16    they were being represented in the US.  I

17    didn't -- but I didn't know where their banking

18    was.  And given the fact that they were already a

19    defendant in a lawsuit, I wanted to watch how that

20    played out a bit.

21              You know, when you are -- when you are

22    the second one in line, it's usually not that good

23    of a deal, because I found with most of these

24    pirate sites, they would settle, you know,

25    somewhat reasonably with the first company that
```

000147

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 147

1    went after them, but then the second time they got

2    hit, they would say, Well, we just can't keep

3    settling with anybody.  So kind of like a vaccine,

4    you know, once they pay their -- pay the piper the

5    first time, they tend to want to fight like hell

6    the second time.

7        Q.   So did there come a time when Oron

8    approached you again in some context?

9        A.    Well, they popped up again because they

10   wound up sending a demand to PornGuardian, of all

11   companies, because PornGuardian was starting to

12   make public statements that they were -- they had

13   a lot of piracy on the site.  So they threatened

14   PornGuardian with a defamation lawsuit through an

15   attorney by the name of Stevan Lieberman.

16          PornGuardian came to me and said, What do

17   you think of this?  I said, I think this is

18   fantastic, because now if they do sue you, you

19   know, I may have -- it would be kind of cool if

20   you shared some information with us, we'll do a

21   counterclaim, then bring in a third-party claim by

22   Corbin Fisher, get some more money out of them,

23   and they are not going to be able to contest

24   jurisdiction.

25          Because they were a Hong Kong based

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 148

1    corporation with -- and I knew at the time or

2    suspected at the time ownership in Eastern Europe,

3    Russia, Moldova, Ukraine.  It was never quite

4    clear where.

5        Q.   So did you wind up approaching, talking

6    to Oron on behalf of Liberty once they had made

7    that threat to PornGuardian?

8        A.   Yeah, the -- I mean, the exact chain of

9    events wasn't quite all that clear, but as I

10   looked at it, I knew what we were going to have to

11   do was make a -- you know, deploy this strategy of

12   getting their money locked up, because I figured

13   out that some of their money was at PayPal, but

14   most of their money was wrapped up in a bank in

15   Hong Kong, and it was going to be expensive to go

16   after them.  But, additionally, you know, they

17   came onto my radar from a company called AEBN,

18   which is also known as Datatech, their general

19   counsel, Datatech's general counsel and I would

20   share information all the time on piracy cases,

21   because he really wanted to team up with us where

22   we -- we would do a joint case against a pirate

23   site, split the expenses, and then split the take.

24       Q.   Did there come a time when you started to

25   make demands to Oron on behalf of Liberty?

Arbitration Proceedings  ~ Volume I ~  February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  149

```
 1        A.   Yeah.  I think I sent something to
 2   Lieberman, and Lieberman and I went back and forth
 3   on it.  We were going to try to do a mediation.  I
 4   think that was -- that was my intent.  I always
 5   tried to get these parties into mediations because
 6   I knew that if I got into a mediation, that meant
 7   we could avoid discovery.
 8        Q.   Let me ask you to take a look at
 9   Exhibit 58, which is in the second binder that you
10   have.
11        A.   Okay.  All right.  I got it.
12        Q.   Do you recognize what that is?
13        A.   Yes.
14        Q.   What is it?
15        A.   It's a memo that I sent to Jason and
16   Brian Dunlap.
17        Q.   Does this sort of indicate what the
18   status was of your negotiations with Oron at this
19   phase?
20        A.   Yes.
21        Q.   So here you're talking about high
22   numbers, 500 -- or $500,000.  Before you said that
23   you had thought of only 50 or 100,000.
24             Why the higher number?
25        A.   Well, it's negotiations strategy.  You
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 150

```
 1    always -- you know, the amount of work I had done

 2    at that point, I felt like they should pay us

 3    more.  And the more I looked at it and knew where

 4    the money was, probably was -- I felt like I had

 5    better cards in my hand.

 6         Q.   Did you keep Mr. Gibson informed about

 7    what was going on in this negotiation?

 8         A.   Yes.

 9         Q.   Did there come a time when the other side

10    offered to -- offered you or your firm money in

11    order to conflict you out or to close the deal?

12         A.   Yes.

13         Q.   Now, before we talk about that

14    specifically, let's talk about that as a practice.

15              Is it unusual, in your experience in the

16    adult industry in these negotiations with sites,

17    for them to try to offer something to the lawyer

18    on behalf of the property holder?

19         A.   It happened to me almost every single

20    negotiation that we had.

21         Q.   And did you -- did it ever happen?  Did

22    anyone ever pay you money to incentivize you to

23    get your client to settle?

24         A.   No.

25         Q.   Did anyone ever complete with you a deal
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1    where they hired you to conflict you out of future
 2    cases?
 3         A.    No.
 4         Q.    Did you ever play along with the
 5    negotiations?
 6         A.    Almost every time.
 7         Q.    Why would you do that?
 8         A.    Because it's -- you know, you are trying
 9    to reel the fish in.  As long as I've got -- if
10    I've got an opposing counsel that wants to suggest
11    this kind of thing, if I think I can string him
12    along, you know, for example, you get -- let's say
13    you get them to agree, hypothetically, they will
14    give me a million dollars to conflict me out of
15    future work.  Well, we're talking about that, his
16    client has obviously agreed that a million dollars
17    going out of his company is acceptable.  It's just
18    a matter of where does it wind up.
19         Q.    So what would be your purpose ultimately?
20    What's your goal?
21         A.    To increase the settlement amount.
22         Q.    To whom?
23         A.    To Corbin Fisher.
24         Q.    So --
25         A.    Because after all, I would get 25 percent
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1    of it one way or the other.

2        Q.    So did you ever tell the people at Corbin

3    Fisher about this?

4        A.    All the time.

5        Q.    How would you describe it to them?

6        A.    Well, I described it colloquially.  I

7    tried to explain it to Jason the first time it

8    happened, and his answer was, Well, why don't you

9    just do it?  Now we can get the case settled.  And

10   I said, Well, I really can't.  It's kind of like

11   he's trying to bribe me to not -- to not adhere to

12   the rule that I can't conflict myself out of

13   future work for payment.

14          And so we colloquially referred to it as

15   a bribe.  But that's certainly not an accurate

16   legal description of it.

17       Q.    Did you ever tell them whether or not it

18   was common in the industry?

19       A.    Well, they knew it was common in the

20   industry because every time it happened, I

21   mentioned it.

22       Q.    Please look at Exhibit 41 in the first

23   volume.  And let me know when you are there,

24   please, and that you are ready to answer questions

25   about it.

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  153

```
 1       A.    Okay.  Yeah.  Here we are.

 2       Q.    Do you recognize the e-mail exchange in

 3   Exhibit 41?

 4       A.    I do.

 5       Q.    And what was the -- what case was the

 6   context of this?

 7       A.    This was the TNAFlix case.

 8       Q.    What year is that?

 9       A.    2010.

10       Q.    And was the TNAFlix a case where the

11   opposing parties engaged in this sort to dialogue

12   with you?

13       A.    Yes.

14       Q.    And here near towards the top, Mr. Gibson

15   writes, Are these the same guys who offered to

16   bribe you?

17       A.    Yep.

18       Q.    So does that refer to an earlier case?

19       A.    I don't know if it refers to an earlier

20   case or just an earlier discussion about this

21   case.

22       Q.    Was that the only time that you discussed

23   this going on with Mr. Gibson?

24       A.    No.

25       Q.    Please turn to Exhibit 53, which is in
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 154

```
 1    the second volume.
 2              MS. KRINCEK:  Sorry.  53?
 3              MR. WHITE:  53.  Thanks.
 4              THE WITNESS:  Got it.
 5    BY MR. WHITE:
 6        Q.   Let me know when you recognize it and you
 7    are ready to discuss it.
 8        A.   I'm ready.
 9        Q.   Do you recognize what this e-mail
10    exchange between you and Mr. Gibson is about?
11        A.   Yes.
12        Q.   What is it about?
13        A.   It's about a settlement in the Megaupload
14    case.
15        Q.   Now, towards the bottom, there's an
16    e-mail from an Ira Rothken.
17        A.   Yes.
18        Q.   Who is that?
19        A.   He is the lead counsel for Megaupload.
20        Q.   And what was he trying to pitch to you?
21        A.   You know what, I want to correct
22    something that I talked about earlier.
23        Q.   What's that?
24        A.   It was Megaupload where they approached
25    me to be defense counsel, not Oron.
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 155

```
 1       Q.   Okay.

 2       A.   It was -- and it was Venkat Balasubramani

 3   who is copied on this.  The two cases were so

 4   similar, I conflated them in my head.

 5       Q.   So did you learn about Oron, then, when

 6   they approached PornGuardian?

 7       A.   Yeah.  That was -- that was when that one

 8   came to my attention.  This one came to my

 9   attention when Venkat asked me would I be counsel

10   for them in their case defending against them

11   in -- defending against Perfect 10 in the Southern

12   District of California.

13       Q.   So what were they -- what in this e-mail

14   change that you forwarded to Mr. Gibson, what was

15   Mr. Rothken trying to pitch?

16       A.   Mr. Rothken was, like every one of these

17   pirate sites, I don't know if there is a memo that

18   goes around to them or what, but in trying to

19   pitch to me that I would take a payment to not

20   represent anyone against Megaupload again.

21       Q.   And so you forwarded this to Mr. Gibson?

22       A.   I did.

23       Q.   Was it unusual for you to keep him

24   informed about things like that happening in

25   cases?
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1       A.   No, it was pretty -- pretty normal.
 2       Q.   Now, in this e-mail, you -- in this
 3  e-mail chain, you indicate you're concerned about
 4  rules of professional conduct --
 5       A.   Uh-huh.
 6       Q.   -- in this.
 7            Is that a tactic you would use in these
 8  negotiations to try to raise the amount you could
 9  get from them for Liberty?
10       A.   I mean, it would depend on the opposing
11  counsel.  I mean, Ira was, I felt in doing this,
12  was not -- Ira was just, you know, incredibly
13  insistent on this, and even wanted to put it into
14  the settlement agreement.
15            I mean, my negotiations with him were a
16  little different than my negotiations with other
17  defense attorneys who brought this issue up.
18       Q.   So what I'm asking is did you take this
19  tact of telling him, I've discovered an ethical
20  problem more than once in multiple cases?
21       A.   Yes.
22       Q.   And was that part of your strategy?
23       A.   It was.
24       Q.   And did Megaupload, this case, did they
25  wind up hiring you?
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 157

```
 1      A.   Oh, no.
 2      Q.   Did they wind up paying you any money to
 3 conflict you out?
 4      A.   No.
 5      Q.   Did they wind up paying you a bribe?
 6      A.   No.
 7      Q.   How about in the TNAFlix case that you
 8 just mentioned a moment ago?
 9      A.   No.
10      Q.   So returning to Oron, in Oron was there a
11 discussion of you getting money or being
12 conflicted out as part of a settlement structure
13 with Liberty?
14      A.   Yep.
15      Q.   And did you believe it was ever going to
16 come to fruition?
17      A.   No.
18      Q.   Had any of these ever come to fruition?
19      A.   Never.
20      Q.   Did you ever go as far as to, for
21 instance, send a proposed retainer agreement --
22      A.   Yes.
23      Q.   -- or something like that to the people
24 who were proposing this to you?
25      A.   I sure did.
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1        Q.   Did any of them ever get signed?
 2        A.   Nope.
 3        Q.    What is your understanding of what this
 4   course of negotiation produced for Liberty?
 5        A.    It would coax more money out of the other
 6   party.  You know, if they were -- at least that
 7   was my -- you know, my belief that if they were
 8   okay with the idea of, let's say in this case, I
 9   mean, I don't know what Ira's number went up to.
10   I want to say at one point it was up to 50 grand
11   or so.
12             Well, if they were willing to give 50
13   grand to me, why not give the 50 grand to Liberty,
14   because that puts more on the fire, gives me more
15   ammunition to go after more targets, and, you
16   know, ultimately benefits the clients and benefits
17   our campaign.
18        Q.   Would you please turn to Exhibit 90, 9-0,
19   in the second binder?
20             ARBITRATOR HABERFELD:  What's the number
21   in the second binder, please?
22             MR. WHITE:  It's 90, Your Honor.
23             ARBITRATOR HABERFELD:  Thank you.
24             THE WITNESS:  Yes, I see it.
25   ///
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 159

