# EXHIBIT 14

# EXHIBIT 14

002492

WENDY MEDURA KRINCEK, ESQ., Bar # 6417
ETHAN D. THOMAS, ESQ., Bar # 12874
LITTLER MENDELSON, P.C.
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
Telephone:   702.862.8800
Fax No.:      702.862.8811

Attorneys for Defendant
EXCELSIOR MEDIA CORPORATION

**ARBITRATION BEFORE JUDICIAL ARBITRATION AND MEDIATION SERVICE**

MARC J. RANDAZZA,

               Complainant,

vs.

EXCELSIOR MEDIA CORPORATION,

               Respondent.

**EXCELSIOR MEDIA CORPORATION'S POST-ARBITRATION REPLY BRIEF**

     Excelsior Media Corporation ("Excelsior" or "Respondent" or "Company") submits this Brief in Reply to Complainant Marc Randazza's Post-Arbitration Brief.  Randazza failed to present evidence which would allow him to prevail on any of his claims.  The entire premise of Randazza's case – that Mr. Gibson began a "campaign" of harassing him because he is a straight, male; then became "sullenly retaliatory" towards Randazza; and eventually pretextually and accused Randazza of negotiating for a $75,000 bribe for himself – was starkly shown at arbitration to be just one more of a long string of falsehoods told by Randazza.  There was no harassment of or retaliation towards Randazza.  The text exchanges between Randazza and Mr. Gibson show the two continued to have a close personal and professional relationship right up until August 13, 2012.  Randazza engaged in ethical misconduct by negotiating for a $75,000 bribe for himself, which was discovered on August 13, 2012.  Having been caught, Randazza resigned his employment and set upon a litigation strategy of trying to make his dispute as expensive as it could for

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

002493

1  Excelsior.  Randazza should not prevail upon any of his claims.

2      Meanwhile, the preponderance of evidence establishes that Excelsior's

3  counterclaims are meritorious.  The breadth and scope of Randazza's self-dealing, ethical

4  failings, and length he will go to cover-up his misdeeds as General Counsel of Excelsior

5  was evident at the arbitration.  Randazza's attempt at misdirection by trying to paint

6  Excelsior and its expert as the ones having the problem telling the truth is exactly that –

7  misdirection.  What Randazza clearly forgets is that the hearing was replete with evidence

8  of lies he told to agencies, courts, state bar associations, opposing counsel, and even his

9  own experts.  Excelsior met and exceeded its burden of proof with respect to its

10  counterclaims and Randazza offers nothing in his Post-Arbitration Brief that should

11  convince the Arbitrator that Excelsior is not entitled to the relief it seeks.

12  **I.    RANDAZZA FAILED TO ESTABLISH HIS CLAIMS AGAINST EXCELSIOR BY A PREPONDERANCE OF THE EVIDENCE**

13  

14      **A.  Randazza's Claims Under The California Labor Code Fail**

15      As noted in Excelsior's Post-Arbitration Brief and in previous briefing to the

16  Arbitrator, Randazza's first and second causes of action allege violations of the California

17  Labor Code (§ 2802 and §§201-203) even though Randazza lived and worked in Nevada

18  when they occurred.  **Tr. at 494:18-495:15; Ex. 302 at ¶ 21**.  Randazza's only argument in

19  defense of these claims is contained in a half-hearted footnote in which he acknowledges

20  the Arbitrator's preliminary conclusion that the California Labor Code does not apply to

21  Randazza's employment while in Nevada but maintains that the Employment Agreement's

22  choice of law provision should govern every single aspect of his employment with the

23  company.  **See Randazza Post-Arbitration Brief (hereinafter "RB") at 8 fn.3.**  As the

24  Arbitrator's July 3, 2013 Order preliminarily found, California wage and hour law is

25  inapplicable to Randazza's Nevada employment.  Accordingly, Randazza's first and second

26  causes of action fail as a matter of law.[1]

27  _____

28  [1] Knowing that his California claims are fatally flawed, Randazza argues that the result is substantially similar under California and Nevada laws.  The problem with this broad and unsupported statement is that Randazza did not bring similar claims to his first and second cause of

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702 862 8800

Even if Randazza's claims didn't fail as a matter of law, the evidence submitted during the arbitration reveals that Randazza is not entitled to the damages he seeks under his first two causes of action. Randazza should not be awarded a $137,500 bonus from the Oron settlement funds for the reasons set forth in Excelsior's Post-Arbitration Brief. Randazza's malpractice and breach of fiduciary duties disentitle him to any compensation that flows from his unethical behavior. *See* **Ex. 304, Kennedy Report at ¶¶ 51-52.5**. Additionally, and as a direct result of Randazza's conduct which prompted an Arbitration Demand to be filed against Liberty by Oron, Liberty was forced to resettle the Oron litigation and $275,000 of the original settlement amount was returned to Oron. **Arbitration Hearing Transcript ("Tr.") at 765:17-768:5, 768:18-769:12, 770:4-770:8.** Accordingly, even if the Arbitrator found that Randazza is entitled to a bonus for the Oron settlement notwithstanding Randazza's ethical misdeeds, it would be 25% of the $275,000 resettlement value.[2]

As to the bonus Randazza claims the Company received from Rushie and the additional portion of the Excubitor bonus he claims he is owed, Randazza is not entitled to these bonuses. Despite a long period of discovery and five days of arbitration, Randazza was unable to obtain and present evidence that Excelsior received the settlement from Rushie. Instead, Randazza could only testify that he was aware of a settlement in Pennsylvania and that he believes it was disbursed to the Company. **Tr. at 296:13-19.** With regard to the Excubitor settlement, Randazza does not dispute that he was paid on the net of that settlement amount as opposed to the gross he now claims he was owed. **Tr. at 296:7-12.** Indeed, Randazza only alleged entitlement to Excubitor-related bonuses on the gross amount subsequent to his separation of employment to try to bolster his claim to entitlement on the gross amount of the Oron settlement. Randazza acknowledges that his

action under Nevada law. For discussion of the Nevada claim Randazza did bring, see section B *infra*.

[2] Randazza claims that the Company only resettled with Oron and paid back the $275,000 in order to cause him harm. Not only does he have no evidence to support his allegation, but it is illogical to think that the Company would voluntarily pay Oron $275,000 in order to lessen the amount of Randazza's bonus which is significantly less than the money they paid back.

LITTLER MENDELSON, P.C.
ATTORNEYS AT LAW
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

3.

002495

1  Employment Agreement does not adequately address whether the bonus should be paid
2  on the net or the gross. **See Tr. at 497:6-498:8; Exhibit 383**. Moreover, the fact that it
3  was Randazza that handled the Excubitor settlement funds – he admittedly received the
4  settlements, paid Excubitor their share, and then remitted the balance to Excelsior for
5  Excelsior to calculate and pay out to him his bonus based upon the net amount Excelsior
6  received – evidences the bonuses paid on those settlements purports with the parties
7  agreement. **Tr. 296:10-12 and 604:24-605:22.** Accordingly, Randazza failed to prove his
8  entitlement to these bonuses by a preponderance of the evidence.

9      Randazza is likewise not entitled to the $2,281.95 in an unpaid raise. The evidence
10  actually shows that the wage increase was optional to Excelsior, and that the Company
11  elected not to give Randazza the raise he claims he was entitled to. Gibson, Excelsior's
12  CEO, testified that Randazza advised him that the Company was not obligated to give him
13  the salary increase. **Tr. at 727:5-728:21.** Randazza, the drafter of the Employment
14  Agreement, never advised Gibson that in order to avoid the raise he would have to execute
15  a Memorandum of Understanding reflecting the same. *Id.* Randazza does not dispute that
16  he gave Gibson advice that the Company did not owe him the wage increase and even
17  attempted to use that fact as a means of convincing Gibson that he was otherwise
18  trustworthy after the Oron bribe was discovered. **See Ex. 327.** In light of these facts,
19  Randazza is not entitled to the unpaid raise he claims he is owed.

20      Randazza also failed to present evidence entitling him to his claimed
21  "reimbursement" of the $25,000 used to pay local counsel fees in Hong Kong for which he
22  had Excelsior sign a promissory note. The promissory note openly refers to the transaction
23  as a loan and characterizes Randazza as the lender and Liberty as the borrower. **Ex. 373.**
24  Moreover in light of Randazza's ethical misdeeds, Excelsior formally seeks voidance of the
25  $25,000 note in section II.D.5, *infra*.

26      Finally, Randazza is not entitled to $20,286 in unpaid wages penalties pursuant to
27  Cal. Lab. Code § 203. As stated previously, this statute is entirely inapplicable to disputes
28  regarding final pay that occur between Nevada employers and employees. For the

4.

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

002496

1   foregoing reasons, Randazza failed to establish his first and second causes of action.

2   **B. Randazza's NRS § 608.050 Claim is Meritless**

3   Randazza's argument that his third cause of action entitles him to the same relief

4   under Nevada law evidences a clear misunderstanding of the statute he has sued under

5   (NRS § 608.050).  NRS § 608.050 allows the continuation of regular wages to an employee

6   who is not paid his or her regular wage when that wage becomes due after the employment

7   relationship terminates, for up to 30 days. *Orquiza v. Walldesign, Inc.*, No. 2:11-CV-1374

8   JCM CWH, 2012 WL 2327685, at *6 (D. Nev. June 19, 2012).  This statute only provides

9   for penalties—not the recovery of actual unpaid wages.  These penalties "apply only to the

10  regular wages owed to an employee for the work performed between pay periods at the

11  time employment ended." *Id.* at 5 (emphasis added); *Evans v. Wal-Mart Stores, Inc.*, No.

12  2:10-CV-1224 JCM VCF, 2014 WL 298632, at *3-5 (D. Nev. Jan. 24, 2014) see also NRS

13  608.012 (specifically noting that a bonus is not within the definition of wages under Nevada

14  law).  Accordingly, Randazza's allegation that the alleged unpaid $25,000 loan and the

15  various bonuses he claims he is owed give rise to this claim lacks merit. Additionally, this

16  statute applies only when an employee was discharged or laid off. NRS § 608.050

17  ("[w]henever an employer of labor shall discharge or lay off employees"). As the Arbitrator

18  is aware, Randazza was not discharged or laid off—he resigned his employment.  Even if

19  the statute were applicable to the instant situation, Nevada case law holds that no private

20  right of action exists to enforce this statute. *McDonagh v. Harrah's Las Vegas, Inc.*, No.

21  2:13-CV-1744 JCM CWH, 2014 WL 2742874, at *3 (D. Nev. June 17, 2014).[3]

22  **C. Randazza Failed to Establish a Breach of Contract (Claim Four).**

23  Randazza failed to establish by a preponderance of the evidence that Excelsior

24  breached Randazza's Employment Agreement.   Randazza's breach of contract claim

25  revolves around whether he resigned his employment (as Excelsior contends) or was

26

27  [3] Randazza cites *Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892 (9th Cir. 2013) for the proposition
    that it can be asserted as a valid claim under Nevada law.  Unfortunately for Randazza, the *Rivera*
    case includes no discussion of whether or not a private right of action actually exists under the

28  statute because there is no evidence that the defendant in that case ever made such an argument.

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

002497

terminated (as Randazza claims).  Excelsior's Post-Arbitration Brief set forth the compelling narrative of the final days of Randazza's employment and how his communications demonstrate that he was planning his exodus from the Company and did in fact resign his employment.  **EXB. at 17-20**.  Randazza's only defense is his self-serving testimony that the email Excelsior interpreted as his resignation was only notifying Excelsior that he "thought he should stop taking new cases, not give up all General Counsel duties." **RB at 7:21-22**.  Had Randazza only intended to inform Excelsior that he should stop taking new cases, then his email would have said that.    Instead, Randazza's August 29, 2012 communication with the subject line "My continued representation of the company" unapologetically informed the Company he was "withdrawing" from representing Liberty "in any further matters." **Ex. 329 (EMC000186).**  It is unrealistic to expect that any company receiving a communication from its General Counsel stating he was withdrawing from representing the company in any further matters would construe that communication as anything but a resignation.

Randazza argues that the only explanation for Gibson not meeting with him during the last week of his employment and for Excelsior consulting with counsel prior to August 29, 2012 is that Excelsior intended to terminate his employment.  The evidence contradicts this claim.   The evidence shows that Gibson was avoiding in-person meetings with Randazza while attempting to process the discovery that his General Counsel had tried to get away with negotiating a $75,000 bribe for himself.  **Tr. at 446:7-449:14.**   The only counsel the company had consulted with by the time Randazza resigned was employment counsel Littler Mendelson.  **Id. at 819:1-18**.  Excelsior had not taken any steps to find replacement counsel for Randazza, evidencing further Randazza resigned and was not terminated, constructively or otherwise.  **Tr. 716:2-6.**  Given the overwhelming amount of evidence which indicates Randazza resigned his employment, he is not entitled to severance. **Ex. 332, Section 7.B (noting that Randazza is not entitled to severance if he resigns his employment).**

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702 862 8800

6.

002498

1    Randazza next argues (albeit unpersuasively) that even if the Arbitrator determines

2    that he resigned his employment, he is still entitled to his severance because it was a

3    constructive discharge.  Randazza claims the following factors created working conditions

4    that were so intolerable that a reasonable person would have felt compelled to resign: (1) a

5    pornographic film being shot in his office several months prior to his actual resignation; (2)

6    emails in which Gibson expressed frustration over the financial status of the company and

7    mounting legal costs; (3)  the alleged sex act in the back of his car; and (4) the fact that

8    Gibson was allegedly avoiding Randazza during the final weeks of his employment.  The

9    evidence showed was that up until August 13, 2012, Randazza and Gibson continued to

10   share a close relationship including dinners, a boat excursion with Randazza and his

11   children, and time spent at Gibson's home.  **Tr. at 312:24-314:15, 438:1-446:6.**  After

12   August 13, 2012, the day Gibson discovered Randazza negotiated a bribe for himself,

13   rather than suffering from an intolerable workplace, Randazza suffered from a guilty

14   conscience.  **Tr. at 446:7-450:3.**

15        Randazza also claims Excelsior breached the contract by not paying him the raise

16   and various bonuses discussed *supra*.  Randazza is not entitled to these alleged damages

17   for various reasons articulated previously, but also because he breached his obligations

18   under the contract which excuses Excelsior's performance.  Randazza's unethical behavior

19   during the Oron litigation, alone, undoubtedly breached his employment agreement and

20   excuses Excelsior from any performance obligations under the contract (to the extent any

21   obligations had not already been fulfilled). *See Brown v. Grimes*, 192 Cal. App. 4th 265,

22   277, 120 Cal. Rptr. 3d 893, 902 (2011)(when material breach occurs, the other party may

23   be discharged from its duty of performance).  In light of these facts, Randazza should not

24   be entitled to recover on his claim for breach of contract.

25        **D.  Randazza Was Not Tortiously Discharged (Claim Five).**

26        Randazza claims he established that he was wrongfully discharged "for complaining

27   about inappropriate sexual humiliation directed at him."  **RB at 9:22-10:2.**  It must be noted

28   that Randazza cannot articulate the difference between his fifth claim (Wrongful Discharge)

7.

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702 862 8800

1   and his seventh claim (Retaliation).  Randazza's Post-Arbitration Brief lumps both causes

2   of action together and cites to various sections of the record and hopes that something will

3   stick.  With respect to his Wrongful Discharge claim, Randazza failed to prove his case.

4        Randazza is purposely vague as to the standard applicable to this claim.  Randazza

5   contends California law might somehow apply to his alleged wrongful termination which

6   occurred in Nevada.  In order to downplay his attempt to confuse the issues, Randazza

7   half-heartedly argues in a footnote that the California elements of a wrongful termination

8   claim are substantially similar under Nevada law.  **RB at 9 fn.4.**  However, he is wrong.

9   Nevada has rejected application of a tortious discharge claim to claims of

10  harassment/discrimination/retaliation covered by Nevada's state anti-discrimination statute.

11  *See Sands Regent v. Valgardson,* 105 Nev. 436, 440, 777 P.2d 898, 900

12  (1989)(concluding that a legislative public policy against age discrimination was not

13  sufficiently strong to warrant an exception to the at-will employment doctrine) and *Canada*

14  *v. Boyd Grp., Inc.*, 809 F. Supp. 771, 782 (D. Nev. 1992)(dismissing plaintiff's wrongful

15  discharge claim premised on sexual discrimination).  It is not that Nevada law does not

16  deem sexual discrimination, harassment, and/or retaliation as against public policy, but

17  rather that "no court remedy in addition to those provided for by statute" are available.  *Id.*

18  Randazza's Fifth Claim for Wrongful Termination should be dismissed as a matter of law.

19       Additionally, Nevada law is unapologetic in its requirement that "recovery for

20  retaliatory discharge under state law may not be had upon a 'mixed motives' theory; thus, a

21  plaintiff must demonstrate that his protected conduct was ***the*** proximate cause of his

22  discharge**.**  *Allum v. Valley Bank of Nevada*, 114 Nev. 1313, 1319-20, 970 P.2d 1062, 1066

23  (1998)(emphasis added); *Rains v. Newmont USA Ltd.*, No. 3:12-CV-00517-MMD, 2014 WL

24  4810317, at *3 (D. Nev. Sept. 29, 2014)("recovery for tortious discharge is not permitted

25  under Nevada law where there are mixed motives for the termination. … The protected

26  activity must have been the sole proximate cause of the termination").  Even if the Arbitrator

27  were to find that Randazza was terminated or constructively discharged (which Excelsior

28  maintains is not true), there is an overwhelming amount of evidence to conclude that it was

LITTLER MENDELSON, P C
ATTORNEYS AT LAW
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169 5937
702 862 8800

warranted in light of the $75,000 bribe. Randazza's involvement in the Oron bribe negotiations would **at least** amount to a mixed motive for terminating/constructively discharging Randazza which is fatal to his wrongful termination claim. *See Allum,* 114 Nev. at 1319-20.

### E. Randazza Was Not Subject to a Hostile Work Environment.

#### 1. Randazza cannot prove he was harassed because he is a heterosexual male.

Randazza failed to establish that he was sexually harassed while employed at Excelsior. In fact, Randazza's Post-Arbitration Brief reveals his fundamental misunderstanding of what must be proven in order to establish his hostile work environment claim. Randazza must show that he was subjected to verbal or physical conduct of a harassing nature and **based on a protected classification.** *Nichols v. Azteca Restaurant Enter., Inc.*, 256 F.3d 864, 873 n.4 (9th Cir. 2001) (based on sex). What Randazza has not shown is that the alleged harassment (which Excelsior disputes) took place **because he is a heterosexual male**.

Because he has no evidence to prove that the alleged acts took place because he is a heterosexual male, Randazza argues that it does not matter if the conduct was aimed at him based on his sex and/or sexual orientation. Specifically, he argues that sexual harassment includes "harassment of a sexual nature directed for non-sexual reasons." **RB at 11:13-15.** Randazza is mistaken in his position. The United States Supreme Court specifically held that in hostile work environment claims (including same-gender harassment claims like the one Randazza makes) the plaintiff "**must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimination … because of … sex.'**" *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81 (1998)(emphasis added). Even the case Randazza cites in support of his position acknowledges this necessary element. *See Singleton v. U.S. Gypsum Co.*, 140 Cal.App.4th 1547, 1561-62 (2006)("it is the disparate treatment of an employee on the basis of sex—not the mere discussion of sex or use of vulgar

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169 5937
702.862.8800

9.

1    language—that is the essence of a sexual harassment claim").

2        What the cited paragraph in *Singleton* actually addresses is an issue that is not

3    actually in dispute in this case.   *Singleton* offered guidance that in same-gender hostile

4    work environment claims the harassment does not need to be motivated by a harasser's

5    sexual desire for the person being harassed.   *Singleton*, 140 Cal. App. 4th at 1564(quoting

6    *Oncale*, 523 U.S. at 80).   Excelsior does not dispute that the harassing conduct does not

7    need to be based on sexual desire, but it still must have occurred because Randazza is a

8    heterosexual male.   Nothing in *Singleton* dispenses with this critical element of Randazza's

9    harassment claim.     The *Singleton* court held that even though the same-gender

10   harassment was not based on desire toward the victim, there was strong evidence that the

11   harassment was based on the victim's sex.   Indeed, the court found that the two harassers

12   specifically **targeted the plaintiff's heterosexual male identity**.   *Singleton*, 140

13   Cal.App.4th 1561-1562.   There is no evidence that the 2 incidents forming the basis of

14   Randazza's harassment claim took place because he is a heterosexual male.

15
        **2.  Randazza failed to establish that he was subject to a hostile work**
16          **environment on the basis of his sex.**

17        Randazza's brief freely admits that the only two incidents he claims created the

18   hostile work environment were: (1) filming a scene in his office, and (2) the alleged sex act

19   Gibson performed in Randazza's vehicle.    Randazza did not prove his claim by a

20   preponderance of the evidence.    Randazza's claim that the evidence revealed the filming

21   of the scene in his office was unwelcome and offensive to him is not true.  In support of this

22   proposition, he cites to his own self-serving testimony of the reasons he claims he was

23   offended including that his wife's painting and other personal effects were in the

24   background, that his tie was used as a prop, that pictures of his children were left on the

25   floor of his office after filming, and that coworkers joked about the scene after it was

26   filmed.[4]  Randazza's Brief tellingly ignores what was the most damning evidence with

---

27   [4] Randazza also claims that bodily fluids were left on his desk after filming and cites only to a
28   screen grab from the film which he apparently believes proves that point.   There is no actual
     evidence that bodily fluids ever made their way onto Randazza's desk, but even if they had, the

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169 5937
702 862 8800

10.

002502

respect to this claim—that he had previously, on more than one occasion and to more than one person, including to Mr. Gibson, proposed and offered his own home as a location for shooting pornography and that he had purchased a company couch that had been used in pornographic scenes and frequently bragged about it to visitors of his home. **Tr. at 338:2-338:18; 339:13-340:12; 683:23-684:17.** Randazza even sent a photograph of his scantily-clad wife on the couch to Mr. Gibson. **Ex. 315; Tr. at 338:19-339:12**. These facts contradict Randazza's contention that the filming in his office was offensive, unwelcome, or in any way related to his status as a straight male.[5]

Randazza's brief also spends copious amounts of time focusing on whether the notice Excelsior provided him on the day of the filming was actual notice. This is a classic red herring. Excelsior presented evidence that it did provide Randazza notice of the filming and that Gibson and Randazza's playful text messages about the filming are evidence that Gibson never thought Randazza would take offense to the filming in his office and that Randazza was in actuality only upset that his personal photos were not returned to their prior position after filming.[6] **Ex. 330 (EMC000459-460, 463-464)("out" messages are from Gibson, "in" messages are to Gibson from Randazza).** Nonetheless, even if the Arbitrator found that actual notice had not been given, that does not establish that the filming created a hostile environment based upon Randazza's status as a heterosexual

---

company followed its typical protocol of cleaning Randazza's office after the filming was completed. **Tr. at 956:4-957:22.**

[5] When considering the objective severity of the harassment, the U.S. Supreme Court has noted that it should be judged "from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Oncale*, 523 U.S. at 81. In so doing the inquiry requires careful consideration of the "social context in which particular behavior occurs and is experienced by its target." *Id.* (noting that a professional football player's working environment is different than a secretary's working environment). There is no evidence to suggest Randazza was actually offended, but even if he were, the objective standard must be looked at through the lens of an employee who works for a pornography company and admittedly enjoys that his career brings him closer to the adult industry.

[6] Randazza cites to portions of Gibson's deposition testimony and his arbitration testimony in an attempt to argue that Gibson has been inconsistent as to what portions of the texts were jokes and which portions were serious. As noted previously, this is entirely irrelevant to whether Randazza was sexually harassed, but even if it were, Gibson's testimony has consistently been that he intended to provide notice to Randazza prior to the filming and Randazza's prior actions and the text messages exchanged that day gave him no reason to think Randazza would object.

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

1    male. The evidence is overwhelming that filming in an employee's office is not unique as

2    the Company commonly films throughout its property including several different offices.[7]

3    **Tr. at 681:15-682:19, 857:17-858:16, 943:7-14, 955:8-956:3.**

4            Randazza also takes umbrage with what he calls the "surprise" testimony of Chaz

5    Vorrias ("Vorrias"), the actual director of the scene in Randazza's office. This testimony was

6    only a surprise to Randazza because he chose not to depose Vorrias. The strategic

7    decision of Randazza and his counsel to not depose certain witnesses or conduct

8    discovery regarding properly identified witnesses is what led to the "surprise."[8] It takes

9    nothing away from the credibility of Vorrias' testimony as to what occurred during filming,

10    that Randazza had frequently suggested filming on his property, and that he communicated

11    directly with Randazza regarding the fact that Randazza's office was going to be used for

12    filming with no objection from Randazza. **Tr. at 952:14-961:23.**

13            As for the alleged sex act in Randazza's car, the only person that supports

14    Randazza's version of events is Randazza. Randazza's other witnesses could only provide

15    unreliable hearsay statements—which the Arbitrator should scrutinize carefully in light of

16    their sources and inconsistencies with the allegations made by Randazza.[9] **Tr. at 945:16-**

17

18    [7] Contrary to Randazza's argument, nothing can be gleaned from the fact that Excelsior did not

19    provide a detailed analysis of when scenes were shot in different offices on company property. The
Company would have done so had Randazza propounded discovery that solicited such information.

20    Randazza never did.
[8] Randazza also argues that somehow Vorrias committed wrongdoing by not saving the text

21    messages he exchanged with Mr. Randazza in 2012. Vorrias testified that he did not keep any text
messages with Randazza from that time period. Respondent was not aware of the text messages

22    at the time they occurred and Vorrias was not under an obligation to maintain them. Vorrias is not a
member of management nor a party to this litigation. In fact, he had little, if any, knowledge as to

23    the actual nature of the dispute between Randazza and the Company until a few months prior to the
arbitration hearing—once the text messages had already been deleted. **Tr. at 964:1-12.**

24    [9] Cari Piper is a former Excelsior employee with an admitted axe to grind against the Company. **Tr.
at 938:9-940:21.** John Gust Anderson is another former Excelsior employee who was terminated

25    less than a year ago and had a confrontation with his supervisor which required a police report to
be filed against Anderson. **John Anderson Deposition Transcript at 64:24-69:25.** Additionally,

26    the testimony during Anderson's deposition revealed inconsistent stories regarding contact he had
with Cari Piper prior to his deposition and Anderson eventually admitted that he had spoken to

27    Piper regarding the substance of her testimony and what he would be testifying to prior to his
deposition. *Id.* at 33:14-42:23; 75:21-24. In light of the obvious coordination of testimony by Piper

28    and Anderson, nothing about their testimony is credible. The only other hearsay witness, Ron

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169 5937
702 862 8800

12.

002504

**946:1.**    Randazza also introduced irrelevant testimony in this case regarding various relationships Gibson had with performers and that he at times hired those performers to non-performer positions at the company.   The sole purpose of introducing this testimony was to drag Mr. Gibson's personal life into the arbitration.   Randazza admitted to a former Excelsior employee that these allegations were a fear Randazza fostered in order to keep the Company from making the dispute public.   **See Tr. at 332:16-335:22; John Thurston Carter ("Chip") Deposition Transcript at Exhibit 89 (Bates No. QUIVX002016-2017).**   It is common for Excelsior to hire performers as employees.   **Tr. 694:5-695:20.**

All Randazza's conjecture aside, the evidence showed the employee who the sex act was allegedly performed on, David McCoig, was severely inebriated and ill on the car ride that day—making Randazza's version of the drive home entirely unbelievable.   **Ex. 309; Tr. at 688:12-691:2.**   Gibson has consistently maintained that the sex act did not occur.   **Tr. at 687:12-688:14.**   Cameron Frost, another individual who was in the car that day, also denies that Gibson engaged in the alleged sex act.   **Ex.   309 (Declaration of Cameron Frost).**   Randazza argues that Cameron Frost's declaration, although sworn to under the penalty of perjury, is somehow incredible because it is not live testimony.   Not only is Randazza's argument unpersuasive, but it ignores the fact that Randazza was free to subpoena Mr. Frost in order to take his deposition or to appear at the evidentiary hearing in this matter, but Randazza chose not to.   Finally, the evidence at the hearing revealed that Randazza made no internal complaints of harassment.   **Tr. at 690:24-691:2; 916:24-917:15.**  Randazza is an attorney, well-aware of the obligation of an employee to report harassing conduct, if not to the employer, to the EEOC.   Randazza made no such reports and has clearly pursued this claim only out of a misguided attempt at obtaining leverage. Randazza failed to establish by a preponderance of the evidence that he was subject to a hostile working environment which altered the terms and conditions of his employment.

---

Green, is Randazza's current employee whose testimony is nothing more than a regurgitation of Randazza's fabricated story.

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169 5937
702 862 8800

13.

**F. There is No Evidence that Randazza Was Retaliated Against**

Randazza claims the evidence at the arbitration shows Excelsior fired him for complaining about "inappropriate sexual humiliation directed at him." Other than Randazza's subjective belief, there is no actual evidence supporting this claim. Randazza's Post-Arbitration Brief once again attempts to confuse what the actual standard is. California discrimination and/or retaliation law is inapplicable to this claim. Discrimination and retaliation claims brought pursuant to Nevada's anti-discrimination laws found in NRS 613 are analyzed under the same standards as those brought under Title VII. *See Walker v. Clark County Library Dist.*, 161 F.3d 16, n.1 (9th Cir. 1998)(citing *Apeceche v. White Pine County*, 96 Nev. 723, 615. P.2d 975 (1980)). Under Title VII, retaliation claims must be proved according to traditional principles of <u>but-for causation</u>, not the lessened causation [motivating factor] test. This standard requires proof that the unlawful retaliation would not have occurred but for Randazza making a protected complaint of harassment. *Univ. of Texas Sw. Med. Ctr. v. Nassar,* 133 S. Ct. 2517, 2533 (2013)).

The only facts Randazza cites to in support of his retaliation claim is that he complained about the video incident in April 2012, Gibson allegedly began treating him differently, and that the termination occurred during the same month as the alleged sex act in his car. The evidence Randazza presents in support of his claim do not establish that retaliation actually occurred. First, Randazza cannot show that he participated in a protected activity. **Tr. at 687:8-11, 685:16-686:4, 690:24-691:2, 916:9-917:5.** When Randazza complained to Gibson he did not claim the filming in his office constituted sexual harassment. Rather, he complained about his office having not been put back together the way he liked it. ***See* Ex. 330, Texts 23782, 23783.** This is not a protected complaint. *E.E.O.C. v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1013 (9th Cir. 1983)(activity must refer to something unlawful). Additionally, there is no evidence that Randazza ever issued a complaint to any executive at the company regarding the alleged sex act that occurred in his vehicle. **Tr. at 687:8-11, 685:16-686:4, 690:24-691:2.** Randazza's Post-Arbitration Brief does not even argue that he complained about the alleged sex act. The employee

14.

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702 862 8800

1  who ran Excelsior's human resources at the time, Kirk Addison, denied that Randazza ever

2  complained to him about Gibson. *Id.* at 916:9-917:5

3      Additionally, Randazza never suffered an adverse employment action because he

4  willingly resigned his employment on August 29, 2012. *See* **Ex. 329.** Finally, even if the

5  Arbitrator were to find that Randazza was subject to an adverse employment action,

6  Randazza cannot prove that he would not have been terminated ***but for*** making a

7  complaint of sexual harassment against Gibson as Title VII requires. The preponderance of

8  the evidence establishes that the root of the discord between Randazza and Gibson stems

9  from the fact that Randazza was caught negotiating for a $75,000 bribe for his firm behind

10  Excelsior's back.

11      **G. Randazza Failed to Present Evidence Warranting Emotional Distress
12      Damages**

13      Randazza claims that he is entitled to compensatory damages for alleged emotional

14  distress he suffered as a result of the alleged wrongful termination and sexual harassment.

15  Randazza is not entitled to emotional distress damages of any sort.  The only evidence of

16  emotional distress Randazza actually cites to is his own self-serving *deposition* testimony.

17  However, that deposition testimony related *solely* to emotional distress Randazza claimed

18  he suffered as a result of harassment based upon his Italian heritage (this claim was

19  voluntarily dismissed by Randazza) not sexual harassment.  **Randazza Deposition at
20  55:17-56:6.**[10]  There is no adequate basis for an award of emotional distress damages

21  even if Randazza were to prevail upon his sexual harassment claim.

22  **II.    EXCELSIOR ESTABLISHED ITS COUNTERCLAIMS BY A PREPONDERANCE**

23  [10] This highlights the larger problem with Randazza's strategy of citing to deposition testimony of
    witnesses who testified at the arbitration for purposes other than impeachment.  In Randazza's
24  Post-Arbitration Brief, deposition testimony is often cited out of context and not directly probative of
    the facts he claims it is.  Randazza's Post-Arbitration Brief cites at multiple times to deposition
25  testimony of witnesses who testified at trial on subjects they were never questioned about during
    the actual hearing.  This provides the witness no opportunity to explain their testimony or to present
26  evidence rebutting the points Randazza avoided at the arbitration but now attempts to prove. For
    these reasons, Excelsior once again objects to the introduction of deposition testimony from
27  witnesses who testified at the arbitration on topics they were not questioned about during the
    evidentiary hearing.

28

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas  NV 89169-5937
702.862.8800

002507

**OF EVIDENCE.**

The preponderance of evidence establishes that Randazza acted with deliberate indifference to his professional obligations as an attorney and member of the Bar and as General Counsel to Excelsior such that damages directly caused by his misconduct and disgorgement of compensation paid to Randazza is warranted.

**A.    Disgorgement Of Compensation Is An Available And Appropriate Equitible Remedy.**

Preliminarily, Randazza mistakenly contends Excelsior only seeks recovery under the equitable remedy of disgorgement.   To the contrary, Excelsior contends it has also proven damages in the form of the following (amongst others detailed at pages 74-75 of Excelsior's brief):

• $275,000 related to the re-settlement of Oron.

• $50,000 also related to the Oron matter.  Oron agreed to pay $600,000 ($50,000 more than the court enforced settlement agreement) in the agreement Randazza provided to Mr. Gibson for review on August 13, 2012.  However, that agreement was not signed by the deadline to accept because the $75,000 bribe to Randazza was disclosed in the agreement.

•    $5,000 in payment towards fees incurred by Excelsior in the Oron matter transmitted by Mr. James Grady to Randazza and not disclosed or turned over to Excelsior.

•    $55,000 in attorney's fees awarded and not disclosed or turned over by Mr. Randazza in connection with his handling of the Righthaven case.

Excelsior further seeks disgorgement of fees/salary and bonuses paid to Randazza as outlined in its brief.  Randazza's contention that Excelsior must prove actual damages in order to be entitled to the equitable remedy of disgorgement lacks the support of even his own experts.  The report of Ellen Peck does not opine that proof of actual damages is a prerequisite to application of the equitable remedy of disgorgement.  **Ex. 21 at page 18.** Instead, Ms. Peck concludes that forfeiture depends upon the egregiousness of Randazza's violations.  In her opinion, Randazza engaged in no wrongdoing (for example,

16.

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

1    she takes Randazza at his word that his negotiations for bribes were insincere settlement

2    negotiation strategy).  Therefore, she concludes fee forfeiture is not warranted.

3         Likewise, although expert Joseph Garin opines that causation of damages is an

4    element of a claim for legal malpractice in Nevada, he does not, because he cannot, opine

5    that proof of causation of damages is an element of a claim for breach of fiduciary duties.

6    **Ex. 22 at page 16 n. 18 and page 23.**  Because he cannot rule out disgorgement as a

7    remedy for Excelsior's claim for breach of fiduciary duty, Mr. Garin goes on to evaluate the

8    factors set forth in the Restatement (Third) Law Governing Lawyers § 37 to be considered

9    when weighing whether forfeiture of compensation paid to a lawyer is warranted.  With

10   respect to Mr. Garin's report and testimony, it is important to note that:  (1) Mr. Garin also

11   premised his report on the notion that Randazza's version of events was truthful; (2) Mr.

12   Garin was, unbeknownst to him, relying upon untruthful information provided to him by

13   Randazza; and (3) Mr. Garin admittedly did not have complete information about all factors

14   in conducting his analysis.  For example, in discussing his conclusion that Randazza

15   brought substantial value to Excelsior through his legal services, Mr. Garin admitted he

16   lacked important information needed to evaluate the value of services rendered by

17   Randazza.  **Tr. 1203:18-1206:6.**  Mr. Garin further conceded that §37 of the Restatement

18   does not say that someone has to show actual monetary damages to be entitled to

19   disgorgement of compensation.  **Tr. 1206:9-17.**

20        With respect to California law, the most recent authority Excelsior has located and

21   cited in its brief, *Fair v. Bakhtiari*, 195 Cal.App.4th 1135 (2011) draws the logical conclusion

22   that the remedy of forfeiture is meant for situations in circumstances present here, where

23   causation of actual damages is difficult or impossible:

24        "It makes sense to require proof of damages where the client seeks
         compensatory damages as a tort remedy for breach of fiduciary duty, but not
25       if the client seeks only forfeiture of fees.  The purpose of compensatory
         damages is to make plaintiffs whole for harm caused by defendants.
26       Forfeiture of legal fees serves several different purposes.  It deters attorney
         misconduct and recognizes that damage caused by attorney misconduct is
27       often difficult to assess (Rest.3d The Law Governing Lawyers § 37, com. B, p.
         272).  It prevents fiduciaries from profiting from their fiduciary breach and
28       disloyalty.  Like compensatory damages, it compensates clients for harm they

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

17.

002509

have suffered, but it reflects not the harms the clients suffer from the tainted representation, but the decreased value of the representation itself.

*Id.* at 1153-1154.  Excelsior compensated Randazza handsomely through his employment, while unbeknownst to it, again and again, Randazza was putting his own personal interests ahead of theirs to its detriment.  The equitable remedy of disgorgement should be awarded here.

**B. TNAFlix:    The Preponderence Of Evidence Establishes Randazza Committed Malpractice, Breached His Fiduciary Duties And Tortiously Breached The Implied Covenant Of Good Faith And Fair Dealing By His Self-Dealing.**

Randazza claims he has no liability with respect to his mishandling of the TNAFlix matter for two reasons.  First, that his negotiations to be conflicted out of being adverse to TNAFlix  and serve as its broker for significant monetary payments to himself was "puffery."  Second, that Excelsior knew Randazza was negotiating for those personal payments.

**1. The preponderance of evidence demonstrates Randazza's negotiations for personal benefit were not insincere puffery.**

Randazza claims Excelsior has no evidence demonstrating his negotiations with TNAFlix for the bribe and broker arrangement were insincere settlement negotiation.  The preponderance of evidence shows Randazza's self-dealing was very real.  First, the fact that Randazza previously lied to the State Bar and claimed he did not negotiate for a bribe from TNAFlix demonstrates his latest claim of puffing is unworthy of belief.  In June 2013, instead of admitting to the State Bar that he negotiated for a bribe in the TNAFlix matter and explaining it was "puffing", Randazza reported that when offered a bribe in the TNAFlix matter, "Randazza explained to Mr. Gurvits and Gibson that Randazza would not accept payment in exchange for a limitation on who Randazza could represent or not represent in the future."  **Ex. 372 at page EMC001606.**  Randazza has only changed his story now and admitted to the negotiations because Excelsior since disclosed that it had obtained his communications with opposing counsel proving he did negotiate for a bribe Randazza's claim of puffing is not worthy of belief and simply a matter of his lies catching up with him.

