James D. Greene, Esq., NV Bar No. 2647
**GREENE INFUSO, LLP**
3030 South Jones Boulevard, Suite 101
Las Vegas, Nevada 89146
Ph: (702) 570-6000
Fax: (702) 463-8401
E-mail: jgreene@greeneinfusolaw.com

E-filed on: *May 19, 2017*

Attorneys for Plaintiffs

# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>MARC JOHN RANDAZZA<br><br>Debtors.<br><br>EXCELSIOR MEDIA CORP., a Nevada Corporation; and LIBERTY MEDIA HOLDINGS, LLC, a Nevada Limited Company,<br><br>Plaintiffs,<br><br>v.<br><br>MARC JOHN RANDAZZA, an individual,<br><br>Defendant. | Case No BK-15-14956-ABL<br><br>Chapter 11<br><br>Adversary Proceeding No. 15-01193-ABL<br><br>**RESPONSE TO STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>**Hearing Date: June 6, 2017**<br>**Hearing Time: 1:30 p.m.** |

Plaintiffs Excelsior Media Corp. ("Excelsior") and Liberty Media Holdings, LLC ("Liberty" and, collectively with Excelsior, "Plaintiffs"), by and through their undersigned counsel, James D. Greene, Esq., of Greene Infuso, LLP, hereby file their Response to the (largely unfounded) Statement of "Undisputed" Facts ("SUF") In Support of Defendant's Motion for Summary Judgment ("Statement") (ECF No. 147).

1

*A. Introduction*

Defendant's so-called statement of "undisputed" facts is rife with unfounded allegations, unsubstantiated claims and legal argument. Included are many allegations and references to the record in the arbitration proceedings conducted prior to this bankruptcy case that were clearly contradicted by other evidence presented at the arbitration. Indeed, a majority of the so called "undisputed facts" referenced in Defendant's SUF are allegations that have already been rejected by an independent arbitrator and simply re-asserted as if they are true.[1] Accordingly, the Court should give no weight to Defendant's Statement of "Undisputed" Facts.

**B.    Response to "Uncontested Facts"**

Plaintiffs respond to Defendant's Statement on a paragraph by paragraph basis as follows:

1.    Defendant contends that the Employment Agreement makes no mention of Defendant representing Liberty, the brand name/website "Corbin Fisher" or any other party: The meaning of this is *not* undisputed. The Employment Agreement and Exhibit A to it specifically reference that Randazza's General Counsel duties encompass IP and copyright work. *See* Exhibit 1 hereto, Bates p. 505. Randazza was already Plaintiffs' outside counsel at the time he drafted the Employment Agreement and was familiar with the nature of each of the entities: i.e. that Corbin Fisher is the brand/website, Excelsior makes the content and Liberty owns all the content (ECF 143, p. 42). Defendant was therefore aware that all the IP-type work would be done in the name of Liberty. Even though Liberty is not specifically referenced in the Employment Agreement – it is impliedly referenced. *See Id* and EFC 142, p. 4/12- p.5/25.

2.    Plaintiffs do not dispute the statements made in this paragraph.

3.    Plaintiffs dispute Randazza's claim he was owed a 5% raise in 2012: First, section 3.B. of the Employment Agreement regarding the raise makes clear entitlement to any raise is "subject to overall satisfactory job performance as determined by Excelsior's CEO"; it is not an automatic entitlement. Second, Randazza alleges the Employment Agreement obligates Excelsior

---

[1] At various places in this Response, Plaintiffs point out that the arbitrator in the pre-petition arbitration that resulted in in the IAA has rejected a factual claim made by Defendant. This Court has yet to rule on Plaintiffs' Motion to Confirm the IAA, or to rule on its preclusive effect. However, given that most of the substantive (as opposed to procedural) facts asserted in his SUF were contradicted by evidence presented by Plaintiffs and were rejected by the arbitrator, it is difficult to understand how merely re-asserting those facts supported by the same evidence means they are now "undisputed".

GREENE INFUSO, LLP
3030 South Jones Boulevard Suite 101
Las Vegas, Nevada 89146
(702) 570-6000

to seek other counsel in proposing a Memorandum of Understanding. He does not specify where in the Agreement this language is contained. More importantly, during Plaintiffs produced an email from Randazza when he was General Counsel confirming that he told Jason Gibson he was not entitled to a raise. *See* ECF 143, pp 727-728 (Gibson testifying that Randazza had verbally advised Gibson that he was not owed, and did not need to be paid, a raise).

