LARSON ZIRZOW & KAPLAN, LLC
ZACHARIAH LARSON, ESQ.
Nevada Bar No. 7787
E-mail: zlarson@lzklegal.com
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
E-mail: mzirzow@lzklegal.com
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170
Fax: (702) 382-1169

Attorneys for Debtor

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| In re: <br><br> MARC JOHN RANDAZZA, <br><br> Debtor. | Case No.: BK-S-15-14956-abl <br> Chapter 11 |
| EXCELSIOR MEDIA CORP., a Nevada corporation; and LIBERTY MEDIA HOLDINGS, LLC, a Nevada limited liability company, <br><br> Plaintiffs, <br><br> v. <br><br> MARC JOHN RANDAZZA, an individual, <br><br> Defendant. | Adv. No. 15-01193-abl <br><br><br><br><br><br><br><br> Date: February 13, 2018 <br> Time: 10:00 a.m. |

**DECLARATION OF MARC J. RANDAZZA IN SUPPORT OF DEBTOR'S MOTION TO APPROVE SETTLEMENT AGREEMENT AND RELEASE WITH EXCELSIOR MEDIA CORP., LIBERTY MEDIA HOLDINGS, LLC AND JASON GIBSON PURSUANT TO FED. R. BANKR. P. 9019**

I, Marc John Randazza, declare as follows:

1. I am over the age of 18 and mentally competent. This declaration is made and based upon my own personal knowledge and if called upon to testify regarding the matters herein,

I would do so consistently herewith. I make this Declaration in support of the *Motion to Approve Settlement Agreement and Release With Excelsior Media Corp., Liberty Media Holdings, LLC and Jason Gibson Pursuant to Fed. R. Bankr. P. 9019* (the "Motion"). I am a manager of Randazza Legal Group and am an attorney licensed to practice law in Arizona, California, Florida, Massachusetts, and Nevada. Unless otherwise indicated, all capitalized terms herein shall have the same meaning as set forth in the Motion. To be consistent with the Motion, I will refer to myself in the balance of this Declaration in the third person as "Mr. Randazza."

2. The Motion seeks to authorize and approve a Settlement Agreement and Release (the "Settlement Agreement") with Excelsior Media Corp. ("Excelsior"), Liberty Media Holdings, LLC, a California limited liability company ("Liberty California"), Liberty Media Holdings, LLC, a Nevada limited liability company ("Liberty Nevada") and Jason Gibson ("Mr. Gibson" and together with Excelsior, Liberty, and, collectively, the "Excelsior Parties") pursuant to Fed. R. Bankr. P. 9019.

A. **Pre-Petition.**

  1. **General Background.**

3. On or about June 10, 2009, Excelsior hired Mr. Randazza as its General Counsel pursuant to an Employment Agreement (the "Employment Agreement"). At all relevant times, Excelsior and Liberty California participate in a joint venture or partnership under the name "Corbin Fisher". The Agreement makes no mention of the Mr. Randazza representing Liberty California, the brand name/website "Corbin Fisher," or any other party. Excelsior and Liberty California allege they are simply "sister" entities.

4. The Employment Agreement contains several provisions regarding Mr. Randazza's compensation. It provides for a starting salary of $239,200 annually, or $4,600 per week, in the event Mr. Randazza relocated to San Diego. (Employment Agreement, § 3(A)). Mr. Randazza did, in fact, relocate to San Diego.

5. Section 3(B) of the Employment Agreement provides for a salary review after six months of employment, followed by salary increases of 5% on each anniversary of Mr. Randazza's employment date. Excelsior could waive or defer this salary increase with an executed

2

Memorandum of Understanding between Excelsior and Mr. Randazza. (Employment Agreement, § 3(B)). Pursuant to the foregoing Excelsior provided Mr. Randazza a 5% salary increase on June 10, 2010 and June 10, 2011. Mr. Randazza's salary should have increased by another 5% on June 10, 2012 pursuant to this section, but Mr. Randazza never received this increase. Excelsior never signed a Memorandum of Understanding with Mr. Randazza waiving or deferring this bonus, nor did it even offer one to Mr. Randazza.