```
 1    BY MR. WHITE:
 2        Q.    And tell me when you recognize it and
 3    Exhibit A to it.
 4        A.    Exhibit A.  Yes, I recognize Exhibit A.
 5        Q.    Exhibit A, which is Bates stamp -- sorry,
 6    it's not Bates stamped.  At the top of the page it
 7    says 2 of 4.  Do you recognize what that exhibit
 8    is?
 9        A.    Is it the one that says Greenberg &
10    Lieberman at the top of it?
11        Q.    Yes, that's what I'm referring to.
12        A.    Yep.
13        Q.    Is this a term sheet that you eventually
14    reached with Oron?
15        A.    That's a settlement agreement the way
16    that both I and Judge Navarro interpreted it.
17        Q.    Well, this is dated July 1st.  Is this
18    when you reached the settlement with Oron?
19        A.    I believe so.
20        Q.    And how did you come to structure it in
21    this particular way where you are signing instead
22    of someone from Liberty?
23        A.    This is what Lieberman sent me, and when
24    he sent it to me, I transmitted it to Jason, and
25    Jason and I, I remember, we discussed it.  And I
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 160

```
 1    didn't particularly like the terms of it.  There
 2    was some nonmonetary terms that I thought were
 3    problematic.  There was certainly a Paragraph 2 I
 4    didn't like because it put me personally on the
 5    hook.  However, Paragraph 1 is the thing that got
 6    Jason happy.  And he said, Well, if we sign this
 7    now, do we lock them in to this as a settlement
 8    agreement?  I said, That's the way it looks to me,
 9    so I signed it and sent it back to him.
10        Q.   So Paragraph 2, when you say it makes you
11    liable, are you talking about the language of
12    Randazza transfer them before settlement is final,
13    you will be personally be liable --
14        A.   Yes.
15        Q.   -- for the funds plus a ten percent
16    penalty?
17        A.   Yes.
18        Q.   Did you give this agreement to Mr. Gibson
19    to review?
20        A.   Yes.  Well, hold on.  I'm not sure if I
21    gave it to him or if I read it to him over the
22    phone.
23        Q.   Well, let's --
24        A.   I know that he is the one who told me to
25    sign it.
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1        Q.   Let's take a look at Exhibit 63, please.

2        A.   Okay.

3        Q.   It should be in the same volume.

4        A.   Got it.  Yeah.

5        Q.   Tell me when you recognize this e-mail

6    and when you are ready to answer a question about

7    it.

8        A.   I am ready to answer a question about it.

9        Q.   Does this indicate to you whether or not

10   you sent the agreement in question to Mr. Gibson?

11       A.   Yes, it would have been attached to this

12   e-mail, from the looks of it.

13       Q.   And did he give you approval in writing?

14       A.   He did.

15       Q.   Now, did Oron go ahead and then give you

16   the $550,000?

17       A.   They did not.

18       Q.   Did they indicate why not?

19       A.   They took the position that it was not a

20   settlement agreement, it was just a terms sheet,

21   and that it was not intended to be seen as an

22   offer to be accepted.

23       Q.   All right.  What did you do strategically

24   in response to that?

25       A.   I filed a motion to enforce the

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 162

```
 1    settlement agreement.

 2         Q.    Was that the Exhibit 90 that we saw to

 3    which the term sheet was Exhibit A?

 4         A.    That was Exhibit 90, yes.

 5         Q.    And what was the result of that motion?

 6         A.    It was successful.

 7         Q.    Please turn to the next exhibit,

 8    Exhibit 91.

 9         A.    Yes.

10         Q.    Tell me if you recognize that?

11         A.    I do.

12         Q.    And what is that?

13         A.    This is the Order by Judge Navarro

14    granting the motion to enforce the settlement.

15         Q.    Now, even as you have the settlement and

16    you are enforcing it, are you also pursuing other

17    methods of putting pressure on Oron?

18         A.    Yes.

19         Q.    What kind of methods?

20         A.    Well, we had done -- before we got that,

21    we had filed a motion for a TRO in Nevada, and

22    then simultaneously we sought a Mareva injunction

23    in Hong Kong.

24         Q.    What's a Mareva injunction?

25         A.    It's this really cool thing that you have
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 163

```
 1    procedurally everywhere that there is -- pretty
 2    much everything that was ever a British colony,
 3    except the United States.  It's a worldwide
 4    injunction on any assets.  It usually goes in
 5    conjunction with an Anton Piller order, which
 6    gives you worldwide discovery on every single
 7    thing that the company would have.
 8          So it's -- it was like a simultaneous
 9    raid on their accounts and their rights to
10    disburse any money from them in both the Nevada
11    case and then in the Hong Kong case in furtherance
12    of that case, so the two cases worked together
13    simultaneously to lock everything up.
14       Q.   Did you perceive, based on your
15    negotiations, that that seemed to put any pressure
16    on Oron?
17       A.   Oh, yeah.  It was awesome.  I mean,
18    that's why we got that term sheet.  At that
19    point -- I mean, I think we were -- I think we
20    went from filing the case to that settlement
21    agreement in like a week.  So from -- you know,
22    from them saying, You will never get us, you know,
23    our money is all hidden, and you will never get
24    jurisdiction over us, to how about $550,000 in
25    less than a week.
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 164

```
 1      Q.    Now, how did you go about getting the
 2   injunction in Hong Kong?
 3      A.    I retained a Hong Kong law firm to work
 4   in conjunction with us on it, so they would --
 5   they would work all -- all night long, and we
 6   would work all day long, and then -- it was a
 7   pretty -- pretty busy period of time.  It was like
 8   phone calls and hearings at 3:00 o'clock and
 9   4:00 o'clock in the morning here.
10      Q.    Now, were they going to charge?  The
11   Hong Kong firm, were they going to charge money
12   to -- that's a terribly stupid question.
13            How much did you think they were going to
14   charge?
15      A.    They gave us an estimate, they said, you
16   know, it would probably cost $50,000.  That's
17   what -- I presumed it would probably be a little
18   more than that, but that was their estimate, as I
19   understood it.
20      Q.    So did you go to Mr. Gibson about the
21   need to fund that?
22      A.    Yes.
23      Q.    And what did you suggest to him?
24      A.    I suggested -- you know, my original plan
25   was to try to get AEBN to split it with us,
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1   especially since AEBN, remember, was investigating
 2   them first.  I mean, really, I kind of -- I kind
 3   of stuck AEBN's general counsel when we moved on
 4   this without waiting for him.  But they were
 5   taking too long to get involved, so we decided to
 6   go at it alone.  But I said, you know, We're going
 7   to need money to pay these guys.
 8       Q.   And so what did -- did you tell
 9   Mr. Gibson your assessment about whether or not it
10   would be worth it to invest -- to pay money to
11   Hong Kong?
12       A.   I made it clear that as far as I could
13   tell, if we did this, we would have every dollar
14   they had, except what apparently they had spirited
15   away in gold bars to -- I think to Moldova.  We
16   would have every -- every bit of cash they had in
17   the world locked up, and that would probably bring
18   them to the table.
19       Q.   All right.  What was Mr. Gibson's
20   response?
21       A.   Woo hoo.
22       Q.   Okay.  Well, what was his response
23   about --
24       A.   I mean, literally.
25       Q.   -- sending the money to Hong Kong?
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 166

1      A.   Oh, you know, he was a little bit

2   reluctant to lay out that kind of money, and, you

3   know, asked me if I would front half of it.

4      Q.   How did you respond to that?

5      A.   I -- I agreed to do it.

6      Q.   Did he say anything to you about why you

7   should be expected to front half of it?

8      A.   That if I didn't have the faith in the

9   case or the company, you know, that -- it would

10  show that I didn't have much faith in the case or

11  in the company if I wasn't willing to risk 25

12  grand -- you know, to put -- risk 25 grand of my

13  own money.

14     Q.   How did you interpret that?

15     A.   That it would be considered to be a sign

16  of disloyalty if I didn't advance $25,000 of my

17  own money to hire these Hong Kong lawyers.

18     Q.   Did you describe it to the Excelsior team

19  as an investment that you were doing with them?

20     A.   No.

21     Q.   How did you describe it?

22     A.   Local counsel fees that we have to pay.

23  I mean, this is how you -- it was a cost that it

24  was going to take in order to do this case.

25     Q.   In your assessment, did the money that

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 167

1   was sent to Hong Kong have an impact on your

2   ability to settle?

3        A.   Yeah.   I mean, like I said, we got the

4   Mareva injunction.   They didn't have any ability,

5   based on the Nevada injunction, they couldn't move

6   any money out of their PayPal account in the

7   United States.   And, you know, they argued that

8   that PayPal account wasn't really subject to the

9   Court's jurisdiction there because it was an

10  offshore PayPal account.

11       But the Mareva injunction closed that

12  hole.   And without the Hong Kong lawyers, we would

13  never have gotten the Mareva injunction.   They

14  might have been able to just squeeze away with all

15  their money, and then there we are holding the bag

16  on a pretty big amount of work and, you know,

17  another judgment that we couldn't collect.

18       Q.   Did you document in any way the fact that

19  you were advancing $25,000 towards costs in

20  Hong Kong?

21       A.   Yes.

22       Q.   How did you do that?

23       A.   I think I put it on an expense report,

24  and I also wrote up a promissory note.