18.

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169 5937
702 862 8800

Second, Randazza's communications show he was inexplicably negotiating to get a larger payment for himself, which is inconsistent with the notion that he was playing along with the offer to bribe him purely to benefit Excelsior. **See Exs. 352, 353, 354 and 356.** Most damning to his claim of puffing his continuing efforts to obtain the bribe and broker agreement for himself ***after*** the TNAFlix matter was settled. The TNAFlix dispute with Excelsior was over as of February 1, 2011. **Tr. at 371: 8-10**. The following communications from Randazza commence the next day after the settlement is finalized:

- February 2, 2011: "So how should we proceed? Do they want a retainer letter from me?" and "....and you're working on a broker agreement that reflects you and me as the brokers for sale – 15% commission split 7.5% for each of us?" **Ex. 361.**
- February 7, 2011: "Someone just asked me if I am now representing TNA .... I don't know if I am." **Ex. 361 (EMC001505)**.
- February 11, 2011: "Val, There is a hot iron that can be struck if we move fast." **Ex. 361 (EMC001506)**.
- February 11, 2011: "Val, Can you get this executed?" attaching a Legal Services Fee Agreement providing for a $36,000 fully-earned upon receipt retainer for Randazza and Randazza the exclusive right to serve as broker for the sale of TNAFlix for a 5% broker fee. **Ex. 362.**[11]
- February 11, 2011: "Please prevail upon them that time is of the essence." **Ex. 363.**
- February 13, 2011: "Val, They need to make a move. There are other things moving around and shifting right now, and by tomorrow, this may all be moot" and "ugh...this thing is going to fall apart." **Ex. 363 (EMC001516)**.
- February 14, 2011: "Val, Tell them this: That Liberty settled this thing super cheap, and that I honestly think this was a $750K case if we went all the way ......The next company lining up has a big litigation plan, and I can assure you, they won't settle cheap..... if TNA can't shit or get off the pot, I can't hold these guys back any longer. I'm not holding them back out of Christian charity ....But, if we don't have our broker agreement in place, I can't blow my wad holding this suit back..." **Ex. 363 (EMC001518)**.
- February 15, 2011: Randazza forwarded an Exclusive Business Broker Agreement to counsel for TNAFlix for him providing for Randazza to receive a 5% broker commission on the sale of TNAFlix. **Ex. 364.**

Randazza's own emails evidence his negotiations were sincere efforts to personally benefit him. Randazza's self-serving and unreliable testimony is insufficient to overcome

---

[11] In another instance of acting contrary to their interests, Randazza did not even have the decency to provide in the agreement a carve-out that would allow him to represent Excelsior adverse to TNAFlix in the future. **Tr. 375:11-15.**

LITTLER MENDELSON, P C.
ATTORNEYS AT LAW
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

1   what is evident from his documented communications, especially in light of the severe

2   credibility issues that plague Randazza.

3      Randazza also contends that his testimony that it is common in his experience for

4   opposing counsel to try to bribe him **(Tr. at 150:9-20)** and the testimony of his expert Ellen

5   Peck that in certain areas of litigation offers to conflict out opposing counsel are common

6   **(Tr. 1247:10-1249:7)** support his contention that his negotiations were not sincere.[12]

7   However, whether or not bribes to conflict out counsel are made (or are even commonly

8   made) is not the point.  The issue is whether Randazza's _negotiation_ for a bribe to himself

9   and to serve as a broker was a façade or not.  There was absolutely no testimony that it is

10  common in any field for attorneys to engage in sham negotiations to conflict themselves out

11  of being adverse to an opponent in the future.  The preponderance of evidence establishes

12  Randazza's negotiations for a bribe and to act as a broker with TNAFlix were sincere

13  efforts to benefit him financially and not puffery as he now claims.

14
15
### 2. Excelsior did not know of or consent to Randazza negotiating for a bribe or to serve as broker for TNAFlix.

16     Randazza's post-arbitration brief claims, "[t]he evidence showed conclusively that

17  Respondents knew that Mr. Randazza engaged in such negotiation tactics with opposing

18  parties."  Randazza's contention should be dismissed out of hand because it is contradicted

19  by what he reported to the State Bar.  As set forth above, rather than reporting to the State

20  Bar that Mr. Gibson knew about the negotiations, Randazza essentially denied to the State

21  Bar that any negotiations took place.  **Ex. 372 (EMC001606).**  Moreover, the evidence cited

22  by Randazza supposedly "conclusively" establishing Excelsior's knowledge that Randazza

23  was negotiating for a bribe shows no such thing.[13]  Instead, the evidence at arbitration

24

---

25  [12] Randazza's own partner testified he has never been offered a bribe.  **Tr. 657:1-4.**

26  [13] Randazza cites to:  (1) his own testimony **(Tr. 150-152)**; however, Randazza merely testified that
    the first time he was ever offered a bribe to conflict him out of being adverse to the opposing party,
27  he described it "colloquially" to Mr. Gibson and told Mr. Gibson that he couldn't take a bribe to
    conflict himself out **(Tr. 152:2-16)**; Mr. Gibson's testimony that Randazza made referenced to being
28  _offered_ bribes but never indicated that he intended to pursue receipt of a bribe or received
    Excelsior's permission to negotiate for a bribe **(Tr. 696:14-697:15)**; Mr. Dunlap's testimony of

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

002512

1  consistently showed that, at most, Randazza made reference to being offered "bribes" – not

2  that he disclosed or Excelsior had knowledge that he was actually negotiating bribes for

3  himself.  In fact, the Arbitrator honed in on this very testimony by Randazza's expert:

> Q:  But they [Excelsior] knew that Marc was approached with the bribes?
> A:  Correct.
> Q:  But not that they knew that Marc was actually engaging in negotiations for the bribe, correct?
> A:  I think it's a disputed fact.  I can't –
> Q:  After that sentence, you say in your report, In fact, Mr. Gibson encouraged it to the extent it facilitated settlements in the various lawsuits or negotiations and saved Excelsior/Liberty litigation costs and time.  The statement that Mr. Gibson encouraged it, what do you mean Mr. Gibson was encouraging?
> A:  This is based on discussions with Marc [Randazza] and/or Henry [Whitehead, counsel for Randazza], and that Mr. Gibson wanted to maximize whatever resolution he could obtain as efficiently and quickly as possible.  And so he gave Mr. Randazza the green light just to do that in the way that he saw fit.
> Q:  I understand.  Nobody actually told you that Mr. Gibson specifically said to him, Do it, take a bribe, negotiate for a bribe; is that fair?
> A:  Fair.
> Q:  With respect to the –
> Arbitrator Haberfeld:  I would like to get – ask a clarification question.  I'm not sure I got this clearly.  I think I heard it, and I want to go back and read – have it read back to us.  Is it a correct understanding what you just testified that embraced within a directive to Mr. Randazza to go out and get as much money as efficiently as possible was implied authority to do what was not specifically or expressly within Ms. Krincek's question about negotiations and bribes?
> A:  Yes.

**Tr. 1195:14-1197:1.**

The Arbitrator should further take note that Randazza's brief, ignores altogether the

fact that in addition to negotiating for a bribe to conflict himself out of being adverse to

TNAFlix, he was negotiating to serve as co-broker in the sale of TNAFlix for a 7.5%

commission on a potential $5 million sale.  It is undisputed that Randazza did not disclose

---

casual references by Randazza of opposing counsel trying to bribe him **(Tr. 896:3-20)**; and Mr. Lowderman's testimony on direct examination where he mistakenly due to nerves at first indicated Randazza disclosed he was negotiating for a bribe in Oron (not the TNAFlix matter) but gathered himself and corrected his testimony that Randazza did not disclose his negotiations for a bribe in Oron **(Tr. 843:12-844:19)**; Henry Leonard's consistent deposition testimony that he heard Randazza reference being offered a bribe but not that he was negotiating for a bribe; Exhibit 41 which is an email exchange between Randazza and Gibson where Gibson inquired "Are these the same guys who **_offered_** to bribe you?"  (emphasis added); and Exhibit 53, which is a lengthy email exchange between Randazza and different opposing counsel in another matter 6 months after TNAFlix was resolved containing no references to Randazza negotiating for a bribe for himself.

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

002513

his proposal and negotiations to serve as a broker for the sale of TNAFlix. **Tr. at 352:23-353:24.**[14] His negotiations to serve as broker make no sense in the context of Randazza's latest yarn about puffery; thus, they are ignored by Randazza. The preponderance of evidence establishes that Excelsior did not have knowledge or consent to Randazza's negotiations for a bribe or to serve as broker for TNAFlix.

### 3. Randazza's conduct breached his fiduciary duties and failed to comport with the standard of care for attorneys.

Randazza's post-arbitration brief only addresses the allegations that (1) Randazza violated CRPC 1-500(A) when he negotiated with TNAFlix for a bribe and (2) violated CRPC 3-510 by failing to disclose the conflict of interest presented by his negotiating with TNAFlix for personal financial benefit at the same time he was negotiating with TNAFlix to resolve the dispute with Excelsior.

Randazza relies upon Ellen Peck's conclusion that he did not negotiate to restrict his legal practice. However, Ms. Peck's conclusion is based upon two faulty premises. First, Randazza's allegation that his negotiations with TNAFlix for a bribe were insincere puffing, which are unworthy of belief. Second, her contention that rather than offering not to sue TNAFlix in the future, Randazza was negotiating to take TNAFlix on as a client just as any other new client. Ms. Peck turned a blind eye to the following emails from Randazza:

- "As far as *conflicting me out of future cases*, that will require significantly, more than $5,000." **Ex. 352.**

---

[14] Presumably because Randazza understands the devastating nature of his expert Mr. Garin's admission that Randazza provided him with false information, Randazza takes a stab at attempting to show that Excelsior's expert was provided false information which falls far short of the mark. Randazza cites to paragraphs 15.8 and 39.16 of Dennis Kennedy's Report (Ex. 20). In paragraph 15.8, Kennedy states, "According to Liberty, Mr. Randazza did not disclose the fact that he was discussing the prospect of either receiving a payment directly from TNA as part of settling the TNA Matter or, alternatively, being retained by TNA immediately after settlement in order to conflict him out of future cases against TNA." Mr. Kennedy's statement is entirely consistent with the testimony and documentary evidence offered by Excelsior establishing that while Randazza made casual reference to being offered bribes, Excelsior did not have knowledge of or consent to his negotiations for a bribe for himself. With respect to paragraph 39.16, Randazza claims Excelsior either withheld Exhibit 53 (relating to an entirely different matter – Megaupload) from Mr. Kennedy or Mr. Kennedy did a cursory job of examining it. This claim is demonstrably untrue. Mr. Kennedy's report sets forth a lengthy citation from Exhibit 53 at paragraph 39.4 of his report (Ex. 20).

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169 5937
702.862.8800

002514

- "Finally, *with respect to conflicting me out*, TNA would have to agree that they would waive any such conflicts for future disputes with Corbin Fisher, but Corbin Fisher, only." **Ex. 352.**
- "*Keeping me completely out of the TNA game* is a little more complicated. *If your client wants to keep me personally out of the TNA game*, then I think that there needs to be a little gravy for me." **Ex. 356.**

Even Randazza did not take issue with the characterization of his negotiations with TNAFlix as being negotiations for an agreement not to sue it in the future. **Tr. 369:1-7.** Ms. Peck could not even maintain the farce that Randazza was not negotiating not to sue TNAFlix for very long. When asked for an example of how direct an offer to restrict an attorney's practice would have to be in her opinion to violate CRPC 1-500(A), Ms. Peck immediately pointed to TNAFlix's initial offer of $5,000 to Randazza to which Randazza was merely countering. There can be no doubt that a preponderance of the evidence establishes Randazza was negotiating to restrict his practice in violation of CRPC 1-500(A).

With respect to failing to disclose the personal, financial conflict of interest created by negotiating for a significant monetary payment and broker fee for himself of potentially hundreds of thousands of dollars, Ms. Peck claimed since those agreements were never actually entered, there was no conflict to disclose. Ms. Peck admitted there is no authority to support her position **(Tr. 1309:8-1311:4)**, which flies in the face of the primary purpose of the rule -- to prevent situations where an attorney might compromise his representation of a client in order to advance his own interests. *Santa Clara Cty. Counsel Attys. Assn. V. Woodside*, 869 P.2d 1142, 1153 (Cal. 1994). Respectfully, the notion that an attorney would not have to disclose to a client that along with negotiating for a payment to the client, the attorney was negotiating for a payment for himself unless or until a final agreement was entered is illogical.

## C. Randazza's Employment As Excelsior's General Counsel Was Permeated With Instances Of Undisclosed Conflicts Of Interest.

Excelsior contends Randazza is further liable to it due to the myriad undisclosed conflicts of interest he hid during the course of his employment as General Counsel. The

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

1    experts agree that Randazza was obligated to obtain informed consent, confirmed in

2    writing, under both California and Nevada law with respect to conflicts of interest.    The

3    evidence at arbitration showed Randazza failed to adhere to his professional

4    responsibilities with respect to Xvideos, XNXX, Bang Brothers, Porn Guardian, Titan Media

5    and Kink.com and hid his relationship with those entities with, at best, opaque verbal

6    references such as references to knowing people at those organizations.    Thus, Randazza

7    is left in his post-arbitration brief with attempting to argue that Excelsior knew about his

8    representation of such entities because an old version of his web site, which there was no

9    testimony anyone at Excelsior ever was aware of or viewed, identified some of these

10    entities as being past clients and that a lack of damages precludes recovery by Excelsior.

11    Randazza's defenses lack merit.

### 1. Xvideos and XNXX

13    Randazza represented Xvideos and XNXX during the last 2 years of his 3-year

14    tenure as General Counsel, without disclosing they were his client, and while advising

15    Excelsior not to take action against them for the frequent copyright infringement brought to

16    his attention.    In addition, to advising Excelsior not to pursue them, the billing records show

17    Randazza worked with Xvideos and XNXX during his tenure as Excelsior's General

18    Counsel to build their defenses to copyright infringement claims.    Consequentially,

19    Randazza's post-arbitration brief essentially concedes (as did Randazza's expert), that

20    Randazza's representation of Xvideos constitutes an undisclosed conflict of interest.    The

21    brief does not reference or attempt to defend his conduct with respect to XNXX at all.

22    Randazza's primary defense to this claim is that of "no harm, no foul."    Randazza contends

23    Excelsior is not entitled to damages against for this undisclosed conflict of interest because

24    Excelsior would not have had a meritorious claim against Xvideos (in his self-serving

25    opinion) and Excelsior did not end up filing suit against Xvideos and XNXX since his

26    departure.    Neither position has merit.

27

28

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

24.

First, with respect to Randazza's claim that Excelsior did not have meritorious claims to pursue against Xvideos and XNXX, this is easily shown to be the disingenuous self-serving claim it is. Randazza admits that when he first took Xvideos and XNXX on as a client, **he defended them in a copyright infringement case brought by his friend, Gill Sperlein, Esq. and negotiated on Xvideos and XNXX's behalf a 6-figure settlement payment to Mr. Sperlein's clients**. Clearly, Randazza's claim of Xvideos and XNXX being so bullet-proof to litigation cannot be deemed credible if he, as their lawyer saw fit to advise to pay 6-figures to resolve a dispute. **Tr. at 507:20-511:1.** Randazza also contends Excelsior had no success pursuing claims against tube sites. This is not true. Mr. Gibson testified about numerous successful results. **Tr. 730:13-732:2.** In fact, TNAFlix is a tube site and paid $50,000 to Excelsior in settlement. According to Randazza, the case against that tube site was worth $750,000. **Ex. 363.**

Second, whether or not Excelsior has commenced litigation in the years since Randazza advised against pursuing Xvideos and XNXX is irrelevant. At the time Excelsior wanted to sue Xvideos and XNXX, Randazza advised against it. Excelsior was not able to obtain substantiation that Xvideos and XNXX were Randazza's clients until Randazza was compelled to make those disclosures during the tail end of discovery in this matter. Last and perhaps most significantly, it is apparent from Randazza's billing records that all the while he was dissuading Excelsior from pursuing their claims against Xvideos and XNXX, Randazza hid his lucrative side representation of those clients and secretly built up their defenses to claims that otherwise could have been pursued by Excelsior. **Ex. 414 and Tr. 542:15-544:7.**

### 2. Bang Bros

With respect to Bang Bros, Randazza claims there was no conflict of interest with respect to him talking Excelsior out of using a third-party for financing the acquisition of Cody Media in favor of considering Bang Bros (his undisclosed client) as financer because the acquisition did not proceed for unrelated reasons. Brian Dunlap, the Excelsior

25.

LITTLER MENDELSON, P C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702 862 8800

executive tasked with leading the effort to obtain financing, did testify the main reason they stopped looking for financing was related to Randazza's departure and resulting drain on the Company's resources **(Tr. 909:6-13)**.    However, Mr. Dunlap explained that Excelsior was significantly into the process of finalizing financing from a third-party, including having delivered a letter of intent, but backed away from that arrangement when Randazza advised against using that source for financing in favor of using his undisclosed client, Bang Bros. **Tr. 870:3-873:9.**

Randazza does not even address the undisclosed conflict of interest presented by his simultaneous representation of Bang Bros company, GRHK, LLC, in a dispute with a copyright infringer Fapzap simultaneously while pursuing Fapzap on behalf of Excelsior. **See EXB at p. 59-60.**  Contrary to Randazza's puzzling contentions that his work for the conflict of interest clients such as Bang Bros somehow benefitted Excelsior, the GRHK conflict starkly demonstrates that was not the case.    Randazza did not even charge GRHK/Bang Bros for representing them on this matter, yet recovered the Fapzap website for them (rather than recover it for Excelsior since he would not be paid on a bonus for a non-monetary recovery), and had Excelsior shoulder the weight of his fees for handling both matters. **Id.**

### 3.  Titan Media, Kink.com, PornGuardian

Randazza does not attempt to defend his failure to obtain written confirmation of Excelsior's informed consent to his representation of Titan Media, Kink.com and Porn Guardian.    Rather, Randazza contends Excelsior cannot quantify harm caused by his representation of these clients.    Excelsior demonstrated that Randazza represented Excelsior with respect to negotiating agreements with all 3 of these entities without Randazza disclosing they were clients of his.    Excelsior further demonstrated that with respect to PornGuardian, Randazza hid the fact that he was simultaneously negotiating for a settlement for Porn Guardian from Oron for $50,000 simultaneously while negotiating with Oron on behalf of Excelsior, as detailed further below.    Additionally, the evidence is

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169 5937
702 862 8800

26.

002518

undisputed that without obtaining informed consent, confirmed in writing, with respect to his representation of PornGuardian, Randazza recommended PornGuardian's use as a vendor, reviewed Excelsior's contract with PornGuardian, and as a result Excelsior paid $700/month for substandard service from PornGuardian. **Tr. 741:23-743:14.** They now receive superior service from a different vendor at reduced cost of $400/month. Excelsior seeks disgorgement of fees paid to Randazza as an equitable remedy. **Id.**

### D. The Evidence Demonstrates Randazza Committed Malpractice, Breached his Fiduciary Duties, and Tortiously Breached the Covenant of Good Faith and Fair Dealing By His Self-Dealing In The Oron Matter.

#### 1. The preponderance of evidence establishes Randazza secretly negotiated a bribe for himself.

Randazza's claim that he negotiated a $75,000 bribe for himself in the Oron matter with the knowledge and consent of Mr. Gibson and that Mr. Gibson's subsequent shock and dismay at the discovery that the company's General Counsel had engaged in such conduct was pretextual is a fiction belied by the documentary evidence.

> *a. Randazza's State Bar response evidences Mr. Gibson did not have knowledge of the $75,000 bribe until presented with the agreement.*

Once again, Randazza tries to pass off a different version of events as his misdeeds catch up with him. His story now is completely different than what he represented to the State Bar. Randazza represented to the State Bar that his discussion with Mr. Gibson about the $75,000 bribe did not occur until after he received the settlement agreement from opposing counsel Val Gurvits providing for the $75,000 bribe to be transferred to Gurvits' trust account. Randazza reported to the State Bar:

> Liberty filed suit in mid-June; Oron settled in early July for $550,000....From July through August 2012, Liberty and Oron litigated over whether the settlement agreement was actually a binding settlement agreement. In early August, the Court held that the settlement agreement was valid and entered judgment in Liberty's favor, which was collected from Oron's PayPal account (and remains in Randazza's trust account today).

> Oron appealed this decision. As part of a blanket resolution of the whole matter, Oron's successor counsel suggested a payment that would include

27.

.ITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702 862 8800

002519

$75,000 for Randazza to not represent others against the site. Randazza did not seek or solicit this payment; it was offered by Oron's counsel. In fact, this is a frequent issue in litigation involving Liberty. In Randazza's first interaction with this attorney, Valentin Gurvits.....[discussion of TNAFlix and Megaupload omitted]

When Mr. Gurvits reappeared in the Oron matter, one of his initial overtures was to attempt to find a way to keep Randazza from being opposing counsel against this client in the future. When Mr. Gurvits made this offer, Randazza reminded him that this was not something with which he was comfortable. Mr. Gurvits then suggested that he would get $75,000 from the Oron frozen funds ..... and Mr. Gurvits stated that it was his intention to use those funds to retain Randazza as his co-counsel after the matter was settled.

Randazza explained to him that he would need to disclose this to his client, and that, if he were to do so, it could not be used to conflict Randazza out of a future dispute between his client and Liberty Media. At that point, Mr. Gurvits provided Randazza with a draft settlement agreement that called for $75,000 to be transferred from his client's account to his trust account. ...

The $75,000 was to be paid to Gurvits' trust account. Randazza explained to Gibson that, if possible and if the money was every actually paid, it would be given to Liberty as the proceeds of the settlement........

**Ex. 372 (EMC001606-1607).**

Randazza's new allegation that Mr. Gibson was aware of his negotiations is not credible. Randazza's statements to the State Bar about the Oron matter are further rife with misrepresentations. Randazza represented that Gurvits proposed the $75,000 bribe. Randazza further represented that he did not "seek or solicit this payment." These statements are demonstrably untrue. Randazza proposed the $75,000 bribe; and he made that proposal to Oron's first attorney, Stevan Lieberman. Randazza emailed Lieberman on August 7, 2012, and stated: "I spoke to my partner, who was adamant that we should earn $100K if we're to never be able to sue FF Magnat, Bochenko, Novafile.com, oron.com, etc. forever and ever. I got him to go with $75K...." **Ex. 366.** Four minutes later, Randazza emailed a $75,000 fee agreement to Lieberman. **Ex. 367.**

Randazza further misreported to the State Bar that in response to the alleged $75,000 offer from Gurvits, Randazza reminded him that was not something he was comfortable with and Gurvits, thereafter, provided a draft settlement agreement calling for the $75,000 to be transferred to Gurvits' trust account. As detailed at pages 40-43 of Excelsior's Post-Arbitration Brief, after Randazza sent the $75,000 retainer agreement to

28.

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169 5937
702 862 8800

Lieberman, Gurvits took over as lead counsel for Oron and provided Randazza with a draft settlement agreement that explicitly provided for the $75,000 payment to Randazza and incorporated Randazza's retainer agreement as an exhibit.   Randazza, not wanting his side-deal to be in the open, engineered removal of those references, proposed treating the $75,000 as a personal settlement payment to him to disguise the nature of the payment, and ultimately landed on the option of having the money directed initially to Gurvits' trust account.   Notably though, Randazza's report to the State Bar confirmed that his discussion with Mr. Gibson about the $75,000 took place *after* Gurvits provided the settlement agreement.   This representation contradicts Randazza's claim in this matter that Mr. Gibson was aware of and approved his negotiations for a $75,000 side deal for himself.

> b. *References by Randazza to having been offered bribes and/or bribes being common in the industry does not equate with Excelsior's knowledge or consent to Randazza negotiating for $75,000 payment to himself.*

Randazza claims that Excelsior had knowledge of and consented to his negotiation of the $75,000 bribe because he told Excelsior that being offered bribes was common. This claim is illogical.  The Excelsior executives testified at arbitration that Randazza made casual references to it being common in the industry to be offered bribes and that he had been offered bribes.  However, Randazza's attempt to conflate statements to Excelsior that he had been offered bribes with Excelsior's knowledge and consent to his actually negotiating a $75,000 bribe for himself is absurd.  In fact, Randazza testified that he did not discuss with Excelsior or receive permission from them to negotiate for the retainer from Oron:

> Q:  You never received permission from Liberty to negotiate for this retainer from Oron, correct?
> A:  I never discussed it with them explicitly.
> Q:  You never received permission from them to represent Oron, correct?
> A:  I don't think I did.

**Tr. 401:2-9.**  Excelsior did not know or consent to Randazza negotiating for a $75,000 bribe for himself.

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas  NV 89169-5937
702 862 8800

29.

1

> *c.  E-mail communications between Randazza and Mr. Gibson*
> *establish Mr. Gibson was not aware of Randazza's self-dealing until*
> *August 13, 2012.*

2

3      Randazza's additional claim that Mr. Gibson's August 13, 2012 email evidences pre-

4  existing knowledge that Randazza negotiated for a bribe does not hold water.  When Mr.

5  Gibson was first presented with the Oron settlement agreement on August 13, 2012, Mr.

6  Gibson drew an arrow to the $75,000 payment with the notation, "Who gets this?".  **Ex.**

7  **325.**  Mr. Gibson should not have made that notation if Randazza's version of events is

8  truthful and Mr. Gibson knew about the $75,000 bribe.  Mr. Gibson testified that Randazza

9  came into his office that day and "sheepishly" presented him the agreement, Mr. Gibson

10  questioned Randazza about the payment, which Randazza explained was a "bribe" to

11  conflict his firm out of suing Oron, and on Randazza's way out the door sensing that Mr.

12  Gibson was upset with the existence of the "bribe" offered to give it to the company.  **Tr.**

13  **701:17-704:24.**  Thus, the statement in Mr. Gibson's subsequent email **(Ex. 324)**, in part,

14  expressing concern that there is no guarantee that the $75,000 would even be received

15  confirms no more than Excelsior's version of events.  Similarly, contrary to Randazza's

16  allegations, Exhibit 69 further establishes Excelsior's version of events, not Randazza's.  In

17  that email, Randazza acknowledged that Mr. Gibson is "chafing about the $75K.  I wish that

18  you'd take 5 minutes to speak to me about it because I get the impression that you have

19  the wrong idea about it."  Mr. Randazza then does go on to state, "I fully disclosed it to you

20  – even before it happened.  I told you they were making overtures about that."  This

21  statement does nothing more than evidence what Excelsior testified to, that Randazza had

22  made references to being offered bribes.

23      Randazza makes additional equally spurious claims.  Randazza claims Mr. Gibson's

24  displeasure with discovery of the "bribe" was a pretext to cover-up pre-existing hostility.

25  The text exchanges starkly establish that this claim lacks merit.  Exhibit 331 establishes

26  that up through August 12, 2012, Randazza and Mr. Gibson continued their close personal

27  friendship.  After August 13, 2012, Randazza is desperate for a meeting with Mr. Gibson to

28

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169 5937
702 862 8800

30.

002522

try to fix the damage caused by disclosure of the bribe on August 13, 2012. Randazza also questions the timing of Mr. Gibson signing the promissory note for $25,000 on August 21, 2012. However, Mr. Gibson's logical explanation was that his signing the note coincided with the timing of Randazza wiring the $25,000 for the Hong Kong counsel. **Tr. 786:3-20.**

d. *Excelsior was damaged by Randazza's self-dealing.*

Randazza's contention that Excelsior was not harmed by his self-dealing lacks merit. Randazza claims, "[i]t's undisputed that Oron accepted a later agreement, that agreement was enforced, and the $550,000 was paid...." This statement is untrue. The $550,000 settlement agreement was entered in July 2012. **Ex. 345.** The settlement agreement presented to Mr. Gibson with the $75,000 bribe for Randazza, included a $600,000 payment to Excelsior. According to Randazza the additional $50,000 was to resolve the award of attorney's fees subsequently entered in Excelsior's favor in the Oron litigation. **Tr. 405:9-406:12.** Mr. Gibson testified that absent inclusion of the $75,000 bribe, he would have executed the settlement agreement. **Tr. 710:11-711:6.** However, the bribe interfered with his ability to enter the agreement and was not accepted by the deadline. **Ex. 370.** Absent Randazza's misconduct with respect for negotiating a $75,000 bribe for himself, Excelsior would have wound up with a $600,000 settlement from Oron; rather, than the $275,000 it resettled the matter for. Randazza further claims Excelsior cannot show that Oron would have paid the $75,000 bribe he negotiated for himself to Excelsior because Gurvits told him that Oron would not pay Liberty more" than $600,000. Given, that according to Randazza both he and Gurvits routinely lied to opposing counsel **(see e.g. Tr. 360:7-11 and 392:18-20)** his reliance on a statement made by Gurvits during settlement negotiations makes no sense.

The evidence in this matter establishes by a preponderance of the evidence that Randazza secretly negotiated a $75,000 bribe for himself to conflict him out from suing Oron in the future. His negotiations tainted the settlement negotiations. For the reasons more fully set forth in its Post-Arbitration Brief, Excelsior should be awarded both its

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

compensatory damages and the equitable remedy of disgorgement.

### 2. Randazza should have disclosed his concurrent representation of PornGuardian against Oron.

Randazza claims he had no obligation to disclose his joint negotiations with Oron for a settlement on behalf of PornGuardian and Excelsior because information learned through PornGuardian allegedly assisted with identifying Oron as a prospective target of litigation. Even if true, this is irrelevant as to whether or not Randazza had a reportable conflict. Randazza's own expert made no reference to this being a factor as to whether or not Randazza had a reportable conflict. Randazza also claims as soon as he concluded there might be a conflict of interest, he discharged PornGuardian as a client. However, as set forth in Excelsior's Post-Arbitration Brief, Randazza did not actually resign from representation of PornGuardian until 5 days after Excelsior's settlement agreement with Oron was executed.

### 3. Randazza assisted Datatech for his own benefit and contrary to Excelsior's interests.

There is no dispute that Oron filed an arbitration proceeding against Excelsior seeking the return of the $550,000 settlement and additional damages, in large part, based upon its allegation that Excelsior assisted Datatech Enterprises, represented by Gill Sperlein, in filing suit against Oron in late August 2012. **Ex. 334 at page 8 (Oron's arbitration demand).** Mr. Gibson testified that the allegations regarding the assistance provided to Mr. Sperlein by Randazza, in addition to allegations by Oron that a hacker had been utilized and misrepresentations by Randazza in the motion underlying the Court's award of attorney's fees [15], motivated the company to re-settle the Oron matter and

---

[15] Randazza represented in the Motion for Attorney's fees filed in federal court in the Oron matter that Randazza Legal Group regularly billed Liberty for its services based on the attorney's standard hourly rates and confirmed at Arbitration that was not a true statement. Liberty had not been invoiced for Randazza Legal Group's work and there was an agreement that Liberty would only pay a reduced hourly rate (not to mention, Randazza was not paid an hourly rate, at all, but was a salaried employee. **Tr. 610:11-612:5.** Oron appealed the award of attorney's fees to the Ninth Circuit where Liberty's new counsel felt it was incumbent upon them to disclose the

32.

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702 862 8800

002524

1   ultimately agree to take only half ($275,000) of the settlement amount in the prior

2   agreement. **Tr. 765:17-769:12**.

3        Excelsior's expert, Dennis Kennedy, Esq., concluded Randazza's assistance to Mr.

4   Sperlein and Datatech was improper. **Ex. 304, paragraphs 32.10 and subparts.**

5   Randazza attempts to justify his breach of the Oron settlement agreement by arguing (1)

6   pursuit of Oron was at first a joint effort with Datatech; (2) that Mr. Gibson supposedly bent

7   on assuring the destruction of Oron insisted on assisting Sperlein even though he was

8   jeopardizing a $550,000 settlement; (3) that Oron's arbitration claimed Excelsior breached

9   the settlement agreement for reasons in addition to Randazza's assistance to Datatech;

10  and (4) Excelsior supposedly gave up half ($275,000) of the Oron settlement money solely

11  to interfere with Randazza's receipt of a bonus on that settlement.    None of these

12  allegations have merit.

13       Excelsior and Datatech did not jointly sue or pursue Oron and Randazza's allegation

14  that during August 2012, he complied with directive's from Mr. Gibson to potentially breach

15  the $550,000 settlement agreement reached with Oron are nonsense.  Randazza relies not

16  upon arbitration testimony, but upon deposition testimony to supposedly establish that

17  Datatech and Excelsior were jointly pursuing Oron.   However, even Randazza's own

18  deposition testimony does not support this assertion.  Randazza testified that Datatech

19  waffled on actually filing suit against Oron and Excelsior proceeded with litigation on its

20  own. **Randazza Depo. 284:16-285:4.**

21       Randazza's contention that during the latter half of August 2012 – when according to

22  Randazza Mr. Gibson's hostility toward him was peaking and Randazza thought he would

23  be terminated – that Randazza would not document a supposed directive from Mr. Gibson

24  to take action that potentially breached a $550,000 settlement is unbelievable.  Likewise, it

25  is not plausible that during this same timeframe Randazza warned that such assistance

26

27  misrepresentations in a submission to the Court.  The appeal of the award of attorney's fees
    remained pending at the time Liberty re-settled the Oron matter for $275,000, half of the prior
28  settlement amount. **Tr. 767:9-768:5.**

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169 5937
702.862.8800

002525

1  could breach the Oron agreement, but failed to document that advice.  Surely, if Randazza

2  had offered that advice, Mr. Gibson rejected it and advised Randazza to take action to

3  breach the Oron agreement, Randazza would have protected himself by documenting that

4  communication.  The only documented communications that took place regarding assisting

5  Mr. Sperlein are by text.  **Ex. 331 at EMC000474.**  On August 24, 2014, *Randazza asked*

6  *Mr. Gibson* about Mr. Sperlein using Excelsior's Hong Kong counsel, Mr. Gibson asked if

7  there was any downside, Randazza responded by indicating the only downside was the

8  microscopic possibility the settlement with Oron would be overturned in which case

9  Excelsior and Datatech would be pursuing the same money from Oron.  There was no

10  directive from Mr. Gibson to assist Datatech.  The only communications between Randazza

11  and Mr. Gibson related to Datatech were with regard to Randazza asking Mr. Gibson to

12  sign a conflict waiver so the Hong Kong counsel could assist Mr. Sperlein (which Randazza

13  probably would not have even had if it were not a requirement that clients sign conflict

14  waivers).  Randazza entirely acted on his own and in his own interests in assisting Mr.

15  Sperlein, including by providing Mr. Sperlein with his entire file on Oron and providing him

16  with information about all known bank accounts of Oron.  It makes sense that Randazza

17  would be looking to curry favor with peers and sources of new work given that by late

18  August 2012 Randazza was well into preparing for his departure from Excelsior.  In the

19  end, once again, Randazza's own communications prove the falsity of his claim that he

20  warned Mr. Gibson that helping Mr. Sperlein could breach the Oron settlement agreement

21  and Mr. Gibson still insisted he do so.  **Exhibit 371** is an email communication from

22  Randazza to Mr. Sperlein where on August 28, 2012 (one day before his resignation),

23  Randazza states that he just realized that assisting Datatech could violate the settlement

24  agreement.

25      Although it is true that Oron alleged various other breaches of the settlement

26  agreement, these were minor points that Randazza and Mr. Gibson had previously

27  communicated could easily be satisfied.  **Exhibit 73.**  The fact of the matter is that given

28  the existence of discoverable email communications documenting both Randazza's use of

34.

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

002526

1  a hacker to gather information about Oron and Randazza's assistance to Datatech,

2  Randazza had left Excelsior entirely vulnerable to the claims asserted by Oron.

3          Last, the notion that Excelsior voluntarily gave up $275,000 of the settlement amount

4  with Oron to interfere with Randazza's receipt of a bonus is unsupported and nonsensical.

5  Randazza attempts to utilize email communications regarding the re-settlement with Oron

6  to support this claim, specifically Exhibits 82, 84, and 85.  However, these communications

7  relate to nothing more than counsel for Excelsior and Oron attempting to navigate release

8  of half of the Oron settlement amount from Randazza's trust account.  Randazza had

9  alleged that he was entitled to retain the settlement as disputed funds by virtue of his own

10  claims and those being pursued by Oron.  Thus, in Exhibit 84, Oron's counsel confirmed in

11  writing it was laying no claim to those funds to negate Randazza's claim to hold them

12  based upon the claims being pursued by Oron in arbitration.

13          **4. Randazza improperly obtained and used a hacker contrary to**
               **Excelsior's interests.**
14

15          Randazza does not dispute that Oron included accusations that Excelsior utilized a

16  hacker in its arbitration demand.  **RB at 31:20-21.**  Gibson testified the allegations were

17  part of the motivation for relinquishing half of the $550,000 settlement with Oron.  **Tr.**

18  **766:21-767:4.**    Randazza's continued claim that he understood that the Oron materials

19  provided by Grady to be lawfully obtained is not credible.  Despite Randazza's contention

20  that Grady did not tell him the source of the information, Grady candidly told him, that he

21  "pay[s] a guy – call him a forensic investigator – to dig past Domains by Proxy and things

22  like that"[16] and that the investigator "didn't get the info at Walmart in the course of normal

23  commerce."  **Exhibit 396.**  There was no assurance by Grady that the material was

24

25  _____
     [16] Randazza's reliance on the website domainsbyproxy.com is misplaced.  Grady did not represent
26   that he obtained the materials from that website.  Rather, the import of Grady's email is that he
     informed Randazza the materials were coming from a paid investigator and not a jilted lover or any
27   other source that Randazza suggested to Grady would be more appropriate for him to claim as the
     source if he were called as a witness.  Grady's paid investigator provided email communications
28   from Oron email accounts, privileged communications between Oron and its counsel and
     confidential banking records.

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

35.

002527

obtained legally.  In fact, Randazza's email to Grady **(Ex. 399),** provided suggestions for Grady to use if asked about the source of the information including suggestions of a "jilted lover," when Randazza was aware a paid investigator was the source.  Dennis Kennedy, Esq., sets forth his conclusion that Randazza violated NRPC 4.4(a) and 8.4(a) with respect to such conduct.  **Ex. 304 at paragraph 32.11 and subparts.**  Randazza did not even have his expert offer an opinion with respect to NRPC 4.4(a) on direct testimony.  However, his expert confirmed on cross-examination that if Randazza believed the material was illegally obtained, Randazza violated NRPC 4.4(a).  **Tr.  1211:24-1212:2.**  A preponderance of the evidence establishes that Randazza understood the materials provided – anonymously at Randazza's request – were illegally obtained and substantially contributed to Excelsior's agreement to give up $275,000 of the Oron settlement.