4. Plaintiffs dispute Randazza's allegation he is entitled to 25% of any settlement funds paid to "Excelsior" and that the bonus was on the gross settlement amount. This statement illustrates the trouble Randazza has created by altering his story. As discussed in Plaintiffs' Reply to the Motion to Confirm, Randazza insisted at arbitration that Excelsior and Liberty were alter egos of one another. *See* Discussion at ECF 142, pp. 4-5. Randazza now claims that Excelsior and Liberty are totally separate and his work for Liberty was not under his Employment Agreement. But, every bonus on a settlement Randazza was ever paid, including all the unpaid bonuses he was claiming in the arbitration, were based are on litigation for Liberty where the settlements were paid to Liberty, not Excelsior.[2] In addition, at the arbitration, Plaintiffs presented evidence that Randazza had been distributing the proceeds of a group of settlements (referred to as the Excubitor settlements) and was paying himself on the *net* settlement amount. *See* ECF 143, pp. 604-605 and pp. 711-712. Clearly, Randazza is changing his position again and the proper calculation of any bonus money Randazza was entitled to receive is very much in dispute.

5. Plaintiffs acknowledge that Randazza would have been entitled to severance pay had he been terminated by them. But Plaintiffs argued, and the Arbitrator agreed, that Randazza resigned. Plaintiffs dispute Randazza's unfounded claim that "certain preliminary steps" were not done pursuant to the Employment Agreement. ECF 147, p.3, lines 11-12. Although it is not clear what is Randazza's reason for in making this claim, it is not supported by any evidence

---

[2] If Randazza is trying to collect bonuses (ie.,contingent fees) based on his work for Liberty as an attorney at his law firm, he is violating Nevada Rule of Professional Conduct 1.5, which requires contingent fee agreements to be in writing. See N.Rule.Prof. Conduct 1.5(c). There is no dispute there was never a written fee agreement between Randazza or his law firm and Liberty.

3

whatsoever. Randazza merely cites to section 7(B) of this Employment Agreement which has nothing to do with whether "certain preliminary steps" were actually performed.

6. Plaintiffs dispute Randazza's allegation that he was contractually permitted to practice law on behalf of other clients through his law firm. Section 1.A. states that the majority of Randazza's client work *will taper down* as quickly, as ethically and practically possible. Section 6.C. only allows continued representation of a "limited number of outside clients....as long as such services are rendered without legal or professional conflict with Excelsior." At the arbitration, Plaintiffs produced testimony and email exchanges where Randazza explained the extremely limited nature his outside work would encompass and described the clients he intended to continue to do work for. *See* EXF 142, pp. 665-669. Plaintiffs also produced evidence showing that Randazza drafted the Employment Agreement after Jason Gibson sent him a generic offer letter. *See Id*.at 667-672.

7. Randazza tries to imply the Oron lawsuit was filed by him using his law firm because (1) his litigation for Liberty was outside his Employment Agreement, and (2) the Rules of Professional Conduct required it. Obviously the first statement is meritless given his prior sworn statements that virtually all his work for Excelsior was protecting Liberty's IP (*see* ECF 142, p.4) and by the fact that he is seeking, in his own words, a bonus on the Oron settlement paid to Liberty *under his Employment Agreement.* The second argument is meritless because regardless of whether his statement about the professional rules is true, he testified that he used his law firm's name because he thought it was more intimidating to opposing counsel if there was a firm behind him, rather than just being a solo in-house attorney. Randazza does not mention ethical rules. *See* ECF 142, p.55.

8. Randazza claims the capitalized and bold font language about review by counsel absolves him of his duty to actually advise Mr. Gibson to get *other counsel* (i.e. not him) to review the Employment Agreement. It is true that this language is included, but that is not the end of the inquiry. Gibson testified at the arbitration that he believed Randazza was Plaintiffs' outside counsel at the time. *See* ECF 142, pp. 673-674. Randazza never advised Gibson that he

4

couldn't advise the company concerning the Agreement or that Plaintiffs should get other counsel to review the Employment Agreement. *Id*.

9. As discussed in response to number 6 above, the Employment Agreement required Randazza to "taper down" his outside practice. Continuing to work 30%-40% of the billable time that most attorneys charge in a year (as the SUF acknowledges, 564 hours per year) was clearly not "tapering down" his practice. It is difficult to believe, and this is very much in dispute, whether Randazza could feasibly work nearly 600 hours per year over and above acting as full time counsel for Plaintiffs and not yet did not do any of the work while being paid by E/L. Moreover, Randazza told Gibson such work would be very limited. *Id* at p. 665, 668-669.