6. Section 3(C) of the Employment Agreement entitled to Mr. Randazza to a nondiscretionary bonus of 25% of any gross settlement funds paid to Excelsior in connection with legal matters. His rights to any such bonus vested at the time of settlement, not collection, and Mr. Randazza was entitled to any vested funds even if his employment ended before Excelsior collected the funds. (Employment Agreement, § 3(C)).

7. Through the course of dealing between Excelsior and Mr. Randazza, bonus payments under Section 3(C) were due and payable on account of settlement funds received on behalf of Liberty California.

8. Mr. Randazza was also contractually entitled to severance payment in the event Excelsior unilaterally terminated his employment. (Employment Agreement, § 7(B)). Unilateral termination under the agreement means termination for any cause or a change in circumstances of employment constituting constructive discharge. (Id.)

9. While serving as general counsel, Mr. Randazza was contractually permitted to practice law on behalf of other clients through his outside law firm, Marc J. Randazza P.A. d/b/a Randazza Legal Group ("MJRPA"). (Employment Agreement, § 6(c)). Thus, for example, at the direction of Excelsior, Mr. Randazza represented Liberty California, through his separate law firm, MJRPA, as required by Nev. R. Prof. Conduct 5.4(d). Such representation included claims for copyright infringement of motion pictures distributed by the Corbin Fisher venture. Although settlement payments were made in the name of Liberty California, the received funds were for the benefit of Excelsior, and Mr. Randazza was customarily paid his bonus by Excelsior based on the recovery for Liberty California.

3

**2.     MJRPA's Representation of Liberty California in the Oron Litigation.**

10.     On June 20, 2012, Liberty California, through MJRPA, filed suit against Oron for copyright infringement (the "Oron Litigation"), in a case styled as Liberty Media Holdings v. FF Magnat Ltd., No. 2:12-cv-01057 (D. Nev.).

11.     As part of the Oron Litigation, MJRPA had to retain Hong Kong-based counsel for Liberty California in order to secure a Mareva or "asset freezing" injunction against Oron's foreign assets in aid of collection. This retention of foreign counsel was a necessary step in procuring Liberty California's $550,000 settlement in the Oron Litigation.

12.     Excelsior agreed to hire Hong Kong counsel for this purpose and agreed to pay for them, but only if Mr. Randazza advanced $25,000 of his personal money toward their legal fees, to be reimbursed from the proceeds of the Oron Litigation. Mr. Gibson, speaking on behalf of Excelsior, told Mr. Randazza that his employability was at risk if he did not procure more copyright infringement settlements, including in the Oron Litigation. In order to keep his job with Excelsior, Mr. Randazza had no choice but to advance the fees for this Hong Kong counsel, with the understanding he would be reimbursed from the settlement proceeds or would at least be reimbursed as any employee would be.

13.     On or about July 1, 2012, Liberty California and Oron reached a settlement in the Oron Litigation (the "Oron Settlement").

14.     On July 6, 2012, because of Oron's recalcitrance, MJRPA filed a motion to enforce the Oron Settlement and a motion for recovery of attorneys' fees and costs then successfully obtained an order enforcing the Oron Settlement on behalf of Liberty California. See Liberty Media Holdings, LLC v. FF Magnat Ltd., No. 2:12-cv-01057, 2012 WL 3255044 (D. Nev. Aug. 7, 2012).

15.     On August 7, 2012, the District Court entered an order granting Liberty California's motion to enforce the Oron Settlement, and entered judgment in favor of Liberty California, and against Oron in the amount of $550,000, and continuing to freeze Oron's accounts to satisfy any attorneys' fee award. That same day, MJRPA filed writs of execution of the foregoing judgment against Oron, and on August 10, 2012, also filed an emergency renewed motion for attorneys' fees

4

and costs incurred.

16. This motion for attorneys' fees and costs filed by MJRPA sought an additional $214,964.00, and the Court ultimately awarded $131,797.50. See <u>Liberty Media Holdings, LLC v. FF Magnat Ltd.</u>, No.: 2:12-cv-01057, 2012 WL 3834744 (D. Nev. Sept. 4, 2012).