25       Q.   Would you turn to Exhibit 70, please?

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 168

```
 1      A.   Okay.  Okay.  I see it.

 2      Q.   Do you recognize what it is?

 3      A.   I do.

 4      Q.   What is it?

 5      A.   It's the promissory note.

 6      Q.   Did you put in here any interest?

 7      A.   No.

 8      Q.   So did Mr. Gibson sign the promissory

 9  note, that you recall?

10      A.   I have never seen a signed copy of it,

11  that I can recall.

12      Q.   Did he inform you that he had signed it?

13      A.   Yes.

14      Q.   Where was the physical copy that you had

15  prepared located?

16      A.   I left it in my office -- or it was left

17  in my office.  I think Erika told me she saw it

18  signed.  It was on my desk when I went away on

19  vacation.

20      Q.   All right.

21           ARBITRATOR HABERFELD:  And Erika is who?

22           THE WITNESS:  My former paralegal at the

23  time, Erika Dillon.

24           MS. KRINCEK:  Well, I guess to be

25  precise, it should be she was employed by the
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 169

```
 1   company.
 2          THE WITNESS:  I will adopt that as my
 3   answer.
 4   BY MR. WHITE:
 5      Q.   Did you later -- we're jumping ahead
 6   here.  But did you ever return to your physical
 7   office after your employment relationship with
 8   Excelsior ended?
 9      A.   I did.
10      Q.   Did you find, then, the promissory note?
11      A.   No.  It was missing.
12      Q.   Now, what was your strategy after you got
13   the order from the court enforcing the settlement?
14   In other words, was it pure litigation, or were
15   you looking, again, to try to settle the
16   situation?
17      A.   I think we had some conversations with
18   Lieberman about just paying a certain portion of
19   it, and then we could all move on.  And then he
20   got replaced at some point.
21      Q.   By whom?
22      A.   He was replaced by an attorney by the
23   name of Val Gurvits, G-u-r-v-i-t-s.
24      Q.   Is that someone with whom you had dealt
25   before?
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 170

```
 1        A.   Again and again.

 2        Q.   Is he also known in the industry as

 3   someone who represents adult clients?

 4        A.   He is known as the pirates' attorney of

 5   choice.

 6        Q.   So what were the risks at this point so

 7   you would go onto settlement?  If you had the

 8   order to enforce the settlement agreement, what

 9   were you trying to enforce it on?

10        A.   Well, I didn't want to have any -- again,

11   I didn't want to have any discovery because Jason

12   didn't want that to happen.  And, also, Jason was

13   really leaning on me hard to get the money fast,

14   being -- just waiting for it to play out was not

15   an option.  I want that money, and I want it now.

16             And I think you can see in one of the

17   earlier exhibits you pointed to, he said, We need

18   it by Friday, next Friday at the latest.  He led

19   me to believe that the company was in such a state

20   of cash poor crisis that without it, we would have

21   some serious issues at the company.

22        Q.   Now, in the subsequent negotiations after

23   granting the motion to enforce, did this whole

24   issue of somehow giving you what was called a

25   bribe or conflicting you out come up again?
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 171

1     A.    It came up, yeah.  It came up before with

2  Lieberman, and then it came up again with Gurvits.

3  I was kind of laughing at the fact that it came up

4  with Gurvits again.

5     Q.    Did you eventually bring a version to

6  Mr. Gibson during this time period prepared by

7  Mr. Gurvits that had some written term in it

8  purporting to give you money as part of the

9  settlement?

10     A.    No.  It was going to transfer -- it was

11  going to transfer all this money that was going to

12  go to the company to my trust account, and then it

13  was going to transfer a bunch of money to Gurvits'

14  trust account, which Gurvits claimed he was then

15  going to use to retain me once everything was

16  settled in order to try and help Oron not get sued

17  in the future.

18     Q.    All right.  I'm going ask you to look at

19  one of the Respondents' exhibits.

20          Mr. Whitehead is going to assist with

21  that.  It's 325.

22          THE WITNESS:  Okay.  At some point in the

23  near future, I've got to take a bathroom break,

24  but it doesn't have to be now.

25          MR. WHITE:  Can you wait five more

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 172

```
 1   minutes?
 2           THE WITNESS:  Yeah.
 3           MR. WHITEHEAD:  325, Ken?
 4           MR. WHITE:  Yes.
 5           THE WITNESS:  Got it.  This is a -- this
 6   is a marked-up draft of the agreement going back
 7   and forth between me and Gurvits.
 8   BY MR. WHITE:
 9       Q.   And is this one that you presented to
10   Mr. Gibson --
11       A.   Yes.
12       Q.   -- to keep him up-to-date about the
13   status of the negotiations?
14       A.   Yes.  I wanted him to know where things
15   stood at that point.
16       Q.   How did Mr. Gibson tend to react when
17   people were making these suggestions?  Did he give
18   any suggestion of whether he thought it should or
19   shouldn't be done?
20       A.   What suggestions are you referring to?
21       Q.   The suggestions from opposing counsel
22   about a bribe or a conflicting out?
23       A.   I remember the first time it happened, he
24   said, Well, why don't you just do it, because that
25   will get us our money quicker?
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  173

```
 1      Q.   All right.  In this one, if you look at
 2  Exhibit 325, the first page --
 3      A.   Yes.
 4      Q.   -- towards the bottom.
 5      A.   Yes.
 6      Q.   There's a reference to $75,000 in there.
 7      A.   Yep.
 8      Q.   And there's a notation, Who gets this?
 9      A.   Right.
10      Q.   Who was, under this draft, at this time
11  supposed to get that?
12      A.   That was supposed to go into Val Gurvits'
13  trust account under this agreement.
14      Q.   But who was supposed to get it next, the
15  way you and Val had been negotiating it?
16      A.   According to Val, he was then going to
17  transfer it to me.
18      Q.   Was it your intention ever to actually
19  get it for yourself?
20      A.   No.
21      Q.   Did you explain that to Jason?
22      A.   I did.
23      Q.   So let's take a look -- it's inevitable
24  that we bounce around a lot, I guess -- at
25  Exhibit 66.  That's in our second volume.
```

Page  174

```
 1       A.   Okay.
 2       Q.   I'm sorry.  That's an incorrect one.
 3  Just a moment, please, and I'll tell you the
 4  correct one.  So many exhibits.
 5            Okay.  I'm sorry.  That should be 67.
 6       A.   Okay.  Got it.
 7       Q.   I would like you to look at all three
 8  pages, and let me know when you are ready to
 9  answer questions about it.
10       A.   Okay.
11       Q.   Okay.  So here there is an e-mail at the
12  bottom of the page from Mr. Gibson saying that his
13  stomach is churning.
14       A.   Yeah.
15       Q.   And he talks on the third page about the
16  bribery deal sits funny --
17       A.   Yep.
18       Q.   -- especially when there is no guarantee
19  we can even get the extra 75 from their attorney's
20  trust fund.
21       A.   Right.
22       Q.   Now, is that, them getting it from the
23  trust fund, consistent with what you told
24  Mr. Gibson?
25       A.   That's exactly what it is.  But he was
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 175

```
 1    concerned that Val wouldn't turn it over and Val
 2    would keep it, which I kind of figured would
 3    happen actually, myself.
 4        Q.    And were you trying to soothe his
 5    concerns about that?
 6        A.    Yes.
 7        Q.    All right.  Did you -- how did he start
 8    reacting to you at this point?  After this e-mail
 9    exchange, was there a further change in the tone
10    of your relationship?
11        A.    I mean, it was -- it was before that,
12    really.  This was -- this all struck me as kind of
13    strange and pretextual when it happened.
14        Q.    Well, did you follow up on the issue?
15        A.    I did.
16        Q.    Would you turn to 69, please?
17        A.    Got it.
18        Q.    Do you recognize what 69 is?
19        A.    Yes.
20        Q.    What is it?
21        A.    It's an e-mail that I sent to Jason.
22        Q.    Is this discussing the 75,000?
23        A.    It is.
24        Q.    What was your purpose of the e-mail?
25        A.    To try to get Jason to speak with me.
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1        Q.    Now, Point 2 here says, I fully disclosed

 2    it to you even before it happened.

 3        A.    Yes.

 4        Q.    I told you they were making overtures

 5    about that; is that true?

 6        A.    Yes.

 7        Q.    Did Mr. Gibson respond to this e-mail by

 8    saying, That's not true, or you never told me, or

 9    anything like that?

10        A.    Not to my recollection, he didn't.

11        Q.    Now, Section 3 here, Bullet Point 3 talks

12    about getting $75,000 and giving it to Liberty.

13        A.    Yep.

14        Q.    Can you read that paragraph and then

15    explain what you meant by it?

16        A.    Let's -- let's just say that Val for the

17    first time in my three or four year history with

18    him, maybe it was less than that, whatever,

19    multiple year history with him actually came

20    through on something like this, there was

21    originally talk of it being for them retaining me.

22    But Val and I talked about maybe it could be

23    restructured as a settlement to me because I -- I

24    wanted the money to go to Liberty.

25              And, frankly, it worked better for me if
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 177

```
 1    it went to Liberty, just as a matter of
 2    self-interest.  Although that might not seem to
 3    make mathematical sense, I wind up getting to do
 4    more cases.  I'd rather do three or four more
 5    cases and get $150,000 per.
 6         Q.   How can it be a settlement to you?  What
 7    claim would you have against Oron?
 8         A.   They were pulling some pretty shady stuff
 9    with me.  I felt that there was a valid defamation
10    claim against them.
11         Q.   Did they make statements outside of court
12    papers about you?
13         A.   They did not.  But what I did was I
14    argued with them about the fact that it seemed
15    like they were using what's known in -- at least
16    under -- I think there is a California case, the
17    creative defamer defense, where, you know, you
18    can -- the litigation privilege only protects you
19    so far.  If it's obvious you put something
20    pretextually into a pleading in order to use it
21    that way, there is at least some avenue there.  I
22    mean, some of the stuff they were putting in there
23    was really sleazy.
24         Q.   So in -- is this what says in 3 that you
25    were trying to -- you know, you would be giving
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  178

```
 1    75,000 to Mr. Gibson, is that anything different

 2    than what you conveyed to him before?

 3         A.   No.

 4         Q.   All right.  Now look at the next

 5    paragraph.

 6         A.   Here's -- well, let me elaborate here.

 7         Q.   Sure.

 8         A.   Here's part of the problem.  When I

 9    called Val, I said, Val, I can't -- like I said in

10    Point 1 here, I can't take a dollar that could

11    otherwise go to Liberty.  And Val said there is

12    absolutely no way that they are going to get more

13    than that.  That's all they are going to get.

14              So I had to structure it in a way if Val

15    was actually going to pay it, that it masked the

16    fact that it was going to the client.

17         Q.   Now, the next paragraph you say -- you

18    say, I've seen enough people get fired from here

19    that I can smell blood when it's in the water.

20         A.   Yep.

21         Q.   Why did you say that?

22         A.   Because, like I said before, I was -- at

23    that point, I knew or at least felt like there was

24    a very good chance I was getting fired.  I was

25    clearly on the disfavored list.  I kind of felt
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 179

```
 1    like if I brought in a big win for the company,
 2    that there might be a way that we could turn that
 3    around.
 4        Q.    Did his reaction to this issue and his
 5    discussion of the 75 form your belief at all that
 6    you thought you were about to be fired?
 7        A.    Yes.  It was just very obvious.  I mean,
 8    it was pretty obvious that he was doing something
 9    here, saying it was pretext -- you know, it was
10    pretextual because he had never reacted this way
11    before.  And this was always a litigation tactic,
12    especially when dealing -- a settlement tactic,
13    especially when dealing with Val.
14        Q.    Had it come up with Val specifically
15    before?
16        A.    It came up with Val specifically before.
17        Q.    So did you make attempts at this point to
18    talk to Mr. Gibson about this particular issue?
19        A.    I did try to, yes.
20        Q.    How successful were you?
21        A.    Very unsuccessful.
22        Q.    Did he convey to you that you were going
23    to be fired?
24        A.    He did not.
25        Q.    All right.  Well, did he convey anything
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 180