## 5. Randazza acted improperly with respect to the $25,000 Promissory Note Agreement he entered with Excelsior.

Randazza attempts to recast the $25,000 loan he made to Excelsior for Hong Kong legal fees related to Oron as advancement of costs.  However, it was Randazza who chose to set up the arrangement as a loan and enter a Promissory Note, which he drafted.  Mr. Kennedy concluded his actions violate NRPC 1.8 because he failed to meet certain necessary requirements to enter a transaction with a client.  The Promissory Note Randazza drafted contained a one-sided provision allowing only him and not Excelsior to recover attorney's fees.  **Ex. 304 at paragraph 32.9.2.**  Even Randazza's own expert was troubled by this provision.  **Tr. 1140:12-17.**  The promissory note also provided that Randazza was entitled to payment within 7 days if his employment ended, regardless of whether or not Liberty had collected any money from Oron.  **Ex. 373.**  There is no dispute that Randazza failed to advise Excelsior to consult independent counsel prior to entering this transaction with him.  Both experts agreed if Randazza violated his professional responsibilities, the agreement is voidable at the Arbitrator's option.  Excelsior contends the Promissory Note should be voided given Randazza's violation of NRPC 1.8 and based upon the number and severity of ethical lapses by Randazza.

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

002528

### 6. The Nevada Bar's closure of Excelsior's grievance based upon pending litigation between the parties is irrelevant.

Randazza attempts to make much of the fact that the State Bar closed the grievance filed by Excelsior. No inferences regarding the merits of Excelsior's claims can be gleaned from the closure for several reasons.[17] First, the State Bar told Excelsior it was closing the grievance because it has, "no authority to take any action which could affect the outcome of any civil disputes or litigation" and invited Excelsior to submit any court findings that clearly establish professional misconduct. **Ex. 434.** The State Bar did not indicate it reached the merits of Excelsior's allegations and even if it had, a different standard of proof would have applied.[18] Moreover, most of the issues and evidence that are the subject of this Arbitration were unknown at the time of Excelsior's grievance filed with the State Bar. For example, although Excelsior raised the $75,000 Oron bribe it had none of the communications with Gurvits. The use of a hacker was not raised at all. The issue of Mr. Randazza assisting Datatech was not raised. The TNAFlix matter was not raised by Excelsior. The Megaupload matter was not raised. The issue of Randazza's representation of Bang Bros was raised, but Excelsior did not have the billing records or information about Fapzap to submit. The issue of Randazza's representation of XNXX was unknown and, therefore, not raised. The issue of Mr. Randazza's representation of some other conflict of interest clients like Xvideos and PornGuardian was raised, but Excelsior did not have retainer agreements and billing records to provide at the time. **See generally, Tr. 1168:11-1172:24.** Not only did the State Bar not have before it all the issues or even close to all the evidence

---

[17] At pages 18-19 of Randazza's Post-Arbitration Brief, Randazza alleges Excelsior fought production of details regarding its counterclaims in bad faith. There is no support for this assertion. Excelsior had to move to compel Randazza to produce information confirming representation of suspected conflict of interest clients and then compelled production of retainer agreements and billing records. Excelsior was ultimately only provided this information with respect to entities Excelsior could sufficiently articulate the basis for its conflict of interest allegation. The full scope of Randazza's client roster while General Counsel of Excelsior and likely additional conflicts of interest remains unknown.

[18] Even if it had, Randazza's expert testified that the State Bar uses a different standard (clear and convincing evidence) than applicable in this proceeding. **Tr. 1226:8-12.**

37.

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

002529

presented during this Arbitration, but it has been definitively proven that Randazza lied to the State Bars in his response to Excelsior's grievance in a manner that even his own expert conceded could be a false statement of material fact (e.g. Randazza's representation to the State Bar that he stopped representing Xvideos in 2009). The fact that Randazza's attempts to rely upon the State Bar's closure demonstrates the weakness of his defense.

## III.    CONCLUSION

Based upon the foregoing, Excelsior requests the Arbitrator:

- Find in favor of Excelsior on each of Randazza's causes of action.
- Find in favor of Excelsior on each of Excelsior's causes of action.
- Award Excelsior the relief requested in its Post-Arbitration brief.
- Consider making a finding that evidence of professional misconduct by Randazza clearly exists and/or referring the matter to the State Bar of Nevada.

Dated: April 22, 2015

Respectfully submitted,

WENDY MEDURA KRINCEK, ESQ.
ETHAN D. THOMAS, ESQ.
LITTLER MENDELSON, P.C.

Attorneys for Defendant
EXCELSIOR MEDIA CORPORATION

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169 5937
702 862 8800

38.

002530

**PROOF OF SERVICE**

I am a resident of the State of Nevada, over the age of eighteen years, and not a party to the within action. My business address is 3960 Howard Hughes Parkway, Suite 300, Las Vegas, Nevada 89169. On April 22, 2015, I served the within document(s):

**EXCELSIOR MEDIA CORPORATION'S POST-ARBITRATION REPLY BRIEF**

☒ By **E-Mail** – a true copy of the document(s) listed above e-mailed to the parties as set forth below.

Kenneth P. White, Esq.
Brown White & Newhouse, LLP
333 South Hope Street, 40th Floor
Los Angeles, CA 90071

(kwhite@brownwhitelaw.com)

Hon. Stephen E. Haberfeld (Ret.)
Reggie Joseph
707 Wilshire Blvd., 46th Floor
Los Angeles, CA 90017

(rjoseph@jamsadr.com)
(shaberfeld@jamsadr.com)

☒ By **Federal Express** - a true copy of the document(s) listed above sent via Federal Express to the person(s) at the  address(es) set forth below.

Hon. Stephen E. Haberfeld (Ret.)
8224 Blackburn Ave., Suite 100
Los Angeles, CA 90048

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 22, 2015, at Las Vegas, Nevada.

Robyn Craig

Firmwide:132777915.2 073131.1001

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

002531

# EXHIBIT 15

# EXHIBIT 15

002532

JAMS ARBITRATION No. 1260002283

**MARK J. RANDAZZA,**

      **Claimant,**

**vs.**

**EXCELSIOR MEDIA CORP., a Nevada Corporation;
LIBERTY MEDIA HOLDINGS, LLC, a California limited
-liability company and JASON GIBSON, individually,**

      **Respondents.**

---

### ORDER OF JULY 3, 2013

The Arbitrator denies Claimant's application for JAMS Employment Arbitration Rule 24(e) preliminary relief, without prejudice. That is principally because Claimant's application is based on the following assertion:

"Mr. Randazza is entitled to a [JAMS Arbitration Rule 24(e)] Preliminary Order because Excelsior, standing alone, does not have sufficient assets to compensate Mr. Randazza [if or] when he recovers at Arbitration." [March 29, 2013 letter application, at p. 2.]

Claimant's March 29, 2013 application, among other things, requested "an Order compelling Excelsior's sister entities, Liberty Media Holdings ('Liberty') and Becar Management, LLC ('Becar') and the companies' principal, Jason Gibson ('Gibson') (collectively the 'Affiliated Parties') to join this arbitration." [Id., at p. 1] Claimant asserted that an order "to secure his likely recovery is warranted" because, importantly, "Jason Gibson (....) (2) kept the intellectual property of the enterprise --- the valuable property --- in the separate entity Liberty to insulate it from any judgment against Excelsior." [Id. at p. 2, see also id. at pp. 4, 7]

On June 27, 2013, Liberty Media Holdings, LLC made an unconditional general appearance in this arbitration.

By so appearing, the Arbitrator has personal jurisdiction over Liberty and, for the reasons set forth below, Claimant shall be afforded the opportunity to amend his pleadings.

There has not been a showing that Liberty no longer has the valuable intellectual property alleged* or that either Excelsior or Liberty --- separately or together --- does/do not have sufficient assets to satisfy Claimant's financial claims --- assuming _arguendo_ that he would prevail the maximum value of his maximum claims and seek enforcement of a monetary arbitration award in his favor.

[*According to Claimant, the intellectual property consists of copyrights and trademarks, which Excelsior produced, sold and licensed are the only assets of value --- other than, to a lesser extent, expensive cars used by Excelsior's employees (which are owned by Becar Management, LLC). Randazza Decl., Pars. 11(a), 12, 23.]

1

002533

In light of the foregoing and based on the scant current record before the Arbitrator, it does not appear necessary to decide whether it is required, appropriate or permissible --- before a full evidentiary hearing --- to decide whether any person or entity is an "alter ego" of Excelsior or, now, of Liberty or that not determining "an alter ego relationship would be tantamount to limiting Mr. Randazza's potential recovery to near zero, even before this arbitration began." [Id. at p.7] If circumstances change, Claimant may re-seek preliminary relief, without prejudice to the denial of initially requested preliminary relief. If that occasion arises, the Arbitrator might revisit the preliminary determination set forth in the first sentence of this paragraph.

The Arbitrator is also not inclined to grant requested early preliminary relief, because a key element in the decisional process is whether or not Claimant has shown the probable validity of his breach-of-contract claim and/or is likely to prevail on at least one of his other claims to warrant freezing or tying up or even liening the asset of a party. The very undeveloped state of the record at this very early stage of the arbitral process militates against making important merits-related determinations at this time. The Arbitrator is also not inclined at this very early stage of the arbitration to dismiss Claimant's Claims One or Two** or to foreclose Claimant from attempting to show that Nevada and/or California law provide legal predicates for the claims which are the subject of the motion to dismiss.

[**The two claims are claims for reimbursement of expenses under California Labor Code sec. 2802 and for unpaid wages and vacation time under California Labor Code secs. 201-203.]

Subject to revisitation and/or reconsideration --- unless and until shown and persuaded otherwise --- the Arbitrator preliminarily believes that:

A) The applicability of California or Nevada wage-and-hour law is not extraterritorial generally --- including not generally following assumed former California employees forever and for all purposes --- but only in certain circumstances, if at all.

B) Whether those circumstances can be alleged and proven to have occurred here is not clear.

C) The "governing law" provision of the parties' employment contract for Claimant's services --- generally providing for the application of California substantive law --- does not govern which law applies to statutory wage-and-hour and other non-contractually-based claims in arbitration. See Narayan v. EGL, Inc., 616 F.3d 895, 899 (9th Cir. 2010) (benefit claims brought under the California Labor Code "do not arise out of the contract, involve the interpretation of any contract terms, or otherwise require there to be a contract.")

    The case law also appears to be that --- even assuming a wholesale incorporation of a particular state's substantive law via a contractual general "governing law" provision, absent a contractual showing of specific intent to the contrary, among other things, such an incorporation must also incorporate the State's presumption against extraterritoriality, if that is the presumption, and so it appears to be under California law.

D) Without resolving the issue at this early juncture, it appears that the strongest authority relied upon by Claimant -- Oracle*** --- only extends the benefits and protections of California wage-and-hour law to "California resident employees of California employers who leave the state temporarily" and that "California law might not apply to nonresident employees of out-of-state businesses who enter California temporarily..." Whether or to what extent the wage-and-hour laws of California, and possibly Nevada (which are not discussed in extenso in either side's papers) appears to be highly fact and circumstances specific and, additionally, involve considerations of the principles of interstate comity.

2

002534

[***Sullivan v. Oracle Corp., 51 Cal.4th 1191 (2011)]

E) The Arbitrator has a few questions, which the parties might consider for future purposes --- assuming, arguendo, that only California and/or Nevada wage-and-hour law arguably applies to what Claimant will contend in a later, particularized writing trigger(s) the benefits and protections of particular statutory wage-and-hour provisions:

   1) At what point --- in the facts and circumstances to be adduced at evidentiary hearing --- did California Labor Code cease to apply and, if different, at what point --- given the same facts and circumstances --- did Nevada wage-and-hour law begin to apply, and what is that law? Is there a material difference between CA and NV law applicable to Claims One & Two?

   2) What is the statutory and/or judicial "trigger" for the applicability of one state's wage-and-hour laws to Claimant's activities claimed to be protected under that state's wage-and-hour laws?

   3) What is the "nexus" between Claimant's actions in and outside of California and his employment by Excelsior --- which Claimant contends makes California and/or Nevada wage-and-hour law applicable to those actions?

F) What is clear at this very early stage is that now is not the time to deprive or deny Claimant the opportunity to amend or to otherwise provide Respondent with written particulars as to applicable law and facts which make that law applicable. In arbitration, motions to dismiss --- while not prohibited --- are not specifically provided for, either. Generally, deciding on a motion to dismiss "on the pleadings" in an arbitration is not usual or appropriate, because pleadings do not have the same importance as in certain jurisdictions or courts.  The JAMS Employment Rules, however, do have Rule 18, to which the parties are respectfully referred.

   While Respondent has asserted that "Nevada law does not have analogous wage and hour [or other] laws under which [Claimant] could bring his claims," and has given some NRS sec. 608 examples [ Reply, at p.10], Claimant will not be foreclosed at this point from showing otherwise.****

[****Claimant has asked for the opportunity "to cure any perceived deficiencies... [including] pleading additional facts regarding Mr. Randazza's work in California and for Liberty, or bringing [the same] or similar causes of action under Nevada law."  Randazza Opp., at pp. 2, 7]

In light of the foregoing and the unconditional general appearance of Liberty Media Holdings, LLC in this arbitration, the Arbitrator hereby grants leave to Claimant to replead --- if he wishes --- and leaves it to another occasion (Rule 18) for both sides, among other things, to submit applicable statutory and case law to show which statutory wage-and-hour/labor provisions --- if any --- are applicable to what conduct on which date(s).

Dated: July 3, 2013

_____
STEPHEN E. HABERFELD
       Arbitrator

3

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Randazza, Marc J. vs. Excelsior Media Corp., Liberty Media Holdings LLC, Jason Gibson
Reference No. 1260002283

    I, Lulu Santos, not a party to the within action, hereby declare that on  July 03, 2013 I served the

attached ORDER OF JULY 3, 2013 on the parties in the within action by Email and by depositing true copies

thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at Los

Angeles, CALIFORNIA, addressed as follows:

Wendy M. Krincek Esq.
Kristina E. Gilmore Esq.
Littler Mendelson
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV   89109
Phone: 702-862-8800
wkrincek@littler.com
KGilmore@littler.com
   Parties Represented:
   Excelsior Media Corp.
   Jason Gibson
   Liberty Media Holdings

Kenneth P. White Esq.
Nannina L. Angioni Esq.
Henry L. Whitehead Esq.
Brown, White & Newhouse,  LLP
333 South Hope St.
40th Floor
Los Angeles, CA   90071-1406
Phone: 213-613-0500
kwhite@brownwhitelaw.com
nangioni@brownwhitelaw.com
hwhitehead@brownwhitelaw.com
   Parties Represented:
   Marc J. Randazza

Mishell Taylor Esq.
Littler Mendelson
501 W. Broadway
Suite 900
San Diego, CA   92101-3577
Phone: 619-232-0441
mtaylor@littler.com
   Parties Represented:
   Excelsior Media Corp.

    I declare under penalty of perjury the foregoing to be true and correct. Executed at Los Angeles,

CALIFORNIA on  July 03, 2013.

_____
Lulu Santos
lsantos@jamsadr.com

002536

# EXHIBIT 16

# EXHIBIT 16

002537

1    WENDY MEDURA KRINCEK, ESQ., Bar # 6417
     ETHAN D. THOMAS, ESQ., Bar #12874
2    LITTLER MENDELSON, P.C.
     3960 Howard Hughes Parkway
3    Suite 300
     Las Vegas, NV 89169-5937
4    Telephone:    702.862.8800
     Fax No.:      702.862.8811
5
     Attorneys for Respondent
6    EXCELSIOR MEDIA CORPORATION

7

8      **ARBITRATION BEFORE JUDICIAL ARBITRATION AND MEDIATION SERVICE**

9

10    MARC J. RANDAZZA,

11             Complainant,      **RESPONDENT'S EXPERT WITNESS**
                                       **DISCLOSURE PURSUANT TO FED. R.**
12    vs.                                      **CIV. P. 26(A)(2)**

13    EXCELSIOR MEDIA CORPORATION,

14             Respondent.

15

16        Pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure, Respondent EXCELSIOR

17    MEDIA CORPORATION ("Respondent" or "Excelsior") hereby discloses and designates the

18    following expert witness it expects to present at the arbitration of this matter:

19           1.      Dennis L. Kennedy
20                    Bailey Kennedy
                     8984 Spanish Ridge Avenue
21                    Las Vegas, NV 89148-1302
                     (702) 851.0047

22    . . .

23    . . .

24    . . .

25

26

27

28

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702 862 8800

1    The additional information that is required to be disclosed by FRCP 26(a)(2)(B) is attached

2    hereto as Exhibit A, and incorporated by reference as though fully set forth herein.

3    Dated: May 16, 2014

4                                  Respectfully submitted,

5

6

7                                  WENDY MEDURA KRINCEK, ESQ.
                                   ETHAN D. THOMAS, ESQ.
8                                  LITTLER MENDELSON, P.C.

9                                  Attorneys for Respondent
                                   EXCELSIOR MEDIA CORPORATION

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

2.

002539

**PROOF OF SERVICE**

I am a resident of the State of Nevada, over the age of eighteen years, and not a party to the within action. My business address is 3960 Howard Hughes Parkway, Suite 300, Las Vegas, Nevada 89169.  On May 16, 2014, I served the within document(s):

**RESPONDENT'S EXPERT WITNESS DISCLOSURES PURSUANT TO FED. R. CIV. P. 26(A)(2)**

☒   By **E-Mail** – a true copy of the document(s) listed above e-mailed to the parties as set forth below.

Kenneth P. White
Brown White & Newhouse, LLP
333 South Hope Street, 40th Floor
Los Angeles, CA 90071

(kwhite@brownwhitelaw.com)

Hon. Stephen E. Haberfeld (Ret.)
Reggie Joseph
707 Wilshire Blvd., 46th Floor
Los Angeles, CA 90017

(rjoseph@jamsadr.com)
(shaberfeld@jamsadr.com)

I am readily familiar with the firm's practice of collection and processing correspondence for mailing and for shipping via overnight delivery service.  Under that practice it would be deposited with the U.S. Postal Service or if an overnight delivery service shipment, deposited in an overnight delivery service pick-up box or office on the same day with postage or fees thereon fully prepaid in the ordinary course of business.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 16, 2014, at Las Vegas, Nevada.

Erin J. Melwak

Firmwide:127041915.1 073131.1001

LITTLER MENDELSON, P.C
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169 5937
702 862 8800

3.

002540

# EXHIBIT A

# EXHIBIT A

## AFFIDAVIT OF DENNIS L. KENNEDY

STATE OF NEVADA     )
                          ) ss:
COUNTY OF CLARK    )

Comes now, DENNIS L. KENNEDY, who being first duly sworn, deposes and says:

1.      I am a resident of Henderson, Nevada.

2.      I am an attorney and have been licensed to practice law in the State of Nevada since 1975. Between 1975 and 2006 I was a member of the firm of Lionel Sawyer & Collins, and was a shareholder and director of that firm from 1979 until January 6, 2006. Since January 9, 2006, I have been a partner in the firm of Bailey❖Kennedy (formerly known as Bailey❖ Merrill). My primary area of practice during these 39 years has been civil litigation. Since 1988 I have devoted a substantial amount of my time (both professional and personal) to the area of professional responsibility and legal ethics. My activities in this area include, without limitation:

2.1    Service on the State Bar Disciplinary Committee (Southern) for nine years, three years as Chairman;

2.2    Service on the State Bar Ethics and Professional Responsibility Committee for eight years, three years as Chairman;

2.3    Service on various Nevada Supreme Court Committees charged with adoption, review and revision of ethics and disciplinary rules;

2.4    Representation of attorneys and judges charged with ethical and disciplinary offenses;

2.5    Defense of the Nevada State Bar and the Nevada Commission on Judicial Discipline in litigation;

2.6    Giving expert testimony and advice on professional ethics;

002542

2.7     Conducting continuing legal education on matters of professional ethics; and

2.8     Occupying the position of adjunct professor of law at the William S. Boyd School of Law (UNLV), where I taught Nevada Civil Practice, a course whose components are Civil Procedure, Evidence, and Professional Ethics. All of this is set forth in my curriculum vitae, which is attached as Exhibit 1. I am charging $1,000.00 per hour for my work on this matter. This is my usual rate for matters of this type.

3.     I have been retained by Excelsior Media Corporation ("Excelsior"), which produces adult entertainment videos, and Liberty Media Holdings, LLC ("Liberty"), which owns the copyrights to the works produced by Excelsior, to render an opinion pertaining to the counterclaims for breach of fiduciary duty, conversion, tortious breach of the duty of good faith and fair dealing, legal malpractice, and breach of contract brought by Excelsior and Liberty against Marc J. Randazza, Esq. ("Mr. Randazza") in *Marc J. Randazza v. Excelsior Media Corporation*, pending before the Honorable Stephen E. Haberfeld (Ret.) in binding arbitration conducted through Judicial Arbitration and Mediation Service, Reference No. 1260002283 (the "Case").[1]

4.     The list of documents and materials that I (along with two of my associates) reviewed in preparing this Affidavit, and which I have considered in reaching my opinions expressed herein, is attached as Exhibit 2.

5.     I have personal knowledge of the facts recited herein derived from a review of the documents and materials described in Exhibit 2, as well as information identified as having been provided to me or members of my firm by Littler Mendelson, P.C. ("Littler"), counsel for

---

[1]     The counterclaims were initially filed by Excelsior against Mr. Randazza. Liberty subsequently appeared in the Case and joined in the Counterclaims.

002543

Excelsior and Liberty in the Case, and am competent to testify as to all opinions expressed herein. The opinions expressed herein are solely my own, and may be modified in the event that other evidence or documents are presented to me. I was assisted in the preparation of this Affidavit by Joshua P. Gilmore, an associate with my firm.

<u>SUMMARY OF OPINIONS</u>

6.    For the reasons stated herein, and based on the totality of the facts and circumstances presented to me, it is my opinion that during the course of and following his employment as in-house general counsel for Excelsior and litigation counsel for Liberty, Mr. Randazza: (i) was disloyal to them; (ii) failed to communicate with them concerning improper side-deals, including potential indirect restrictions on his right to practice law, that he was negotiating for himself during settlement talks with opposing counsel; (iii) ignored conflicts of interest; (iv) elevated his personal interests above those of Excelsior and Liberty; (v) abused their trust and confidence; (vi) misappropriated their property; and (vii) took actions that were contrary to their best interests;[2] specifically:

6.1.    Mr. Randazza violated California Rule of Professional Conduct ("California RPC") 1-500(A) (agreements restricting a member's practice), 3-310(B)(4) (avoiding the representation of adverse interests), 3-500 (communication) and 3-510 (communication of settlement offer) by initially negotiating a payment for himself, and then negotiating to be retained by the opposing party with his fees to be paid by the opposing party through an initial, non-refundable retainer deemed to be earned by Mr. Randazza upon receipt— without Liberty's knowledge or consent—during the course of settlement negotiations with

---

[2]    A portion of the acts discussed herein were committed by Mr. Randazza while working for Excelsior and Liberty in California (where he was admitted to practice law in May 2010). He was required to comply with the California Rules of Professional Conduct during that time. The other acts discussed herein were committed by Mr. Randazza while working for Excelsior and Liberty in Nevada (where he was admitted to practice law in January 2012). He was required to comply with the Nevada Rules of Professional Conduct during that time.

002544

counsel for the opposing party in a lawsuit that Mr. Randazza filed on behalf of Liberty against

that opposing party—Youngtek Solutions Ltd. d/b/a TNAFlix.com ("TNA");

   6.2. Mr. Randazza violated California RPC 3-310(B)(4) (avoiding the

representation of adverse interests) and 3-500 (communication) by negotiating with opposing

counsel to broker a potential sale of the opposing party (TNA) to one of Mr. Randazza's other

clients, which would have earned him a six-figure broker's fee—without the knowledge or

consent of his client (Liberty)—during the course of settlement negotiations with counsel for

TNA in the lawsuit that Mr. Randazza filed for Liberty against TNA;

   6.3. Mr. Randazza violated Nevada Rule of Professional Conduct ("Nevada

RPC") 1.4 (communication), 1.7(a)(2) (conflict of interest: current client), and 5.6(b)

(restrictions on right to practice) by initially negotiating a payment for himself, and then

negotiating to be retained by the opposing party with his fees to be paid by the opposing party

through an initial, non-refundable retainer deemed to be earned by Mr. Randazza upon receipt—

without Liberty's knowledge or consent— during the course of settlement negotiations with

counsel for the opposing party in a lawsuit that Mr. Randazza filed on behalf of Liberty against

that opposing party—FF Magnat Limited d/b/a Oron.com ("Oron");

   6.4. Mr. Randazza violated Nevada RPC 1.7(a)(2) (conflict of interest: current

client) and 1.8(a) (conflict of interest: current client: specific rules) by loaning money to Liberty

and then advising Liberty to sign a promissory note regarding the terms of repayment of the loan,

which note contained terms that were favorable to Mr. Randazza, without advising Liberty of its

right to seek the advice of independent counsel relating to the transaction and without obtaining

Liberty's informed consent, confirmed in writing, to the essential terms of the transaction and to

Mr. Randazza's role as a lender in the transaction;

002545

6.5.    Mr. Randazza violated Nevada RPC 1.2(a) (scope of representation and allocation of authority between client and lawyer) and 1.4 (communication) by assisting other attorneys in the pursuit of litigation against Oron in direct violation of the settlement agreement between Liberty and Oron—without Liberty's knowledge or consent;

6.6.    Mr. Randazza violated Nevada RPC 4.4(a) (respect for rights of third persons) and 8.4(a) (misconduct) by knowingly using information related to Oron, including privileged communications, that was obtained by a "forensic investigator" in violation of Oron's legal rights—without Liberty's knowledge or consent;

6.7.    Mr. Randazza allowed numerous conflicts of interest to arise while representing Excelsior and Liberty in violation of either California RPC 3-310(C)(2) or Nevada RPC 1.7(a)(2) without obtaining informed written consent from Excelsior and Liberty, including:

6.7.1.    Representing Bang Bros (personally and through another member of his law firm), a direct competitor of Excelsior and Liberty, while recommending that Excelsior borrow money from Bang Bros to finance the purchase of another adult content producer;

6.7.2.    Representing XVideos (personally and through another member of his law firm), a "tube site" that permits users to upload copyrighted videos, including those owned by Liberty, onto its website for widespread public dissemination and viewing, while advising Liberty not to pursue a lawsuit against XVideos for copyright infringement;

6.7.3.    Representing Porn Guardian, a company that monitors online illegal distribution of copyrighted works on behalf of adult content producers, including Liberty, while hiring Porn Guardian to act as Liberty's DMCA[3] agent to monitor unlawful uploads of its

---

[3]    "DMCA" refers to the Digital Millennium Copyright Act.

002546

copyrighted works and while negotiating a settlement on behalf of Porn Guardian with counsel

for Oron in the lawsuit that Mr. Randazza filed on behalf of Liberty against Oron; and

6.7.4.   Representing Titan Media and Kink.com (companies that produce, market, and/or distribute adult entertainment videos) while negotiating the terms of producer agreements on behalf of Liberty with Titan Media and Kink.com;

6.8.    Mr. Randazza violated California RPC 1-500(A) (agreements restricting a member's practice), 3-310(B)(4) (avoiding the representation of adverse interests), 3-500 (communication) and 3-510 (communication of settlement offer) by offering, during settlement negotiations, to represent the opposing party immediately after settlement—without the knowledge or consent of his client (Liberty).  This offer was made to opposing counsel in a dispute that Mr. Randazza initiated for Liberty against Megaupload Ltd. ("Megaupload");

6.9.    Mr. Randazza acted outside the scope of his authority by making statements to parties adverse to Liberty—to Liberty's detriment—without Liberty's consent;

6.10.   Mr. Randazza violated Nevada RPC 1.16 (terminating representation) by retaining, rather than returning, his company-issued iPhone at the conclusion of his relationship with Excelsior;

6.11.   Mr. Randazza violated California RPC 3-100 (confidential information of a client) by voluntarily disclosing confidential information, which he learned while representing Liberty, to a third party (XVideos) without Liberty's consent;

6.12.   Mr. Randazza violated Nevada RPC 1.9(a) (duties to former clients) by assisting a former employee of Excelsior in pursuing a harassment claim against Excelsior for acts that occurred while Mr. Randazza was employed by Excelsior and overseeing employment issues for Excelsior; and

002547

6.13.    Mr. Randazza violated Nevada RPC 4.2 (communication with person represented by counsel) and 4.4(a) (respect for rights of third persons) by communicating with and obtaining inside information from a managing-speaking agent of Liberty—without Liberty's knowledge or consent.

7.    The volume of breaches of duty committed by Mr. Randazza over an extended period of time and his repeated failures to meet the standard of care is sufficient, in my opinion, to justify an order from the arbitrator that Mr. Randazza forfeit and/or disgorge part of his salary, bonuses, and fees earned (or which he claims to have earned) while representing Excelsior and Liberty, including, without limitation, those amounts that he earned (or claims to have earned) while representing Liberty in disputes against TNA, Megaupload, and Oron.

## OPINIONS AND ANALYSIS

8.    The following are my detailed opinions and analyses of the ethical and professional negligence issues presented in the Case.

### SPECIFIC ALLEGATIONS AGAINST MR. RANDAZZA

9.    Excelsior and Liberty allege in the Case that Mr. Randazza: (i) failed to disclose numerous conflicts of interest while employed by Excelsior and representing Liberty; (ii) made decisions that were not in their best interests; (iii) failed to return company property; and (iv) failed to comply with his ethical obligations.[4]

---

[4]    Excelsior and Liberty have filed grievances against Mr. Randazza with the State Bars of Arizona, California, Florida, and Nevada, which address in detail the allegations set forth herein (and others). No disciplinary proceedings have been commenced against Mr. Randazza, mainly because he is involved in litigation with Excelsior and Liberty and the disciplinary authorities have declined to take any action against Mr. Randazza that could affect the outcome of the litigation. Most of the issues in the grievances overlap with the allegations in the Case, give rise to the claims asserted by Excelsior and Liberty against Mr. Randazza, and operate as a defense to Mr. Randazza's claims; however, a few of the issues, while possibly giving rise to future disciplinary action against Mr. Randazza, do not constitute civil claims against him (though they may impact the type of relief awarded by the arbitrator based on a pattern of unethical behavior). The fact that certain allegations addressed in the grievances are not addressed herein should not be construed to mean that those allegations are not meritorious.

002548

10.    For purposes of this opinion, I will group and analyze the ethical and professional negligence issues arising out of the Case in four parts: (i) the TNA Issues; (ii) the Oron Issues; (iii) the Other Conflicts Issues; and (iv) the Miscellaneous Issues (each as defined herein).[5] I will then address a remedy that I believe to be appropriate for Excelsior and Liberty in the Case; namely, forfeiture and/or disgorgement of most of Mr. Randazza's fees, salary, and bonuses that he earned (or claims to have earned) while representing Excelsior and Liberty which, as set forth below, does not require proof of actual damages.[6]

11.    Before analyzing each set of issues and the forfeiture and/or disgorgement remedy, I will first set forth the basic rules and principles governing legal malpractice claims and the use of expert testimony to address whether an attorney has either met the applicable standard of care or breached a duty in representing a client.[7]

<u>APPLICABLE LEGAL PRINCIPLES</u>

12.    The basic principles governing legal malpractice claims are found in *Day v. Zubel*, 112 Nev. 972, 922 P.2d 536 (1996). They are as follows:

12.1.    The existence of an attorney-client relationship;

12.2.    The attorney's duty to use such skill, prudence and diligence as lawyers of ordinary skill and capacity possess in exercising and performing tasks that they undertake;

12.3.    Breach of that duty by the attorney;

---

[5]    The issues are organized for convenience of analysis.

[6]    Although not addressed in this Affidavit, Excelsior and Liberty may—if proven—also be entitled to recover compensatory and punitive damages from Mr. Randazza resulting from his breaches of fiduciary duty and the standard of care. I am not rendering an opinion concerning those damages.

[7]    The counterclaims for breach of fiduciary duty (arising out of an attorney-client relationship), tortious breach of the duty of good faith and fair dealing, legal malpractice, and breach of the employment agreement (which required Mr. Randazza to "adhere to the professional ethical standards imposed upon attorneys by state bar associations and under the common law") are all claims for legal malpractice (though they may give rise to different forms of relief), and therefore, are collectively analyzed as such. *See, e.g., Oasis W. Realty, LLC v. Goodman*, 250 P.3d 1115, 1120-21 (Cal. 2011); *Stalk v. Mushkin*, 125 Nev. 21, 28-29, 199 P.3d 838, 842-43 (2009).

002549

12.4.   Proximate causation of the client's damages by the attorney's breach; and

12.5.   Actual loss or damage to the client as a result of the attorney's negligence.

*Id.* at 976, 922 P.2d at 538.[8]

13.   The standard of care below which an attorney's conduct should not fall is generally established through expert testimony. *See, e.g., Flatt v. Super. Ct.*, 885 P.2d 950, 963 (Cal. 1994); *Mainor v. Nault*, 120 Nev. 750, 767-69, 101 P.3d 308, 320-21 (2004). An expert is someone who is qualified by virtue of special knowledge, skill, experience, training or education to express an opinion on matters within the scope of such knowledge. *See* Cal. Evid. Code § 720(a); NRS 50.275. The Nevada Rules of Professional Conduct are evidence of the standard of care to which Nevada-licensed attorneys are held. *See* Nevada R.P.C. 1.0A(d); *Mainor*, 120 Nev. at 768-69, 101 P.3d at 320-21. The California Rules of Professional Conduct are evidence of the standard of care to which California-licensed attorneys are held. *See, e.g., City & Cty. of San Francisco v. Cobra Solutions, Inc.*, 135 P.3d 20, 25 (Cal. 2006); *Mirabito v. Liccardo*, 5 Cal. Rptr. 2d 571, 573 (Ct. App. 1992).

## TNA ISSUES

14.   The first issues that I address concern whether Mr. Randazza violated the California Rules of Professional Conduct while representing Liberty in a lawsuit that he brought for Liberty against TNA (the "TNA Issues").

## Background

15.   The following events are pertinent to the TNA Issues and, except as otherwise provided herein, do not appear to be subject to reasonable dispute. Therefore, they are assumed true for purposes of this opinion.

---

[8]       California law is the same. *See, e.g., Hall v. Kalfayan*, 118 Cal. Rptr. 3d 628, 632-33 (Ct. App. 2010).

002550

15.1.   Mr. Randazza, through his law firm, Randazza Legal Group ("RLG"), represented Liberty in a lawsuit that he filed in the United States District Court for the Southern District of California against TNA (Case No. 10-CV-1972-JHA-POR) alleging that TNA (a file-sharing website) infringed Liberty's copyrighted works (the "TNA Matter"). Valentin Gurvits, Esq. ("Mr. Gurvits") of the Boston Law Group, LLP ("Boston Law") represented TNA.

15.2.   In December 2010 and January 2011, Messrs. Randazza and Gurvits negotiated a settlement of the TNA Matter. During the course of those negotiations, Mr. Gurvits raised a concern about his client (TNA) being sued by other copyright owners in the future—after settling with Liberty—based on the same or similar allegations made by Liberty against TNA in the TNA Matter. In an email dated December 7, 2010, Mr. Randazza advised Mr. Gurvits that he "could largely prevent other plaintiffs from entering the fray."

15.3.   According to Mr. Randazza, Mr. Gurvits wanted to pay Mr. Randazza a "fee" of five thousand dollars ($5,000.00) in order to conflict Mr. Randazza out of future cases against TNA. In an email dated December 22, 2010, Mr. Randazza responded to Mr. Gurvits' offer as follows:

> As far as conflicting me out of future cases, that will require significantly more than $5,000. In fact, I have someone waiting in the wings with a $50k retainer right now.
>
> Naturally, I'm in a strange ethical bind, as your offer to conflict me out of future cases against your client is something that would benefit my current client. Accordingly, I would be willing to be conflicted out of cases against TNA, but that $5k figure has to come up. Either that, or you can give [Liberty] what they asked for, and I'll conflict myself out for a token payment.
>
> Finally, with respect to conflicting me out, TNA would have to agree that they would waive any such conflict for future disputes with Corbin Fisher,[9] but Corbin Fisher only.

---

[9]   . It is my understanding that Corbin Fisher is the brand associated with the works owned by Liberty and produced by Excelsior.

002551

15.4.    Messrs. Randazza and Gurvits continued to discuss the prospect of conflicting Mr. Randazza out of future cases against TNA during the course of negotiating a settlement of the TNA Matter.  For example, on January 11, 2011, Mr. Randazza wrote in an email to Mr. Gurvits:

> Keeping me out of the TNA game is a little more complicated.
>
> If your client wants to keep me personally out of the TNA game, then I think that there needs to be a little gravy for me.  And it has to be more than the $5k you were talking about before.  I'm looking at the cost of at least a new Carrera in retainer deposits after circulating around the adult entertainment expo this week.  I'm gonna [sic] want at least used BMW money.
>
> In order to conflict me out of future matters, I suggest this:
>
> Your firm retains me as "of counsel" to you.  I get $5k per month (for six months) paid to me, from you (TNA will reimburse you, I presume).  I will render advice on TNA and TNA only, and I'll be Chinese walled from your other clients so that other conflicts are not created.
>
> *        *        *        *
>
> That way, I'm adequately compensated for my loss of major potential work, and I'm conflicted out of acting adversely to TNA.

15.5.    On January 12, 2011, Mr. Randazza purportedly discovered that he was ethically prohibited from discussing limitations on his right to practice law during the course of settlement negotiations on behalf of a client, and sent an email to Mr. Gurvits saying that he could no longer discuss it; to wit: "But I'm certain now that such an arrangement is unethical, in the terms we've been discussing it."  Nevertheless, Mr. Randazza recommended finding "some other way of addressing [TNA's] interests," and stated as follows:

002552

> Like I said before, if TNA wants to hire me *after* settlement, on
> terms that we discuss *after* settlement, then my phone line will
> be open. However, it seems that if we place any part of a "buyoff"
> as a condition of settlement, then all four of us could wind up in
> bar trouble. I'm certainly not risking it.

15.6.    On February 1, 2011, Liberty signed a Settlement Agreement and General

Release of Claims, dated as of February 1, 2011 (the "TNA Settlement Agreement"). In brief,

Liberty agreed to dismiss its claims against TNA without prejudice in exchange for payment of

fifty thousand dollars ($50,000.00). The next day (February 2, 2011)—before Mr. Randazza had

received the signature of Mr. Gurvits' client[10] on the TNA Settlement Agreement and the same

day that Mr. Randazza received the settlement payment from TNA[11]—Mr. Randazza sent an

email to Mr. Gurvits asking if TNA wanted "a retainer letter from [him]."

15.7.    On February 11, 2011, Mr. Randazza emailed Mr. Gurvits a draft retainer

letter for TNA to sign, which required a thirty-six thousand dollar ($36,000.00) retainer to be

paid at the outset of the representation and deemed to be earned upon receipt. TNA did not,

however, sign the retainer letter, as evident from an email that Mr. Randazza wrote to Mr.

Gurvits in late June 2011; to wit, "You will recall that I am not conflicted out of representing

another client against [TNA]."

15.8.    According to Liberty, Mr. Randazza did not disclose the fact that he was

discussing the prospect of either receiving a payment directly from TNA as part of settling the

TNA Matter or, alternatively, being retained by TNA immediately after settlement in order to

conflict him out of future cases against TNA.