10. Bang Bros was a competitor of Plaintiffs. Randazza, who had worked for Plaintiffs for some time before being hired as General Counsel so was aware of that fact. Even if Randazza could "grow his practice" while working for Plaintiffs (as opposed to tapering it down), it would be a conflict of interest for him to be representing a competitor of Plaintiffs. Randazza also certainly knew that Excelsior never would have agreed to this representation. Randazza would refer to the in-house counsel for Bang Bros., Mark Bryn, as being his "buddy", but withheld the fact that he represented Bang Bros. even when he was encouraging Excelsior to borrow money from Bang Bros. The evidence at the arbitration, as summarized in Plaintiffs' post trial arbitration brief, is as follows:

> One of Randazza's long-time adult industry clients is Bang Bros. Tr. at 544:9-24. Randazza billed over $20,000 to Bang Bros *while he was representing Excelsior and Liberty*. Id. at 545:8-546:7. In June 2012, Liberty was negotiating a potential acquisition of Cody Media, Inc. ("Cody Media"), a large adult entertainment producer. Id. at 550:21-24. Liberty intended the finance the purchase through a third-party lender. Id. at 550:25-551:2. During a meeting in which potential funding options were discussed, Randazza advised the Company to not seek funding from a potential source that had been identified (Ackrell Capital) and instead suggested that the Company obtain financing from Bang Bros. Id. at 551:3-25, 739:6-740:23, 871:9-874:1. Randazza failed to advise Liberty that he also represented Bang Bros and never obtained informed consent to continue representing both companies. Id. at 544:25-545:7, 847:7-10.
>
> Randazza should have disclosed his ongoing work for Bang Bros to Liberty in writing. Exhibit 304, Kennedy's Report at ¶¶ 37.2-37.4; Tr. at 1035:19-1037:7. Randazza also needed Liberty to consent in writing to his concurrent work for Bang Bros to the extent that he was advocating having Liberty use Bang Bros to

GREENE INFUSO, LLP
3030 South Jones Boulevard Suite 101
Las Vegas, Nevada 89146
(702) 570-6000

5

finance the acquisition of Cody Media. Id. The same can be said of Randazza simultaneously pursuing claims on behalf of GRHK and Liberty against a common defendant while negotiating the settlement. Tr. at 1036:16-1037:14. Liberty ultimately did not proceed with the acquisition of Cody Media, but it is clear the claims of Randazza in this paragraph are in dispute.

11. Excelsior representatives regularly forwarded to Randazza examples of sites pirating their content. Randazza usually ignored them or actively told them they did not have a good claim because Xvideos had a good defense. Randazza did not disclose that, not only was he the pirates' attorney, but that he helped them build their defense against copyright claims to Plaintiffs' detriment. Randazza concealed the fact that he was the piraters' attorney, causing Plaintiffs' to not file meritorious lawsuits against Randazza's other clients.

13. Randazza says the Righthaven $55,000 payment was for "administrative expenses". The funds were characterized as such in the order, but it consisted of reimbursement for attorney's fees. Randazza's sworn testimony at the arbitration was that it was an award of attorney's fees:

```
    Q. And in the Righthaven cases, you obtained
21 an award of fees, correct?
22 A. Correct.
23 Q. And that included fees for your time,
24 correct?
25 A. Correct.
1 Q. And the fee award was $55,000, correct?
2 A. Sounds right.
3 Q. And you collected on that award, correct?
4 A. Yes.
5 Q. You did not tell Excelsior you collected
6 on it, correct?
7 A. It was widely reported in the press. I'm
8 pretty sure we discussed it.
9 Q. You have a recollection of telling
10 someone at Excelsior that you collected $50,000 in
11 fees on the Righthaven pro bono case?
12 A. I don't have an affirmative memory of
13 every conversation I had two and a half years ago.
14 Q. Well, do you have an affirmative memory
15 of that conversation?
16 A. I don't. But it was so widely reported,
17 someone -- I don't know how anyone could have
18 missed it.
19 Q. Did you turn over the 55,000 -- the
```

6

> 20 portion of the 55,000 fee award that was
> 21 attributed to your time to Liberty?
> 22 A. I did not spend any Liberty time on that
> 23 matter.
> 24 Q. There were matters you were handling
> 25 where you were using an outside vendor named

Arbitration Transcript, pp 603:20 to 604:25.