17. As set forth in the disbursement breakdown, of the original $550,000 Oron settlement received, Mr. Randazza was owed his 25% commission of $137,500, plus an additional $25,000.00 for the litigation advance he made to retain Hong Kong counsel for Liberty California. As counsel, MJRPA was also required to disburse $31,800 in litigation costs to third parties. (<u>Id.</u>) Additionally, Liberty California owed MJRPA $21,279.50 for the services of professionals other than Mr. Randazza in the Oron Litigation. Finally, Liberty California owed MJRPA $2,601 for non-Oron matters.

18. At the end of August 2012, MJRPA, as Liberty California's counsel, with the assistance of Hong Kong counsel, seized the settlement funds from Oron through court order. Mr. Randazza communicated this on August 29, 2012 and <u>within hours</u> of receipt of the funds, which is especially quick considering that the Mr. Randazza was out of the office at that time to attend his sister's wedding.

19. On August 29, 2012, MJRPA proposed a <u>contingent</u> distribution of the proceeds from the Oron Settlement. The proposed distribution was contingent because not all of the settlement terms had been performed, precluding any vesting of any interest of Liberty California in the proceeds, and Mr. Randazza was personally liable, as an escrow agent, for the funds plus a 10% penalty if he released them before all terms were complied with.

20. Mr. Gibson, acting for Liberty California, disagreed with the proposed contingent distribution, even though it resulted in a larger net benefit to it than it proposed. MJRPA was prepared to deliver to Liberty California the funds it was entitled to receive; however, Liberty California demanded the entire amount of settlement funds and without payment to MJRPA for its fees and costs incurred, and with the express position that it would cause Excelsior to cheat Mr. Randazza of his bonus.

21. MJRPA, acting through Mr. Randazza, then immediately recommended to Liberty

5

California that MJRPA withdraw from representing <u>Liberty California</u> in <u>further</u> matters due to the dispute between the two. In response, Mr. Gibson, acting for <u>Excelsior,</u> communicated that, rather than simply rely on the words Mr. Randazza used, it would "construe his email" as Mr. Randazza's resignation from his General Counsel position with Excelsior per the Employment Agreement, and alleges that Mr. Randazza did, in fact, resign. Mr. Randazza disputed this purposeful mischaracterization of his words then and continues to dispute it now. On August 31, 2012, Liberty California, acting through new counsel, filed a motion to substitute attorneys to replace MJRPA, which was approved by order entered by the District Court on September 4, 2012.

22. On September 4, 2012, the District Court also entered an order determining that the actual value of MJRPA and the Mr. Randazza's services in the Oron Litigation was $131,797.50, and entered judgment thereon. Subtracting out Mr. Randazza's labors, for which compensation is due under the Employment Agreement, the other attorneys and legal professionals working for MJRPA earned $81,433.98.

23. On September 5, 2012, Oron appealed the District Court's decisions to the United States Court of Appeals for the Ninth Circuit, which appeal was dismissed about nine (9) months later on June 25, 2013.

24. On June 26, 2013, which was the day after the Ninth Circuit dismissed Oron's appeal, Liberty California, acting through new counsel, filed what it called a motion for adjudication that attorney's charging lien is unenforceable and for declaratory order against MJRPA, and an emergency motion for disbursement of funds against MJRPA.

25. On July 26, 2013, the District Court denied Liberty California's motions to adjudicate and render unenforceable MJRPA's charging lien, and also its motion to disburse funds without payment to MJRPA.

26. No further actions were thereafter taken in the Oron Litigation, and on August 5, 2014, the Clerk's Office was authorized to dismiss the Oron Litigation for want of prosecution

27. Mr. Randazza has never been reimbursed the $25,000 he personally advanced, at Excelsior's insistence, to Hong Kong counsel for the Oron Litigation. Liberty California refused to pay MJRPA any portion of the fees and costs it earned in the Oron Litigation. Excelsior has

6

refused to pay the Mr. Randazza's remaining compensation owing under the terms of the Employment Agreement.

28. August 2012 was a trying time for Excelsior. On August 7, 2012, Mr. Gibson reported that two significant employees would be terminated, one specifically for economic reasons. Excelsior eliminated employee benefits, including 401(k) matching and dependent coverage. Sales were declining and the ownership claimed to be dipping into personal assets to cover business expenses.