```
 1    to you to the contrary?
 2        A.   No.   I mean, he did say -- I remember
 3    some communication with him where he said, Don't
 4    presume the worst.  But at that point, I was --
 5    you know, I came to figure out that I was already
 6    fired at that point.  I just didn't know it yet.
 7            MR. WHITE:  I'm sorry.  My computer just
 8    had a minor slow down, but just a moment.
 9            May we take the brief break that
10    Mr. Randazza requested?
11            ARBITRATOR HABERFELD:  Sure.  See you
12    back in ten.
13            (Whereupon, a recess was taken.)
14            ARBITRATOR HABERFELD:  Back on the
15    record.
16            MR. WHITE:  Thank you.
17    BY MR. WHITE:
18        Q.   Mr. Randazza, we were talking about your
19    communications with Mr. Gibson after this issue
20    about the $75,000 arose between you.
21        A.   Uh-huh.
22        Q.   Would you please turn to Exhibit 68?
23        A.   Okay.  I'm there.
24        Q.   And take a look through the pages until
25    you can tell me if you recognize it and what's in
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 181

```
 1    it.
 2         A.    These are text messages with Jason.
 3         Q.    Please look at the second page of texts,
 4    and the first two from you at the top of the page.
 5              Do you see that?
 6         A.    I don't know if we're looking at the same
 7    thing here.  Second page?
 8         Q.    Second page.
 9         A.    Okay.
10         Q.    First two at the top of the page, do you
11    see those?
12         A.    Yep.
13         Q.    Were you reaching out to him to try to
14    have a meeting with him?
15         A.    Yes.
16         Q.    Was he cooperating?
17         A.    No.
18         Q.    Did you continue -- that was on the 16th.
19    Did you continue to try to talk to him?
20         A.    Yep.
21         Q.    So look at the bottom of the same page on
22    August 18th, third from the bottom.
23         A.    Uh-huh.
24         Q.    I want to have a talk about the terms of
25    my departure and what we can do to preserve the
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1   friendship, if anything.

 2        A.   Yep.

 3        Q.   What did you mean by that?

 4        A.   I was aware that I was being -- there was

 5   a virtual certainty I was being terminated, so I

 6   wanted to talk to Jason, hopefully straighten

 7   things out.  If not, we could part ways amicably.

 8        Q.   So looking at the next page, Jason

 9   responds and says, In the interim, I would ask

10   that you please quit assuming the worst and give

11   me the benefit of any doubt, as you are expecting

12   of me.

13        A.   Yep.

14        Q.   Do you see that?

15        A.   I do.

16        Q.   Did you take that at face value?

17        A.   No.

18        Q.   By this time, had you talked to anyone at

19   the company about whether or not you were going to

20   be terminated?

21        A.   Yes.

22        Q.   Who?

23        A.   Kirk and Andrew.

24        Q.   Is that Kirk Addison?

25        A.   Yes.
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 183

```
 1       Q.   And what is his position?

 2       A.   At the time, he was HR director.

 3       Q.   So what was your conversation with him?

 4       A.   I talked about a lot of the issues I was

 5  having at the company, and that it was pretty

 6  obvious that I -- the way I was being treated and

 7  pretty obvious that I knew I was going to get

 8  fired, and Kirk confirmed that.

 9       Q.   And what about -- you said Andrew.  Is

10  that Andrew Rasmus?

11       A.   Yes.

12       Q.   The same one who was a performer and had

13  a relationship with Mr. Gibson?

14       A.   Yes.

15       Q.   What was the context of that

16  conversation?

17       A.   Andrew told me that while he wasn't

18  included in any of the meetings, he knew that they

19  were meeting with attorneys about getting rid of

20  me.

21       Q.   Now, earlier you talked about filing the

22  motion with the Federal Court to enforce the

23  judgment.  But did you also seek fees on that?

24       A.   We did.

25       Q.   Have you reviewed the fee motion and
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 184

```
 1    Order that are attached as our Exhibit 92 and 93?
 2        A.   Yes.
 3        Q.   So were you successful in moving for
 4    fees?
 5        A.   We were.
 6        Q.   But the Order -- did the Order come down
 7    while you were still at Excelsior?
 8        A.   No, just a few days after.
 9        Q.   During this time period, how were you
10    trying to get the money that the court had
11    ordered, the 50 -- $550,000 in the settlement the
12    court had enforced?
13        A.   It was a real challenge because PayPal
14    did not want to disburse it, and Oron was, of
15    course, fighting it, threatening to appeal, saying
16    there was no settlement agreement.  So I was both
17    doing so formally through enforcement proceedings.
18    In fact, even threatening to file for a writ of
19    bodily attachment against the person at PayPal who
20    didn't want to -- who didn't want to approve it.
21        Q.   Did PayPal, however, eventually come
22    through and transfer money held there based on
23    that enforced settlement?
24        A.   Once I threatened to file for a writ of
25    bodily attachment against their counsel, yes.
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 185

```
 1       Q.   Were there any hiccups where they were
 2  about to produce it, and then didn't?
 3       A.   Yeah, that happened a couple of times.
 4  We were -- you know, they assured me, We're going
 5  to disburse it in a few hours, and then it didn't
 6  happen, and then they came up with some new reason
 7  why they couldn't do it or wouldn't do it.
 8            For a case that settled in six days, it
 9  sure got complicated.
10       Q.   Did they, in fact, eventually send money
11  from PayPal to your trust account?
12       A.   They did.
13       Q.   And where were you when that happened?
14       A.   I'm pretty sure I was in Massachusetts.
15       Q.   For what?
16       A.   For my sister's wedding.
17       Q.   Could you please take a look at
18  Exhibit 73 --
19       A.   Okay.
20       Q.   -- before you?
21            Take a look at it, and let me know when
22  you recognize what it is so I can ask some
23  questions about it.
24       A.   Okay.  I recognize what it is.
25       Q.   So this series of e-mails is dated
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

1   August 29th.  Is that consistent with when you

2   were in Massachusetts?

3       A.    It is.

4       Q.    And you forwarded something to

5   Mr. Gibson, if we're looking at the third page?

6   Pardon me.  The page that has EMC179 as the Bates

7   stamp.

8       A.    Yeah.  I just to be clear, on one of the

9   days that I was gone on this vacation, I went down

10  to Miami for the day, so it may have been sent

11  from Miami.

12      Q.    All right.

13      A.    But I don't think that's really relevant,

14  but I thought I would make sure I was clear.

15      Q.    So Page EMC179.

16      A.    Yes.

17      Q.    About midway down the page, there is an

18  e-mail from you to Mr. Gibson saying, I'm figuring

19  all this out.  But, FYI?

20      A.    Uh-huh.

21      Q.    So what is this you are forwarding to

22  him?

23      A.    Letters from our Hong Kong counsel.

24      Q.    Now, Mr. Gibson comes back and says that

25  now they are learning that you received the

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1    550,000 in your trust account?
 2        A.   Yes.
 3        Q.   Had you been concealing that from them?
 4        A.   No.
 5        Q.   How long ago had you learned it?
 6        A.   It was really a matter of hours.  I know
 7    that I got a fax from my bank when it came in.  It
 8    couldn't have been more than a few hours.
 9        Q.   What did Mr. Gibson want you to do?
10        A.   He wanted me to immediately disburse it
11    to Liberty.
12        Q.   Did you understand that you could do
13    that?
14        A.   I couldn't do it yet.
15        Q.   Why not?
16        A.   Because all of the settlement terms
17    weren't fully executed, and thus I was personally
18    on the hook for whatever I disbursed plus ten
19    percent.
20        Q.   If you look up to Page EMC178 --
21        A.   Yeah.
22        Q.   -- did you outline to Mr. Gibson the
23    things that still had to be done --
24        A.   Yes.
25        Q.   -- to effectuate the settlement
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 188

```
 1   agreement?

 2        A.   Yes.

 3        Q.   And looking up at EMC177, did he respond?

 4        A.   He did.

 5        Q.   So did he give a calculation about how he

 6   thought the funds should be disbursed?

 7        A.   He did.

 8        Q.   And that's the calculation there on

 9   Page 177?

10        A.   It is.

11        Q.   Did you notice anything about that

12   calculation in terms of what you believed you were

13   entitled to?

14        A.   Yes.

15        Q.   What was that?

16        A.   That he was trying to make it net, that I

17   would get 25 percent of net, not gross.

18        Q.   All right.  Did you respond to that?

19        A.   I did.

20        Q.   Look at the first page of the exhibit,

21   please.

22        A.   Yes.

23        Q.   Did you send him your calculations?

24        A.   I did.

25        Q.   Now, this refers to RLG fees for Oron
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 189

```
 1   litigation.

 2        A.   Yep.

 3        Q.   What's RLG?

 4        A.   Randazza Legal Group.

 5        Q.   And had Randazza Legal Group done work on

 6   the Oron litigation?

 7        A.   Yes.

 8        Q.   Now, was Excelsior paying full freight

 9   for RLG's hourly rates?

10        A.   No.  One of the -- one of the deals that

11   we had was that although I had this outside firm

12   with all these other people working for it, I

13   didn't want to ever be seen by self-dealing by

14   referring outside work to my personal firm for my

15   own benefit.

16             So what I did is I calculated what the --

17   to the best of my ability, and, you know, frankly,

18   if we have a forensic accountant go through and

19   figure out if this is right, I don't know if I

20   would come out above or below.

21             But to the best of my ability, I figured

22   out what everybody cost me.  For example, JAF is

23   Jason Fischer.  He costs me 75 per hour.  Jay

24   DeVoy costs me 60 an hour.  Laura costs me 35.83

25   an hour.  And Ron costs me 180.83 per hour.
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1            So rather than me make a dime of profit
 2    off them, I just charged at that rate.  And where
 3    are you going to get a 14-year litigator for $180
 4    an hour?
 5        Q.   All right.  Let's -- now that we're at
 6    the 29th, let's shift a bit to the issue of you
 7    leaving the company.
 8        A.   Uh-huh.
 9        Q.   Which the other side has characterized as
10    a resignation, and you've characterized as a
11    termination.
12        A.   Yes.
13        Q.   So August of 2012.
14        A.   Yes.
15        Q.   Is it correct that by this point, the
16    incident in the back of your car had already
17    happened?
18        A.   Yes.
19        Q.   And by this point, late August 2012, had
20    the -- that e-mail exchange with Mr. Gibson about
21    the $75,000 happened?
22        A.   Yes.
23        Q.   Were there other things going around that
24    also made you think that you were likely to be
25    terminated?
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1      A.   Well, aside from the meetings with other
 2  attorneys about them wanting to fire me, and the
 3  fact that Jason would not -- you know, I had a
 4  client that wouldn't communicate with me except to
 5  tell me to transfer the money.  And it was -- you
 6  know, it was just very obvious.  I knew.  And it
 7  was confirmed to me by both Andrew and Kirk.
 8           And, you know, I asked -- I also asked
 9  Mr. Lowderman about it, but he told me that there
10  was absolutely no plan to terminate me, but --
11      Q.   Let's take a look at Exhibit 66, please.
12      A.   Yep.
13      Q.   Let me know when you are there, please.
14      A.   Okay.  I am there.
15      Q.   Look at the start of this e-mail chain
16  first.
17      A.   Uh-huh.
18      Q.   What is that you are doing in this -- in
19  this e-mail on August 7th, 2012?
20      A.   The very top one?
21      Q.   The very first one, which I guess would
22  be the bottom, we'll call it.
23      A.   Oh, I'm sorry.
24           This is where I'm telling everybody in
25  the company that we just got word that our motion
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 192

```
 1   to enforce the settlement against Oron was

 2   granted.

 3        Q.   Did you see that as a big deal?

 4        A.   Yeah, because everybody in the company

 5   knew that this was a really big, hard fought case.

 6        Q.   And next you see an e-mail from Cameron

 7   Frost?

 8        A.   Yes.

 9        Q.   Saying congratulations?

10        A.   Yes.

11        Q.   Did Mr. Gibson respond?

12        A.   Yes.

13        Q.   So let's look at the first page of this

14   exhibit.

15        A.   Right.

16        Q.   Was this to anyone other than you?

17        A.   No, it was just to me.

18        Q.   So did this e-mail help to inform your

19   understanding of what was going to happen to you,

20   based on what he said about benefits in this?

21        A.   Yeah.  I mean, he had told me before that

22   that -- actually, it might have been before, it

23   might have been after, but around this time, I was

24   informed that benefits for my family would be cut.

25        Q.   And so he reacted to the news by saying
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 193