---

[10]    Mr. Gurvits forwarded a signature from his client to Mr. Randazza on February 3, 2011.

[11]    Pursuant to the RLG Trust Report, which was produced in discovery by Excelsior and Liberty, Mr.
Randazza received the settlement payment from TNA on February 2, 2011.

002553

<u>Additional Material Facts Concerning the TNA Matter</u>

16.     The following events are pertinent to the TNA Issues and, except as otherwise

provided herein, do not appear to be subject to reasonable dispute.  Therefore, they are assumed

true for purposes of this opinion.

16.1.    On December 30, 2010, Mr. Randazza emailed Mr. Gurvits to inform him

that another client of his was interested in acquiring TNA.  Mr. Randazza further stated:

> This puts me in a weird position, I think.  But, I believe that if
> TNA is interested in such discussions, that I can orchestrate an
> ethical way for us to manage that.  May as well ask them if they
> would have any interest.  If so, you and I can figure out how to
> ethically work on such a transaction.  I'd imagine that you
> personally could earn a shitload more money for a broker fee than
> you'd be earning litigating this case (and me as well).

16.2.    In another email sent by Mr. Randazza to Mr. Gurvits on December 30,

2010, he hypothesized about how to avoid the obvious conflict:

> Here's how I think we could do it – and I think that I have more
> ethical pitfalls than you.  I'd have to reveal to Liberty that this was
> going on, and I think that a settlement with [Liberty] would have to
> be part of the deal.  But, I think that we could do it so that the
> settlement would be paid only after the sale – so that there was no
> suspicion on [TNA]'s part that this was any sleight of hand on my
> part to just get Liberty a settlement.

16.3.    On January 11, 2011, Messrs. Randazza and Gurvits continued to discuss

the potential acquisition of TNA.  Mr. Randazza suggested that each of them split a fifteen

percent (15%) broker's fee for "put[ting] the deal together."  He further stated:

> And, to make the deal go smoothly – we are going to need to kill
> off the case.  If we put together a $2mil to $5mil deal, or even a
> $1mil deal, the money we are talking is on the toilet seat, and we
> shouldn't let that queer the deal . . . .

002554

16.4.    In response, Mr. Gurvits wrote that he did not want to "muddy the waters with the possible sale," and that, "[i]f the case can be settled, we should settle it without reference to the sale."

16.5.    On January 20, 2011, Mr. Gurvits wrote an email to Mr. Randazza in which he stated that he was "concerned about ethical issues that arise if these two things are connected," and asked to finish the case "one way or another, and then move on to the sale." Mr. Randazza agreed; however, he also wrote in a response email to Mr. Gurvits as follows: "But I wouldn't be so cavalier about saying '$50k, take it or leave it' with that plane flying around."

16.6.    On February 2, 2011 which, as stated above, was before Mr. Randazza had received the signature of Mr. Gurvits' client on the TNA Settlement Agreement and the same day that Mr. Randazza received the settlement payment from TNA, Mr. Randazza asked Mr. Gurvits about preparing a broker agreement related to the sale.

16.7.    By February 14, 2011, Mr. Randazza was getting anxious about brokering the sale of TNA,[12] and emailed Mr. Gurvits as follows:

> Tell them this: That Liberty settled this thing super cheap, and that I honestly think this was a $750k case if we went all the way.  But, we do what our clients tell us to do.
>
> The next company lining up has a big litigation plan, and I can assure you, they won't settle cheap.
> I am close friends with them – but did not encourage them to get in this thing.  They sent me a draft complaint today, and they have only held off on filing it because I begged them to wait.
>
> If TNA can't shit or get off the pot, I can't hold these guys back any longer.

---

[12]    On February 13, 2011, Mr. Randazza wrote an email to Mr. Gurvits claiming that the sale "is going to fall apart" if TNA did not "make a move."

002555

I'm not holding them back out of Christian charity. I'm holding them back because I can probably broker a deal where they get a little something out of the sale, and save the sale.

But, if we don't have our broker agreement in place, I can't blow my wad holding this suit back. And this suit will make them worht [sic] about 10% of what they are worth now.

I realize they are probably not the best communicators – I have similar clients. But, if you've got a way to shake them up, please do so . . . you and me stand to lose a fat commission.

16.8.    On February 15, 2011, Mr. Randazza emailed Mr. Gurvits a draft broker agreement (which Mr. Randazza had already signed). However, later that same morning, Mr. Randazza wrote another email to Mr. Gurvits advising that they were "screwed" because his other client was filing its lawsuit against TNA the next day.[13]

<u>Mr. Randazza Breached His Fiduciary Duty and Failed to Meet the</u>

<u>Standard of Care While Settling the TNA Matter</u>

17.    The TNA Issues presented in the Case are as follows:[14]

17.1.    Whether Mr. Randazza failed to communicate with Liberty about the side-deals that he was negotiating with Mr. Gurvits while attempting to settle the TNA Matter;

17.2.    Whether Mr. Randazza had a personal conflict of interest in settling the TNA Matter while simultaneously negotiating either a bribe from or to be retained by TNA concurrent with or immediately after settlement;

17.3.    Whether Mr. Randazza improperly attempted to restrict his right to practice law while attempting to settle the TNA Matter; and

---

[13]    *See Fraserside IP, LLC v. Youngtek Solutions, Ltd.*, No. C11-3005-MWB (N.D. Iowa).

[14]    For purposes of the TNA Issues, because the matter was handled in California, I focus on the California Rules of Professional Conduct and secondary authority with regard to the applicable standard of care and duties owed by Mr. Randazza to Liberty.

002556

17.4.    Whether Mr. Randazza had a personal conflict of interest in settling the TNA Matter while simultaneously discussing a potential sale of TNA to a third party, which would have yielded a sizeable broker's fee for Mr. Randazza.

18.    The basic rules and principles governing the duty to communicate with a client are as follows.

18.1.    California RPC 3-500 provides that a lawyer "shall keep a client reasonably informed about significant developments relating to the employment or representation."

18.2.    "The guiding principle is that the lawyer should fulfill reasonable client expectations for information consistent with the duty to act in the client's best interests[.]" MODEL RULES OF PROF'L CONDUCT R. 1.4 cmt. [5].[15]

18.3.    A lawyer's duty to provide competent representation includes communicating information to his client. *See* American Bar Association, Standing Committee on Ethics & Professional Responsibility, Formal Op. No. 08-450 (2008).  A lawyer should furnish his client with such information to enable his client "to participate intelligently in decisions concerning the objectives of the representation[.]" MODEL RULES OF PROF'L CONDUCT R. 1.4 cmt. [5].

---

[15]    ABA Model Rule of Professional Conduct ("Model Rule") 1.4(a)(3) similarly provides that a lawyer shall keep a client "reasonably informed about the status of the matter."

California is the only state that has not adopted or adapted the Model Rules.  However, on July 24, 2010 and September 22, 2010, the Board of Governors of the State Bar of California adopted proposed new rules of professional conduct, which, in large part, mirror the Model Rules, and voted to repeal the current California Rules of Professional Conduct.  The proposed new rules have not yet been approved by the California Supreme Court.  While the California Commission for the Revision of the Rules of Professional Conduct considered, but did not recommend for adoption certain Model Rules, none of them is at issue in the Case.  Notwithstanding, California courts consider the Model Rules for guidance when interpreting and applying the California Rules of Professional Conduct "absent on-point California authority or a conflicting state public policy."  *See, e.g., Cobra Solutions, Inc.,* 135 P.3d at 29.

002557

18.4.   In the course of negotiating a settlement, a lawyer is required to communicate to his client all amounts, terms, and conditions of any written offer of settlement. California RPC 3-510(A)(2).  This rule applies equally to oral settlement offers if they are significant.  *See* Discussion to California RPC 3-510.[16]

19.    The basic rules and principles governing personal conflicts of interest and the duty of loyalty are as follows.

19.1.   California RPC 3-310(B)(4) provides, *inter alia*, that a lawyer "shall not accept or continue representation of a client without providing written disclosure to the client" where the lawyer has "a legal, business, financial, or professional interest in the subject matter of the representation."  Written disclosure is defined as informing the client in writing "of the relevant circumstances and of the actual and reasonably foreseeable adverse consequences to the client."  *See* California RPC 3-310(A)(1), (3).

19.2.   "The primary purpose of this prophylactic rule is to prevent situations in which an attorney might compromise his or her representation of the client in order to advance the attorney's own financial or personal interests."  *Santa Clara Cty. Counsel Attys. Assn. v. Woodside*, 869 P.2d 1142, 1153 (Cal. 1994).[17]

19.3.   Loyalty and independent judgment are essential elements of the attorney-client relationship.  *See* MODEL RULES OF PROF'L CONDUCT R. 1.7 cmt. [1];[18] *see also People v.*

---

[16]     The comments to the California Rules of Professional Conduct contained in the Discussion of each rule "are intended to provide guidance for interpreting the rules." *See* California RPC 1-100(C).

[17]     *Superseded by statute on other grounds as stated in Coachella Valley Mosquito & Vector Control Dist. v. Cal. Public Employment Relations Bd.*, 112 P.3d 234, 237 (Cal. 2005).

[18]     Model Rule 1.7(a)(2) provides that a lawyer shall not represent a client if "there is a significant risk that the representation . . . will be materially limited by . . . a personal interest of the lawyer"; however, the lawyer may continue to represent the client despite the conflict if, *inter alia*, the client gives informed written consent, which requires disclosure of the risks and material advantages of the representation burdened with a conflict and reasonably available alternatives. *See* Model Rule 1.7(b)(4). Thus, unlike the Model Rule, the California rule only requires written disclosure of the conflict to the client, without also requiring the client to consent in writing to the

**Page 17 of 89**

002558

*Speedee Oil Change Sys., Inc.*, 980 P.2d 371, 379 (Cal. 1999) ("Attorneys have a duty to maintain undivided loyalty to their clients to avoid undermining public confidence in the legal profession and the judicial process."); *Gilbert v. NHP*, 84 Cal. Rptr. 2d 204, 212 (Ct. App. 1999) (providing that "an attorney may not do anything which could divert the attorney's attention from the client's business or lessen the amount of energy the attorney can give to the client's interests").

  19.4. Because a lawyer is a fiduciary, "assurances of competence, diligence, and loyalty are vital." RESTATEMENT (THIRD) LAW GOVERNING LAWYERS § 16 cmt. b; *see also id.* § 121 cmt. b ("[T]he law seeks to assure clients that their lawyers will represent them with undivided loyalty.").[19]

  19.5. A lawyer's own interests "should not be permitted to have an adverse effect on representation of a client." *See* MODEL RULES OF PROF'L CONDUCT R. 1.7 cmt. [10]. For example, "when a lawyer has discussions concerning possible employment with an opponent of the lawyer's client, or with a law firm representing the opponent, such discussions could

---

conflict. The California rule presupposes that if the client does not consent to the conflict upon being informed of it in writing, the client will retain other counsel. *See, e.g., Santa Clara Cty. Counsel Attys. Assn.*, 869 P.2d at 1153 n.3 ("The County is quite correct that the disclosure required by rule 3-310(B) implies the right of the client to dismiss the attorney if it finds the disclosed conflict sufficiently problematic.").

  The California Supreme Court and Courts of Appeal frequently look to Model Rule 1.7 and its commentary for guidance in interpreting California RPC 3-310. *See, e.g., Oasis W. Realty, LLC*, 250 P.3d at 1122-23; *Fletcher v. Davis*, 90 P.3d 1216, 1222 (Cal. 2010) (explaining how the ABA requires lawyers to "resolve conflicts between their personal interests and their ethical and professional responsibilities"); *Flatt*, 885 P.2d at 953-54 (discussing the "ethical stricture against attorney conflicts of interest embodied in rule 3-310 . . . and its counterparts in the . . . Model Rules"); *People v. Bonin*, 765 P.2d 460, 474 (Cal. 1989) ("Conflicts of interest broadly embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or by his own interests.") (citing Model Rule 1.7 and its comments); *Sharp v. Next Entm't Inc.*, 78 Cal. Rptr. 3d 37, 52 (Ct. App. 2008) (discussing the Model Rule's definition of informed consent when dealing with a conflict).

[19] The California Supreme Court and Courts of Appeal frequently rely upon the Restatement of The Law Governing Lawyers. *See, e.g., Oasis W. Realty, LLC*, 250 P.3d at 1122-23; *Fletcher v. Davis*, 90 P.3d 1216, 1222 (Cal. 2004): *Moore v. Anderson Zeigler Disharoon Gallagher & Gray, P.C.*, 135 Cal. Rptr. 2d 888, 893-94 (Ct. App. 2003); *Pringle v. La Chapelle*, 87 Cal. Rptr. 2d 90, 94 n.5 (Ct. App. 1999).

materially limit the lawyer's representation of the client." *Id.* In addition, a lawyer "may not allow a related business interest to affect representation." *Id.*

19.6.    A lawyer's efforts while representing a client "must be for the benefit of the client." RESTATEMENT (THIRD) LAW GOVERNING LAWYERS § 16 cmt. c; *see also* RESTATEMENT (THIRD) LAW OF AGENCY § 8.02 cmt. b ("[A]n agent's interest in acquiring a benefit from a third party may supersede the agent's commitment to obtain terms from the third party that are best from the standpoint of the principal. Although the agent may believe that no harm will befall the principal, the agent is not in a position disinterestedly to assess whether harm may occur or whether the principal's interests would be better served if the agent did not pursue or acquire the benefit from the third party.").

19.7.    An objective standard is employed to assess the presence of a conflict, and the attorney's actions are reviewed based upon the facts and circumstances at the time that a conflict may have arisen. RESTATEMENT (THIRD) LAW GOVERNING LAWYERS § 121 cmt. c(iv).

19.8.    Written disclosure of a conflict of interest to a client is intended to "impress" upon the client the seriousness of the decision that the client is being asked to make by continuing with the representation despite the conflict. *See* MODEL RULES OF PROF'L CONDUCT R. 1.7 cmt. [20].

20.    The basic rules and principles governing restrictions on a lawyer's right to practice law are as follows.

20.1.    California RPC 1-500(A) provides that a lawyer shall not "be a party to or participate in offering or making an agreement, whether in connection with the settlement of a lawsuit or otherwise, if the agreement restricts the right of [the lawyer] to practice law."

002560

"Neither counsel may demand or suggest such provisions nor may opposing counsel accede or agree to such provisions." *See* Discussion to California RPC 1-500(A).

20.2.    Model Rule 5.6(b) similarly "prohibits a lawyer from agreeing not to represent other persons in connection with settling a claim on behalf of a client." *See* American Bar Association, Standing Committee on Ethics & Professional Responsibility, Formal Op. No. 93-371 (1993).

20.3.    Attorneys who agree to restrict their right to practice law can be subject to severe sanctions. *See, e.g., The Florida Bar v. Rodriguez*, 959 So.2d 150, 161 (Fla. 2007); *The Florida Bar v. St. Louis*, 967 So.2d 108, 123 (Fla. 2007).

20.4.    The rule against restricting a lawyer's right to practice law encompasses instances where a lawyer separately, though simultaneously, negotiates to be retained by an opposing party in litigation during settlement talks even if the retainer agreement is signed after the settlement agreement. *See, e.g., Cardillo v. Bloomfield 206 Corp.*, 988 A.2d 136, 139-40 (N.J. App. 2010) ("The parties cannot circumvent the import of RPC 5.6(b), and the reality of their transaction by expressly claiming during the negotiations that they are negotiating the two agreements separately and then by executing two separate agreements. Nor may they defeat application of the RPC by the device of arranging to execute the agreements on different days or with minor negotiations in the interim."); *In re Brandt/Griffin*, 10 P.3d 906, 918-19 (Ore. 2000) (holding that a retainer agreement entered into in connection with settling a case, which indirectly limited the lawyer's right to pursue claims against the defendant, violated the Oregon-equivalent to Model Rule 5.6(b), explaining that the rule "does not distinguish between direct and indirect restrictions").

002561

21.    Based on these and other rules and principles governing professional responsibility and legal ethics, and the documents and materials reviewed in connection with the Case, it is my opinion that Mr. Randazza violated California RPC 1-500(A), 3-310(B)(4), 3-500 and 3-510 during the course of settlement negotiations in the TNA Matter; specifically:

21.1.    Mr. Randazza should not have been discussing the prospect of receiving a payment directly from TNA through settlement of the TNA Matter, because he was potentially directing money away from his client to himself.  While Mr. Gurvits appears to have made the first offer to have TNA pay Mr. Randazza directly through settlement in exchange for restricting his right to sue TNA in the future, Mr. Randazza urged him to do so (albeit indirectly) by stating that he could stave off other plaintiffs from filing similar claims against TNA.

21.2.    Mr. Randazza immediately recognized that accepting a personal payment from TNA created a conflict (to wit, "I'm in a strange ethical bind"), but it did not stop him from pursuing it if the price was right; in his own words, "there needs to be a little gravy for me," and "I'm gonna [sic] want at least used BMW money."

21.3.    After Mr. Randazza discovered the rule that strictly prohibits lawyers from negotiating a payment for themselves during settlement negotiations for a client,[20] he immediately attempted to circumvent the rule by recommending that he be retained by TNA immediately after settlement.[21]  The tone of his January 12, 2011 email says it all.  Such an attempt to indirectly restrict his right to practice law is also prohibited by California RPC 1-500(A). *See, e.g., Cardillo*, 988 A.2d at 139-40; *In re Brandt/Griffin*, 10 P.3d at 918-19.

---

[20]    Ignorance of the rules of professional conduct is no excuse. *See, e.g., Attorney Grievance Comm'n of Md. v. Stein*, 819 A.2d 372, 379 (Md. Ct. App. 2003).

[21]    In his email, Mr. Randazza cites an ethics article concerning practice restrictions in settlement agreements, which discussed, *inter alia*, indirect restrictions on the right to practice law.

002562

21.4.    Before the ink had dried on the TNA Settlement Agreement and as soon as the settlement payment was received by Mr. Randazza for Liberty, Mr. Randazza sought to be retained by TNA.  This is not an instance where a defendant later decides to retain the lawyer of its prior adversary after a case has ended—Mr. Randazza encouraged TNA to retain him while he was in the process of settling the TNA Matter, and suggested that he would sue TNA on behalf of another client if TNA did not retain him (to wit, advising Mr. Gurvits that he has "someone waiting in the wings with a $50k retainer right now").

21.5.    Rather than focusing on Liberty's interests, which he was required to do as its fiduciary, Mr. Randazza was motivated by his own personal gain in the form of earning a non-refundable, earned-upon-receipt retainer of $36,000.00 as soon as he settled the TNA Matter.  By so doing, he violated California RPC 1-500(A) and compromised the trust and confidence reposed in him by Liberty.

21.6.    Mr. Randazza was unable to exercise independent professional judgment and provide unbiased advice to Liberty in settling the TNA Matter given his personal interest in being retained by TNA for a substantial sum immediately upon settlement of the TNA Matter. He was required to disclose those interests and the resulting conflict to Liberty in writing pursuant to California RPC 3-310(B)(4), 3-500 and 3-510 so that Liberty could intelligently decide whether and how to proceed with settling the TNA Matter.  I have not seen any documents or evidence from the Case showing that he made such disclosure.

21.7.    Aside from the impermissible restriction on his right to practice law and personal conflict of interest, Mr. Randazza should not have broached a possible multi-million dollar sale of TNA with Mr. Gurvits while attempting to settle the TNA Matter, which created another personal conflict of interest for him.

002563

21.8.   The 15% broker's fee proposed by Mr. Randazza to be split with Mr. Gurvits would, on a $5,000,000.00 sale of TNA, have earned Mr. Randazza three hundred and seventy-five thousand dollars ($375,000.00). Mr. Randazza admitted in several emails that the potential sale presented an ethical dilemma for him; however, it did not stop him from discussing it at length with Mr. Gurvits.

21.9.   The prospect of earning up to $375,000.00 undoubtedly clouded Mr. Randazza's independent professional judgment and his ability to give unbiased advice to Liberty in settling the TNA Matter; it was impossible for him to separate one from the other, as he acknowledged in the January 20, 2011 email that he sent to Mr. Gurvits. While Mr. Randazza was only due to earn twenty-five percent (25%) of the TNA Settlement, or twelve thousand five hundred dollars ($12,500.00), pursuant to his employment agreement with Liberty,[22] he was hoping to earn up to thirty (30) times that amount by brokering a sale of TNA to another one of his clients.

21.10.  Liberty itself decided to settle the TNA Matter for $50,000.00— substantially less than Mr. Randazza believed the settlement value to have been. The prospect of earning a broker's fee prevented Mr. Randazza from advising Excelsior to demand more money from TNA to settle; at a minimum, it raises a substantial question regarding the soundness and unbiased nature of his advice. Simply put, the sooner Mr. Randazza could "kill off the case" (his words), the sooner he could earn a potential $375,000.00 broker's fee for arranging a sale of TNA. Mr. Randazza admits in his February 14, 2011 email that the TNA Matter settled for much less than it was worth. I have not seen any documents or evidence from the Case showing that he counseled his client to demand more money.

---

[22]      It is my understanding that the parties dispute the proper calculation of Mr. Randazza's bonuses arising out of settlements and whether they are based on gross or net recovery. I am not rendering an opinion concerning the meaning of the terms of his employment agreement.

002564

21.11.  Mr. Randazza was required to advise Liberty in writing, pursuant to California RPC 3-310(B)(4) and 3-500, that he was discussing a potential sale of TNA (the adverse party) to a third party that could earn him a sizeable broker's fee so that Liberty could assess whether Mr. Randazza was capable of providing an unbiased opinion on settlement of the TNA Matter.  I have not seen any documents or evidence from the Case showing that he disclosed the potential sale or broker's fee to Liberty.

21.12.  Mr. Randazza heedlessly documented his conflicts of interest and willingness to restrict his right to practice law in the TNA Matter in numerous emails that he exchanged with Mr. Gurvits.  This, in my opinion, demonstrated a willful disregard of the rules governing conflicts of interest and his duty of loyalty.

21.13.  Based on the totality of the circumstances, it is my opinion that Mr. Randazza suffered from multiple conflicts of interest in settling the TNA Matter and violated his ethical and fiduciary obligations by initially negotiating a payment for himself, and then instead to be retained by TNA immediately after settlement (an indirect restriction on his right to practice law), alongside discussing a potential sale of TNA to one of his other clients in exchange for a broker's fee—all without making written disclosure to Liberty.

<u>ORON ISSUES</u>

22.    The second issues that I address concern whether Mr. Randazza violated the Nevada Rules of Professional Conduct while representing Liberty in a lawsuit against Oron (the "Oron Issues").

002565

Background

23.    The following events are pertinent to the Oron Issues and, except as otherwise provided herein, do not appear to be subject to reasonable dispute. Therefore, they are assumed true for purposes of this opinion.

23.1.    Mr. Randazza, through his firm (RLG), represented Liberty in a lawsuit that he filed in the United States District Court for the District of Nevada against Oron (Case No. 2:12-cv-01057-GMN-RJJ) alleging that Oron (a file-sharing website) infringed Liberty's copyrighted works (the "Oron Matter"). Stevan H. Lieberman, Esq. ("Mr. Lieberman") of Greenberg & Lieberman LLC (the "G&L Law Firm") represented Oron. A concurrent action was filed by Liberty (through the law firm of S.T. Poon & Wong) against Oron in the High Court of the Hong Kong Special Administrative Region, Court of First Instance, Miscellaneous Proceeding No. 1257 of 2012.

23.2.    On June 21, 2012, Liberty obtained a Temporary Restraining Order from the Nevada Federal Court freezing Oron's assets in the United States, including nearly two million dollars ($2,000,000.00) that was being held in one or more accounts with Pay Pal, Inc. ("Pay Pal"). A similar Temporary Restraining Order was entered by the Court in Hong Kong on June 22, 2012, freezing Oron's foreign assets.

23.3.    In or around late June 2012, Messrs. Randazza and Lieberman commenced settlement negotiations concerning the Oron Matter. In a memorandum prepared by Mr. Randazza on June 25, 2012, which he sent to various executives of Liberty, Mr. Randazza suggested that Liberty let Oron know that he (Mr. Randazza) was in a position to stop other lawsuits that were intended to be filed against Oron given his "contact with a number of other

002566

adult companies." In his own words: "I can turn off the heat right away or they can continue to deal with it."

23.4.    Settlement discussions ensued, and on July 1, 2012, Mr. Lieberman sent a letter to Mr. Randazza that memorialized the parties' settlement terms. In brief, Oron agreed to pay Liberty five hundred and fifty thousand dollars ($550,000.00) in exchange for a dismissal of the Oron Matter with prejudice (the "Oron Settlement"). With Liberty's approval, Mr. Randazza signed the letter on its behalf.

23.5.    A dispute subsequently arose between the parties concerning the terms of the Oron Settlement. On July 6, 2012, Mr. Randazza filed a Motion to Enforce Settlement with the Nevada Federal Court (the "Motion to Enforce"). Oron filed its Opposition to the Motion to Enforce on July 12, 2012, and Liberty filed its Reply to the Motion to Enforce on July 23, 2012. On August 7, 2012, the Nevada Federal Court entered an Order granting the Motion to Enforce, and in so doing, entered judgment in favor of Liberty against Oron for $550,000.00 with execution to proceed forthwith,[23] and dismissed the action with prejudice while reserving Liberty's right to file a motion for attorneys' fees and costs.

23.6.    On August 10, 2012, Liberty filed a Motion for Attorneys' Fees with the Nevada Federal Court (the "Motion for Fees").[24] Oron filed its Opposition to the Motion for Fees on August 27, 2012, and Liberty filed its Reply to the Motion for Fees on August 28, 2012. On September 4, 2012, the Nevada Federal Court entered an Order granting, in part, the Motion for Fees, ordering Oron to pay Liberty one hundred thirty-one thousand seven hundred ninety-

---

[23]    On August 21, 2012, Liberty obtained an Order from the Nevada Federal Court directing Pay Pal to satisfy the judgment out of Oron's frozen funds. The money was later transferred to RLG's client trust account.

[24]    Liberty had previously filed a Motion for Attorney Fees concurrently with its Motion to Enforce; however, it was not ruled on by the Nevada Federal Court.

002567

seven and 50/100 dollars ($131,797.50), and on September 4, 2012, judgment was entered in favor of Liberty against Oron in that amount.

23.7.    After the Nevada Federal Court entered the $550,000.00 judgment against Oron, but before it decided Liberty's Motion for Fees, Messrs. Randazza and Lieberman recommenced settlement negotiations. On August 7, 2012, Mr. Randazza sent an email to Mr. Lieberman offering to completely resolve the Oron Matter if Oron agreed to wire $550,000.00 to his trust account within twenty-four (24) hours. Mr. Randazza then stated:

> And, if Oron would like someone to show them how not to get sued in the future and would like to have some more of my play book, they are welcome to contact me directly, or through you. I make a much better friend than enemy.

23.8.    According to Mr. Randazza, Mr. Lieberman subsequently offered to have Oron pay him directly as part of the settlement to preclude him from representing other plaintiffs against Oron in the future.[25] On August 7, 2012, Mr. Randazza responded as follows:

> Then, whatever you guy [sic] pay me to retain me would come from your paypal account . . . I spoke to my partner, who was adamant that we should earn $100k if we're to never be able to sue [Oron] forever and ever. I got him to go with $75k. But, for that, we'll provide some really great value – including a jurisdiction derailing plan that you'll drool over.

23.9.    Four minutes later, on August 7, 2012—while Mr. Randazza was still negotiating a final resolution of the Oron Matter for Liberty—Mr. Randazza emailed a fee agreement to Mr. Lieberman purporting to memorialize his future retention by Oron. Among its terms, Mr. Randazza required an initial, non-refundable retainer of seventy-five thousand dollars ($75,000.00) deemed to be earned by Mr. Randazza upon receipt, which would entitle Oron to

---

[25]    As stated above, Mr. Randazza suggested that Liberty executives propose to Oron that Oron hire Mr. Randazza. I have not seen any documents or evidence from the Case showing that a conversation took place between Liberty and Oron; nevertheless, the memorandum reflects Mr. Randazza's interest in securing a personal benefit for himself through the settlement with Oron. Further, as stated herein, Mr. Randazza later refers to it as his offer to represent Oron.

002568

"advice and counsel for a period of thirty (30) days immediately following execution of this agreement"; Oron would thereafter be billed by Mr. Randazza and other members of his firm (RLG) on an hourly basis.  Mr. Randazza further included a provision stating that Oron must first fully resolve all matters with Liberty before his representation of Oron would commence.

23.10.  Sometime in early August 2012, Mr. Gurvits (the same attorney who represented TNA) took over settlement negotiations on behalf of Oron in place of Mr. Lieberman.

23.11.  On August 9, 2012, Mr. Randazza purportedly consulted with ethics counsel and asked to modify a portion of his proposed settlement agreement; to wit:

> Please inform Oron that my prior offer to represent them is revoked.  It is not that I would not consider it in the future, but I think that even discussing it at this point creates an ethical gray area that I would rather not be in.
>
> As you're aware, it is ethically improper to enter agreement [sic] that restricts an attorney's right to practice.  I think that having that issue even being contemplated at this point is premature and can sour the whole deal, potentially even making the entire agreement unenforceable.
>
> I guess I will just have to realize that if they do not get some of the benefits that they had hope [sic] to get, that I will not get $75,000.  That is a hell of a lot of money, so they can probably consider my possible incentives and act accordingly.  Given that I know that I have a $75,000 pot of gold at the end of the rainbow, one could guess how I might be incentivized to behave.  However, I can make no representations in that regard.

23.12.  On August 10, 2012, Mr. Randazza proposed an alternative way for him to net an additional $75,000.00 out of the Oron Settlement: "I think we can deal with the other thing by saying the $75k is released to my trust for a settlement with me personally.  It's not a retainer for services, but rather a settlement.  That might work."  There is no evidence that Mr.

002569

Randazza had a personal claim against Oron that could be settled contemporaneously with settlement of Liberty's claims against Oron.

      23.13.  On August 12, 2012, Mr. Gurvits sent an email to Mr. Randazza outlining a potential six hundred thousand dollar ($600,000.00) settlement between Oron and Liberty and an additional $75,000.00 to be held by Mr. Gurvits pending Mr. Randazza's later agreement to assist Oron "after Liberty is paid and the Liberty cases are dismissed." Mr. Randazza replied: "Well that sounds like the original deal. So it should work." In another email sent by Mr. Randazza to Mr. Gurvits on August 12, 2012, Mr. Randazza discussed being retained by Oron "to explore malpractice issues."

      23.14.  On August 12, 2012, Mr. Gurvits emailed a proposed settlement agreement to Mr. Randazza. The agreement provided, *inter alia*, that $600,000.00 would be transferred from Oron's frozen Pay Pal account to Mr. Randazza's trust account (earmarked for Liberty) and an additional $75,000.00 would be transferred to Mr. Gurvits' trust account (earmarked for Mr. Randazza).[26] The agreement further provided that Mr. Randazza would personally assist in dissuading others from suing Oron. In his comments back to Mr. Gurvits, Mr. Randazza acknowledged that $75,000.00 "ought to do it."

      23.15.  On August 13, 2012, Mr. Gurvits informed Mr. Randazza that Oron would be willing to retain him for $75,000.00, but only after its Pay Pal accounts were unfrozen.

---

[26]    An earlier version of the proposed settlement agreement contained a provision stating that a total of seven hundred thousand dollars ($700,000.00) would be transferred from Oron's Pay Pal account to Mr. Randazza's trust account, with six hundred and twenty-five thousand dollars ($625,000.00) being remitted to Liberty and the remaining $75,000.00 being used to "satisfy any other debts that [Oron] may direct to be satisfied, including, but not limited to, payment of legal fees for the Defendants." In other words, Mr. Randazza's non-refundable, earned-upon-receipt retainer was a direct part of the settlement coming from the same account at Pay Pal that he froze on behalf of Liberty.

002570

23.16.  Sometime in August 2012, Mr. Randazza sent a draft of the proposed

settlement agreement to Liberty for review.  Liberty's Chief Executive Officer, Jason Gibson

("Mr. Gibson"), immediately questioned why $75,000.00 was being set aside for Mr. Gurvits:

> I'm going to be frank that my stomach is churning after reading the
> proposed agreement.

*      *      *      *

> We feel pretty strongly that every dollar that comes from a
> defendant should be ultimately earmarked for the company . . .
> The whole "bribery" deal sits funny with us as it is written,
> especially when there is no guarantee we will even get the extra
> $75k from their attorney's trust fund.[27]

23.17.  According to Liberty, Mr. Randazza characterized the $75,000.00

payment as a bribe from Oron in order to keep him from suing Oron in the future.  Mr. Randazza

admits that he used the term "bribe," though claims that it was in jest.

23.18.  Upon learning that Oron was willing to pay Mr. Randazza to represent it

in the future as part of settling the Oron Matter, Liberty demanded that it receive the money, and

not Mr. Randazza.  In an email to Mr. Gurvits on August 14, 2012, Mr. Randazza acknowledged

that he had an "ethical problem" arising out of this demand by Liberty because, in his mind,

giving Liberty the extra $75,000.00 constituted "illegal fee sharing."

23.19.  On August 16, 2012, Mr. Randazza wrote an email to Mr. Gibson

attempting to explain the $75,000.00 payment.  He first indicated that the money was not being

taken from Liberty because Oron was only willing to pay Liberty $600,000.00.  Second, he

indicated that he had fully disclosed it to Mr. Gibson "even before it happened."[28]  Third, he told

---

[27]     Mr. Gibson had a number of other concerns with the proposed settlement agreement and the Oron Matter in
general, including the cost of pursuing the matter in Hong Kong.

[28]     I have not seen any documents or evidence from the Case containing a communication from Mr. Randazza
to Mr. Gibson or other executives of Liberty explaining the $75,000.00 payment from Oron; rather, the
communications were made after Mr. Gibson asked about it.

002571

Mr. Gibson that it would constitute improper "fee sharing" if he gave Liberty the money;
nevertheless, he "was willing to step over that line" for Liberty.

23.20.    Oron did not retain Mr. Randazza.  It is my understanding that Oron
initially appealed to the United States Court of Appeals for the Ninth Circuit from select Orders
entered by the Nevada Federal Court (not including the Order granting the Motion to Enforce);
however, Oron and Liberty later settled the Oron Matter under confidential terms.

<u>Additional Material Facts Concerning the Oron Matter</u>

24.    The following events are pertinent to the Oron Issues and, except as otherwise
provided herein, do not appear to be subject to reasonable dispute.  Therefore, they are assumed
true for purposes of this opinion.

24.1.    Prior to filing a lawsuit on behalf of Liberty against Oron for copyright
infringement, Mr. Randazza solicited other adult content producers to potentially join in the
action in order to minimize the costs to Liberty of pursuing its claims against Oron.  James
Grady ("Mr. Grady") of Group Five Photosports, LLC was interested in pursuing Oron, and
agreed to contribute five thousand dollars ($5,000.00) and to assist Mr. Randazza in gathering
pertinent facts in support of Liberty's claims.

24.2.    On June 6, 2012, Mr. Randazza emailed Mr. Grady for information about
the owner of Oron, Maxim Bochenko ("Mr. Bochenko").  In response, Mr. Grady indicated that
Mr. Bochenko is of Russian descent, married, and lives in Florida.

24.3.    Mr. Grady stated in his June 6, 2012 email to Mr. Randazza that he
"pay[s] a guy – call him a forensic investigator – to dig past Domains by Proxy and things like
that."  With regard to the information concerning Oron, Mr. Grady told Mr. Randazza that the
forensic investigator "didn't get the info at Walmart in the course of normal commerce."

002572

24.4.    Despite knowing that Mr. Grady's "forensic investigator" was not using legitimate means of obtaining evidence from Oron, Mr. Randazza continued to solicit Mr. Grady for information about Oron—without Liberty's knowledge or consent.  For example, and without limitation: ·

24.4.1. On June 8, 2012, Mr. Randazza asked Mr. Grady for more information about Mr. Bochenko.  In response, Mr. Grady told Mr. Randazza that he (Mr. Bochenko) lives in Florida and processes approximately thirty-thousand dollars ($30,000.00) in sales every day.

24.4.2. On June 20, 2012, Mr. Randazza asked Mr. Grady for bank account information related to Oron.  Mr. Grady emailed him back with information concerning two accounts (one in Hong Kong, and one in Germany).

24.4.3. On June 20, 2012, Mr. Randazza asked Mr. Grady if he could determine whether Oron was moving money around.  Mr. Grady, after speaking with his source, told Mr. Randazza that Pay Pal had released money to Oron's bank account in Hong Kong, and sent Mr. Randazza a confirmation receipt from Pay Pal (which appears to have been solely directed to Oron).  Mr. Grady also summarized communications that Mr. Lieberman was having for Oron with attorneys in Germany—thus indicating that Mr. Grady, through his source, had access to Oron's emails with its lawyers.[29]  Mr. Grady also indicated that Mr. Lieberman was talking with Oron about changing its terms of service.[30]

---

[29]    On June 8, 2012, Mr. Grady emailed Mr. Randazza a screen shot of an email string between Mr. Bochenko and a third-party.  Moreover, Mr. Grady knew that Oron had retained Mr. Lieberman before Mr. Randazza told him; to wit, in an email from Mr. Randazza to Mr. Grady, dated June 9, 2012, Mr. Randazza said, "[T]here's no way you could have known Stevan's name unless you had some good intel.  I've never told you, nor anyone else, that I'm talking to Stevan.  Even Liberty doesn't know his name."

[30]    In another email, Mr. Grady indicates that Mr. Lieberman tried to convince Oron to meet with Liberty.

002573

24.4.4. On June 25, 2012, Mr. Randazza asked Mr. Grady for phone numbers and Skype account information related to Mr. Bochenko. In response, Mr. Grady provided Mr. Randazza with "fully SKYPE call logs" for a three-month time period for Mr. Bochenko and his wife. Mr. Grady indicated that he discovered Mr. Bochenko's Skype account from "emails into / out of support@oron.com"—thus confirming that he had access to the support@oron.com email account.[31]

24.4.5. On June 24, 2012, Mr. Grady advised Mr. Randazza that as soon as he filed the lawsuit on behalf of Liberty against Oron, Oron transferred thirty-thousand dollars ($30,000.00) out of an AlertPay.com account.

24.5. On June 25, 2012, Mr. Randazza emailed Mr. Grady about potentially appearing as a witness for Liberty in the Oron Matter. Mr. Randazza stated that as far as he knew, Mr. Grady's source had obtained information about Oron "lawfully," and that Mr. Grady "certainly got it lawfully." Mr. Randazza admitted that it would be "problematic" if the forensic investigator was a hacker.

24.6. On July 18, 2012, Mr. Grady told Mr. Randazza that he had a "package of papers" to deliver related to Oron. Mr. Randazza told him to send the documents anonymously to Corbin Fisher, "With a To Whom it May Concern."

24.7. Mr. Randazza used the information provided by Mr. Grady related to Oron in support of obtaining the Temporary Restraining Order from the Nevada Federal Court against Oron (*e.g.*, by relying on the transfer of funds from Pay Pal to Hong Kong and the change in Oron's terms of service). In its response to Liberty's Motion for Preliminary Injunction, Oron

---

[31] On June 8, 2012, Mr. Grady sent Mr. Randazza a letter from a lawyer in Hong Kong to Oron, which had been attached to an email from the support@oron.com email account.