Jason Gibson's testimony at arbitration was as follows:

> Q. The company authorized Mr. Randazza to
> 7 litigate against Righthaven on behalf as a
> 8 pro bono client; is that correct?
> 9 A. That's correct.
> 10 Q. Did the company continue to pay Marc even
> 11 for time spent working on that case?
> 12 A. Yes.
> 13 Q. And was any benefit to the company
> 14 expected?
> 15 A. Yes. The way he explained it to us,
> 16 because of the litigation we had taken against
> 17 people infringing on our content, that this would
> 18 make our company -- it would be good PR for our
> 19 company to be credited with this, helping out with
> 20 this, so --
> 21 Q. Were you aware that Mr. Randazza
> 22 recovered $55,000 in attorney's fee award in that
> 23 case?
> 24 A. After he resigned, yes.
> 25 Q. Did Marc ever tell you that he was
> 1 awarded attorney's fees for his work in that case?
> 2 A. No, he did not.
> 3 Q. Did he ever come to you and offer to
> 4 remit any portion to the company of that
> 5 attorney's fee award?
> 6 A. No, he did not, nor did he -- it
> 7 wasn't -- Erika helped him on -- well, it appears
> 8 to be about everything, so -- but she helped him
> 9 on a lot of stuff, so there was no -- nothing
> 10 offered to pay -- be paid back to us.
> 11 Q. You understand Erika Dillon assisted on
> 12 the Righthaven matter?
> 13 A. Yes, we believe she did.
> 14 Q. And you were paying Erika Dillon,
> 15 correct?
> 16 A. Yes.
> 17 Q. Or the company was paying Erika Dillon?
> 18 A. Right, yes.

7

Arbitration Transcript, 719:6-720:18.

14. Plaintiffs do not dispute the statements made in this paragraph.

15-16. Randazza's allegation that he negotiated bribes without intending to consummate them is certainly disputed. Not only did Randazza initially deny ever engaging in such negotiations, including in his rebuttals to the state bar associations, but even after the TNAflix settlement agreement was finalized and executed, numerous e-mails obtained in arbitration discovery illustrate Randazza's duplicity in that he was desperately trying to finalize the deal with TNAFlix to pay him not to sue it again in the future. Some are quoted at length in the prior filings of Plaintiffs (*See* ECF 58, pp. 5-9) and can be summarized as follows

- o    February 2, 2011: "So how should we proceed? Do they want a retainer letter from me?" and "....and you're working on a broker agreement that reflects you and me as the brokers for sale – 15% commission split 7.5% for each of us?" Ex. 361.

- o    February 7, 2011: "Someone just asked me if I am now representing TNA .... I don't know if I am." Ex. 361 (EMC001505).

- o    February 11, 2011: "Val, There is a hot iron that can be struck if we move fast." Ex. 361 (EMC001506).

- o    February 11, 2011: "Val, Can you get this executed?" attaching a Legal Services Fee Agreement providing for a $36,000 fully-earned upon receipt retainer for Randazza and Randazza the exclusive right to serve as broker for the sale of TNAFlix for a 5% broker fee. Ex. 362.

- o    February 11, 2011: "Please prevail upon them that time is of the essence." Ex. 363.

- o    February 13, 2011: "Val, They need to make a move. There are other things moving around and shifting right now, and by tomorrow, this may all be moot" and "ugh...this thing is going to fall apart." Ex. 363 (EMC001516).

- o    February 14, 2011: "Val, Tell them this: That Liberty settled this thing super cheap, and that I honestly think this was a $750K case if we went all the way ......The next company lining up has a big litigation plan, and I can assure you, they won't settle cheap..... if

8

TNA can't shit or get off the pot, I can't hold these guys back any longer. I'm not holding them back out of Christian charity .... But, if we don't have our broker agreement in place, I can't blow my wad holding this suit back..." Ex. 363 (EMC001518).

- o  February 15, 2011: Randazza forwarded an Exclusive Business Broker Agreement to counsel for TNAFlix for him providing for Randazza to receive a 5% broker commission on the sale of TNAFlix. Ex. 364.

17. Plaintiffs do not dispute the statements in this paragraph because the documents referenced speak for themselves.

18-19. Randazza's claims in these paragraphs is that he had no duty to turn over or account for funds he received from James Grady totaling $5,000 because Mr. Grady simply gave him the money to use at his discretion for any anti-infringement purpose. His "evidence" in support of this is a declaration of Mr. Grady filed for the first time on February 4, 2017. *See* ECF 126. Mr. Grady was neither deposed nor testified at the arbitration as, presumably, Randazza did not see fit to call him as a witness. Tellingly, however, Randazza testified at the arbitration that Mr. Grady gave him the $5,000 because he "contributed to Liberty's legal fees, yes." ECF 142. 602:18-19. Randazza also said he "put it toward the expenses for this case", but could not explain where, exactly, the money went or how it was used. *Id*. pp. 602:20-603:7. It is abundantly clear that the "undisputed facts" in these paragraphs are either very much in dispute or simply false.