29. Mr. Randazza agrees that there was animosity between him and Corbin Fisher and that he contemplated quitting. As Excelsior recognizes, however, Mr. Randazza determined to continue and even advanced $25,000 of his own funds at Excelsior's insistence, to litigation in Hong Kong, efforts that indisputably proved successful.

30. In addition to corporate financial strain, Mr. Randazza was subjected to personal disrespect as part of Excelsior's desire to force him to resign. And yet, he did not.

31. In April 2012, without prior notice to Mr. Randazza or his prior consent, Corbin fisher employees shot a pornographic film in Mr. Randazza's office, which included a woman urinating on his desk. Mr. Randazza did not think his office could become a filming studio prior to this point. In that same filming session, Corbin Fisher employees also photographed male-on-male homosexual pornography in Mr. Randazza's office. Mr. Gibson explicitly highlighted to Mr. Randazza that he was shooting gay porn on Mr. Randazza's office desk & couch.

32. Then, on August 9, 2012, Mr. Gibson performed fellatio on another employee in the back seat of Mr. Randazza's vehicle, compelling Mr. Randazza to watch. In light of this personal harassment and Corbin Fisher's financial pressures, Mr. Randazza anticipated his termination was imminent.

33. Mr. Randazza's anticipation proved prescient. When Excelsior "construe[d] his email" as a resignation, Excelsior actually terminated Mr. Randazza's employment without cause.

34. Finally, in May 2013, Liberty California and Oron agreed that the $550,000 in settlement funds recovered by Mr. Randazza was vested in Liberty California.

35. At no time was Mr. Randazza paid his 25% bonus due and owing, being

LARSON ZIRZOW & KAPLAN, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

7

$137,500.00, from the Oron settlement; at no time was Mr. Randazza repaid his $25,000 litigation advance; at no time was Mr. Randazza paid his agreed upon 5% raise in 2012; and at no time was Mr. Randazza paid his severance. Mr. Randazza submits that these are clear breaches of contact.

**3.  The Arbitration and State Court Proceedings.**

36. In light of disputes over Mr. Randazza's termination from his job at Excelsior, on November 15, 2012, Mr. Randazza initiated an arbitration proceeding against Excelsior, Liberty California, and Mr. Gibson, being JAMS No. 1260002283 (the "Arbitration") for obligations owed to him under the Employment Agreement, as well as for wrongful termination, and in the alternative, for constructive discharge and retaliation. Excelsior also pled counterclaims in the Arbitration against Mr. Randazza.

37. As a further result of the foregoing disputes, on December 9, 2012, MJRPA filed an action against Liberty California in the Eighth Judicial District Court, Clark County, Nevada (the "Nevada State Court"), being Case No. A-12-673275-C (the "MJRPA State Court Litigation"), therein alleging claims for money due for legal services rendered. Liberty California asserted various counterclaims against MJRPA State Court Litigation as well.

38. On June 3, 2015, the Arbitrator entered an *Interim Arbitration Award* (the "IAA") in favor of Excelsior on certain items, but left various other matters unresolved. Although beyond the scope of the discussion necessary with respect to the current Motion to approve the instant Settlement Agreement, there were significant injustices and inconsistencies with the Arbitrator's decision in the IAA.

39. On June 15, 2015, certain of the Excelsior Parties filed a motion in the Nevada State Court, thereby commencing Case No. A-15-719901-C (the "State Court Confirmation Proceedings"), which sought to confirm the IAA and have formal judgment entered against the Mr. Randazza.[1] Mr. Randazza opposed this request and also sought, in the alternative, to vacate or modify it.

---

[1] The State Court Action was filed in the wrong jurisdiction, because any action to enforce any arbitration award arising from the Employment Agreement, including the IAA, was contractually required to be venued in San Diego County, California. (Employment Agreement, § 9.E).

40. On the Petition Date, and thus prior to the Nevada State Court hearing argument and ruling on the pending matters in the State Court Confirmation Proceedings, and also prior to the Arbitration continuing any further beyond the IAA with respect to the remaining matters still unresolved in the Arbitration, Mr. Randazza filed his bankruptcy petition, thereby staying those proceedings by operation of section 362 of the Bankruptcy Code.