```
 1   to you that Cameron would be fired?
 2       A.   Yeah.  And Cameron was a pretty important
 3   person at the company.  I mean, this is a -- this
 4   is a porn company.  Getting rid of the
 5   photographer seems to me like a really strange
 6   thing to do, given that he's probably the most --
 7   I mean, at least one of the most important people
 8   there.
 9       Q.   And he mentioned some things that were
10   going to be cut?
11       A.   Yes.
12       Q.   And he said he's going to do that because
13   the money from Oron doesn't make up for what has
14   been stolen from us --
15       A.   Right.
16       Q.   -- in the form of declining sales?
17       A.   Right.
18       Q.   Was that the message he had been giving
19   you recently?
20       A.   Yes.  I figured the -- I figure the
21   pretext for getting rid of me was going to be, We
22   just can't afford you anymore.
23       Q.   And then down there at the very bottom,
24   you see where it says, There are going to be cuts
25   for everyone else on this recipient list in the
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 194

```
 1   very near future?
 2        A.   Uh-huh.  And I'm on that list.
 3        Q.   So once you are in August 2012 and you
 4   believe that you are going to be fired, what did
 5   you start to do about it?
 6        A.   I don't understand the question.
 7        Q.   Sure.  Did you start making any plans for
 8   if you were fired?
 9        A.   Yes.
10        Q.   Did you consider resigning?
11        A.   I did.
12        Q.   How far did you go on that path?
13        A.   I actually wrote a resignation letter.
14        Q.   Did you send it?
15        A.   No.
16        Q.   Why not?
17        A.   I still had a hope that if I brought in a
18   big enough of a win for the company on Oron, that,
19   you know, Jason's mood would elevate, and we would
20   be able to -- and get things back on track.  You
21   know, a $550,000, plus maybe the attorney's fees
22   on it, that would have been our -- I think our
23   biggest score to date, and probably could have
24   kept -- you know, if the company was really in
25   such dire financial straits, it would have kept us
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 195

```
 1   going for a while.  It, at least, would have paid
 2   my salary for a couple years.
 3       Q.   Did you start moving things out of your
 4   office?
 5       A.   I did.
 6       Q.   Why was that?
 7       A.   Because I just didn't want to have it
 8   there anymore.  I was afraid that at some point I
 9   would be frog marched out of the place, and
10   then -- and then I'd be -- wouldn't be able to go
11   in and get my stuff.  Jason was a little bit
12   vindictive that way.
13       Q.   Now, you mentioned Erika Dillon before,
14   correct?
15       A.   Yes.
16       Q.   Was she employed by Excelsior?
17       A.   She was.
18       Q.   Did she work as your paralegal at
19   Excelsior?
20       A.   She did.
21       Q.   Did you talk to her about the possibility
22   that you would be leaving one way or another?
23       A.   I did.
24       Q.   Did you ask her to leave with you?
25       A.   She actually brought it up, as I
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 196

```
 1    remember.
 2        Q.    What did she say?
 3        A.    She said that -- you know, she asked if
 4    there would be a job for me at my firm.
 5        Q.    What did you tell her?
 6        A.    I told her I would certainly love to have
 7    her, but I didn't think that I could afford her
 8    because she would have to take -- you know, if she
 9    wanted to come, I would love to have her, but she
10    would have to take a pretty large salary cut.  At
11    the time, she was making 50,000 a year, and I told
12    her the best I could promise her would be 30,000 a
13    year.
14        Q.    What was her response to this discussion
15    about what she wanted to do?
16        A.    She didn't care.  She said that she had
17    come to the company to work for me, not to --
18            MS. KRINCEK:  I'm just going to object.
19    This is hearsay, and we've got Erika Dillon's
20    deposition that is being entered into evidence,
21    Arbitrator.
22            ARBITRATOR HABERFELD:  Overruled.
23    BY MR. WHITE:
24        Q.    Did you do anything to pressure her into
25    leaving?
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 197

```
 1        A.   Oh, God, no.
 2        Q.   Did you threaten her, like things would
 3   go badly for her in the industry?
 4        A.   No.  In fact, I tried to -- you know, I
 5   wanted her to come, but I was pretty clear that it
 6   was going to be a huge pay cut, and, you know,
 7   maybe not even any benefits to start off, but that
 8   I would do my best to fix that.
 9        Q.   Okay.
10        A.   The worst job offer I've ever seen.
11        Q.   So aside from speaking with Ms. Dillon
12   about the possibility of joining you, did you take
13   any steps to secure your personal data?
14        A.   Yes.
15        Q.   Let's talk about the computers you used
16   when you were there.  Did you have a laptop, a
17   company-issued laptop at this time?
18        A.   Yeah, I had -- I had had two by this
19   time.
20        Q.   The one you had at this point, what kind
21   of laptop was it?
22        A.   It was a MacBook Air.
23        Q.   And when you did Excelsior work on it,
24   did you store Excelsior documents long term on the
25   laptop?
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1      A.   No.  Everything was kept on a cloud
 2  server.
 3      Q.   What's a cloud server?
 4      A.   It's a -- it's like when you look on your
 5  desktop, and it looks like you have a hard drive,
 6  but that hard drive is not located on your
 7  computer, that hard drive is located, I don't know
 8  where, but it's -- it's located at Amazon's -- on
 9  this system -- I originally started doing this
10  through iCloud, which was an Apple service.  But
11  then Jungle Disk is the one I switched to because
12  it was more secure, it was encrypted and faster.
13      Q.   So when you had -- while working on
14  Excelsior or Liberty matters, would you store all
15  the pleadings and correspondence on your computer?
16      A.   No.  Everything would be stored on the
17  cloud server.
18      Q.   Would you ever have something maybe
19  temporarily saved on the computer?
20      A.   Yeah.  While I was working on a computer,
21  while I was in that particular document, I would
22  save it to a folder called Working Files, which
23  was really just, as far as I was concerned, a
24  trash folder.  Because when I was done with it, I
25  would save the final draft back to the server, and
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 199

```
 1    then move on to the next project.
 2        Q.    Now, the Jungle Drive, did you have any
 3    sort of approach to making sure that all of Corbin
 4    Fisher's materials would be preserved on there?
 5        A.    Yeah.  I saved everything to it.
 6        Q.    At this time, when you are still employed
 7    there, who had access to the Jungle Drive?
 8        A.    Me, Erika, and other -- any RLG lawyer
 9    who was working on a Corbin Fisher project.
10        Q.    Now --
11        A.    And we actually had two Corbin -- drives
12    for Corbin Fisher.  We had one for the Oron
13    litigation itself, and then one for all other
14    Corbin Fisher files.
15        Q.    Mr. Randazza, did you have anything
16    personal on that laptop?
17        A.    Yes, I did.
18        Q.    What types of things did you have?
19        A.    I would have like when my wife would send
20    me personal pictures, I would save them to a
21    folder there, personal documents that I might scan
22    in to deal with later, I would save there.
23        Q.    Any tax documents there?
24        A.    Yes.
25        Q.    Did you have any concerns about those, if
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1   you left, falling into the hands of Excelsior?
 2       A.   I did at the end, because it was clear I
 3   was being lied to about whether I was being fired,
 4   and I knew that -- you know, I suspected that
 5   Jason would be vindictive about that stuff, so I
 6   didn't want it to fall into his hands.
 7       Q.   So did you, in fact, take steps to wipe
 8   that laptop?
 9       A.   I did.
10       Q.   Do you remember the exact sequence of
11   events, when exactly you did it?
12       A.   I'll do my best to remember.  I really
13   didn't know how to do it, so I called Nick Mosier,
14   who worked for the company, and asked him how to
15   do it.  And he gave me a few instructions, which I
16   couldn't really figure out, so I -- he had me
17   install something called TeamViewer, which is a
18   piece of software that let's a remote person proxy
19   into your computer and them be able to do things
20   for you, so I had Nick do it for me.
21       Q.   And the respondents have shown an expert
22   report that indicates that the first wipe started
23   on the 28th.
24       A.   Uh-huh.
25       Q.   Do you remember whether or not that's
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 201

```
 1   accurate?  Do you have any independent
 2   recollection?
 3        A.   I mean, it sounds right.  I don't -- I
 4   didn't like calendar when I did it.
 5        Q.   Is it possible you moved forward with
 6   securing the private data before you ultimately
 7   had the exchange in which you say you were fired?
 8        A.   Oh, I know for a fact.  I was -- I was so
 9   sure I was going to get fired that I thought I
10   should work on doing that right away.
11        Q.   Would doing this have -- on this
12   computer, have eliminated any of Excelsior's data
13   that wasn't saved elsewhere?
14        A.   No, it would not have.  At worst, it
15   would have wiped out a former draft of something
16   that was no longer relevant.
17        Q.   Now, was wiping personal items something
18   that was done at Excelsior when someone left?
19        A.   Yes.
20        Q.   Did Mr. Gibson ever communicate that to
21   you?
22        A.   You know, there wasn't a written stated
23   policy about it, but I do remember when, like I
24   said before, Kirk started working there, it was my
25   job to be the executioner when people got fired.
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 202

```
 1     So I remember when I had to fire a woman by the

 2     name of Micah Stoffel, when I fired her, she had

 3     wiped her personal information from her -- one of

 4     her devices, and I remember seeing an e-mail from

 5     Jason that said that that was, you know, of

 6     course, consistent with what we do.

 7         Q.    Would you please look at Exhibit 38?

 8         A.    Okay.

 9         Q.    Do you recognize what this is?

10         A.    Yes.

11         Q.    What is it?

12         A.    It was an e-mail from Jason to me on or

13     about the date that I fired Micah.

14         Q.    Looking at the last paragraph, do you see

15     the last paragraph on the page in the portion of

16     the e-mail from Mr. Gibson?

17         A.    Yes.

18         Q.    Referring to getting the phone ready,

19     tasks include deleting all of Micah's personal

20     photos, texts, and others?

21         A.    Yes.

22         Q.    Was that consistent with what you

23     understood the practice to be?

24         A.    Yes.

25         Q.    Now, sometimes in your experience, did
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 203

```
 1    phones not get wiped at the company?
 2         A.   Yes.
 3         Q.   Did you ever observe Mr. Gibson making
 4    use of phones of former members -- former people
 5    who worked at the company?
 6         A.   Yes.
 7         Q.   In what context?
 8         A.   I think he showed me Jon Price's phone
 9    that he had kept, and he was using it to
10    essentially intercept text messages that were
11    intended to go to Jon from people who didn't know
12    that Jon no longer had the phone.
13         Q.   Now you had an iPhone that the company
14    issued, correct?
15         A.   Yes, I did.
16         Q.   Was the fact that you had seen that, did
17    that play any role in your feeling about whether
18    or not you should turn over the iPhone?
19         A.   Yes.
20         Q.   Have you in this litigation offered to
21    pay for the value of the iPhone?
22         A.   I did.
23         Q.   And did we turn it over to the
24    examination expert, agreed upon by the parties for
25    analysis?
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 204

```
 1        A.    We did, and I believe they still have it.

 2        Q.    So I'm going to turn your attention,

 3   again, to August 29, 2012.  And I would like you

 4   to turn your attention to Exhibit 74.

 5        A.    Okay.  I got it.

 6        Q.    And let's start from the last page, the

 7   first e-mail.

 8        A.    Okay.

 9        Q.    Do you see this e-mail from you to Jason

10   entitled, My continued representation of the

11   company?

12        A.    Yes.

13        Q.    What was your intent in sending this?

14        A.    To try to get Jason to have a

15   conversation with me.  At the time, you know, even

16   though I've said I felt like it was inevitable

17   that I was being fired, you know, I thought there

18   was at least some chance that if he got this, he

19   might see -- he might see that maybe it's time for

20   me to talk to this guy.

21        Q.    Now, your first clause there, you say,

22   Given our now openly adversarial relationship.

23              What was that referring to?

24        A.    Well, we had had an exchange of e-mails

25   where I think I even accused him of trying to
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 205

 1    cheat me out of my bonus.  You know, it was -- we

 2    were clearly at loggerheads to an extent that we

 3    had never been before.

 4        Q.   The next clause says, It seems

 5    appropriate that I withdraw from representing

 6    Liberty in any further matters.

 7        A.   Yes.

 8        Q.   What did you mean by that?

 9        A.   There was like one case that we had

10    talked about me filing, and I -- against

11    Gaytorrent.net, and so I didn't want to open any

12    new files if I was no longer going to be working

13    there.

14        Q.   Your next sentence says, There might be a

15    way I can continue to wind down existing matters,

16    but it's going to require a call to discuss it.

17        A.   Yep.

18        Q.   Do you see that?

19        A.   I do.

20        Q.   Did you intend to convey that you were

21    dropping out of all the cases immediately?

22        A.   Well, of course not.  That would be a

23    very poor way to phrase it if I was.

24        Q.   Did you intend this as a resignation?

25        A.   I did not.

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  206

```
 1        Q.    So what time did you -- does this show

 2   you sending it?