002574

argued that the information about its transfer of funds from Pay Pal to a bank account in Hong

Kong was not public knowledge, and could only have been obtained by a hacker.

24.8.   It is my understanding that the Oron Matter was costly for Liberty to

pursue.  Mr. Randazza had to use other members of his firm (RLG) to assist with the

representation.  Mr. Randazza also had to retain counsel to represent Liberty against Oron in

Hong Kong.

24.9.   The fees and costs generated by Hong Kong counsel rose to the point

where Liberty began to reconsider the benefits of pursuing a simultaneous action against Oron in

Hong Kong.  Mr. Randazza urged Liberty to continue funding the litigation in Hong Kong, and

in order to accommodate Liberty's concern over rising costs, he offered to personally advance

twenty-five thousand dollars ($25,000.00) toward payment of the fees of Hong Kong counsel.

24.10.  In an email sent by Mr. Randazza to Mr. Gibson on August 5, 2012, he

acknowledged that the advance resulted in him putting his "personal credit on the line."

24.11.  The parties dispute whether Mr. Randazza made a loan to Liberty with

payment being contingent on recovering money from Oron or, in the alternative, advanced costs

on behalf of his client related to the Oron Matter.  According to Liberty, Mr. Randazza agreed to

go "50/50 on the investment" in the Hong Kong litigation.  Mr. Randazza does not characterize it

as an investment, but rather, a cost of litigation that he expected to be repaid out of any future

settlement.

24.12.  Regardless of whether it is characterized as an investment or a cost of

litigation, Mr. Randazza had Liberty execute a promissory note memorializing the advance and

establishing the terms of repayment.  The promissory note refers to it as a loan, characterizes Mr.

Randazza as the "lender" and Liberty as the "borrower," and includes a payment schedule.  The

002575

promissory note also includes a unilateral attorneys' fee provision; to wit, "If Lender prevails in a lawsuit to collect on this note, Borrower will pay Lender's costs and lawyer's fees in an amount the court finds to be reasonable." The promissory note is to be construed, governed, and enforced in accordance with Nevada law.

24.13.  As stated above, Mr. Randazza signed the Oron Settlement agreement on behalf of Liberty on July 1, 2012. Although the parties disputed the scope of the release contained in the settlement agreement (which gave rise to the Motion to Enforce), the settlement agreement also included a provision that required Liberty to "dissuade others from bringing suit against Oron."

24.14.  Prior to settlement, Mr. Randazza had been coordinating with other attorneys, including Patricia Benson, Esq. ("Ms. Benson") of Mitchell Silberberg & Knupp LLP (the "MS&K Law Firm"), and D. Gill Sperlein, Esq. ("Mr. Sperlein") of The Law Office of D. Gill Sperlein ("Sperlein Law"), who were pursuing similar claims against Oron on behalf of other clients.

24.15.  After signing the July 1, 2012 Oron Settlement agreement, and even after the Nevada Federal Court entered its August 7, 2012 Order enforcing the Oron Settlement, Mr. Randazza continued to provide Ms. Benson and Mr. Sperlein with information about the Oron Matter, including, without limitation, pleadings and motions (in both .pdf and .doc formats), Oron account information, and general "intel on Oron," and strategized with them about freezing Oron's assets, including advising them to "grab some of Oron's remaining money." It was not until August 28, 2012—nearly two months later—that Mr. Randazza purportedly decided to stop assisting Ms. Benson and Mr. Sperlein, recognizing that it "violates our settlement with [O]ron."

002576

24.16.  On August 28, 2012, Mr. Sperlein filed a copyright infringement action on behalf of DataTech Enterprises, LLC ("DataTech") against Oron in the United States District Court for the Northern District of California (Case No. 3:12-cv-04500-CRB) containing allegations substantially similar to those made by Liberty against Oron in the Oron Matter.  Mr. Sperlein also obtained a Temporary Restraining Order freezing Oron's assets, including its Pay Pal account.

24.17.  On August 29, 2012, Mr. Randazza wrote an email to his paralegal (Erika Dillon) in which he discussed filling a "half-hearted Motion to Stay" with the Nevada Federal Court in order to "mask that we are not helping [Mr. Sperlein]."  He further stated that they cannot help Mr. Sperlein "until the appeal deadline passes."

24.18.  On August 29, 2012, Mr. Randazza received the $550,000.00 settlement payment from Oron.  In an email to Mr. Gibson, he indicated that he intended to deduct, among other expenses, the amount that he loaned to Liberty in order to pay Hong Kong counsel from the settlement before remitting the balance to Liberty.

<u>Mr. Randazza Breached His Fiduciary Duty and Failed to Meet the</u>

<u>Standard of Care While Handling the Oron Matter</u>

25.    The Oron Issues presented in the Case are as follows:[32]

25.1.    Whether Mr. Randazza failed to communicate with Liberty about the side-deal that he was negotiating with Messrs. Lieberman and Gurvits while attempting to settle the Oron Matter;

---

[32]    For purposes of the Oron Issues, because the matter was handled in Nevada, I focus on the Nevada Rules of Professional Conduct and secondary authority with regard to the applicable standard of care and duties owed by Mr. Randazza to Excelsior and Liberty.

002577

25.2.    Whether Mr. Randazza had a personal conflict of interest in settling the Oron Matter while simultaneously negotiating to be paid by Oron (either a bribe or a fee) concurrent with or immediately after settlement;

25.3.    Whether Mr. Randazza improperly attempted to restrict his right to practice law while settling the Oron Matter;

25.4.    Whether Mr. Randazza entered into a business transaction with Liberty without giving Liberty an opportunity to consult with independent counsel, without advising Liberty of (and obtaining its informed consent, confirmed in writing, to) the essential terms of the transaction and his role in the transaction;

25.5.    Whether Mr. Randazza jeopardized his client's rights arising out of the Oron Settlement and acted beyond the scope of his authority by assisting other attorneys to pursue litigation against Oron after settling the Oron Matter and by using a private investigator to secretly obtain confidential and privileged information about Oron through wrongful or improper means.

26.    The basic rules and principles governing the duty to communicate with a client are set out in detail in Paragraph 18, *supra*, and incorporated herein by reference.[33]  The rule in Nevada is as follows.

26.1.    Pursuant to Nevada RPC 1.4(a) and (b), the duty to communicate with a client includes:

26.1.1. Advising the client about substantive matters requiring the client's informed consent;

---

[33]    In Nevada, the Model Rules "may be consulted for guidance in interpreting and applying the Nevada Rules of Professional Conduct." *See* Nevada R.P.C. 1.0A.  They are also frequently relied upon by the Nevada Supreme Court. *See, e.g., Palmer v. Pioneer Inn Assocs., Ltd.*, 118 Nev. 943, 949-50, 59 P.3d 1237, 1241-42 (2002); *In re Discipline of Schaefer*, 117 Nev. 496, 508, 25 P.3d 191, 199 (2001).

002578

26.1.2. Reasonably consulting with the client about the means to accomplish the client's objectives;

26.1.3. Keeping the client abreast of the status of the representation; and

26.1.4. Explaining matters to the client as is reasonably necessary to permit the client to make informed decisions.

27.    The basic rules and principles governing personal conflicts of interest and the duty of loyalty are set out in detail in Paragraph 19, *supra*, and incorporated herein by reference.[34]  The rule in Nevada is as follows.

27.1.    Nevada RPC 1.7(a)(2) provides that an attorney shall not represent a client if there is a significant risk that the representation will be materially limited by a personal interest of the lawyer (a concurrent conflict of interest).

27.2.    Notwithstanding the existence of a concurrent conflict of interest:

27.2.1. If an attorney reasonably believes that he can competently and diligently represent the client;

27.2.2. The representation does not involve the assertion of a claim by one client against the other client in the same matter; and

27.2.3. The representation is not prohibited by law, the attorney can undertake the representation if—but only if—the client provides informed consent, confirmed in writing.  *See* Nevada RPC 1.7(b).  "'Informed consent' denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." Nevada RPC 1.0(e).

---

[34]    The Nevada Supreme Court frequently relies on the Restatement of The Law Governing Lawyers. *See, e.g., NC-DSH, Inc. v. Gardner*, 125 Nev. 647, 656, 218 P.3d 853, 861 (2009); *Leibowitz v. Eighth Jud. Dist. Ct.*, 119 Nev. 523, 531 n.19, 532 n.23, 78 P.3d 515, 520 n.19, 521 n.23 (2003); *Palmer*, 118 Nev. at 949, 59 P.3d at 1247.

002579

28.     The basic rules and principles governing restrictions on a lawyer's right to practice law are set out in detail in Paragraph 20, *supra*, and incorporated herein by reference. The rule in Nevada is as follows.

28.1.   Nevada RPC 5.6(b) provides that an attorney "shall not participate in offering or making [a]n agreement in which a restriction on the lawyer's right to practice is part of the settlement of a client controversy."

29.     The basic rules and principles governing business transactions between a lawyer and a client are as follows.

29.1.   Nevada RPC 1.8(a) states that a lawyer may not enter into a business transaction with a client unless:

29.1.1. The transaction and the terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;

29.1.2. The client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and

29.1.3. The client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

29.2.   The main purpose of Nevada RPC 1.8(a), which is based on Model Rule 1.8(a), is to prevent overreaching by a lawyer. *See* MODEL RULES OF PROF'L CONDUCT R. 1.8 cmt. [1].

002580

29.3.    If the lawyer represents the client in the transaction, or if the client expects the lawyer to represent him in the transaction, or if there is a significant risk that the lawyer's representation of the client "will be materially limited by the lawyer's financial interest in the transaction," the lawyer must also comply with Nevada RPC 1.7 (governing conflicts of interest).

29.4.    Loans between a lawyer and his client "are among the most common situations to which Rule 1.8(a) is applied." *See* ABA CENTER FOR PROFESSIONAL RESPONSIBILITY, ANNOTATED MODEL RULES OF PROFESSIONAL CONDUCT 147 (7th ed. 2011).

29.5.    Where a lawyer fails to comply with Nevada RPC 1.8(a), "the transaction may be voidable at the election of the . . . client—even if the transaction is considered economically fair to all parties—provided the client acts to undo the transaction within a reasonable time after it learned or should have learned of the pertinent facts." *See DiLuglio v. Providence Auto Body, Inc.*, 755 A.2d 757, 772 (R.I. 2000) (analyzing Rhode Island's equivalent of Nevada RPC 1.8(a)).[35]  A factfinder may also consider the level of the client's sophistication for purposes of deciding whether to void the transaction. *See id.*  ("Also relevant is whether the client was a sophisticated businessperson or business entity.").

29.6.    Nevada RPC 1.8(e) states that while a lawyer "shall not provide financial assistance to a client in connection with pending or contemplated litigation," a lawyer "may advance court costs and expenses of litigation, the repayment of which may be contingent on the outcome of the matter."

29.7.    The comment to Model Rule 1.8(e) (upon which Nevada RPC 1.8(e) is based) provides that lawyers "may not subsidize proceedings . . . brought on behalf of their

---

[35]    The Nevada Supreme Court cited *DiLuglio v. Providence Auto Body, Inc.* with approval in *Mainor v. Nault*. *See id.*, 120 Nev. at 768 n.39, 101 P.3d at 320 n.39.

002581

clients . . . because such assistance gives lawyers too great a financial stake in the litigation." *See* MODEL RULES OF PROF'L CONDUCT R. 1.8 cmt. [10].

30.    The basic rules and principles governing the scope of a lawyer's representation of a client and the allocation of authority between the lawyer and client are as follows.

30.1.    Nevada RPC 1.2(a) provides that a lawyer shall consult with a client as to the means of carrying out the representation, "may take such action as is impliedly authorized to carry out the representation," and shall "abide by a client's decision whether to settle a matter."

30.2.    While clients rely on their lawyers to make "technical, legal and tactical" decisions, lawyers usually defer to their clients to handle issues concerning costs and the rights of third parties "who might be adversely affected" by certain actions taken by their lawyers. *See* MODEL RULES OF PROF'L CONDUCT R. 1.2 cmt. [2].

30.3.    Once a client has authorized a specific course of action, the lawyer can proceed without further consultation or approval from the client absent a material change in circumstances. MODEL RULES OF PROF'L CONDUCT R. 1.2 cmt. [3].

31.    The basic rules and principles concerning a lawyer's obligation to refrain from using methods of obtaining evidence that violate the legal rights of a party are as follows.

31.1.    Nevada RPC 4.4(a) states that in representing a client, "a lawyer shall not . . . use methods of obtaining evidence that violate the legal rights of [a third] person."

31.2.    Rule 4.4(a) is also intended to prevent "unwarranted intrusions into privileged relationships, such as the client-lawyer relationship." MODEL RULES OF PROF'L CONDUCT R. 4.4 cmt. [1]; *see also P.T. Barnum's Nightclub v. Duhamell*, 766 N.E.2d 729, 737 (Ind. Ct. App. 2002) (indicating that Rule 4.4 "prohibits an attorney from inducing anyone to violate an attorney-client privilege").

002582

31.3.    In *Merits Incentives, LLC v. Eighth Judicial District Court*, 127 Nev. __,

262 P.3d 720 (2011), the Nevada Supreme Court discussed Rule 4.4(a) and its proscription

against lawyers either taking a part in "obtaining an opposing party's documents" through

wrongful means or being "complicit in actions used to wrongfully obtain those documents."

*Id.* at __, 262 P.2d at 725; *see also* Nevada RPC 5.3(c)(1) (indicating that a lawyer is responsible

for the acts of a non-lawyer if the lawyer, "with the knowledge of the specific conduct, ratifies

the conduct involved" by the non-lawyer); Nevada RPC 8.4(a) (providing that it is professional

misconduct for a lawyer to violate the Rules of Professional Conduct "or do so through the acts

of another"); *accord Midwest Motor Sports v. Arctic Cat Sales, Inc.*, 347 F.3d 693, 698 (8th Cir.

2002) (recognizing that a lawyer may be held liable for wrongful acts committed by a private

investigator, including improper communications with represented parties).

31.4.    When utilizing the services of a private investigator, "a lawyer must make

reasonable efforts to ensure that the services are provided in a manner that is compatible with the

lawyer's professional obligations." MODEL RULES OF PROF'L CONDUCT R. 5.3 cmt. [3].

32.    Based on these and other rules and principles governing professional

responsibility and legal ethics, and the documents and materials reviewed in connection with the

Case, it is my opinion that Mr. Randazza violated Nevada RPC 1.2(a), 1.4(a)(3), 1.4(b) 1.7(a)(2),

1.8(a), 4.4(a), 5.6(b), and 8.4(a) while representing Liberty in the Oron Matter; specifically:

32.1.    Mr. Randazza should not have been discussing the prospect of receiving a

payment directly from Oron through settlement of the Oron Matter because he risked diverting

money away from his client (Liberty) to himself.  Such disloyalty strikes at the heart of the

attorney-client relationship because the attorney should at all times be focused on advancing the

interests of his client.

002583

32.2.    Consistent with his approach to the TNA Matter, Mr. Randazza opened the door to discussions about conflicting himself out of future cases against Oron by implying that he could prevent other plaintiffs from filing similar claims against Oron.[36] He encouraged Oron to hire him (to wit, "I make a much better friend than enemy"). Mr. Randazza knew that Nevada RPC 5.6(b) prohibited him from directly or indirectly negotiating to conflict himself out of future cases against Oron (admitting that it "creates an ethical gray area" for him). He should have flatly rejected the suggestion when it was raised by opposing counsel.

32.3.    The prospect of earning a non-refundable, earned-upon-receipt retainer of $75,000.00 for 30 days' worth of work likely blinded Mr. Randazza to his fiduciary obligation— negotiating a settlement exclusively for and on behalf of Liberty—and created a personal conflict of interest under Nevada RPC 1.7(a)(2) for which he did not obtain informed consent, confirmed in writing, from Liberty as required by Nevada RPC 1.7(b).[37]

32.4.    The proposed fee agreement with Oron listed Mr. Randazza's hourly rate at five hundred and fifty dollars ($550.00). At that rate, he would have had to work nearly one hundred and thirty-seven (137) hours in order to bill $75,000.00. Unless he was planning to terminate his employment with Excelsior, he would have continued to serve full-time as its in-house general counsel, and thus, could not have reasonably expended 137 hours working for Oron.[38] The $75,000.00 non-refundable, earned-upon-receipt retainer would have resulted in a substantial windfall for Mr. Randazza, and was too lucrative for him to pass up (in his own

---

[36]    Not only did he mention it to opposing counsel, he also told his clients to bring it up in a direct discussion with Oron. He should not have advised his client to leverage a settlement by suggesting that he would be willing to restrict his right to practice law (and thus, violate Nevada RPC 5.6(b)) in exchange for favorable settlement terms.

[37]    While he did exchange emails with Mr. Gibson about the $75,000.00 payment, those emails do not meet the requirement of obtaining a client's informed consent, confirmed in writing, to the conflict. As to the consent, Mr. Gibson had serious concerns with the fact that Mr. Randazza was anticipating receiving money directly from Oron as part of settling the Oron Matter.

[38]    As discussed in the next section of this Affidavit, Mr. Randazza could only work on matters for a limited number of outside clients "during non-working hours, on vacation days, or on unpaid leave days."

002584

words, Oron was offering him "a hell of a lot of money," and enough money for Oron to "guess how [he] might be incentivized to behave").

32.5.    One of the initial proposed settlement agreements with Oron required Mr. Randazza to actively dissuade other clients from pursuing claims against Oron. Prior to addressing it with his client, Mr. Randazza did not object to this provision, so long as he earned his $75,000.00 (in his own words, that amount "ought to do it"). Again, Nevada RPC 5.6(b) prohibited him from considering it as a part of the settlement—Mr. Randazza could not simultaneously represent future clients in matters adverse to Oron while advising them not to pursue claims against Oron.

32.6.    Mr. Randazza emailed his proposed fee agreement to Oron's counsel before he had fully and finally resolved the Oron Matter. Thus, his anticipated retention was an integral part of settlement negotiations.[39] Mr. Randazza appears to believe that while he cannot include a direct restriction on his right to practice law in a settlement agreement, he can indirectly restrict his right to practice law by simultaneously negotiating with opposing counsel to have the adverse party retain him immediately after settling his client's claims against the adverse party.[40] He is wrong. As stated above, such indirect restrictions are also prohibited by and constitute a violation of Nevada RPC 5.6(b). *See, e.g., Cardillo*, 988 A.2d at 139-40; *In re Brandt/Griffin*, 10 P.3d at 918-19.

32.7.    While I have not seen any documents or evidence from the Case to determine whether the $550,000.00 settlement plus the fee award was more or less than what the

---

[39]    Moreover, Mr. Randazza sought to obtain his non-refundable, earned-upon-receipt retainer from the same Pay Pal account that he froze on behalf of Liberty.

[40]    Specifically, in his Sur-Reply in Further Support of Opposition to Liberty's Motion to Compel Production of [Liberty's] iPhone Currently in [His] Possession, submitted on July 31, 2013, Mr. Randazza argued that in order to accommodate Oron's "insistence that a component of any settlement would be some assurance that [he] would not be counsel against them again," he purportedly solved the "ethical quandary" by allowing Oron to retain him "after all matters with [Liberty] were settled in full."

002585

Oron Matter was worth from Mr. Randazza's perspective (contrary to his belief that the TNA Matter settled for substantially less than what it was worth), the $75,000.00 payment earmarked for Mr. Randazza out of Oron's frozen Pay Pal account precluded Mr. Randazza from giving unbiased advice to Liberty in regard to settlement; at a minimum, it raises a substantial question regarding whether Oron would have been willing to pay the additional $75,000.00 to Liberty (instead of Mr. Randazza) in order to settle its claims.  Mr. Randazza should have disclosed these issues to Liberty pursuant to Nevada RPC 1.4, but did not.

   32.8. Mr. Randazza attempted to avoid sharing the $75,000.00 payment from Oron with Liberty by claiming that it would constitute "illegal fee sharing."  His argument misses the point.  Nevada RPC 5.6(b) flatly prohibited him from discussing being retained by Oron while settling the Oron Matter.  Nevertheless, the fact that he was willing to share legal fees with a non-lawyer—an act prohibited by Nevada RPC 5.4(a)—demonstrates his willingness to disregard the rules of professional conduct when it suits his interests to do so.

   32.9. Aside from the impermissible restriction on his right to practice law and resulting conflict of interest (neither of which he disclosed to Liberty as required by Nevada RPC 1.4 and 1.7(b)), Mr. Randazza impermissibly obtained a personal interest in the Oron Matter by loaning money to Liberty to fund the litigation in Hong Kong.

   32.9.1. The loan[41] to Liberty constituted a business transaction. Accordingly, Mr. Randazza had to meet certain requirements to complete the transaction under Nevada RPC 1.8(a), including advising Liberty in writing of the desirability of consulting with independent counsel and being given a reasonable opportunity to do so.  I have not seen any

---

[41] I do not view the transaction as an advance of costs by Mr. Randazza as permitted by Nevada RPC 1.8(e). I have never seen a lawyer ask his client to sign a promissory note governing the terms of repayment of litigation costs—liability for such costs should be addressed in an engagement letter.

002586

documents or evidence from the Case showing that any such written disclosure was made to Liberty.

32.9.2. Liberty should have been told to consult with independent counsel about the terms of the promissory note. For example, it includes a unilateral attorneys' fee provision in favor of Mr. Randazza. A separate lawyer for Liberty would surely have revised the provision to make it bilateral.[42] Similarly, the promissory note requires repayment either upon receipt of funds from Oron or within seven (7) days of Mr. Randazza's termination. Mr. Randazza could have terminated his relationship with Liberty while the Oron Matter was pending (in fact, he did), thereby triggering repayment of the loan before Liberty settled with Oron (defeating Liberty's expectation that Mr. Randazza would be paid out of future settlement funds). Independent counsel for Liberty would likely have removed this alternative repayment date and either made payment contingent on any future recovery from Oron or over time, whether with or without interest (so that Liberty did not have to pay it all back at once while still funding the litigation against Oron in Nevada and Hong Kong).

32.9.3. In addition, Mr. Randazza had to obtain Liberty's informed consent, confirmed in writing, to the essential terms of the transaction and Mr. Randazza's role as a lender in the transaction, which required Mr. Randazza to explain the advantages and disadvantages of the loan and reasonably available alternatives (*e.g.*, borrowing money from a different lender, negotiating alternative terms for repayment, etc.). *See, e.g., In re Discipline of Singer*, 109 Nev. 1117, 1120, 865 P.2d 315, 317 (1993). I have not seen any documents or

---

[42]    The governing law provision is particularly important as it pertains to the attorneys' fee provision. For example, unlike Nevada, California has a statute that creates a rule of reciprocity with respect to the contractual right to recover attorneys' fees in an action brought to enforce the contract; specifically, if a contract allows one party to recover its fees to enforce the contract, the other party can likewise recover its fees "whether he or she is the party specified in the contract or not." *See* Cal. Civ. Code § 1717(a); *contra Rowland v. Lepire*, 99 Nev. 308, 315-16, 662 P.2d 1332, 1336-37 (1983) (providing that the Nevada district court erred in finding an implied contractual right for a party to recover its attorneys' fees "under the theory of mutuality of remedy").

002587

evidence from the Case showing that any such written disclosure was made by Mr. Randazza to Liberty, let alone informed written consent provided by Liberty. Importantly, the fact that Liberty signed the promissory note does not constitute written consent to the essential terms of the transaction and Mr. Randazza's role in the transaction—such written consent had to be obtained separately by Mr. Randazza. *See, e.g.*, *In re Trewin*, 684 N.W.2d 121, 135-36 (Wis. 2004) (explaining that Rule 1.8(a) "clearly contemplates two separate writings").

32.9.4. The loan created a conflict between Mr. Randazza's duty of loyalty to Liberty and his own self-interest. In fact, Mr. Randazza admitted in an email that his personal credit was on the line in the Oron Matter as a direct result of loaning money to Liberty. The fact that he risked losing his own money jeopardized his ability to exercise independent professional judgment.

32.9.5. The loan also created a personal conflict of interest for Mr. Randazza because he was simultaneously representing Liberty in the Oron Matter, requiring him to comply with Nevada RPC 1.7(b). I have not seen any documents or evidence from the Case showing that Mr. Randazza obtained informed consent, confirmed in writing, from Liberty to the conflict of interest created by Mr. Randazza's personal interest in the Oron Matter.

32.9.6. Finally, Mr. Randazza improperly utilized his position as counsel for Liberty in the Oron Matter to guarantee himself repayment of the loan. In his August 29, 2012 email to Mr. Gibson, Mr. Randazza indicated that he would repay himself out of the settlement proceeds that he recovered for Liberty from Oron (rather than wait to be paid once Liberty received the settlement funds as stated in the promissory note).

002588

32.9.7. Because Mr. Randazza did not comply with Nevada RPC 1.8(a) when he loaned money to Liberty, the transaction may be voidable at Liberty's election.[43] *See, e.g., DiLuglio*, 755 A.2d at 772.

32.10.  Mr. Randazza should not have continued to assist other attorneys in pursuing claims against Oron following the Oron Settlement.

32.10.1.        The Oron Settlement agreement clearly states that Liberty shall actively dissuade others from pursuing claims against Oron.  Mr. Randazza was Liberty's attorney at the time, and his actions after settlement (while the case was still pending) may be attributable to Liberty under the law of agency.[44]  Mr. Randazza's violation of the Oron Settlement potentially exposed Liberty to a claim for breach of the Oron Settlement, and in fact, was the subject of claims filed by Oron against Liberty in separate arbitration.

32.10.2.        Mr. Randazza knew that his conduct was in violation of the Oron Settlement agreement as he admits in the August 28, 2012 email that he sent to his paralegal ("Don't assist Mr. Sperlein further.  It violates our settlement with [O]ron.").

32.10.3.        It is unknown to me why Mr. Randazza believed that he could continue assisting other lawyers after Oron's time for appeal had passed.  The Oron Settlement agreement does not contain a time-restriction on the provision that requires Liberty to dissuade others from suing Oron.

---

[43]      I am not rendering an opinion concerning whether the arbitrator should void the loan.  I am also not rendering an opinion concerning whether Mr. Randazza would still be entitled to recover the $25,000.00 under a separate unjust enrichment theory; however, unlike an action to recover under the promissory note for breach of contract, Mr. Randazza would not be entitled to recover his attorneys' fees for pursuing an unjust enrichment claim.

[44]      Mr. Randazza arguably acted outside the scope of his authority as Liberty's attorney and for his own personal benefit in assisting other lawyers, relieving Liberty of liability for his actions.  For example, Mr. Randazza asked Ms. Benson on July 10, 2012 about joining her team in pursuing claims against Oron on behalf of her client, indicating that he "want[s] to be part of killing Oron."  Any such work would not have been for Liberty's benefit (since all such fees would have been paid to Mr. Randazza), and thus, was only meant to advance Mr. Randazza's personal interests.

002589

32.10.4.        While Mr. Randazza appeared to have initial client approval to work with other attorneys who were pursuing or contemplating bringing similar claims against Oron, once he settled with Oron (and sought enforcement of the Oron Settlement agreement with the Nevada Federal Court), such a material change in circumstances required him to obtain approval from Liberty under Nevada RPC 1.2(a) in order to continue assisting other attorneys. I have not seen any documents or evidence from the Case showing that Mr. Randazza had authority from Liberty to continue helping other lawyers pursue claims against Oron following the Oron Settlement. As a result, he acted outside the scope of his authority.

32.11.  Finally, Mr. Randazza potentially exposed his client, Liberty, to liability by acquiescing in and ratifying the means by which Mr. Grady's "forensic investigator" obtained information related to Oron.[45]

32.11.1.        Based on the emails that were exchanged between Messrs. Randazza and Grady, it is clear that Mr. Grady, through his source: (i) obtained access to Oron's email account, which included privileged emails that Oron was exchanging with its lawyers, including Mr. Lieberman, related to the Oron Matter; (ii) received confidential business and financial information related to Oron; and (iii) accessed Mr. Bochenko's personal email account and Skype phone logs.

32.11.2.        Mr. Randazza knew that Mr. Grady's source was a hacker who used improper or wrongful means to gain access to privileged and confidential information concerning Oron. A reasonable lawyer under similar circumstances would have refrained from utilizing the services of Mr. Grady's source or any of the information that he provided, since it was being obtained through unlawful means. Instead, Mr. Randazza took advantage of the

---

[45]     Mr. Randazza acted outside the scope of his authority as Liberty's attorney by relying on information from a hacker who unlawfully accessed Oron's email accounts and banking information.

002590

information that Mr. Grady's source obtained from Oron in obtaining a Temporary Restraining Order against Oron.

        32.11.3.      Even though Mr. Randazza turned a blind eye to the means by which Mr. Grady's source was obtaining information from Oron, his willful ignorance does not excuse non-compliance with the rule against obtaining evidence by wrongful means in violation of the rights of another party.  By taking advantage of the information that Mr. Grady's source obtained from Oron (and soliciting Mr. Grady to get additional information through his source), rather than refusing to work with Mr. Grady or his source, Mr. Randazza violated Nevada RPC 4.4(a) and Nevada RPC 8.4(a).

        32.12.  Based on the totality of the circumstances, it is my opinion that Mr. Randazza suffered from multiple conflicts of interest in the Oron Matter and violated his ethical and fiduciary obligations by seeking to be retained by Oron while negotiating to settle the Oron Matter (an indirect restriction on his right to practice law) as well as by making an improper loan to Liberty and taking actions that exposed Liberty to potential claims by Oron, including assisting other lawyers in pursuing similar claims against Oron after settlement and by taking advantage of information about Oron that a source obtained from Oron in violation of Oron's legal rights—all without informed written consent from or notice to Liberty.

OTHER CONFLICTS ISSUES

        33.      The third issues that I address concern whether Mr. Randazza had one or more conflicts of interest arise during the course of his employment with Excelsior and representation of Liberty (the "Other Conflicts Issues").

002591

<u>Background</u>

34.    The following events are pertinent to the Other Conflicts Issues and, except as otherwise provided herein, do not appear to be subject to reasonable dispute.  Therefore, they are assumed true for purposes of this opinion.

34.1.    Pursuant to his employment agreement with Excelsior (dated June 10, 2009), Mr. Randazza was entitled to "provide professional services to a limited number of outside clients on an ongoing basis, as long as such services [were] rendered without legal or professional conflict with Excelsior, and such projects [w]ere rendered through a separate legal entity[.]"[46]  Such work for other clients had to occur "during non-working hours, on vacation days, or on unpaid leave days."  Mr. Randazza agreed that his work for Excelsior would always take precedence over his work for other clients.[47]

34.2.    Mr. Randazza's right to represent a limited number of outside clients was neither permanent nor unrestricted; another portion of his employment agreement stated that the majority of his current work for other clients would "taper down as quickly as ethically and practically possible."

34.3.    Despite his contractual and ethical obligations to remain conflict free, Mr. Randazza represented companies with interests materially adverse to Excelsior and Liberty without obtaining informed consent, confirmed in writing, from Excelsior and Liberty;[48] specifically:

---

[46]    I have not seen any document memorializing Mr. Randazza's attorney-client relationship with Liberty; regardless, the rules of professional conduct govern how he has to handle conflicts.

[47]    Mr. Randazza stated in an email to Mr. Gibson on May 19, 2009 (prior to formalizing his employment relationship with Excelsior) that he would not permit conflicts to arise through his representation of other clients while working for Excelsior, and if conflicts arose, he would resolve them in Excelsior's favor.

[48]    Mr. Randazza alleges in his arbitration demand that Mr. Gibson expressly consented to Mr. Randazza's representation of other clients including "when a possible conflict could arise."  Even assuming that such consent could be given, I have not seen any documents or evidence from the Case evidencing informed consent, confirmed

002592

*Bang Bros*

34.3.1. Mr. Randazza has represented Bang Bros for several years.[49] According to Mr. Randazza, he billed nearly seventy-nine (79) hours to Bang Bros while he was representing Excelsior and Liberty.  Jason Fisher, Esq. ("Mr. Fisher"), an employee of RLG, spends half of his time working for RLG and half of his time working for Bang Bros.

34.3.2. In or around June 2012, Liberty was negotiating a potential acquisition of Cody Media, Inc. ("Cody Media"), a large producer of adult entertainment videos, for five million five hundred thousand dollars ($5,500,000.00).  Liberty intended to finance the acquisition through one or more third-parties.  Mr. Randazza was kept informed about the acquisition.

34.3.3. According to Liberty, Mr. Randazza suggested that it obtain financing from Bang Bros to acquire Cody Media; however, he failed to advise Liberty that he also represented Bang Bros and did not obtain informed consent, confirmed in writing, to continue representing both Bang Bros and Liberty once it became apparent that his representation of Liberty could be materially limited by his concurrent representation of Bang Bros.

34.3.4. According to Mr. Randazza, he orally disclosed his relationship with Bang Bros to Liberty and agreed to waive any broker's fee that he would have otherwise expected to have received from Liberty through arranging its source of financing to acquire Cody

---

in writing, from Mr. Gibson on behalf of Excelsior and Liberty to Mr. Randazza's work for clients with interests adverse to those of Excelsior and Liberty.  Mr. Randazza also denies that any conflicts arose while he worked for Excelsior and Liberty.

[49]     In November 2011, an employee of Titan Media, a company that produces adult entertainment videos, emailed Mr. Randazza about a copyrighted video owned by Titan Media that was available for viewing on a website owned by Bang Bros.  Mr. Randazza advised in response that he would be conflicted out of any potential action against Bang Bros.

002593

Media. It is unknown to me whether Mr. Randazza anticipated receiving a finder's fee from Bang Bros for arranging the potential transaction with Liberty.

34.3.5. Liberty did not proceed with the acquisition of Cody Media.

### *XVideos*

34.3.6. Mr. Randazza has represented XVideos for several years. According to Mr. Randazza, he billed approximately one hundred and two (102) hours to XVideos while he was representing Excelsior and Liberty.

34.3.7. In January 2011, Liberty contemplated suing XVideos for copyright infringement. Mr. Randazza was reluctant to do so. In an email to Excelsior, dated January 17, 2011, Mr. Randazza indicated that he and Jessica Christensen, Esq. ("Ms. Christensen"), an employee of RLG, had previously advised XVideos to implement a system for detecting unauthorized uploads of copyrighted works onto its website, which would present a strong defense to copyright infringement claims. He then noted that it would present an "ethical problem" for him to sue XVideos. No further details were contained in the email.

34.3.8. Because Liberty was contemplating suing XVideos, Mr. Randazza called XVideos to advise it that he could not represent it in an upcoming dispute with Liberty. According to Liberty, Mr. Randazza did not have authority to disclose its intent to sue XVideos to XVideos.

34.3.9. In September 2011, Liberty again contemplated suing XVideos for copyright infringement. Mr. Randazza advised against that proposed course of action, claiming that XVideos' use of Liberty's content was "fair use," and thus, protected under federal law. He indicated that Liberty would look bad from a publicity standpoint for bringing a claim against XVideos and advised against sending it a DMCA takedown request.

002594

34.3.10.   According to Liberty, Mr. Randazza did not disclose that he represented XVideos and did not obtain informed consent, confirmed in writing, from Liberty to continue representing XVideos once it became apparent that his representation of Liberty could be materially limited by his concurrent representation of XVideos.

<em><u>Porn Guardian</u></em>

34.3.11.   Mr. Randazza has represented Porn Guardian since January 2011. According to Mr. Randazza, he billed nearly three (3) hours to Porn Guardian while he was representing Excelsior and Liberty.

34.3.12.   In or around early 2012, Mr. Randazza retained Porn Guardian on Liberty's behalf to monitor unauthorized uploads of its copyrighted works to various file sharing websites, including content uploaded onto Oron's website, and to send DMCA takedown requests to the owners of such websites, including Oron, in exchange for a monthly fee. Pursuant to an email from J. Malcolm DeVoy IV, Esq. ("Mr. DeVoy"), an employee of RLG, to Mr. Gibson, dated August 22, 2012, Mr. Randazza used his "long-standing relationship" with Porn Guardian to obtain a reduced fee for its services.

34.3.13.   During the course of the Oron Matter, a dispute[50] arose between Porn Guardian and Oron.

34.3.14.   Mr. Randazza attempted to include a settlement of the dispute between Porn Guardian and Oron as a part of the settlement between Liberty and Oron even though Porn Guardian was not a party to the Oron Matter. Specifically, on July 1, 2012, Mr. Lieberman (counsel for Oron) emailed a draft settlement offer to Mr. Randazza. In addition to paying Liberty Media $550,000.00 out of its frozen Pay Pal account, Oron offered to pay Porn

---

[50]  I am not aware of the facts or circumstances surrounding the dispute.

<strong>Page 54 of 89</strong>

002595

Guardian fifty thousand dollars ($50,000.00). The settlement offer stated that "there will be two separate agreements that shall be signed concurrently and that . . . neither shall be enforceable unless the other has also been signed."

34.3.15.    On July 2, 2012, Mr. Randazza responded to Mr. Lieberman and told him that "we have a deal." However, he also indicated that he was "starting to feel a little bit of a conflict in repping [sic] both [companies,] so [he was] having [Porn Guardian] continue either pro se, or with separate counsel."

34.3.16.    According to Liberty, Mr. Randazza never advised the company that he was concurrently representing Porn Guardian and did not obtain informed consent, confirmed in writing, to such concurrent representation.

34.3.17.    I have not seen any evidence to indicate whether Oron settled its dispute with Porn Guardian, or used funds from its frozen Pay Pal account to do so.

*Titan Media and Kink.com*

34.3.18.    Mr. Randazza has represented the owner of Kink.com for several years. According to Mr. Randazza, he billed almost nine (9) hours to Kink.com while he was representing Excelsior and Liberty. Mr. Randazza has also represented Titan Media since at least May 2011.

34.3.19.    During the course of his relationship with Liberty, Liberty acquired the internet domain "gay.xxx." With Mr. Randazza's assistance, Liberty began entering into producer agreements with other adult entertainment producers to sell their content on gay.xxx.

34.3.20.    It is my understanding that in mid-2012, Titan Media and Kink.com entered into producer agreements with Liberty related to gay.xxx. During the course

002596

of negotiating the producer agreement with Titan Media, Mr. Randazza urged Liberty to make an exception with respect to a certain term of the agreement as requested by Titan Media.

34.3.21. According to Liberty, Mr. Randazza never disclosed that he represented Titan Media and Kink.com in other matters and did not obtain its informed consent, confirmed in writing, to do so once it became apparent that his representation of Liberty could be materially limited by his concurrent representation of Titan Media and Kink.com.

<u>Mr. Randazza Breached His Fiduciary Duty By Engaging in Multiple Conflicts of Interest</u>

35. The Other Conflicts Issues presented in the Case are whether Mr. Randazza had one or more conflicts of interest arise during the course of his employment with Excelsior and work for Liberty, including with respect to Bang Bros, XVideos, Porn Guardian, Titan Media and Kink.com, which required him to disclose the conflict to Excelsior and Liberty and obtain informed consent, confirmed in writing, from Excelsior and Liberty.