20-21. The background on the $25,000 Hong Kong loan is that the Oron lawsuit was costing more than Randazza led Excelsior to believe. He came to them and told them that for $50,000 retainer to a Hong Kong firm, he could get a Mareva injunction tying up the bulk of Oron's money which would leverage a settlement. This was in Randazza's financial interest since he would get bonused on the settlement. Excelsior was skeptical and not happy about the prospect of spending another $50,000, so Jason Gibson told Randazza that if he really thought it was worth it, if he would put up half and they would proceed.[3] Randazza drafted the loan

---

[3] The Oron litigation involved a strategic lawsuit being filed in Hong Kong against Oron so that an injunction could be obtained to freeze Oron's bank accounts outside of the United States. Tr. at 720:19-722:4. Seeking the injunction necessitated that Liberty retain counsel in Hong Kong. Id. In order to do so, it would cost $50,000 in fees to Hong Kong counsel. Id. Gibson and Brian Lowderman were growing weary of the ever-increasing fees in the Oron case so

9

agreement between the two (which itself was a blatant ethical breach Randazza) but did not end up paying the $25,000 until months later. Randazza's employment was never threatened.

22. Plaintiffs do not dispute the statements in this paragraph, except that they are uncertain of the date referenced.

23. Plaintiffs do not know who desired to reopen settlement negotiations as stated in the first sentence of this paragraph. Plaintiffs deny Randazza was acting in his capacity as a private lawyer and assert he was acting as General Counsel under the Employment Agreement in negotiating the Oron settlement. Plaintiffs further deny that Mr. Gibson put pressure on Randazza to renegotiate the deal and deny any knowledge of Randazza negotiating "the prospect of potential representation of Mr. Gurbits' client."

24. The statements in this paragraph are vigorously disputed. The parties call the $75,000 in the Oron settlement "bribe" because when Jason Gibson first saw the provision in the agreement and asked what it was Randazza used the word "bribe" to describe it and said it was going to him. As described in Plaintiffs' post-arbitration brief:

> On August 13, 2012, Randazza presented a draft of the proposed settlement agreement to Gibson for his review. Tr. at 424:7-425:9, 701:15-702:10. Upon review, Gibson questioned why the $75,000 was being set aside for Gurvits and who the money would be going to. Id. at 425:14-16; 701:21-702:10. Randazza then, for the first time, informed Gibson that the money was a "bribe" from Oron in order to keep him from suing Oron in the future. Id. at 701:21-702:24, 703:1-704:24. Upon hearing this, Gibson demanded that Liberty receive the money and not Randazza. Tr. at 428:11-19; see also Exhibit 324. Randazza informed Gibson that he had an ethical problem as a result of his demand because giving Liberty the money would result in illegal fee sharing. Tr. at 428:11-19 Because he knew Gibson was "chafing" over the $75,000 "bribe," on August 16, 2012 Randazza sent an email to Gibson attempting to explain it. Exhibit 327. He first indicated that the money was not being taken from Liberty because Oron was only willing to pay $600,000 anyway. Id. He also represented that he had

---

they asked if Randazza was confident that this was the correct strategy. Id. at 722:6-723:10. When Randazza said he was, Gibson asked if Randazza would chip in half of the "investment" given how confident he was. Id. Randazza agreed to loan the company the $25,000 and subsequently prepared a note reflecting the transaction. Id.; Exhibit 373. Gibson signed the note and gave it back to Randazza. Exhibit 373. The promissory note refers to the transaction as a loan and characterizes Randazza as the lender and Liberty as the borrower. Id. The note also includes a unilateral attorneys' fee provision for collection on the note. Id. Contrary to Randazza's allegations, no one at the Company ever stated or implied that Randazza would be terminated if he didn't contribute the $25,000 to the optional pursuit of the injunction. Tr. at 723:11-20. Randazza prepared the note but gave no verbal or written explanation of what his role as a lender meant, nor did he encourage Gibson to consult with separate counsel prior to executing the agreement. Id. at 723:21-724:12.

GREENE INFUSO, LLP
3030 South Jones Boulevard Suite 101
Las Vegas, Nevada 89146
(702) 570-6000

disclosed the payment to Gibson "even before it happened." Id. Finally, he told Gibson that it would be improper fee sharing if he gave the money to Liberty but he was willing to step over that line for him. Id. Gibson denies having any knowledge that Randazza was actively negotiating a payment to his firm throughout the course of the Oron litigation. Tr. at 701:17-701:20, 702:14-702:24. He also denies consenting to such negotiations. Id. at 704:25-705:3, 705:23-706:16.