**B.    Post-Petition.**

41. On October 28, 2015, Excelsior and Liberty California filed their *Motion to Modify the Automatic Stay to Allow a Pre-Petition Arbitration to Proceed to Judgment* (the "Stay Relief Motion") [ECF No. 60], wherein they argued that the Court should grant them relief from the automatic stay to allow them to return to Nevada State Court and seek confirmation of the IAA, and otherwise proceed with the remainder of the Arbitration. Excelsior and Liberty California attached copies of the IAA and Mr. Randazza's Employment Agreement to their Stay Relief Motion. On December 18, 2015, the Court entered a written order denying the Stay Relief Motion [ECF No. 93], which incorporated the Court's prior ruling on December 15, 2015 [ECF No. 116 (transcript)].

42. On December 29, 2015, Excelsior filed a *Proof of Claim* (the "Proof of Claim") in the stated amount of "in excess of $1,552,614.29." [Claim No. 8]. Neither Liberty California, Liberty Nevada, nor Mr. Gibson filed their own separate proofs of claim in the Chapter 11 Case, but "Liberty Media Holdings" is listed as "another name the creditor used with the debtor" in the Proof of Claim. Excelsior also attached the unconfirmed IAA as an exhibit to its Proof of Claim as the sole exhibit thereto. Excelsior provided no other exhibits or explanation with the Proof of Claim. Certain of the Excelsior Parties later attempted to argue that the filing of the Stay Relief Motion should be construed as a so-called "informal" proof of claim on behalf of Liberty California.

43. On November 30, 2015, Excelsior and Liberty California (collectively, the "Plaintiffs") filed their original complaint against the Mr. Randazza (the "Original Complaint") [Adv. ECF No. 1], which asserted claims for nondischargeability pursuant to sections 523(a)(2)(A) and (a)(4) of the Bankruptcy Code, thereby commencing the Adversary Proceeding.

9

44. On February 10, 2016, which was almost two and a half months after the Plaintiffs filed their Original Complaint, but neglected to serve it, Excelsior and Liberty Nevada filed their *First Amended Complaint* (the "FAC") [Adv. ECF No. 11], thereby asserting claims for nondischargeability against Mr. Randazza pursuant to sections 523(a)(2), (4), and (6) of the Bankruptcy Code. The filing of the FAC rendered moot the claims by Liberty California in the Original Complaint.

45. On March 14, 2016, Mr. Randazza filed a motion to dismiss the FAC or, in the alternative, for partial summary judgment [Adv. ECF No. 19], which was thereafter fully briefed by the parties. [Adv. ECF Nos. 23, 24, 37-39, 43-45 and 48]. In the foregoing briefing, Mr. Randazza argued, among other matters, that collateral estoppel did not apply to the IAA because it was unconfirmed, and that under applicable caselaw, unconfirmed arbitration awards lacked preclusive effect as a matter of law [Adv. ECF No. 19, pp. 6-8; ECF No. 42, pp. 7-16].

46. In or about 2016, and based on a bar complaint filed by Mr. Gibson, the State Bar of Nevada, acting by and through the Office of Bar Counsel, filed a complaint, thereby commencing Case No. OBC15-0747 against Mr. Randazza before the State Bar of Nevada, Southern Nevada Disciplinary Board (the "State Bar Disciplinary Proceeding").

47. On June 16, 2016, the Court entered a written order granting Mr. Randazza's motion to dismiss the FAC, but with leave allowing it to be replead [Adv. ECF No. 52], which also incorporated by reference the Court's oral ruling on the matter on June 10, 2016 [Adv. ECF No. 55 (transcript)].

48. On July 7, 2016, Excelsior and Liberty Nevada filed their *Second Amended Complaint* (the "SAC") [Adv. ECF No. 58], which alleged the same nondischargeability claims pursuant to section 523(a) of the Bankruptcy Code as alleged in the FAC. On August 8, 2016, Mr. Randazza filed a motion to dismiss the SAC, which was then fully briefed by the parties. [Adv. ECF Nos. 75, 85-86.] On October 19, 2016, the Court entered an order granting Mr. Randazza's motion to dismiss, in part [Adv. ECF No. 91], which incorporated by reference the Court's oral ruling made on the record on October 18, 2016 [Adv. ECF No. 94 (transcript)]. In particular, the Court dismissed the section 523(a)(2) claim with prejudice, because there was no basis for a claim

for false pretenses, a false representation, or actual fraud committed by Mr. Randazza.