 3        A.    At 3:10 p.m.

 4        Q.    And turning to the next one, what's the

 5   time for Mr. Gibson's response?

 6        A.    4:04 p.m.

 7        Q.    Do you recall where he was with respect

 8   to where you were?

 9        A.    He was in Las Vegas.

10        Q.    All right.

11        A.    And I was on the East Coast.  This is

12   printed from a different server.  This is printed

13   from one that --

14        Q.    Well, this one has the Respondents' Bates

15   stamp, correct?

16        A.    Oh, yeah.

17        Q.    EMC?

18        A.    Yeah.

19        Q.    And he says in here, he directs you to

20   counsel that he's hired, correct?

21        A.    Uh-huh.

22        Q.    Did you -- and he says your -- We

23   construe your e-mail as a resignation of your

24   employment and accept your resignation effective

25   immediately.
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 207

```
 1              Do you see that?
 2      A.   I do.
 3      Q.   Did you respond to that promptly?
 4      A.   I did.
 5      Q.   And the very top e-mail on the page --
 6      A.   Yes.
 7      Q.   -- what did you say?
 8      A.   I wrote to Wendy and Patrick saying that
 9    it wasn't a resignation, as much as Mr. Gibson
10    would like it to be so he can try and evade
11    payment of my severance.
12      Q.   And looking at the second paragraph,
13    there is a reference to you being represented by
14    people --
15      A.   Yes.
16      Q.   -- in respect to this.
17              Had you already lined up the
18    representation before you got that response from
19    Mr. Gibson?
20      A.   I had not.
21      Q.   How did you get it together that quickly?
22      A.   Well, Allan Rubin at Jackson Lewis is a
23    good friend of mine, as is Clyde DeWitt.  So I
24    called Allan, because I knew that Allan and
25    Jackson Lewis specialized in employment law, and
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1    Clyde was local, and I called in a favor with each

 2    one of them.

 3        Q.   Did you, based on this exchange, direct

 4    Erika Dillon to do anything that you had discussed

 5    with her before?

 6        A.   I don't recall directing her to do

 7    anything, although I think I probably told her

 8    to -- you know, to -- if she is going to quit, she

 9    might as well quit now.

10        Q.   Did you continue with the process of

11    wiping your laptop as you discussed?

12        A.   I'm not quite sure, but I did see on

13    their expert report that it continued to go, but

14    then one time it stopped after five percent.  I

15    really can't -- I don't know.

16        Q.   But you were trying, at least, to wipe

17    the laptop the way you discussed, right?

18        A.   For sure, yes, I was.

19        Q.   Were you hiding from Excelsior at this

20    time that you had wiped the laptop?

21        A.   No.

22        Q.   Did you tell anyone there?

23        A.   I'm pretty sure I told the HR director,

24    Kirk.

25        Q.   Would you please look at Exhibit 76?
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  209

```
 1       A.   Yes.

 2       Q.   And let me know when you recognize what

 3  that is.

 4       A.   I recognize it.

 5       Q.   Okay.  Is that an exchange between you

 6  and Kirk Addison?

 7       A.   It is.

 8       Q.   And looking on the second page, would you

 9  look at the last e-mail on the second page?

10       A.   Yes.

11       Q.   Do you see where it says, Okay, I will

12  try to log in.  Do you know my employee number?

13  It was on my computer, which has been wiped.

14       A.   Yep.

15       Q.   Was it your intent to convey to them that

16  it had been wiped?

17       A.   Well, I wasn't trying to hide it.  That's

18  the HR director.  I was telling him.

19       Q.   Did anyone -- did he respond to you, stop

20  wiping, or you shouldn't wipe?

21       A.   No, but I think I got a -- I know

22  eventually I got a letter from Wendy telling me

23  not to do it.  It was after the fact.

24       Q.   Did you tell Excelsior that you were

25  going to keep the entire 550,000?
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  210

1        A.    No.

2        Q.    Did you convey to them a plan for

3    conveying the parts that were not in dispute?

4        A.    Yes.

5        Q.    Will you please look at Exhibit 75?

6        A.    I see it.

7        Q.    Does this include your plan for your

8    proposal for what to do about the $550,000?

9        A.    Well, I was hoping that we could meet and

10   work it out.

11            MS. KRINCEK:  Your Honor, I would object

12   to the instruction of this.  It seems to me it's

13   along the vein of the settlement proposal.

14            ARBITRATOR HABERFELD:  Response?

15            MR. WHITE:  If so, it's by my client, so

16   I don't think Ms. Krincek has standing to object.

17   Also, it's not for the purpose of showing my

18   client's liability, which is the part of the no

19   settlement communications rule.  So it would be --

20   it's simply to show that he was not denying access

21   to the money.

22            ARBITRATOR HABERFELD:  What's your

23   position on that, Ms. Krincek?

24            MS. KRINCEK:  Well, I don't believe the

25   rule about the admissibility of the settlement

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 211

1    communications is similar to an attorney/client

2    privilege where it can be waived by one party or

3    the other or invoked by one party or the other.  I

4    think the rule is just --

5            ARBITRATOR HABERFELD:  It is or it isn't?

6            MS. KRINCEK:  Yeah.

7            ARBITRATOR HABERFELD:  I will go with

8    that.

9            What about the second part of what

10   Mr. White said?

11           MS. KRINCEK:  The second part being the

12   reference to -- I missed the second part.

13           MR. WHITE:  The second part I articulated

14   is that the purpose isn't to establish

15   Mr. Randazza's liability, which is the root of the

16   rule against admitting settlement communications,

17   the purpose is to show that contrary to the

18   narrative that he was running off with the money,

19   that he immediately offered a discussion about

20   what parts should be turned over.

21           MS. KRINCEK:  Yeah.  Okay.  So in the

22   context -- that was in the context --

23           ARBITRATOR HABERFELD:  And what made it

24   settlement talk?  If somebody says, Here is the

25   way it should be, does that immediately trigger a

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1    settlement, or does that -- what's to show that
 2    they were actually settlement as opposed to
 3    something else?
 4             Do you get my drift?
 5             MS. KRINCEK:  I do.  I think he was
 6    referring in here to some matters about ways that
 7    the issues might be resolved between the two
 8    parties.
 9             ARBITRATOR HABERFELD:  Could you direct
10    me to that language?
11             MS. KRINCEK:  With respect to any
12    outstanding matters unrelated to the issue between
13    your client and myself, I'm not yet instructing --
14    he's talking about the steps he's going to take
15    with regard to other outside counsel.
16             You know, I'll withdraw my objection.
17             ARBITRATOR HABERFELD:  Okay.  Thank you.
18             MS. KRINCEK:  I don't have a problem with
19    it.
20    BY MR. WHITE:
21        Q.   Did you send that the next day to
22    Ms. Krincek?
23        A.   I did.
24        Q.   Had you talked to anyone
25    contemporaneously with this exchange of e-mails in
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 213

```
 1   which they said you resigned and you said you were

 2   fired that characterize what had happened?

 3       A.   I'm sorry.  I don't understand your

 4   question.

 5       Q.   Yeah, it should be taken out and shot.

 6            At the time that you had that exchange in

 7   which they said we accept your resignation, did

 8   you have any contemporaneous communications with

 9   people about whether you had quit or whether you

10   had been fired?

11       A.   I think I had a text message exchange

12   with Andrew.

13       Q.   Is that, again, Andrew Rasmus?

14       A.   It was Andrew Rasmus, yes.

15       Q.   Would you take a look at Exhibit 77?

16       A.   Yes.

17       Q.   And I'm going to ask you to turn to the

18   page that's Bates stamped EMC39955?

19       A.   Okay.  I'm there.

20       Q.   And look at the last text on the page.

21       A.   It's official, I'm terminated, open

22   paren, or I quit, if you believe Jason's version,

23   close paren.

24       Q.   Did you send that at about the time this

25   happened?
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 214

```
 1        A.    Yes.

 2        Q.    Now, did you immediately after this give

 3   Excelsior the access to the Jungle Drives?

 4        A.    No.

 5        Q.    And why not?

 6        A.    Because it was my understanding under --

 7   that I was able to hold onto that if I hadn't been

 8   paid all sums due to me.

 9        Q.    Your understanding under what authority?

10        A.    Under Nevada law.

11        Q.    Would that be the Nevada Rules of

12   Conduct?

13        A.    Yes.

14        Q.    Did you later turn them over in this

15   litigation?

16        A.    I did, despite the fact that I believe I

17   had a right to continue to maintain them until

18   being paid.

19        Q.    Do you believe you have all of your

20   e-mail traffic with Excelsior in spring of 2012

21   and later?

22        A.    Not only do I not believe I do, I know

23   for a fact I do not.

24        Q.    Was there any change in the way e-mail

25   was handled at around spring of 2012?
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 215

```
 1        A.    Yes.

 2        Q.    What was the change?

 3        A.    I don't really know what caused it,

 4   because, again, I -- there are some things I'm

 5   pretty tech savvy about.  This one I had no idea

 6   what happened.

 7              But sometime in the spring of 2012, up

 8   until that point, I had used a mail program

 9   like -- you know, like you use the Mac mail

10   program.  It is kind of like Outlook if you don't

11   use a Macintosh to download, read, and handle

12   e-mail.  I also used the mail program that is on

13   the iPhone.

14              And at some point, then, it -- somehow

15   the way the e-mail was handled changed so I could

16   only access it through the Webmail client, so I

17   would actually have to log into a Website, read it

18   on the Website, and then keep it there.

19              And that was also -- there was an app

20   that you could use on the phone that would allow

21   you to do the same thing, but you couldn't

22   actually download copies of the -- of it unless

23   you actually specifically printed it to a PDF and

24   saved it, or at least I couldn't.

25        Q.    So when you left, did you have copies of
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 216

```
 1   all the mail that you had exchanged during that
 2   time period after that new system went in place?
 3        A.   No.  In fact, I only had a few scattered
 4   e-mails that were copied to other servers.
 5        Q.   Let's turn back your -- the issue of you
 6   leaving and the issue of Oron are intertwined.
 7   Let's turn back for a moment with what was going
 8   on with Oron at this time.
 9             Who is Gill Sperlein?
10        A.   Gill was the attorney for Titan Media,
11   the in-house counsel for Titan Media, who had his
12   own outside clients as sort of the paradigm for
13   how my representation was supposed to be.
14        Q.   And did he have -- was he pursuing any
15   possible claims against Oron?
16        A.   Yes.  He was -- AEBN brought him in when
17   it became apparent that I was going to go my own
18   way with representing Corbin, but not doing a
19   joint case against Oron with AEBN.
20        Q.   Had they filed yet by the time that you
21   got the settlement agreement enforced?
22        A.   I don't recall.  It was either -- I
23   don't -- I really don't know.
24        Q.   Was -- was he interested in getting your
25   help of any kind in his possible suit against
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 217

 1    Oron?

 2        A.    Well, AEBN was.  So AEBN had communicated

 3    with me that, Hey, you know, can we have whatever

 4    files you got here since we jointly worked on

 5    getting them?