36. The basic rules and principles governing the duty of loyalty are set forth in Paragraph 19, *supra*, and incorporated herein by reference. The basic rules and principles governing conflicts between clients with interests (potentially or actually) materially adverse to one another are as follows.[51]

36.1. California RPC 3-310(C)(1) provides that an attorney shall not, without the informed written consent of each affected client, accept representation of more than one client in a matter in which each client's interests potentially conflict. Similarly, California RPC 3-310(C)(2) provides that an attorney shall not, without the informed written consent of each affected client, continue the representation of more than one client in a matter in which each client's interests actually conflict.

---

[51] The conflicts addressed in this section involve acts that occurred in both California and Nevada.

002597

36.2.    The rule against representing conflicting interests in a matter applies even if the attorney's intentions are honest. *See, e.g., Flatt*, 885 P.2d at 958. "A lawyer's failure to inform the clients [of a conflict] might . . . bear on the motives and good faith of the lawyer." RESTATEMENT (THIRD) LAW GOVERNING LAWYERS § 122 cmt. b.

36.3.    Nevada RPC 1.7(a)(2) provides that an attorney shall not represent a client if there is a significant risk that the representation will be materially limited by the lawyer's responsibilities to another client (a concurrent conflict of interest).  However:

36.3.1. If an attorney reasonably believes that he can competently and diligently represent both clients; and

36.3.2. The representation does not involve the assertion of a claim by one client against the other client in the same matter; and

36.3.3. The representation is not prohibited by law, the attorney can undertake the representation if—but only if—both affected clients provide informed consent, confirmed in writing. *See* Nevada RPC 1.7(b).

36.4.    The rule against representing conflicting interests in the same matter is intended to ensure that clients do not feel betrayed or fear that their lawyers will hesitate to zealously represent their interests out of deference to other clients. *See* MODEL RULES OF PROF'L CONDUCT R. 1.7 cmt. [6]; *see also* RESTATEMENT (THIRD) LAW GOVERNING LAWYERS § 121 cmt. b (explaining that a conflict of interest can undermine a lawyer's independent professional judgment).  In other words, a lawyer who represents conflicting interests in a matter may be limited in advocating all possible positions that each client might take "because of the lawyer's duty of loyalty to the others." MODEL RULES OF PROF'L CONDUCT R. 1.7 cmt. [8]. "The critical questions are the likelihood that a difference in interests will eventuate and, if it does, whether it

002598

will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client." *See id.*

36.5.   "If a conflict arises after representation has been undertaken, the lawyer ordinarily must withdraw from the representation, unless the lawyer has obtained the informed consent of the client under the conditions of paragraph (b)." MODEL RULES OF PROF'L CONDUCT R. 1.7 cmt. [4].

36.6.   "Relevant factors in determining whether there is significant potential for material limitation include the duration and intimacy of the lawyer's relationship with the client or clients involved, the functions being performed by the lawyer, the likelihood that disagreements will arise and the likely prejudice to the client from the conflict." MODEL RULES OF PROF'L CONDUCT R. 1.7 cmt. [26]. "The question is often one of proximity and degree." *Id.*

36.7.   "While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.9, or 2.2, unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm." Nevada RPC 1.10(a).

36.8.   The rule of imputation of conflicts is premised on the fact that "a firm of lawyers is essentially one lawyer for purposes of the rules governing loyalty to the client, or from the premise that each lawyer is vicariously bound by the obligation of loyalty owed by each lawyer with whom the lawyer is associated." MODEL RULES OF PROF'L CONDUCT R. 1.10 cmt. [2]; *see also* RESTATEMENT (THIRD) LAW GOVERNING LAWYERS § 14 cmt. h (explaining that

002599

once a client retains an attorney, it is generally understood that the attorney's law firm and its members assume similar responsibility for representing the client).

37.    Based on these and other rules and principles governing professional responsibility and legal ethics, and the documents and materials reviewed in connection with the Case, it is my opinion that Mr. Randazza: (i) had a conflict of interest related to the Cody Media acquisition based on his and his associate's concurrent work for Bang Bros, for which he did not obtain informed written consent from Liberty in violation of Nevada RPC 1.7(a)(2); (ii) had a conflict of interest in advising Liberty not to pursue a copyright infringement action against XVideos based on his existing professional relationship with XVideos, for which he did not obtain informed written consent from Liberty in violation of California RPC 3-310(C)(2); (iii) had a conflict of interest in both hiring Porn Guardian as Liberty's DMCA agent and in negotiating a potential settlement for Porn Guardian in the Oron Matter on behalf of Porn Guardian, for which he did not obtain informed written consent from Liberty in violation of Nevada RPC 1.7(a)(2); and (iv) had a conflict of interest related to the producer agreements that Liberty signed with Titan Media and Kink.com based on his existing professional relationship with both of these companies, for which he did not obtain informed written consent from Liberty in violation of Nevada RPC 1.7(a)(2); specifically:

37.1.    Mr. Randazza was permitted to maintain a small client base outside of his work for Excelsior and Liberty.  However, he could not allow his outside work to result in conflicts of interest or interfere with his loyalty and independent professional judgment. Nevertheless, he frequently acted in the face of conflicts of interest without obtaining informed written consent from Excelsior and Liberty to do so.

002600

37.2.    First, with regard to Bang Bros, Mr. Randazza should have explained in writing to Liberty his ongoing work for Bang Bros and the work that was being performed by Mr. Fisher for Bang Bros as its part-time in-house counsel.[52]  While Mr. Randazza claims that he orally disclosed his professional relationship with Bang Bros to Liberty, I have not seen any documents or evidence from the Case showing that such disclosure was made in writing as required by Nevada RPC 1.7(b).  Nevertheless, Mr. Randazza further needed Liberty to consent in writing to his and Mr. Fisher's concurrent work for Bang Bros[53] to the extent that he was going to advocate having Liberty use Bang Bros to finance the acquisition of Cody Media.  No such written consent was sought or obtained by Mr. Randazza from Liberty.

37.3.    The conflict with Bang Bros was obvious because, on the one hand, Mr. Randazza had an obligation to negotiate the best deal for Liberty to finance the purchase of Cody Media; on the other hand, Mr. Randazza had an interest in benefiting Bang Bros by convincing Liberty to pay a high interest rate, among other loan terms.[54]  There was a substantial likelihood that if Liberty elected to use Bang Bros to finance the acquisition of Cody Media, a difference of opinions would have arisen that would have interfered with Mr. Randazza's ability to zealously represent both clients with respect to the transaction.

37.4.    While the conflict involving Bang Bros was consentable, Mr. Randazza did not obtain it from either client, resulting in a violation of Nevada RPC 1.7(a)(2).  *See* MODEL RULES OF PROF'L CONDUCT R. 1.7 cmt. [28] (providing that a lawyer may represent more than

---

[52]    Because Mr. Fisher was exposed to Liberty's confidential information while representing Liberty in litigation, there was a significant risk of disclosure of that information by Mr. Fisher to Bang Bros.

[53]    By working part-time for Bang Bros, Mr. Fisher would have been conflicted out of matters adverse to Bang Bros.  His conflict was imputed to Mr. Randazza and the other members of his firm (RLG) pursuant to Nevada RPC 1.10(a).

[54]    Although Mr. Randazza claims that he told Liberty that he would waive any applicable finder's fee for locating Bang Bros to finance the acquisition of Cody Media, it is unknown whether Mr. Randazza sought to collect a similar or related fee from Bang Bros.

002601

one client in a matter where their interests are generally aligned "even though there is some difference in interest among them").

    37.5.   Second, with regard to XVideos, Mr. Randazza should have refrained from advising Liberty on the merits of a copyright infringement action against XVideos based on his and Ms. Christensen's concurrent work for XVideos, particularly since he and Ms. Christensen had assisted XVideos in implementing a software system intended—by Mr. Randazza's own admission—to insulate XVideos from future liability for or, at a minimum, to provide a strong defense to, copyright infringement actions.  Instead, Mr. Randazza dissuaded Liberty from bringing suit against XVideos.

    37.6.   Mr. Randazza was put between a rock and a hard place once he was asked to advise Liberty on the merits of a lawsuit against XVideos.  Had he chosen to sue XVideos, XVideos likely would have sought to disqualify him based on his and Ms. Christensen's prior work for XVideos related to the matter.

    37.7.   Under these circumstances, the conflict with XVideos was not consentable because it involved a potential claim by one of Mr. Randazza's clients against his other client. He should have referred the matter to separate counsel.  By failing to do so, and instead giving Liberty advice on the matter, he violated California RPC 3-310(C)(2).

    37.8.   Third, with regard to Porn Guardian, Mr. Randazza had an obligation to inform Liberty at the time that he hired Porn Guardian to act as its DMCA agent that he also represented Porn Guardian in various matters.  While their interests were aligned and the relationship appeared amicable, there was a potential for a conflict that could arise if Liberty later questioned the work being performed by Porn Guardian.[55]

---

[55]    And in fact, such conflict did arise when Mr. Gibson complained about the fees charged by Porn Guardian.

002602

37.9.   Once Mr. Randazza recovered the $550,000.00 settlement payment from Oron, he informed Liberty that he would pay Porn Guardian for its work related to the Oron Matter out of the settlement proceeds (among other expense deductions) before remitting the balance to Liberty.  Thus, Mr. Randazza sought to protect Porn Guardian's interests over Liberty's (particularly since Mr. Gibson had questioned the fees charged by Porn Guardian).

37.10.  Mr. Randazza had a conflict by concurrently representing Porn Guardian and Liberty in the Oron Matter.  Mr. Randazza attempted to include a settlement between Porn Guardian and Oron in the settlement between Liberty and Oron.  I have not seen any documents or evidence from the Case showing that Mr. Randazza informed Liberty of his intent to utilize the advantages that he obtained over Oron in the Oron Matter (e.g., freezing its Pay Pal account) on behalf of Liberty in furtherance of resolving an undisclosed dispute between his other client (Porn Guardian) and Oron.

37.11.  By negotiating a settlement for Porn Guardian with Oron's counsel, Mr. Randazza potentially diverted settlement funds away from Liberty (since the money would come from the Pay Pal account).

37.12.  Mr. Randazza recognized during settlement negotiations that he had a conflict of interest, and withdrew from continuing to represent Porn Guardian.  However, by that point, he had already reached a settlement in principle with Oron and those parties simply needed to execute a settlement agreement.  Mr. Randazza could not sidestep the conflict by having Porn Guardian represent itself at the eleventh hour.  Mr. Randazza needed Liberty to provide informed consent, confirmed in writing, to the work that he had done and was simultaneously doing for Porn Guardian.  His failure to do so resulted in a violation of Nevada RPC 1.7(a)(2).

002603

37.13. Finally, with regard to Titan Media and Kink.com, Mr. Randazza had to disclose his professional relationship with these companies to Liberty. While their interests were arguably aligned with respect to gay.xxx, there was a potential for a conflict in the future to the extent that a disagreement arose over the terms of the producer agreements, which would have prevented Mr. Randazza from zealously advocating all positions on behalf of all clients. Mr. Randazza needed to obtain Liberty's informed consent, confirmed in writing, to represent Titan Media and Kink.com while negotiating the producer agreements for Liberty. He failed to do so in violation of Nevada RPC 1.7(a)(2).

37.14. Based on the totality of the circumstances, it is my opinion that Mr. Randazza created multiple conflicts of interest during the course of his work for Liberty, which compromised his duty of loyalty, hampered his ability to offer unbiased advice, and precluded him from exercising independent professional judgment.

MISCELLANEOUS ISSUES

38.    The final issues that I address concern whether Mr. Randazza violated either the California Rules of Professional Conduct or Nevada Rules of Professional Conduct while representing Liberty in various other matters and after he ended his relationship with Excelsior and Liberty (the "Miscellaneous Issues").

Material Facts Concerning Megaupload

39.    The following events are pertinent to the Miscellaneous Issues and, except as otherwise provided herein, do not appear to be subject to reasonable dispute. Therefore, they are assumed true for purposes of this opinion.

39.1.    Mr. Randazza represented Liberty in a copyright infringement dispute against Megaupload (the "Megaupload Matter"). Ira P. Rothken, Esq. ("Mr. Rothken") of

Page **63** of **89**

Rothken Law Firm ("Rothken Law") and Venkat Balasubramani, Esq. ("Mr. Balasubranamin") of Focal PLLC ("Focal Law") represented Megaupload.

    39.2.   In August and September 2011, the parties attended mediation through Judicial Arbitration and Mediation Service with the Honorable Eugene F. Lynch (Ret.) ("Judge Lynch"). The parties eventually settled after exchanging multiple drafts of settlement agreements.

    39.3.   During the course of negotiations over the Megaupload Matter, it is my understanding that Mr. Rothken expressed an interest in precluding Mr. Randazza from pursuing similar claims on behalf of other clients against Megaupload.

    39.4.   In an email dated August 22, 2011, Mr. Randazza responded to the interest in taking him out of "future games" against Megaupload as follows:

> In order to address any of your client's concerns about future suits, I am blocking off some time on September 5, 2011 (which should be sufficiently beyond the wire date for my client to consider the matter closed). I will make myself available for an hour . . . to have a conversation with your client about assisting them in putting some protections in place to counter future attacks from other companies. I think that I have some good ideas, which would prove useful to them, and which may act as a prophylactic (if implemented) from future infringement suits. Naturally, to share those ideas, I will need Mega[upload] to share some confidential information with me. And, I believe that possession of that information in that context will place me in a position of not being able to represent other companies against them, as the receipt of that confidential information in the course of representation would make it unethical for me to later represent another party against them.

> However, I must make it clear that I can not [sic] come to any specific terms about that while there is still unresolved business between Mega[upload] and Corbin [Fisher].

002605

But, to help assure your clients that this offer is sincere, [Mr. Balasubranamin] can confirm that I was asked to be co-counsel in defending the Perfect 10 case.[56]  I was willing to do that, (and even excited about the notion) once the conflict between Mega[upload] and Liberty was cleared.  I will state here in writing that I am still willing to assist in that case as well.  In fact, I would enjoy it.

39.5.    Mr. Randazza went on to state that while Megaupload wanted him "to agree to do something unethical," he could not "act that way," and that if he ever agreed "to do something like that, it would . . . bring dishonor upon [him]."  He then repeated that he could discuss representing Megaupload in more detail as soon as he finalized the settlement for Liberty.

39.6.    In his response to Mr. Randazza's August 22, 2011 email, Mr. Rothken told Mr. Randazza to work with Mr. Balasubranamin "in a manner that passes ethical muster."

39.7.    On August 24, 2011, Mr. Randazza wrote an email to Mr. Rothken in which he acknowledged that even discussing the prospect of his future representation of Megaupload was unethical (citing California RPC 1-500).  Mr. Randazza further indicated that a provision of the settlement agreement that was prepared by Mr. Rothken purported to restrict his right to practice law.[57]

39.8.    In his response to Mr. Randazza's August 24, 2011 email, Mr. Rothken indicated that Megaupload "is not asking that you represent them in any manner in any way shape or form or as a condition of entering into any settlement agreement."  He further stated that Megaupload "is not asking that you be improperly restricted in practicing law in any manner," and has "no interest in violating any ethics rules."

---

[56]    In early 2011, Perfect 10, Inc. filed a copyright and trademark infringement action in the United States District Court for the Southern District of California against Megaupload (Case No. 11cv0191-IEG (BLM)).

[57]    I have not seen a copy of the draft settlement agreement.

002606

39.9.    On August 24, 2011, Mr. Randazza sent a follow-up email to Mr. Rothken in which he stated that he must have misinterpreted Megaupload's intentions: "If what you say is correct, then we're good."

39.10.  Notwithstanding the above written exchanges between Messrs. Randazza and Rothken, in a separate email sent by Mr. Randazza to Mr. Rothken on August 24, 2011, he indicated that Mr. Rothken "absolutely could not resist, on each call, trying to get [him] to agree to break [California RPC] 1-500." He then wrote that "[r]ather than file a bar complaint against you for it, I decided to force you to negotiate in a medium in which you know better than to play those games."

39.11.  In response, Mr. Rothken "overtly disclaimed anything that can run afoul of [California RPC 1-500] . . . and advised [Mr. Randazza] to not communicate with [him] about such issues." He further stated that Mr. Randazza "couldn't control [himself] and . . . may have put some uninvited and inappropriate things in writing in one or more emails"; "[Y]ou writing . . . that you would post-settlement look at Mega[upload]'s site and give an hour's worth of an opinion on how to improve it looks like you may have caused yourself to run afoul of the very rule you cite."

39.12.  On August 26, 2011, Mr. Rothken wrote an email to Mr. Randazza addressing various revisions to the parties' current draft of the settlement agreement. It is my understanding that Mr. Randazza asked to include a provision in the agreement indicating that nothing therein violates the Rules of Professional Conduct. Mr. Rothken called it an "extremely unusual provision." He then asked Mr. Randazza to revoke any offers that he (Mr. Randazza) made "that would violate ethical rules," and stated that he and Megaupload reject all such offers.

002607

39.13.  In response to Mr. Rothken's August 26, 2011 email, Mr. Randazza acknowledged that it was an unusual provision.  He then stated as follows:

> I must have hallucinated this fantasy of you telling me that you'd like to pay me $5,000 for some advice after this thing is over, and that Megaupload wanted that certainty.  I apologize for this, occasionally I am delusional when I don't eat for long stretches of time.  So, lets [sic] just agree that this event never happened, that conversation never happened, and I am completely delusional with respect to any notion that it happened.

39.14.  On August 31, 2011, in response to additional proposed revisions to the settlement agreement sent by Mr. Rothken, Mr. Randazza questioned why Mr. Rothken was uncomfortable about including a provision in the agreement which purportedly makes it clear that "nothing in the agreement is intended to violate the rules of professional responsibility."  He later indicated that Mr. Rothken was "trying to do whatever [he] can to circumvent [California RPC] 1-500."

39.15.  Liberty and Megaupload eventually settled the Megaupload Matter.  In brief, Liberty agreed to release its claims against Megaupload in exchange for payment of five hundred twenty-five thousand dollars ($525,000.00) (the "Megaupload Settlement").  Mr. Randazza received the settlement payment on September 26, 2011.

39.16.  According to Liberty, Mr. Randazza did not disclose the fact that he was discussing the prospect of being retained by Megaupload immediately after settlement of the Megaupload Matter in order to conflict him out of future cases against Megaupload.

### Material Facts Concerning Statements Adverse to Excelsior and Liberty

40.    The following events are pertinent to the Miscellaneous Issues and, except as otherwise provided herein, do not appear to be subject to reasonable dispute.  Therefore, they are assumed true for purposes of this opinion.

Page **67** of **89**

40.1.   Mr. Randazza regularly represented Liberty in lawsuits brought against persons who would unlawfully upload and/or download Liberty's copyrighted works on "BitTorrent" websites.

40.2.   Upon advice of Mr. Randazza, Liberty created an "amnesty program" whereby it would send demand letters to persons identified as having engaged in copyright infringement with respect to Liberty's works and offer to settle with those individuals before bringing formal legal action against them.

40.3.   Liberty's amnesty program resulted in a large number of individual settlements for Liberty.  However, it also appears to have generated controversy in the adult entertainment industry because Liberty was accused of being a copyright troll and "outing" young, homosexual males who were secretly viewing Liberty's works on their parents' or friends' computers.

40.4.   In February 2011, Mr. Randazza communicated with an individual who objected to the impact of Liberty's amnesty program on young, homosexual males.  In one of his emails, Mr. Randazza stated that Liberty also owns straight content, and therefore, "any thieving little shit who gets caught can very easily lie to his parents that he was looking at straight porn."

40.5.   Mr. Randazza's comment was subsequently disseminated by various media outlets and caused negative publicity for Excelsior and Liberty.  Several executives from Excelsior subsequently advised Mr. Randazza to refrain from making such statements in the future and to be mindful of how his statements could be misinterpreted.  Mr. Randazza agreed that his comment was in "error" and a result of "bad judgment."

002609

<u>Material Facts Concerning Improper Retention of Company Property</u>

41.    The following events are pertinent to the Miscellaneous Issues and, except as otherwise provided herein, do not appear to be subject to reasonable dispute. Therefore, they are assumed true for purposes of this opinion.

41.1.    Mr. Randazza acknowledged in his employment agreement with Excelsior that he would not use Excelsior equipment for other clients (except for incidental or *de minimus* use) and, in an addendum to his employment agreement, acknowledged that he would immediately return all Excelsior equipment and other property belonging to Excelsior in his possession at the end of his employment.

41.2.    Immediately after ending his employment relationship with Excelsior, Mr. Randazza wiped all personal data on his company-issued laptop.[58] Mr. Randazza did so without first notifying Excelsior.

41.3.    While employed by Liberty, Mr. Randazza assisted in drafting the company's employee handbook, which includes a provision that prohibits personal use of company property.

41.4.    Despite the fact that Mr. Randazza's relationship with Excelsior has ended, Mr. Randazza has refused to return his company-issued iPhone. According to Mr. Randazza, Mr. Gibson approved the use of Mr. Randazza's iPhone to communicate with other

---

[58]    Excelsior believes that Mr. Randazza deleted company files from his laptop; however, Mr. Randazza denies doing so and maintains that all company files were stored on a cloud server, and not on his laptop. On August 29, 2012, Mr. Randazza instructed Ms. Dillon to transfer various files from the server for Excelsior and Liberty to his law firm's server and to cut off access to his law firm's server for Excelsior and Liberty. I have not seen any documents or evidence from the Case identifying what specific information, other than personal information, was deleted from Mr. Randazza's laptop or transferred to RLG's server (the forensic analysis performed by QUiVX simply confirms that data was in fact deleted without describing the actual data). I reserve the right to amend this Affidavit if it is later determined that Mr. Randazza deleted company files that may have been stored on his laptop and/or removed files that belonged to Excelsior and Liberty.

002610

clients and for personal use during the course of his employment with Excelsior. Mr. Gibson denies giving him such approval.

      41.5.   I have not seen any documents or evidence from the Case showing that Excelsior amended its employment agreement with Mr. Randazza in writing in order to permit Mr. Randazza to use his iPhone for personal use and to communicate with other clients.[59]

Material Facts Concerning Mr. Randazza's Assistance of a Former

Excelsior Employee in a Matter Directly Adverse to Excelsior

      42.    The following events are pertinent to the Miscellaneous Issues and, except as otherwise provided herein, do not appear to be subject to reasonable dispute. Therefore, they are assumed true for purposes of this opinion.

      42.1.   According to information provided by Littler, a former Excelsior employee, Eric Carrender ("Mr. Carrender"), has filed a claim against Excelsior for sexual harassment. Mr. Carrender claims that he was harassed by Nick Mosier ("Mr. Mosier"), another Excelsior employee.

      42.2.   It is my understanding that Excelsior has used a forensic expert in the Case to obtain deleted text messages from Mr. Randazza's iPhone. Those text messages reveal that Mr. Randazza has communicated with Mr. Mosier about Mr. Carrender's claim against Excelsior.[60] For example, on May 25, 2013, Mr. Randazza texted Mr. Mosier that he should testify for Mr. Carrender against Excelsior with respect to the harassment claim.

---

[59]     In an unrelated context while handling a dispute between Excelsior and one of its actors, Mr. Randazza was quick to point out that the actor's agreement required all contract modifications to be "in writing" in order to be valid. Mr. Randazza then wrote: "Why? I because I put that in there so we never have a legal issue with someone claiming 'Brian said,' or 'Jason said,'" and them saying 'no we did not.'"

[60]     Mr. Mosier assisted Mr. Randazza with deleting information on his company-issued laptop at the conclusion of Mr. Randazza's employment with Excelsior.

002611

42.3.    According to information provided by Littler, the events underlying Mr. Carrender's claim occurred while Mr. Randazza was employed as Excelsior's in-house general counsel.

42.4.    Along with talking to Mr. Mosier about Mr. Carrender's claim, Mr. Randazza has communicated directly with Mr. Carrender, and in fact, encouraged him to pursue his claim against Excelsior.

42.4.1. Mr. Randazza and his law firm (RLG) initially agreed to represent Mr. Carrender with respect to the matter, as indicated by Mr. DeVoy (a member of RLG) in an email to Mr. Carrender, dated June 6, 2013 ("As your attorney . . . our communications will be privileged"). In that same email, Mr. DeVoy discussed meeting with Mr. Carrender in person to discuss his claim against Excelsior.

42.4.2. On June 18, 2013, Mr. Carrender emailed the results of an investigation conducted by the Nevada Equal Rights Commission ("NERC") with respect to his claim against Excelsior to Messrs. Randazza and DeVoy and discussed his anticipated response. He also asked Messrs. Randazza and DeVoy for advice; to wit, "Let me know what you want me to do, you guys are the experts."

42.4.3. On June 25, 2013, Mr. Carrender sent a draft of his response to NERC to Messrs. Randazza and DeVoy for review, and said, "[T]hank you for the help thus far."

42.4.4. On June 25, 2013, Mr. Randazza sent an email to Mr. Carrender indicating—for the first time—that he "cant [sic] advise you" regarding the response to NERC because "I am not your attorney." He did, however, indicate that he would "serve as a witness that you were not incompetent." Mr. Randazza later told Mr. Carrender that he did not believe Excelsior's "story . . . makes a lot of sense."

002612

42.4.5. After claiming that he did not represent Mr. Carrender (without addressing the prior advice and assistance given to Mr. Carrender by him and Mr. DeVoy), Mr. Randazza assisted Mr. Carrender in trying to locate another attorney to represent him with respect to the matter, giving him the names of several attorneys to consider.

### Material Facts Concerning Mr. Randazza's Improper Communication with and Solicitation of Inside Information from a Former Excelsior Director

43.    The following events are pertinent to the Miscellaneous Issues and, except as otherwise provided herein, do not appear to be subject to reasonable dispute. Therefore, they are assumed true for purposes of this opinion.

43.1.    Mr. Randazza and Chip Carter ("Mr. Carter"), a former Excelsior employee, have texted about the current dispute between Mr. Randazza, Excelsior and Liberty. For example:

43.1.1. On April 5, 2013, Mr. Randazza asked to review a copy of Excelsior's bar complaint against Mr. Randazza. Mr. Randazza told Mr. Carter to use a personal email address, and not Excelsior email address, to send him the complaint. Mr. Randazza then texted with Mr. Carter regarding his opinions related to the merits of the bar complaint.

43.1.2. On April 5, 2013, Mr. Carter texted Mr. Randazza and advised him that Brian Dunlap (Excelsior's Vice President of Business Development) "knows someone [is] feeding you info- or suspects strongly."[61] Because both of them were planning to attend the same event, Mr. Randazza told Mr. Carter to avoid him and that, "if we bump in to each other, tell me to fuck off so you're covered." Mr. Carter later suggested that the two of them stop texting; to wit: "Well I'm not a lawyer, but no further contact is probably best."

---

[61]    According to information provided by Littler, Mr. Carter was feeding information about the Case to Mr. Randazza.

002613

43.1.3. According to information provided by Littler, Mr. Randazza approached Mr. Dunlap at the event and quoted sales figures for Liberty to Mr. Dunlap even though Mr. Randazza no longer had access to those figures and the information is not public.

43.2. At the time that he was communicating with Mr. Randazza, Mr. Carter was the Director of Marketing for Excelsior and Liberty, and his office was in the executive team wing of the building.

43.3. Mr. Randazza knew that Excelsior and Liberty were represented by counsel in the Case at the time that he was speaking with Mr. Carter.

### Mr. Randazza Breached His Fiduciary Duty and Failed to Meet the Standard of Care
### While Representing Excelsior and Liberty in Other Matters

44. The Miscellaneous Issues presented in the Case are as follows:

44.1. Whether Mr. Randazza, during the course of settling the Megaupload Matter:

44.1.1. Failed to communicate with Liberty about being retained by Megaupload immediately after settlement;

44.1.2. Had a personal conflict of interest in settling the Megaupload Matter while simultaneously negotiating to be retained by Megaupload immediately after settlement; and

44.1.3. Improperly attempted to restrict his right to practice law;

44.2. Whether Mr. Randazza improperly revealed confidential information related to his representation of Liberty to XVideos without Liberty's consent;

44.3. Whether Mr. Randazza acted outside the scope of his representation of Excelsior and Liberty by making statements to a third party adverse to their interests;

002614

44.4.    Whether Mr. Randazza is withholding property that belongs to his former client;

44.5.    Whether Mr. Randazza had a conflict of interest in assisting a former employee of Excelsior in a dispute with Excelsior (his former client) without Excelsior's informed, written consent;

44.6.    Whether Mr. Randazza used improper or wrongful means to obtain Liberty's confidential information from an employee of Liberty without Liberty's knowledge or consent; and

44.7.    Whether Mr. Randazza improperly communicated with Liberty and Excelsior concerning the Case despite knowing that Liberty and Excelsior were represented by counsel and did not authorize Mr. Randazza to speak with their executives about the Case.

45.    The basic rules and principles governing communication with a client, personal conflicts of interest and the duty of loyalty, restrictions on a lawyer's right to practice law, the scope of a lawyer's representation of a client and the allocation of authority between the lawyer and client, and a lawyer's obligation to refrain from using methods of obtaining evidence that violate the legal rights of a party are set out in detail in Paragraphs 18-20, 26-28, and 30-31, *supra,* and incorporated herein by reference.

46.    The basic rules and principles governing the confidentiality of information relating to the representation of a client are as follows.[62]

46.1.    California RPC 3-100(A) provides that a lawyer shall not reveal information that is protected from disclosure by law without the client's informed consent.[63]

---

[62]    Mr. Randazza's disclosure of Liberty's confidences to XVideos occurred while he was working in California.

[63]    California RPC 3-100(B) contains an exception that does not apply to the Case.

002615

46.2.    California Business and Professions Code Section 6068(e)(1) provides that a lawyer must "maintain inviolate the confidence, and . . . the secrets[] of his or her client."[64]

46.3.    "Preserving the confidentiality of client information contributes to the trust that is the hallmark of the client-lawyer relationship."  *See* Discussion to California RPC 3-100(A).

47.    The basic rules and principles governing safekeeping client property and returning it upon the conclusion of the representation of a client are as follows.[65]

47.1.    Nevada RPC 1.15(a) provides that a lawyer shall keep client property separate from his own property.

47.2.    Nevada RPC 1.16(d) provides that upon termination of representation, a lawyer shall surrender papers and property to which the client is entitled; however, the lawyer may retain papers belonging to the client to the extent permitted by other law (*e.g.*, a retaining lien).  *See also* NRS 7.055(1) (providing that a discharged attorney shall immediately deliver to the client "all papers, documents, pleadings, and items of tangible personal property which belong to or were prepared for th[e] client").

48.    The basic rules and principles governing former client conflicts are as follows.

48.1.    Nevada RPC 1.9(a) provides that a lawyer "who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing."

---

[64]    California Business and Professions Conduct Section 6068(e)(2) contains an exception that does not apply to the Case.

[65]    Mr. Randazza was working in Nevada at the conclusion of his representation of Excelsior and Liberty.

002616

48.2.    When assessing whether two matters are substantially related, the Nevada

Supreme Court considers the following: (i) the scope of the prior representation; (ii) whether it is

reasonable to infer that confidential information would have been obtained by the lawyer during

the course of the prior matter; and (iii) whether information learned by the lawyer in the prior

matter is relevant to the issues raised in the subsequent matter. *See Nevada Yellow Cab Corp. v.*

*Eighth Jud. Dist. Ct.*, 123 Nev. 44, 52, 152 P.3d 737, 742 (2007); *see also* MODEL RULES OF

PROF'L CONDUCT R. 1.9 cmt. [3] ("Matters are substantially related for purposes of this Rule

if . . . there otherwise is a substantial risk that confidential factual information as would normally

have been obtained in the prior representation would materially advance the client's position in

the subsequent matter.").

48.3.    "The underlying question is whether the lawyer was so involved in the

matter that the subsequent representation can be justly regarded as a changing of sides in the

matter in question." MODEL RULES OF PROF'L CONDUCT R. 1.9 cmt. [2].

48.4.    The substantial relationship test is intended to not only protect client

confidences, but to preserve the client's reasonable expectation of continuing loyalty. *See, e.g.,*

*In re I Successor Corp.*, 321 B.R. 640, 649-50 (Bankr. S.D.N.Y. 2005).

49.    The basic rules and principles concerning a lawyer's obligation to refrain from

communicating with a represented party about the subject of the representation are as follows.

49.1.    Nevada RPC 4.2 provides that in representing a client, "a lawyer shall not

communicate about the subject of the representation with a person the lawyer knows to be

represented by another lawyer in the matter, unless the lawyer has the consent of the other

lawyer or is authorized to do so by law or a court order."

002617

49.2.    Rule 4.2, which is commonly referred to as the "no-contact rule," is intended to "protect the attorney-client relationship from intrusion by opposing counsel." *Palmer v. Pioneer Inn Assocs., Ltd.*, 118 Nev. 943, 948, 59 P.3d 1237, 1240 (2002). "It also promotes counsel's effective representation of a client by routing communication with the other side through counsel, who can present the information in a way most favorable to the client." *Id.* A variety of sanctions are available if a lawyer violates the no-contact rule. *See id.*

49.3.    Nevada follows the managing-speaking agent test, which provides that communications with a represented organization may not occur with those employees who have "speaking" authority for the organization, *i.e.*, "those with legal authority to bind the organization." *Id.* at 955, 960-61, 59 P.3d at 1244-45, 1248.

49.4.    Rule 4.2, like Rule 4.4, applies even if the lawyer is representing himself with respect to the matter. *See* ABA CENTER FOR PROFESSIONAL RESPONSIBILITY, ANNOTATED MODEL RULES OF PROFESSIONAL CONDUCT 416, 430 (7th ed. 2011) (citing cases).

50.    Based on these and other rules and principles governing professional responsibility and legal ethics, and the documents and materials reviewed in connection with the Case, it is my opinion that Mr. Randazza (i) violated California RPC 1-500(A), 3-310(B)(4), 3-500 and 3-510 during the course of settlement negotiations in the Megaupload Matter; (ii) made statements to a third-party that were adverse to the interests of Excelsior and Liberty and that were outside the scope of his authority; (iii) retained his iPhone at the conclusion of his employment with Excelsior in violation of Nevada RPC 1.16; (iv) violated California RPC 3-100 by voluntarily disclosing Liberty's intent to sue XVideos to XVideos without Liberty's express or implied consent; (v) violated Nevada RPC 1.9(a) by initially representing, and then assisting, Mr. Carrender, a former employee of Excelsior, to pursue a sexual harassment claim against

002618

Excelsior; and (vi) violated Nevada RPC 4.2 and 4.4(a) by communicating with and soliciting

Liberty's confidential financial information from a former managing-speaking agent of Liberty

(Mr. Carter) without Liberty's knowledge or consent; specifically:

      50.1.   In response to an inquiry from Megaupload, Mr. Randazza offered to

represent Megaupload immediately after settling the Megaupload Matter (an indirect restriction

on his right to practice law). Mr. Randazza explained the value of his services to Megaupload

and how he would be precluded from suing Megaupload on behalf of other clients in the future if

retained by Megaupload. By so doing, he violated California RPC 1-500(A).

      50.2.   The fact that Mr. Randazza sought to avoid California RPC 1-500(A) by

claiming that the details of his representation for Megaupload would be addressed after

settlement does not change the fact that the matter was discussed at length during settlement

negotiations for the Megaupload Matter.

      50.3.   Mr. Randazza subsequently attempted to disclaim any violation of

California RPC 1-500 by inserting a self-serving provision into the settlement agreement

claiming that it did not violate the Rules of Professional Conduct. This did not excuse his failure

to comply with California RPC 1-500(A).

      50.4.   By discussing the prospect of being retained by Megaupload, Mr.

Randazza acted contrary to the interests of his client.

      50.5.   Ironically, Mr. Randazza stated in an email to Mr. Rothken that he did not

want to bring dishonor upon himself by violating California RPC 1-500(A), but did just that by

soliciting and continuing to discuss the matter.

      50.6.   Mr. Randazza should have refrained from discussing any potential future

work for Megaupload. The prospect of earning $5,000 for a 1-hour phone call with Megaupload,

002619

and the likelihood of future work for Megaupload, created a personal conflict of interest for Mr. Randazza that he was required to disclose to Liberty in writing pursuant to California RPC 3-310(B)(4), 3-500 and 3-510 so that Liberty could decide whether Mr. Randazza was capable of providing unbiased advice and exercising independent professional judgment. I have not seen any documents or evidence from the Case showing that he made such disclosure.

50.7.   When Liberty was first contemplating suing XVideos, Mr. Randazza unilaterally decided to give XVideos advance notice of the claim. He had no authority to make such disclosure of confidential information.

50.8.   Liberty trusted Mr. Randazza and confided in him about suing XVideos. He was required to keep that information confidential. By disclosing it to XVideos, he violated California RPC 3-100(A) and California Business and Professions Code Section 6068(e)(1).

50.9.   With regard to litigation against individuals for copyright infringement, Mr. Randazza exceeded his authority by making a statement that appears to have resulted in substantial negative publicity for Excelsior and Liberty. While Mr. Randazza had the authority to negotiate on Liberty's behalf with third-parties and to offer amnesty to potential copyright infringers, he did not have the authority to take actions that damaged Liberty's (and Excelsior's) reputation.

50.10.   When Mr. Randazza ended his relationship with Excelsior, he unilaterally decided to keep, rather than return, his company-issued iPhone. Mr. Randazza claims that he used the iPhone for personal use and to communicate with other clients. However, I have not seen any documents or evidence from the Case showing that Mr. Randazza amended his employment agreement with Excelsior in writing in order to permit such personal usage of company property or its retention by him at the conclusion of his employment.

002620

50.11.  Nevada RPC 1.15(a) precluded Mr. Randazza from using his client's property for personal use or for the benefit of other clients, and Nevada RPC 1.16(d) required Mr. Randazza to return the iPhone at the conclusion of his representation.  He violated both provisions by using his iPhone to communicate with other clients and refusing to return it once he stopped working for Excelsior.

50.12.  With regard to the sexual harassment claim filed by Mr. Carrender against Excelsior, neither Mr. Randazza nor Mr. DeVoy should have assisted Mr. Carrender, whether by giving him advice about the merits of his claim, agreeing to testify on his behalf, or helping him to find a lawyer to represent him.  A reasonably prudent lawyer under similar circumstances would have refrained from offering any advice or suggestions to Mr. Carrender, other than to consult with other counsel.

50.13.  Mr. Randazza was working as in-house general counsel for Excelsior at the time that Mr. Mosier allegedly harassed Mr. Carrender.  By his own admission, Mr. Randazza's role as in-house general counsel was not limited in any respect, and thus, included handling and overseeing employment issues.  Accordingly, his prior work for Excelsior—during which time Mr. Mosier allegedly harassed Mr. Carrender—precludes him (and other members of RLG) from assisting Mr. Carrender in bringing a claim against Excelsior for sexual harassment because it is reasonable to infer that Mr. Randazza was privy to confidential information related to Excelsior's employment practices and other issues while he was working for Excelsior—information that would be relevant to the claim brought by Mr. Carrender against Excelsior.