25. Plaintiffs do not dispute the statements in this paragraph.

26. Plaintiffs do not dispute the statements in this paragraph because the documents speak for themselves.

27. Plaintiffs do not dispute the statements in this paragraph because the documents speak for themselves.

28. Plaintiffs acknowledge that filming occurred in Randazza's office, but Plaintiffs dispute his characterizations of the filming. Plaintiff's post arbitration briefing addressed this as follows:

> It must be noted that the Company believes Randazza included his sexual harassment allegation purely to embarrass Gibson, ensure the Company would not make its dispute with Randazza public, and serve as a vehicle to invade Gibson's privacy by making spurious allegations. The evidence introduced at the hearing confirms the Company's suspicions. After filing the Arbitration Demand, Randazza was in communication with Excelsior's Director of Marketing, Chip Carter ("Carter"), and questioned whether Gibson had sent the state bar complaints Excelsior filed against Randazza to the media or any of his clients. Tr. at 332:16-335:22; John Thurston Carter ("Chip") Deposition Transcript at Exhibit 89 (Bates No. QUIVX002016-2017). When Carter told Randazza that he had not sent them to the media because Randazza's allegations raise too many questions and Gibson didn't want the sexual harassment stuff to be public, Randazza responded by stating that Gibson's fear was "[a] fear I tried to foster." Id. Additionally, during a conversation Randazza had with Excelsior executive Brian Dunlap ("Dunlap") while at the Phoenix Forum in April 2013, Randazza told Dunlap "[i]f I have to file and fight for the $200,000 I deserve, I might as well go for $4 million." Tr. at 881:3-884:4; Brian Dunlap Deposition Transcript at Exhibit 302 (EMC003473). Randazza also conceded to Dunlap that his Arbitration Brief was "out there." Id. Both of these instances indicate that the sexual harassment allegations Randazza asserts are not centered in a pursuit of justice, but are actually a means by which Randazza felt he could bully Excelsior and Gibson.
> With regard to the allegations relating to the scene in his office, Randazza claims that when he was informed that Excelsior was going to use his office in a scene prior to filming, he believed the warning to be in jest. Randazza claims that the next day, however, he discovered that his office had been used in filming the scene, including the desk where he keeps pictures of his children. Randazza also

GREENE INFUSO, LLP
3030 South Jones Boulevard Suite 101
Las Vegas, Nevada 89146
(702) 570-6000

11

claims that the next day he complained about the use of his office to Gibson, who responded that Randazza should not be "butthurt"about it. A review of the text message exchange between Gibson and Randazza shows that Randazza was not actually offended by having a scene shot in his office. In fact, in his typical crude manner, Randazza encouraged it—as evidenced by the fact that after he was alerted that his office would be used in a scene, Randazza texted Gibson "Don't get jizz on my briefs." Exhibit 330 (EMC000459-460), Text Message Exchange between Marc Randazza and Jason Gibson Texts 23605 and 23622 ("out" messages are from Gibson, "in" messages are to Gibson from Randazza). Randazza even stated that he didn't want the mess cleaned up in Text 23662. He later stated "I'm glad to help out if we need a place to shoot. I'd just ask that I get some notice so I can prep the place for it next time." Id. at Text 23774.

Excelsior fully acknowledges that it did film a scene for an adult film in Randazza's office. However, the evidence established that this is not unique; Excelsior commonly uses other areas of its facilities to film scenes including offices, the fitness center, and cafeteria. Tr. at 681:15-682:19, 857:17-858:16, 943:7-14, 955:8-956:3. In fact, at that time, customers were requesting more variety as to filming locations. Id. at 681:15-682:19. Nothing about the scene shot in Randazza's office was out of the ordinary, and after the scene was completed his office was cleaned and sanitized as per Company protocol. Id. at 956:4-957:22. Filming in an office has never been considered harassing conduct before.

Further, two additional facts clearly contradict Randazza's contention that the filming in his offensive was offensive, unwelcome, or in any way related to his status as a straight male. First, Randazza admitted he offered up his own personal residence for use in filming pornographic scenes prior to the filming in his office. Id. at 339:13-340:12; 683:23-684:17. Randazza not only admitted to making this overture to Gibson and others, but one of Excelsior's scene directors additionally testified Randazza had frequently made this offer and that he, in fact, communicated directly with Randazza regarding the fact that Randazza's office was going to be used for filming with no objection from Randazza. Tr. at 953:14-23; 954:10-955:1, 957:23-958:25.

Additionally, Randazza's testimony to his offense at the thought that his desk had been used in a pornographic scene is utterly belied by the fact that he purchased a couch from Excelsior that had been used in multiple pornographic films, placed that couch in the home he occupied with his family, and boasted to visitors that pornography had been filmed on the couch. Id. at 338:2-338:18. Randazza even sent a photograph of his scantily-clad wife on the couch to Gibson—which, of course, flies in the face of his allegations that Gibson had any issues with the fact that he was a straight male. Exhibit 315; Tr. at 338:19-339:12. While Randazza now claims he made formal complaints to then Human Resources manager, Kirk Addison, Addison denies ever receiving such a complaint. Id. at 916:9-23, 917:3-5. The truth is that Randazza's only complaints in April 2012 about filming a scene in his office was that his effects had been cleaned off of his desk and not properly replaced. See Exhibit 330 (Texts 23782, 23783).