49.  On July 22, 2016, the Bankruptcy Court entered an order (the "MJRPA Settlement Order") [ECF No. 157], thereby approving a Settlement Agreement and Mutual Release (the "MJRPA Settlement Agreement"), involving, among other parties, the Excelsior Parties, Mr. Randazza, MJRPA, and Randazza Legal Group, PLLC, a Nevada professional limited liability company ("RLG"). The MJRPA Settlement Agreement provided that the MJRPA State Court Litigation was dismissed with prejudice in exchange for a payment of $205,000 paid made by MJRPA's professional liability insurance carrier, and without any admission of liability. The MJRPA Settlement Agreement also contained a purported limited carveout of the impact of that agreement on certain parts of the Adversary Proceeding.

50.  On November 2, 2016, Mr. Randazza filed his *Answer* to the surviving claims of the SAC, and *Counterclaims* [Adv. ECF No. 98], which Counterclaim included an objection to Excelsior's Proof of Claim per section 502 of the Bankruptcy Code (the First Claim for Relief), and various other counterclaims for sums due and owing under his Employment Agreement (the Second through Fifth Claims for Relief, which are all for breach of contract).

51.  On December 5, 2016, certain Excelsior Parties filed their *Answer* to Mr. Randazza's Counterclaim and response to Mr. Randazza's objection to the Proof of Claim [Adv. ECF No. 103].

52.  On December 22, 2016, certain Excelsior Parties filed their *Motion for Order Confirming Interim Arbitration Award* (the "Motion to Confirm") [ECF No. 104], which requested that the Bankruptcy Court confirm the IAA. Mr. Randazza filed a comprehensive opposition to the Motion to Confirm the IAA [Adv. ECF No. 125], and also later filed an accompanying declaration [Adv. ECF No. 137], and various requests for judicial notice [Adv. ECF Nos. 138, 150 and 175].

53.  On April 10, 2017, Mr. Randazza filed his *Motion for Partial Summary Judgment* as to the SAC (the "MPSJ") [Adv. ECF No. 147], which was fully briefed by the parties [Adv. ECF Nos. 165 and 172].

54.  On June 8, 2017, the Court entered its written order denying the Motion to Confirm

the IAA [Adv. ECF No. 181], which incorporated the Court's prior oral ruling on June 6, 2017 [Adv. ECF No. 195 (transcript)].

55. On June 8, 2017, the Court also entered its *Order Scheduling Trial and Continuing Scheduling Conference* (the "Scheduling Order") [Adv. ECF No. 183], which, among other matters, set this Adversary Proceeding for trial on April 3, 5, 9, 12 and 16, 2018.

56. On August 2, 2017, the Court entered an *Order* granting in part, and denying in part Mr. Randazza's MPSJ, thereby dismissing Liberty Nevada's nondischargeability claims, but permitting Excelsior's remaining claims in the SAC to proceed. [Adv. ECF No. 199].

57. On August 3, 2017, the Court entered a *Judgment* [Adv. ECF No. 201] in favor of Mr. Randazza and against Liberty Nevada, thereby confirming the dismissal of all of Liberty Nevada's nondischargeability claims against Mr. Randazza.

58. On August 28, 2017, the parties filed a joint *Standard Discovery Plan* (the "Discovery Plan") [ECF No. 208], which provided a discovery cutoff of February 2, 2018 (the "Discovery Cutoff").

59. Subsequently, the Parties engaged in a settlement dialogue, which discussions included several telephone calls of counsel, and written settlement correspondence and email. The proposed Settlement Agreement herein is the product of good faith and arm's length negotiations between the parties, and after substantial briefing before the Bankruptcy Court, as well as significant proceedings in the Arbitration. Both sides have been represented by experienced and knowledgeable counsel throughout this litigation, both pre and post-petition, as well as in these settlement negotiations in particular. The Settlement Agreement makes no admissions of liability as to any of the theories pleaded by the Parties, and rather is agreed to by both sides as a way to end their very long, expensive and time-consuming disputes.