 6        Q.    Were there other types of assistance they

 7    were asking for, as well?

 8        A.    Well, there was some talk about them

 9    filing their case and us giving them certain

10    additional assistance, like signing a conflict

11    waiver to let our Hong Kong counsel represent both

12    parties, and in exchange -- you know, at the time,

13    there was still no -- no indication as to when we

14    were going to get this money.

15            But I think the deal that we worked on

16    with them was, Go ahead, you know, you can use our

17    Hong Kong counsel, but we want the first $550,000

18    that you get because it will feel like we're

19    entitled to that.

20        Q.    So was there also any interest in them

21    getting information from you about where Oron's

22    assets were located?

23        A.    Well, those were all in the public record

24    already.

25        Q.    Okay.

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  218

```
 1      A.   I think they wanted additional
 2  information from our files.
 3      Q.   Did this possibility of helping them
 4  cause any risks or problems under the settlement
 5  agreement that had been enforced by the court?
 6      A.   I thought it was very theoretical,
 7  because we were supposed to -- under the
 8  settlement agreement, we were supposed to dissuade
 9  other companies from filing suit, whatever that
10  means.
11          However, at the time, AEBN, like I said,
12  was already on the path to filing suit against
13  them, frankly, before we were.  However, I still
14  felt like I needed to talk about it with Jason and
15  tell him that if Oron finds out that we're doing
16  this, they may -- they may pounce on that as some
17  argument for the fact that we had violated the
18  agreement.  So I did talk to him.
19      Q.   Now, did -- I'm sorry.
20      A.   It's okay.
21      Q.   Please complete your question -- or your
22  answer.
23      A.   No.  I just -- I talked to Jason about
24  that at least as the hypothetical problem.
25      Q.   Now, during this time you were having --
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 219

1    you testified that you were having problems

2    meeting with Mr. Gibson, correct?

3         A.    Yes.

4         Q.    Did you manage to meet with him about

5    this?

6         A.    I did manage to get a few minutes with

7    him on this.

8         Q.    All right.  So did you tell him what you

9    just said to me about the risk of what Oron might

10   do with the information that they found out?

11        A.    Yeah.  I mean, there was a -- you know,

12   there is really a whole decision tree here.  One,

13   Oron says there is no settlement agreement.  If

14   Oron says there is no settlement agreement, then

15   there is no agreement to violate.  We say there is

16   a settlement agreement, thus there is an agreement

17   to violate.

18             Is giving a company that was already

19   going after them not encouraging other people to

20   sue, I don't know.  That's open to stat -- to

21   contractual interpretation, but you at least

22   should know that if we do help them in any way and

23   they find out, they're most likely going to argue

24   that that is some kind of violation.

25             I said I didn't think it was a good

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 220

```
 1    argument, but he needed to be aware of it if he

 2    wanted me to -- if he wanted to make a decision

 3    about what I should do next.

 4        Q.   What were his instructions?

 5        A.   Fuck them.  I mean, that's a quote.

 6        Q.   Is that literal?

 7        A.   Yes.  He didn't care.  He said -- you

 8    know, Jason, again -- these guys, as far as he was

 9    concerned, and I continue to endorse his position,

10    that we had locked up about $2 million worth of

11    their money, and as far as we were all concerned,

12    all $2 million was ill-gotten gains stolen not

13    just from us, but stolen from all these other

14    companies in the adult entertainment industry.

15            So essentially Oron had two million bucks

16    of stolen money and was going to get away with

17    about 75 percent of it because we had settled

18    early.  So Jason also asked me, he said, Well, how

19    are they -- how would they find out was, you know,

20    his other question.  And I said, Well, you know,

21    you can tell them or AEBN can tell them.  He said,

22    Well, I'm not going to tell them, so go ahead and

23    do it.

24        Q.   So did you take steps to start giving

25    assistance to Mr. Sperlein on behalf of AEBN?
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 221

```
 1       A.   I did.
 2       Q.   Did you keep -- did you keep Mr. Gibson
 3  in the loop about that issue as you did so?
 4       A.   I did.
 5       Q.   Would you please turn back again to
 6  Exhibit 68?
 7            And look at the last page and the last
 8  couple of texts on the last page.
 9       A.   Okay.
10       Q.   Let me know when you are there, please.
11       A.   I'm there.
12       Q.   There's an exchange on August 24th.
13            Do you see that?
14       A.   I do.
15       Q.   What's the significance of what you are
16  talking about there when you are talking about if
17  they use our Hong Kong attorneys, they will need a
18  conflict waiver?
19       A.   Okay.  Oh, well, see, there's -- that's
20  where there could be a potential conflict because,
21  you know, the Oron attorneys -- the Hong Kong
22  attorneys said that under their rules, they would
23  need a conflict waiver.
24       Q.   And would that make it open and obvious
25  that assistance was being given?
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1        A.    Yes.
 2        Q.    So was this the only writing in which you
 3   kept him up-to-date about the analysis of this
 4   issue?
 5        A.    No.
 6        Q.    Would you look at Exhibit 72, please?
 7        A.    Just to elaborate, this is -- this is
 8   where I'm giving him additional instructions as to
 9   what the possible downside is.
10              72?
11        Q.    Yes, please.
12        A.    Okay.  I'm here.
13        Q.    Take a look at it and tell me when you
14   have recognized it and I can ask questions about
15   it.
16        A.    I recognize it.
17        Q.    Now, is this an e-mail about this
18   subject?
19        A.    It is.
20        Q.    And is Mr. Gibson copied on it?
21        A.    He is.
22        Q.    What's the point of this mail?
23        A.    To keep him up-to-date what's going on
24   and to share Randall Arthur's position, and to let
25   Gill know that we couldn't continue to assist him.
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  223

```
 1        Q.   Did either that text exchange or this
 2   e-mail, did Mr. Gibson ever write back, and, you
 3   know, ask you what you were doing or demand that
 4   you stop?
 5        A.   No.  In fact -- no.
 6        Q.   Now did you monitor some of the pleadings
 7   in the Oron litigation after you departed
 8   Excelsior?
 9        A.   Yes.  Most notably we got the attorney's
10   fees order that we had filed just prior to my
11   departure.
12        Q.   Did Liberty ever attempt to get an order
13   in that case to force you to turn over the money
14   in your trust account, $550,000?
15        A.   I don't have an immediate recollection of
16   that.
17        Q.   Take a look at Exhibit 94, please, if you
18   would.
19        A.   Okay.  Yes, I remember this now.
20        Q.   So in 2013, did they make an attempt to
21   get the court to order to get the money out?
22        A.   Yes.
23        Q.   Did you file documents stating your
24   position about why it was appropriate to keep it
25   in your trust account?
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  224

```
 1        A.   Yes, we did.
 2        Q.   Now, you've reviewed the exhibits in our
 3   case.  Would those be 95 and 96, your objections
 4   to their motion and your reply?
 5        A.   Yes.
 6        Q.   Was there a hearing?
 7        A.   There was.
 8        Q.   If you would look at 97, please?
 9        A.   Yes, I see it.  It appears to be the
10   transcript from that hearing.
11        Q.   What did Judge Navarro ultimately do at
12   that hearing with respect to their demand that the
13   money be turned over?
14        A.   I believe she denied that request.  She
15   seemed very puzzled by the whole thing.
16        Q.   Did you articulate to her the basis for
17   which you believe that you were entitled to
18   maintain it in the trust account --
19        A.   Yes.
20        Q.   -- during these proceedings?
21        A.   Yes.  That they were contested funds, and
22   we were entitled to be paid.  And Liberty's
23   counsel, actually, at that hearing admitted that
24   we're entitled to be paid something, but didn't
25   have a position as to how much.
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 225

```
 1       Q.   Did you, in the course of this

 2   litigation, eventually transmit a certain amount

 3   of the $550,000 to Liberty?

 4       A.   I did.

 5       Q.   And was that after negotiation between

 6   the two sides about what we viewed is not in

 7   dispute?

 8       A.   Yes.  However, it wasn't just in dispute

 9   with me.  Since there was an appeal, I think,

10   filed by Oron, and I want to say there was also an

11   arbitration filed by Oron, there were really three

12   parties claiming -- or four parties, even,

13   claiming entitlement to those funds.

14       Q.   Let's discuss that.  Did you learn

15   eventually that Oron filed arbitration demand

16   against Liberty after you had left?

17       A.   I did.

18       Q.   Have you ever been able to review it?

19       A.   I do remember getting a quick look at it.

20            MR. WHITE:  So please look at -- Your

21   Honor, if you would look in Volume 1 of the

22   Respondents' exhibits.

23            Mr. Randazza, if you have that, as well,

24   Exhibit 334?

25            THE WITNESS:  This isn't it, is it?  Oh,
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 226

```
 1    got it.  Got it.

 2             Yes, I have it.

 3    BY MR. WHITE:

 4        Q.   All right.  Please take a look at it

 5    until you get to the portion that says FF Magnat

 6    Limited's notice of claims and remedies, JAMS

 7    Arbitration.

 8        A.   Uh-huh.

 9        Q.   On Page -- that's EMC734.

10        A.   I see it.

11        Q.   First of all, who is FF Magnat Limited?

12        A.   That's the owners of Oron.  So when I say

13    Oron, that's the -- that's who I'm talking about.

14        Q.   In this pleading, is it fair to say that

15    they laid out some of their complaints about how

16    they believe that Liberty had violated the

17    settlement agreement?

18        A.   Well, that's what it purports to be, yes.

19        Q.   All right.  So looking at Page 6 of this

20    complaint -- excuse me, Page 7.

21        A.   Okay.

22             ARBITRATOR HABERFELD:  EMC number,

23    please?

24             MR. WHITE:  740, Your Honor.

25             ARBITRATOR HABERFELD:  Thank you.
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  227

```
 1    BY MR. WHITE:
 2        Q.    The section heading Claims, and the first
 3    one says that in contravention of the agreement,
 4    Liberty did not dismiss the Hong Kong action with
 5    prejudice --
 6        A.    Uh-huh.
 7        Q.    -- instead it moves forward.
 8            Now, once you left Liberty, did you have
 9    any influence over whether or not the Hong Kong
10    action would move forward?
11        A.    No.  I had no authority at all to have
12    anything to do with that.
13        Q.    Point 2 on the next page is about
14    assisting Datatech.  Is that the Datatech that you
15    testified about before?
16        A.    Yes.
17        Q.    Was that the assistance as you understand
18    it that you discussed with Mr. Gibson?
19        A.    Yes.
20        Q.    Point 3 is that Liberty has done nothing
21    to assist Oron in convincing its payment
22    processors to unfreeze accounts.
23            Once you left Liberty, did you have any
24    ability to impact that?
25        A.    No.  In fact, I think it would have been
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  228

```
 1    improper for me to even try.
 2        Q.   Point 4 says that Liberty hasn't publicly
 3    announced that Oron is protected by the DMCA and
 4    that there was never any child porn on it.
 5        A.   Right.
 6        Q.   Did you have any ability to do that on
 7    behalf of Liberty once you left?
 8        A.   No, I did not.
 9        Q.   Point 5 is about a joint letter with
10    Liberty.  Did you have any ability to do that once
11    you left?
12        A.   No.
13        Q.   They also complain that you didn't keep
14    the document private, but included it in a public
15    filing.
16        A.   Uh-huh.
17        Q.   Was that part of what you felt you had to
18    do to get it enforced in the action with Judge
19    Navarro?
20        A.   Yes.  Actually, I even want to say -- I
21    mean, you can check up on me by looking at the
22    actual public court record here, but I'm pretty
23    sure it was Oron that included it as an exhibit,
24    not us.
25        Q.   Did you later learn that Oron and Liberty
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 229

```
 1   had entered into a new settlement?