50.14.  Mr. Randazza owes a duty of loyalty to his former client (Excelsior), and under Nevada RPC 1.9(a), he cannot—without obtaining informed, written consent from Excelsior—assist persons such as Mr. Carrender whose interests are materially adverse to those

002621

of Excelsior in matters substantially related to the prior work that he (Mr. Randazza) did for Excelsior. I have not seen any documents or evidence from the Case showing that Mr. Randazza obtained Excelsior's informed, written consent to his representation or assistance of Mr. Carrender in pursuit of his harassment claim against Excelsior.[66]

50.15. Mr. Randazza also cannot avoid the prohibition of Nevada RPC 1.9(a) by indirectly assisting Mr. Carrender through encouraging Mr. Mosier to testify against Excelsior. *See* Nevada RPC 8.4(a) (providing that a lawyer commits professional misconduct by violating the Rules of Professional Conduct "through the acts of another").

50.16. Finally, with regard to his communications with Mr. Carter, Mr. Randazza should not have been speaking with Mr. Carter concerning the Case because he knew that Liberty and Excelsior were represented by counsel.

50.17. As the Director of Marketing, Mr. Carter would qualify as a managing-speaking agent under Nevada law, and therefore, pursuant to Nevada RPC 4.2, Mr. Randazza needed counsel for Liberty and Excelsior to consent to his request to speak with Mr. Carter. I have not any documents or evidence from the Case showing that Mr. Randazza had approval to speak with Mr. Carter on matters related to the Case.

50.18. Moreover, Mr. Randazza should not have asked Mr. Carter to disclose to him confidential financial information related to Liberty. As stated, Mr. Randazza knows that Liberty is represented by counsel and involved in a dispute with Mr. Randazza, and therefore, any attempt by him to obtain information from Liberty, which Mr. Randazza could use to support one or more of his claims or defenses, should be done through the ordinary channels of discovery, and not surreptitiously without Liberty's knowledge or consent.

---

[66]     While Mr. Randazza claimed to not represent Mr. Carrender, Mr. DeVoy previously stated the opposite and met with Mr. Carrender to discuss the merits of his claim.

002622

50.19.  The fact that Mr. Randazza is represented by counsel in the Case does not matter—Mr. Randazza is a lawyer, has been actively involved in the Case, and therefore, is subject to Rules 4.2 and 4.4.

50.20.  Mr. Randazza flaunted his violation of Nevada RPC 4.2 and 4.4(a) by boasting to Mr. Dunlap that he was privy to Liberty's sales figures.  His conduct shows a complete disregard for Liberty's rights.[67]

50.21.  Based on the totality of the circumstances, it is my opinion that Mr. Randazza breached his fiduciary duty and failed to meet the standard of care by making improper disclosures of client confidences, acting outside the scope of his authority, improperly retaining company property, assisting a former employee in pursuing a claim against his former client involving acts that occurred under his direct supervision as in-house general counsel for the client, obtaining confidential information from Liberty through improper and wrongful means, and communicating with Liberty (through Mr. Carter) related to the dispute between Mr. Randazza and Liberty without consent from Liberty's counsel.

<u>FORFEITURE AND/OR DISGORGEMENT</u>

51.  The basic rules and principles governing disgorgement and/or forfeiture of fees earned by an attorney while violating one or more duties owed to his client are as follows.

51.1.  If an attorney violates the duties owed to a client while representing that client, he is generally precluded from recovering his fees.  *See, e.g.*, *Pringle*, 87 Cal. Rptr. 2d at 93-94; *Settelmeyer & Sons, Inc. v. Smith & Harmer, Ltd.*, 124 Nev. 1206 , 1217, 197 P.3d 1051, 1059 (2008); *see also* RESTATEMENT (THIRD) LAW GOVERNING LAWYERS § 37 (stating that,

---

[67]  It is unknown what additional confidential information Mr. Randazza may have obtained from Mr. Carter without Liberty's knowledge or consent.  I reserve the right to supplement this Affidavit if it is determined that Mr. Randazza secretly obtained attorney-client privileged communications, protected attorney work product, or other confidential information from Mr. Carter.

002623

where a lawyer engages in a "clear and serious violation of duty to a client," the lawyer "may be required to forfeit some or all of the lawyer's compensation for the matter"); RESTATEMENT (THIRD) OF AGENCY § 8.01 cmt. d(2) ("An agent's breach of fiduciary duty is a basis on which the agent may be required to forfeit commissions and other compensation paid or payable to the agent during the period of the agent's disloyalty.").

      51.2.    Stated differently, a lawyer is only entitled to keep his fees if he provides services to his client consistently with his ethical obligations. *See, e.g.*, *Lawyer Disciplinary Bd. v. Ball*, 633 S.E.2d 241, 253 (W. Va. 2006).

      51.3.    For example, it is well-settled that an attorney who engages in conflicting representation without obtaining informed consent from all affected clients is not entitled to his fees. *See, e.g.*, *Marirossian & Assocs., Inc. v. Ersoff*, 62 Cal. Rptr. 3d 655, 682 (Ct. App. 2007); *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz*, 602 A.2d 1277, 1285 (Pa. 1992); *see also Image Tech. Svc., Inc. v. Eastman Kodak Co.*, 136 F.3d 1354, 1358 (9th Cir. 1998) (providing that an attorney is not entitled to fees for representing conflicting interests even if the two matters are unrelated).

      51.4.    Factors to consider when assessing forfeiture and/or disgorgement include: (i) the gravity and timing of the violation; (ii) the attorney's willfulness; (iii) the effect of the violation on the value of the attorney's work for the client; (iv) other threatened or actual harm suffered by the client; and (v) the adequacy of other available remedies. *See* RESTATEMENT (THIRD) LAW GOVERNING LAWYERS § 37; *see also id.* § 37 cmt. d. (explaining that conscious disloyalty to a client is also a factor).

      51.5.    It is generally a question of fairness and reasonableness in determining what portion and/or amount of fees the attorney and/or his law firm must disgorge and/or forfeit.

002624

*See* RESTATEMENT (THIRD) LAW GOVERNING LAWYERS § 37 cmt. e.  However, apportionment may not be appropriate "if an employee receives a general salary, without a breakdown of fees for specific services, and there is therefore no basis for allocating the salary between services performed with and without disloyalty."  *See Ulico Cas. Co. v. Wilson, Elser, Moskowitz, Edelman & Dicker*, 843 N.Y.S.2d 749, 764-65 (N.Y. Sup. Ct. 2007) (refusing to apportion the fees earned by a law firm that engaged in a "persistent pattern of disloyalty," which were calculated based on a percentage of the policy premiums on which claims were reported and thus, "tantamount to a salary," and instead ordering forfeiture of all monthly fees earned during the relevant period of disloyalty);[68] *accord Zakibe v. Ahrens & McCarron, Inc.*, 28 S.W.3d 373, 385-86 (Mo. App. 2000) (finding that a corporate officer and director forfeited his right to compensation, including bonuses and severance pay, to which he was attempting to recover under his employment contract from the corporation, as a result of his breach of fiduciary duty).

   51.6.   It is also true that "an attorney is not entitled to retain a fee from an opposing party if that payment was the product of multiple ethics violations." *In re Hager*, 812 A.2d 904, 923 (D.C. Ct. App. 2002).  Even if the money comes from someone other than the client, an attorney is not entitled to keep it if it was earned in an unethical manner. *See id.*

   51.7.   Finally, a client is not required to prove actual damages resulting from the fiduciary breach in order to seek forfeiture and/or disgorgement of fees. *See, e.g., Burrow v. Arce*, 997 S.W.2d 229, 237-40 (Tex. 1999); *see also* RESTATEMENT (THIRD) OF AGENCY § 8.01 cmt. d(2) ("Forfeiture may be the only available remedy when it is difficult to prove that harm to a principal resulted from the agent's breach or when the agent realizes no profit through the breach . . . The requirement [that a principal establish damage] may also tempt an agent to

---

[68]     *Affirmed as modified by Ulico Cas. Co. v. Wilson, Elser, Moskowitz, Edelman & Dicker*, 56 A.D.3d 1, 13 (N.Y. App. Div. 2008) (reversing, *inter alia*, because the forfeiture order should be decided "on a full record after trial" in light of genuine issues of material fact as to the claim for breach of the duty of loyalty).

002625

undertake conduct that breaches the agent's fiduciary duty in the hope that no harm will befall the principal or that, if it does, the principal will be unable to establish it or unable or unwilling to expend the necessary resources required to litigate the question.").

52.     Based on these and other rules and principles governing professional responsibility and legal ethics, and the documents and materials reviewed in connection with the Case, it is my opinion that the arbitrator would be justified to order Mr. Randazza to forfeit and/or disgorge the amounts that he earned (or claims to have earned), including his salary, bonuses, and fees, while representing Excelsior and Liberty in the TNA Matter, the Megaupload Matter, the Oron Matter, and during those times when he engaged in conflicts of interest involving other clients; specifically:

52.1.     Mr. Randazza exhibited a pattern of unethical conduct during the course and after the conclusion of his representation of Excelsior and Liberty.  When it suited his interests, he freely breached his fiduciary duties of loyalty and independent professional judgment acted below the standard of care.

52.2.     Mr. Randazza's conduct did not involve in a single act resulting in a trivial breach of duty; instead, he committed numerous breaches over several years, even after ending his relationship with Excelsior and Liberty.  This course of misconduct supports ordering forfeiture and/or disgorgement of a large portion of his salary, bonuses, and fees. *See* RESTATEMENT (THIRD) LAW GOVERNING LAWYERS § 37 cmt. d. (explaining that forfeiture is more appropriate "for repeated or continued violations").

52.3.     The factors set forth by the Restatement of The Law Governing Lawyers weigh in favor of forfeiture and/or disgorgement under these circumstances:

002626

52.3.1. The gravity of the breaches of duty cannot be understated. Mr. Randazza is not accused of making bad decisions in litigation. His breaches involve conduct calculated to advance his own personal and professional interests in the TNA Matter, the Megaupload Matter, and the Oron Matter. He also allowed his judgment to be clouded by concurrently representing adverse interests while handling various matters for Liberty. He has also appeared to have acted vindictively by assisting a former employee of Excelsior in pursuing a claim for sexual harassment against Excelsior for acts that occurred while Mr. Randazza was employed by Excelsior, and in bragging about his improper and unauthorized communications with managing-speaking agents of Excelsior and Liberty.

52.3.2. The breaches of duty occurred over several years, and in the case of the attempted indirect restriction on the right to practice law, occurred three different times— even after Mr. Randazza purportedly discovered that he was ethically prohibited from negotiating (directly or indirectly) to restrict his right to practice law.

52.3.3. There is little doubt that Mr. Randazza's acts were willful. In several emails he admits that he has a conflict of interest, including (i) while brokering a sizable fee to sell TNA to a third party, (ii) when considering whether to restrict his right to practice law in the Megaupload Matter, (iii) while concurrently representing Porn Guardian in the Oron Matter, and (iv) while advising Liberty not to sue XVideos, and yet, he continued onward each time without disclosing these issues to his client and obtaining his client's informed consent, confirmed in writing.[69]

---

[69]     Mr. Randazza is familiar with the requirements of conflict waivers. For example, he obtained written conflict waivers when he represented an employee and actor of Liberty (Henry Leonard and Abel Petruescu, respectively). He also discussed in an October 27, 2010 email the restriction on his representation of Liberty against Mr. Gibson in light of his prior representation of Mr. Gibson individually.

002627

52.3.4. Mr. Randazza's conflicts affected the work that he performed for Liberty. For example, he readily admits that he settled the TNA Matter for substantially less than what he believed that it should have settled for.

52.3.5. Mr. Randazza's conduct in the Oron Matter, including breaching the Oron Settlement, inhibited Liberty from speedily resolving its dispute. It is my understanding that Liberty had to incur substantial fees and costs after ending its relationship with Mr. Randazza before finally resolving the Oron Matter.

52.3.6. Mr. Randazza's conduct in the Oron Matter is further troubling given his reliance on unlawful means of obtaining evidence in furtherance of Liberty's claims.

52.3.7. While other remedies may be available to Excelsior and Liberty, including damages according to proof, the arbitrator would be justified in not allowing Mr. Randazza to keep the fruits of his unethical gains. His disloyalty and wrongdoing weighs heavily in favor of forfeiture and/or disgorgement.

52.4.    I am not suggesting that the arbitrator should order Mr. Randazza to forfeit and/or disgorge all of his salary, bonuses, and fees earned during the entire time that he worked for Excelsior and Liberty.[70] Rather, fairness and reasonableness dictate that forfeiture and/or disgorgement should be limited to those matters where Mr. Randazza had a conflict of interest or otherwise engaged in a serious breach of duty. Thus, the arbitrator would be justified, on the evidence, to order Mr. Randazza to disgorge and/or forfeit: (i) his salary while he was settling the TNA Matter; (ii) any bonus that he received from the TNA Settlement; (iii) his salary while he

---

[70]    Mr. Randazza's employment agreement with Excelsior set forth the terms of his compensation. I have not seen any documents or evidence from the Case showing that he had a separate fee agreement with Liberty for representing it in litigation. Because Mr. Randazza earned and claims to still be owed bonuses out of settlements that he recovered for Liberty (rather than Excelsior), he needed the fee arrangement with Liberty to be in writing under both California Business and Professions Code Section 6147 and Nevada RPC 1.5(c), since the bonuses were contingent on the outcome of litigation.

002628

was settling the Megaupload Matter; (iv) any bonus that he received from the Megaupload

Settlement; (v) his salary while he was handling the Oron Matter; (vi) his salary while he was

assisting with the Cody Media acquisition; (vii) his salary while he was advising Liberty not to

sue XVideos; and (viii) his salary while he was negotiating producer agreements for Liberty with

Titan Media and Kink.com. This reasoning would also preclude Mr. Randazza from recovering

any bonus or fees that he claims to be owed out of the Oron Settlement, thus nullifying his

purported retaining lien over a portion of the Oron Settlement that he currently holds in his trust

account.[71] *See, e.g., First Nat. Bank of Cincinnati v. Pepper*, 454 F.2d 626, 633 (2d Cir. 1972)

("[A]n attorney discharged for cause or guilty of professional misconduct in the handling of his

client's affairs has no right to payment of fees, and, *ipso facto*, no right to a retaining lien upon

the papers [or property] of a former client in his possession in order to exact payment.") (internal

citations omitted); *Starks v. Browning*, 20 S.W.3d 645, 651 (Tenn. Ct. App. 1999) (explaining

that a retaining lien may be lost "if a lawyer fails to represent his or her client's interests

faithfully, honestly, and consistently or fails to discharge his or her duties with the utmost

---

[71]    It is my understanding that Mr. Randazza is holding approximately one half (1/2) of the settlement proceeds from the Oron Settlement in trust pursuant to Nevada RPC 1.15(e) as disputed funds related to his services in the Oron Matter and for the services of other members of RLG for the Oron Matter. RLG has filed a separate action for breach of contract and quantum meruit in Nevada State Court (Case No. A-12-673275-C) against Liberty to attempt to recover its fees for work performed in the Oron Matter. Mr. Randazza personally claims to be owed: (i) twenty-five percent (25%) of the settlement, or one hundred thirty-seven thousand five hundred dollars ($137,500.00); (ii) 25% of the fee award, or thirty-two thousand nine hundred and forty-nine dollars ($32,949); and (iii) $25,000 in costs that he loaned to Liberty (discussed above). Although I am not rendering an opinion concerning the terms of his employment agreement, notably, it only entitles him to a percentage of "any settlement funds paid to Excelsior in connection with legal matters"—it does not say anything about recovering a percentage of fee awards. It is also unknown to me whether Liberty actually recovered all or a portion of its fee award from Oron. Nevertheless, as expressed herein, Mr. Randazza's misconduct related to the Oron Matter precludes him from seeking to recover any amounts that he claims to be owed from the Oron Settlement.

        Furthermore, according to information provided by Littler, Mr. Randazza is holding the money in a trust account in Massachusetts in Bank Gloucester. Nevada Supreme Court Rule ("Nevada SCR") 78.5(1)(a) requires lawyer trust accounts to be maintained in financial institutions approved by the Nevada State Bar. Bank Gloucester is not among the list of approved financial institutions. *See* http://www.nvbar.org/content/approved-financial-institutions-under-scr-785. By holding the money outside of Nevada in a bank that is not authorized by the Nevada State Bar to maintain client funds for lawyers, Mr. Randazza violated Nevada SCR 78.5(1)(a). *See also* Nevada RPC 7.5A(c)(5)(iii) (providing that a multi-jurisdictional law firm must maintain trust accounts in accordance with Nevada SCR 78.5(1) and hold "all funds arising from any matter in Nevada . . . in those accounts").

002629

faith."); *see also In re Kaufman*, 93 Nev. 452, 457, 567 P.2d 957, 960 (1977) (finding that if the petitioner did have a right to assert a retaining lien over his client's files and property, he lost the right to do so through his failure to comply with his ethical obligations at the time that he voluntarily withdrew from representing the client in pending litigation).

      52.5.   Based on the totality of the circumstances, it is my opinion that the arbitrator would be justified, on the evidence, in ruling that Mr. Randazza is not entitled to retain or collect any amounts that he earned (or claims to have earned) while breaching his fiduciary duty and the standard of care in representing Excelsior and Liberty.

    53.   Discovery is ongoing in the Case.  Excelsior and Liberty have sought to obtain additional information about Mr. Randazza's work for other clients during the course of his representation of them, as well as information concerning actions that he has taken following termination of his representation of Excelsior and Liberty.  I reserve the right to supplement this Affidavit if any such additional information is obtained from Mr. Randazza and provided to me.

    DATED this 16th day of May, 2014.

DENNIS L. KENNEDY

Subscribed and Sworn to before me on
this *16* day of May, 2014.

Notary Public, in and for said County and State

My commission expires: *2/16/2015*

SUSAN RUSSO
Notary Public State of Nevada
No. 99-1968-1
My appt. exp. Feb. 16, 2015

002630

# EXHIBIT 1

# EXHIBIT 1

002631

# DENNIS L. KENNEDY
# CURRICULUM VITAE

## EDUCATION

- B.A. Economics, University of Washington (1972)
- J.D., University of Washington School of Law (1975)
- Board of Editors, Washington Law Review

## PROFESSIONAL ASSOCIATIONS

- State Bar of Nevada
- American Bar Association
- American College of Trial Lawyers
- American Bar Association Standing Committee on Lawyers' Professional Responsibility

## EMPLOYMENT

- Lionel Sawyer & Collins (1975 - 1/6/2006)
- Bailey❖Kennedy (1/9/2006 - present)

## OTHER POSITIONS

- Adjunct Professor, UNLV/William S. Boyd School of Law; Health Care Law (2001, 2003, 2005); Nevada Civil Practice (2006, 2007, 2008)
- Chairman, Board of Trustees, Nathan Adelson Hospice (1995 - present)

## PUBLICATIONS

- Co-Author, Nevada Civil Practice Manual (5th ed., 2001)(2003-2013 supplements)

- Co-Editor (with Professor Jeffrey Stempel), Nevada Civil Practice Manual (5th ed.) (2003-2013 supplements)

- Solo and Small Firm Ethics Traps, Clark County Bar Association COMMUNIQUE (December 2013)

## SUPREME COURT AND BAR COMMITTEES

- State Bar of Nevada Disciplinary Committee (1989-1997). Chairman, Southern District (1993-1995)

- Member of State Bar Committee on Ethics and Professional Responsibility (December 2001 - December 2009; Chairman 2003-2007)

1

002632

- Member of State Bar Committee on the Revisions to the Nevada Rules of Professional Conduct (the "Ethics 2000 Committee") (2003-2004)

- State Bar Professionalism Task Force (2004-present); Chairman, CLE Subcommittee (2009-2010). (Task force recently developed a mentoring program designed to assist newly admitted lawyers in the transition into the profession.)

- Nevada Supreme Court Bench-Bar Committee (SCR 14) (2005-present) (General function of the Committee is to consult with the Supreme Court on issues affecting the practice of litigation, including proposed amendments to the Nevada Rules of Civil and Appellate Procedure.)

- Member of Nevada Supreme Court Article 6 Commission (2007-2011) (Commission's projects were (i) the proposed intermediate court of appeals, (ii) changes in judicial selection process and (iii) changes in judicial campaign fund raising and disclosure). Final report of Commission issued June 2011

- Member of Nevada Supreme Court Committee on Public Access to Lawyer Discipline (1994). Committee report resulted in amendments to SCR 121

- Member of Nevada Supreme Court Committee on Judicial Ethics and Election Practices (1995). Committee report resulted in the adoption of the Rules Governing the Standing Committee on Judicial Ethics and Election Practices (1997)

- Member of Nevada Supreme Court Committee to Study the Amendment of NRCP 68 (offers of judgment) (2008-present)

## RATINGS AND RANKINGS

- Martindale Hubbell "A" "V" rating.

- Mountain States "Super Lawyer" 2005-present (top 75 lawyers in Nevada, Utah, Montana, Idaho and Wyoming).

- Chambers U.S.A. - one of the top 5 commercial litigators in Nevada (2005-present).

- Best Lawyers In America - Commercial Litigation and "Bet the Company" cases (1998-present).

- Best Lawyers' 2012 Las Vegas Health Care Lawyer of the Year.

2

002633

<u>REPORTED CASES (1985-present)</u>

- <u>Lakeside Community Hospital v. Levenson</u>, 101 Nev. 777, 710 P.2d 727 (1985).

- <u>Herbst v. Humana Health Ins. of Nevada</u>, 105 Nev. 586, 781 P.2d 762 (1989).

- <u>In re Discipline of Stuhff</u>, 108 Nev. 629, 837 P.2d 853 (1992).

- <u>In re Discipline of Singer</u>, 109 Nev. 1117, 865 P.2d 315 (1993).

- <u>Forsyth v. Humana, Inc.</u>, 827 F. Supp. 1498 (D. Nev. 1993), aff'd in part and rev'd in part by <u>Forsyth v. Humana, Inc.</u>, 99 F.3d 1504 (9th Cir. 1996); superseded on rehearing by <u>Forsyth v. Humana, Inc.</u>, 114 F.3d 1467 (9th Cir. 1997); affirmed by <u>Humana, Inc. v. Forsyth</u>, 525 U.S. 299 (1999).

- <u>Snoeck v. Brussa</u>, 153 F.3d 984 (9th Cir. 1998).

- <u>State of Nevada v. Reliable Health Care</u>, 115 Nev. 253, 983 P.2d 414 (1999).

- <u>Baker v. District Court</u>, 116 Nev. 527, 999 P.2d 1020 (2000).

- <u>Nguyen v. State</u>, 116 Nev. 1171, 14 P.3d 515 (2000) (amicus brief for Nevada Resort Assn.).

- <u>Brown v. District Court</u>, 116 Nev. 1200, 14 P.3d 1266 (2000).

- <u>Badillo v. American Brands</u>, 117 Nev. 34, 16 P.3d 435 (2001).

- <u>Badillo v. American Brands</u>, 202 F.R.D. 261 (D. Nev. 2001).

- <u>Michel v. Bare</u>, 230 F. Supp. 2d 1147 (D. Nev. 2002).

- <u>Maduka v. Sunrise Hospital</u>, 375 F.3d 909 (9th Cir. 2004).

- <u>Poulos v. Caesar's World, Inc.</u>, 379 F.3d 654 (9th Cir. 2004).

- <u>International Game Technology, Inc. v. Second Judicial District Court</u>, 122 Nev. Adv. Op. 13, 127 P.3d 1088 (2006).

- <u>Leroy's Horse and Sports Place v. Racusin</u>, 2001 WL 1345974 (9th Cir. November 1, 2001) (reversing district court judgment re damages and attorney's fees and remanding for jury trial); <u>Leroy's Horse and Sports Place v. Racusin</u>, CV-S-950-00927 (D. Nev. July 8, 2003) (jury verdict of $2,310,000); <u>Hartunian v. Racusin</u>, 2005 WL 79089 (9th Cir. January 14, 2005) (reversing district court order refusing to award pre-judgment interest on $2,310,000 jury verdict and remanding for determination of interest amount); <u>Racusin v. American Wagering,</u>

002634

Inc., 465 F.3d 1048 (9th Cir. 2006), withdrawn on rehearing 493 F.3d 1067 (2007) (reversing BAP decision subordinating debt and affirming client's status as creditor entitled to payment of $2,310,000 judgment).

- Nanopierce Technologies, Inc. v. Depository Trust Clearing Corp., 123 Nev. Adv. Op. 38, 168 P.3d 73 (September 20, 2007) (brief and oral argument on behalf of amicus curiae North American Securities Administrators Assn.).

- State of Nevada v. District Court (RJR Tobacco), 125 Nev. Adv. Op. No. 5, 199 P.3d 828 (2009).

- Betsinger v. D.R. Horton, Inc., 126 Nev. Adv. Op. No. 17, 232 P. 3d 433 (May 27, 2010.

- Orion Portfolio Services 2, LLC v. Clark County, ex rel. University Medical Center, 126 Nev. Adv. Op. No. 39, 245 P. 3d 529 (October 14, 2010).

- U-Haul International, Inc. v. Albright, 626 F. 3d 498 (9th Cir. 2010).

- Bahena v. Goodyear Tire & Rubber Co., 126 Nev. Adv. Op. 57, 245 P.3d. 1182 (2010) (brief on behalf of amicus curiae United States Chamber of Commerce).

- Stultz v. Bellagio, LLC, Nevada Supreme Court Case No. 56164 (October 29, 2011).

- Walters v. Eighth Jud. Dist. Ct. ex rel. Cnty., of Clark, 127 Nev. Adv. Op. No. 66, 263 P.3d 231 (2011).

- In re City Center Construction and Lien Master Litigation, Nevada Supreme Court Case No. 57186 (October 19, 2011).

- Richman v. District Court, Nevada Supreme Court Case No. 60676 (May 31, 2013).

ETHICS/PROFESSIONAL RESPONSIBILITY REPRESENTATION

- Defense of non-Nevada lawyer on charges of unauthorized practice (and related offenses) before State Bar Disciplinary Panel (1998-1999). (Name of counsel and law firm are confidential.)

- Representation of candidate for district court in defense of complaint regarding campaign advertisements before Standing Committee on Judicial Ethics and Campaign Practices. (1998). Name of candidate is confidential.

- Representation of attorney in appeal of disqualification order (SCR 160). Brown v. Eighth Judicial District Court, 116 Nev. 1200, 14 P.3d 1266 (2000).

4

002635

- Representation of attorney before fee dispute panel in matter involving recovery of quantum meruit fee in the absence of written fee agreement in contingent fee case. <u>West v. Myers</u>, No. 02-128.

- Representation of members of Nevada Commission on Judicial Discipline in defense of action challenging constitutionality of the Commission's rules and activities. <u>Snoeck v. Brussa</u>, 153 F.3d 984 (9th Cir. 1998).

- Representation of Members of Nevada Commission on Judicial Discipline in defense of RICO and Civil Rights claims. <u>Mosley v. Gang, et al.</u>,   Case No. CV-S-00-0976-JLQ(LRL).

- Representation of State Bar of Nevada in defense of action brought by out-of-state law firm challenging the constitutionality of SCR 199 firm name provision. <u>Lewis & Roca v. Bare</u>, Case No. CV-S-99-0757-JBR (RLH).

- Representation of law firm in challenge to constitutionality of Supreme Court Rule prohibiting use of trade name by lawyers. <u>Michel v. Bare</u>, 230 F. Supp. 2d 1147 (D. Nev. 2002) (declaring SCR 199(1) unconstitutional).

- Representation of candidate for district court in defense of complaint regarding allegedly untrue and defamatory statements made concerning opponent before Standing Committee on Judicial Ethics and Campaign Practices. (2002). Name of candidate is confidential.

- Representation of Nevada Commission on Judicial Discipline in defense of § 1983 civil rights claim. <u>Luckett v. Hardcastle, et al.</u>, Case No. CV-S-05-0726 RLH-RJJ. (Complaint dismissed).

- Representation of attorney in defense of lawsuit alleging negligence and malpractice. <u>Malignaggi v. Goldberg</u>, Case No. A 508763, District Court, Clark County, Nevada (case dismissed).

- Representation of law firm in opposing disqualification motion. <u>Provenza v. Yamaha Motor Co.</u>, Case No. A446708, District Court, Clark County, Nevada.

- Representation of law firm in opposing disqualification motion. <u>Roth v. BMW</u>, Case No. A453810, District Court, Clark County.

- Representation of non-Nevada lawyer regarding allegations of lack of candor toward tribunal (SCR 172) (2006). (Name of counsel and law firm are confidential.)

- Representation of law firm in opposing disqualification motion. <u>Daniell v. Peake Development</u>, Case No. A508494, District Court, Clark County.

002636

- Representation of attorney in defense of State Bar proceeding regarding violations of NRPC 1.8 (business transactions with client) and NRPC 1.7 (conflict of interest).  Name of attorney confidential (SCR 121).

- Representation of attorney in defense of claims for misappropriation of confidential information.  Friedman v. Friedman, Case No. D07-376354D, District Court, Clark County, Nevada.

- Representation of attorneys in defense of claims alleging violations of NRPC 4.2 arising out of contacts with putative class members prior to class certification.  Del Webb Communities, Inc. v. The Eighth Judicial District Court of the State of Nevada in and for the County of Clark, and The Hon. Timothy C. Williams, District Judge, and Real Parties in Interest, Case No. 49423, Nevada Supreme Court.

- Representation of attorney in defense of State Bar proceeding regarding violations of NRPC 1.5 (fees) and NRPC 4.2 (contact with represented person).  Case dismissed.  Name of lawyer is confidential.  (SCR 121).

- Representation of entity owned by attorney in defense of NRPC 1.8 claim.  In re Receivership of Southwest Exchange, Case No. A535439, District Court, Clark County, Nevada.

- Representation of attorney in defense of malpractice/breach of fiduciary duty claim.  Sorrell v. Snell & Wilmer, Case No. 08-CV-00761-RCJ-LRL, U.S. District Court, Nevada.  Case settled.

- Representation of attorney in appeal of judgment refusing to enforce contingency fee agreement's term regarding attorney's entitlement to particular fee in the event of his termination.  Golightly v. Gassner, Case No. 50212, Nevada Supreme Court.  Case decided.

- Representation of party in defense of claim for attorney's fees arising out of alleged "frivolous" litigation.  Club 93, Inc. v. County of Elko, CV-C-08-163, Fourth Judicial District Court, Elko, Nevada.  Case settled.

- Representation of client against attorney in claim for refund of alleged "non-refundable" retainer.  Sperberg v. Hunterton, Case No. 08-149 (State Bar Fee Dispute Proceeding).  Case decided.

- Representation of attorney in action against former partner and others for wrongful expulsion from law firm. Powell v. Powell Naqvi, Case No. 08-566761, Eighth Judicial District Court.  Case settled.

- Representation of clients in seeking review of U.S. Magistrate Judge's order imposing monetary sanctions upon parties, individual lawyers, and law firm.

002637

<u>Dennis Montgomery, Montgomery Family Trust v. eTreppid Technologies, L.L.C.; Warren Trepp, Department of Defense of the United States of America; and Does 1 through 10, and Related Cases</u>, Case No. 3:065-CV-00145-PMP-VPC, U.S. District Court, District of Nevada. Matter settled.

- Representation of suspended attorney in proceedings seeking reinstatement to Nevada Bar. (<u>In re Richard Pipkins</u>). Matter pending. Representation terminated.

- Representation of attorney and law firm in opposing disqualification motion. <u>Edwin K. Slaughter, et al. v. Uponor, Inc., et al.</u>, Case No. 2:08-CV-01223-RCJ-GWF, U.S. District Court, District of Nevada. Case dismissed.

- Representation of non-Nevada lawyer on State Bar inquiry into charges of unauthorized practice. (2009-2010). Matter concluded without action by State Bar. Name of lawyer is confidential.

- Representation of attorneys in defense of State Bar disciplinary proceeding alleging fee-splitting with non-lawyer and other matters. <u>State Bar v. Eglet</u> (Case No. SG-10-0874) and <u>Adams</u> (Case No. SG-12-0803).

- Representation of attorney in fee dispute arbitration. <u>Davidson v. Gentile</u>, Case No. 10-085, Nevada State Bar Fee Dispute Committee. Matter decided.

- Representation of attorney in defense of State Bar disciplinary proceeding. <u>State Bar of Nevada v. Anthony Lopez</u>, Bar No. 08-175 (and numerous related and consolidated cases). Matters pending.

- Representation of judicial candidate in action challenging constitutionality of Nevada Code of Judicial Conduct Canon 4, Rule 4.1(A)(11). <u>Kishner v. Nevada Standing Committee on Judicial Ethics and Election Practices</u>, Case No. 2:10-cv-01858-RLH-RJJ, U.S. District Court, Nevada. Matter concluded.

- Representation of attorney in matter where attorney disclosed confidential information relating to the representation of a client to prevent the commission of a criminal and fraudulent act by the client. Nevada RPC 1.6(b)(2) and (3). Attorney's name is confidential. Case settled.

- Representation of former clients in action against law firm and attorney. <u>Frias Holding Co. v. Greenberg Traurig</u>, Case No. A-10-630319-C, Eighth Judicial District Court, Clark County, Nevada. Engagement concluded.

- Representation of former client against law firm in defense of fee collection proceeding and in prosecution of malpractice counterclaim. <u>Lionel Sawyer & Collins v. DeWald</u>, State Bar Fee Dispute Committee Matter No. 10-108. Case dismissed.

7

002638

- Representation of law firm and lawyers in dispute with insurer over coverage for claims of professional negligence. <u>Pacifica v. Goold Patterson, et al.</u>, Case No. A557726 (and related cases), Eighth Judicial District Court, Clark County, Nevada. Matter settled.

- Representation of attorneys in defense of five consolidated disciplinary complaints arising out of consumer bankruptcy representation. Nevada RPC 1.3, 1.4, 5.3 and 8.1. <u>State Bar v. Haines and Krieger</u>, Case Nos.10-121-2842; 10-134-2842; 10-137-2557; SG10-0023; and SG10-0044. Matters concluded.

- Representation of law firm and lawyers in defense of lawsuit alleging violations of Nevada RPC 1.8. <u>Richman v. Haines & Krieger, LLC, et al.</u>, Case No. A-11-643004-C, Eighth Judicial District Court, Clark County, Nevada; Case No. 60676, Nevada Supreme Court (May 31, 2013). Matter pending following remand.

- Representation of lawyers in defense of numerous bar grievances and complaints arising out of consumer bankruptcies and residential loan restructurings. John Hunt/Haines & Krieger, Grievance No. SG11-1045 (and related matters).

- Representation of attorneys in challenge (by mandamus) to order of disqualification. In re City Center Construction and Lien Master Litigation: <u>MGM Mirage Design Group v. District Court</u>, Nevada Supreme Court Case No. 57186 (October 19, 2011).

- Representation of Trust Beneficiaries in motion to disqualify counsel for trustee. <u>In Re Cook Trusts</u>, Case No. P-11-071394-T. Eighth Judicial District Court, Clark County, Nevada. Matter Decided.

- Representation of former client in defense of fee collection suit by law firm and prosecution of malpractice counterclaim. <u>Lionel Sawyer & Collins v. DeWald</u>, Case No. 79 194 Y 00090 11 nolg (AAA). Engagement concluded.

- Representation of not-for-profit entity in State Bar proceeding alleging unauthorized practice by assisting homeowners in dealings with mortgage lenders. (Name of client is confidential). Engagement concluded.

- Representation of Stokes & Stokes, Ltd. in the defense of various bar grievances. Matters pending.

- Representation of parties in action seeking to overturn arbitrators' decision on grounds of fraud and partiality. <u>Parker v. Carlson, et al.</u>, Case No. A571921, Eighth Judicial District County, Nevada. Matter settled.

- Representation (special counsel) of Allstate Insurance Co. on privilege and work product issues arising from interviews of former clients of an attorney. <u>Allstate</u>

8

Insurance Co., v. Balle, et al., Case No. 2:10-CV-02205-KJD-RJJ, United States District Court, District of Nevada. Matter concluded.

- Representation of attorney and law firm in defense of allegations of unauthorized practice (Rule 5.5) and failure to register as a multi-jurisdictional law firm (Rule 7.5A). Waite v.Clark County Collection Service, Case No.2:11-cv-01741-LRH-VCF, United States District court, District of Nevada. Matter concluded

- Representation of attorney in defense of State Bar disciplinary proceeding as to alleged violations of RPC 1.7 (current client conflict), RPC 5.4 (professional independence/fee splitting with non-lawyers), and RPC 8.4 (misconduct involving dishonesty and fraud). State Bar v. Noel Gage, Case No. 08-053-1890. Disciplinary case concluded. Matter pending before Nevada Supreme Court.

- Representation of bar applicant before State Bar Moral Character and Fitness Committee on charges relating to alcohol abuse, plagiarism and financial responsibility. In re Melanie Feldhauser-Thomas. Matter concluded.

- Representation of law firm and its clients in opposing motion to disqualify law firm for acquisition and use of allegedly privileged documents. In re C.E. Cook Family Trust, Consolidated Case No. P-11-071394-T, District Court, Clark County, Nevada. Matter concluded.

- Representation of attorney in defense of State Bar disciplinary proceedings as to alleged violation of trust account rules. State Bar v. Joseph Scalia, Case Nos. SG11-1737, SG12-0903. Case pending.

- Representation of former client of law firm in dispute with law firm arising out of law firm's conflict of interest in defending former client and another defendant at trial, where former client was found liable and other defendant was not. Action not yet filed. Names of client and law firm are confidential.

- Representation of attorney in appeal of letter of private reprimand resulting from attorney's conduct in federal court litigation. In re Steven Gibson, Case No. SG-12-0104. Matter decided.

- Representation of law firm in dispute with second law firm over payment of fees alleged to be due under fee sharing agreement. Gage Law Firm v. Feinberg Mayfield Kaneda & Litt, LLP d/b/a Fenton Grant Mayfield Kaneda & Litt, LLP f/k/a Feinberg Grant Mayfield Kaneda & Litt, Case No. A-14-697336-B, District Court, Clark County, Nevada. Matter pending.

- Representation of defendant entity sued by plaintiff's counsel with whom defendant entity had prior relationship, in proceedings regarding disqualification of plaintiff's counsel. Matter is confidential.

002640

- Representation of departed lawyer in dispute with former firm regarding client files and compensation.  Matter is confidential.

- Representation of law firm in dispute with departed lawyer regarding compensation.  Matter is confidential.

- Representation of (former) client in dispute with law firm resulting from law firm's simultaneous representation of two defendants with adverse interests. Dispute is being mediated prior to filing of complaint.

## RETENTION AS EXPERT:  ETHICS/PROFESSIONAL RESPONSIBILITY

- Retained by bar applicant to give expert testimony before State Bar Moral Character and Fitness Committee regarding duty of confidentiality arising out of applicant's seeking employment with law firm representing adverse party. Testimony given. (2004)  (Name of bar applicant is confidential).

- Retained by Cherry & Bailus to give expert testimony before State Bar Fee Dispute committee on issues regarding attorneys' withdrawal/termination of representation.  Testimony given.

- Retained by Dominic Gentile to give expert testimony in U.S. Bankruptcy Court, Orange County, California, on attorney's obligations to client upon withdrawal and attorney's duty to withdraw.  Offer of proof; no testimony given.  In re Ken Mizuno; The Bankruptcy Estate of Ken Mizuno v. Ken Mizuno, Dominic P. Gentile, Terrance G. Reed, et. al., Case No. SA94-14429LR, Adv. No. AD95-01043, United States Bankruptcy Court, Central District of California.