29. Plaintiffs dispute the statements in this paragraph. As stated in their arbitration brief:

12

> As for the alleged sex act in Randazza's car, the Company denies that Randazza witnessed anything sexually inappropriate between Gibson and the other Excelsior employee on August 9, 2012, or any other day. In fact, the only person that actually supports Randazza's version of events is Randazza. Gibson testified that the alleged sex act did not occur. Tr. at 687:12-688:14. Cameron Frost, another individual who was in the car that day also denies that Gibson engaged in the alleged sex act. Exhibit 309 (Declaration of Cameron Frost). The evidence shows that the employee who the act was allegedly performed on, David McCoig, was severely inebriated and ill on the car ride that day—making Randazza's version of the drive home entirely unbelievable. Exhibit 309; Tr. at 688:12-691:2. Additionally, Randazza never made formal complaints about the alleged sex act to Gibson or Addison. Tr. at 690:24-691:2; 916:24-917:15.

30. Plaintiffs do not dispute that Randazza filed complaints with these agencies, which Plaintiffs vigorously contested. Plaintiffs do not know if Randazza needed different attorney for each proceeding.

31. Plaintiffs do not dispute the first sentence in this paragraph. Plaintiffs dispute the second sentence in that the Exhibit cited appears to indicate that Gibson initially contracted Randazza about receipt of the funds having heard it from another source (ECF 138-24, p.4), not the other way around as Randazza implies.

32. Plaintiffs dispute the statements contained in the first sentence of this paragraph as the Exhibit cited speaks for itself and Plaintiffs dispute that this was "proposed".

33. Plaintiffs do not dispute the statements in the first sentence of this paragraph, except (a) the language "Defendant would be cheated of his vested bonus, and (b) the reference to giving Liberty "the funds it was entitled to receive." The cited Exhibit in no way supports these statements. Also, the citation to and legal conclusions asserted in the paragraph and in footnote 6 are not appropriate in a statement of facts. Also, assuming Randazza was entitled to receive a 25% bonus (which Plaintiffs do not), it was not due to be paid for 30 days after receipt of the funds by *Excelsior*. *See* Exhibit 1 hereto Bates p. EMC000496.

34. Plaintiffs acknowledge that Defendant sent them his August 29, 2012 e-mail (part of ECF 138-6) which Plaintiffs believed was a resignation. The arbitrator agreed with Plaintiffs' reading of the e-mail. Plaintiffs dispute Defendant's remaining statements in this paragraph as they are clearly the subject of dispute and have been previously rejected by the arbitrator.

13

**GREENE INFUSO, LLP**
3030 South Jones Boulevard Suite 101
Las Vegas, Nevada 89146
(702) 570-6000

35.   Plaintiffs vigorously dispute Defendant's statements in this paragraph which were rejected by the arbitrator.

36.   Plaintiffs vigorously dispute Defendant's statements in this paragraph which were rejected by the arbitrator. Plaintiffs do not, and never have, admitted that all of their records were preserved on a separate server all asserted in this statement. Since Plaintiffs don't know what was on the laptop before it was wiped, they cannot know if anything is missing. Defendant cites paragraph 65 of the SAC for this proposition, but nothing in that paragraph supports this claim.

37.   Plaintiffs dispute Defendant's claims that, he had to wipe his company-issued laptop before returning it to comply with ethical rules. The arbitrator, who heard Mr. Randazza's testimony as well as that of multiple legal ethics experts, addressed this issue as follows:

> As E/L's inside general counsel and employee, Mr. Randazza had a legal and fiduciary duty- no later than when his employment ceased, regardless of whether or not with or without cause and/or by whom ended-to deliver every file and other piece of data and/or information-complete, intact and undeleted, unmodified and immediately accessible and usable by E/L. That included all files and data stored on the computers entrusted to Mr. Randazza and his legal assistant Erika Dillon for their use by and on behalf of E/L. Because of his noncompliance, indeed resistance to compliance with those duties, they continued and continue to the day of the rendering of this award-including beyond Mr. Randazza's belated and resisted turnover of one of the laptop computers because another laptop entrusted to Mr. Randazza remains unreturned. Those continuing fiduciary duties owed by him to E/L exist, including by reason of his exclusive control over the computers and thus superior knowledge of what was on each computer's hard drive before and after he had everything on the returned laptops completely and multiply deleted-including prior and in contemplation of his planned resignation on August 29, 2012.
>
> In the circumstances, Mr. Randazza's generalized and unspecified claims of privacy- in attempted justification of his ordered complete and multiple wipings of company-owned computers- cannot be accorded weight or credibility. By the same token, that ordered conduct raises an inference that whatever was deleted was known and intended by Mr. Randazza to be harmful to him and any claims and contentions which he might make in any dispute with E/L—i.e., deliberate spoliation, in addition to conversion.