C. **Application.**

   1. **Probability of Success.**

60. Analyzing the probability of success involves an analysis of each side's remaining claims and potential remedies. Mr. Randazza asserts that the Excelsior Parties have a low probability of success in their claims for a variety of reasons. First, both of the Excelsior Parties'

attempts to confirm the IAA have been denied by the Bankruptcy Court, including by the Court's denial of their Stay Relief Motion to proceed with the State Court Confirmation Proceedings and the remainder of the Arbitration, and the Court's later denial of their Motion to Confirm in the Adversary Proceeding.

61. Second, because the IAA is both only an interim award, not final, and is also an unconfirmed and indeed now unconfirmable arbitration award, it also has no preclusive effect as a matter of law under prevailing caselaw, and thus the Excelsior Parties are required to reprove their claims in their entirety in the Adversary Proceeding.

62. Third, under applicable Ninth Circuit authority interpreting the Federal Arbitration Act, when claims are required to be arbitrated, the parties do in fact arbitrate, and an arbitration award is issued that is neither vacated nor confirmed, the party in whose favor the arbitration award was rendered is left without remedy. As a result, Mr. Randazza asserts that the Excelsior Parties could not proceed further on any claim in light of their failure to obtain confirmation of the IAA, thus leaving them without a remedy.

63. Fourth, the Court has already dismissed with prejudice the Excelsior Parties section 523(a)(2) claim for nondischargeability based upon fraud, and also more recently has dismissed Liberty Nevada as a party entirely from the proceedings, thus leaving only Excelsior as a party. Mr. Randazza asserts that the foregoing decisions have effectively gutted the Excelsior Parties' claims in the Adversary Proceeding such that Excelsior, as the sole remaining party, really does not have any real remaining claims for nondischargeability against Mr. Randazza pursuant to sections 523(a)(4) and (a)(6) of the Bankruptcy Code. Were this matter to reach trial, Mr. Randazza would show that all funds were accounted-for; there was neither fraud nor defalcation in a fiduciary capacity and he inflicted no malicious injury upon Excelsior.

64. By contrast, Mr. Randazza asserts that his remaining breach of contract counterclaims are strong. Indeed, during the parties' settlement discussions, Mr. Randazza was preparing and only days away from filing his own motion for partial summary judgment as to his counterclaims, which he asserts had a substantial probability of success. Given the foregoing likelihood of Mr. Randazza's counterclaims being granted, this would have resulted in him having

a large potential offset against any claims the Excelsior Parties could ever have established.

65. As such, given the probability of success of Mr. Randazza, as well as the significant limitations on the Excelsior Parties' probabilities of success in light of the Court's rulings and their remaining claims, this first factor weighs strongly in favor of approval of the Settlement Agreement.

### 2. Collection Difficulties.

66. There do not appear to be significant collection difficulties against the Excelsior Parties. The Excelsior Parties have substantial means given their profitable business. By contrast, Mr. Randazza is obviously presently a debtor in bankruptcy, and thus even if the Excelsior Parties were able to obtain a nondischargeable judgment against him, there would be difficulties in collecting any sum. Further, as previously noted, the Excelsior Parties would have potential difficulty in collection because of the fact that Mr. Randazza has offsetting claims. As such, the difficulties in collection also strongly favor approval of the Settlement Agreement, especially given that the Settlement Payment amount is only $40,000, and is proposed to be paid over time in equal monthly payments of $1,000 per month over the next three plus years. This Settlement Payment is obviously substantially less than what was originally alleged by the Plaintiffs. As such, this second factor also weighs heavily in favor of approving the Settlement Agreement.