 2        A.   I got word of that, yes.

 3        Q.   Did you know at the time the terms?

 4        A.   No.

 5        Q.   Did you follow some of the things that

 6   they were saying in the Court of Appeals in the

 7   Ninth Circuit?

 8        A.   Yes.

 9        Q.   So let's take a look, please, at

10   Exhibit 99, if you would.

11        A.   Okay.  They are in Volume 3.

12             ARBITRATOR HABERFELD:  Mr. Whitehead?

13             MR. WHITEHEAD:  There you are.

14             ARBITRATOR HABERFELD:  Thank you.

15   BY MR. WHITE:

16        Q.   Do you recognize this appellate motion?

17        A.   I do.

18        Q.   Have you reviewed it?

19        A.   A long time ago.

20        Q.   Did Liberty begin to assert that you had

21   improperly sought fees in the District Court in

22   this and other actions?

23        A.   It did.

24        Q.   What was the thrust of that argument?

25        A.   That I had not been honest with the court
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 230

```
 1   about the attorney's fees sought by seeking the
 2   amount incurred rather than the amount paid,
 3   essentially relying on lodestar.
 4       Q.   So, in other words, it's fair to say that
 5   you talked about in your -- your applications for
 6   fees the number of hours expended, the rates that
 7   you believed were reasonable?
 8       A.   Yes.  And we had an independent law firm
 9   give us an opinion on that, as well.
10           MS. KRINCEK:  Your Honor, I would object
11   to Mr. Randazza testifying about Liberty's --
12   Liberty Media's other counsel's positions taken
13   with respect to why his fee application in Oron
14   was improper.
15           He's not in a position to characterize
16   what their arguments were, and he's submitted the
17   motion practice and the pleadings where they
18   specifically identify what the problems were.
19           MR. WHITE:  Your Honor, I'll move on with
20   just one or two more questions and not ask him to
21   characterize any more than what's in this
22   document.
23           ARBITRATOR HABERFELD:  Objection
24   sustained.
25   ///
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1   BY MR. WHITE:
 2       Q.   Mr. Randazza, did you understand this
 3   pleading to be saying to the Ninth Circuit that
 4   even though you charge incorrectly, it didn't
 5   matter, because it came out the same under the
 6   lodestar method?
 7       A.   That is what it says here in plain
 8   English.
 9       Q.   Did Excelsior know the method you used to
10   ask courts for attorney's fees on those occasions
11   when you were able to do so?
12       A.   Yes, they did.
13       Q.   And under what circumstances would they
14   find out?
15       A.   Well, we made motions for attorney's fees
16   on a regular basis.
17       Q.   Who would sign off -- I mean, did you
18   have to have declarations from Excelsior and
19   Liberty?
20       A.   Yes.
21       Q.   Who would sign the declarations?
22       A.   I know that Eric Gapp signed them from
23   time to time, Mr. Dunlap, maybe Henry Leonard.
24   I'm pretty sure Henry Leonard signed one or two.
25       Q.   And did you ever discuss it in writing
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  232

1    with them?

2        A.    I don't recall any specific circumstance

3    of doing so, but sitting here today, I'm pretty

4    sure I did.

5        Q.    Just one moment.  I will show you another

6    exhibit.  There are so very many.  I'll have to

7    return to that.

8            Mr. Randazza --

9            ARBITRATOR HABERFELD:  Off the record.

10            (Whereupon, a recess was taken.)

11            ARBITRATOR HABERFELD:  Back on the

12    record.

13    BY MR. WHITE:

14        Q.    Before we broke, Mr. Randazza, I was

15    asking you whether or not you ever talked to

16    Mr. Gibson in writing about the fact -- the way

17    that you submitted attorney fee bills.

18            Do you recall that?

19        A.    Yes.

20        Q.    I would like you to look at Respondents'

21    Exhibit 372, and if you would look at the very

22    last one.

23        A.    Okay.

24        Q.    If you look at literally the last page of

25    that exhibit.

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 233

```
 1      A.   Yes.

 2      Q.   And let me know when you are there,

 3  please.

 4           Are you ready to answer a question about

 5  it?

 6      A.   Yes.

 7      Q.   Is this an e-mail between you and

 8  Mr. Gibson?

 9      A.   Yes.

10      Q.   And who is Eric Gapp, G-a-p-p, who was

11  CC'd?

12      A.   He was an assistant in the legal

13  department.  He was my paralegal.  And Jason also

14  gave him some other authority.

15      Q.   What are you explaining to Mr. Gibson in

16  this e-mail?

17      A.   That we are running this through RLG

18  instead of in-house so that we can see the

19  lodestar fees.

20      Q.   Is that at the bottom, This way I can

21  submit the bills to the court for the full 400 per

22  hour and not risk that?

23      A.   Yes.

24      Q.   What is the other benefit of doing it

25  that way?
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 234

```
 1        A.   Well, so that some --
 2        Q.   Gentleman?
 3        A.   -- less than gentlemanly defense attorney
 4   would try to pry into Liberty's internal records.
 5        Q.   Let's move to the second to last category
 6   of our discussion.
 7        A.   Okay.
 8        Q.   And that is Liberty's claims against you.
 9        A.   Okay.
10        Q.   Let's first talk about the claim that you
11   hid from Excelsior that you were doing business
12   through RLG as a separate entity.
13        A.   Right.
14        Q.   Why were you using a separate entity?
15        A.   Well, first of all, it was required under
16   my contract -- oh, wait.  For representing
17   Excelsior or Liberty?
18        Q.   Or why were you running your own separate
19   clients through RLG?
20        A.   Because that was the contractual
21   requirement, that if I'm going to have separate
22   clients, they will have to be represented through
23   a separate entity.
24        Q.   Did you conceal from Mr. Gibson that RLG
25   was a going concern, something that actually had
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1   clients?

 2       A.   Anything but.

 3       Q.   Did you ever have a discussion --

 4           MS. KRINCEK:  I'm just going to object.

 5   We haven't -- we're not -- our counterclaims

 6   aren't based upon him having established Randazza

 7   Legal Group, and you said for pleadings and court

 8   filings.  We're not making that claim.

 9           MR. WHITE:  Well, I'm judging in part

10   based on Mr. Gibson's deposition testimony where

11   he suggested that it was hidden from him that this

12   was really a going concern.  I can find the quote

13   if you like, but I could also move on for now.

14           MS. KRINCEK:  That's not part of our

15   counterclaim, so we won't be arguing that in our

16   closing brief.

17           MR. WHITE:  I will move on, then.  Thank

18   you.

19           ARBITRATOR HABERFELD:  Will there be any

20   testimony about that as presented by you,

21   Ms. Krincek?

22           MS. KRINCEK:  No.  I mean, we made

23   allegation about the number of clients and amount

24   of outside work he was doing, but not related to

25   merely having established Randazza Legal Group.
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 236

```
 1              ARBITRATOR HABERFELD:  Mr. White?
 2              MR. WHITE:  Then I will skip that area of
 3    questioning.
 4              ARBITRATOR HABERFELD:  Okay.
 5    BY MR. WHITE:
 6        Q.    When you ran Randazza Legal Group, did it
 7    have a Website?
 8        A.    It did.
 9        Q.    And did that Website list on it at least
10    some of the clients, the clients in which you
11    represented them in public entities -- excuse
12    me -- in public affairs?
13        A.    Yes.  Any clients that I had represented,
14    that it was a matter of public record that I
15    represented them, was revealed on the Website;
16    however, I felt that even a mere representation of
17    a client was confidential until that happened.
18        Q.    So, for instance, was Bang Brothers
19    listed on your Website?
20        A.    Yes, it was.  I want to say it was
21    probably the first one listed.
22        Q.    And Kink, was that listed on your
23    Website?
24        A.    Yes, it was.
25        Q.    And those are two of them as to which the
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

```
 1    respondents have claimed a conflict of interest,
 2    right?
 3         A.   Correct.
 4         Q.   Did you try and conceal your
 5    representation of those from Excelsior?
 6         A.   It had to be the worse concealment job in
 7    history, because it was there, and, in fact, we
 8    discussed it, as well --
 9         Q.   Your Honor, just to flag --
10         A.   -- openly.
11         Q.   -- just to flag a dispute between the
12    parties, one of my exhibits is a printout from an
13    Internet archive, which is a way to print out
14    Websites as they appeared on certain past dates.
15              I did not produce it until very recently,
16    I think last week, because it didn't occur to me
17    until about then.  Ms. Krincek reasonably is
18    arguing that it's late.  My position is that it's
19    a resource that's equally available to everyone
20    out there, and -- but I'll submit on that.
21              ARBITRATOR HABERFELD:  Prejudice?
22              MS. KRINCEK:  Could you remind me of the
23    exhibit number?
24              MR. WHITE:  Yes.  It's 89.
25              MS. KRINCEK:  So what Exhibit 89 is, and
```

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page  238

```
 1    these were just produced, I think within the week

 2    or two, maybe two weeks before the arbitration.

 3    It appears to me that they're printouts from some

 4    Website that claims it can go back and produce old

 5    versions of Websites.  So it's appearing to me

 6    like this is tempting to show what would have

 7    shown on the Randazza Legal Group Website years

 8    ago.

 9              ARBITRATOR HABERFELD:  That's what I'm

10    hearing.

11              MS. KRINCEK:  Yeah, right, years ago.

12    And the representation on here is not that they

13    are current clients, it's here's clients the firm

14    has represented.  Doesn't say now, it doesn't say

15    when, it doesn't say who in the firm has

16    represented them.

17              So it's untimely, it's not probative.

18    And I've gathered at least four documents worth of

19    the -- that were submitted to the arbitrator where

20    we were trying to compel Mr. Randazza to identify

21    the outside clients he worked for, and continually

22    the position that we were getting in response is

23    they have a right to privacy under the California

24    Constitution, it's privileged, it's confidential.

25              ARBITRATOR HABERFELD:  I thought we were
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Arbitration Proceedings ~ Volume I ~ February 9, 2015
***Marc J. Randazza vs. Excelsior Media Corporation***

Page 239

1    working our way through that.

2          MS. KRINCEK:  Yeah.

3          ARBITRATOR HABERFELD:  How far did we get

4    in that as far as what you want to represent to

5    the arbitrator?

6          MS. KRINCEK:  What we ended up doing,

7    Your Honor, you put the onus on us to come forward

8    and explain a basis for believing that there were

9    clients -- specific clients that he represented

10   that would be conflicts of interest with my

11   client.

12         So we had to come forward and identify

13   which ones we suspected he worked for and why we

14   thought it was going to be a conflict.  So we only

15   actually were able to have him respond as yes or

16   no whether these people are his clients and

17   potential conflicts of interest, a very limited

18   scope of --

19         ARBITRATOR HABERFELD:  Let me hear from

20   Mr. White.  Probative value of what these Websites

21   would show?

22         MR. WHITE:  Your Honor, you have

23   Mr. Randazza's testimony that a few of these

24   clients, just the ones that were public, appeared

25   on the site.  The --