- Retained by Law Offices of Stan Hunterton to testify in State Court case on issues concerning attorney's obligations in billing client for fees and charging for costs and expenses.  Report prepared.  No testimony given.  Shinehouse & Duesing, a Nevada partnership, and Rumph & Peyton, a Nevada Partnership v. R.D. Prabhu, an individual, Case No. A379297, District Court, Clark County, Nevada.  Case dismissed and re-filed as Shinehouse & Duesing v. Prabhu, Case No. A456661, District Court, Clark County, Nevada.  Case dismissed.

- Retained by Law Offices of Gary Logan to testify as to lawyer's duties to jointly represented clients.  Testimony given.  Nault v. Mainor, Case No. A401657, District Court, Clark County, Nevada,  Mainor v. Nault, 120 Nev. Adv. Op. 84, 101 P.3d 308 (2004).

- Retained by Alverson, Taylor, Mortensen, Nelson & Sanders to testify as to duties of attorney (competence) and scope of representation.  Report prepared.  Case dismissed.  Ilbert Mednicoff, an individual and CCN, Inc., a Nevada corporation v. George F. Holman, an individual, Robert L. Bolick, an individual, Stewart A. Gollmer, an individual, Gary Fields, an individual, Law Offices of Robert L.

10

Bolick, Ltd., a Professional corporation and Does 1 through 100, inclusive, Case No. A377374, District Court, Clark County, Nevada.

- Retained by Alverson, Taylor, Mortensen, Nelson & Sanders to testify as to duties of law firm to supervise work of associate attorney. Report prepared. Case dismissed. Anthony Guymon, an incompetent person, by and through his Guardian ad Litem, Barbara Guymon; Barbara Guymon v. Cory J. Hilton; Hilton & Kahle; Villani, Hilton & Kahle; Villani, Gardner & Hilton; Perry & Spann; Pico & Mitchell, Ltd.; and Does 1 to 10, inclusive, Case No. 00-A-422013-C, District Court, Clark County, Nevada.

- Retained by Alverson, Taylor, Mortensen, Nelson & Sanders to testify as to lawyer's conduct in trial and settlement of case. Report prepared. Case dismissed. Mark J. Brown v. Alan Catley (and related cross actions), Case No. A381988, District Court, Clark County, Nevada.

- Retained by State Bar to testify in disciplinary proceeding as to lawyer's duties under SCR 170 (prohibition on filing frivolous litigation). State Bar v. Mirch, Case No. 3-34-20. Report prepared. Testimony given. In The Matter of Discipline of Kevin Mirch, Case No. 49212, Nevada Supreme Court, April 10, 2008 (attorney disbarred).

- Retained by Holland & Hart to testify as to duties owed by lawyer who engages in business transactions with clients. Rivers v. Romano, et al., Case No. A483701, District Court, Clark County, Nevada. Report prepared. Testimony given. Case dismissed.

- Retained by attorney to testify regarding duties under SCR 152 (scope of representation), SCR 153 (diligence) and SCR 166 (declining or terminating representation), State Bar v. Goldberg, No. 04-013-1536. Testimony given. Case dismissed.

- Retained by Cristalli & Saggese to testify as to issues regarding formation of attorney-client relationship, scope of representation, and breach of duties arising therefrom. Johnson v. Smith, Case No. 512364. Report prepared. Case dismissed.

- Retained by Snell & Wilmer to testify regarding duties and responsibilities of attorney providing opinion in real estate sale transaction. Sundance West LLC, et al. v. Orix Capital Markets, LLC, Case No. CV-04-01995, Second Judicial District Court, Washoe County, Nevada. Report prepared. Case dismissed.

- Retained by Alverson, Taylor, Mortensen, Nelson & Sanders to testify regarding issues pertaining to insurer's "captive" law firm, including disclosure and client consent requirements. Artisan Tile & Plumbing, Inc., a Nevada corporation, formerly known as Davila Jimenez, Inc. doing business as Pueblo Landscape

11

002642

<u>Company, Inc. v. Assurance Company of America, a New York Corporation;
Bennion Clayson Marias & Haire fka Bennion & Clayson; Does 1 through 10,
inclusive</u>, Case No. A503744, District Court, Clark County, Nevada.

- Retained by Menter & Witkin to testify regarding (i) attorney's acceptance of
defense of insured subject to insurer's litigation guidelines; (ii) conflicts arising
from attorney's representation of four co-defendants in construction defect
litigation; (iii) duty of insurer to provide independent counsel; and (iv) whether
attorney's conduct met standard of care. <u>National Fire & Marine Insurance
Company v. Roger Gurr and Elsie Gurr (and counterclaim)</u>, Case No. 3:05-CV-
0658-BES-VPC, United States District Court, District of Nevada. Report
prepared. Case settled.

- Retained by Alverson, Taylor, Mortensen & Sanders to testify regarding
attorney's conduct in determining proper defendants in litigation. <u>Lesky v.
Callister</u>, Case No. 527875, District Court, Clark County, Nevada. Report
prepared. Case dismissed.

- Retained by Gordon & Silver to testify regarding conduct of attorney and law
firm in business transaction with client. <u>Richards v. Allison, MacKenzie, et al.</u>,
Case No. 03-01781A, First Judicial District Court, Carson City, Nevada. Report
prepared. Case dismissed. Appeal pending.

- Retained by Deaner Scann Malan & Larsen to testify regarding an alleged conflict
of interest arising from law firm's prior work and status of lawyer as shareholder
in party to case. <u>D & J Properties v. Siena Office Park 2</u>, Case No. A537781,
District Court, Clark County, Nevada. Report prepared. Testimony Given.
Matter decided.

- Retained by Solomon Dwiggins & Freer to testify regarding the conduct of a
lawyer and his law firm in the handling of an estate where the lawyer acted as
trustee of various trusts and retained his own law firm to represent him. <u>Leseberg
v. Woods</u>, Case No. P59334, District Court, Clark County, Nevada. Report
prepared. Deposition testimony given. Trial testimony given. Case settled.

- Retained by Menter & Witkin to testify regarding (i) duties of Nevada lawyer
residing out of state and maintaining office in Nevada (SCR 42.1); and (ii) duties
of multi-jurisdictional law firm maintaining office in Nevada (NRPC 7.5A).
<u>Roger and Elsie Gurr v. National Fire & Marine Insurance Company, Reiser &
Associates, and Does 1 through 40</u>, Case No. 07-CV-615-HDM-VPC, in the
United States District Court, Reno. Report prepared. Case settled.

- Retained by Lewis Brisbois Bisgaard & Smith to testify regarding restitution of
fees paid to law firm who is later disqualified due to conflict of interest. <u>American
Heavy Moving and Rigging, Inc. v. Lewis Brisbois Bisgaard & Smith, LLP</u>, State

12

002643

Bar Fee Dispute Case No. 07-055 (State Bar Fee Dispute Panel).  Rebuttal report prepared. Testimony given.  Case decided.

- Retained by Michael Warhola to testify regarding waiver of attorney-client privilege by inadvertent disclosures of e-mail from client.  Seidman v. Dilloo, Case No. D260143, District Court, Clark County, Nevada.  Report prepared.

- Retained by attorney as consulting expert regarding opposing counsel's violations of NRPC 1.2(d) and 8.4(d) by rendering legal aid and advice to fugitive client to enable him to prosecute and defend litigation in Nevada.  Joseph A. Bravo, David Z. Chesnoff, and Eckley M. Keach, Capital Growth Limited, Inc., Punta Arena De La Ventana, S.A. de C.V., Boca De La Salina, SA De C.V. v. Capital Growth, LLC, and Kerry Rogers, and All Related Actions, Case No. A536644, A542755, A535548, District Court, Clark County, Nevada.  Report prepared.  Underlying case dismissed.  Bar Grievance filed.  Screening panel testimony given.  Matter decided.

- Retained by attorney as consulting expert to advise whether opposing counsel's conduct (harassment of witness) violated NRPC 8.4(d).  Julia Brady, et al v. Kerry Rogers, et al., Case No. A572440, District Court, Clark County, Nevada. Report prepared.  Underlying case dismissed.

- Retained by Alverson, Taylor, Mortensen, Nelson & Sanders to testify regarding duties and responsibilities of a lawyer who is counsel of record in pending litigation, whose client retains other counsel and then ceases communicating with the lawyer.  Geier v. Denue, et al., Case No. A525183, Eighth Judicial District Court, Clark County, Nevada.  Report prepared.  Case settled.

- Retained by Marquis & Aurbach (later replaced by Lionel Sawyer & Collins) to testify regarding duties of lawyer who prepares a trust document, is appointed trustee upon client's death, and then retains his own law firm to represent the trust.  In the Matter of the Total Amendment and Restatement of the William Eversole Family Trust Originally Dated April 6, 1996, Case No. P-09-0654430-T, Eighth Judicial District Court, Clark County, Nevada.  Report prepared.  Case settled.

- Retained by law firm to advise as to firm's duties when potential conflict arises between clients jointly represented by firm in defense of litigation.  NRPC 1.7. (Name of firm and identities of clients are confidential).

- Retained by Thorndal Armstrong Delk Balkenbush & Eisinger to testify regarding the scope of duties owed by a lawyer who has been retained to render only limited services.  Brewer v. State of Nevada, et al., Case No. 554064, Eighth Judicial District Court, Clark County, Nevada.  Report prepared.  Matter settled.

002644

- Retained by Alverson, Taylor, Mortensen, Nelson & Sanders to testify regarding the duties owed to a minority shareholder by a lawyer who represents a closely held corporation. Jackson v. Ira Levine, et al., Case No. A538983, Eighth Judicial District Court, Clark County, Nevada. Report prepared. Trial testimony given. Case decided.

- Retained by Schiff Hardin, LLP to testify as to reasonableness of attorneys' fees. DTPI Holdings, LLP v. Forrest Binkley & Brown Capital Partners, LLP, Case No. 2:07-CV-00690-BES-RJJ, U.S. District Court, District of Nevada. Report prepared. Case decided.

- Retained by Doyle Berman Murdy, P.C. to opine on attorney's conduct in representing several parties in related transactions.   XMASCO, LLC v. Wellborn & Associates, P.C., et al., Case No. A566261, Eighth Judicial District Court, Clark County, Nevada. Case dismissed.

- Retained by Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP, to testify as to attorney's duties regarding safekeeping and distribution of client's funds. Azine, et al. v. Johnson, et al., Case No. A587009, Eighth Judicial District Court, Clark County, Nevada. Case settled.

- Retained by Lewis Brisbois Bisgaard & Smith to testify as to law firm's duties in preparing and communicating with client regarding drafts of transactional documents. Padilla v. Smith, Case No. A569307, Eighth Judicial District Court, Clark County, Nevada. Report prepared. Case settled.

- Retained by Solomon Dwiggins & Freer to testify regarding attorney's conduct in representing trustors and beneficiaries of a trust. Buck v. Hoffman, Case No. CV09-00324, Second Judicial District Court, Washoe County, Nevada. Report prepared. Deposition taken. Case settled.

- Retained by Lewis Brisbois Bisgaard & Smith to testify regarding attorney's conduct in representing closely held corporation. RPC 1.13.  Rita Quam Family Trust, et al. v. OPA Management, LLC, et al., Case No. A568829, Clark County District Court. Report prepared. Case concluded on summary judgment in favor of attorney. Amended Complaint filed,. Additional report prepared. Matter settled.

- Retained as special counsel to brief and argue defendants' rights and obligations (vis-a-vis, non-settling plaintiffs) regarding possibly privileged or confidential documents received by defendants from some plaintiffs as a part of a settlement. Klaas v. Vestin Mortgage, Case No. A528385, Clark County District Court (matter decided).

- Retained by Glaser, Weil, Fink, Jacobs, Howard & Shapiro, LLP to testify as to lawyer's obligations upon receipt from a third party of documents and

14

information which appear to have been misappropriated from adverse party. <u>Merits Incentives, LLC v. Eighth Jud. Dist. Ct. ex rel. Cnty. of Clark</u>, 127 Nev. Adv. Op. 63, 262 P.3d 720 (2011).

- Retained by Thorndal, Armstrong, Delk, Balkenbush & Eisinger to testify regarding attorney's conduct (diligence and competence) in representing client in complex mechanic's lien litigation. <u>Maui One Excavating v. Mead & Pezzillo, et al.</u>, Case No. A539801, Clark County District Court. Report prepared. Case settled.

- Retained by Robertson & Vick, LLP to testify as to reasonableness of attorneys' fees. <u>Voggenthaler, et al. v. Maryland Square, et al.</u>, Case No. 2:08-CV-01618 RCJ (GWF), U.S. District Court, District for Nevada. Report prepared. Matter decided.

- Retained by Travelers Companies, Inc. to opine on issues relating to the unauthorized practice of law (Nevada RPC 5.5 and SCR 49.10). Opinion prepared.

- Retained by Chamberlain Hrdlicka White Williams & Martin to opine on several Nevada RPC 8.3 issues in <u>Valdez v. Cox Communications, et al.</u>, Case No. 2:09-CV-1797-PMP-RJJ in the U.S. District Court, District of Nevada. (Oral opinion delivered.)

- Retained by Mark Zaloras and the Law Offices of Peter Goldstein to opine on several malpractice, billing and fee issues. <u>Gaxiola-Lim v. Michel</u>, Case No. A-10-613812-C, Clark County District Court. Preliminary report prepared. Matter settled.

- Retained by the Cashill Law Firm to opine on attorney's entitlement to a fee for work done on behalf of an incompetent client. <u>Merle Layton Trust</u>, Case No. PR98-00336. Second Judicial District Court, Washoe County, Nevada. Report prepared.

- Retained by Marquis Aurbach Coffing to testify as to attorney's conduct in representation of clients and matters relating to negotiation of release from malpractice liability. <u>Gugino v. Nevada Contractors Ins. Co., et al.</u>, Case No. A-11-637935-B, Clark County District Court. Report prepared. Testimony given. Matter pending.

- Retained by Vernon L. Bailey, Esq. to testify as to attorneys' conduct in representation of clients and matters relating to legal malpractice, breach of fiduciary duty and negligence. <u>Inca Investments, Inc.; Platina, Inc. v. Kevin R. Hansen, Esq.; Wilde Hansen, LLP; Gregory L. Wilde, Esq.; Richard S. Ehlers, Esq.</u>, Case No. A-09-604391-C, Clark County District Court. Report prepared. Deposition taken. Case settled.

002646

- Retained by Laxalt & Nomura to testify as to attorneys' obligations to and conduct affecting opposing party in litigation. Pompei v. Hawes, et al., Case No. A-11-642012-C, Clark County, District Court. Report prepared. Deposition taken. Matter pending.

- Retained by Randolph Goldberg to testify as to attorney's conduct regarding various issues. State Bar v. Goldberg, Case Nos. 09-049-1536; 09-102-1536; and 09-235-1536. Report prepared. Matter pending.

- Retained by multi-jurisdictional law firm to render advice on compliance with Nevada registration and practice requirements (Nev. R.P.C. 7.5A).

- Retained by  Christian, Kravitz, Dichter, Johnson & Sluga, LLC to testify regarding attorneys' obligations when terminating employment with a law firm and starting a new firm. Burr v. Dodds, Case No. A-11-650060-B, Clark County District Court. Matter settled.

- Retained by Hong & Hong to testify as to duties of attorneys (competence) in conduct of litigation. Wacht v. Peel & Brimley, Case No. A646410, Clark County District Court. Report prepared. Matter decided.

- Retained by attorney to render opinion on duties regarding disposition of disputed funds held by attorney. (Nev. R.P.C. 1.15) (Attorney's name is confidential.)

- Retained by Greenspoon Marder, P.A. to render opinion on attorney's duty to obtain clients' informed consent before settling or dismissing claims. Pittman v. Westgate Planet Hollywood Las Vegas, LLC, Case No. 2:09-CV-00878-PMP-GWF, United States District Court, District of Nevada.  Report prepared.  Matter decided.

- Retained by Simon & Berman to render opinion on conduct of lawyer and law firm in representing client in litigation (diligence, competence and communications)., Chandler v. Black & LoBello, et al., Case No. A-11-643955, refiled as Case No. A-12-660252, Clark County District Court.  Matter settled.

- Retained by Lewis Brisbois Bisgaard & Smith LLP to render opinion on conduct of attorney in matters pertaining to failed investment.  Softwind Capital, LLC v. Global Project Solutions, LLC, et al., Case No. 2:11-CV-02057-JCM-GWF, United States District Court.  Case settled.

- Retained by Lewis Brisbois Bisgaard & Smith LLP to render opinion on conduct of attorney regarding loans made to client (Nevada RPC 1.8).  Albert D. Massi v. Donald and Mary Nobis, Case No. A672579 in the District Court, Clark County, Nevada.  Case settled.

16

002647

- Retained by law firm as consulting expert to render opinion regarding attorney's duty to report misconduct by opposing counsel. Nevada RPC 8.3(a). Name of law firm and subject attorney are confidential.

- Retained by Lewis Roca Rothgerber to render opinion on whether the common religious affiliation of the judge and one party's counsel requires the judge to recuse himself. <u>Lynan v. Health Plan of Nevada</u>, Case No. A583772 and <u>Magana v. Health Plan of Nevada</u>, Case No. A583816, District Court, Clark County, Nevada. Report prepared. Matter decided.

- Retained by Littler Mendelson to render opinion as to the propriety of self-dealing and other activities by company's in-house counsel. <u>Randazza v. Excelsior Media Corp.</u>, JAMS Case No. 1260002283. Case pending.

- Retained by Judy M. Sheldrew, Esq. to render an opinion on the propriety of several attorneys' conduct in dealing with client having diminished capacity <u>Andrews v. Rowe, et al.</u>, Case No. 12-PB-0075 in the Ninth Judicial District Court, Douglas County, Nevada. Case settled.

- Retained by Christine A. Zack to opine on issues of unauthorized and multi-jurisdictional practice of law. <u>In re: Fundamental Long Term Care, Inc.</u>, Case No. 8-11-BK-22258-MGW, District of Florida. Matter pending.

- Retained by Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, to opine on issues of supervision and trust account matters. <u>SBS Retail, Inc. v. Yves Chantre, Inc.</u>, Case No. A-13-681083-C, District Court, Clark County, Nevada. Matter pending.

- Retained by Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, to opine on issues regarding the conduct of class counsel in dealing with class representative. <u>Goldsmith v. Sill, et al.</u>, Case No. 2-12-CV-0090-LDG-CWH in the U.S. District Court, District of Nevada. Report prepared. Case pending.

- Retained by Lewis Brisbois Bisgaard & Smith LLP to opine on issues regarding conduct of counsel with respect to claims alleged in <u>David Siebrasse, as Personal Representative of the Doreen Siebrasse Estate v. Jeffrey Burr, Ltd.; Jeffrey Burr; Mark Dodds; John Mugan; et al.</u>, Case No. A-11-648532-C, in the District Court, Clark County, Nevada. Report prepared. Case pending.

- Retained by Lewis Brisbois Bisgaard & Smith LLP to opine on issues regarding conduct of counsel with respect to claims alleged in <u>T&R Construction Group v. Clark Tatom, LLC; and Bradley R. Tatom</u>, Case No. A-13-689637-B, in the District Court, Clark County, Nevada. Report prepared. Case pending.

- Retained by Fulbright & Jaworski to opine on that firm's conduct in representing related entities in commercial transaction. <u>Verano Land Group, LP v. VTLM Texas LP, et al</u>, Case No. A-12-655514-B in the Eighth Judicial District Court, Clark County, Nevada. Matter pending.

17

002648

<u>CONTINUING LEGAL EDUCATION INSTRUCTION (1997-Present)</u>

- Association of Legal Administrators, Las Vegas Chapter (5/13/14): "Issues in New Business Intake."

- American Bar Association Group Legal Services Association and Solo, Small Firm and General Practice Division Annual Meeting (5/2/14): "Ethics Issues In Marketing and Client Development."

- State Bar of Nevada: Section of Environmental and Natural Resources Law (2/27/14) "Ethics Issues for Environmental Lawyers."

- Clark County Bar Association (12/13/13). 10th Annual Ethics CLE.

- City of Henderson, City Attorneys' Annual Retreat (10/17/13). "A Lawyer Walks Into a Bar . . . The Dangers of Casual Advice and Conversation."

- Las Vegas Paralegal Society: Keeping Abreast of Conflicts and Unauthorized Practice (6/18/13).

- Association of Legal Administrators, Las Vegas Chapter: Legal Administrator's Role in Preventing Malpractice (6/11/13).

- American Bar Association Section of Environment, Energy and Resources, 31st Annual Water Law Conference: Water Lawyers and Ethics (6/7/13).

- Clark County Bar Association (5/8/13) "4[th] Annual Solo and Small Firm Ethical Traps."

- UNLV Boyd School of Law (3/8/13) "Professionalism and Popular Culture."

- Clark County Bar Association (11/2/12). 9th Annual Ethics CLE.

- Clark County Bar Association (3/28/12). "3[rd] Annual Hanging Out a Shingle? Solo and Small Firm Ethical Traps."

- American Bar Association Business Law Section Spring Meeting (3/22/12). "Saints and Sinners: Ethical Issues and Dilemmas in Client and Practice Development."

- Southern Nevada Association of Women Attorneys (2/24/12). "Ten for Twelve: Ethics 2012."

- Clark County Bar Association (11/3/11) "8[th] Annual Ethics CLE."

18

- Nevada Paralegal Assn. (6/18/11) "UPL: Attorney Supervision of Paralegals."

- Department of Energy Contractor Attorneys' Assn. (5/27/11) "Ethics: Ten Things You Should Know."

- Southern Nevada Association of Women Attorneys (2/25/11) "Ten For Eleven: Ethics 2011."

- Clark County Bar Association (2/4/11) "Hanging Out A Shingle?  Solo and Small Firm Ethical Traps."

- Clark County Bar Association (9/30/10) "7th Annual Ethics Issues: 2010."

- American Society of Breast Surgeons (4/30/10) Avoiding and Responding to Litigation.

- Clark County Bar Association (3/26/10) Avoiding Solo/Small Firm Ethical Traps.

- Southern Nevada Association of Women Attorneys (2/26/10) Ethics 2010: Ten Thoughts for '10.

- State Bar of Nevada (11/12/09): Nevada Legal Ethics (2009).

- State Bar of Nevada, Clark County Bar Association and Washoe County Bar Association (10/13/09, Las Vegas; 10/14/09, Carson City): 2009 Professionalism Summit.

- Clark County Bar Association (9/18/09):  "Sixth Annual Ethics Issues: 2009."

- Public Relations Society of America (7/24/09):  "Keeping Out of Hot Water: Legal Considerations in Communications."

- Lecture and panel discussion with Justice Nancy Saitta and District Judge Linda Bell: "Professionalism in Litigation."  Boyd School of Law (4/1/09).

- Southern Nevada Association of Women Attorneys (2/20/09): "ETHICS 2009: Being Good Gets Harder Every Year."

- State Bar of Nevada (12/5/08): "Nevada Legal Ethics 2008."

- State Bar of Nevada (11/19/08): "Nevada Legal Ethics 2008."

- Indiana State Bar Association (11/13/08): "Ethics: A Western Perspective on Maintaining A Healthy Legal Practice."

19

002650

- Clark County Bar Association (9/19/08): "Fifth Annual Ethics Issues 2008" (Prepared materials. Presentation made by David J. Merrill).

- Southern Nevada Association of Women Attorneys (2/22/08): "Ethics 2008 - Be Careful Out There."

- State Bar of Nevada (11/30/07) "Nevada Legal Ethics 2007."

- State Bar of Nevada (11/16/07) "Nevada Legal Ethics 2007."

- Clark County Bar Association (10/31/07) "Lawyer Advertising: The New Rules."

- Wisconsin Law Alumni Association (9/8/07) "The New Rules of Professional Conduct."

- Clark County Bar Association (8/24/07) "Fourth Annual Legal Ethics - 2007."

- National Assn. of Retail Collection Attorneys (5/11/07) "Ethics Issues for Legal Collection Professionals."

- Southern Nevada Association of Women Attorneys (2/23/07) "Desperately Seeking Ethics - 2007."

- State Bar of Nevada (12/1/06) "Nevada Legal Ethics 2006."

- State Bar of Nevada (11/17/06) "Nevada Legal Ethics 2006."

- Clark County Bar Assn. (6/30/06) "Ethics 2006: The New Nevada Rules of Professional Conduct."

- State Bar of Nevada Professionalism Summit: Speaker and Panel Member (4/20/06).

- Southern Nevada Association of Women Attorneys (1/27/06) "Ethics Issues for 2006."

- State Bar of Nevada (11/18/05) "Nevada Legal Ethics 2005."

- State Bar of Nevada (11/4/05) "Nevada Legal Ethics 2005."

- Clark County Bar Assn. (9/15/05) "Ethics 2005: Current Issues."

- Clark County Bar Assn. (3/4/05) Speaker and Panel Member: First Annual Professional Summit.

- State Bar of Nevada (11/19/04) "Ethics 2004: Year in Review."

002651

- State Bar of Nevada (11/5/04) "Ethics 2004: Year in Review."

- Clark County Bar Assn. (7/30/04) "Current Issues In Ethics."

- Lorman Business Institute (7/20/04) "Current Issues in Ethics."

- National Hospice Assn. (3/21/04) "Legal Issues For Physicians In End of Life Care."

- Southern Nevada Assn. of Women Attorneys (1/30/04) "Ethics Issues for 2004."

- State Bar of Nevada (1/20/04) "Workers Compensation: Current Issues in Ethics."

- National Business Institute (10/21/03) "Current Issues In Attorney Client Privilege and Confidentiality."

- Sterling Educational Systems (9/25/03) "Common Ethical Problems for Transactional Lawyers."

- Clark County Bar Assn. (2/28/03) "ERISA 2003:  What's New?"

- Southern Nevada Assn. of Women Attorneys (1/31/03) "Ethics:  2003."

- State Bar of Nevada (11/22/02) "Nevada Legal Ethics - the Year In Review."

- American Corporate Counsel Assn. (6/18/02) "Issues of Attorney-Client Privilege for In-House Counsel."

- National Business Institute (12/7/01) "Current Issues In Legal Ethics:Nevada 2001."

- National Business Institute (7/13/01) "Attorney-Client-Privilege and the Work Product Doctrine In Nevada."

- National Business Institute (12/12/00) "Practical Legal Ethics."

- State Bar of Nevada (3/31/00) "Professionalism and Ethics."

- Southern Nevada Assn. of Women Attorneys (1/28/00) "Multi-Disciplinary Practice:  Ethical Considerations."

- State Bar of Nevada (12/10/99) "Winning Without Losing Your Professionalism."

- National Business Institute (11/17/99) "Practical Legal Ethics."

002652

- Law Seminars Int'l. (6/25/99) "Ethics Considerations for Construction Lawyers."

- National Practice Institute (12/4/98) "Ethical Problems: Dealing With Difficult Lawyers."

- ALAS (10/21/98) "Ethical Issues for Healthcare Lawyers."

- State Bar of Nevada (3/21/98): "Ethics and Attorneys' Fee Agreements."

- CLE International (12/5/97) "Current Issues In Ethics"

- Institute for Paralegal Practice (8/26/97) "Preventing Unauthorized Practice of Law"

[Additional CLE instruction available upon request.]

002653

# EXHIBIT 2

# EXHIBIT 2

002654

## MATTERS REVIEWED

- Arbitration Claims of Marc J. Randazza v. Excelsior Media Corp., Liberty Media Holdings, LLC, and Jason Gibson, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Excelsior Media Corp.'s Affirmative Defenses and Counterclaims against Marc J. Randazza, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Marc J. Randazza's Affirmative Defenses to Counterclaims of Excelsior Media Corporation, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Amended Arbitration Claims of Marc J. Randazza v. Excelsior Media Corp., Liberty Media Holdings, LLC, Becar Management LLC, and Jason Gibson, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Notice of Appearance by Liberty Media Holdings, LLC, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Respondent Excelsior Media Corp.'s and Liberty Media Holdings, LLC's Affirmative Defenses to Marc J. Randazza's Amended Arbitration Claims, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Stipulated Protective Order, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Stipulation and Order Adjusting Arbitration Schedule, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Letter from Kenneth P. White to Hon. Stephen E. Haberfeld (Ret.), dated March 29, 2013, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Letter from Wendy Krincek to Hon. Stephen E. Haberfeld (Ret.), dated April 16, 2013, and enclosures, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Letter from Kenneth P. White to Hon. Stephen E. Haberfeld (Ret.), dated April 29, 2013, and enclosures, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Excelsior Media Corporation's Partial Motion to Dismiss, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

002655

- Letter from Kenneth P. White to Hon. Stephen E. Haberfeld (Ret.), dated May 1, 2013, and enclosures, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Excelsior Media Corporation's Reply in Support of its Partial Motion to Dismiss, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Order of July 3, 2013, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Respondent's Motion to Compel Production of Respondent's iPhone Current in Complainant's Possession, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Complainant's Opposition to Respondent's Motion to Compel Production of Respondent's iPhone Current in Complainant's Possession, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Respondent's Reply in Support of its Motion to Compel Production of Respondent's iPhone Current in Complainant's Possession, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Complainant's Sur-Reply in Further Support of Opposition to Respondent's Motion to Compel Production of Respondent's iPhone Current in Complainant's Possession, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Respondent's Response to Complainant's Sur-Reply in Further Support of Opposition to Respondent's Motion to Compel Production of Respondent's iPhone Current in Complainant's Possession, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Order of July 30, 2013, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Order of August 2, 2013, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Order of November 11, 2013, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Excelsior Media Corporation's Initial Disclosures, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- First Supplement to Excelsior Media Corporation's Initial Disclosures, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

002656

- Second Supplement to Excelsior Media Corporation's Initial Disclosures, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Third Supplement to Excelsior Media Corporation's Initial Disclosures, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Fourth Supplement to Excelsior Media Corp.'s Initial Disclosures, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Respondent Excelsior Media Corporation's Response to Complainant's First Set of Interrogatories, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Respondent Excelsior Media Corporation's Amended Response to Complainant's First Set of Interrogatories, ROG No. 1, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Respondent Excelsior Media Corporation's Response to Complainant's First Set of Request for Production of Documents, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Letter from Kenneth P. White to Wendy Krincek, dated April 1, 2013, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Subpoena to Erika Dillon, dated June 24, 2013, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Deposition Transcript (with changes) of Erika Dillon, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Documents and text messages provided by Erika Dillon, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Marc J. Randazza's Initial Disclosures (RANDAZZA 000001-003691), *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Complainant Marc J. Randazza's Responses to Excelsior Media Corporation's Interrogatories, Set One, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Complainant Marc J. Randazza's Responses to Excelsior Media Corporation's Requests for Production of Documents, Set One, *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

- Documents produced by Marc J. Randazza (MJR000001-045620), *Marc. J. Randazza v. Excelsior Media Corp., et al.*, JAMS Reference No. 1260002283

002657

- QUiVX Forensic Analysis, dated May 6, 2013

- Various Emails between Marc Randazza and Val Gurvits, and between Marc Randazza and Stevan Lieberman

- Email from Ethan Thomas to Wendy Krincek, dated April 17, 2014, enclosing an email string and attachments between and among Eric Carrender, J. Malcom DeVoy, and Marc Randazza

- Miscellaneous Text Messages and Skype Messages for Marc J. Randazza

- Letter from Henry L. Whitehead to Wendy Krincek, dated March 26, 2014

- Letter from Henry L. Whitehead to Wendy Krincek, dated September 5, 2013, and enclosures

- Letter from Wendy Krincek to Kenneth P. White, dated August 30, 2013

- Letter from State Bar of Nevada to Jason Gibson, dated November 12, 2013

- Letter from State Bar of California to Jason Gibson, dated October 4, 2013

- Letter from State Bar of Florida to Jason Gibson, dated July 19, 2013

- Letter from State Bar of Arizona to Jason Gibson, dated July 1, 2013

- Letter from Brian L. Tannebaum to State Bar of Florida, dated June 13, 2013, and enclosures

- Letter from Jason Gibson, et al. to State Bar of Florida, dated June 26, 2013

- Letters from State Bar of Arizona to Jason Gibson, dated April 11, 2013

- Letter from Jason Gibson to State Bar of Florida, dated April 3, 2013, and enclosures

- Civil Docket for *Liberty Media Holdings, LLC v. FF Magnat Limited, et al.*, Case No. 2:12-cv-01057-GMN-NJK

- Docket Nos. 140-43, 146-47, 151, 153, 155, *Liberty Media Holdings, LLC v. FF Magnat Limited, et al.*, Case No. 2:12-cv-01057-GMN-NJK

- Plaintiff's First Amended Complaint, *Marc J. Randazza P.A. v. Liberty Media Holdings, LLC*, Case No. A-12-673275-C

- Defendant Liberty Media Holdings, LLC's Answer to Plaintiff's First Amended Complaint and Counterclaim, *Marc J. Randazza P.A. v. Liberty Media Holdings, LLC*, Case No. A-12-673275-C

002658

- Plaintiff/Counter-Defendant RLG's Answer to Defendant/Counter-Claimant Liberty's Counterclaim, *Marc J. Randazza P.A. v. Liberty Media Holdings, LLC*, Case No. A-12-673275-C

- Joint Case Conference Report, *Marc J. Randazza P.A. v. Liberty Media Holdings, LLC*, Case No. A-12-673275-C

**Page 5 of 5**

# EXHIBIT 17

# EXHIBIT 17

002660

# JAMS
# Employment
# Arbitration
# Rules &
# Procedures

*Effective July 1, 2014*



002661

may receive the evidence necessary to render an Award by affidavit. The notice of Hearing shall specify if it will be in person or telephonic.

(k) Any Party may arrange for a stenographic or other record to be made of the Hearing and shall inform the other Parties in advance of the Hearing.

(i)  The requesting Party shall bear the cost of such stenographic record. If all other Parties agree to share the cost of the stenographic record, it shall be made available to the Arbitrator and may be used in the proceeding.

(ii)  If there is no agreement to share the cost, the stenographic record may not be provided to the Arbitrator and may not be used in the proceeding, unless the Party arranging for the stenographic record agrees to provide access to the stenographic record either at no charge or on terms that are acceptable to the Parties and the reporting service.

(iii) If the Parties agree to the Optional Arbitration Appeal Procedure (see Rule 34), they shall, if possible, ensure that a stenographic or other record is made of the Hearing.

(iv)  The Parties may agree that the cost of the stenographic record shall or shall not be allocated by the Arbitrator in the Award.

## Rule 23.  Waiver of Hearing

The Parties may agree to waive the oral Hearing and submit the dispute to the Arbitrator for an Award based on written submissions and other evidence as the Parties may agree.

## Rule 24.  Awards

(a) The Arbitrator shall render a Final Award or a Partial Final Award within thirty (30) calendar days after the date of the close of the Hearing, as defined in Rule 22(h) or (i), or, if a Hearing has been waived, within thirty (30) calendar days after the receipt by the Arbitrator of all materials specified by the Parties, except (1) by the agreement of the Parties; (2) upon good cause for an extension of time to render the Award; or (3) as provided in Rule 22(i). The Arbitrator shall provide the Final Award or the Partial Final Award to JAMS for issuance in accordance with this Rule.

(b) Where a panel of Arbitrators has heard the dispute, the decision and Award of a majority of the panel shall constitute the Arbitration Award.

(c)  In determining the merits of the dispute, the Arbitrator shall be guided by the rules of law agreed upon by the Parties. In the absence of such agreement, the Arbitrator will be guided by the law or the rules of law that he or she deems to be most appropriate. The Arbitrator may grant any remedy or relief that is just and equitable and within the scope of the Parties' agreement, including, but not limited to, specific performance of a contract or any other equitable or legal remedy.

(d)  In addition to a Final Award or Partial Final Award, the Arbitrator may make other decisions, including interim or partial rulings, orders and Awards.

(e)  Interim Measures. The Arbitrator may grant whatever interim measures are deemed necessary, including injunctive relief and measures for the protection or conservation of property and disposition of disposable goods. Such interim measures may take the form of an interim or Partial Final Award, and the Arbitrator may require security for the costs of such measures. Any recourse by a Party to a court for interim or provisional relief shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.

(f)  The Award of the Arbitrator may allocate Arbitration fees and Arbitrator compensation and expenses, unless such an allocation is expressly prohibited by the Parties' Agreement or by applicable law. (Such a prohibition may not limit the power of the Arbitrator to allocate Arbitration fees and Arbitrator compensation and expenses pursuant to Rule 31(c).)

(g)  The Award of the Arbitrator may allocate attorneys' fees and expenses and interest (at such rate and from such date as the Arbitrator may deem appropriate) if provided by the Parties' Agreement or allowed by applicable law. When the Arbitrator is authorized to award attorneys' fees and must determine the reasonable amount of such fees, he or she may consider whether the failure of a Party to cooperate reasonably in the discovery process and/or comply with the Arbitrator's discovery orders caused delay to the proceeding or additional costs to the other Parties.

(h)  The Award shall consist of a written statement signed by the Arbitrator regarding the disposition of each claim and the relief, if any, as to each claim. The Award shall also contain a concise written statement of the reasons for the Award, stating the essential findings and conclusions

002663

on which the Award is based. The Parties may agree to any other form of Award, unless the Arbitration is based on an arbitration agreement that is required as a condition of employment.

(i)  After the Award has been rendered, and provided the Parties have complied with Rule 31, the Award shall be issued by serving copies on the Parties. Service may be made by U.S. mail. It need not be sent certified or registered.

(j)  Within seven (7) calendar days after service of a Partial Final Award or Final Award by JAMS, any Party may serve upon the other Parties and on JAMS a request that the Arbitrator correct any computational, typographical or other similar error in an Award (including the reallocation of fees pursuant to Rule 31 or on account of the effect of an offer to allow judgment), or the Arbitrator may *sua sponte* propose to correct such errors in an Award. A Party opposing such correction shall have seven (7) calendar days thereafter in which to file any objection. The Arbitrator may make any necessary and appropriate corrections to the Award within twenty-one (21) calendar days of receiving a request or fourteen (14) calendar days after his or her proposal to do so. The Arbitrator may extend the time within which to make corrections upon good cause. The corrected Award shall be served upon the Parties in the same manner as the Award.

(k)  The Award is considered final, for purposes of either the Optional Arbitration Appeal Procedure pursuant to Rule 34 or a judicial proceeding to enforce, modify or vacate the Award pursuant to Rule 25, fourteen (14) calendar days after service is deemed effective if no request for a correction is made, or as of the effective date of service of a corrected Award.

## Rule 25.  Enforcement of the Award

Proceedings to enforce, confirm, modify or vacate an Award will be controlled by and conducted in conformity with the Federal Arbitration Act, 9 U.S.C. Sec 1, *et seq.*, or applicable state law. The Parties to an Arbitration under these Rules shall be deemed to have consented that judgment upon the Award may be entered in any court having jurisdiction thereof.

## Rule 26.  Confidentiality and Privacy

(a)  JAMS and the Arbitrator shall maintain the confidential nature of the Arbitration proceeding and the Award, includ-

002664