Finally, at the arbitration, Randazza said nothing about wiping the laptop to comply with ethical rules, rather, he testified he wiped the computers because he was sure he was about to be fired and he was concerned about Mr. Gibson being vindictive if he gained access to Randazza's personal information. ECF 142, pp. 199-200.

**GREENE INFUSO, LLP**
3030 South Jones Boulevard Suite 101
Las Vegas, Nevada 89146
(702) 570-6000

38. Plaintiffs do not dispute the statements in this paragraph.

39. Plaintiffs do not dispute the statements in this paragraph.

40. Plaintiffs do not dispute the statements in this paragraph.

41. Plaintiffs do not dispute the statements in this paragraph.

42. Plaintiffs do not dispute the statements in this paragraph.

43. Plaintiffs do not dispute the statements in this paragraph, but deny the statements in the last sentence of the paragraph.

44. Plaintiff's dispute Defendant's characterization of the arbitrator's request concerning his positioning during his testimony. The arbitrator did not direct Randazza to look at the wall rather than at the Arbitrator or opposing counsel during cross examination as Randazza claims. Randazza misleadingly cites to a request from the Arbitrator given just prior to Randazza's direct examination by his own counsel. On direct examination, Randazza's counsel opted to stay seated at the same side of the conference table as Randazza leaving Randazza seated with his attorney asking questions to the right of him and the Arbitrator and court reporter to the left of them. ECF 142,pp.; 10:16-11:22. In that position, Randazza could not simultaneously look at both his own attorney and the Arbitrator and court reporter, hence, the Arbitrator indicated that Randazza should look towards the Arbitrator and court reporter. *Id.* No such instruction was given during cross-examination and would have been unnecessary since Randazza and opposing counsel were seated across the conference table from each other. Even if there was any factual accuracy to Randazza's contentions, which there is not, the fact that the IAA took partially into account Randazza's positioning on cross-examination (or perhaps it was Randazza's misrepresentation about his position during cross-examination that was taken into account) when assessing Randazza's credibility does not amount to specific facts indicating an improper motive by the Arbitrator.

45. Plaintiffs do not dispute the statements in this paragraph.

48. Plaintiffs do not dispute the statements in this paragraph

49. Plaintiffs do not dispute the statements in this paragraph.

53. Plaintiffs do not dispute the statements in this paragraph.

15

54. Plaintiffs do not dispute the statements in this paragraph.

55-56. Plaintiffs do not dispute the statements in this paragraph.

DATED this ___ day of May 2017.

                                            GREENE INFUSO, LLP

                                            __/s/ James D. Greene_____
                                            James D. Greene, Esq.
                                            Nevada Bar No. 2647
                                            3030 South Jones Boulevard, Suite 101
                                            Las Vegas, Nevada 89146

**CERTIFICATE OF SERVICE**

I am employed by the law firm of Greene Infuso, LLP in Clark County. I am over the age of 18 and not a party to this action. My business address is 3030 South Jones Boulevard, Suite 101, Las Vegas, Nevada 89146.

On May 19, 2017 I served the document(s), described as:

**RESPONSE TO STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

☒ by placing the ☐ original ☒ a true copy thereof enclosed in a sealed envelope addressed as follows

☐ a. ECF System *(You must attach the "Notice of Electronic Filing", or list all persons and addresses and attach additional paper if necessary)*

☒ b. BY U.S. MAIL. I deposited such envelope in the mail at Las Vegas, Nevada. The envelope(s) were mailed with postage thereon fully prepaid.

Zachariah Larson, Esq.
LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101

I am readily familiar with Greene Infuso, LLP.'s practice of collection and processing correspondence for mailing. Under that practice, documents are deposited with the U.S. Postal Service on the same day which is stated in the proof of service, with postage fully prepaid at Las Vegas, Nevada in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after the date stated in this proof of service.

☐ c. BY PERSONAL SERVICE.

☐ d. BY DIRECT EMAIL

☐ e. BY FACSIMILE TRANSMISSION

I declare under penalty of perjury that the foregoing is true and correct.

Dated, this 19th day of May 2017.

             /s/ Frances M. Ritchie
            An employee of Greene Infuso, LLP