### 3. The Complexity, Expense, Inconvenience and Delay of the Litigation.

67. The litigation of the Parties' disputes has been exceedingly complex, expensive, time consuming, and resulted in significant delays. Prior to the Chapter 11 Case, the Parties engaged in various expensive and extensive proceedings, including a full Arbitration proceeding and arbitration hearing, the MJRPA State Court Case, and the State Court Confirmation Proceedings, which involved multiple sets of attorneys. Prior to the Petition Date, these matters were litigated from late 2012 to the middle of 2015. Additionally, since the filing of the Chapter 11 Case, the various matters in the Chapter 11 Case and the Adversary Proceeding have also been extensively litigated at great time and expense to both parties. In particular, not only did the parties have a contested Stay Relief Motion, but in the Adversary Proceeding, the Excelsior Parties have filed three versions of their adversary complaint, those have been met with several motions to

dismiss and a motion for partial summary judgment, and the parties have also litigated a separate Motion to Confirm the IAA in the Adversary Proceeding. In particular, in the Adversary Proceeding the Original Complaint was filed on November 30, 2015, and it was not until June 2017 (more than a year and a half later) that the matter moved beyond the initial pleading stage given the various dispositive motion practice, the Motion to Confirm and the Counterclaims that the Parties engaged in prior to the commencement of discovery in that proceeding. Going forward, and because the Parties will basically need to reprove their entire case given the lack of any relevance or effect of the unconfirmed IAA, the parties were looking at very expensive litigation involving numerous depositions, hundreds of exhibits, various dueling expert witnesses, likely further dispositive motion practice, and a lengthy four or more day trial in the Adversary Proceeding. In sum, the Parties have already spent a substantial amount of time and incurred a significant amount of expense only to find themselves back to having to retry their disputes against each other, which will add even more time and expense to the parties.

68. Second, the litigation in the Adversary Proceeding has proven to be very complex with very lengthy and extensive motion practice and legal briefing on various areas of law, which complexity undoubtedly would continue through the course of the case given the nature of the disputes, the parties, and the counsel involved. Similarly, the Adversary Proceeding has essentially delayed Mr. Randazza's ability to proceed with a Chapter 11 Case and plan confirmation proceedings. Although there is always the potential for claims estimation proceedings for purposes of determination the confirmability of a chapter 11 plan, there is no guaranty that the Court would have allowed such a process in this case and/or that the estimated amount would have necessarily been at the amount that would have allowed Mr. Randazza to confirm a plan notwithstanding the continued pendency of the Adversary Proceeding. All of the foregoing indicates that the matters at issue in the Adversary Proceeding involve complex, expensive and delaying matters that strongly weigh in favor of a compromise.

**4.     The Paramount Interest of the Creditors.**

69. Finally, the proposed Settlement Agreement is in the best interest of the creditors because it finally resolves the Adversary Proceeding, thus resolving one of the largest claims

15

asserted in the Chapter 11 Case, and indeed the only parties who filed a nondischargeability adversarial action pursuant to section 523(a) of the Bankruptcy Code. As previously noted, the pendency of the Adversary Proceeding, given the claims for nondischargeability, significantly complicated Mr. Randazza's ability to proceed with plan confirmation until those claims therein were at least whittled down, tested, and/or adjudicated. As such, the Settlement Agreement achieves the best result by providing an actual final resolution of the Excelsior Parties' claims, thus removing this impediment to plan confirmation and Mr. Randazza's ultimate exit from bankruptcy. For the avoidance of doubt, no admission of liability or nondischargebility is made or implied by the Settlement Agreement, and it is merely a means to bring about a timely resolution, as both parties have obviously spent substantially more in attorneys' fees and costs contesting the issues among them and such fees and costs far outweigh the settlement amount herein to a significant degree. All of the remaining creditors in the Chapter 11 Case hold general unsecured claims, and other matters such as the recently entered default judgment against Ms. Cox should significantly reduce another large claim, thus allowing Mr. Randazza to proceed with plan confirmation. As such, the Settlement Agreement is in the best interest of all creditors of the estate.

I declare under penalty of perjury of the laws of the United States that these facts are true to the best of my knowledge and belief.

Dated: January 5, 2018.

                                          /s/ Marc J. Randazza  
                                          MARC J. RANDAZZA

LARSON ZIRZOW & KAPLAN, LLC  
850 E. Bonneville Ave.  
Las Vegas, Nevada 89101  
Tel: (702) 382-1170   Fax: (702) 382-1169